UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Meda AB,

        Plaintiff,

    -against-

3M Company; 3M Innovative Properties
Company; and Riker Laboratories, Inc.

        Defendants.

Index No. 11-cv-0412 (AJN)

**PLAINTIFF'S [CORRECTED] PRETRIAL MEMORANDUM OF LAW**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 4

    A.    3M Develops Flecaine LP ................................................................ 4

    B.    The French Drug Pricing System ..................................................... 5

    C.    3M Seeks Approval To Sell Flecaine LP In France ......................... 7

    D.    The "Flecaine Steering Committee" ................................................ 8

    E.    3M Decides to Sell the Business .................................................... 10

    F.    Meda Is Approached as a Potential Buyer ..................................... 12

    G.    3M Presents the Business As Profitable With Stable Future Cash Flows ............... 12

    H.    Meda's Valuation of 3M's Pharmaceutical Business ...................... 14

    I.    Meda's Due Diligence On 3M's Pharmaceutical Business .............. 15

    J.    Meda's Valuation and Bid ............................................................. 18

    K.    The Acquisition Agreement And 3M's Representations And Warranties Regarding Its Compliance With And Disclosure Of All Regulatory Filings and Material Contracts ............................................. 21

    L.    3M Executives Involved In The Transaction Knew 3M's Representations And Warranties Were False Because 3M Failed To Disclose the Convention ...................... 23

    M.    3M's Feeble Attempt To Unilaterally Cancel the Convention's Price Reduction Provisions In September 2006 ............................ 28

    N.    CEPS Informs Meda of the Convention More Than A Year After The Signing of the Acquisition Agreement ................................ 29

ARGUMENT ........................................................................................................ 31

I.    3M Fraudulently Induced Meda to Enter Into the Acquisition Agreement ................ 32

    A.    During Negotiations With Meda, 3M Made Material Omissions and Misrepresentations That 3M Knew to Be False ............................ 32

        1.    3M's Failure to Disclose the Convention to Meda Was a Material Omission of a Fact That 3M Had a Duty to Disclose ............... 32

        2.    3M Affirmatively Misrepresented Projected Sales and Other Financial Information Relating to the Business to Meda ............ 35

i

B.   3M Made These Misrepresentations and Omissions for the Purpose of Inducing Meda to Rely on Them ................................................................. 36

1.   Knowledge of 3M's Officers Is Properly Imputed to 3M ......................... 36

2.   3M Acted With Intent to Defraud (Scienter) ................................................. 38

C.   Meda Reasonably and Justifiably Relied on 3M's Misrepresentations and Omissions ............................................................................................................ 42

1.   3M's Misrepresentations and Omissions Related to Matters Peculiarly Within 3M's Knowledge and to Matters That Were the Subject of Express Warranties ...................................................................... 42

2.   Contractual Disclaimers Do Not Preclude Meda From Reliance on 3M's Misrepresentations and Omissions ..................................................... 44

D.   Meda Suffered Damages as a Result of 3M's Fraudulent Conduct ...................... 46

II.   3M Breached the Acquisition Agreement .......................................................................... 46

A.   3M Breached Section 3.07 ...................................................................................... 48

B.   3M Breached Section 3.12 ...................................................................................... 48

C.   3M Breached Section 3.15 ...................................................................................... 49

D.   Meda Is Entitled To Attorneys' Fees .................................................................... 51

CONCLUSION ............................................................................................................................. 51

# TABLE OF AUTHORITIES

**Page**

## Cases

*4Connections LLC v. Optical Commc'n Group., Inc.,*
   618 F. Supp. 2d 178 (E.D.N.Y. 2009) ..............................................................44

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,*
   651 F. Supp. 2d 155 (S.D.N.Y. 2009) ..............................................................44

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,*
   57 F.3d 146 (2d Cir. 1995) ...............................................................................40

*Barrett v. Freifeld,*
   64 A.D.3d 736 (2d Dep't 2009) ........................................................................41

*Brass v. American Film Techs., Inc.,*
   987 F.2d 142 (2d Cir. 1993) .............................................................................41

*Buy This, Inc. v. MCI Worldcom Commc'ns, Inc.,*
   209 F. Supp. 2d 334 (S.D.N.Y. 2002) ..............................................................33

*Caiola v. Citibank, N.A., N.Y.,*
   295 F.3d 312 (2d Cir. 2002) .............................................................................43

*Center v. Hampton Affiliates, Inc.,*
   66 N.Y.2d 782 (1985) ......................................................................................35

*Chaikovska v. Ernst & Young, LLP,*
   913 N.Y.S.2d 449 (App. Div. 4th Dep't 2010) ................................................35

*Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.,*
   873 F. Supp. 808 (S.D.N.Y. 1994) ..................................................................50

*DDJ Management, LLC v. Rhone Group LLC,*
   15 N.Y.3d 147, 905 N.Y.S.2d 118 (2010) ................................................42, 44

*Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.,*
   68 N.Y.2d 954 (1986) ......................................................................................45

*Defer LP v. Raymond James Fin., Inc.,*
   654 F. Supp. 2d 204 (S.D.N.Y. 2009) ..............................................................36

*Dimon Inc. v. Folium, Inc.,*
   48 F. Supp. 2d 359 (S.D.N.Y. 1999) ........................................................43, 44

*Don King Prods., Inc. v. Douglas,*
   742 F. Supp. 741 (S.D.N.Y. 1990) ..................................................................50

*First Bank of Ams. v. Motor Car Funding, Inc.,*
   690 N.Y.S.2d 17 (1st Dep't 1999) ........................................................42, 45, 46

*Fischer & Mandell, LLP v. Citibank, N.A.*,
  632 F.3d 793 (2d Cir. 2011) ........................................................................46

*Freudenberg v. ETrade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..........................................................36

*Goshen Litho, Inc. v. Kohls*,
  582 F. Supp. 1561 (S.D.N.Y. 1983) ..............................................................34

*Hi-Tor Industrial Park, Inc. v. Chemical Bank,* ,
  494 N.Y.S.2d 751 (App. Div. 2d Dep't 1985) ..............................................43

*International Multifoods Corp. v. Commercial Union Ins. Co.*,
  309 F.3d 76 (2d Cir. 2002) ............................................................................46

*JP Morgan Chase Bank v. Winnick*,
  350 F. Supp. 2d 393 (S.D.N.Y. 2004) ..........................................................44

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) ..........................................................36

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
  108 F.3d 1531 (2d Cir. 1997) ..................................................................43, 44

*Leasing Serv. Corp. v. Broetje*,
  545 F. Supp. 362 (S.D.N.Y. 1982) ................................................................34

*Liberty Mut. Ins. Co. v. Fast Lane Car Service, Inc.*,
  681 F. Supp. 2d 340 (E.D.N.Y. 2010) ..........................................................45

*Mallis v. Bankers Trust Co.*,
  615 F.2d 68 (2d Cir. 1980)) ..........................................................................44

*MBIA Ins. Corp. v. Merrill Lynch*,
  916 N.Y.S.2d 54 (App. Div. 1st Dep't 2011) ...............................................43

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*,
  244 F.R.D. 204 (S.D.N.Y. 2007) ..................................................................41

*In re Marsh & McLennan Cos. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006) .....................................................35, 36

*MBIA Ins. Corp. v. Merrill Lynch*,
  81 A.D.3d 419, 419 (1st Dep't 2011)............................................................44

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
  500 F.3d 171 (2d Cir. 2007) ...................................................31, 33, 41, 42, 45

*Metropolitan Coal Co. v. Howard*,
  155 F.2d 780 (2d Cir. 1946) ..........................................................................42

*Pfizer, Inc. v. Stryker Corp.*,
  02 CIV.8613 LAK, 2003 WL 21660339 (S.D.N.Y. July 15, 2003).............42

*Sabo v. Delman*,
    3 N.Y.2d 155 (1957) .......................................................................................45

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
    959 F.2d 425 (2d Cir. 1992) ...........................................................................46

*Steinhardt Group. v. Citicorp*,
    272 A.D.2d 255 (1st Dep't 2000) ..................................................................43

*Steinhardt Group.*,
    708 N.Y.S.2d at 93 .........................................................................................44

*Stewart v. Jackson & Nash*,
    976 F.2d 86 (2d Cir. 1992) .............................................................................45

*United States v. Bank of New England, N.A.*,
    821 F.2d 844 (1st Cir. 1987) ..........................................................................36

*United States v. Lennox metal Mfg. Co.*,
    225 F.2d 302 (2d Cir. 1955) ...........................................................................46

*United States v. Philip Morris USA, Inc.*,
    449 F. Supp. 2d 1, 2006 WL 2380650 (D.D.C. 2006), *rev'd in part on other grounds*,
    566 F.3d 1095 (D.C. Cir. 2009) ......................................................................36

*Williams v. Freeman*,
    208 N.Y.S. 691 (1st Dep't 1925) ..............................................................34, 35

*Woo v. Times Enter., Inc.*,
    No. 98 CIV. 9171, 2000 WL 297114 (S.D.N.Y. Mar. 22, 2000) ...............34, 35

*Yurish*,
    507 N.Y.S.2d at 235 .......................................................................................43

## **Rules**

Rule 30(b)(6) ........................................................................................................24

## **Other Authorities**

Federal Practice & Procedure § 2730 (3d ed.)....................................................34

Plaintiff Meda AB ("Meda"), respectfully submits this Pretrial Memorandum of Law pursuant to Paragraph 5(B)(ii) of the Individual Practices In Civil Cases of the Hon. Alison J. Nathan and in support of its claims against Defendants 3M Company, 3M Innovative Properties Company, and Riker Laboratories, Inc. (collectively, "3M").

## PRELIMINARY STATEMENT

This action seeks to hold 3M accountable for its massive fraud and egregious breaches of contract in connection with the sale of its European pharmaceutical business (the "Business") to Meda at a grossly inflated price of $854 million. When the parties executed the Acquisition Agreement for the sale of the Business on November 8, 2006, 3M was aware that it had been in breach of a material agreement with *le Comité Economique des Produits de Santé* ("CEPS")— the French government agency responsible for establishing and negotiating the price of reimbursable drugs in France—for nearly six months. The agreement—or "convention," as it is known in France (the "Convention")—provided that, by April 2006, 3M was required to reduce the price of the Business's most significant revenue-generating product, Tambocor CR, by 50%, or launch a generic version of that product. 3M, however, failed not only to disclose the fact that it was in breach of the Convention by not reducing the price of Tambocor CR or launching a generic in April 2006 (or anytime thereafter), it failed to disclose even *the existence* of the Convention to Meda. For purposes of Meda's breach of contract claim, there can be no legitimate dispute that 3M's omissions were a breach of its specific representations and warranties set forth in the Acquisition Agreement requiring 3M to disclose all information and agreements material to the Business. Indeed, David Wanlass, 3M's finance manager, admitted in his deposition that the Convention should have been disclosed to Meda and claimed 3M's failure to disclose it must have been "a mistake." Brad Sauer, the head of 3M's Healthcare Business, made a similar admission.

As for Meda's fraud claim, the evidence will show that 3M's purported "mistake" was not innocent, but rather part of an intentional (or reckless) effort to keep Meda from discovering the financial impact the Convention would have on the Business. The evidence will also show

that 3M made numerous, affirmative and material misrepresentations to Meda in order to induce Meda to buy the Business at an inflated price.  3M, for example, provided Meda with sales projections and other financial information that falsely represented that 3M expected the Business to generate stable and consistent cash flows for years to come.  Internally, however, 3M executives knew that the real story was much different, with significant pricing and competition pressures on the Business and 3M's other pharmaceutical efforts, leading 3M's CEO to remark, in early 2006, that it was "a pity" they could not have been sold earlier.  Rather than disclose this bad news to potential acquirers, 3M instead provided projections that simply ignored the reduction in the price of Tambocor CR required by the Convention, and therefore painted a grossly misleading picture of the Business's projected future earnings.  As a result, Meda based its valuation of the Business on inflated earnings projections and ultimately agreed to purchase the Business from 3M for over $210 million more than it was worth.

At trial, the evidence will show that obtaining an inflated price for the Business was precisely what 3M hoped to achieve by not disclosing the Convention to Meda.  3M's executives have testified that, by 2005, they had concluded that 3M's pharmaceutical business was a "drag" on the company's overall profitability and had determined that the pharmaceutical business should either be sold or, absent a willing buyer, 3M should "harvest" the business—*i.e.*, let it die off over time by continually reducing its budget.

The Convention was of particular concern to 3M because it posed a significant risk to the Business's future profitability and would inevitably have a negative impact on the price that potential acquirers would be willing to pay for the Business.  Indeed, Tambocor CR (or Flecaine LP, as it is known in France) was projected to account for so much of the Business's EBITDA (earnings before taxes, depreciation, and amortization) in 2007 that honoring the Convention would cut 25% off the Business's projected 2007 EBITDA.  In response, 3M created a "Flecaine Steering Committee" with a specific mandate to devise a strategy for avoiding the Convention's price reduction provisions.  As discussed in detail below, internal 3M emails and documents show that the Flecaine Steering Committee members soon realized that their task was futile

because CEPS viewed the Convention's price reduction provisions as "contractually set" and that CEPS would therefore likely enforce the Convention "with ferocity."  Accordingly, the Committee shifted its focus to delaying interactions with CEPS and keeping the Convention hidden from potential purchasers in order to paint "a more 'attractive' image of the business in France for prospective buyers."

3M admits that, despite all its representations and warranties in the Acquisition Agreement that it had disclosed to Meda "all material Assumed Contracts" and "Regulatory Filings," and that 3M was in compliance with all material contracts, regulatory filings, and regulatory requirements, 3M disclosed neither the existence or terms of the Convention, nor 3M's breaches thereof.  Throughout these proceedings, 3M has repeatedly changed the excuse for its failure to disclose the Convention.  3M has sought to defend its glaring misrepresentations and omissions by variously (and erroneously) contending that: (1) Meda allegedly knew the Business faced a substantial risk of a significant reduction in the price of Flecaine LP in France before signing the Acquisition Agreement based on certain disclosures in the OM and the Management Presentation (even though neither disclosure comes even remotely close to disclosing the Convention); (2) 3M allegedly disclosed certain information that should have caused Meda to ask for the Convention; (3) the Convention's price reduction provisions were allegedly non-binding and therefore did not need to be disclosed to Meda; (4) the Convention allegedly "expired of its own terms" on December 31, 2006 (*i.e.*, after the Acquisition Agreement was signed); (5) 3M allegedly "cancelled" the Convention's price reduction provisions in September 2006 by drawing a line through the provisions and sending the Convention to CEPS; and (6) 3M's failure to disclose the Convention was allegedly a simple "mistake."  For purposes of Meda's fraud claim, the inconsistencies among 3M's excuses serve only to strengthen the inference of 3M's scienter. The excuses cannot all be true—3M's failure to disclose the Convention, for example, could not have been both a "mistake" *and* a conscious determination by 3M that the Convention did not need to be disclosed because it was non-binding.  Moreover, 3M's excuses are utterly illogical—for example, 3M's purported

"cancellation" of the Convention's price reduction provision in *September* 2006, a mere two weeks after Meda submitted its final binding offer for the Business, cannot be squared with 3M's failure to disclose the Convention in the Offering Memorandum it provided Meda in *April* 2006 or 3M's omission of the Convention from the data room that 3M made available to Meda in *June* 2006.  As will become clear at trial, 3M cannot point to a scrap of contemporaneous evidence supporting its excuses; they are post-hoc rationales devised for purposes of this litigation.

The evidence that Meda will present at trial—including contemporaneous 3M internal emails and other documents—makes plain that 3M understood that it was obligated to disclose the Convention to Meda.  3M's intentional or reckless failure to do so was not only a breach of its express representations and warranties under the Acquisition Agreement—and the duty of good faith and fair dealing implicit in the Acquisition Agreement—it constituted fraud under New York law.  As a result of 3M's fraud and breaches of contract, 3M obtained substantially more than it internally valued the Business in its presentations to 3M's board of directors.  And, as Meda's damages expert will explain at trial, 3M's fraud and breaches of contract caused Meda to overpay for the Business by more than $210 million.

At the conclusion of trial, Meda will have proved each of its claims against 3M, and will respectfully request that the Court order 3M to compensate Meda for its damages.

## STATEMENT OF FACTS

### A.  3M Develops Flecaine LP

Flecainide acetate ("Flecaine") is a compound that is used to prevent and treat certain types of life-threatening irregular heartbeats, or arrhythmias. [1]  In 1974, 3M patented an immediate-release form of flecainide acetate that was sold under various brand names in different markets, including Flecaine LI in France, and Tambocor IR in other European countries.[2]  In 1988, 3M patented a controlled-release version of the drug, commonly known as

---

[1]   Joint Stipulation of Uncontested Facts ("Stipulation") ¶ 8.

[2]   *Id*. ¶ 10.

Tambocor CR, that became available in France in April 2003 under the brand name Flecaine LP.[3]  The Flecaine LP patent was not set to expire in France until November 2009.

### B.    The French Drug Pricing System

In France, approved pharmaceutical drugs are reimbursed by the Government's social security system.[4]  To bring a new drug to market in France, the company must first obtain approval from multiple government agencies.[5]  First, the company must obtain approval from the Agency for the Health and Safety of Products ("AFFSSAPS").[6]  Next, the Transparency Commission of the High Health Authority ("HAS") must assign an "SMR Rating" to the drug reflecting its overall medical benefits, and an "ASMR Rating" reflecting the comparative benefits of the drug relative to other drugs.[7]  Upon receiving its SMR and ASMR ratings, the company must then negotiate a reimbursement price for the drug with *le Comité Economique des Produits de Santé* ("CEPS") before it can sell its drug in the French market.[8]  If the negotiations with CEPS are successful, the company and CEPS execute a "convention" that sets the agreed-upon price for the drug.[9]

The terms of CEPS conventions—which may involve non-price-related concessions by the company in order to obtain a higher price, and occasionally include conditions for changing the price in the future—are strictly confidential; only the current wholesale and retail reimbursement prices provided in the conventions are made public.[10]  If the pricing negotiations

---

[3]  *Id.* ¶ 11.

[4]  JX-128 (Mariotte Expert Report), at 3; PX-415 (Destal Amended Declaration) at 20.

[5]  *Id.*; *see also* Stipulation ¶ 5.

[6]   Stipulation ¶ 12.  The agency is known as the *Agence Française de Sécurité Sanitaire des Produits de Santé* in French.

[7]  *Id.* ¶ 6.  The agency is known as the *Haute Autorité de Santé* in French.

[8]  *Id.* ¶ 7.

[9]  JX-128 (Mariotte Expert Report), at 15.

[10]  Felber Dep. Tr. at 98; PX-394, at 14; PX-409, at 21; Schur Dep. Tr. at 118-19; Dierks Trial Decl. ¶ 17; JX-128 (Mariotte Expert Report), at 14-15; Destal Trial Decl. ¶ 20.

fail, CEPS is authorized to fix the price for the drug unilaterally.[11]  Thus, the company has a strong incentive to reach a negotiated price with CEPS.[12]

CEPS is an inter-ministerial governmental authority vested with regulatory powers, and its conventions are considered to be both regulatory decisions and contractual agreements that are binding on both the company and CEPS.[13]  The French Social Security Code ("CSS") provides that when CEPS enters a convention that, in addition to setting the drug's price, also sets forth the conditions for changes in price, "CEPS guarantees the compliance to such changes."[14]  The CSS sets forth specific regulatory rules that govern the procedures for changing the terms of a convention; a convention may not be freely modified by the company or CEPS.[15] Under French law, when an agreed condition requiring a reduction in the price of a drug draws near, the company has to remind CEPS of the reduction, and the company must implement the agreed reduction.[16]  Failure to do so may result in catastrophic consequences for the company: upon CEPS' determination that the company has breached its agreement to reduce the drug price pursuant to a convention, CEPS has broad discretion to make an example of the company by unilaterally reducing the price for the drug that is the subject of the breached convention, and may withhold pricing approval for future drugs, and/or cut renewal prices for existing drugs, as those pricing decisions become due.[17]  In short, breaching a convention with CEPS creates an existential threat to a pharmaceutical company in France.  Companies that want to continue to do

---

[11]  JX-128 (Mariotte Expert Report), at 13;  PX-415 (Destal Amended Declaration), at 20.

[12]  *Id.*

[13]  Article L. 162-16-4 of the French social security Code (the "CSS"); JX-135 at 20-22; JX-128 at 13; JX-129 at 6.

[14]  *Id.*

[15]  JX-135 at 22 (Article R. 163-11 of the CSS is explicit concerning this procedure and provides only two possibilities for changing a drug's price: the signing of a new convention or a decision by CEPS.)

[16]  JX-135 at 22, 24.

[17]  Mariotte Trial Decl. ¶ 26.

business in France simply cannot afford to risk the consequences that CEPS may impose in the event of a breach.

### C.   3M Seeks Approval To Sell Flecaine LP In France

In December 2001, 3M, through its wholly owned subsidiary *Laboratoires 3M Santé* ("3M Santé"), sought to introduce a controlled-release version of Tambocor ("Tambocor CR") in France under the brand name Flecaine LP.[18]   3M complied with the AFFSSAPS and Transparency Commission procedures,[19] and on April 24, 2002, 3M Santé's Eric Felber met with the President and Chairman of CEPS, Noël Renaudin, to discuss obtaining a reimbursement price for Flecaine LP.   From the outset, Mr. Renaudin made clear that CEPS wanted significant concessions from 3M before it would agree to a price for the drug, because CEPS viewed Flecaine LP as part of a 3M strategy to mitigate lost sales resulting from generic competition on Flecaine LI.[20]  One of the conditions that CEPS initially insisted on was that 3M launch a generic version of Flecaine LP simultaneously with the branded version.[21]   3M resisted CEPS's demands, and negotiations dragged on throughout 2002-2003.

By 2003, however, 3M was desperate to begin selling Flecaine LP in France,[22] and needed a price from CEPS before it could do so.[23]  3M's Eric Felber explained in his deposition that obtaining a price to sell Flecaine LP in France was "very important for 3M" because, at the time, 3M hoped to use proceeds from the sale of Flecaine LP to finance its efforts to bring another drug to the French market—Aldara—that 3M believed would generate substantial

---

[18]  JX-142.

[19]  *Id.*

[20]  JX-024 ("CEPS's position on Flécaïne LP [slow-acting] is that there is no innovation and that this galenic form is intended to circumvent the generic form.").

[21]  JX-142, at 5.

[22]  JX-142 ("We feel, one year after filing, that we are in a situation where we are being blocked [by CEPS], harming our industrial activity.").

[23]  Sampson Dep. Tr. at 73; JX-128 (In France, "the only feasible way to create a market for a drug . . . is to obtain a reimbursement price—which requires a Marketing Authorization from AFFSSAPS and a pricing agreement with CEPS."); Maupas Dep. Tr. at 19 (in France, attempting to sell a pharmaceutical product absent a convention is "synonymous with killing the product").

revenues.[24]  After a "long, difficult and tumultuous" negotiation process, as a compromise, 3M and CEPS agreed that 3M could sell Flecaine LP at an agreed price for three years, so long as 3M either introduced a generic of Flecaine LP, or reduced the price of Flecaine LP to the price of a generic (*i.e.*, by 50%), when the three years were up.[25]  Critically, the Convention ultimately signed by 3M and CEPS included, in Article 2.2 of Annex 4, the following commitment by 3M:

> [3M] agrees to take all necessary steps to ensure that, at the end of a 3-year period dating from the publication in the Official Journal of the prices of the proprietary drugs mentioned in Table 2 of Article 1, an equivalent of each of these proprietary drugs, or failing that, each of these proprietary drugs, are placed on the market at the price of the generic drug corresponding to these proprietary drugs.[26]

3M's Eric Felber, who negotiated the Convention with CEPS and signed the Convention on behalf of 3M Santé, testified that "[a]ll the elements [of the Convention] were important and they had to be negotiated with CEPS,"[27] and that the actions required of 3M in 2006 pursuant to Article 2.2 were conditions for CEPS agreeing to give 3M a relatively favorable price for Flecaine LP until 2006.[28]  Felber further testified that he understood and intended that the Convention, including Article 2.2, was binding on 3M.[29]

### D.   The "Flecaine Steering Committee"

Shortly after executing the Convention—and having secured the benefit of its bargain, the reimbursement price for Flecaine LP—3M began devising a strategy for avoiding its price reduction obligations. 3M created a "Flecaine Steering Committee" to accomplish that

---

[24]  Felber Dep. Tr. at 78:21-79:1 ("[While] waiting until Aldara got to cruise speed for sales it was important for Flecaine to continue to finance France.").

[25]  Felber Dep. Tr. at 88:22-25; PX-034; JX-142..

[26]  JX-019..

[27]  Felber Dep. Tr. at 88:22-89:9.

[28]  Felber Dep. Tr. at 89:11-25; PX-026 ("anticipated availability of a generic [and] innovation co-marketing in N+4 at the generic price"); JX-142 (the Convention "will include the commitment by 3M to immediately release a generic form of LI on the market, to release a generic form of LP into the market within 3 years and to provide for renegotiating the price of LP if a generic form of LP arrives on the market.").

[29]  Felber Dep. Tr. at 17:3-7.

objective.[30]  The Flecaine Steering Committee reported to Brad Sauer, Executive Vice-President of 3M's Health Care Business,[31] and the 3M senior executive who was in charge of the sale of the Business in 2006.  The Flecaine Steering Committee members included 3M Santé executives Benoit Traineau, Maxime Delpy, Frederick Biffaud, Helene Kolsky, and Philippe Husson.[32]

On July 21, 2004, 3M's Kolsky, Biffaud, and Agathe Le Breton met with CEPS's President Mr. Renaudin in an attempt to renegotiate Article 2.2.  As reflected in the detailed minutes of the meeting prepared by Ms. Kolsky and Ms. Le Breton, Mr. Renaudin rejected 3M's attempt to renegotiate Article 2.2, and conveyed to 3M in no uncertain terms that CEPS viewed the Convention as a binding agreement that it intended to enforce against 3M.  The minutes demonstrate that Mr. Renaudin informed 3M that:

- "*When the CEPS signs the agreements involving generic products, it applies them.  It is imperative that the roadmaps be respected.*"

- "Flecaine: << *[3M has] already obtained much, after having cried enough* >> For the future, President Renaudin indicates that he is not worried since everything is contractually set."

- "CEPS's position on Flecaine LP [slow acting] is that there is no innovation and that this galenic form is intended to circumvent the generic form."

- "The agreement [*i.e.*, the Convention] has a very limited renegotiation margin:  For Renaudin, and on the basis of the agreement signed by 3M in April 2003, registration of a generic of the slow-acting product in 2006 is *nonnegotiable*: <<*the CEPS will see to it that all contracts are executed with ferocity*>>."[33]

The members of the Flecaine Steering Committee, however, were under significant pressure to renegotiate Article 2.2 from, among others at 3M, 3M Pharma's Division Vice-President Barry Labinger (John Sampson's predecessor), who was prepared personally to get involved in the negotiations if necessary.[34]  In light of the directives from their superiors at 3M,

---

[30]  PX-059.

[31]  Barreau Dep. Tr. at 80-81.

[32]  Traineau Dep. Tr. at 50-51; JX-055.

[33]  JX-024.

[34]  *Id.*

the Flecaine Steering Committee, despite previously having been rebuffed by Mr. Renaudin, "agreed … on the importance of appearing before Renaudin prior to the agreement renewal date of April 2006 to start the renegotiation *of the specific Flecaine clause* [*i.e.*, Article 2.2]."[35]

Throughout the Spring of 2006, as the Flecaine Steering Committee considered approaching CEPS, the Committee members internally predicted Mr. Renaudin's likely reaction to their overtures as:

- "I do not understand, I will apply the agreement, the entire agreement, and will follow the specified schedule."

- "LP at the price of a generic."

- "[I]n 2003 you signed an agreement, everything is specified in it; today we just need to apply it!"[36]

Thus, despite significant pressure from 3M's senior executives to try to renegotiate Article 2.2, the steering committee believed their task was futile.

### E.    3M Decides to Sell the Business

3M's John Sampson, who took over from Mr. Labinger as the global head of 3M's pharmaceutical business, admitted in his deposition that, by 2005, 3M had concluded that the pharmaceutical business would not be a profitable one for 3M.[37]   Indeed, 3M viewed the business's prospects as so bleak that it had considered taking the desperate measure of "harvesting" the business—*i.e.*, continuing to service existing accounts in the short term while cutting the business's budget and allowing the business to slowly die off.[38]   Brad Sauer, Executive Vice-President of 3M's Health Care Business, wrote to 3M's CEO George Buckley in February 2006—just weeks before 3M put the entire pharmaceutical business up for sale—that the "[p]rospects for Pharma [in Europe] are worsening," and noted that "Tambocor (our big profitable Cardio business) is under generic attack in France and lost 16% share in Q4.  This is in

---

[35]   PX-063

[36]   JX-141 at MEDA00205738.

[37]   Sampson Dep. Tr. at 50-53.

[38]   *Id.*

addition to the big unilateral government price reductions *we knew were coming*."[39]  Sauer explained that, in light of these developments, 3M's ability to "spin" off its pharmaceutical business was now "even further in doubt."[40]  CEO Buckley responded: "This is no real surprise to me.  What a pity we waited so long and didn't do this last year."[41]

On February 11, 2006, Sauer gave a presentation to 3M's board of directors and informed them that the pharmaceutical business was "by far the largest" of the "significant issues in our [Health Care] portfolio."[42]  Sauer explained that although the pharmaceutical business "was supposed to be our growth engine, [it] is now a drag."[43]  Sauer recommended that 3M divest the business, and made clear to the board that "[s]ale of 3M Pharma will not be an easy process" given that 3M projected (at least internally) "declining growth in the near term, [and] steeper declines post-2010."[44]  Sauer also advised the board that "[t]ime is of the essence" in selling the business.[45]  Given the negative outlook, the board resolved that 3M should immediately attempt to sell its pharmaceutical business, either in a single transaction for the global business, or in separate transactions for geographic or product segments.[46]  3M hired Goldman Sachs as its advisor in the sale process.  Sauer, recognizing the challenges 3M faced in selling the business, instructed 3M's Paul Keel to make sure that Goldman was "pulling out all the stops to sell [3M] Pharma."[47]

---

[39]  PX-133 (emphasis added).

[40]  *Id.*

[41]  *Id.*

[42]  *Id.*

[43]  PX-143.

[44]  PX-143 at 3M00466801.

[45]  *Id.* at 3M00466788.

[46]  The three geographic segments were the Americas, Europe, and APACA (Asian Pacific, South Africa, and Australia).

[47]  PX-120.

### F.   Meda Is Approached as a Potential Buyer

In early April 2006, Goldman approached Meda's CEO Anders Lönner to see if Meda might be interested in acquiring all or part of 3M's pharmaceutical business.  After signing confidentiality papers, Goldman provided Meda an Offering Memorandum ("OM") that Goldman had prepared with 3M that described the nature of the business, its products, and financial performance.[48]  Mr. Lönner, Anders Larnholt (Meda's head of business development), and Meda's COO Jörg-Thomas Dierks reviewed the OM thoroughly and concluded that Meda could potentially increase profitability by incorporating the business portrayed in the OM into Meda's existing infrastructure.[49]

### G.   3M Presents the Business As Profitable With Stable Future Cash Flows

The OM described 3M Pharma as a "highly profitable business which generates substantial and consistent cash flow."[50]  3M claimed that it was optimistic about the future of the business, stating that "[g]oing forward, management expects gross margins to remain strong and EBITDA margins to reach 45%."[51]  Given Meda's model of growth by acquisition of steady businesses and products that had a track-record of generating consistent cash flows, the business that 3M described in the OM—and the cardiology segment in particular—was of interest to Meda.[52]

The OM prominently featured Tambocor as the Business's most important cardiology product in terms of revenue generation.  The OM provided:

---

[48]   PX-168.

[49]   Lönner Trial Decl. ¶ 27; Larnholt Trial Decl. ¶ 22; Dierks Trial Decl. ¶¶ 26, 31-35.

[50]   PX-168 at MEDA00188620.

[51]   *Id.* at MEDA00188617.

[52]   Lönner Trial Decl. ¶ 31; Larnholt Trial Decl. ¶¶ 26-31.

- "The strength of the cardiology franchise, combined with the remaining product portfolio, provides the European business with strong and consistent cash flows."[53]

- "Since its launch, Tambocor has been a consistent performer. Sales are approximately $140mm worldwide, and the product continues to see moderate growth overall. Strong growth in the recently launched Tambocor CR (+46% year-over-year) offsets declines in the base product (-11%)."[54]

The OM also included a table titled, "Europe, Projected Profit and Loss Statement," which contained actual sales from 2005, and estimated sales for 2006-2010, broken down by areas of treatment, including "cardio."[55] 3M projected that revenues and the costs of goods sold for cardiology products would remain stable through at least 2010.[56] These figures indicated to Meda that the average per-unit sale prices and number of units sold for 3M's cardio products were also expected to remain stable.[57]

Although the OM projected a $61 million decline in the Business's revenues in 2006, it further explained that 75% of the decrease was due to the expiration of a patent on MetroGel-Vaginal, and that "[t]he remaining decrease is expected to come from lower sales of Tambocor and Minitran in Europe, as government pricing mandates in France, Spain and Italy will reduce selling price. As patients in France switch from Tambocor IR to Tambocor CR, some of these pricing issues might be offset."[58] 3M's John Sampson, Meda's Jorg-Thomas Dierks, and Goldman Sachs's Jason Haas, have all testified that they understood the "government pricing mandates" mentioned in the OM to refer to general pricing pressure from European governments, not to specific pricing agreements for specific products like the Convention.[59] These witnesses, as well as 3M's own experts, further testified that the "offset" 3M predicted "as

---

[53] PX-168 at MEDA00188616.

[54] *Id.* at MEDA00188639.

[55] *Id.* at MEDA00188690.

[56] *Id.*

[57] Dierks Trial Decl. ¶¶ 32-33.

[58] PX-168 at MEDA00188692.

[59] Sampson Dep. Tr. at 219:19-220:13; Haas Dep. Tr. at 170:14-171:17; Dierks Trial Decl. ¶ 71.

patients in France switch from Tambocor IR to Tambocor CR" depended on 3M's ability to maintain the higher price for Tambocor CR.[60]  If the price were significantly reduced, as required under the Convention, the "offset" could not occur.[61]

Overall, in the OM 3M falsely represented, among other things, that it expected the price and sales of Tambocor CR to remain stable and offset declines in sales of Tambocor IR, even though 3M knew that it was required to reduce the price of Tambocor CR by 50% in April 2006.

### H.    Meda's Valuation of 3M's Pharmaceutical Business

Based on 3M's representations in the OM that the business was stable and generated consistent cash flows, Meda applied an EBITDA multiple valuation methodology to calculate its initial bid for 3M's pharmaceutical business.[62]  An EBITDA multiple valuation methodology involves applying a multiple to a company's projected EBITDA to calculate its total enterprise value.[63]  In this case, Meda derived the multiple by reference to historical multiples for similar companies and transactions.[64]  Meda determined that a multiple of about 8.0 times EBITDA would be a good price for 3M's worldwide pharmaceutical business, and that a multiple of about 9 times EBITDA would be a good price for its European business.[65]  Ultimately, Meda submitted a preliminary, non-binding bid of $2.15 billion for 3M's worldwide pharmaceutical business, and a preliminary bid of $800 million for the European segment of the business.[66]  Based on these

---

[60]   Sampson Dep. Tr. at 218:22-219:10; Haas Dep. Tr. 171:24-172:8; Garrambone Dep. Tr. at 102; Dierks Trial Decl. ¶¶ 31-34.

[61]   Garrambone Dep. Tr. at 102; Dierks Trial Decl. ¶ 34.

[62]   Larnholt Trial Decl. ¶¶ 37-38.

[63]   Larnholt Trial Decl. ¶¶ 13, 37.

[64]   Larnholt Trial Decl. ¶ 35.   Goldman Sachs followed a similar approach of reviewing comparable companies and transactions in presenting its valuation of the business to 3M.  *See* PX-125; PX-140.

[65]   Larnholt Trial Decl. ¶ 39.

[66]   Lönner Trial Decl. ¶ 32; Larnholt Trial Decl. ¶ 39.

preliminary bids, on June 14, 2006, 3M invited Meda to continue in the sale process and conduct due diligence.[67]

### I.    Meda's Due Diligence On 3M's Pharmaceutical Business

Meda performed due diligence on 3M's pharmaceutical business throughout the Spring and Summer of 2006.[68]  Anders Lönner and Anders Larnholt were responsible for coordinating and overseeing the due diligence process.[69]  Meda's due diligence team consisted of experienced employees and advisors with expertise in the legal, financial, regulatory, IP, and management fields.[70]  The team spent nearly two months focused intensely on its due diligence efforts.[71]  All of Meda's senior managers were focused on the 3M acquisition.[72]

3M gave Meda access to a due diligence data room on June 19, 2006.[73]  In preparing the data room in April and May of 2006, 3M instructed its employees, including members of the Flecaine Steering Committee, such as Maxime Delpy, to collect, among other relevant documents, "all relevant contracts" and to "include all active agreements related to the business" in the data room.[74]  With respect to government "price and reimbursement" agreements, 3M's employees in France were specifically instructed to include the following documents and information in the data room: the "last reimbursement status and price"; the "[d]ate for renewal" of pricing agreements; a "[s]ummary of the price dossier"; and any "*[s]pecific commitment that 3M could have regarding price (volume clause etc…).*"[75]  Similarly, a 3M data room index indicates that 3M understood that it should include "information on formulary coverage for key

---

[67]   Larnholt Trial Decl. ¶ 40.

[68]   Larnholt Trial Decl. ¶ 46; Lönner Trial Decl. ¶¶ 33-58.

[69]   Larnholt Trial Decl. ¶ 41.

[70]   Larnholt Trial Decl. ¶ 42; Lönner Trial Decl. ¶ 35.

[71]   Larnholt Trial Decl. ¶ 46.

[72]   Larnholt Trial Decl. ¶ 45; Lönner Trial Decl. ¶ 33.

[73]   JX-073.

[74]   PX-183.

[75]   JX-163 (emphasis added).

products including **reimbursement policies of [] government**," "Reports filed and significant correspondence with … regulatory agencies," and "**all material contracts with any government or governmental agency**."[76]

This evidence proves that 3M understood the need to disclose to potential acquirers the pricing and reimbursement agreements for its pharmaceutical products in France and to include those documents in the data room.  Nevertheless, 3M admits that it did not include the Convention in the data room or otherwise disclose the Convention or its terms to Meda.[77]  Far from a simple mistake, 3M's representatives testified that the issue of whether to include pricing agreements was raised by 3M's internal counsel and that 3M's John Sampson had the final say on what documents and information made it into the data room.[78]

In addition to thoroughly reviewing the documents and information in the data room, Meda's due diligence included: attending meetings and asking questions of 3M's management; submitting written questions to and receiving written answers from 3M; asking questions of 3M and Goldman representatives orally in meetings or teleconferences; conducting site visits of 3M's manufacturing plants; reviewing data collected from IMS, an external provider of historical pharmaceutical sales data across the globe; reviewing 3M's audited financials, as well as the audit-work papers from 3M's external auditor, PricewaterhouseCoopers; reviewing publicly available information relating to 3M Pharma; and conducting analyses of comparable companies. [79]  Throughout the due diligence process, 3M continuously presented its pharmaceutical business as consisting of stable assets that 3M projected would generate consistent cash flows for years to come.[80]

---

[76]   DX-162 at 3M00622344-45.

[77]   Wanless Dep. Tr. 31:11-33:18, 86:15-87:15; Sauer Dep. Tr. 266:16-267:19.

[78]   Wanless Dep. Tr. 34:15-35:10.

[79]   Larnholt Trial Decl. ¶ 48.

[80]   PX-168 (Offering Memorandum, dated April 2006); PX-421 (Management Presentation given to Meda on June 26, 2006); PX-285 ("The business continues to perform well, with Sales and EBITDA both up ~3% versus the OM").

As part of the due diligence process, representatives from Meda attended a management presentation delivered by 3M in St. Paul, Minnesota on June 26, 2006, in which 3M executives, including John Sampson, walked the Meda executives through a PowerPoint presentation regarding 3M's pharmaceutical business (the "Management Presentation"). [81]    In the Management Presentation, 3M falsely represented, among other things, that it projected European sales of Tambocor in 2006, 2007, and 2008 to be $117 million, $121 million and $122 million, respectively, and that strong growth in Tambocor CR sales would more than offset any declines in sales of Tambocor IR.[82]  The Management Presentation specifically stated that this resulted in a compound annual growth rate of 2.1% in European overall Tambocor sales for the 2006-2008 period.[83]  Although the Management Presentation, like the OM, noted that "European government mandated price reductions also result in lower selling prices and sales for Tambocor and Minitran,"[84] 3M's executives and advisors—including John Sampson himself—as well as Meda's executives, have all consistently testified that they viewed these disclosures as relating to Tambocor IR and/or general pricing pressure in Europe, not to a specific agreement between 3M and CEPS to reduce the price of Tambocor CR.[85]  Like 3M's other false representations to Meda, the Management Presentation portrayed Tambocor as generating stable and consistent cash flows, and gave no indication that 3M had agreed to an already overdue 50% price reduction for Tambocor CR in France.[86]

---

[81]  Lönner Trial Decl. ¶¶ 35-37 (The following individuals attended the meeting presentation on behalf of Meda:  Anders Lönner (CEO), Jörg-Thomas Dierks (COO), Anders Larnholt (VP of Business Development and Investor Relations), Mårten Österlund (VP of Scientific Affairs), Pär-Ola Wirenlind (Treasurer), Hans-Jürgen Kromp (VP of Group Legal Services), and Christer Nordén (Secretary of the Board and outside legal counsel).

[82]  PX-421.

[83]  *Id.*

[84]  *Id.* at MEDA00188586.

[85]  Keel Dep. Tr. at 102-105, 163-164, 201-203; Sampson Dep. Tr. at 249-252; Haas Dep. Tr. at 170-171, 248-249; Dierks Trial Decl. ¶ 71.

[86]  Dierks Trial Decl. ¶¶ 34, 38-41.

At the end of the main Management Presentation and before the break-out sessions, Meda's CEO Anders Lönner asked 3M's John Sampson a question that he has asked his counterpart in every acquisition: Is there anything else that Meda should know about the Business that 3M has not already disclosed?[87]  Mr. Lönner and other Meda executives who attended the meeting with 3M will testify that Sampson assured Lönner that "Meda knew everything it needed to know."[88]  When asked point blank in his deposition whether this exchange occurred, Sampson did not deny that it did.[89]

On June 30, 2006, Meda received a copy of 3M's "Financial Model," which included detailed historical and projected financial information.[90]  Like the OM and the Management Presentation, the Financial Model predicted stable and consistent cash flows from Tambocor in Europe, specifically forecasting gross sales for 2006, 2007, 2008, 2009 and 2010 of $111 million, $112 million, $113.5 million, $112.5 million and $112 million, respectively.[91]  These figures—upon which Meda relied in valuing the Business[92]—failed to account for the overdue 50% price reduction required by the Convention.[93]

### J.    Meda's Valuation and Bid

Meda's senior executives worked collaboratively to value 3M's pharmaceutical business.[94]  In doing so, they used an EBITDA multiple valuation methodology that relied on 3M's Financial Model and 2007 EBITDA projection, but made certain adjustments to account

---

[87]   Lönner Trial Decl. ¶¶ 38-39; Dierks Trial Decl. ¶ 41.

[88]   *Id.*

[89]   Sampson Dep. Tr. at 160.

[90]   JX-077.

[91]   *Id.*

[92]   Lönner Trial Decl. ¶ 54; Larnholt Trial Decl. ¶¶ 52-53; Stenqvist Trial Decl. ¶¶ 26, 43, 67, 89.

[93]   Larnholt Trial Decl. ¶ 101.

[94]   Lönner Trial Decl. ¶ 41; Larnholt Trial Decl. ¶ 32.

for items Meda discovered during its due diligence—none of which related to Tambocor CR.[95] After Meda substantially completed its due diligence, it concluded that Meda's indicative bid of $2.15 billion for the worldwide business represented a valuation of 11.2 times EBITDA, not 9.2 times EBITDA, as Meda believed before conducting its diligence.[96]   Accordingly, Meda determined that an acquisition of the worldwide business was not in its interest.[97]  Meda instead decided to explore an acquisition of one of the individual business segments—Europe.[98]

For Europe, Larnholt asked Goldman Sachs for an extension of the August 30, 2006 bid deadline but he was rebuffed by Goldman, which informed Meda that "[3M is] sticking firm with the August 30 bid date and that the majority of buyers appear to be on track."[99]  Ultimately, following discussions among 3M's executives and Meda's board of directors, and with the board's approval, Meda submitted a binding offer of $825 million for the European segment (the "Business"), and a separate bid of $960 million for the European segment together with the APACA segment.[100]   Both bids were based on the same EBITDA multiple valuation methodology that Meda had used to determine its preliminary indication of interest in June 2006, however Meda decided to apply a multiple of 9.5 times EBITDA, and determined that a multiple of 10 times EBITDA was the absolute highest level to which it would go.[101]  The final valuation of the Business was based on 3M's projections in the OM, plus or minus adjustments for items found in due diligence, none of which related to Tambocor CR.[102]

---

[95]   Larnholt Trial Decl. ¶¶ 56, 58, 60, 61.

[96]   JX-137; Lönner Trial Decl. ¶ 51; Larnholt Trial Decl. ¶ 59.

[97]   Lönner Trial Decl. ¶ 52; Larnholt Trial Decl. ¶ 64.

[98]    JX-085.

[99]    PX-248.

[100]   JX-089; Lönner Trial Decl. ¶ 59; Larnholt Trial Decl. ¶¶ 66-68.

[101]   Lönner Trial Decl. ¶ 58; Larnholt Trial Decl. ¶ 68.

[102]   Lönner Trial Decl. ¶ 59; Larnholt Trial Decl. ¶¶ 68-69.

As Mr. Larnholt will testify at trial, Meda was comfortable using 3M's forecasted EBITDA as the starting point for its valuation.[103]  In the OM, 3M represented that its projections for sales of cardiovascular products in Europe already accounted for downward pricing pressure in all markets in Europe, including France.[104]  Meda understood the risk of downward pricing pressure in Europe to be simply that: a generalized risk.[105]  Meda was not aware, and 3M did not disclose, that the Business faced an overdue 50% reduction in the price of Tambocor CR as a result of the Convention.  Based on their collective experience, Meda executives believed that any price reduction would be consistent with the marginal decreases of 1-3% that individuals like Larnholt had observed in the past.[106]  Moreover, 3M's projections in the OM stated that the gross margin for cardiovascular products in Europe was stable and even improving.[107]  The information provided by 3M presented a business that was not expecting any major price changes for any of its cardiovascular products in Europe.[108]

On August 30, 2006, of the twenty companies that submitted preliminary bids and went on to conduct due diligence, only eight companies submitted binding offers to 3M:  two for the global business, one for the Americas, one for Europe, and four for APACA.[109]  Meda outbid its lone competitor for the European Business, Almirall, by $125 million.[110]

3M, in an act that can only be described as based on pure greed, then instructed Goldman to tell Meda (falsely) that Meda "ha[d] not clearly differentiated [it]self from a value standpoint and we would like to give [Meda] the opportunity to do so."[111]  Implementing 3M's scheme,

---

[103]   Larnholt Trial Decl. ¶¶ 30, 37.

[104]   PX-168 at MEDA00188692.

[105]   Larnholt Trial Decl. ¶¶ 71-73; Dierks Trial Decl. ¶ 71; Stenqvist Trial Decl. ¶ 68.

[106]   Larnholt Dep. Tr.. at 257:8-16.

[107]   PX-168 at MEDA00188690.

[108]   Dierks Trial Decl. ¶¶ 33-35, 39.

[109]   JX-099 at GS0000102349.

[110]   *Id.*

[111]   PX-262.

Goldman told Meda that it "should consider raising [its] bid to 850"[112] to be a contender, even though, by September 8, 2006, 3M had already internally decided to reject Almirall's bid and negotiate exclusively with Meda for the Business.[113]  In the end, Meda paid 3M $854 million and agreed to assume certain liabilities.  This amount exceeded by several hundred million dollars the low end of the range that Goldman had told 3M it could expect for the Business—a range that Goldman's Jason Haas testified would have been reduced had it accounted for the price reduction for Tambocor CR required by the Convention.[114]

In November 2006, Sauer had reported to 3M's Board that 3M needed to generate at least $1.288 billion from the sale of 3M's global pharmaceutical business to make the deal viable.  Ultimately, 3M was successful in selling all segments of this "drag" on the company for a combined sales price of $2.206 billion.[115]  A 3M board presentation noted that, "[o]verall, we greatly exceeded our fears about what we might have to accept for this challenged business, and solidly exceeded our estimate and expectations."[116]  As the evidence at trial will prove, 3M would not have been able to do so absent its fraud and breaches of representations and warranties.

**K.    The Acquisition Agreement And 3M's Representations And Warranties Regarding Its Compliance With And Disclosure Of All Regulatory Filings and Material Contracts**

On November 8, 2006, Meda and 3M entered into an Acquisition Agreement (the "Agreement"), whereby Meda agreed to purchase the Business in exchange for: (i) the assumption of certain Assumed Liabilities (as defined in the Agreement); and (ii) a cash payment of $854 million.[117]  The cash payment was approximately 9.93 times EBITDA—just shy of the

---

[112]   JX-094; Lönner Trial Decl. ¶ 60; Larnholt Trial Decl. ¶ 74.

[113]   Sauer Dep. Tr. at 223-25; PX-272.

[114]   Haas Dep. Tr. at 283-94.

[115]   Sauer Dep. Tr. at 249:23-251:5; PX-303.

[116]   PX-303.

[117]   PX-305.

10 times EBITDA that Meda determined was the absolute top price that it would be willing to pay for the Business.[118]

In the Agreement, 3M made several, specific representations and warranties to Meda.  In particular, in Sections 3.07,[119] 3.12,[120] and 3.15,[121] 3M represented that it was in compliance with all applicable "regulatory requirements," and that it had provided Meda with copies of all "Material Contracts" and "Regulatory Filings" relating to the Business.  As 3M was aware, these representations were critical to Meda; without them, there would have been no deal.[122]  Despite these express representations and warranties, 3M admits that it did not disclose the Convention, or the fact that 3M was in breach of the Convention at all times since April 2006, to Meda.[123]

---

[118]   Larnholt Trial Decl. ¶ 76.

[119]   *See* PX-305.  Section 3.07 provides in relevant part: "To Seller's Knowledge, the Business is not in violation of any Law, including any Environmental Law.  Since December 31, 2004, **Seller has complied in all material aspects with all applicable regulatory requirements** and all industry guidance concerning the marketing, promotion and distribution of medicinal products in the Territory . . . ." (Emphasis added).

[120]   Section 3.12 provides in relevant part: "(a) <u>Section 3.12(a) of the Seller Disclosure Schedule</u> sets forth, as of the date hereof, a complete list of every Assumed Contract . . . that . . . (iii) materially restricts the Business from engaging in any business activity anywhere in the Territory . . . **Seller has made available to Purchaser true and complete copies of all material Assumed Contracts** . . . (b) . . . **Seller or its Subsidiary . . . is not in any material respect in violation or breach of or default under each such material Contract**." (Emphasis added).

[121]   Section 3.15 provides in relevant part: "(a) All existing material Regulatory Filings held by any Seller are set forth on <u>Section 3.15 of the Seller Disclosure Schedule</u>. . . . (b) . . . **Seller has provided Purchaser with access to true and complete copies of all Regulatory Filings . . . Seller is in compliance in all material respects with all Regulatory Filings and Laws applicable to the Products** . . . (d) Seller has not received any written . . . notice of proceedings from a Governmental Authority regarding any actual, alleged, possible or potential . . . (iii) renewal of the Regulatory Filings on terms less advantageous to the Seller than the terms of those Regulatory Filings currently in force." (Emphasis added).

[122]   Larnholt Trial Decl. ¶¶ 79-81, 83 ("The representations and warranties in the Acquisition Agreement were something that Meda took very seriously"); (Shah Direct)  (reps and warranties provide comfort); Larnholt Tr. at 95-97, 300, 305; Lönner Tr. at 164; PX-403 (at 21) ("All of the representations and warranties would have provided a significant level of assurance for Meda that any significant matters had been disclosed to Meda.").)

[123]   Wanless Dep. Tr. 31:11-33:18, 86:15-87:15; Sauer Dep. Tr. 266:16-267:19; *see also* PX-539, at pp. 5-6.

**L.**    **3M Executives Involved In The Transaction Knew 3M's Representations And Warranties Were False Because 3M Failed To Disclose the Convention**

When 3M represented and warranted in the November 2006 Acquisition Agreement that it was in compliance with and had disclosed to Meda all regulatory requirements, regulatory filings, and material contracts, 3M's executives knew that these representations and warranties were false.  At a minimum, 3M's executives knew of the Flecaine Steering Committee, knew that 3M had breached the Convention, and knew that 3M had not disclosed the Convention to Meda.

In April 2006, while the Flecaine Steering Committee was searching for a way to avoid 3M's obligations under Article 2.2, 3M was also preparing the data room for potential acquirers' due diligence on 3M Pharma.  In fact, Flecaine Steering Committee members were required to help with this task.[124]  On April 28, 2006, for example, Flecaine Steering Committee member Maxime Delpy received an email from 3M's in-house counsel Ian Brown instructing Delpy and others at 3M, for purposes of preparing the data room, to "identify relevant documents to include *all active agreements related to the business* being offered and all expired agreements that may have ongoing obligations…. *We will provide a list of all relevant agreements to prospective buyers*…. If you have questions about this, please contact me or Maureen [Harms]."[125]  3M's privilege log reflects that Delpy had purportedly privileged communications with Ms. Harms concerning the procedures for "creating the data room,"[126] and that Delpy then relayed purportedly privileged information concerning "procedures for creating the data room" to his colleagues on the Flecaine Steering Committee, including Benoit Traineau, Helene Kolsky, and Philippe Husson.[127]  3M has refused to produce these communications on the basis of the attorney-client privilege,[128] but there can be no doubt that Delpy was aware of his obligation to

---

[124]    PX-183.

[125]    *Id.* (emphasis added).

[126]    PX-396 (Defendant's Privilege Log Entry P000902).

[127]    *Id.* at Entry POOO813.

[128]    *Id.*

include all relevant documents and agreements in the data room and discussed this obligation with his colleagues on the Flecaine Steering Committee, with the end result that the Convention was withheld from the data room.

Similarly, in an April 20-21, 2006 email chain among 3M Santé executives, Genevieve Giovannoni, a Regulatory Affairs Manager at 3M Santé, instructed her colleagues to ensure that the data room contained all "price and reimbursement elements" for the "big 5" products—including "Flecaine."[129]   In her email, Ms. Giovannoni explained that the "price and reimbursement elements" to be disclosed for each product in the data room included the "last reimbursement status and price" for the product, a "summary of the price dossier" for the product, and any "***specific commitment that 3M could have regarding [the] price***" at which the product was reimbursed, so that "eventual acquirers … may audit the dossiers" of the products.[130]   The following day, Catherine Basset, also a Regulatory Affairs Manager at 3M Santé, forwarded Ms. Giovannoni's email to Flecaine Steering Committee member Helene Kolsky and requested that Ms. Kolsky provide "the elements that concern the price and reimbursement … for Flecaine" so that Basset could include the information in the data room.[131] Rather than provide the requested information, Kolsky questioned whether disclosure of "the specific price / volume clauses [for] … flecaine" to potential acquirers was appropriate given that "these elements have always remained confidential."[132]   And again, the Convention never made it into the data room.

David Wanlass, who was designated as 3M's Rule 30(b)(6) witness for 3M's procedures for collecting documents for the data room, testified that John Sampson, as Division Vice President, had the final say regarding which documents would be included in, or excluded from,

---

[129]   JX-163.

[130]   *Id.* (emphasis added).

[131]   *Id.*

[132]   *Id.*

the data room, and that Sampson would also have consulted with 3M's Brad Sauer.[133]  Wanlass further testified that Sampson had a "long history" with 3M's pharmaceutical business and had "full familiarity with pharma specific issues like European pricing agreements, regulatory requirements, and the like."[134]

In his deposition, Mr. Sampson claimed that he was unaware of the Convention or the requirements of Article 2.2.[135]  An internal 3M presentation relating to Tambocor, however, makes clear that Sampson attended a May 19, 2006 meeting in Cergy, France, along with 3M executives Benoit Traineau and Ton Van't Hullenar, in which Flecaine Steering Committee member Helene Kolsky delivered a forty-five minute slide presentation on the "Tambocor File."[136]  The presentation states, "J. Sampon / May 2006" in the bottom left hand corner of every page, indicating that the presentation was intended primarily for Sampson's benefit.  Sampson claimed in his deposition that he could not recall receiving the Tambocor File presentation at the May 19, 2006 meeting, or the topics discussed at the meeting.  Indeed, Sampson claimed he could not recall even *attending* the meeting.  He acknowledged, however, that "certainly from these documents it looks as though I did."[137]

The May 19 presentation included a slide describing the early history of the Convention and explaining that before CEPS would approve a price for Flecaine CR upon 3M's application in 2002, CEPS had insisted on a "CR formulation Price decrease after 3 years."[138]  The presentation also noted that one of 3M's "Key Business Directions" was "[t]o succeed the Tambocor CR price renegotiation."[139]  The presentation concluded by asking Sampson: "How

---

[133]   Wanlass Dep. Tr. 34-35, 84:3-15; *see also* Haas Dep. Tr. 203-04 (confirming that 3M made the ultimate call as to whether or not a particular document should be included in the data room).

[134]   *Id.* 83:13-25.

[135]   Sampson Dep. Tr. 77:17-24; 80:13-18.

[136]   JX-067; Sampson Dep. Tr. 226:4-227:7.

[137]   Sampson Dep. Tr. 226:10-16.

[138]   JX-067; Sampson Dep. Tr. 240:2-12.

[139]   JX-067 at MEDA00216159.

do you want to be updated regarding the price process/outcome [of 3M's negotiations with CEPS over Flecaine]?"[140]  Given Sampson's central role in 3M's effort to sell the Business during the period in which the meeting in Cergy occurred, and the obvious importance to 3M of the negotiations with CEPS over Article 2.2, Sampson's testimony that he has no recollection of the meeting in Cergy, the Tambocor File presentation, or discussions with Kolsky or anyone else at 3M about the Convention or its terms,[141] is not credible.   The evidence makes clear that Sampson—the 3M executive ultimately responsible for determining the information to be included in the data room—was aware of the Convention and the risks it posed to the Business's revenues.  But yet again, the Convention did not make it into the data room.  This was not the result of a series of innocent mistakes—it was the result of widespread concealment and fraud.

3M's Brad Sauer, the 3M executive that signed the Acquisition Agreement, also was aware of the Convention and the importance of its price reduction provisions.[142]  On February 3, 2005, Sauer was given a 3M presentation titled "Maintaining Tambocor high contribution level on the 3M Pharma business in France: January 2006, Tambocor re-registration (mandatory)."[143]  The presentation noted, among things, that (1) Tambocor made the "[t]op contribution [to] the 3M Pharma business in France"; (2) the reimbursement price for pharmaceutical products in France is determined by a "[c]ontractual agreement between Government and companies (Convention)"; and (3), pursuant to the 3M-CEPS "IR and CR price negotiation in 2002," 3M faced a required "[Tambocor] CR formulation price decrease after 3 years."[144]

On February 3, 2006, Sauer emailed 3M's new CEO, George Buckley, and CFO Patrick Campbell, to deliver his negative assessment of 3M's European pharmaceutical business, stating:

---

[140]   *Id.* at 246:8-21.

[141]   Sampson Dep. Tr. at 225:16-228:17; *see also* Wanless Dep. Tr. at 86-87; Haas Tr. at 178 (testifying that he would have expected an agreement that would reduce the sales price of Tambocor CR by a material amount to have been brought to his attention).

[142]   Sauer Dep. Tr. at 82:24-83:6, 90:15-91:2, 137:25-139.

[143]   JX-174.

[144]   *Id.*

"Prospects there for Pharma are worsening…. Tambocor (our big profitable Cardio business) is under generic attack in France and lost 16% share in Q4.  This in addition to the big unilateral ***government price reductions we knew were coming in France*** and Italy."[145]  Thus, Sauer clearly understood (1) the importance of Tambocor to the Business, (2) the Convention could be implemented unilaterally, and (3) Tambocor CR's price in France would "decrease after 3 years" pursuant to the Convention.  Yet Sauer did nothing to confirm that the Convention was disclosed to Meda.  Nevertheless, Saur signed the Acquisition Agreement and falsely represented and warranted to Meda that 3M was in compliance with, and had disclosed, all regulatory filings, regulatory requirements and material contracts.

The evidence is overwhelming that 3M's failure to include the Convention in the data room was intentional, and designed to prevent the inevitable consequence that would occur if the Convention were disclosed to potential acquirers of the business—*i.e.*, a reduction in bid prices or a failure to sell the Business altogether.  On May 30, 2006, Helene Kolsky—the Flecaine Steering Committee member who, on April 21, 2006, was instructed to provide all pricing and reimbursement information for Flecaine LP for inclusion in the data room—sent her Committee colleagues an email explaining that, by delaying the committee's negotiations with CEPS, 3M could achieve "a more 'attractive' image of France pharma for prospective buyers between now and the fall than there will be at the end of the negotiation."[146]  Kolsky and 3M, however, failed to tell Meda that this "more attractive image" was a lie and that 3M had already breached the Convention in April 2006.  In November 2006, following Meda's execution of the Acquisition Agreement, Kolsky sent the committee members and others at 3M another email making clear that the committee intentionally delayed the review of the Flecaine case file "in order to preserve the price of Flecaine IR & CR until the end of the year 2006 and the non-application of the specific clause."[147]

---

[145]   PX-133 (emphasis added).

[146]   PX-194.

[147]   JX-104.

3M's David Wanlass and Brad Sauer have admitted 3M's failure to include the Convention in the data room or otherwise disclose the Convention or its terms to Meda.[148]  Their suggestion that this was a mere "mistake," however, is flatly contradicted by the evidence.  This was not an innocent mistake, but rather the result of an intentional scheme to defraud Meda, or another unsuspecting buyer, into overpaying for the Business.

## M.   3M's Feeble Attempt To Unilaterally Cancel the Convention's Price Reduction Provisions In September 2006

In attempting to defend its admitted failure to disclose the Convention or its terms to Meda, 3M argues—in addition to its several other, inconsistent excuses—that it did not disclose the Convention or the price reduction provisions set forth in Article 2.2 because 3M believed it had unilaterally "cancelled" Article 2.2 in September 2006, when 3M Santé Director General Philippe Husson "struck out by hand all of the Flecaine provisions" and sent the Convention back to CEPS without offering anything of value to CEPS in return.[149]  3M's argument cannot be squared with the uncontroverted evidence that: (1) the 3M executive who originally signed the Convention understood that Article 2.2 was binding;[150] (2) 3M created a "Flecaine Steering Committee" specifically to devise a strategy for avoiding 3M's binding obligations under Article 2.2, a complete waste if a unilateral handwritten change could eliminate Article 2.2;[151] (3) the Flecaine Steering Committee members, who had numerous prior discussions with CEPS regarding Article 2.2, believed that Article 2.2 was "non-negotiable" and would be enforced "with ferocity";[152] (4) 3M spent over a year attempting (unsuccessfully) to renegotiate Article 2.2 with CEPS;[153] and (5) French law does not permit revision of a CEPS Convention in this

---

[148]   Wanlass Dep. Tr. 31:11-33:18, 86:15-87:15; Sauer Dep. Tr. 266:16-267:19.

[149]   PX-263; *see also* 3M's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, Dkt. No. 56, at ¶ 20.

[150]   Felber Tr. at 18; JX-031; JX-038 ("Contractual agreement between Government and companies (Convention)"); Sampson Tr. at 89-91; JX-135.

[151]   PX-057; *see also* PX-058-063.

[152]   JX-024.

[153]   PX-311.

fashion.[154]  Moreover, even if certain individuals at 3M deluded themselves into believing that they had effectively cancelled Article 2.2 by drawing a line through it by hand, the purported cancellation in *September* does not explain (1) 3M's failure to disclose the Convention to Meda in the OM, the Management Presentation, or the data room—all of which had been created or compiled months earlier; or (2) 3M's failure to disclose the purported cancellation—which Husson himself described as "a substantial change" to the Convention[155]—or to provide Meda with proof that the cancellation was effective (which it clearly was not).[156]

Notably, 3M's French law expert provides no opinion that the Convention was cancelled. In fact, he aptly explained that "the past is prologue" and even if the Convention had been cancelled he would want to know about it because CEPS could re-implement it the next day.[157]

### N.    CEPS Informs Meda of the Convention More Than A Year After The Signing of the Acquisition Agreement

On December 4, 2007, more than one year after the signing of the Acquisition Agreement, CEPS sent a fax enclosing the Convention to Meda's Christian Senac.[158]  This was the first time that anyone at Meda had learned of the Convention or the price reduction provisions contained in Article 2.2.[159]  Senac and Christophe Maupas, Meda's newly appointed French country manager, were shocked.[160]

Maupas' December 31, 2007 email sums up Meda's reaction upon learning of the Convention: "The document has been sent to us by the Economic Committee, and is a total

---

[154]   Mariotte May 21, 2012 Expert Report, pages 17-20; Mariotte October 8, 2012 Decl. ¶¶ 57-61.; Destal Trial Decl. ¶ 21.

[155]   3M's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, Dkt. No. 56, at ¶ 20.

[156]   Mariotte May 21, 2012 Expert Report, pages 17-20; Mariotte October 8, 2012 Decl. ¶¶ 57-61; Destal Trial Decl. ¶¶ 21, 44-45.

[157]   Schur Tr. at 124:19-125:8.

[158]   PX-345.

[159]   Maupas Dep. Tr. at 62:13-23

[160]   *Id.*. at 102-03.

surprise to us . . .  Christian [Senac] mentions that his predecessor [3M's] Benoit Traineau never raised this very significant commitment from 3M to the French authorities not to mention 3M never fulfilled it."[161]  Maupas warned his colleagues of the very serious consequences that could result if Meda failed to immediately comply with Article 2.2:  "The alternative is not to sign anything which means entering into conflict with the Committee which is not advisable as it may lead amongst others to cancellation of rebates obtained on 2007 payback and entering into a far more penalizing payback scheme in 2008.  Of course Aldara AK reimbursement would become immediately out of reach and all new price re-negotiation at stake."[162]  Thus, if Meda were to have simply ignored the requirements of Article 2.2—as 3M had wantonly done while it hurried to sell the Business—the prices of all of Meda's products in France would have been in jeopardy.

Meda immediately tried to devise a plan for dealing with the Convention and sought to discuss it with CEPS.  Meda explained to CEPS that 3M had failed to disclose Article 2.2 to Meda prior to its acquisition of the Business, and pleaded for leniency.[163]  Initially, Mr. Renaudin indicated that there would certainly be a price cut to Tambocor CR, but given the unusual circumstances, CEPS might be willing to modify the price-reduction required by Article 2.2.[164]  Meda's hope did not last long, however, because on June 20, 2008, CEPS made clear its official position that Meda, as the Business's new owner, would be required to abide by the Convention executed by 3M, and mandated a 50% price reduction for Flecaine LP.[165]  On June

---

[161]  *Id.*

[162]  *Id.*  On December 21, 2007, Maupas and Senac jointly sent a letter to Renaudin, noting that they "are very surprised" to discover the Convention 3M entered into with CEPS.  Meda reluctantly assumed the conventions "only as a formality and with the greatest reservations."  PX-348.

[163]  3M contends that it provided the Convention to Meda immediately after the closing.  Even if true, this would only highlight the importance of the Convention and 3M's fraud.

[164]  DX-411.

[165]  PX-371; Dierks described the correspondence as: "a letter by the French authorities concerning a price reduction of the slow release form of Tambocor agreed upon with 3M in the past in case no generic is launched.  While the oral information received in a meeting in April

23, 2008, Meda's Christophe Maupas emailed Meda's COO Jorge-Thomas Dierks and explained that, following discussions with CEPS, it was clear that Article 2.2 "is binding Meda as it was binding 3M."[166]

Throughout the Summer and Fall of 2008, Meda stepped up its efforts to renegotiate the Convention with CEPS, and emphasized that, because Meda had purchased the Business unaware of the Convention (due to 3M's failure to disclose), and a 50 percent price reduction for Flecaine LP would cripple Meda's French operations, CEPS should at least reconsider the extent of the price reduction required under Article 2.2.  As a result of Meda's efforts and negotiations, CEPS eventually agreed to a modified price reduction of 30%, and that Meda could reduce the price of Flecaine LP over the course of two years, with a 13 percent reduction in November 2008 and a further 20 percent reduction in October 2009.[167]

## ARGUMENT

At trial, Meda will prove by clear and convincing evidence that 3M fraudulently induced Meda to enter into the Agreement through intentional, material misrepresentations and omissions.  3M's fraudulent conduct resulted in damages to Meda of more than $210 million. Meda will further demonstrate that 3M's conduct breached multiple representations and warranties in the Acquisition Agreement.

In particular, overwhelming evidence will show that 3M intentionally failed to disclose the existence of the Convention, an agreement with an agency of the French Government that materially reduced the value of the Business Meda purchased from 3M, and its breach in April 2006.  3M had a duty to disclose the Convention and its breach to Meda based on 3M's superior knowledge of the Convention and its breach—facts which were not available to Meda—and 3M's knowledge that Meda was acting on the basis of a mistaken understanding resulting from

---

was positive and let us [think] that the reduction will be much less we today received in writing that the French authorities go back to what was agreed upon with 3M and which would mean for us a loss per annum of about 20 [million Euro] in sales and profit."  PX-372.

[166]   DX-411.

[167]   PX-388.

3M's omission, and based on express representations and warranties in the Acquisition Agreement.  Overwhelming evidence will also show that, in addition to this material omission, 3M made affirmative material misrepresentations to Meda involving sales projections and other financial information for the Business.

## I.   3M FRAUDULENTLY INDUCED MEDA TO ENTER INTO THE ACQUISITION AGREEMENT

To prove fraud under New York law,[168] a plaintiff must show the following elements by clear-and-convincing evidence: (1) that the defendant knowingly or recklessly misrepresented a material fact, (2) intending to induce the plaintiff's reliance (scienter), (3) that the plaintiff relied on the misrepresentation, and (4) that the plaintiff suffered damages as a result.  *See, e.g., Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007).  To show fraud by omission, rather than affirmative misrepresentation, the plaintiff must also prove that the defendant had a duty to disclose the concealed fact.  *See id.*

### A.   During Negotiations With Meda, 3M Made Material Omissions and Misrepresentations That 3M Knew to Be False

#### 1.   3M's Failure to Disclose the Convention to Meda Was a Material Omission of a Fact That 3M Had a Duty to Disclose

As 3M was plainly aware, the Convention was a material agreement between 3M and CEPS, in that it concerned the reimbursement price for one of the Business's most important products in the biggest market for the Business.  3M's actions demonstrate its understanding of the importance of the Convention to the Business:

- In or around April 2005, 3M set up a "Flecaine Steering Committee" for the purpose of mitigating the Convention's economic impact on the Business;[169]

- The Flecaine Steering Committee was under significant pressure from senior 3M executives to renegotiate the Convention, and the committee resolved to appear before CEPS "prior to the agreement renewal date of April 2006 to start the

---

[168]   Section 11.11(a) of the Acquisition Agreement provides that New York law governs the claims asserted in this action.

[169]   PX-057; *see also* PX-058-64.

renegotiation of the specific Flecaine clause" (a clear reference to Article 2.2 of the Convention);[170]

- Throughout at least March and May 2006, the Flecaine Steering Committee prepared negotiation materials that revealed the committee's prediction that CEPS would be unwilling to renegotiate the pricing provisions in the Convention;[171]

Although 3M's David Wanlass described 3M's failure to include the Convention in the data room provided for Meda's due diligence as a "mistake,"[172] the facts demonstrate that the omission was actually an intentional effort to avoid disclosure until the acquisition was completed:

- During the *same period* that the Flecaine Steering Committee was plotting its strategy for renegotiating the pricing provisions in Article 2.2 of the Convention, certain members of the committee, including 3M Santé's in-house lawyer Maxime Delpy, and 3M Santé Director Helen Kolsky, were tasked with identifying all material agreements and, specifically, all pricing and reimbursement information for Flecaine LP, and ensuring that the agreements and information were placed in 3M's data room;[173]

- 3M's privilege log indicates that Mr. Delpy had communications with other members of the Flecaine Steering Committee regarding "procedures for creating the data room" (which communications 3M has withheld);[174]

- Ms. Kolsky specifically questioned the instruction that she provide all pricing and reimbursement information for Flecaine LP for inclusion in the data room on the basis that "the specific price / volume clauses [for] … flecaine" were "confidential";[175]

- Neither Delpy, Kolsky, the other members of the Flecaine Steering Committee, nor anyone else at 3M, *ever* took steps to ensure that the Convention was included

---

[170] PX-064.

[171] JX-140 (predicting Renaudin's reaction to 3M's attempt to renegotiate the pricing agreement as "I do not understand, I will apply the agreement, the entire agreement, and will follow the specified schedule."); JX-141 ("simple; in 2003 you signed an agreement, everything is specified in it; today we just need to apply it!").

[172] Wanlass Dep. Tr. 86-87.

[173] PX-183; JX-163.

[174] PX-396 at P000813.

[175] JX-163.

in the data room;

- On May 30, 2006, Ms. Kolsky celebrated a "delay" in the negotiations with CEPS over Flecaine, writing to her colleagues on the Flecaine Steering Committee that the delay presented an opportunity for 3M to present "a more 'attractive' image of France pharma for prospective buyers between now and the fall than there will be at the end of the negotiation";[176]

- Upon learning that Meda had signed the Acquisition Agreement in November 2006, Kolsky sent another email to her colleagues rejoicing in the fact that, as a result of the committee's efforts to delay negotiations with CEPS, the "price of Flecaine LI & LP could be maintained until the end of the year," and noting "the end of this long and exciting negotiation will not occur under the aegis of 3M and particularly with the steering committee that has supported us the whole way; this was how much this challenge was of importance for our company."[177]

Given this record, it is beyond legitimate dispute that 3M viewed the Convention as material to the Business—why else would 3M have created a Flecaine Steering Committee that spent nearly two years plotting a strategy for dealing with the Convention?  3M's internal correspondence leaves no doubt that 3M specifically contemplated including the Convention in the data room but chose not to because it feared that disclosure of the Convention, and the expected impact that the Convention would have on revenues, would cause potential acquirers to reduce their bids.

3M had a duty to disclose the Convention to Meda.  The following critical facts are undisputed:  (1) 3M was aware that the Convention was not publicly available;[178] (2) 3M did not provide the Convention to Meda until after the transaction closed;[179] and (3) Meda first learned of the Convention *from CEPS*, not from 3M.[180]  The fact that 3M had superior knowledge of the Convention not readily available to Meda, and that 3M knew that Meda was acting on the basis

---

[176]  PX-194.

[177]  PX-311.

[178]   Felber Dep. Tr. at 98; PX-394 at 14 ("Although the current price of a reimbursed pharmaceutical is published in the official gazette, all other terms included in all conventions with CEPS are confidential, as they are private agreements between the pharmaceutical company and CEPS."); Schur Dep. Tr. at 118-19; Dierks Trial Decl. ¶¶ 53.

[179]  PX-413 ("It is true that the Convention was not furnished to Meda during due diligence").

[180]  PX-345.

of mistaken knowledge, created a duty of disclosure on the part of 3M.  *See, e.g., Buy This, Inc. v. MCI Worldcom Commc'ns, Inc*., 209 F. Supp. 2d 334, 338-39 (S.D.N.Y. 2002).

3M also had a duty to disclose the Convention pursuant to its express representations and warranties in the Acquisition Agreement.  *See, e.g., Allegheny*, 500 F.3d at 181-82.  In particular, 3M represented and warranted (1) that it was in compliance with all regulatory requirements (§ 3.07); (2) that it had disclosed and was in compliance with all material contracts (§ 3.12), and (3) that it had disclosed and was in compliance with all regulatory filings and laws (§ 3.15).  As discussed in detail in Section II, *infra*, the Convention falls within each of these representations and warranties.  Contort the language as it may, 3M cannot escape all of the representations and warranties that required disclosure of the Convention.

At trial, the evidence will show that the only reasonable inference to be drawn from 3M's failure to disclose the Convention is that 3M's conduct was intentional and designed to deceive Meda.[181]  At a minimum, 3M's failure to disclose the Convention was reckless.[182]

### 2.   3M Affirmatively Misrepresented Projected Sales and Other Financial Information Relating to the Business to Meda

3M's OM, Management Presentation, financials, and representations and omissions during meetings with Meda were equally misleading.  For example, in the OM, 3M represented that its pharmaceutical business was a "highly profitable business which generates substantial

---

[181]   *Goshen Litho, Inc. v. Kohls*, 582 F. Supp. 1561, 1564 (S.D.N.Y. 1983) (knowledge of fraud is rarely susceptible to direct proof, it must often be inferred from circumstantial evidence); *Williams v. Freeman*, 208 N.Y.S. 691, 698 (1st Dep't 1925) ("Fraud … can seldom be proved by direct evidence, but is dependent upon circumstances which, separately considered, may be quite immaterial, but when combined are not only material but have great persuasive force."); Charles Alan Wright et al., Federal Practice & Procedure § 2730 (3d ed.) ("[I]nformation relating to state of mind generally is within the exclusive knowledge of one of the litigants and can be evaluated only on the basis of circumstantial evidence.").

[182]   *See Leasing Serv. Corp. v. Broetje*, 545 F.Supp. 362, 366 (S.D.N.Y. 1982) ("The element of scienter includes representations known to be untrue or made with a reckless indifference to error, with the intent to cause the other party to act in reliance upon them."); *Woo v. Times Enter., Inc.*, No. 98 CIV. 9171, 2000 WL 297114, at *5 (S.D.N.Y. Mar. 22, 2000) (misrepresentations or omissions "known to be untrue or recklessly made" sufficient to sustain a claim of fraud).

and consistent cash flow"[183] and that "[g]oing forward, management expects gross margins to remain strong and EBITDA margins to reach 45%."[184]  Far from disclosing the substantial risks facing Tambocor sales in France, 3M represented in the OM and Management Presentation that it believed Tambocor sales in Europe would remain stable, even though France was the biggest market for Tambocor, and went so far as to state that increased Tambocor CR sales would more than offset any declines in Tambocor IR.[185]  Moreover, when Meda's CEO looked 3M's John Sampson in the eye and asked the question he asks in every acquisition—is there anything else Meda should know about the Business that had not been disclosed—Sampson falsely represented to Lönner that there was nothing.[186]

### B.   3M Made These Misrepresentations and Omissions for the Purpose of Inducing Meda to Rely on Them

#### 1.   Knowledge of 3M's Officers Is Properly Imputed to 3M

3M has erroneously argued that Meda's fraud claim against the 3M *corporate* defendants should fail because there is insufficient evidence of scienter on the part of any particular 3M *employee*.  *First*, as discussed above, and as the evidence will show at trial, several high-ranking officers of 3M—including Brad Sauer, John Sampson, Benoit Traineau, Helene Kolsky, and Maxime Delpy—had full and actual knowledge of the fraud at the time of the transaction.  It is well established under New York law that the knowledge of these 3M employees is properly imputed to 3M.[187]

---

[183]   PX-168 at MEDA00188620.

[184]   *Id.* at MEDA00188617.

[185]   *Id.* at MEDA00188690.

[186]   Lönner Trial Decl. ¶ 39.

[187]   *Williams*, 208 N.Y.S. at 698 ("A principal who accepts the benefits of a transaction negotiated by his agent adopts with such benefits the means taken to procure them."); *see also Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985) ("The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it."); *Chaikovska v. Ernst & Young, LLP*, 913 N.Y.S.2d 449, 451-52 (App. Div. 4th Dep't 2010) (noting that the misconduct of managers acting within the scope of their employment will normally be imputed to the corporation); *In re Marsh & McLennan Cos. Sec.*

*Second*, "a corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual who then would have comprehended its full import.  Rather the corporation is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly."[188]  If the rule were otherwise, a corporation could insulate itself from liability by deliberately compartmentalizing information across several individuals.[189]  That is precisely the danger here, where, at a minimum, 3M committed a reckless failure of corporate oversight and, at worst, a deliberate strategy of concealment.  As between a recklessly disorganized corporate entity and an innocent third party, the corporation should be held responsible for the circumstances that permitted the knowing or reckless misstatements of its agents.[190]

---

*Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("A corporate defendant's scienter is necessarily derived from its employees.").

[188]   *United States v. Bank of New England, N.A.*, 821 F.2d 844, 855, 856 (1st Cir. 1987) ("the bank's knowledge is the totality of what all of the employees know within the scope of their employment . . . . [I]f Employee A knows one facet of the [matter at issue], B knows another facet of it, and C a third facet of it, the bank knows them all.") (quoting *United States v. T.I.M.E.-D.C., Inc.*, 381 F. Supp. 730, 738 (W.D. Va. 1974); *see also In re Worldcom, Inc. Sec. Litig.,* 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) ("To carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter. Proof of a corporation's collective knowledge and intent is sufficient.").

[189]   *See United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 896-97, 2006 WL 2380650 (D.D.C. 2006) (explaining that in the absence of the collective knowledge doctrine, defendants "could avoid liability by simply dividing up duties to ensure that fraudulent statements were only made by [] uninformed employees"), *rev'd in part on other grounds*, 566 F.3d 1095 (D.C. Cir. 2009).

[190]   *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218 (S.D.N.Y. 2009) (collective knowledge doctrine "serves to protect third parties with which [a corporation] does business.").  Likewise, "[a] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements. If nothing else, the . . . official is at fault for a material omission in failing to correct such statements in that context."  *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 195 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *In re* SmarTalk, 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000)).  Accordingly, to the extent that 3M executives had actual knowledge of the price reduction required by the Convention yet failed to disclose this information, 3M is equally liable for fraud. *See Marsh*, 501 F. Supp. 2d at 481 ("[T]here is no requirement 'that the same individual who made an alleged misstatement on behalf of a

### 2. 3M Acted With Intent to Defraud (Scienter)

Since the commencement of this litigation, 3M has scrambled to present an "innocent" excuse for its omission of the Convention, but each of 3M's purported excuses is unavailing and serves only to heighten the inference of scienter.

3M initially argued that it disclosed the pricing pressure on Tambocor before signing the Acquisition Agreement in the OM and the Management Presentation. During discovery, however, 3M and Goldman Sachs deponents uniformly testified that they understood that the disclosures in question related to *general* pricing pressures from European governments, not to a *specific* pricing agreement for Tambocor in France.[191] If the 3M employees and advisors who knew about the particular disclosures but did not consider them to relate to the Convention, it is inconceivable that an outsider such as Meda would have understood them to relate to a specific agreement regarding Tambocor CR.[192]

Faced with the futility of this excuse, 3M shifted its position to claim that Meda did not disclose the Convention because it had "*expired of its own terms* on December 31, 2006"[193]— *i.e.*, after the Acquisition Agreement was signed but before it came into effect on January 2, 2007. More recently, in an August 13, 2012 letter to the Court, 3M offered a third excuse, claiming it did not disclose the Convention because the pricing provision in Article 2.2 was "expressly cancelled [in September 2006] before the Acquisition Agreement was signed" when a 3M executive drew a line through Article 2.2 and sent it to CEPS.[194] In its August 13 Letter, 3M also offered a fourth excuse: It did not disclose the Convention because Article 2.2 did not "*require* 3M to reduce the price of Flecaine LP by 50% by April 2006 or introduce a generic

---

corporation personally possessed the required scienter.'" (quoting *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005)).

[191]   Keel Dep. Tr. 163-164, 201-203; Sampson Dep. Tr.. 249-252; Jason Haas Dep. Tr. 170-71, 248-49.

[192]   Shah Trial Decl. ¶¶ 29-31.

[193]   PX-538.

[194]   PX-413.

version of the product"[195]—*i.e.*, because the Convention was not binding, 3M chose not to disclose it.  In his deposition, 3M's David Wanlass offered a fifth excuse: the failure to disclose the Convention to Meda was simply "a mistake."[196]

The inconsistencies among these explanations are obvious: 3M's failure to disclose the Convention cannot be both a "mistake" *and* the result of a conscious determination by 3M that the Convention (a) need not be disclosed because 3M unilaterally cancelled it, (b) was not binding, and/or (c) expired on its own terms.

These inconsistencies aside, each of 3M's various explanations is also contradicted by the evidence.  For example, 3M's claim that it did not disclose the Convention because 3M did not believe the Convention was binding on 3M is utterly belied by 3M's own documents and conduct:

- The Convention itself provides that 3M "*agrees* to take all necessary steps to ensure that" a generic of Flecaine LP would be placed on the market, or failing that, the price of Flecaine LP would be placed on the market at the price of the generic drug (*i.e.*, at a 50% discount);[197]

- 3M's Eric Felber, who negotiated the Convention with CEPS, and signed the agreement on behalf of 3M Santé, testified that Article 2.2 was a condition for CEPS agreeing to give 3M a relatively high price for Flecaine LP until April 2006, and further testified that he viewed the Convention as binding on 3M;[198]

- CEPS' Renaudin made clear to 3M that he did not see any ambiguity in the meaning of Article 2.2 "since everything is *contractually* set";[199]

- 3M was aware of the binding nature of the Convention, repeatedly referring to it as an "*agreement*" and a "*contract*" that involved a "*commitment*" by 3M that CEPS would enforce "*with ferocity*";[200]

---

[195]   *Id.*

[196]   Wanlass Dep. Tr. at 86:15-87:15.

[197]   JX-019 (emphasis added); *see also* PX-034; JX-142.

[198]   Felber Dep. Tr. at 89.

[199]   JX-024 (emphasis added).

[200]   Felber Tr. at 18; JX-142 ("An addendum to the agreement is being drafted and should be finalized next Monday.  In addition to the prices, it will include the commitment by 3M to immediately release a generic form of LI on the market, to release a generic form of LP into the

- 3M created a "Flecaine Steering Committee" that spent nearly two years attempting to mitigate the impact of the Convention that 3M now claims was not binding.[201]

Moreover, CEPS' enforcement of Article 2.2 against Meda confirms that the provision was understood by CEPS to be binding.[202]

3M's contention that it unilaterally cancelled the Convention by crossing out Article 2.2 by hand—which occurred in *September* 2006—plainly is no excuse for its failure to disclose the Convention in the Offering Memorandum in *April* 2006, or to omit the Convention from the data room that it compiled in *April* and *May* 2006.  Moreover, Meda experts Messrs. Mariotte and Destal will testify that no reasonable person could have considered 3M's unilateral crossing out of Article 2.2 by hand to have had the effect of cancelling the provisions.[203]  For example, Destal will explain that, under French law, because the 3M's handwritten markings on the document at issue were not initialed by CEPS, they were not agreed to by CEPS or binding on CEPS.[204] Mariotte will further explain that the CEPS committee—whose approval is necessary for any modifications to pricing agreements—could not have approved this modification in just one week, as 3M claims.[205]  And both experts will explain that CEPS would not have agreed to such a modification without extracting from 3M some benefit for French taxpayers in return.[206]  In

---

market within 3 years and to provide for renegotiating the price of LP if a generic form of LP arrives on the market."); JX-031 at 3M00282920 ("launch desired and expected by Renaudin, in any case it is listed in our agreement"); JX-038 ("Contractual agreement between Government and companies (Convention)"); JX-24; PX-47 (referring to "[y]early contractual agreement (convention)"); Sampson Tr. at 89-91; PX-409 at 30.

[201]  PX-057; *see also* PX-058, PX-059, PX-60, JX-031.

[202]  PX-371 (June 23, 2008 email from Maupas to Dierks regarding Renaudin's intent to enforce Article 2.2 against Meda and stating we know the annex r [which contained Artice 2.2 is binding on Meda as it was binding 3M"); JX-122 (demanding 50% price reduction for Flecaine LP "so that it is equivalent to the [price] of the corresponding generic").

[203]  Mariotte May 21, 2012 Expert Report, pages 17-20; Mariotte October 8, 2012 Decl. ¶¶ 57-61.; Destal Trial Decl. ¶ 21.

[204]  Destal October 5, 2012 Amended Decl. ¶¶ 61-63.

[205]  Mariotte May 21, 2012 Expert Report, pages 19-20.

[206]  Mariotte May 21, 2012 Expert Report, page 20; PX-415 (Destal Amended Declaration) at 32.

response, 3M's French legal expert, Jonathan Schur, offers no opinion that 3M's unilateral handwritten modification of the Convention effectively terminated 3M's obligations under Article 2.2.[207]  Thus, the uncontroverted expert testimony is that 3M did not effectively cancel or amend Article 2.2 prior to consummation of the Acquisition Agreement.  Indeed, given the years that 3M's Flecaine Steering Committee put into attempting—unsuccessfully—to renegotiate Article 2.2, 3M's litigation excuse that it believed that it could cancel Article 2.2 by simply drawing a line through it strains credulity.

In fact, in Ms. Kolsky's November 21, 2006 email to her colleagues on the Flecaine Steering Committee, she celebrates only the Committee's successful effort to "delay review of the case file in order to preserve the price of Flecaine IR & CR until the end of the year 2006," and the fact that "negotiation process" with CEPS over Article 2.2 was now a problem to be borne by the new buyer rather than 3M.[208]  Kolsky does not say a word about any alleged cancellation of Article 2.2 that supposedly occurred over two months earlier.

3M's "it expired" excuse is similarly unavailing.  As Meda's experts Destal and Mariotte explain, Article 2.2 was not going to disappear until it was either complied with or formally changed by CEPS.[209]  And that makes sense: 3M had already extracted the benefit of the Convention with three years of higher prices from April 2003 to April 2006.  It could not dodge the consideration for this benefit—a 50% price cut or a generic version of Flecaine LP—by arguing expiration.  To do so would turn the Convention on its head and disregard the reason that Article 2.2 was included in the Convention in the first place.

In any event, even if 3M genuinely believed that the Convention was not binding on 3M, or that it expired on its own terms on December 31, 2006, or that 3M effectively cancelled Article 2.2 by unilaterally striking it from the Convention, that would not excuse 3M's failure to disclose the Convention and its breach to Meda.  The Convention and its breach were plainly

---

[207]   Schur Dep. Tr. 261-63.

[208]   JX-104.

[209]   Mariotte Trial Decl. ¶ 29; Destal Trial Decl. ¶ 18.

material to the Business and 3M had a duty to disclose it and the breach prior to the acquisition; 3M's intentional failure to do so was fraud.[210]

C. **Meda Reasonably and Justifiably Relied on 3M's Misrepresentations and Omissions**

1. **3M's Misrepresentations and Omissions Related to Matters Peculiarly Within 3M's Knowledge and to Matters That Were the Subject of Express Warranties**

Meda's witnesses will testify that they relied on, among other things, 3M's representations in the OM, the Management Presentation, and 3M's financial model, all of which portrayed to predict stable and consistent cash flows for the Business, with Tambocor CR sales increasing more than enough to offset declines in Tambocor IR, but all of which failed to account for the reduction in the price of Flecaine LP in France required by the Convention.[211] The evidence will also show that Meda relied on Sampson's false representation that 3M had disclosed all documents and information material to the business.[212]

Meda will present ample evidence of justifiable reliance.  In particular, Meda reasonably relied on 3M's omissions, including its failure to disclose the Convention, which was peculiarly within 3M's knowledge. [213]   *See, e.g., Allegheny*, 500 F.3d at 181 (stating that where misrepresentations relate to matters peculiarly within the other party's knowledge, the wronged party may rely on them "without further investigation"). [214]   3M had a duty to disclose the Convention.  *See id.*  In this case, Meda could not have discovered the Convention because CEPS conventions are confidential and CEPS will not disclose their terms to non-parties.  Thus,

---

[210]   *See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 155 (2d Cir. 1995) (a party to a business transaction that possesses superior knowledge of material information has a duty to inform its counterparty of the material information if the first party knows that the counterparty is acting on the basis of mistaken knowledge).

[211]   Lönner Trial Decl. ¶ 31, 54, 55;  Larnholt Trial Decl. ¶¶ 92-96, 100-01.

[212]   Lönner Trial Decl. ¶ 39.

[213]   *Barrett v. Freifeld*, 64 A.D.3d 736, 738 (2d Dep't 2009).

[214]   *See also Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 213 (S.D.N.Y. 2007) (quoting *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

Meda could have learned of the Convention only from 3M, but 3M chose to keep the Convention to itself—at least until after the close of the transaction, at which point, in 3M's view, it became Meda's problem.

Meda's witnesses will further testify that they relied in fact on 3M's representations and warranties in the Acquisition Agreement.[215]   Meda's reliance on these representations and warranties was not only reasonable but also expressly anticipated by the parties.[216]   In fact, the Acquisition Agreement expressly recognized the possibility of a fraud claim arising out of the agreement, and specified fraud as the basis on which to exceed the $100 million cap on damages otherwise imposed.[217]   "A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely.  It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself."[218]   3M had a contractual obligation arising out of these representations and warranties, discussed in Section II, *infra*, to disclose the Convention.   The express representations and warranties of the Acquisition Agreement "in effect represent contractual stipulations that the facts covered by them be treated as information exclusively within [3M's] knowledge."   *See Allegheny*, 500 F.3d at 181-82; *see also DDJ Management, LLC v. Rhone Group LLC*, 15 N.Y.3d 147, 905 N.Y.S.2d 118, 122 (2010).

---

[215]   Lönner Trial Decl. ¶ 62; Larnholt Trial Decl. ¶¶ 79-81, 83, 89-90; Stenqvist Trial Decl. ¶ 49; Dierks Tr. at 145-47, 214-15.

[216]   Acquisition Agreement §§ 3.17, 4.05.

[217]   *Id.* §§ 10.01(c)(iv), 10.03(b).

[218]   *See Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.); *see also Pfizer, Inc. v. Stryker Corp.*, 02 CIV.8613 LAK, 2003 WL 21660339, at *1 (S.D.N.Y. July 15, 2003) ("Where, as here, a party warrants and represents a present existing fact, there simply is no reason why it should not have a remedy in contract for breach of the warranty and a remedy in tort for deliberate, fraudulent misrepresentation, assuming the facts otherwise justify such relief."); *First Bank*, 690 N.Y.S.2d at 21 ("[A] fraud claim can be based on a breach of contractual warranties . . . .").

2.      **Contractual Disclaimers Do Not Preclude Meda From Reliance on 3M's Misrepresentations and Omissions**

The Acquisition Agreement's disclaimer of reliance plainly does not apply to 3M's misrepresentations in the Acquisition Agreement itself.  As the New Your Court of Appeals explained in *DDJ Management, LLC v. Rhone Group LLC*,

> Where … a plaintiff has taken reasonable steps to protect itself against deception, it should not be denied recovery merely because hindsight suggests that it might have been possible to detect the fraud when it occurred. In particular, where a plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry.

15 N.Y.3d 147 (2010).

The disclaimer in the Acquisition Agreement also does not bar Meda's reliance on 3M's extra-contractual misrepresentations and omissions.  Any argument by 3M that Meda's reliance on these representations and omissions is barred by boilerplate disclaimers in the Acquisition Agreement is misplaced.

Under New York law, a contractual disclaimer of reliance on a seller's representations does not preclude the purchaser from claiming reliance on any misrepresentations by the seller where the misrepresented facts are peculiarly within the seller's knowledge.  *See, e.g., Dimon Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999).  Furthermore, a disclaimer is generally enforceable only if it "tracks the substance of the alleged misrepresentation."  *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 330 (2d Cir. 2002).  As explained in detail in Meda's Opposition to Summary Judgment (at 21-23), the disclaimers at issue here are too general to bar Meda's reliance with respect to the undisclosed Convention.  Moreover, 3M has admitted that it did not disclose the Convention to Meda;[219] Meda could not obtain the Convention from CEPS independently;[220] and, accordingly, the Convention was within 3M's "peculiar knowledge."[221]

---

[219]   Wanlass Dep. Tr. 31:11-33:18, 86:15-87:15; Sauer Dep. Tr. 266:16-267:19.

[220]   Schur Dep. Tr. at 118-19.

3M argues that the Court should excuse its fraud because:  (1) Meda is a "sophisticated, multi-national corporation that, prior to the acquisition, had done substantial business in the pharmaceutical market in France"[222]; (2) 3M did not refuse to provide the Convention to Meda (because Meda did not ask for a Convention it did not know existed)[223]; and (3) Meda did not negotiate for fuller information or more complete warranties.  This argument has no basis in law (and certainly none in equity).  The law is clear that the peculiar knowledge exception applies even to complicated transactions between sophisticated parties.[224]  Moreover, for purposes of applying the peculiar knowledge exception, the question is not whether "the facts allegedly misrepresented *literally* were within the exclusive knowledge of the defendant."  The exception also applies "where the truth theoretically might have been discovered, though only with

---

[221]   *See also Steinhardt Group. v. Citicorp*, 272 A.D.2d 255, 257 (1st Dep't 2000) ("A purchaser may not be precluded from claiming reliance on misrepresentations of facts peculiarly within the seller's knowledge, notwithstanding the execution of a specific disclaimer."); *see also Yurish*, 507 N.Y.S.2d at 235 (a defendant accused of fraud "may not invoke even specific disclaimer clauses in order to preclude evidence of . . . misrepresentations 'if the facts allegedly misrepresented are peculiarly within the [defendant's] knowledge'" (quoting *Hi-Tor Industrial Park, Inc. v. Chemical Bank, ,* 494 N.Y.S.2d 751, 725 (App. Div. 2d Dep't 1985)); *DIMON* 48 F. Supp. 2d at 368; *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir. 1997) ("When matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth") (internal quotation marks omitted) (quoting *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980)); *MBIA Ins. Corp. v. Merrill Lynch*, 916 N.Y.S.2d 54, 55 (App. Div. 1st Dep't 2011) (where a defendant has "exclusive" knowledge of facts relevant to the representation, a disclaimer will not be enforced).

[222]   Defs. 56.1 ¶¶ 4-6.

[223]   Defs. 56.1 ¶¶ 23-34.

[224]   *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 181 (S.D.N.Y. 2009) (sophisticated plaintiffs could reasonably rely on representations concerning credit ratings); *Steinhardt Group.* 708 N.Y.S.2d at 93 (applying peculiar knowledge exception to fraud claim brought by sophisticated plaintiff); *see also JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 410 (S.D.N.Y. 2004); *4Connections LLC v. Optical Commc'n Group., Inc.*, 618 F. Supp. 2d 178, 185 (E.D.N.Y. 2009) ("Even sophisticated businessmen . . . may justifiably rely on a representation unless the information it has access to would have alerted them to the untruthfulness of the representations."); *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154, 17 (2010) (sustaining fraud claim asserted by sophisticated participants in $40 million loan transaction).

extraordinary effort or great difficulty."[225]  3M's own expert admits that, prior to execution of the Acquisition Agreement, Meda could not have obtained the Convention or its terms from any source other than 3M.[226]

### D.      Meda Suffered Damages as a Result of 3M's Fraudulent Conduct

Meda's damages expert, Dr. Jonathan Neuberger, will testify at trial that Meda suffered substantial damages, over $200 million, as a result of 3M's material misrepresentations and omissions.   Fraud damages for the sale of a business are governed by New York law and represent the difference between (a) the actual purchase price of the business and (b) its true value as of the date of the sale, plus interest.[227]  *See, e.g., Allegheny*, 500 F.3d at 183.[228] Furthermore, the amount of damages is generally measured as of the date of the sale.  *See id*. Under New York law, Meda should be awarded damages equal to the amount that the purchase price of the Business exceeded its actual value on the date of purchase as a result of 3M's misrepresentations and omissions.  *See id*.

## II.     3M BREACHED THE ACQUISITION AGREEMENT

3M's fraudulent misrepresentations and omissions breached express representations and warranties in the Acquisition Agreement.  These acts give rise to a separate claim for breaches of contract, in addition to Meda's fraudulent inducement claim.  A fraudulent inducement claim is

---

[225]    *DIMON*, 48 F. Supp. 2d at 368;  *see also Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir. 1997) ("'When matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth.'") (quoting *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980)); *MBIA Ins. Corp. v. Merrill Lynch*, 81 A.D.3d 419, 419 (1st Dep't 2011) (where a defendant has "exclusive" knowledge of facts relevant to the representation, a disclaimer will not be enforced).

[226]    Schur Dep. Tr. at 118-19; Felber Dep. Tr. at 98; PX-394 at 14 ("Although the current price of a reimbursed pharmaceutical is published in the official gazette, all other terms included in all conventions with CEPS are confidential, as they are private agreements between the pharmaceutical company and CEPS."); Dierks Tr. at 81.

[227]    Neuberger Trial Decl. ¶ 18.

[228]    *See Liberty Mut. Ins. Co. v. Fast Lane Car Service, Inc.*, 681 F. Supp. 2d 340, 350 (E.D.N.Y. 2010) ("Under New York law, where claims involve a breach of contract or misrepresentation, the plaintiff is entitled to 9% per annum prejudgment interest.")

not rendered redundant by the fact that the misrepresentations on which the fraud claim is based also breach representations and warranties set out in the contract. *See, e.g., Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986); *Sabo v. Delman*, 3 N.Y.2d 155, 161-62 (1957); *First Bank of Ams. v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 21 (1st Dep't 1999); *Stewart v. Jackson & Nash*, 976 F.2d 86, 88-89 (2d Cir. 1992). The representations and warranties at issue in the Acquisition Agreement are not promises to perform but statements of present fact and therefore give rise to a separately maintainable claims for breach of contract. *See, e.g., First Bank*, 690 N.Y.S. 2d at 21.

The elements for a breach of contract claim under New York law are well known.[229] Here, the Court need resolve only two issues for Meda's breach of contract claim: (1) whether 3M breached the Acquisition Agreement; and (2) if so, the extent to which Meda was damaged by the breach.

Sections 3.07, 3.12, and 3.15 of the Acquisition Agreement required 3M to disclose the Convention, its breach in April 2006, and the effect that 3M knew the Convention and breach would have on the price of Flecaine LP in France. To the extent there is any ambiguity in these provisions[230]—and there is none—their drafting history demonstrates that Meda specifically negotiated for representations relating to all governmental registrations required to sell products,

---

[229] The elements are: (1) an agreement, (2) adequate performance of the agreement by the plaintiff, (3) breach by the defendant, and (4) damages to the plaintiff as a result of the breach. *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). The parties have stipulated that Acquisition Agreement an enforceable agreement, and 3M does not dispute that Meda performed its obligations thereunder. Stipulation ¶¶ 27, 61.

[230] Ambiguous language is that which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement, and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). In interpreting such language, courts look at the surrounding circumstances, for "[t]he text [of a contract] should always be read in its context. Indeed, text and context necessarily merge to some extent." *See International Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 87 n.4 (2d Cir. 2002) (quoting *United States v. Lennox metal Mfg. Co.*, 225 F.2d 302, 311 (2d Cir. 1955)).

including specific language covering "*all pricing and reimbursement approvals*."[231] Accordingly, by failing to disclose the Convention and its breach, 3M breached its representations and warranties under the Acquisition Agreement.

### A.  3M Breached Section 3.07

In § 3.07, 3M represented to Meda that "[s]ince December 31, 2004, [3M] has complied in all material respects with *all applicable regulatory requirements* … concerning the marketing, promotion and distribution of medicinal products in the Territory…." This representation was a lie. 3M's French law expert admits that the Convention was a "regulatory decision."[232] And, at the time 3M made the § 3.07 representation, it had been knowingly in violation of the Convention since April 2006. As interpreted by CEPS itself, Article 2 of the Convention required 3M, by April 2006, to have introduced a generic form of Tambocor CR onto the French market, or alternatively, to reduce the price of Tambocor CR to that of a generic (a 50% price cut).[233] There is no dispute that 3M did neither. 3M's assertion that the Convention is not a "regulatory requirement" is baseless. CEPS, which is a regulatory agency under any definition of the term, views its pricing agreements as binding,[234] and noncompliance with a Convention can result in punitive price reductions,[235] which directly affects marketing, promotion and distribution of the company's medical products. Conventions are plainly covered by § 3.07, and 3M breached the Acquisition Agreement by making a false representation in § 3.07 by failing to disclose the Convention and its April 2006 breach.

### B.  3M Breached Section 3.12

Under Section 3.12, 3M represented that it had "made available to [Meda] true and complete copies of all material Assumed Contracts," and that 3M "is not in any material respect

---

[231]  Larnholt Trial Decl. ¶¶ 86-87.

[232]  JX-129 at 6.

[233]  PX-370.

[234]  *See* JX-024, JX-031; JX-140, JX-141.

[235]  Mariotte Trial Decl. ¶ 26.

in violation or breach of or default under each such Material Contract."[236]  This representation

was another lie.  Section 3.12 required 3M to disclose *all* material contracts that Meda would be

assuming in the acquisition, not just a subset of these documents listed on the Seller Disclosure

Schedule, as 3M argues.[237]  Interpreting this provision in a manner other than Meda interpreted it

would have permitted 3M to hide contracts imposing material liabilities on the Business by not

including them on the Seller Disclosure Schedule.  This result plainly was not intended by the

parties.[238]

      3M argues that the Convention was not a contract, but the Convention's negotiating

history and Mr. Felber's testimony flatly contradicts that argument.[239]  Meda's French law expert

Destal confirms that the Convention is both a regulatory decision, in that CEPS can implement it

unilaterally, and a negotiated contract.[240]  As a result, 3M's failure to disclose the Convention

breached Section 3.12 in addition to Section 3.07.

### C.    <ins>3M Breached Section 3.15</ins>

      In § 3.15(a) of the Acquisition Agreement, 3M represented that it had disclosed all

Regulatory Filings in the Seller Disclosure Schedule.  3M also represented that it had provided

Meda with copies of all such filings, was in compliance with the filings, and was not aware of

any "possible or potential" Regulatory Filing that could be renewed on less advantageous

---

[236]   Acquisition Agreement § 3.12(b).

[237]   Larnholt Trial Decl. ¶¶ 79, 80, 83, 89, 90; *see also* PX-403 (Shah Expert Report) at 19 ("At some point, the buyer, despite every effort it might make, will still realize it cannot know everything about the business it is buying, especially when compared to the information the seller has about its business.  This is precisely the reason representations and warranties are used in acquisition agreements."). Any argument by 3M that Meda did not "assume" the Convention when it acquired the Business is incorrect.  CEPS enforced the Convention against Meda in 2008.

[238]   3M also breached § 3.12(b), in which 3M represented that it was not in violation or default of any material contract, because it failed to introduce a generic version of Tambocor CR into the market, or reduce the price of Tambocor CR to the price of a generic, by April 2006 as required by the Convention.

[239]   Felber Dep. Transr. at 17:3-7.

[240]   Destal Trial Decl. ¶ 17.

terms.[241]  "Regulatory Filings" is defined broadly, and includes "Marketing Authorizations," as well as all study data and correspondence between 3M and any health authority relating to any Marketing Authorization.[242]  The evidence will show that the parties also chose to define "Marketing Authorizations" broadly to include "marketing authorizations, registrations, permits and other licenses… that permit the clinical development, manufacture, use or sale of the Product… and any supplements or variations thereto, ***including all pricing and reimbursement approvals.***"[243]  Like 3M's representations in Sections 3.07 and 3.12, its representation in 3.15 was also a lie.

In an effort to account for the fact that, in Europe, marketing authorizations have two parts—a medical approval, and a pricing and reimbursement approval—Meda's Anders Larnholt specifically added the language "*all pricing and reimbursement approvals*" to the definition of "Marketing Authorizations" to ensure that 3M would be obligated to disclose the types of pricing agreements included in the Convention.[244]  Moreover, 3M Santé's Helene Kolsky, a member of the Flecaine Steering Committee, was specifically instructed that "the elements that concern the price and reimbursement … for Flecaine" should be included in the data room.[245]  Thus, there can be no legitimate dispute that the parties understood the types of pricing agreements set forth in the Convention to be covered by Section 3.15.  By failing to disclose the Convention to Meda, 3M breached the Acquisition Agreement.

By its actions, 3M also breached the representations contained in § 3.15(b).  Section

---

[241]   Acquisition Agreement §§ 3.15(b), (d).

[242]   *Id.* Article I.

[243]   The phrase "all pricing and reimbursement approvals" was not originally included in the first draft of "Marketing Authorizations" but was inserted by Meda when they sent back the first draft with comments.  *Compare* PX-235 at MEDA00026891 *with* JX-089 at MEDA00010730.

[244]   Larnholt Trial Decl. ¶¶ 86-87; JX-089.  Absent the Convention, Tambocor CR would not have been marketed, used or sold in France.  *See* JX-128 at 9 ("However, as a practical matter, in the vast majority of cases, the only feasible way to create a market for a drug in France is to obtain a reimbursement price—which requires a Marketing Authorization from AFSSaPS and a pricing agreement from CEPS."); Sampson Dep. Tr. at 73.

[245]   *Id.*

3.15(b) represents that 3M was in compliance with "all Regulatory Filings and Laws applicable to the Business's products." "Laws" is defined as "any law, statute, ordinance, regulation, rule, code or other requirement or rule enacted or promulgated by any Governmental Authority, including any Governmental Order." "Governmental Authority" is defined as "any national. . . authority . . . or any regulatory agency… or other subdivision [thereof]." "Governmental Order" includes "any order… stipulation, determination or award…" By failing to introduce a generic of Tambocor CR or reduce the price by 50% in April 2006, 3M was in violation of the Convention. The Convention was, at a minimum, a stipulation between 3M and CEPS. And at a minimum, CEPS was a subdivision of a national authority regulatory agency of the French Government. Given that 3M had knowingly breached the Convention in April 2006, 3M was in breach of § 3.15(b) representation that it was in compliance with "Regulatory Filings and Laws" as soon as it was made.

### D.   Meda Is Entitled To Attorneys' Fees

Pursuant to Section 10.01(a) of the Acquisition Agreement, Meda is entitled to recover its "reasonable attorneys' fees and expenses" because its claims "arise out of any breach by Seller of any of Seller's representations and warranties."[246]

### CONCLUSION

For the foregoing reasons, the Court should issue its verdict and judgment in favor of Meda and against 3M as follows: (i) declaring that 3M fraudulently induced Meda to enter into the Acquisition Agreement; (ii) declaring that 3M breached sections 3.07, 3.12 and 3.15 of the

---

[246]   As discussed in Meda's Opposition to Summary Judgment (at 16-17), its breach of good faith and fair dealing claim is not duplicative of its breach of contract claims. A party may "breach [] its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations." *Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.*, 873 F. Supp. 808, 815 (S.D.N.Y. 1994). That duty is breached, for example, "when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under their agreement," *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 767 (S.D.N.Y. 1990). In Meda's view, 3M clearly breached its obligations under the Acquisition Agreement. In the event this Court finds that, as a technical matter, 3M did not breach its contractual obligations, 3M clearly failed to abide by its duty of good faith and fair dealing.

Acquisition Agreement; (iii) declaring that 3M breached the covenant of good faith and fair dealing implied in the Acquisition Agreement; (iv) awarding Meda damages in the amount of $325 million, which represents the amount that Meda overpaid for the Business as a result of 3M's misconduct, plus prejudgment interest; and (v) awarding the attorneys' fees, expert fees, and other costs incurred by Meda in this action.

DATED: December 16, 2012
   New York, New York

             QUINN EMANUEL URQUHART &
             SULLIVAN, LLP

          By:  /s/ Peter J. Armenio
             Peter J. Armenio
             Michael B. Carlinsky
             Deborah K. Brown
             Nicholas J. Calamari
             Stephen A. Broome
             Christopher J. McNamara
             51 Madison Avenue, 22nd Floor
             New York, New York  10010
             (212) 849-7000

             *Attorneys for Plaintiff Meda AB*