**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
| | |
|---|---|
| **MEDA AB,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | : |
| **3M COMPANY, 3M INNOVATIVE** | : |
| **PROPERTIES COMPANY, and RIKER** | : |
| **LABORATORIES, INC.,** | : |
| | : |
| **Defendants.** | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

No. 11 Civ. 0412 (AJN)

---

# DEFENDANTS' POST-TRIAL FACT MEMORANDUM
# WITH CITATIONS TO RECORD EVIDENCE

---

BICKEL & BREWER
William A. Brewer III
James S. Renard
Michael J. Collins
Alexander Widell
Jeremy D. Camp
767 Fifth Avenue, 50th Floor
New York, New York 10153
Telephone:  (212) 498-1400
Facsimile:  (212) 489-2384
adw@bickelbrewer.com

DORSEY & WHITNEY LLP
Theresa M. Bevilacqua
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota  55402
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868
bevilacqua.theresa@dorsey.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

I.  **MEDA HAS NOT CARRIED ITS BURDEN OF PROVING ITS CLAIM FOR FRAUD BY CLEAR AND CONVINCING EVIDENCE ............... 1**

    A.  Meda Has Not Demonstrated By Clear And Convincing Evidence Any Actionable Misrepresentations Or Omissions Of Material Fact By 3M .................. 1

        1.  3M made no actionable extra-contractual misrepresentations of material fact. ........................................................................................... 1

            a.  Pursuant to Sections 3.17 and 4.05 of the Acquisition Agreement, Meda disclaimed any actionable extra-contractual representations or warranties ........................................ 1

            b.  The Offering Memorandum of April 2006 contained no misrepresentations of material fact. ................................................. 2

            c.  The Management Presentation of June 26, 2006, contained no misrepresentations of material fact. ........................................... 3

            d.  John Sampson made no misrepresentations of material fact during the management presentation on June 26, 2006. .................. 4

        2.  3M made no actionable misrepresentations or omissions of material fact in connection with its contractual warranties to Meda. .......... 4

            a.  3M was not required to disclose the CEPS Conventions. ................ 4

            b.  3M's representations in Section 3.07 of the Acquisition Agreement were not false. ............................................................. 5

            c.  3M's representations in Section 3.12 of the Acquisition Agreement were not false, and 3M did not fail to disclose anything that it was obligated to disclose. ....................................... 9

            d.  3M's representations in Section 3.15 of the Acquisition Agreement were not false, and 3M did not omit anything that it was obligated to disclose. .................................................. 10

        3.  3M did not omit to provide any information it was obligated to provide. ................................................................................................. 12

            a.  3M had no contractual duty to disclose any CEPS Conventions and breached no contractual disclosure obligation. ....................................................................................... 12

            b.  Meda and 3M negotiated the subject transaction at arm's-length, and were not in a fiduciary or other special relationship from which any extraordinary common law duty of disclosure arose. ............................................................. 12

i

   c.  Meda has failed to establish the applicability of the "exclusive knowledge" exception. .................................................12

B. Meda Has Not Established By Clear And Convincing Evidence That 3M Made Any Alleged Misrepresentation Or Omission With The Requisite Scienter. .........................................................................................20

  1.  3M was not seeking to unload an unprofitable business. ..........................20

  2.  At the time of the parties' execution of the Acquisition Agreement on November 8, 2006, and subsequent closing on January 2, 2007, no employee of 3M believed that Article 2.2 was a binding obligation or was otherwise in effect. .......................................................21

  3.  3M did not delay negotiations with CEPS in 2006, nor did it portray a false picture of 3M's pharmaceutical business to prospective purchasers. .............................................................................25

  4.  3M endeavored to be open and transparent during the due diligence process. ....................................................................................................26

C. Meda Has Not Demonstrated By Clear And Convincing Evidence That It Reasonably Relied On Any Alleged Misrepresentations Or Omissions By 3M. .........................................................................................................27

  1.  Meda expressly disclaimed reliance on any extra-contractual misrepresentations. ...............................................................................27

  2.  Meda has failed to establish the applicability of the "peculiar knowledge" exception to the enforceability of disclaimers of reliance. .............................................................................................27

  3.  In any event, Meda could not have reasonably relied upon the projections contained in the Offering Memorandum. ...............................27

  4.  In addition, Meda could not have reasonably relied upon the projections contained in the Management Presentation. ..........................28

  5.  Meda could not have reasonably relied on the statement allegedly made by John Sampson on June 26, 2006. .................................................28

  6.  Knowing of the absence in the data room of any convention or reimbursement price agreement regarding any product in any country, and the absence of any listing of such documents on the relevant schedules to the Acquisition Agreement, Meda elected not to:  (1) request such conventions and agreements; (2) make any inquiry regarding the existence of those documents or the contents thereof; or (3) ask any general or specific questions relating to product pricing. ...................................................................................29

  7.  Meda had pre-closing knowledge of the information that it alleges was misrepresented or not disclosed. ....................................................30

D.     Meda Has Not Demonstrated That It Sustained Any Damages Caused By Its Alleged Reliance On 3M's Alleged Misrepresentations And Omissions.........31

     1.     Meda's request for damages is based upon unreliable information, subjective speculation, incorrect factual presumptions, and a flawed methodology...................................................................................31

     2.     Meda did not suffer any injury in connection with its French subsidiary's acquisition of 3M Sante's French Business and Assets. 33

     3.     In any event, Article 2.2 did not lead to or cause any price reduction in Tambocor CR, and Meda sustained no injury. ......................34

     4.     A knowledgeable buyer would have assigned no independent risk to Article 2.2, as is evident from the actual conduct of both 3M and Meda. 35

II.     **MEDA HAS NOT CARRIED ITS BURDEN OF PROVING ITS CLAIM FOR BREACH OF CONTRACT ..............................................37**

     A.     3M Did Not Breach Any Of The Representations Or Warranties Of The Acquisition Agreement On Which Meda Sues.......................................37

     B.     In Any Event, The Acquisition Agreement Did Not Govern The Transfer And Sale Of The French Business And Assets.......................................37

     C.     The Alleged Breaches Of Warranties Did Not Cause Meda Any Damages For Which It Is Entitled To Indemnification. ........................................38

Defendants 3M Company, 3M Innovative Properties Company, and Riker Laboratories, Inc. (collectively, "3M" or "Defendants") hereby submit their Post-Trial Fact Memorandum with Citations to Record Evidence, as follows:

## I.

### MEDA HAS NOT CARRIED ITS BURDEN OF PROVING ITS CLAIM FOR FRAUD BY CLEAR AND CONVINCING EVIDENCE

**A.    Meda Has Not Demonstrated By Clear And Convincing Evidence Any Actionable Misrepresentations Or Omissions Of Material Fact By 3M.**

According to Meda's current pleading, its fraud claim is based on three categories of alleged conduct: (1) alleged extra-contractual misrepresentations made in the Offering Memorandum delivered to Meda in April 2006, in a written Management Presentation given to Meda on June 26, 2006, and in an oral statement by Mr. John Sampson during that management presentation meeting; (2) alleged misrepresentations and omissions arising out of 3M's purported breach of contractual warranties – specifically, Sections 3.07, 3.12, and 3.15 of the Acquisition Agreement dated November 8, 2006 (the "Acquisition Agreement"); and (3) alleged failures to disclose Article 2.2 of the convention dated March 10, 2003, and the striking of Article 2.2 from the amendment dated September 15, 2006, to the convention of November 17, 2003.  *See* Meda's Amended Complaint at ¶¶ 10-13, 15-16, 39-40, 42-44, 48-49, 57-62, 67-84, and 95-96.  Each of those three categories is addressed below.

**1.    3M made no actionable extra-contractual misrepresentations of material fact.**

**a.    Pursuant to Sections 3.17 and 4.05 of the Acquisition Agreement, Meda disclaimed any actionable extra-contractual representations or warranties**

- *See* DX-281 (Acquisition Agreement) at § 3.17 ("[N]either the Seller nor any other Person has made any representation or warranty, express or implied, as to . . . the accuracy or completeness of any information regarding the Business that the Seller furnished or made available to Purchaser and its representatives . . .."); *id.* at § 4.05(a)

1

("Purchaser understands that Seller has not made any other representations and warranties regarding any materials or information provided by Seller or any of its Affiliates or any of their representatives."); *id.* at § 4.05(b) ("Purchaser acknowledges that, except to the extent expressly set forth in Article III of this Agreement or in any Ancillary Agreement, (i) no representation or warranty has been made by or on behalf of Seller, any of its Affiliates or any of their respective employees, agents or representatives with respect to any information, documents or material provided or made available by Seller, any of its Affiliates or any of their respective employees, agents or representatives to Purchaser or any of its employees, agents or representatives relating to the Business, Seller, the Subsidiaries of Seller, the respective businesses of Seller and its Subsidiaries or the transactions contemplated by this Agreement and the Ancillary Agreements . . .").

- *See* DX-281 (Acquisition Agreement) at § 3.17 ("[N]either the Seller nor any other Person has made any representation or warranty, express or implied, as to the Business (or the value or future thereof) or the Assets . . ."); *id.* at § 4.05(b) ("Purchaser acknowledges that, except to the extent expressly set forth in Article III of this Agreement or in any Ancillary Agreement, (i) no representation or warranty has been made by or on behalf of Seller, any of its Affiliates or any of their respective employees, agents or representatives with respect to . . . any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials . . .").

        **b.**    **The Offering Memorandum of April 2006 contained no misrepresentations of material fact.**

- The Offering Memorandum accurately stated that the cardiology franchise, including Tambocor IR and CR, provided the business with "strong and consistent cash flows" and that 3M expected the product to continue "moderate growth."

  *See* PX-168 at 29, 45; Trial Tr. at 1279:15-1280:13 (Sampson); Trial Tr. at 868:3-5 (Sampson).

- The financial projections set forth in 3M's Offering Memorandum were non-actionable, forward-looking statements.

  *See* PX-168 (Offering Memorandum) at MEDA00188681 ("The projections presented on the following pages contain certain forward-looking statements that are subject to risks and uncertainties and include information about possible or assumed future results of operations.")

- The projections were intentionally conservative and, in fact, forecasted lower revenues than 3M's internal budgets.

  *See* Wanlass Decl. at ¶ 16 ("In developing the projections to provide to potential buyers, we were intentionally conservative.  In fact, from the start, I was explicitly instructed to be careful not to overstate the future prospects of the business. . . . [T]he goal was to put forward projections that were built as realistic assumptions and attainable.  I believe we achieved that objective."); Wanlass Decl. at ¶ 23; Keel Decl. at ¶¶ 37-38 ("In developing

the projections, we were deliberately conservative. . . . [W]e – primarily me, David Wanlass, and John Sampson, with input from Goldman – developed the forecasts by creating conservative projections based on historical performance, adjusted for any known trends or risks moving forward."); Trial Tr. at 861:7-11 (Sampson); Trial Tr. at 1030:22-1031:7 (Wanlass).

- In the Offering Memorandum, 3M advised potential bidders:  "This memorandum does not purport to contain all of the information that may be required to evaluate such transaction and any recipient hereof should conduct its own independent analysis of 3M Pharma and the data contained or referred to herein . . . Neither 3M nor Goldman, Sachs & Co. expects to update or otherwise revise the memorandum or other materials supplied herewith."

    PX-168 (Offering Memorandum) at MEDA00188607; *see also* Trial Tr. at 1262:6-12 (Sampson); Trial Tr. at 733-34 (Sauer).

    c.    **The Management Presentation of June 26, 2006, contained no misrepresentations of material fact.**

- The Management Presentation accurately described the business and 3M's expectations for the business in the future.

    *See* PX-421 (Management Presentation) at 243, 246; Trial Tr. at 1270:10-1271:14 (Sampson) (testifying that he believed that 3M was correct to assume "European government mandated price reductions [would] result in lower selling prices and sales for Tambocor and Minitran" in 2006 and that cardiology sales would be "generally flat [between 2007-2009] with a modest decline in 2010"); Trial Tr. at 868:3-5 (Sampson).

- The financial projections set forth in the Management Presentation were non-actionable, forward-looking statements.

    *See* PX-421 (Management Presentation) at MEDA00188608 ("Statements about 3M Pharma's expected future business and financial performance, strategies for growth, product development and life cycle management, future performance or results of current or anticipated products are based on certain assumptions and expectations of future events and trends that are subject to risks and uncertainties. . . . Risks Affecting International Operations – International operations also could be affected by . . . actions affecting approval, production, pricing, reimbursement and marketing of products . . . Any of these changes could adversely affect the Business.").

- In the Management Presentation, 3M cautioned Meda:  "3M makes no representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this presentation, and nothing contained herein is, or shall be relied upon as, a promise or representation, whether as to the past or the future.  This presentation does not purport to contain all of the information that may be required to evaluate such transaction and any recipient hereof should conduct its own independent analysis of 3M Pharma and the data contained or referred to herein."

PX-421 (Management Presentation) at MEDA00188345; *see also* Trial Tr. at 1269:3-17 (Sampson).

### d. <u>John Sampson made no misrepresentations of material fact during the management presentation on June 26, 2006.</u>

- John Sampson did not make any statements at the Management Presentation regarding the pricing of Flecaine LP.

  *See* Sampson Decl. at ¶¶ 27-28; Keel Decl. at ¶ 56; Wanlass Decl. at ¶ 19.

- John Sampson's alleged statement to Anders Lonner at the Management Presentation was, at best, a non-actionable opinion expressed at the outset of Meda's due diligence and months prior to the parties' execution of the Acquisition Agreement.

  *See* Lonner Decl. at ¶ 39; Dierks Decl. at ¶ 41; Keel Decl. at ¶ 56 ("I note that such an exchange [as allegedly took place between Lonner and Sampson] would have been nonsensical at such an early stage of the process, because the vast majority of due diligence was to take place after the Management Presentation.  One would not logically ask whether there was '<u>any other information</u> that Meda would want to review,' when most of Meda's due diligence review had yet to be undertaken."); Sampson Decl. at ¶ 28 ("I have no recollection of Mr. Lonner, or any other representative of Meda, asking me such a question or anything remotely similar to it.  However, I am certain that if Mr. Lonner had asked that question, I would have told him to thoroughly review the materials provided and be sure to ask for anything Meda wanted to see.").

### 2. <u>3M made no actionable misrepresentations or omissions of material fact in connection with its contractual warranties to Meda.</u>

### a. <u>3M was not required to disclose the CEPS Conventions.</u>

- Section 5.02(b) of the Acquisition Agreement provides:  "Notwithstanding anything contained in this or any other agreement between Purchaser and Seller executed on or prior to the date hereof, Seller shall not have any obligation to make available to Purchaser or its representatives, or provide Purchaser or its representatives with . . . (ii) any information if making such information available would . . . (y) contravene any applicable Law or binding agreement (including any confidentiality agreement to which Seller or any of its Affiliates is a party) (it being understood that Seller shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to Purchaser to occur without so losing privilege or contravening such Law, duty or agreement); <u>provided</u>, that Seller, upon the reasonable request of Purchaser, will provide Purchaser with a complete and accurate factual description of the type of such information withheld from Purchaser."  DX-281 (Acquisition Agreement) at 37-38.

- The Convention dated November 17, 2003, contained and was subject to a "confidentiality" provision, while providing for amendment of the Convention.

*See* PX-041A (Convention dated November 17, 2003) at Article 4.1 ("This agreement is established for a term of 4 years from January 1, 2003 to December 31, 2006.  The parties reciprocally undertake to respect its confidentiality."); *id.* at Article 4.2 ("The procedures for its modification upon the initiative of either party . . . are established in compliance with the Social Security Code and the framework agreement."); *see also* Trial Tr. at 1342 (Schur) ("The November 2003 convention integrated and thus abrogated the prior March 2003 convention and that November 2003 convention includes [a] confidentiality clause.").

- Meda fully understood before the transaction that drug companies may not lawfully disclose their CEPS conventions to competitors.

   *See* Trial Tr. at 194 (Dierks) ("Q:  Does Meda share with any of its competitors the conventions that it has entered into with CEPS?  A:  [I]f I would do this, I would go directly to jail because it's not allowed to share any kind of information with regard to pricing in Europe.  I don't know how it is in the U.S. but in Europe it's not allowed.").

### b.   3M's representations in Section 3.07 of the Acquisition Agreement were not false.

- Section 3.07 of the Acquisition Agreement provides, in relevant part:  "To Seller's Knowledge, the Business is not in violation of any Law, including any Environmental Law.  Since December 31, 2004, Seller has complied in all material respects with all applicable regulatory requirements and all industry guidance concerning the marketing, promotion and distribution of medicinal products in the Territory, including the European Code of Practice for the Promotion of Medicines and similar guidance in each country in the Territory."  DX-281 (Acquisition Agreement) at 26-27.

- The phrase "Seller's Knowledge" is defined in the Acquisition Agreement to mean the "actual knowledge of any of the individuals without inquiry listed in Section 1.01(e) of the Seller Disclosure Schedule."  The only persons listed in Section 1.01(e) of the Seller Disclosure Statement relevant to this matter are Benoit Traineau, John Sampson, and Ton van't Hullenaar.

   *See* DX-281 (Acquisition Agreement) at 6, § 1.01; DX-348 (Seller Disclosure Schedule) § 1.01(e) (at 3M00171408).

- The business was not in violation of any "Law" to "Seller's Knowledge."

   o  Benoit Traineau, who is one of the individuals listed on the "Seller's Knowledge" list, understood and believed that Article 2.2 was not binding – a belief that was based on his experience and confirmed by his colleagues at 3M Sante.  In fact, all of the evidence underscores the fact that Mr. Traineau and the employees of 3M Sante never believed there existed an obligation to drop the price of Flecaine LP by 50%.

   *See* Traineau Decl. at ¶ 11 ("Accordingly, it was my belief, confirmed by my experience, that CEPS conventions are not binding on the Economic Committee, as it

may call for reductions for the reimbursement price unilaterally – or not – as the circumstances warrant."); Traineau Decl. at ¶ 14 ("In my discussions with representatives of the Economic Committee during 2005 and 2006, although CEPS indicated the obvious intent to seek a price reduction at some point, there was never any statement or suggestion that 3M Santé would have to introduce a generic of Flécaïne LP or reduce the price of Flécaïne LP to generic prices by April 2006."); *see also* Barreau Decl. at ¶ 21 ("[W]e never viewed Article 2.2 of the March 2003 Convention as imposing a self-effectuating mandate or automatic price reduction for Flécaïne LP in 2006."); Trial Tr. at 1108:8-15 (Barreau); Trial Tr. at 1142:23-1143:2 (Barreau); Forey Decl. at ¶ 23.

o John Sampson, another individual listed on the "Seller's Knowledge" list, initially learned of the existence of the March 2003 Convention at a meeting in France in May 2006, but did not understand it to require a 50% price reduction for Flecaine LP (let alone, a past-due obligation to lower the price by 50%).

   *See* Trial Tr. at 838:13-841:25 (Sampson).

o Ton van't Hullenaar, one of the individuals listed on the "Seller's Knowledge" list, testified that he was not aware of the existence of any binding contract with CEPS regarding the pricing of Tambocor CR. Mr. van't Hullenaar was the head of Europe for 3M Pharma. After the transaction, he joined Meda. As of his deposition on March 27, 2012, he was still a Meda employee. Mr. van't Hullenaar attended the same meeting in May 2006 at which Mr. Sampson learned of the existence of a convention.

   *See* van't Hullenaar Dep. at 111:24-112:24.

o The March 2003 Convention was not in effect at the time of the Acquisition Agreement.

   *See* Trial Tr. at 1357-58 (Schur) ("Q:  Can you tell us whether or not the [March] 2003 convention that Meda has spoken about in its cross-examination of you, existed one year later, one year from the day of its execution?  A:  Well, the November, 2003 convention had the effect of replacing or abrogating the prior convention that concerns Flecaine, the March 2003 convention.  Because it included provisions with respect to the price of Flecaine.  Q:  Did the [March] 2003 convention [JX-019A] exist on November 8, 2006? . . . A:  It was of no further effect."); Trial Tr. at 1354-55 (Schur) ("Q:  Approximately how many conventions were there between those two parties [CEPS and 3M Sante] from this March 10, 2003 convention, until the sale of 3M Sante's pharmaceutical assets to Meda France on January 2, 2007?  A:  Counting out loud, there was the March 2003 convention, the November 2003 convention, and then there were conventions in each of 2004, 2005, and 2006.  So I think that makes five. . . . Q:  Did the Article two change come in, come out of [e]ffect; . . . was it modified at all by the subsequent conventions that you saw?  A:  Yeah, it did change . . . Article two was not included in some of the subsequent conventions, and the last one, 2006, it was expressly stricken out.").

o   Article 2.2 was eliminated by the Convention Amendment dated September 15, 2006.

*See* JX-095A (Convention Amendment dated September 15, 2006) (striking Article 2.2 and maintaining the reimbursement price of Flecaine LP at 17.10 Euros); Husson Dep. at 40 ("Q:   Now, this document [the September 15, 2006 Convention Amendment] has two signatures on it, is that correct?   A:   Yes, it is correct.   Q: When this document was sent to Mr. Renaudin by you, did it have Mr. Renaudin's signature on it?   A:   No.   Q:   Was Mr. Renaudin's signature applied to this document after you signed it?   A:   Yes, absolutely."); Traineau Decl. at ¶ 30 ("In or around August 2006, the Economic Committee sent us a draft "avenant" (*i.e.*, a rider) to the Convention that contained the provisions of Article 2.   In light of the changed circumstances, we believed that the provisions of Article 2 of the March 2003 convention was no longer applicable.   Accordingly, on September 8, 2006, we sent back a signed copy of the avenant with Article 2 struck out, along with a letter pointing out and explaining the change.   As reflected by DX-248 and DX-254, Mr. Renaudin then signed the modified avenant on behalf of the Economic Committee on September 15, 2006.   Accordingly, we understood that the Economic Committee likewise believed that Article 2 was no longer a part of the Convention."); Schur Decl. at ¶ 89 ("[U]nder French law, Article 2.2 was eliminated . . . in September 2006 because:   (1) French law does not apply the special formalities required for *actes authentiques* [regarding the initiating of handwritten changes to notarized instruments] to CEPS conventions; (2) there is no requirement in CEPS' internal procedures that such deletions be initialed by the president of CEPS; (3) 3M made it clear to CEPS' president, Mr. Renaudin, both that 3M believed Article 2.2 had become invalid and that 3M had struck it out; and (4) Mr. Renaudin thereafter signed the convention on behalf of CEPS."); Schur Decl. at ¶¶ 90-91 ("CEPS generally sends unsigned drafts to drug companies, and the record here shows that the draft Conventions sent to 3M and Meda by CEPS were not signed . . . Meda itself made handwritten changes to Conventions.").   *See also* JX-115 (Convention dated September 28, 2007, at Annex 3) (by handwriting, Meda added drugs and modified both the prices and the effective dates of many of its other drugs); JX-126 (Convention Amendment dated September 17, 2008) (by handwriting, Meda modified the effective dates of the price changes for Tambocor CR).

o   Under French law, subsequent CEPS conventions abrogate prior conventions.

*See* Trial Tr. at 1356-57 (Schur) ("Q:   Mr. Schur, given the fact that there are conventions [, a] chronology or sequence of conventions with respect to drugs generally, if the Court wanted to determine what the provisions both with respect to the regulatory act setting of prices, but also whatever term and provisions there were between CEPS and the specific pharmaceutical manufacturer at any point in time – and let me pick a hypothetical point in time, November 8, 2006, among the sequence of conventions, which one or ones would you consult in order to answer that question?   A:   You would consult the most recent convention that referred to the pricing for the product . . . [A]ll of the conventions that we've been dealing with specifically relate to the pricing of Flecaine and, as such, the subsequent conventions abrogate the prior conventions.").

7

- Article 2.2 did not set a price or provide a price change formula and, thus, was not a "regulatory requirement."

    o Article 2.2 was not a price change clause.

    *See* Trial Tr. at 1351-52 (Schur) ("[I]t's not a price change clause, because it doesn't say failing that, the price of these drugs will be modified to be equal to . . . an amount or formula . . . [I]t doesn't say when you're applying the test. It doesn't say whether it's at the time of signature of the document, at the time of application, at some later date . . . [I]t's not a formula."); Trial Tr. at 1327-28 (Schur) ("If there was a clause in a convention that provides for a modification of a price, in that case CEPS simply notifies the company and publishes the new price. That's it . . . The only thing CEPS can do is publish that new price. But for that to be the case, there has to be a provision in the convention that says the new price, puts it down in a Euro amount or provides a formula for determining a new price. There also has to be a provision in the convention that says the price will be changed, and that I cannot find in 2.2."); Trial Tr. at 1352 (Schur) ("Q: As I understand what you said about the 50 percent or getting better than 50 percent, if a pharmaceutical company had introduced or had the rights to introduce a generic equivalent of Flecaine LP, do we know whether that would be a 50 or 60 or 70 percent of what the allowed CEPS price would be for? A: No, we do not. We do not know what the price, when it says the price of the generic drug, would be. Q: I think you've testified that it doesn't set forth the specific price or fixed formula, or a formula for fixing the price. In this circumstance where we're talking about placing on the market a drug with a price corresponding to the generic and everything you've said about the generic, could this be effectuated in any way by CEPS? A: No."); Trial Tr. at 1340-41 (Schur) ("CEPS could clearly have written in it, the price will be changed to either the current or the then existing price of a generic if certain circumstances occur or do not occur. But CEPS didn't write it [that way] . . . [H]ad they written it, it [w]ould have had to be implemented in exactly that form. And they didn't want that. They wanted to have a discussion in three years about where the product was, where the market was, and what would be the appropriate price . . . They put down the marker at three years."); Trial Tr. at 1362 (Schur) ("If CEPS had understood that its obligation . . . was to impose a lower price at a future date, they would have put that language down. They know how to do it. They knew how to draft that kind of clause.").

    o Generics were not required to be priced at 50% of the corresponding brand-name drug. *See* PX-417A (CEPS 2005 Activity Report) at 15 ("[T]he Committee [CEPS] decided to set the price reduction at 50% of that of brand-name medicinal products . . . as the level at which the price proposed by generics manufacturers should be accepted without discussion."); Trial Tr. at 1350-51 (Schur) ("A: [A] generic drug can be priced at a price which is higher than would be the price that would be indicated by CEPS' policies concerning quote non-haggling at a given time. Q: If someone introduces a generic and wants to negotiate a price with CEPS, can a pharmaceutical company do that? A: Yes, absolutely. Q: And is the pharmaceutical company, is it a take it or leave it 50 percent or can you get better . . . terms? A: You can get better terms . . . Q: Better terms meaning? A: A higher price . . . You can

get a higher price or a lower percentage reduction from the pre-generic price."); Schur Decl. at ¶ 54 ("There was clearly no hard-and-fast rule requiring that a generic (or a product treated as if it were a generic) be priced with a 50% discount from the pre-generic price of the branded version of the drug.").

     **c.**     <u>**3M's representations in Section 3.12 of the Acquisition Agreement were not false, and 3M did not fail to disclose anything that it was obligated to disclose.**</u>

- Section 3.12(a) provides, in relevant part:  "Section 3.12(a) of the Seller Disclosure Schedule sets forth, as of the date hereof, a complete list of every Assumed Contract referred to in clauses (i) through (xi) of the definition thereof (excluding purchase orders and invoices) that . . . (iii) materially restricts the Business from engaging in any business activity anywhere in the Territory . . . (collectively, the "Material Contracts").  Seller has made available to Purchaser true and complete copies of all material Assumed Contracts."  *See* DX-281 (Acquisition Agreement) at 29.

- Section 3.12(b) provides:  "Each Material Contract is in full force and effect and constitutes a legal, valid and binding agreement of Seller or its Subsidiary, as applicable and is enforceable in accordance with its terms by Seller or its Subsidiary, as applicable against the applicable counterparties . . . and Seller or its Subsidiary, as applicable, is not in any material respect in violation or breach of or default under each such Material Contract. . . ."  *See* DX-281 (Acquisition Agreement) at 29.

- The Acquisition Agreement defines "Assumed Contracts" as the contracts identified in thirteen clauses of the definition of "Assumed Contracts" contained in Section 1.01.  *See* DX-281 (Acquisition Agreement) at 3, § 1.01.

- Those clauses are logically grouped into three categories:  (1) clauses that refer to specific contracts "that are set forth on Section 1.01(a) of the Seller Disclosure Schedule;" (2) clauses that refer to certain "Purchaser Shared Contracts" and "Nonassignable Assets;" and (3) a clause that refers to "other contracts of the type referred to in [the other clauses] entered into . . . from the date hereof to the Closing Date."  *See* DX-281 (Acquisition Agreement) at 3, § 1.01.

- None of 3M Sante's CEPS Conventions was an "Assumed Contract" under the plain language of the Acquisition Agreement because it is not listed on Section 1.01(a) of the Seller Disclosure Schedule, nor was it entered into between the date of the Acquisition Agreement and the closing of the transaction.  *See* DX-348 (Seller Disclosure Schedule) at § 1.01(a).

- The Acquisition Agreement defines "Material Contracts" as those "Assumed Contract[s] referred to in clauses (i) through (xi) of the definition thereof" that also meet one of seven defined materiality standards set forth in Section 3.12(a).  *See* DX-281 (Acquisition Agreement) at § 3.12(a).

9

- Because none of 3M Sante's CEPS Conventions was an "Assumed Contract," it was not a "Material Contract." *See* DX-281 (Acquisition Agreement) at § 3.12(a).

### d. 3M's representations in Section 3.15 of the Acquisition Agreement were not false, and 3M did not omit anything that it was obligated to disclose.

- Section 3.15(a) of the Acquisition Agreement provides:   "All existing material Regulatory Filings held by any Seller are set forth on Section 3.15 of the Seller Disclosure Schedule.  Seller is the sole and exclusive owner of all Regulatory Filings relating to any Product.  Each material Regulatory Filing (i) has been validly issued or acknowledged by the appropriate Governmental Authority and is in full force and effect and (ii) to the extent permitted by applicable Law, is transferable to the Purchaser."  DX-281 (Acquisition Agreement) at 31.

- Section 3.15(b) provides:  "Seller has completed and filed all annual and other reports required by any applicable Health Authority to maintain the Regulatory Filings.  Seller has made available to Purchaser summaries of all Marketing Authorizations for Products along with a copy of the most recent Periodic Safety Update Report for Products that require such a report in the Territory. Seller has provided Purchaser with access to true and complete copies of all Regulatory Filings and all annual and other reports submitted to Health Authorities with respect to the Products and all adverse event reports and product complaints with respect to the Products.  Seller is in compliance in all material respects with all Regulatory Filings and Laws applicable to the Products, including all post-approval monitoring, reporting and other obligations."   DX-281 (Acquisition Agreement) at 31-32.

- Section 3.15(d) provides:  "Seller has not received any written or, to Seller's Knowledge, other notice of proceedings from a Governmental Authority regarding any actual, alleged, possible or potential (i) obligation on the part of Seller to undertake, or to bear all or any portion of the costs of, any product recall of any nature with respect to the Products, (ii) loss of or refusal to renew the Regulatory Filings relating to the Products, (iii) renewal of the Regulatory Filings on terms less advantageous to Seller than the terms of those Regulatory Filings currently in force or (iv) action to enjoin production of any Product." DX-281 (Acquisition Agreement) at 32.

- The Acquisition Agreement defines "Regulatory Filings" as follows:  "'Regulatory Filings' means (i) the Marketing Authorizations, all approval letters dated on or after the date of the regulatory approval letter for any Product, and all study data, materials and information supporting or pertaining to the information in the Marketing Authorizations and related submissions . . . (ii) all Investigational New Drug Applications . . . and (iii) all correspondence between Seller and the Health Authorities relating to any INDs or to any Marketing Authorizations."  DX-281 (Acquisition Agreement) at 7, § 1.01.

- The Acquisition Agreement defines "Marketing Authorizations" as:  "[T]he marketing authorizations, registrations, permits and other licenses (including those now issued or pending) for a Product issued by a Health Authority that permits the clinical

development, manufacture, use or sale of the Product within the Territory, and any supplements or variations thereto, including all pricing and reimbursement approvals." DX-281 (Acquisition Agreement) at 6, § 1.01.

- CEPS is not a "Health Authority."  CEPS is not responsible for "granting licenses and/or approvals permitting the clinical testing, manufacture or sale of [a] Product."  *See* Schur Decl. at ¶ 27; *see also* DX-281 (Acquisition Agreement) at 5, § 1.01 (definition of "Health Authority").

- CEPS' approval is not required to sell a pharmaceutical product in France.  *See* Mariotte Decl. at Exhibit 2 (Mariotte Expert Report) at 3 ("CEPS determines the price for reimbursable drugs . . . [I]t is possible for a pharmaceutical company to sell a prescription drug in France without entering into an agreement with CEPS . . .").

- A Convention is not a Marketing Authorization because it is not a "supplement[] or variation[]" to any "marketing authorizations, registrations, permits [or] other licenses." *See* Schur Decl. at ¶ 95.

- CEPS Conventions are not "Marketing Authorizations" issued by a "Health Authority."

*See* Schur Decl. at ¶ 95 ("[I]n the November 8, 2006 Acquisition Agreement, the definition of 'Marketing Authorization' states that it must be issued by a 'Health Authority.' . . . CEPS is not a 'Health Authority,' so a Convention cannot be considered a 'Marketing Authorization' for purposes of the Acquisition Agreement."); Schur Decl. at ¶ 5 ("[T]he Amended Complaint misdescribes the Convention, which is not [a] . . . 'Marketing Authorization' as defined in the Acquisition Agreement."); Schur Decl. at ¶ 8(a) ("ANSM [formerly AFSSAPS], which has comparable powers as to drugs as the Food & Drug Administration ('FDA') in the United States, grants marketing authorizations for drugs."); Schur Decl. at ¶ 27 ("CEPS does not grant licenses or approvals for clinical testing, manufacture or sale of drugs, and is thus not a 'Health Authority' as defined in the Acquisition Agreement between 3M and Meda dated November 8, 2006.  *See* C.S.S. art. L. 162-17-3, which defines the powers of CEPS, and which does not give CEPS the power to grant such licenses or approvals.  Such licenses or approvals are granted by ANSM."); Trial Tr. at 540-41 (Destal) ("AFSSAPS [now ANSM] is the only authority which can give marketing authorizations."); Mariotte Decl. at Exhibit 2 (Mariotte Expert Report) at 4 ("ANSM [formerly AFSSAPS] . . . rules on requests made by pharmaceutical companies for 'marketing' or 'medical' authorizations."); Mariotte Decl. at Exhibit 2 (Mariotte Expert Report) at 8 ("The Marketing Authorization [in the period 2003-2006] was delivered by either the European Medicine Agency (EMA) or the CEO of AFSSAPS, after consultation with the Marketing Authorization Committee."); Mariotte Decl. at Exhibit 2 (Mariotte Expert Report) at 14 (A pharmaceutical company files "a note of economic interest" with CEPS only "[a]fter a pharmaceutical company obtains a marketing authorization for a drug" from the ANSM/AFSSAPS.); Trial Tr. at 247-48, 250 (Dierks) ("Q:  [W]hen do you believe the first convention was that was executed between Meda France and CEPS relating to Flecaine LP?  A:  Normally that can only be after we had acquired the product and have – the marketing authorization has been transferred to us . . . After only that, you

are in the possession, you as the so-called marketing authorization holder, and then it's you who has to do the legal things with CEPS and all.").

- The French "Marketing Authorizations" transferred to Meda France were the registered licenses listed on Schedule 5.2(b).5 of the French Acquisition Agreement. *See* DX-330 (French Agreement) at Schedule 5.2(b).5 (at MEDA-00071732).

- Schedule 3.15 to the Acquisition Agreement, which lists "Regulatory Filings" held by 3M, does not list any CEPS conventions or any pricing information for any drug in any country; rather, it lists particular licenses and marketing authorizations held by 3M with respect to each product. *See* DX-348 (Seller Disclosure Schedule) at Schedule 3.15 (at 3M00171463).

- 3M complied with Section 3.15 because Article 2.2 had been eliminated prior to the execution of the Acquisition Agreement. *See* JX-095A (September 2006 Amendment).

**3. <u>3M did not omit to provide any information it was obligated to provide.</u>**

    **a. <u>3M had no contractual duty to disclose any CEPS Conventions and breached no contractual disclosure obligation.</u>**

*See supra* § I.A.2.

    **b. <u>Meda and 3M negotiated the subject transaction at arm's-length, and were not in a fiduciary or other special relationship from which any extraordinary common law duty of disclosure arose.</u>**

- The sale of 3M's European pharmaceutical business to Meda was an arm's-length transaction resulting from an auction process involving a number of potential third-party purchasers.

  *See* Keel Decl. at ¶ 26; Lonner Decl. at ¶ 30; *id.* at ¶ 61; Trial Tr. at 1088:5-11 (Keel) ("This was an auction. This was a global open auction initiated by 3M . . . We specifically hired Goldman Sachs to be the auctioneer because they have the best contacts globally. They contacted over a hundred parties. Over 60 offering memoranda were sent out. I received bids from two dozen groups."); Trial Tr. at 425:25-426:3, 426:15-19 (Haas); JX-070 (Meda's preliminary offer letter); JX-089 (Meda's firm offer letter); PX-303.

    **c. <u>Meda has failed to establish the applicability of the "exclusive knowledge" exception.</u>**

        **(1) <u>The information that Meda claims it did not have was disclosed by 3M.</u>**

- Meda executives learned about Article 2.2 during a meeting on November 28, 2006.

*See* Traineau Decl. at ¶¶ 36-43 ("I informed Messrs. Lonner and Dierks at that meeting about the back-and-forth communications with the Economic Committee since 2003 regarding the reimbursement pricing of Flécaïne LP in France. In particular, I told them about the March 2003 convention, which contained Flécaïne-specific provisions – including Article 2.2, which could have been read as calling for the launch a generic of Flécaïne LP or reduction in the price of Flécaïne LP to generic prices prior to the expiration of the applicable patent – but which had not been invoked by the Economic Committee. I informed them that Article 2 had lapsed and been eliminated. I further explained that we would need to negotiate a new convention with the Economic Committee. However, I emphasized that there was a genuine risk that the Economic Committee could seek to reduce the reimbursement price of Flécaïne LP in the near future. In fact, I pointed out that both Aldara and Flécaïne, which were the two most important drugs for the business in France, faced a risk of price reductions because of the age of Flécaïne and the incremental volume of Aldara."). *See also* Trial Tr. at 1186:16-19 (Traineau) ("Q: Did you specifically tell [Lonner and Dierks at the November 2006 presentation] we had a Convention with CEPS, it has a provision in it, and that provision says that as of 2006, we were supposed to either introduce a generic of Tambocor CR or reduce the price to 50 percent, did you tell them that? A: I shared that with them, but I share[d] also with them that this Convention was unclear on several Article[s] . . . especially on this one. And I share[d] also with them that this Article 2.2 was struck out."); Trial Tr. at 1202:23-1203:7 (Traineau) DX-297 (email from Benoit Traineau to Jörg-Thomas Dierks and cc to Ton van't Hullenaar dated November 29, 2006) (attaching presentation given to Lonner and Dierks).

- 3M disclosed to Meda that price negotiations between 3M and CEPS regarding the re-registration of Flecaine LP were ongoing.

  o A regulatory product report for Tambocor was in the data room and disclosed that pricing negotiations for Tambocor IR and CR in France were ongoing.

    *See* DX-167 (Tambocor Regulatory Product Report) at 19.

  o Meda personnel reviewed the Tambocor regulatory product report during the due diligence process.

    *See* DX-373 (Wellington Data Room Activity Report though May 4, 2007) at 3M00469880, rows 25260-25261; DX-374 (Wellington Data Room Activity Report though July 31, 2006) at 3M00471869, rows 29197-29201.

  o Benoit Traineau advised Meda executives in November and December 2006, that pricing negotiations were in progress.

    *See* Traineau Decl. at ¶¶ 39-40; *id.* at ¶¶ 44-48 ("During my calls with Mr. Senac in December 2006, we discussed a number of issues relating to the 3M Pharma France business, including the status of negotiations with the Economic Committee regarding the price of Flécaïne LP. I have a clear and specific recollection of informing Mr. Senac of the history of our discussions with the Economic Committee and the

importance of the work done by the steering committee members in the past negotiations. . . . During our conversations in December 2006, Mr. Senac and I openly discussed pricing pressures and the likelihood that the Economic Committee would seek a price reduction during the upcoming negotiations.  In fact, I told Mr. Senac that we (3M Pharma France) believed there was a risk of a 10% reduction in the price of Flécaïne LP for 2007.  Mr. Senac expressly recognized that it was quite possible that the Economic Committee would seek a reduction on such a mature drug . . .").  *See also* DX-297 (email from Benoit Traineau to Jörg-Thomas Dierks and cc to Ton van't Hullenaar dated November 29, 2006) (stating that, "Burning Issues -- 3 critical issues -- Manage the Health authorities price pressure . . . Tambocor IR&CR CURRENT PRICE NEGOTIATION -- Giving us a large breath of air to re negotiate [*sic*] the price although the current general context and the past situation between 3M Pharma and the CEPS"); DX-299 (email from Jörg-Thomas Dierks to Christian Senac dated November 29, 2006, forwarding Traineau's presentation); DX-293 (email from Benoit Traineau to Ton van't Hullenaar dated November 26, 2006).

### (2)   The price-reduction risk of which Meda asserts it was unaware was a matter of public record.

- Article 2.2 reflected CEPS' reimbursement pricing policies for counter-generics such as Tambocor CR.

  *See* Trial Tr. at 1362-63 (Schur) ("Ministry of Instructions indicated that there should be price reductions to drive the price of the counter generic Flecaine LP down to the price of the generic of the original product Flecaine LI . . . If you interpret clause 2.2 as saying we are going to require you to reduce the price down to the price of the generic of Flecaine LI, or a generic of LP or some close product . . . then that's in keeping with the Ministry of Instructions and 2.2 adds nothing to your knowledge."); Schur Decl. at ¶¶ 72-73, 77 ("The negotiating process with CEPS can be flexible and unpredictable, even if pricing policies are almost always applied, sooner or later and with greater or lesser rigor . . . The ministerial instructions given to CEPS and CEPS policies concerning the implementation are public record . . . Indeed, a drug company knowing only the ASMR rating of Flecaine LP, the pre-generic cost of Flecaine LI and the cost of Flecaine LI generics – all of which were public record in 2006 – could have predicted that there would be pressure to align the price of Flecaine LP with that of generics of LI during the 2006-2009 period, without knowing about the [March] 2003 Flecaine Convention."); DX-038 (CEPS 2003 Activity Report) at 28-29 ("Discussion of the price of a medicinal product with an ASMR rating therefore takes the form of an open negotiation . . . [T]he ministerial guidelines specify the framework of negotiations . . . [w]here a medicinal product with an ASMR IV rating [such as Tambocor CR] is intended to replace the prescription of a genericisable drug [such as Tambocor IR].").

- Pursuant to the Ministry Guidelines regarding reimbursement pricing of counter-generics such as Tambocor CR, Tambocor CR should be priced no higher than Tambocor IR and progressively reduced to the price of the generics of Tambocor IR.

*See* DX-038, Annex 1 (Ministers' Guideline Letter, dated December 24, 2002) at 44-45 ("We ask the Committee [CEPS] specifically to be especially attentive, where companies apply for the registration of medicinal products [such as Tambocor CR] designed to replace the pharmaceutical specialties which they market and which are genericised [such as Tambocor IR] . . . to ensure that prices are not accepted which would result in an unjustified additional cost in health insurance spending . . . Where such medicinal products benefit from a lower [less than V] ASMR rating, their registration can only take place at a price – or price schedule – such that the registration does not entail, in the short or medium term, any additional cost to health insurance."); DX-038 (CEPS 2003 Activity Report) at 28-29 ("[W]here a medicinal product with an ASMR IV rating [such as Tambocor CR] is intended to replace the prescription of a generisable drug [such as Tambocor IR] or passes as one, registration can only be made at such price, or price schedule, that the registration incurs no additional cost in the short or medium term for the health insurance system."); DX-412 (CEPS 2007 Activity Report) at 21 ("The Committee . . . applies the ministerial guidelines relating to 'price consistency' which lead, in the classes where generics appear and grow [such as Tambocor IR], to a progressive reduction in the price differences between these generics and the drugs with the same therapeutic target [such as the treatment of arrhythmia] which are still protected by patents [such as Tambocor CR].").

- Meda knew in 2006 that Tambocor IR was subject to potential TFR pricing.

  *See* Maupas Dep. at 77-78; DX-038, Annex 1 (Ministers' Guideline Letter dated December 24, 2002) at 45 ("The law now makes it possible to introduce reimbursement reference prices . . . Decisions regarding the introduction of reference prices and the setting of their level are a ministerial prerogative, not dependent therefore on an agreement between the Committee and the companies concerned.").

- It was publicly known that CEPS reduced the reimbursement price of Tambocor IR and other drugs facing generic competition by 15% in 2006. *See* PX-417A (CEPS 2005 Activity Report) at 15 ("[N]ew measures were being implemented in the perspective of a very difficult 2006 financial year. Those measures, prepared under the authority of the Minister of Health during the second semester of 2005, brought to bear . . . on the generics list. A decision was made [to] institute a general 15% price reduction for brand-name medicinal products as well as generics . . . The implementation of those reductions was prepared in 2005, but not applied until the first quarter of 2006.").

### (3)   **Meda was a sophisticated drug company with substantial experience in the French market and was given complete access to all relevant information.**

- *See* DX-281 (Acquisition Agreement) at § 4.05(a) ("Purchaser is experienced and sophisticated with respect to the transactions contemplated by this Agreement and the Ancillary Agreements. Purchaser has conducted its own independent review and analysis of the Assets, the Assumed Liabilities and the Business and the intellectual property that is the subject of the Intellectual Property License Agreement and acknowledges that Purchaser has been provided access to the personnel, properties, premises and records of

Seller relating to the Assets, the Assumed Liabilities and the Business and the intellectual property that is the subject of the Intellectual Property License Agreement for such purpose."); *see also id.* at § 3.17 ("Purchaser acknowledges that it and its representatives have been permitted full and complete access to the books and records, facilities, equipment, contracts and other properties and assets of the Business that it and its representatives have requested to see or review, and that it and its representatives have had an opportunity to meet with officers and employees of the Business to discuss the Business.").

- Prior to its acquisition of 3M's European pharmaceutical business, Meda had substantial business in France, and extensive knowledge of, and experience with, the French pharmaceutical market.  *See* Trial Tr. at 112:12-113:25 (Lonner); *see also* Trial Tr. at 158:7-159:1 (Dierks); Dierks Decl. at ¶ 13; Keel Decl. at ¶¶ 57, 59.

- France was a significant market for Meda prior to the 3M transaction.  *See* Trial Tr. at 113:24-114:1 (Lonner).

- Prior to closing, Meda was very familiar with pricing pressures in Europe, including France.  *See* Trial Tr. at 131:17-20 (Lonner); Trial Tr. at 132:2-14 (Lonner); Trial Tr. at 321:19-322:14 (Larnholt); Trial Tr. at 369:23-370:5 (Stenqvist).

- Prior to the 3M transaction, Meda had conventions with CEPS regarding the reimbursement prices of the several drugs it sold in France.  *See* Trial Tr. at 115:20-116:6 (Lonner); *see also* Trial Tr. at 159:2-161:6 (Dierks); Dierks Decl. at ¶¶ 14 and 18.

- Products that are reimbursed by the French government were an important part of Meda's business prior to the 3M acquisition.  *See* Trial Tr. at 114:10-18 (Lonner).

- The prices that Meda receives from CEPS on its products are an important part of Meda's business.  *See* Trial Tr. at 115:11-14 (Lonner).

- 3M endeavored to answer all questions asked by Meda during the due diligence process, but Meda never asked about reimbursement pricing in France.  *See* Keel Decl. at ¶ 61 ("Not only did Meda have access to worldwide documents available through the electronic data room, it also submitted a number of due diligence questions through a data room feature, through Goldman Sachs, or to me directly via e-mail, in-person meetings, and teleconferences.  Not one of the hundreds of questions inquired about product pricing in any specific market, much less Flecaine pricing in France.  And to my knowledge, all questions were fully answered to Meda's satisfaction.  As I was in regular communication with Meda's deal team, as a matter of course all open issues were drawn to my attention.  For example, Exhibit DX-274 shows my notes from a call between the 3M team . . . and the Meda team . . . Several open items were noted (e.g., the Interim Sales Agreement, Exhibits to the Transition Services Agreement) but that 'everything else is in order.'"); Keel Decl. at ¶ 62 ("With respect to the question-and-answer feature of the electronic data room, Meda submitted 105 questions—again, all of which, to my knowledge were answered fully to Meda's satisfaction.  I would note that of the 105 questions Meda posed, not a single one inquired about product pricing in any specific

16

market, much less Flecaine pricing in France."); DX-548 (due diligence question-and-answer log).

> **(4)** **With full knowledge of the absence of any conventions in the data room, Meda nevertheless failed to request or inquire about them.**

- When acquiring a business, Meda wants to know the reimbursement price it will be receiving from the French government.  *See* Trial Tr. at 115:15-19 (Lonner).

- Prior to the closing of the transaction with 3M, Meda knew that conventions existed between 3M Sante and CEPS.  *See* Trial Tr. at 195:8-14 (Dierks) ("I'm sure that they existed because if you sell a product in France which is reimbursed, there must be a CEPS convention.").

- Prior to the closing of the transaction with 3M, Meda knew that CEPS conventions can contain non-public terms about future pricing, such as rebates and volume discounts, and that conventions do more than simply state the published reimbursement price.

  *See* Trial Tr. 159:2-161:12 (Dierks) (acknowledging that Meda had its own CEPS conventions and Meda knew that the Annex 4 to a pricing convention contains special provisions regarding specific drugs such as rebates and volume-price information); Trial Tr. at 241:13-23 (Dierks) (acknowledging that CEPS conventions do other things beyond setting the current reimbursement price).

- The data room did not contain any pricing convention for any product in any European country.

  *See* Trial Tr. at 478, 480 (Shah); Trial Tr. at 1013 (Wanlass).

- Meda knew prior to closing that no pricing conventions for any drug in any country had been provided in the data room.

  *See* Dierks Decl. at ¶ 43 ("In addition to the OM [Offering Memorandum] and the management presentation, an electronic data room was made available to Meda.  Meda employees, including myself, and our outside legal counsel reviewed documents in the 3M data room. . . . In the data room I did not come across any information related to a signed agreement in France mandating either a price reduction to Tambocor CR or the introduction of a generic version of Tambocor CR, and no such agreement was ever brought to my attention."); Trial Tr. at 280-81 (Dierks) ("The Court:  [Y]ou said I recall specifically looking at documents relating to sales information including product information and in the data room you didn't come across any information related to a signed agreement in France mandating [a] price reduction.  Did you come across other CEPS conventions including the annual renewals?  A:  No."); Trial Tr. at 282 (Dierks) ("The Court:  [S]houldn't there be sort of a bulk of documents, even the annual renewals that show the published price?  A:  Yes, I would have thought CEPS would have been in the regular −  The Court:  Shouldn't somebody have − and I'm assuming they weren't?

A:  Yeah.  The Court:  Is that right, they weren't?  A:  No, they weren't, according to my knowledge."); Trial Tr. at 313 (Larnholt) ("Q:  Were there any CEPS conventions in the electronic data room?  A:  I don't think so.").

- Meda knew from the Offering Memorandum and Management Presentation that there was pricing pressure on the cardiology products, including Tambocor, in Europe.

  *See* PX-168 (Offering Memorandum) at MEDA00188692 ("The remaining decrease is expected to come from lower sales of Tambocor and Minitran in Europe, as government pricing mandates in France, Spain and Italy will reduce selling price."); PX-421 (Management Presentation) at MEDA00188586 ("European government mandated price reductions also result in lower selling pricing and sales for Tambocor and Minitran.").

- 3M's advisor, Goldman Sachs, informed Meda that 3M and Goldman Sachs were willing to answer any questions that might arise based on its review of the data room and the management presentation.

  *See* JX-077 (Email from Ogunjimi to Larnholt *et al.*, dated June 30, 2006); JX-073 (Email from Lorence Kim, Goldman Sachs, to Anders Larnholt dated June 14, 2006); PX-226A (Project Karl-Oskar presentation dated July 20, 2006) at MEDA00204748; DX-548 (due diligence question-and-answer log) at 3M00633060.

- Yet, Meda made no inquiries to 3M regarding product pricing.

  *See* Keel Decl. at ¶¶ 55, 85; Wanless Decl. at ¶¶ 18, 22; Trial Tr. at 1072-74 (Keel) ("I had countless conversations with Meda, to quantify it, tons of hours in person, dozens of hours on the phone, hundreds of e-mails and questions that I answered, and not a single one of those dealt with specific prices of specific products in specific markets . . . [W]hen issues came up, we talked about issues that were material to Meda, we discussed them and we dealt with them and closed them out . . . But there is a record of the hundred and five formal questions that Meda submitted to 3M that was part of the electronic data point.  As part of my [preparation] for this, I went back and read every one of the hundred and five questions that Meda submitted.  Not a single one of those questions . . . asked about the price of any product.  And furthermore, your Honor, not a single one of those questions references Tambocor."); DX-548 (due diligence question-and-answer log); Trial Tr. at 327:16-19 (Larnholt) ("Q:  I'm just asking about this process, the spreadsheet process.  Did Meda ask any questions about pricing of 3M's pharmaceutical products in France?  A:  I don't think so.").

- Prior to the closing of the transaction with 3M, no one from Meda ever saw *any* conventions between 3M and CEPS or asked anyone from 3M about either the existence of such conventions or for copies of such conventions.

  *See* Trial Tr. at 117:25-121:7 (Lonner); Trial Tr. at 126:3-127:1 (Lonner); Trial Tr. at 195:15-17 (Dierks); Trial Tr. at 302:13-14, 313:20-22, 314:1-315:4 (Larnholt).

18

(5)   **Meda did not involve its most knowledgeable person regarding French pharmaceutical pricing in the due diligence process.**

- Christian Senac, Meda France's former country manager, was one of the two most knowledgeable Meda France employees during the period 2005, through early 2007, concerning CEPS conventions and the French reimbursement pricing system.  *See* Trial Tr. at 161:13-19 (Dierks); Dierks Decl. at ¶ 22; Senac Dep. at 38:6-10.

- Senac was charged with the responsibility of dealing directly with CEPS in connection with the negotiation of Meda-related conventions.  *See* Trial Tr. at 161:22-25 (Dierks); Dierks Decl. at ¶ 22.

- Meda, however, did not assign Senac any responsibility for either reviewing documents or for asking questions of 3M representatives in connection with Meda's acquisition of 3M's European pharmaceutical business because it believed "[t]here was no need to do so."  *See* Trial Tr. at 177:21-25 and 179:1-6 (Dierks); Trial Tr. at 313:9-22 (Larnholt); Senac Dep. at 47:5-10.

- In fact, Senac did not even review documents delivered to him by Benoit Traineau on the day of closing until several months later.  Importantly, among those documents were the conventions for 3M Sante's products.  *See* Traineau Decl. at ¶ 53 ("Upon the closing of the transaction, certain hard-copy files needed to be physically transferred from 3M Santé to Meda France. . . . Accordingly, on January 2, 2007, acting on instructions I received prior to the closing, I personally 'hand-delivered' two boxes of documents to Mr. Senac at the offices of Meda France.  The boxes contained, among other files, the Convention between 3M Santé and the Economic Committee."); DX-344 (power of attorney and receipt); Senac Dep. at 94:2-95:3.

- No employee of Meda France reviewed the documents that 3M made available to Meda in the virtual data room.  *See* Trial Tr. at 178:9-12 (Dierks); Trial Tr. at 313:9-22 (Larnholt).

(6)   **3M did not make any "partial or ambiguous" statements regarding the price of Flecaine LP in France.**

- During due diligence, 3M did not make any statements, nor did Meda ask, about the price of Flecaine LP in France.

  *See* Sampson Decl. at ¶ 27; Wanlass Decl. at ¶¶ 17-22; Keel Decl. at ¶ 55, 69, 85; DX-548 (due diligence question-and-answer log); Trial Tr. at 1072-74 (Keel); Trial Tr. at 307:13-308:2, 313:9-19 (Larnholt).

**B.**    **Meda Has Not Established By Clear And Convincing Evidence That 3M Made Any Alleged Misrepresentation Or Omission With The Requisite Scienter.**

**1.**    **3M was not seeking to unload an unprofitable business.**

- 3M's pharmaceutical business was profitable.

    *See* Keel Decl. at ¶ 17 ("the Pharma business had an attractive economic model (high margins and solid growth)"); Trial Tr. at 1195:25-1196:4 (Traineau) ("I share[d] with them that in France the business was very strong business and very profitable, high margin, high gross margin, and economic committee financing effort to keep this business alive.  So it was a very good business and I was very proud of the business."); Trial Tr. at 563:21-564:2 (Haas) (3M's pharmaceutical business was a profitable business.); Trial Tr. at 1281:2-18 (Sampson).

- 3M's pharmaceutical business had a long history of profitable growth.

    *See* DX-082 (3M Health Care Strategic Business Review, presentation to 3M board of directors dated August 8, 2005) at 3M00481543 and 3M00481545 ("The good news is that this business has a long history and successful track record of sustained profitable growth . . . We generated over $200 million in operating income last year, even with $160 million in lab spend."); DX-102 (3M Health Care Strategic Business Review, presentation to 3M board of directors dated November 14, 2005) at 3M00481430 ("Point number one was that 3M Health Care has long been a central contributor to the Company. . .."); PX-169 (Email from Dawn L. McGinley to Brad T. Sauer, dated April 4, 2006, with attached press release) at 3M00149355 ("3M's branded pharmaceutical business has been very successful . . .").

- In the year preceding the sale, the pharmaceutical business continued to generate profits, despite substantial R&D expenditures.  *See* DX-082 (3M Healthcare Strategic Business Presentation dated August 2005) at 3M00481545.

- 3M decided to sell the pharmaceutical business because it was no longer a good fit at 3M – not because the business was failing.

    o   The pharmaceutical business was not a "core" business for 3M and did not match the risk profile of most of 3M's businesses.

        *See* Trial Tr. at 744 (Sauer) ("[O]ur collective pharmaceutical business was a narrow business, and we felt that the assets in the business were good, but that they needed to draw on a company that had a business model that fit pharmaceuticals, and 3M is not a company as a business model that fits pharmaceuticals.  So it was further that the business is too narrow, it hasn't been invested in enough, and the best option was to take these assets and put them into the hands of others who could add value to them, realize synergies with them . . ."); *id.* at 746-47 (Sauer); *id.* at 765-66 (Sauer) ("[T]he principal reason behind the divestiture was that . . . 3M's business model and investor base rewards consistent growth/modest investment.  That's our business model and

what our investors expect.  The pharmaceutical business is highly variable growth, super heavy investment.  And so we had invested up until this point something like $900 million in this technology thinking we had a block buster drug and a pipeline of block buster drugs behind it.  So even though pharmaceutical business doesn't really fit 3M – we're a diversified industrial company – if we had a block buster, it was going to be fine; but without a block buster, the model was completely out of whack. . . . [T]o have a narrow pharmaceutical business inside this diversified industrial company was not a good fit."); Trial Tr. at 564 (Haas) ("Well, [3M] viewed the Pharma business as non-core to their core business, and there was investment required to . . . maintain and grow the business which was inconsistent with where they wanted to spend their capital.  So it was a capital allocation discussion and decision."); Keel Decl. at ¶ 17 ("[A]lthough the Pharma business had an attractive economic model (high margins and solid growth), the business model carried a risk profile in conflict with the rest of 3M, a diversified industrial manufacturer."); DX-082 (3M Healthcare Strategic Business Presentation dated August 8, 2005) at 3M00481546 ("[D]ivesting it means better matching Pharma's risk/return and ownership profiles."); PX-169 (Email from Dawn L. McGinley to Brad T. Sauer, dated April 4, 2006, with attached press release) at 3M00149355.

o 3M believed that the business could be maximized only under the ownership of a pharmaceutical company with a more appropriate business model.

*See* Keel Decl. at ¶ 28 ("a more natural owner could realize synergies not available to 3M (such as cross-selling with other pharmaceutical products and the elimination of core redundancies")); Trial Tr. at 1071:25-1072:7 (Keel); Trial Tr. at 758:22-759:4 (Sauer) ("We were quite pleased that these assets were put into the hands of other companies who could support them and get synergies and add value to them, so it was – we were – we were happy about that."); PX-142 (3M Health Care Pharma Strategic Business Review, dated February 11, 2006) at 3M00198118 and 3M00198123 ("We have an extremely narrow, high investment, high risk Pharma business inside a diversified portfolio valued for its steadiness. . . . We think this business would be best in the hands of a more natural owner, and we'd negotiate a share of the synergies created.").

**2.   At the time of the parties' execution of the Acquisition Agreement on November 8, 2006, and subsequent closing on January 2, 2007, no employee of 3M believed that Article 2.2 was a binding obligation or was otherwise in effect.**

- Meda has failed to establish that <u>any</u> employee of 3M believed that Article 2.2 was a binding or enforceable obligation to reduce the price of Tambocor CR.

   *See* Trial Tr. at 842-43 (Sampson).

- Moreover, the employees of 3M Sante did not believe that Article 2.2 was a binding or enforceable obligation to reduce the price of Tambocor CR.

*See* Biffaud Decl. at ¶¶ 32, 34-35, 40-41, 55; Barreau Decl. at ¶¶ 12-14; Traineau Decl. at ¶¶ 15 and 39; Forey Decl. at ¶¶ 7 and 9; Trial Tr. at 1103:23-1104:5 (Barreau); Trial Tr. at 918:2-10 (Biffaud) ("[T]he process of relationship between drug company and CEPS, ongoing discussion and negotiation. It's not binding by one document. And it's taking into account the evolution of the environment. So the Convention, as you stated before, is the result of a negotiation at a certain time, given a certain environment. And we all know . . . that most of what is in the Convention will be subject to further discussions with CEPS on these ongoing basis."); Trial Tr. at 1210:4-16 (Traineau) (testifying that he did not believe Article 2.2 to be binding); Labinger Dep. at 116-117 (testifying that the outcome of pricing negotiations with CEPS is highly variable and unknowable in advance).

- 3M's belief that Article 2.2 was neither a binding nor enforceable obligation to reduce the price of Tambocor CR was reasonable. *See supra* § I.A.2.b.

- 3M believed that Article 2.2 had been eliminated in September 2006.

  o *See* Traineau Decl. at ¶ 30; Husson Dep. at 35-40; Barreau Decl. at ¶ 28; *see also* Trial Tr. at 1186:11-20 (Traineau) ("I share[d] also with [Lonner and Dierks] that this Article 2.2 was struck out.").

  o On September 8, 2006, 3M Sante sent CEPS a draft rider to the November 2003 Convention that crossed out Article 2.2. The accompanying letter called CEPS' attention to the change. *See* JX-093A (Letter from Husson to Renaudin dated September 8, 2006).

  o CEPS' President, Noel Renaudin, subsequently signed and returned the rider to the Convention that contained the strike-through of Article 2.2. *See* JX-095A (September 2006 amendment); Husson Dep. at 39-40; DX-253.

- 3M's belief that Article 2.2 had been eliminated was reasonable. *See supra* § I.A.2.b.

- 3M expected to negotiate with CEPS regarding the price of Tambocor CR.

*See* Trial Tr. at 949:22-23 (Biffaud); Trial Tr. at 842:14-17 (Sampson); JX-024A (Email from Kolsky to Biffaud dated July 21, 2004) (Mr. Renaudin's acknowledgement that a joint re-registration of Flecaine LI and LP could "open the door for renegotiation" in 2006); Trial Tr. at 961:3-14 (Biffaud) (Explaining that the purpose of the steering committee was not to convince Renaudin not to apply the March 2003 convention: "I explained to you before that the steering committee was formed in order to build the case for future negotiation in a tougher environment with TFR . . . [s]o the aim of the committee was to build a strong case in all the factors that are taken into account by CEPS in negotiation, meaning, technical brief, meaning economical brief, meaning economical footprint of our company in terms of employment, taxes and investments and also in terms of how we were doing the promotional activity around. So that was the aim of the steering committee."); Trial Tr. at 976:21-977:3 (Biffaud) ("When [Renaudin] said that the joint reregistration of LI and LP could, could open the door to renegotiation, and

in that case that we will be talking about it in 2006, the reason of that is that from a pure time line perspective, LI and LP were not supposed to come at the same time in terms of reregistration.  And for Renaudin, the interest of everything at the same time is to look at the total cost of time LI, LP, generic for the health care system, so it was better."); Trial Tr. at 987:9-22 (Biffaud) (Testifying that the steering committee had a "strong belief" that it could maintain the reimbursement price of Flecaine LP:  "Well, there was a strong belief about it.  I mean, we knew there was a potential risk of price decrease, but our aim was to maintain the price, which is what we presented in each of our executive review[s].  I had personally, in 2005, and when I say as long as we were moving into the ongoing discussions, this belief was even stronger, as to a good result in terms of price renegotiation.  So at the end of 2005 and moving forward, in 2006, I would say that the steering committee perspective on price was that if there is a risk, it is a limited risk on price decrease.").

- 3M's expectation regarding price negotiations with CEPS was reasonable.

See Trial Tr. at 1353 (Schur) ("Q:  Under this [Article 2.2] provision, can you tell us whether or not it would take another negotiation and another convention?  A:  [I]f the goal of CEPS was to seek a price reduction, and because the price hadn't been fixed, you have to have another negotiation.  There's no other way.  Because prices can only be set by a convention.  And if there isn't an agreement that is embodied in 2.2, that defines what is the new price, then the only way is to go through the negotiation of [a] convention.  Q:  You said if there wasn't.  You tell us.  A:  Oh, there isn't.  Q:  Is there a provision in 2.2 that establishes a new price or fixes a certain formula for setting the price?  A:  No, there clearly isn't.  There clearly isn't.").  See Trial Tr. at 1339:7-13 (Schur) ("Because what I think they were doing instead is saying, do what's necessary and if you don't we will draw the consequences that we need to draw when we go into our next negotiation setting a price in three years.  That's why for me it's leading to -- it's putting down a series of markers as to what's going to be important to them when they enter into the pricing negotiations in three years."); Trial Tr. at 1340:17-22 (Schur) ("[CEPS] wanted to have a discussion in three years about where the product was, where the market was, what would be the appropriate price.  So they put in a clause that put down a couple of markers but that wasn't considered either by 3M or by CEPS as it accepts the authority to change  the price."); Trial Tr. at 1341:2-8 (Schur) ("So, you can say that they had to take all actions necessary in order to ensure that it's on the market and the price of another product or generic or an equivalent.  The simple fact of the matter is that was not something that 3M could do.  They found a good solution for the immediate problem they had.  They put down the marker at three years.  They knew what was under consideration."); Trial Tr. at 1341:17-1342:6 (Schur) "[Article 2.2] didn't have any significant legal effect.  It was a marker.  It was nothing they had to do.  CEPS had numerous ways to bring 3M to the negotiating table in three years.  Among other things, the price was going to be a subject of discussion as part of the renewal of the products registration was going to happen anyway.  So 2.2 didn't really add that much to CEPS, which explains why CEPS was not very careful about including 2.2 in subsequent versions of its versions with 3M.  It just wasn't critical. . . .  It added something.  It added an idea of what was in CEPS mind of what they would be looking to in future negotiations.").

- 3M reasonably believed that Article 2.2 did not pose a material risk to the price of Tambocor CR.

  o 3M believed that Article 2.2 was not a good indicator of the likely future price of Tambocor CR because of changed conditions.

    *See* Biffaud Decl. at ¶¶ 32, 34-35, 40-41, 55; Trial Tr. at 970:9-17 (Biffaud); Trial Tr. at 1108:8-15 (Barreau); Trial Tr. at 1142:23-1143:2 (Barreau).

  o 3M Sante operating budgets, prepared with full knowledge of the Convention and Article 2.2, assumed a price reduction for Tambocor CR of 13% and 10% in 2006 and 2007, respectively.

    *See* Forey Decl. at ¶¶ 21-24 ("Beginning in September 2005 and continuing until the end of 2005, my team and I built the Operating Plan for 3M Santé's pharma business. The 2006 Operating Plan assumed a 13% decrease in the reimbursement price of Flécaïne LP, to take effect in July 2006. . . . We used those assumptions because my team and I concluded, after conducting an exhaustive analysis of the potential scenarios and all of the factors that could impact pricing negotiations with the Economic Committee, that such price decreases reflected reasonable and conservative assumptions.  Our assumptions regarding price decreases were based on the above-described analysis – not on the terms of Article 2.2 of the Convention.  In fact, in March 2006, only one month prior to the expiration of the three-year period set forth in Article 2.2, we continued to forecast only a 13% decrease in the price of Flécaïne LP (to take effect in July 2006).  As it turned out, the Economic Committee did not attempt to negotiate a lower price for Flécaïne LP at all during 2006.  Beginning in September 2006, I oversaw the preparation of the 2007 Operating Plan.  That budget assumed a 10% decrease in the price of Flécaïne LP in 2007."); Barreau Decl. at ¶¶ 26-28.  *See also* Trial Tr. at 1112:19-25 (Barreau) ("For 2006 we included 13 percent risk and for 2007 we included 10 percent risk.  And then was also [counts] is what . . . happened, and in 2006 in fact we had no price decrease."); Trial Tr. at 1116:16-1117:3 (Barreau).  *See also* DX-135; DX-138; DX-250 (Email from Traineau to Hullenaar dated September 11, 2006) at 259; JX-114 (Email from Le Seigneur to Wittman dated August 2007); JX-176 (Email from Husson to Barreau dated March 2006).

  o As demonstrated by the subsequent price decreases to Tambocor CR, 3M Sante's assumptions about pricing risks were reasonable and, indeed, conservative – the actual decreases were 0% in 2006, 0% in 2007, 13% in 2008, and 20% beginning the month before the patent on CR expired in 2009.

    *See* JX-125 (Email from Maupas to Hullenaar and Dierks dated September 2008); PX-381 (Email from Dierks to Maupas and Hullenaar dated September 2008); PX-388 (Email from Dierks to Lonner and Stenqvist dated September 2008).

- The Flecaine Steering Committee was formed to build the case for maintaining the price of Tambocor CR – not because of concern about Article 2.2.  *See* Biffaud Decl. at ¶¶ 37-

42; Barreau Decl. at ¶¶ 15, 16, and 19; Traineau Decl. at ¶ 15; Forey Decl. at ¶ 10.  *See also* Trial Tr. at 961:3-14 (Biffaud); Trial Tr. at 1100:1-14 (Biffaud).

o 3M believed that the biggest threat to the price of Tambocor CR was the potential application of "TFR" reference pricing – a risk that faded in the fall of 2005.  *See* Trial Tr. at 979:16-980:15 (Biffaud).

o Nevertheless, the members of the Flecaine steering committee strongly believed that 3M Sante would be able to maintain the reimbursement price of Tambocor CR until the patent expired in November 2009.  *See* Trial Tr. at 987:9-22 (Biffaud); Biffaud Decl. at ¶¶ 38-42; Forey Decl. at ¶ 15; Traineau Decl. at ¶ 19.

o 3M Sante applied for renewal of registration of Tambocor CR and IR in January 2006 and, in connection with that application, requested that CEPS maintain the reimbursement price of Tambocor CR at 17.10 Euros.  *See* JX-049A (Request for Renewal of Registration on the List of Reimbursement Drugs, dated January 2006) at MEDA00177804 ("Flecaine LP.  The price has been stable since its registration.  It is currently at € 17.10 (factory price, excluding tax) . . . In light of all the above, maintenance of the price of Flecaine LP at € 17.10 (factory price, excluding tax) is proposed.").

### 3.   3M did not delay negotiations with CEPS in 2006, nor did it portray a false picture of 3M's pharmaceutical business to prospective purchasers.

- *See* Trial Tr. at 991:13-20 (Biffaud) (Testifying that neither he nor anybody else he worked with were instructed to slow down 3M Sante's negotiations with CEPS generally, or to do so until the conclusion of the sale of 3M's pharmaceutical business); Trial Tr. at 768:22-770:5 (Sauer)  (Testifying that negotiations with CEPS was not impacted by 3M's decision to sell its pharmaceutical business:  "I don't believe that to be the case.  We were public in April, and the negotiations had been going on for a long time prior to that, and the team was working on negotiating, proving efficacy for CR.  I looked at it as a continued work stream that was continuing independent of the sale process.  That would be my view.").

- Negotiations with CEPS were delayed in 2006 because of the actions of the Transparency Committee.

  *See* JX-063A (Email from Kolsky dated April 2006) (Demonstrating that the Transparency Committee selects the date of its examination of 3M Sante's Flecaine registration filing, and that the subsequent review and negotiation dates are triggered by the Transparency Committee's examination); Trial Tr. at 989:14-991:20 (Biffaud) (Testifying that neither 3M nor any other pharmaceutical company selects the date on which the Transparency Committee reviews registration filings:  "No, we can not [select the date that the Transparency Committee reviews the filing].  I mean, transparency committee is, is managing probably hundreds and hundreds of briefs each year and there is one, one day per week for official review.  So the agenda are set up well in advance.");  PX-194 (Email from Kolsky dated May 2006) (demonstrating that the Transparency

Committee delayed its review of 3M Sante's registration filing because it wanted to conduct a deeper review of the Obepine study submitted with the filing); Trial Tr. at 990:17-991:5 (Biffaud) (Testifying that with respect to PX-194: "[t]his is, this was an information coming from HAS, or transparency committee, and they are decided to further out our epidemiological study, which is Obepine. And consequently as mentioned by HAS, the initial review meeting of June 28 was not any more possible. The July meetings were all full for the reasons I explained before, and there were no review meetings in August because this is vacation period, and consequently the official review of Tambocor technical brief was postponed to September 22nd.").

### 4. 3M endeavored to be open and transparent during the due diligence process.

- 3M engaged in a massive effort to gather documents that would allow potential purchasers to "dig deep" into the details of the business.

  *See* Trial Tr. at 865 (Sampson); *id.* at 866 (Sampson); *id.* at 1273-74 (Sampson) ("It was a large [due diligence] team . . . It was a large effort. . . . The goal was to create a comprehensive easy-to-access, easy-to-read, all-in-one-place electronic format so that those there were allowed in the [data] room could navigate it in an easy way and would also allow them to dig deep if they needed to and ask appropriate questions if and when they needed to."); *id.* at 1273 (Sampson).

- 3M did not deliberately conceal the existence of the CEPS Convention from Meda.

  *See* PX-182 (Email from Ian Brown dated April 28, 2006) (proposing process for highly sensitive documents whereby such documents would not initially be placed in the data room and instead a placeholder would be inserted indicating that such a document would only be available upon request); Trial Tr. at 1017:24-1018:4 (Wanlass) ("Q: [Y]our understanding is that the failure to disclose the Tambocor CR French convention to Meda was a mistake? A: My understanding was that it was a mistake that the process wasn't followed; that 3M's internal process wasn't followed to put a slip sheet in."); Trial Tr. at 837, 865 (Sampson did not know whether the Convention or a slip sheet was included in the data room); Trial Tr. at 1078:10-11 (Keel had not seen or heard of the Convention prior to this lawsuit).

- Benoit Traineau visited with Meda executives prior to closing to openly discuss the business and fully disclosed the opportunities and challenges/risks of the business. There was no attempt to keep *any* information secret.

  *See* Traineau Decl. at ¶¶ 36-43; Trial Tr. at 1186:16-19 (Traineau); Trial Tr. at 1202:23-1203:7 (Traineau); DX-297 (email from Benoit Traineau to Jörg-Thomas Dierks and cc to Ton van 't Hullenaar dated November 29, 2006).

- There is no evidence of any intent to deceive in connection with the preparation of 3M's financial projections – in fact, those projections were demonstrably conservative.

*See* Wanlass Decl. at ¶ 23 ("[T]he team developing the projections expended significant effort to ensure that the forecasts were conservative and presented buyers with a realistic picture of the business.  There was never any hint or suggestion that anyone working on the financial model was trying to hide potential pricing decreases or anything else from Meda or other bidders.  To the contrary, we adjusted financial projections downward based on the threat of government pricing pressures and disclosed that fact to potential buyers."); Keel Decl. at ¶ 41; Trial Tr. at 1029:21-1030:6 (Wanlass) ("Q:  Can you explain what was the basis of including an assumed reduction for all of cardio in your financial modeling?  A:  Well, in doing the financial modeling in February of 2006, we learned that that was going to be a 15 percent price decline in France for Tambocor IR, and so certainly John [Sampson] and I were taking that into account, and then just based on pressures, both historically and looking forward, that we knew there was some pricing pressures, not just for Tambocor IR or whatever, but for all of cardio drugs, Minitran as well.  We tried to take that into account in terms of being conservative going forward."); *id.* at 1030:22-1031:7 (Wanlass); DX-535 (Meda 2007 Annual Report) at 18 (The 3M acquisition contributed SEK 2,045 million in net sales, which translates to roughly $317 million – compared to the $275 million in net revenue projected in the offering memorandum.); DX-535 (Meda 2007 Annual Report) at 18 (Sales of Tambocor were SEK 871 million in 2007, which equates to approximately $135 million, compared to the $112 million projected in 3M's financial model.).

C.   **Meda Has Not Demonstrated By Clear And Convincing Evidence That It Reasonably Relied On Any Alleged Misrepresentations Or Omissions By 3M.**

 1.   **Meda expressly disclaimed reliance on any extra-contractual misrepresentations.**

- *See* DX-281 (Acquisition Agreement) at § 3.17 ("Except for the representations and warranties set forth in this Agreement or any Ancillary Agreement, . . . (ii) Purchaser has not relied on any representation or warranty from the Seller or any other Person in determining to enter into this Agreement."); *id.* at § 4.05(a) ("In entering into this Agreement and the Ancillary Agreements, Purchaser is not relying on the accuracy or completeness of any representations and warranties provided (whether in writing or orally) by or on behalf of Seller, any of its Affiliates or any of their respective employees, agents or representatives, except for those representations and warranties contained in Article III of this Agreement or any of the Ancillary Agreements . . .").

 2.   **Meda has failed to establish the applicability of the "peculiar knowledge" exception to the enforceability of disclaimers of reliance.**

- *See supra* § I.A.3.c.

 3.   **In any event, Meda could not have reasonably relied upon the projections contained in the Offering Memorandum.**

- *See supra* § I.A.1.b.

- In the Offering Memorandum, 3M advised potential bidders: "Neither 3M nor Goldman, Sachs & Co. makes any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this memorandum, and nothing contained herein is, or shall be relied upon as, a promise or representation, whether as to the past or the future." *See* PX-168 (Offering Memorandum) at i. *See also* Trial Tr. at 1004:25-1005:10, 1029:21-1031:7 (Wanless).

- 3M further informed bidders with respect to the financial projections contained in the Offering Memorandum: "Many possible events or factors could affect future financial results and performance. These factors could cause results or performance to differ materially from those expressed in these projections. These projections are not a guarantee of future performance and involve certain risks, uncertainties and assumptions, which are difficult to predict. Therefore, actual outcomes and results may differ materially from what is expressed or forecasted in, or implied by, this forward-looking information." *See* PX-168 (Offering Memorandum) at MEDA00188681. *See also* Trial Tr. at 1004:25-1005:10, 1029:21-1031:7 (Wanless).

- The Offering Memorandum also disclosed the risk of price pressures in France and other European countries. *See* PX-168 (Offering Memorandum) at MEDA00188692 ("The remaining decrease is expected to come from lower sales of Tambocor and Minitran in Europe, as government pricing mandates in France, Spain and Italy will reduce selling price.").

### 4.      In addition, Meda could not have reasonably relied upon the projections contained in the Management Presentation.

- The Management Presentation cautioned against and negated any possible reliance on the statements therein. *See supra* § I.A.1.c. *See also* PX-421 (Management Presentation) at MEDA00188345; Trial Tr. at 1262:6-12, 1269:3-17 (Sampson).

- The Management Presentation also disclosed the risk of price pressures in France and other European countries. *See* PX-421 (Management Presentation) at MEDA00188586 ("European government mandated price reductions also result in lower selling pricing and sales for Tambocor and Minitran.").

### 5.      Meda could not have reasonably relied on the statement allegedly made by John Sampson on June 26, 2006.

- The alleged statement (i.e., that "there was no other information not already provided in the due diligence material" that "Meda should know" before proceeding with the transaction), even if made, was so general and indefinite as to preclude any conceivable reliance by a sophisticated drug company investigating a potential acquisition of a global pharmaceutical business operating in more than 50 countries. *See* Lonner Decl. at ¶ 39.

- This is especially so because the alleged statement by Mr. Sampson was at the very beginning of Meda's due diligence activities, and its review of the documents in the electronic data room had just begun. *See* DX-374 (data room activity log) (reflecting that

Meda first accessed the data room on or about June 22, 2006 – 4 days before the management presentation).

- The alleged statement by Mr. Sampson could not have been construed by Meda as a specific representation regarding the pricing of any product or as a reason for Meda to refrain from undertaking or completing the due diligence activities necessary for a transaction of this size (*see infra* § 1.C.6.).

**6.**     **Knowing of the absence in the data room of any convention or reimbursement price agreement regarding any product in any country, and the absence of any listing of such documents on the relevant schedules to the Acquisition Agreement, Meda elected not to: (1) request such conventions and agreements; (2) make any inquiry regarding the existence of those documents or the contents thereof; or (3) ask any general or specific questions relating to product pricing.**

- *See supra* § I.A.3.c.(4).

- Meda did not rely upon, or take into consideration, potential future pricing changes of any particular product in any particular country in evaluating the potential acquisition of 3M's pharmaceutical business.  *See* Garrambone Decl. at ¶ 3; Trial Tr. at 1048:14-17, 1056:19-1057:9 (Garrambone).

- The due diligence approach and valuation method Meda adopted demonstrates that potential future variations in Tambocor CR pricing in France were not material to Meda's acquisition of the business.  *See* Garrambone Decl. at ¶ 3; Trial Tr. at 1045:2-14 (Garrambone).

- Meda did not conduct individualized financial analyses of any of 3M's major products. *See* Garrambone Decl. at ¶ 10; Trial Tr. at 1048:14-17 (Garrambone).

- Meda's acquisition analysis did not focus on product pricing in specific countries.  *See* Trial Tr. at 1045 (Garrambone) ("From the documents I've reviewed, Meda's approach was an aggregate approach that did not get into the specifics of individual products in individual countries.  And so they looked at everything in the aggregate . . . [T]hey didn't really focus on individual products and individual countries."); Trial Tr. at 194-95 (Dierks) ("Q:  You saw no due diligence report, memorandum, email, prepared by anyone at Meda that set forth what the prices were for those drugs [Tambocor CR and IR]?  A:  No, not that I remember. . . . Q:  You never asked for copies of 3M conventions with CEPS, correct?  A:  That's correct."); Keel Decl. at ¶¶ 55, 61-62, 69, 85-86; Trial Tr. at 1072:12-17 (Keel).

- Meda's diligence was focused on potential synergies rather than product pricing.  *See* Keel Decl. at ¶ 86; DX-535 (Meda's 2007 Annual Report) at 11 (discussing the strategic advantages to Meda of acquiring 3M's European pharma division).

### 7.   Meda had pre-closing knowledge of the information that it alleges was misrepresented or not disclosed.

- *See supra* § I.A.3.c.(1) and (2).

- Prior to closing, Meda was specifically informed about Article 2.2, the status of pricing negotiations with CEPS, and the likelihood of a future price decrease with respect to Tambocor CR.

  o In December 2006, Benoit Traineau gave a presentation to Meda executives on November 28, 2006, during which he specifically discussed Article 2.2, the ongoing negotiations with CEPS, and the likelihood of a future decrease in the price of Tambocor CR.  *See* Traineau Decl. at ¶¶ 36-39; Trial Tr. at 1194:5-1204:18 (Traineau); DX-293 (Email from Traineau to Hullenaar dated November 26, 2006) at 3M00407603, 629-631, and 633; DX-297 (Email from Traineau to Dierks dated November 29, 2006) at MEDA00185728, 747, and 769-771; DX-299 (Email from Dierks to Senac dated November 29, 2006) at MEDA00201268 (attaching the presentation given by Traineau on November 28, 2006, and stating that Senac should "get into contact with Benoit in order to really come up together with a common plan asap.").

  o In December 2006, Benoit Traineau discussed the history of the Convention, the ongoing negotiations with CEPS, and the likelihood of a 10% future price decrease for Tambocor CR with Meda's Country Manager for France.  *See* DX-302 (Email chain dated December 13, 2006) (indicating Senac had discussed potential price reductions with Traineau); Traineau Decl. at ¶¶ 44-48; JX-110 (Email chain dated December 19, 2006) (discussing potential price decreases).

  o In December 2006, Benoit Traineau provided Meda with a budget reflecting a 10% decrease in the price of Tambocor CR in France.  *See* DX-310 (budget provided by 3M to Meda for 2007 reflecting a 10% decrease in the price of Tambocor CR); Trial Tr. at 315:17-316:2 (Larnholt).

  o Meda's subsequent conduct when presented with Article 2.2 demonstrates that it already knew about that provision prior to closing.  *See* Traineau Decl. at ¶¶ 36-39; *see also* JX-161A (reflecting that 3M Sante's conventions and correspondence with CEPS were delivered to Meda on January 2, 2007); *see also* DX-588 (presentation showing the text of Article 2.2); Senac Dep. at 70:16-71:4, 79:18-80:5, 91:20-95:12.

- However, rather than declaring a "Material Adverse Effect" or otherwise refusing to move forward once it had knowledge of Article 2.2, Meda proceeded with the purchase – without any objection or reservation.

  o *See* DX-301 (Email from Senac to Dierks, dated December 13, 2006) (Meda internally discussed "whether or not we shall discuss guaranties from 3M France on the occasion of the local closing," but ultimately no such guaranties were proposed or agreed to.).

o   *See* DX-281 (Acquisition Agreement) at § 8.03(a) (condition to Closing that there be no breach of warranty having a Material Adverse Effect arising between the date of the Acquisition Agreement and the Closing); *id.* at 6 (definition of "Material Adverse Effect").

o   *See* DX-281 (Acquisition Agreement) at § 9.01 ("This Agreement may be terminated at any time prior to Closing . . . (d) by Purchaser, upon prior written notice to Seller, in the event a condition set forth in Section . . . 8.03 becomes incapable of being fulfilled and has not been waived by Purchaser.").

o   *See* Keel Decl. at ¶ 87 ("[A]t no time did Meda seek to renegotiate the purchase price for the European Pharma business pursuant to the Material Adverse Effect provisions of the Acquisition Agreement (Exhibit DX-281).   In fact, Meda never once even mentioned the possibility of doing so to me or, to my knowledge, to *anyone* at 3M or Goldman despite the fact that numerous other issues were raised and resolved.").

**D.      Meda Has Not Demonstrated That It Sustained Any Damages Caused By Its Alleged Reliance On 3M's Alleged Misrepresentations And Omissions.**

**1.      Meda's request for damages is based upon unreliable information, subjective speculation, incorrect factual presumptions, and a flawed methodology.**

•   Neuberger's damages opinions are dependent upon the validity of the opinions of Mariotte and Gallagher.   Trial Tr. at 790 (Neuberger) ("Q: When you say your ultimate opinion regarding the amount of damages was based on inputs from other experts, first of all, what experts?   A:  That would be Mr. Gallagher and Mr. Mariotte."); *id.* at 793 ("Q: Would it be fair to say that the damages figures that you've ultimately published in your reports and in your declaration depend on the validity of the input that you receive[d] from those two experts? A:  The specific numbers themselves, yes . . .").

•   Mariotte's opinions are purely subjective.   Trial Tr. at 621 (Mariotte) .("Q: You understand, Mr. Mariotte, that the damages expert for Meda in this case, Mr. Neuberger, is basing his calculations in part upon your assessment of [the] probabilities that CEPS would have enforced Article 2.2 of the March 2003 convention?  A:  Yes, I do."); *id.* at 629 ("Q: [I]s there some formula, objective quantification formula, that you used in coming up with those probabilities that you express?  A:  No . . . I speak as just an experienced person . . .").

•   It is essential in a damage analysis to isolate the effects of the alleged breach.  Trial Tr. at 796 (Neuberger) ("Q: It is your opinion is it not [that] in quantifying the difference between breach and non-breach purchase prices, it is essential to properly isolate the effects of the alleged breach?  A:  Yes, I do believe that very strongly . . . Q: If . . . it would be expected that there would be a price decrease due to factors other than knowledge of the [March] 2003 convention, that's something you would have to separate, correct, from the effects of knowing of that 2003 convention in order to do what you say needs to be done, namely, to isolate the effects of the alleged breach? A:  Yes.").   *See also* Neuberger Decl. at ¶ 19; Neuberger Report at ¶ 13.

- However, Mariotte did <u>not</u> isolate the purported effects of the alleged breach from other factors that would have caused a reasonable purchaser to expect future reductions in the reimbursement price of Tambocor CR.  *See* Mariotte Decl. and Reports attached as Exhibits 2 and 4 thereto.

- Mariotte provided certain percentage price reductions, but failed to separate those percentages from any of the other pricing risks facing any pharmaceutical company applying for reimbursement in France.  In fact, Mariotte acknowledges that the price of Tambocor CR in France today is still "higher than Flecaine LI to this day, in violation of CEPS' policy."  *See* PX-410 (Mariotte Rebuttal Report) at 14.

- Furthermore, Mariotte presumed that the price of the "generic drug corresponding" to Tambocor CR would be 50% of the price of Tambocor CR – which is incorrect (the price of a generic is negotiable).  *See* Mariotte Decl. at ¶ 33; *see also supra* § I.A.2.b.

- Mr. Gallagher performed a calculation based solely on assumptions provided by counsel for Meda; he rendered no opinion on the reasonableness or reliability of any proffered percentage price decrease.  Gallagher simply applied price reductions of 30%, 40%, and 50% as provided to him by counsel and prepared several calculations incorporating those percentages.  Although Gallagher allegedly attempted to calculate what a hypothetical Tambocor CR 2007 France sales number would be based on information provided by 3M to Meda, the information Meda received from 3M does not identify any such number.  Through his various calculations, Gallagher came up with a number for projected 2007 *net* Tambocor CR France sales of $55 million.  This projected *net* sales number <u>exceeds</u> the gross sales 3M projected in the Management Presentation for <u>all</u> of Tambocor CR in <u>all</u> of <u>Europe</u> by <u>$8 million</u> and exceeds the 3M strategic plan projection for Tambocor CR 2007 revenues in France by $12 million.  *See* Gallagher Decl. at ¶¶ 12 and 19; *see also* PX-401 (Gallagher Report) at 3, I (first sentence) and 7, VI; Trial Tr. at 647:8-24, 649:19-650:12, 657:24-659:25, and 653:24-655:8 (Neuberger); DX-192; PX-412.

- Gallagher also admitted that he had not seen Neuberger's report and did not know what Neuberger had done with any calculations he provided to Neuberger.  In fact, Neuberger simply adopted Gallagher's $55 million projected *net* 2007 Tambocor CR sales number as if it were (1) based on an actual opinion as to the isolation of any factors and (2) reasonable, reliable, and a constant.  Neuberger relied on the $55 million being a constant in his damages calculation, because otherwise he "would have a lot of moving parts, it would be very difficult to implement."  Neuberger testified that his formula is a "function of the EBITDA projections that Mr. Gallagher produced," and "a relationship between that percentage price reduction and certain elements of the income statement from 3M's pharma business."  Gallagher's calculation, however, was <u>not</u> based on any cardio sales figures or cost of goods sold figures from any 3M income statement provided to Meda and did not produce a number that bore any resemblance to the numbers 3M or Meda projected at any point prior to or during the negotiations.  In addition, Gallagher did not attempt to isolate any impact of Article 2.2.  *See* Trial Tr. 651:14-20 and 795:3-18 (Neuberger).

- The only evidence based on fact and not expert speculation is what 3M did to account for the risk and what Meda did to account for the risk, when each was aware of Article 2.2. As Neuberger concedes, with full knowledge of the convention and Article 2.2 – whatever it meant – 3M based its operating plans for 2006 and 2007 upon the assumption of a 13% price decrease for 2006 and a 10% price decrease for 2007.  When Meda purportedly first learned of Article 2.2, it never altered its 15% price decrease already built into its budget and based on other risk factors, separate and apart from Article 2.2. *See* Trial Tr. 799:13-800:16 (Neuberger); *see also* Trial Tr. 366:14-25 (Stenqvist); JX-116.

### 2.   Meda did not suffer any injury in connection with its French subsidiary's acquisition of 3M Sante's French Business and Assets.

- The French pharmaceutical Business and Assets for which Meda alleges it overpaid were actually conveyed by a party <u>other</u> than 3M to an entity <u>other</u> than Meda pursuant to a contract <u>other</u> than the Acquisition Agreement.  *See* DX-330 (French Agreement); Keel Decl. at ¶ 78.

- The French Agreement conveyed valuable, business-critical assets with respect to Tambocor CR.  For example, Schedule 5.2(b).5 to the French Agreement is a list of transferred "Marketing Authorizations," which includes French marketing authorizations for various dosages of Tambocor CR.   Schedule 5.2(b).2 lists transferred "pre-wholesalers and other customers" of Meda France, including cardiologists prescribing Tambocor CR.  *See* DX-330 (French Agreement) at Schedule 5.2(b).

- The rights to Tambocor CR and IR were sold by 3M Sante to Meda France, and not to Meda.  *See* Trial Tr. at 199-200 (Dierks) ("Q:  By the way, Mr. Dierks, who owns the drug registrations for Flecaine LI and LP today?  A:  Owns is a good question.  Normally, the holder is the country organization . . . I think the registration itself is held by the country organization, which means [Meda] France . . ."); Trial Tr. at 387 (Stenqvist) ("Q: And part of the assets including [in the French transaction] – I'm looking at page 36 in the excerpt [of the French Acquisition Agreement] – are lists of marketing authorizations to be transferred . . . to the buyer?  A:  Yeah, the marketing authorizations, they have to be included in local agreements because it's really the local companies who deal with the local regulatory authorities . . .").

- Meda France, Meda's French subsidiary, was the "Buyer" of the French Business and Assets and the obligor by whom the $132,987,438 purchase price was "payable."  *See* DX-330 (French Agreement) at §§ 1.1 and 5.2; *see also* DX 393 (First Amendment to French Agreement); DX 421 (Second Amendment to French Agreement).

- Meda paid $132,987,438 for the French Business and Assets *not* on its own behalf, but rather, as agent and on "behalf" of non-party Meda France.  *See* DX-330 (French Agreement) at § 1.2; Keel Decl. at ¶¶ 76, 79.

- Meda made a loan to Meda France to acquire the rights to Tambocor CR in France, and obtained a valuable receivable in return.  *See* Trial Tr. at 388-89 (Stenqvist) ("Q:  As I

understand it, the way money flowed was that Meda AB paid the purchase price stated in the French agreement and addendum of $132 million . . . on behalf of its French subsidiary, and then took a receivable on its balance sheet.  Is that generally correct?  A: Yes, we finance all our subsidiaries through deby, but only as much debt as we can. . . . Q:  Then . . . if you apply that conversion rate to this balance sheet, you get about $451 million that the parent company accounted for as a receivable on its balance sheet?  A: Yes.  Yes.  What form did that receivable take?  Was it a note, securitized debt?  A: What's reflected here is our intercompany financing . . . The group extends loans to the subsidiaries.  This particular year [2007], the local acquisitions were an important part of those reasons because obviously France didn't have any resources to purchase anything.").  *See also* DX-535 (Meda 2007 Annual Report) at 92.

- The stipulated price set forth in the French Agreement represents the agreed-upon value paid for the entirety of that Business and those Assets (including Tambocor-related French marketing authorizations, customer lists, and contracts) – which is far <u>less</u> than the damages Meda seeks to recover from 3M.  *See* DX-330 (French Agreement) at § 7.12; *id.* at Schedule 5.2(b).

- There were two amendments to the French Agreement, the second of which in September 2008, increased the purchase price for the French Business and Assets, reaffirming Meda's valuation of the French Business and Assets even after Meda had asserted a claim against 3M.  *See* DX-393 (First Amendment to French Agreement); DX-421 (Second Amendment to French Agreement).

- Meda's own damages experts did not take into account the agreed-upon monetary value exchanged for the French Business and Assets.  *See generally* Gallagher Decl.; Neuberger Decl.

### 3.   <u>In any event, Article 2.2 did not lead to or cause any price reduction in Tambocor CR, and Meda sustained no injury.</u>

- Meda's September 2007 Convention with CEPS regarding Tambocor CR did <u>not</u> contain Article 2.2.  *See* Senac Dep. at 96, 104 ("Q:  [Y]ou entered a convention with CEPS in September 2007, correct?  A:  Yes. . . .  Q:  And those [Article 2] clauses were not included in the September 2007 convention that you signed with Mr. Renaudin, correct?  A:  Yes, that is correct."); JX-095 (September 2007 Convention); Senac Dep. at 104-05 ("Q:  And in connection with the September 2007 convention you had no discussion with Mr. Renaudin regarding those clauses, the Flecaine clauses?  A:  I am under oath and my answer is no."); *id.* at 109 ("Q:  In this September 28th, 2007 meeting that you had with Mr. Renaudin did he mention a contractual decrease of 50% to the price of Flecaine LP? A:  The answer is no.").

- The pre-closing reimbursement price of Tambocor CR remained at its pre-Closing level of 17.10 Euros for twenty-two (22) months following the Closing on January 2, 2007; this despite Meda's own projections pre-closing which assumed a reduction of 10%.  *See* JX-95, JX-115, and JX-126.

- In both 2007 and 2008, Meda's sales of Tambocor CR exceeded projections related to Tambocor CR in France, Tambocor CR in Europe, and Tambocor CR+IR in Europe. *See* JX-131 (Expert Report of Michael Cragg) at ¶ 23 and Figures 1.1, 1.2, and 1.3.

- Meda performed better than was budgeted in both 2007 and 2008. *See* Diakonoff Dep. at 43:4-9 and 51:13-17; PX-432 and PX-434 (listing the budget information for 2007 and 2008 compared to the actual results listed in PX-431 and PX-433, respectively).

### 4. <u>A knowledgeable buyer would have assigned no independent risk to Article 2.2, as is evident from the actual conduct of both 3M and Meda.</u>

- Article 2.2 was a reflection of CEPS' published policies. *See* Trial Tr. at 1362:7-1363:25 (Schur); DX-259 (Email dated September 26, 2006 from Larnholt to Keel) (indicating Meda's knowledge of the generic competition that would affect Minitran and Tambocor). *See also supra* § I.A.3.c.(2).

- 3M projected only moderate price decreases for Tambocor CR in 2006 and 2007. *See* Trial Tr. at 799 (Neuberger) ("Q: [I]n 2006, 2007, was there a pharmaceutical company who was both possessed of knowledge of the [March] 2003 convention and made projections of future price movements with respect to the drug at issue? A: Yes, that would be 3M."); Trial Tr. at 1136-37 (Barreau) ("[W]hat we included for 2006 operating plan was minus 13 percent on flecainide LP . . . [I]n 2007 operating plan, we included minus 10 percent on the selling price for Flecaine LP.").

- Meda's purchase of the business assumed a 10% price reduction. *See* Larnholt Decl. at ¶ 77; Stenqvist Decl. at ¶¶ 50-52; Trial Tr. at 319:20-320:17 (Larnholt).

- The 10% price reduction assumed by Meda was based on 3M Sante's assumptions in its 2007 Operating Plan. *See* Traineau Decl. at ¶ 50; Forey Decl. at ¶ 24; JX-110 (Email from Kromp to Senac dated December 19, 2006); DX-310 (Email from Piccault to Forey dated December 20, 2006); Dierks Decl. at ¶¶ 48-49.

- The 10% price reduction contained in 3M Sante's 2007 Operating Plan was based on a reasonable estimate of the actual pricing risks confronting Tambocor CR. *See* Barreau Decl. at ¶ 28; *see also* Forey Decl. at ¶¶ 24-25; Trial Tr. at 1116:10-1117:3 (Barreau); Stenqvist Decl. ¶ 68; Trial Tr. at 369-370 (Stenqvist).

- The 3M employees preparing 3M Sante's 2007 budget had every reason to be as accurate as possible in preparing the budget. *See* Barreau Decl. at ¶¶ 9 and 20-21; *see also* Forey Decl. at ¶¶ 17-20.

- Meda assigned no independent risk to Article 2.2 once it purportedly learned of the provision. Meda never believed that Article 2.2 actually presented a 50% price reduction on its largest product in its largest market as demonstrated by its own risk allocation and forecasting. *See* Cragg Decl. at ¶ 18; *see also* Trial Tr. at 1252:15-1253:23 (Cragg); DX-588 (Email from Kolsky to Senac dated January 22, 2007).

- Meda built a 15% price reduction for Tambocor CR into its 2008 budget based on Christian Senac's recommendation from his negotiations with CEPS and Noel Renaudin in September 2007, where Mr. Renaudin mentioned only the new lower tariff price of Tambocor IR as a basis for requesting a reduction in the price of Tambocor CR in 2008. *See* JX-116 (Email from Nicole Beau de Lomenie dated October 3, 2007).

- The 15% price reduction for Tambocor CR in France was built into Meda's budget for 2008.  *See* Trial Tr. at 363:23-364:7 (Stenqvist).

- Meda contends it learned of Article 2.2 and CEPS' demand to reduce the price by 50% on December 31, 2007.  Meda, however, did not change its budgeted forecast.  Meda did not change its forecast at any point in 2008 because "there was a dialogue going on between our local French company and the CEPS authority. So it was we had some hopes that this convention would be renegotiated." Meda never accounted for any additional risk, above or beyond the 15% risk it had in its initial 2008 budget.  Thus, Meda believed its negotiations could and would yield only a 15% (or less) price reduction for Tambocor CR.  *See* Trial Tr. at 364:10-23, 365:9-16, 365:17-366:25 (Stenqvist).

- The risk, if any, imposed by Article 2.2 was no different or greater than the risk imposed by the pricing pressures known to Meda and disclosed by Meda to its own investors.  *See* Cragg Decl. at ¶¶ 16-17.

- The 15% risk that Meda incorporated into its 2008 budget is a risk encompassed by the generalized disclosures made in its 2007 Annual Report DX-535.  Those known, public risk factors on pricing of products and actions by governmental authorities such as CEPS existed regardless of Article 2.2.  *See* Trial Tr. at 373:20-376:3 (Stenqvist).

- Even when Meda admittedly knew of Article 2.2, Meda did nothing to separately account for that risk, beyond what it had already built in reflecting the generalized risks and risks recommended by Senac having nothing to do with Article 2.2.  *See* Trial Tr. at 366:20-25 (Stenqvist).

- Meda has not been damaged because the forecasts for Tambocor sales upon which it purportedly relied were lower than forecasts that incorporated the estimated risks posed by Article 2.2.  *See* Cragg Decl. at ¶ 12; Trial Tr. at 1232:32-1239:7 (Cragg).

## II.

## MEDA HAS NOT CARRIED ITS BURDEN OF PROVING
## ITS CLAIM FOR BREACH OF CONTRACT[1]

**A.    3M Did Not Breach Any Of The Representations Or Warranties Of The Acquisition Agreement On Which Meda Sues.**

- *See supra* § I.A.2.

**B.    In Any Event, The Acquisition Agreement Did Not Govern The Transfer And Sale Of The French Business And Assets.**

- The French Agreement governed the sale of the French Business and Assets.  *See* DX-330 (French Agreement); *see also* DX-281 (Acquisition Agreement).

- The operative representations and warranties relating to the French Business and Assets are contained in the French Agreement (none of which were breached or alleged to have been breached).  *See* DX-330 (French Agreement).

- The Acquisition Agreement did not represent the *conclusion* of a purchase-and-sale process, but rather, was the *beginning* of a contemplated series of contracts and transactions pursuant to which the assets relating to 3M's pharmaceutical business in specific European countries were sold by various 3M subsidiaries to the various Meda subsidiaries.  *See* DX-281 (Acquisition Agreement) at 15; Keel Decl. at ¶ 75.

- Meda was bound by the French Agreement and the Side Letter.  *See* DX-281 (Acquisition Agreement) at § 4.02; DX-330 (French Agreement) at § 7.3; DX-336 (Side Letter).

- The Side Letter provided for specific incorporation of the sections of the Acquisition Agreement relating to price adjustments and employment matters into the French Agreement.  *See* DX-336 (Side Letter) at § (i) (The parties agree "they will implement the French Agreement (in particular its provisions relating to the price's adjustment and to the employee matters) in accordance with the more detailed provisions contained in the Master Agreement.").

- Section (ii) of the Side Letter provided that "in the event of any conflict between the provisions of the French Agreement and the Master Agreement, the provisions of the Master Agreement shall prevail."  *See* DX-336 (Side Letter) at § (ii).

- As the parties to the Acquisition Agreement specifically provided in § 11.16, "Notwithstanding any other provisions in this Agreement to the contrary, in the event and to the extent that there shall be a conflict between the provisions of this Agreement and

---

[1] These facts also defeat Meda's claim for breach of the implied duty of good faith and fair dealing.

37

the provisions of any Ancillary Agreement [which comprises the French Agreement] entered into by Seller and Purchaser pursuant to this Agreement, the provisions of such Ancillary Agreement shall control (unless the Ancillary Agreement provides otherwise)." *See* DX-281 (Acquisition Agreement) at § 11.16.

- Section 7.3 of the French Agreement provided that "Seller Parent [defined as 3M Company] is a third-party beneficiary of Seller and Buyer Parent [defined as Meda AB] is a third-party beneficiary of Buyer for all purposes under this Agreement." *See* DX-330 (French Agreement) at § 7.3.

- Section 7.9 of the French Agreement provided that "[t]his Agreement constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter of this Agreement." *See* DX-330 (French Agreement) at § 7.9.

- Thus, the French Agreement, as modified by the Side Letter, supplanted those provisions of the earlier Acquisition Agreement that did not concern the post-closing implementation of the French Agreement (such as the pre-closing representations and warranties at issue in this action). *See* DX-330 (French Agreement) at § 7.9; DX-281 (Acquisition Agreement) at § 11.16; DX-336 (Side Letter).

- The parties demonstrated their reliance on the French Acquisition Agreement by virtue of their approval subsequent amendments to the French Agreement. *See* DX-393 (First Amendment to French Agreement); DX-421 (Second Amendment to French Agreement).

- Meda closed with full knowledge of the facts which it claims it did not know. *See* Traineau Decl. at ¶¶ 36-39; Trial Tr. at 1194:5-1204:18 (Traineau).

## C. The Alleged Breaches Of Warranties Did Not Cause Meda Any Damages For Which It Is Entitled To Indemnification.

- *See supra* § I.D.

- The alleged breaches did not cause Meda any injury because it knew that it had not been provided with any CEPS' conventions, yet refrained from terminating the Acquisition Agreement pursuant to Sections 8.03(a) and 9.01(d) thereto. *See* Trial Tr. at 280-82 (Dierks); Trial Tr. at 313 (Larnholt). *See also* DX-281 (Acquisition Agreement) at 53-54.

- The alleged breaches did not cause Meda any damage because the disclosure of Article 2.2 would not have materially impacted the price paid by a reasonable purchaser. *See* Cragg Decl. at ¶ 18; *see also* Trial Tr. at 1252:18-1253:23 (Cragg).

- Meda did not suffer any "Losses" for which it is entitled to indemnification.

  o Section 10.01 of the Acquisition Agreement, provides, in pertinent part: "(a) From and after the Closing, Seller shall indemnify, defend and hold harmless Purchaser . . . from and against all Losses incurred the Purchaser . . . that arise out of: (i) Any

breach by Seller of any of Seller's representations and warranties contained in this Agreement . . . (b) Seller's indemnification obligation under Section 10.01(a) . . . shall be subject to each of the following limitations:  (iv) There shall be no obligation to indemnify under Section 10.01(a)(i) . . . for any amount, in the aggregate, in excess of one hundred million dollars ($100 million) . . ." DX-281 (Acquisition Agreement) at § 10.01.

o  Section 10.03(a) of the Acquisition Agreement, provides, in pertinent part:  "From and after the Closing, the exclusive remedy of each party in connection with this Agreement and the transactions contemplated hereby (whether under this contract or arising under common law or any other Law), other than claims of, or causes of action arising from, fraud, shall be as provided in this Article X . . . , and each party hereby waives, from and after the Closing, to the fullest extent permitted under applicable Law, any and all other rights, claims and causes of action related thereto." DX-281 (Acquisition Agreement) at § 10.03(a).

o  In Section 10.03(b), Meda agreed that its only remedy for breach of the contractual representations and warranties of the Acquisition Agreement (other than claims for fraud) is to seek indemnification for any actual "Losses" incurred.  *See* DX-281 (Acquisition Agreement) at § 10.03(b).

o  The term "Losses" is defined in Section 1.01 of the Acquisition Agreement as:  "'Losses' means any and all <u>actual</u> losses, Liabilities, damages, judgments, settlements and expenses (including interest and penalties recovered by a third party with respect thereto and reasonable attorneys' fees and expenses)."  DX-281 (Acquisition Agreement) at 6, § 1.01 (emphasis added).

o  Plaintiff's asserted damages are not Losses under the Acquisition Agreement because Plaintiff has not suffered any <u>actual</u> pecuniary harm as a result of any alleged breach – to the contrary, the business has exceeded the forecasts upon which Meda allegedly relied.  *See* JX-131 (Expert Report of Michael Cragg) at ¶ 23 and Figures 1.1, 1.2, and 1.3.

•  Meda failed to comply with the notice requirements of Section 10.02 of the Acquisition Agreement relating to requests for indemnification..

o  Meda seeks over $200 million based on its allegation that it overpaid for 3M's European pharmaceutical business.

o  Section 10.02 of the Acquisition Agreement provides that in order to assert a claim under Article X, Meda must provide 3M with a "Claim Notice."  *See* DX-281 (Acquisition Agreement) at § 10.02.

o  Meda's Claim Notice, dated March 28, 2008, while timely served, does not "specif[y] in reasonable detail the nature" of Meda's breach of contract claim in this case, as required by Section 10.02(a).  *See* DX-399 (Letter from Farrington to 3M dated March 27, 2008).

- o   Specifically, Meda's Claim Notice described the "Nature of the Claim" as being "estimate[d]" losses that Meda "could incur" because it will be forced sell the drug Flecaine within France for a lower price than anticipated at closing.  Meda also alleged "estimates" of losses that it "could incur" if the French government imposed additional pricing directives on the drug Aldara because of 3M's alleged failure to carry out certain regulatory obligations prior to the closing. Nowhere in the Claim Notice did Meda assert a claim for "overpayment" of 3M's European pharmaceutical business.  *See* DX-399 (Letter from Farrington to 3M dated March 27, 2008).

- In addition, Meda failed to comply with the mitigation provisions of Section 10.05 of the Acquisition Agreement.

  - o   Meda first asserted a claim for indemnification against 3M on March 27, 2008.  3M responded approximately one month later, on April 24, 2008.  *See* DX-399 (Letter from Farrington to 3M dated March 27, 2008).  *See also* DX-425 (Letter from Malech to Larson dated November 24, 2008).

  - o   Meda was required to cooperate with 3M in resolving Meda's alleged issues with CEPS.  *See* DX-281 (Acquisition Agreement) at § 10.05.

  - o   Meda, however, unilaterally entered into negotiations and subsequent agreements with CEPS – without notice to 3M or an opportunity for 3M to be involved in the discussions.  *See* DX-425 (Letter from Malech to Larson dated November 24, 2008); JX-126 (Convention dated September 17, 2008).

Dated:  New York, New York        **BICKEL & BREWER**
       January 30, 2013


By:  /s/ Alexander D. Widell
     William A. Brewer III
     James S. Renard
     Michael J. Collins
     Alexander Widell
     Jeremy D. Camp
     767 Fifth Avenue, 50th Floor
     New York, New York 10153
     Telephone:  (212) 489-1400
     Facsimile:  (212) 489-2384
     adw@bickelbrewer.com


**DORSEY & WHITNEY LLP**

Theresa M. Bevilacqua
50 South 6th Street, Suite 1500
Minneapolis, Minnesota 55402
(612) 340-2600


**Attorneys for Defendants**

41