D1FJMED1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
MEDA AB

                    Plaintiff

          v.                            11 CV 0412 (AJN)

3M COMPANY, 3M INNOVATIVE
PROPERTIES COMPANY, and RIKER
LABORATORIES, INC.

                    Defendants
------------------------------x

                                        New York, N.Y.
                                        January 15, 2013
                                        9:30 a.m.


Before:
                    HON. ALISON J. NATHAN,
                                        District Judge

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

D1FJMED1

1          (Trial resumes)

2          (In open court)

3          THE COURT:  Good morning, everyone.  Please be seated.

4          Preliminary matters to address.  We had talked about,

5  talking about the translation dispute.  Do you want to do that

6  now?

7          MR. ARMENIO:  We can give an update, your Honor.  We

8  did have discussions with the defendants and we have narrowed

9  the disputed number of JXA translations to 8.  We are going to

10  try to get it down even further.  None of those disputed

11  translations related to anyone who testified yesterday or

12  anyone through the fact witnesses of Mr. Renaudin and Mr.

13  Stenqvist this morning.  With the court's permission, we'll

14  keep trying to even further hopefully narrow or eliminate the

15  disputes.

16          THE COURT:  That sounds good and that would be great.

17          While we are here, do you want to move the admission

18  of the undisputed translations in if you have the other 172

19  numbers?

20          MR. ARMENIO:  It is actually a pretty lengthy -- what

21  we can put on the record more easily for the court is perhaps

22  list the 8 that remain disputed.

23          THE COURT:  Is this broader than the 1 through 180?

24          MR. ARMENIO:  It is within the JXA 1 through 180.

25  Instead of listing the --

D1FJMED1

1          THE COURT:  You don't have to do that.

2          MR. ARMENIO:  -- the disputed JXA's remain only 8, JXA

3    24, 25, 26, 140, 141, 163, 167 and 173, those are the only

4    JXA's still under dispute and discussion, so we would offer all

5    of the other JXA exhibits.

6          THE COURT:  Okay.  Just verbal agreement from the

7    defendant?

8          MR. CAMP:  No objection.

9          THE COURT:  With the exception of the translations Mr.

10   Armenio just noted, JX 1 A through 180 A are admitted.

11         (Joint Exhibits 1 A through 180 A received in

12   evidence)

13         THE COURT:  Anything else you want to move in at this

14   point?  We haven't talked about how you want to do the

15   declaration designations and exhibits.  Do you want to move

16   those at one particular point or how did you want to address

17   this?

18         MR. ARMENIO:  We were going to try to work with the

19   defendants to just have one en mass deposition designation

20   proffer for your Honor just so we can do it all at once and not

21   take up the court's time throughout.  I would think we are

22   still working on that maybe tomorrow if we could.

23         THE COURT:  That is fine.  So you'll do that and

24   taking into account both the designations and the proffered

25   exhibits to the extent that any exhibits are coming in via the

D1FJMED1

1   designations through agreement, and you'll just identify for me

2   any outstanding objections that you need to have resolved or

3   have in mind, okay?

4          MR. ARMENIO:  Yes, your Honor.  Thank your Honor.

5          THE COURT:  Another logistical question.  I found some

6   time on my calendar a week from today.  If want to move -- two

7   weeks from today.  Thank you -- two weeks from today if you

8   want to move the closing, the oral closing to the Tuesday after

9   we finish rather than the next day, and as I say, I want to do

10  this quite fast after the close of evidence so it is fresh in

11  my mind, but I also want to give both you all and me some

12  reasonable amount of time to put it together.

13         MR. ARMENIO:  So for the plaintiff's, your Honor,

14  unfortunately, Mr. Carlinsky would have a conflict with the new

15  proposed date.  We certainly appreciate the court offering it,

16  but we propose to keep it as your Honor already suggested on

17  next Thursday.

18         MR. CARLINSKY:  Just to be clear, I have a rescheduled

19  oral argument in the Central District of California that day.

20  I would endeavor to try to move it, but I have close to zero

21  optimism on moving it.

22         THE COURT:  Did you reschedule it because I said we

23  were going to be here that Thursday?

24         MR. CARLINSKY:  I rescheduled it because we had the

25  final pretrial on the 8th, scheduled January 8th.  So I moved

D1FJMED1

```
 1   it, got it moved to the 29th.

 2               THE COURT:  Okay.  We looked to see, I am just seeing

 3   if there is anything else that week that we can do.

 4               (Pause)

 5               THE COURT:  I could potentially do Wednesday.  I have

 6   a guilty plea which I would move, but we can just break for

 7   that, and I have students coming in for a mock trial, but I can

 8   see about moving that if that worked.  If it doesn't --

 9               MR. CARLINSKY:  The problem is --

10               THE COURT:  -- I'll let the kids come in.

11               MR. CARLINSKY:  The problem for me is the argument is

12   the 29th.  I am hoping to catch the the red eye on the 29th.  I

13   am not going to be in particularly good shape on the 30th.

14               THE COURT:  I have a sentencing that we'd have to work

15   around on that Thursday, but that is definitely the outer

16   limit.  Otherwise, I'm running against my --

17               MR. ARMENIO:  Thank your Honor.  We appreciate your

18   Honor's understanding of Mr. Carlinsky's oral argument and

19   happily accept the defendants' date.

20               MR. RENARD:  Moving it would allow us a more effective

21   opportunity to look at the record and gather everything

22   together for your Honor's benefit.  Thursday would be

23   agreeable.

24               THE COURT:  Thursday, the 31st works?

25               MR. RENARD:  Yes.
```

D1FJMED1

1          THE COURT:  All right.  We'll do that.  I'll let you

2      know what time we'll start.  Let's assume 9:30.  I'll let you

3      know if that's going to change.

4          MR. CARLINSKY:  I want to thank the court.

5          THE COURT:  You're welcome.  I saw the looks on your

6      faces when I said Thursday is all I can bear.

7          In honesty, I want that, that's for me for it to be

8      useful.  As long as you don't come up with some crazy new

9      arguments between when we close evidence and -- which never

10     happens in this case -- I think it will be useful for all of us

11     to have some time together.  My thought is it won't be too far

12     away that the freshness of the evidence won't be lost.

13         I wanted to just give some thoughts on the evidentiary

14     objections yesterday.  I have looked at the hearsay objections

15     that were made with respect to the Lonner and Dierks testimony

16     and accompanying exhibits.  It seems to me to the extent that

17     that testimony and exhibits are being offered to establish the

18     truth of what Mr. Renaudin said, the business record exception

19     which is proffered, at least as proffered would not apply.  I

20     would sustain that objection.

21         There were some -- now, some alternative theory of the

22     basis for the proffer was offered which I would consider as

23     needed in forming my opinion on this.  It is not clear to me

24     exactly what -- actually, I want to make a record so I

25     understand it.  What was the alternative for the purpose

D1FJMED1

1    suggested?  I think you said something like for its impact?

2              MR. ARMENIO:  Yes, your Honor.  There were two

3    alternative purposes.  One was that these were contemporaneous

4    recordings and recordings of what Mr. Renaudin said because

5    they had indicia of credibility.

6              THE COURT:  You're making the business record

7    exception?

8              MR. ARMENIO:  Correct.

9              THE COURT:  Under the business records exception?

10             MR. ARMENIO:  Business records exception for

11   established recording and conduct.  Then there is the general

12   catchall for hearsay exceptions where the indicia of

13   credibility --

14             THE COURT:  I wasn't sure if you were looking at the

15   catchall or making just the argument within the business record

16   exception.

17             MR. ARMENIO:  The business record exception would be

18   one and I think that addresses the first level.  The e-mail

19   itself is fine.  Now the report of the Renaudin statement, I

20   would say it is contemporaneous in time so it has that aspect

21   of overcoming hearsay.

22             It also has in general a catchall indicia of

23   credibility since it is a report from a subordinate to a

24   superior about a recent conversation, the third basis that your

25   Honor mentions, you had mentioned, your Honor had mentioned in

D1FJMED1

1    the final pretrial conference you may want to understand the

2    conduct between CEPS and Meda after closing because it may

3    impact on certain of your Honor's thinking about how people

4    actually dealt with this in the real world, and on that

5    alternative basis, what's being reported to Meda about Mr.

6    Renaudin's comments certainly shows what Meda's state of mind

7    was when it took certain actions and made certain agreements

8    with CEPS.  So that was the alternative basis for the proffer.

9         THE COURT:  Thank you.  It seems to me that

10   non-hearsay basis would be appropriate.  I don't think, I don't

11   think this fits at least based on the foundation in front of me

12   of the business records exception, and I wouldn't, I wouldn't

13   apply the catchall, either.

14        The demand letters that were also -- oh, sorry.  I

15   looked at the specifics.  They were all generally of the same

16   pattern with the exception of two of the e-mails, forwarded

17   letters from Renaudin.  That is a different situation.  I

18   didn't know whether, Mr. Collins, your objection, your

19   objection, Mr. Collins, applied to the letters as well or if it

20   is the letters you agreed would come in?

21        MR. COLLINS:  I guess they're still hearsay, your

22   Honor.  I guess the argument is it is a business record, but I

23   don't think that is proved or not properly --

24        THE COURT:  You don't think the letters on the

25   letterhead from the committee and the like at least have the

D1FJMED1

1    indicia of reliability?

2             Would you think it is somehow not kept as, the

3    documents aren't kept as a regular matter at Meda?

4             MR. COLLINS:  My objection would be I have no reason

5    to believe they're not, but I don't think they met the burden

6    of proof.

7             MR. ARMENIO:  Your Honor, it is an official record, as

8    your Honor records on its face it has the CEPS letterhead

9    signed by Mr. Renaudin.

10            THE COURT:  Public record?

11            MR. ARMENIO:  Public record.  In addition to being

12   conveyed as a business record, that is separate, it is a public

13   record in and of itself, so it is not hearsay.

14            MR. COLLINS:  I don't think it gets the proper use of

15   a public record exception, that it is not something that is

16   generally found in the public records.  It is not in the public

17   records.  It is a letter to Meda.  I am not saying either way,

18   I just don't know.  Again I don't think they met the burden of

19   showing it was public records.

20            THE COURT:  Who did the letter go?  It went to Maupas?

21            MR. ARMENIO:  Mr. Maupas, M A U P A S.

22            THE COURT:  I've got designations from him, right?

23            MR. ARMENIO:  Yes.

24            THE COURT:  Do they provide any foundation for the --

25   I can't remember.  I think it might be attached, these e-mails

D1FJMED1

1    might be attached to his --

2          MR. ARMENIO:  We have to check and easily can confirm

3    that for you.

4          THE COURT:  Why don't you, as part of your efforts to

5    see if you have agreement on coming in through the depo

6    designations, see if you can get agreement on that.  It seems

7    to me that letter is likely coming in.

8          Then there was also a slide.  This I just was not

9    clear from the text of PX 541 which there was a paragraph in

10   Mr. Dierks' declaration that seemed a bit of a non sequitur.

11   It is something like we had a meeting yesterday and 541 was a

12   set of slides.  This doesn't fall into the general pattern of

13   seeming to me trying to get in for the truth of what Mr.

14   Renaudin said, so I can't apply my same basic approach.

15         What is the objection for the slides?

16         MR. RENARD:  Your Honor, I am sorry.  541 is?

17         THE COURT:  It is one of the -- PX 541, it was

18   referenced in Paragraph 54 of Mr. Dierks' declaration, which I

19   think you raised this objection, too?

20         MR. RENARD:  Yes, your Honor.  This is an internal

21   Power Point being used by Meda, not by defendants for admission

22   purposes.  It contained a lot of information, especially what

23   purports to be a history of some of the Flecaine negotiations,

24   some of the so-called rules which haven't been proved.

25         It is clearly hearsay.  It is a Meda Power Point being

D1FJMED1

1    introduced by Meda supposedly for the purpose of proving the

2    matters, at least some of the matters asserted in the Power

3    Point.

4            MR. ARMENIO:  Your Honor, this is a classic business

5    record.  You can see the e-mails from Christoph Maupas.  We can

6    establish he was a country manager in France.  It was to

7    Jorge-Thomas Dierks.  The evidence establishes he was COO, and

8    the evidence establishes he was the regional manager.

9            THE COURT:  I don't know what the slide is, do I?

10           All the declaration says is Mr. Dierks says he met

11   with Maupas and in Paris.  Attached as Exhibit 8 is an e-mail

12   from Mr. Maupas sent me the day after our meeting.

13           MR. ARMENIO:  If it is, what is trying to be conveyed

14   there, this is what was discussed at the meeting, but certainly

15   Dr. Dierks will be continuing to be on the stand and we can

16   inquire further if your Honor would like.

17           THE COURT:  As we sit here, the objection is

18   sustained, all right?  Then the last issue raised were the

19   demand letters DX 399 and DX 425.  I understand the argument is

20   that they're not -- well, that they're pursuant to 10.02 of the

21   acquisition agreement, but the language in the letter seems to

22   me quite consistent with a demand letter seeking to work out a

23   resolution.  In 399 it says we trust the seller and will work

24   with Meda to resolve the issues expeditiously and look forward

25   to receiving your response.

D1FJMED1

1          Then in 425 it is clearer, I think.  In the spirit of

2    cooperation, we notified you of material omission with the hope

3    that Traineau will act responsibly for the mistake and attempt

4    to resolve this dispute without resort to additional

5    proceedings and/or litigation.

6          I think this is for Mr. Collins.  Isn't that quite

7    classically a demand letter even though you invoke 10.02?

8          MR. COLLINS:  I guess, your Honor, the first argument

9    would be a demand by letter by itself is not a settlement

10   within Rule 408.

11         THE COURT:  A demand letter in the spirit of

12   cooperation working to negotiate a resolution?

13         MR. COLLINS:  Your Honor, with that language there,

14   but if we look at the purpose of it, that letter, it is to

15   invoke 10.02 and get that going, that we want you to indemnify

16   us and here we have to send this notice.

17         Your Honor, we believe under their interpretation of a

18   dispute resolution procedure is the filing of a complaint would

19   be the commencement of a dispute resolution procedure.  That

20   may lead to discussions.

21         THE COURT:  So your theory is that any pre-litigation

22   settlement discussion would not be covered by the rule?

23         MR. COLLINS:  It could, your Honor.  That is why we

24   have to look carefully at what we are looking at.  Our position

25   is we shouldn't use broad categories.  The fact they put some

D1FJMED1

conciliatory language in something, that's to conceal the real

purpose.  It wasn't sent under the dispute resolution.  It was

specific under Article Section 11.10 of Article 11.  It was

sent pursuant to 10.02 which required them to specify amount,

unless it is saying demand, honor your indemnification

obligations.  I agree with your Honor there is conciliatory

language in there, too.  That is not the purpose, that is not

the purpose of sending the demand under 10.02.

THE COURT:  For what purpose do you want the letter

in?  Specifically the information pertaining to an initial

evaluation of damages?  You are offering this up to -- well,

what is this for?

MR. COLLINS:  One reason, and I was thinking about

possibly using it in another examination today is they confirm

that they learned on December 31 they were horribly damaged.

Well, the 2007, no secret, 2007 annual report goes out.  I

think they said April yesterday.  It was March 27, 2008.  The

same day they sent out this demand, they don't disclose the

demand.  We think it goes to they were harming us.

THE COURT:  And, therefore, what?  If they didn't

think they were harmed, their damages theory is undermined.

What exactly do you want to do?

MR. COLLINS:  Your Honor, one goes to damages, yes,

whether they have been damaged or thought they were damaged

versus candidly they had some discussions with CEPS.

D1FJMED1

1          Whether they say oh, my God, we may have to pay some

2     money to CEPS here, in other of our negotiations they should

3     have anticipated.  By the way, we have this opportunity to get

4     money from -- this is something we are developing possibly lead

5     in the case.

6          THE COURT:  All right.  Well, I'll continue to

7     reserve.  I'll let you do examination today.  I think I am not

8     yet persuaded the invocation of 10.02 takes it otherwise

9     outside of the spirit of what the rule in attempting to

10    encourage settlement discussions would preclude so long as the

11    letter conveys generally a sense of openness to a discussion,

12    but I'll take a closer look at 10.02 and think about the

13    purposes you have just suggested.

14         The first one I think, if I conclude that it is a

15    demand letter, the purposes you suggested are precisely what

16    the rule prohibits but I need to think about the second.

17         MR. COLLINS:  It also goes to our belief of what are

18    the proper damages in this case, that Article X sets forth a

19    cap of a hundred million dollars in breach of contract.  Also

20    we believe requires the incurred losses versus damages what you

21    say you obtained.  That also goes to damages.

22         THE COURT:  Okay.  Anything else preliminarily before

23    we bring Mr. Dierks back up?

24         MR. ARMENIO:  Not for plaintiff, your Honor.

25         MR. RENARD:  No, your Honor.

D1FJMED1

1          THE COURT:  Would you bring up Mr. Dierks Jorge-Thomas

2     Dierks, resumes.  I'll just remind you that you are under oath.

3          THE WITNESS:  Okay.

4          THE COURT:  Thank you.

5          MR. RENARD:  Your Honor, the first thing I would like

6     to do is to tender to the witness, the court and plaintiff's

7     counsel a notebook of exhibits that I intend to inquire about

8     this morning at the conclusion of Mr. Dierks' testimony.

9          Your Honor, then before I begin the examination, I

10    would like to tender into evidence the first 7 tabs of this

11    notebook, and I will identify those for the record.  DX 23, CX

12    41, DX 42, DX 86, JX 95, DX 383 and DX 418.

13         THE COURT:  The defendants?

14         MR. ARMENIO:  Ah --

15         THE COURT:  Sorry.  For the plaintiffs?

16         MR. ARMENIO:  Lot of these are JX's, and that is what

17    is making it confusing.  If we can have a moment to review it

18    while counsel examines, and we'll let the court know if we have

19    any objections?  Some of these look unobjectionable and just

20    identify for the record the proper JX.  If we can may have a

21    moment to go through them?

22         THE COURT:  You mean they're not marked as JX, but

23    they're duplicative of JX stock exhibits already in evidence?

24         MR. ARMENIO:  We think some of them are.  We are

25    cross-checking right now.

D1FJMED1

1           THE COURT:  I appreciate that.

2           MR. ARMENIO:  Thank your Honor.  We'll get back with

3    you in a moment.

4    JORGE-THOMAS DIERKS, resumes

5    CROSS EXAMINATION (Continued)

6    BY MR. RENARD:

7    Q.  Mr. Dierks, good morning.

8           I would like to begin this morning at a point where we

9    left off yesterday.  Do you have your witness statement in

10   front of you, sir?  We'll be contending with two different

11   notebooks, but I'll certainly alert you when we're switching

12   from one to the other.  If you take a look at Page 16 Paragraph

13   50 of your declaration.

14   A.  Yes.

15   Q.  You state in December 2007 I learned the first time that

16   the NX4 agreement between 3M and CEPS which was contained in an

17   earlier pricing convention between 3M and CEPS.

18          My first question is, in December 2007 did you

19   actually see the NX4 to which you refer there?

20   A.  Not in December.  I think I saw it first in January.

21   Q.  And the NX4 that you referred to there in Paragraph 50, you

22   say was contained in an earlier pricing convention.  What

23   earlier pricing convention between 3M and CEPS are you

24   referring to?

25   A.  I was referring then to something that I saw that was,

D1FJMED1                          Dierks - cross

1   according to my understanding, sent from CEPS to us which was

2   an agreement out of the Year 2005 between 3M and CEPS.

3   Q.   In fact, sir, just to, for accuracy and completeness, if we

4   turn to the next page, Page 17, Paragraph 53, the second

5   sentence there states, "When I first learned of this NX4, I

6   thought the price reduction was due in 2008 because the NX4

7   stated that the reduction would occur three years from the time

8   of publication, and the convention I saw was from 2005."

9              Is that what you're referring to here?

10  A.   Yes.

11  Q.   Then you say, "Subsequently, I learned that the NX4 first

12  appeared in a 2003 convention," and then it continues on.

13             When did you first see the 2003 convention that you

14  referred to there in the third sentence of Paragraph 53?

15  A.   What was the situation was as I said, the, according to my

16  understanding, as we had these things in-house, it was CEPS to

17  send us these things.

18             In the document you saw the convention in June of 2005

19  was the date of 2005, and there was all the paperwork without

20  the date which was the same, more or less the same wording and

21  I learned later on this was from 2003, but in what we had

22  received, we couldn't see that this was already out of 2003.

23             The only date we could see was 2005.  So later on I

24  can't say exactly I heard that this was also signed the same

25  paper more or less in 2003.

D1FJMED1                        Dierks – cross

1   Q.  When you say you didn't have a convention in-house, are you

2   referring to the fact that there was a search made within Meda

3   France and no one could find the conventions that 3M had

4   transferred, physically delivered to Meda?

5   A.  I referred to --

6           MR. ARMENIO:  Objection; assumes facts.

7           THE COURT:  Could you repeat the question.

8   BY MR. RENARD:

9   Q.  Do you know whether or not, Mr. Dierks, 3M physically

10  delivered the 3M conventions that it had with Meda in all the

11  prior conventions -- I am sorry.  Let me start that again.

12          Do you know whether or not 3M, upon closing of the

13  transaction on January 2, 2007, physically delivered to Meda

14  the conventions that 3M had executed with CEPS prior thereto?

15  A.  I do not know.

16  Q.  But, in any event, I take it some search was conducted to

17  see if those conventions were, in your words, in-house and the

18  search turned up nothing?

19  A.  What I can only say is when I was informed from Mr.

20  Traineau that is a CEPS convention signed by 3M and CEPS with

21  regard to an increased price, increased after three years, but

22  I learned then that afterwards are the papers had to be sent

23  from CEPS to us as of that time, at least nobody had them and I

24  can't say whether someone was asking someone in France to

25  search this because, as you know, out of the materials I was

D1FJMED1                        Dierks - cross

1     informed by the regional director who had spoken to the country

2     managers, so I can't say whether someone asked someone to

3     search something, whether or not.

4              The only information I received, as I told you, that

5     they had not had it in hand at that time; and, therefore, they

6     asked CEPS to send it to them.

7     Q.  Did you ever ask Mr. Noel Renaudin, who was your regional

8     director, or Mr. Christian Senac, who was your country manager,

9     words to the effect gentleman, when this deal closed, didn't we

10    get the conventions from 3M?  Did you ever ask that?

11    A.  For sure.

12    Q.  You did?

13    A.  At that time what we are speaking now and what you're

14    referring to, this is the time of December 2007, and at that

15    moment we learned their situation we have someone in, according

16    to my understanding, someone in 2007 prior.  The first thing I

17    asked for sure, I want to see this in writing.

18             As I said, according to what I know, nobody had it.

19    Therefore, they were asking CEPS to send it to them.

20    Q.  To whom did you ask that question?

21    A.  To Mr. Traineau.

22    Q.  What was his response?

23    A.  I think I said several times I said it, that nobody had it

24    in hand; and, therefore, they asked to send it from CEPS to

25    them.  But I can't say whether Mr. Traineau has asked -- at

D1FJMED1                        Dierks - cross

1    that time the next thing you were referring to Mr. Senac, at

2    that time Mr. Senac wasn't our country manager any more, it was

3    Mr. Maupas.  I would have -- Maupas -- it would have been sent

4    to us at any time.  At that time in December for me it was not

5    so much the question where it was, whether we had on file or

6    not on file.  I wanted to know what was written.

7    Q.  Since the filing of this lawsuit by Meda against my

8    clients, to your knowledge, has any search been undertaken to

9    see whether or not Meda France had in its possession the 3M

10   conventions?

11   A.  Yes.

12   Q.  What did that search turn up?

13   A.  I was out really knowing in detail.  I assume it was

14   somewhere in our files.

15   Q.  But you don't know one way or the other?

16   A.  No.

17   Q.  Sir, if you will now, let's go back to the new notebook

18   that I gave you this morning.  You can set that aside.  I want

19   you to turn to Tab 17.

20           I just want to ask a predicate question here, and that

21   is:  Is this the document that you first saw that led you to

22   believe that the NX4 became effective in 2005?

23   A.  I can't say the first page I've seen for the first time in

24   my life.  I assume the other pages have been sent, yes.

25           MR. RENARD:  We offer in evidence DX 345.

D1FJMED1                        Dierks - cross

1             MS. BROWN:  No objection.

2             THE COURT:  Not even to the first page that was never

3    before seen in his life?

4             MS. BROWN:  It is a plaintiff's exhibit, your Honor.

5             THE COURT:  That is a good reason.  345, and any

6    dispute as to the translation?

7             MS. BROWN:  No, your Honor.  It is the translation we

8    submitted with the exhibits.

9             THE COURT:  Plaintiff's 345 and 345 A are admitted.

10            (Plaintiffs' Exhibits 345 and 345 A received in

11   evidence)

12            MR. ARMENIO:  While we are discussing exhibits, we do

13   not have objection to the previously proffered exhibits except

14   to adjust, so we are all having the same exhibits, four of them

15   are JX's, and I can just read them into the record if your

16   Honor would like.

17            THE COURT:  Go ahead.

18            MR. ARMENIO:  DX 23 is actually JX 19.  DX 86 is

19   actually JX 42.  DX 95 is JX 168.  And DX 418, that was

20   proffered as JX 126.

21            THE COURT:  So were there any additional --

22            MR. ARMENIO:  No additional objections other than

23   trying to use the same JX's so every witness is referring to

24   the same thing as much as possible.

25            THE COURT:  Can you tell me what the new document

D1FJMED1                         Dierks - cross

1    numbers were that Mr. Renard mentioned that were not JX

2    exhibits?

3         MR. ARMENIO:  Yes, he used the DX numbers.  So he

4    used, among the exhibits he mentioned, there was DX 23, 86, 95

5    and 418, and they correspond to in the same order, JX --

6         THE COURT:  I understand that point.  He had three

7    additional ones.

8         MR. ARMENIO:  No objection to those.

9         THE COURT:  Do you know what those were?

10        MR. ARMENIO:  The other DX's you were offering, we

11   don't have an objection to them.

12        MR. RENARD:  Okay.  DX's that we were offering were DX

13   23, DX 42, DX 86, DX 383, DX 418.

14        MR. ARMENIO:  For your Honor's question, the three

15   that are uniquely DX's are DX 41, 42 and 383.

16        THE COURT:  DX 41, 42 and 383 are admitted.

17        (Defendant Exhibits 41, 42 and 383 received in

18   evidence)

19        THE COURT:  Go ahead, Mr. Renard.

20   BY MR. RENARD:

21   Q.  Your Honor, I am sorry to have to ask this question.

22        Then with respect to the other DX's --

23        THE COURT:  Those are already admitted because they're

24   the same as joint exhibits that I admitted this morning.

25        MS. BROWN:  The issue is really with the translations.

D1FJMED1                          Dierks - cross

 1              We had this issue with the JXA translations.  If you
 2      were to look at DX 23, which is the very first document in this
 3      binder, you have defendant's translation; but since we were
 4      able to reach agreement on all of the translations except for
 5      the A's that we are still discussing at this point, it makes
 6      sense to use the transalations we actually agreed upon rather
 7      than the DX translations.
 8              THE COURT:  It makes sense.  It is messy, okay?
 9              So presumably if I've already admitted the
10      translation, then the translation is in, I don't need to admit
11      again or a new translation.  So we are good to go.  And folks
12      will work a little harder going forward to make sure if we are
13      going to rely on documents that are already in, we refer to
14      them by what is already in or otherwise try to streamline the
15      process.
16      BY MR. RENARD:
17      Q.  Mr. Dierks, back to Tab 17 in the binder which is PX 345.
18      I believe you said you did not recognize the first page of
19      that.  Let me ask you about the third page.  Which is in,
20      pardon my French, entitled (French), correct?
21      A.  Sorry?
22      Q.  If you answer out loud?
23      A.  Yes, I think someone has written those words.
24      Q.  At least number one, had you seen this before?
25      A.  As I said, I assume that these are the papers that, as I

1    said, I have asked to get from the CEPS and then brought to my

2    attention.

3    Q.  If you take a look, sir, on the second page of that

4    supplement to the November 17, 2003 convention, that's dated

5    October 14th, 2005, correct?

6    A.  The last page of the paper?

7    Q.  Yes, sir.

8    A.  Yes, that is the date.  It is 14th of October, 2005 dated.

9    Q.  Is this the document to which you refer in your declaration

10   that you believe from the 2005 date that led you to believe

11   that the three-year period applicable to NX4 expired in 2008?

12   A.  That's correct.

13   Q.  Does this document, sir, this two page supplement -- let me

14   ask this differently.

15          This supplement refers on its face only to Aldara,

16   correct?

17   A.  No.  I understand that the first page refers to Flecaine

18   because it is written Flecaine.

19   Q.  I am talking about this document entitled Avenant or

20   supplement.  That two-page document refers only to Aldara?

21   A.  No.  As I said, I see three pages in a row.

22          MS. BROWN:  Your Honor, I want to state an objection.

23   He is referring to two pages.  The witness is testifying about

24   the entire document.  I don't think this line of questioning is

25   very fair since we are taking these two pages out of context.

1          THE COURT:  At the least it is not clear.  I am having

2    trouble knowing what precisely; and, therefore, the record

3    surely won't show what it is that we're exactly talking about.

4          Mr. Renard, why don't you make it clear.

5    BY MR. RENARD:

6    Q.  Is it your understanding, Mr. Dierks, that the second page

7    of this Exhibit PX 345, which is entitled "Convention," that

8    that page, the third page and the fourth page were all one

9    document executed in 2005?

10   A.  My understanding that I will repeat, we have asked CEPS

11   with regard to what came up that there is a convention about

12   the price decrease and that they have sent us these pages that

13   are in front of me and seem to be the same, and as you see, a

14   lot of boxes are mentioned 2005.  So use Avenant (French) if

15   you look past this, you will see Avenant and -- (French) you

16   see all the parts there written in 2005, and honestly, the

17   point is, is the following different?

18         We were speaking about Flecaine, so the look on this

19   was with regard to Flecaine.  What is mentioned on the first

20   page is with regard to the price decreases after three years.

21   Q.  My question, sir, is did you understand that this

22   convention which is the second page of 345 --

23         THE COURT:  You're asking about what is Bates at the

24   bottom as Meda OO201245.

25         MR. RENARD:  44, your Honor, whether that --

1          THE COURT:  That is what you're calling the second

2      page?

3          MR. RENARD:  The second page of the exhibit, your

4      Honor.  I'll be more precise just so we're clear.

5      BY MR. RENARD:

6      Q.  Is it your understanding, Mr. Dierks, that the convention

7      that ends with the Bates number bottom-right-hand corner 44,

8      included the pages that are marked 45 and 46?

9      A.  What was the question?

10     Q.  Did you understand that the document entitled "Convention"

11     that ends in the No. 44 included the pages that are marked 45

12     and 46?

13     A.  I understood at that time it was one document.

14     Q.  You understand differently today, though, don't you?

15     A.  To what?  No, today I understand at that time I

16     understood -- I understand also today that the document that

17     has been sent to us at that time, I saw this one document.

18     Q.  Sir, do you understand today that the convention, Page 44,

19     was a document that was executed in March of 2003?

20     A.  Today I know that there was already a convention started in

21     the Year 2003.

22     Q.  And, therefore, do you also understand that the document

23     that is made up of pages 45 and 46 was a different document

24     that was executed in October 2005 that applied only to Aldara?

25     A.  No.  I understand that that was a document which was

1    already signed in 2003, and there is the same document signed

2    in 2005.  That is my understanding.

3    Q.  Let's go back to the first tab.

4              THE COURT:  I just want to make sure I understand your

5    understanding.  We're looking at PX 345 and the pages that

6    begin Meda 201244 and then 20145 and 201246.

7              You said, I understand, that that was a document which

8    was already signed in 2003, and there is the same document

9    signed in 2005.  I don't understand what you mean.

10             THE WITNESS:  At that time when I asked for the

11   document to see, this was signed, and as you see, out of the

12   last page it was signed in 2005.  So I was assuming this is a

13   document that is signed in 2005.  If you go into the text, you

14   see about three years from then.  I was assuming three years

15   from 2005 would mean 2008.

16             I have that understanding in 2008 we have to bring the

17   genetic to the market which --

18             THE COURT:  I understand that.

19             THE WITNESS:  -- afterwards I learned that the same

20   document with the same text as already was signed in 2003, but

21   then I learned afterwards, but that I learned afterwards.

22   BY MR. RENARD:

23   Q.  Mr. Dierks, go to Tab 1 which is --

24   A.  Which of the books?

25   Q.  -- Tab 1 in the book we are still in.

D1FJMED1                        Dierks - cross

1    A.  Okay.

2    Q.  Which is JX 19.  I'll ask you, sir, if, number one, had you

3    ever seen this before?  It is a convention, dated March 10,

4    2003?

5    A.  No.

6    Q.  Tell me, sir, if the first page of JX 19 appears to be the

7    same page, going again to Tab 17 --

8              THE COURT:  What is JX?

9              THE WITNESS:  I don't know why we are not --

10             MR. RENARD:  JX 19, your Honor, is the JX equivalent

11   of DX 23, Tab 1.

12             THE COURT:  Tab 1 in the book?

13             MR. RENARD:  Yes.

14             THE COURT:  Which is marked here as DX 23.

15             MR. RENARD:  Yes, your Honor.

16             THE COURT:  But has been admitted as JX --

17             MR. RENARD:  19.

18             THE COURT:  -- 19, okay?

19             MR. RENARD:  I will make sure henceforth, your Honor,

20   I will make all of that clear on these particular documents.

21   BY MR. RENARD:

22   Q.  Does that first page of that exhibit on Tab 1, Mr. Dierks,

23   appear to be the same page we were looking at at Tab 17, which

24   I Bates numbered 44?

25   A.  It seems to be the same text.

1    Q.  Turn, sir, to Tab 2 in that same book which is PX 41.  Does

2    that appear to be a convention executed between 3M Sante and

3    CEPS, dated November 17, 2003?

4            Does it appear to be a convention dated November 17,

5    2003 between 3M Sante and CEPS?

6    A.  I don't know what you're talking about.

7    Q.  You have never seen this document before?

8    A.  No.

9    Q.  Did anyone ever tell you, Mr. Dierks, that after March 10,

10   2003, that 3M Sante and CEPS executed a convention, dated

11   November 17, 2003, that did not have an NX4 related to

12   Flecaine?

13   A.  No.

14   Q.  Turn, sir, if you will, to Tab 5, which is JX 95.

15           Does that appear to be a supplement to a convention?

16   And let me make this very specific.  Does this appear to be a

17   document, dated September 15, 2006, that is titled a supplement

18   to a convention, dated November 17, 2003?

19   A.  This is a question?

20   Q.  Yes, sir.  Is that what it appears to be?

21   A.  Yes, that is what is written there.

22   Q.  Had you ever seen it before?

23   A.  No.

24   Q.  Can you then tell me, sir, what documents executed between

25   CEPS and 3M Sante that you saw prior to this lawsuit being

D1FJMED1                          Dierks - cross

filed that you believe indicates that 3M Sante or 3M was under

some obligation to CEPS with respect to either putting a

generic on the market or putting pricing for Flecaine LP at a

generic level?

A.   Think you express this quite nice.  If you say

"obligation," I think there is a signed contract between CEPS

and 3M, and this is, of course, on this paper you have shown

from the 10th of March 2003 that notes there is an obligation,

that is an obligation to do so.

Because two parties have signed this and not have CEPS

perhaps eventually we could do this or something like this, and

it is signed.  I think to understand a little bit what you want

to express here, a signed agreement has not to be shown up in

each CEPS agreement new.  A signed agreement states in life

also if it is not mentioned each year in this general annual

renew-ment of CEPS agreement.

So meaning that what you mean that you have an

agreement -- no.  If you sign an agreement on the 10th of March

and you sign another agreement to a totally other thing on the

17th of March, it doesn't mean that the 10th of March agreement

is not in form.

MR. RENARD:  I will object to everything after the

identification of the March 3 document as being the document he

was referring to.

THE COURT:  You're objecting on what ground?

1           MR. RENARD:  Your Honor, my question was can you

2       identify what documents that he saw prior to the lawsuit being

3       filed that he believed indicated an agreement between 3M Sante

4       and CEPS providing for the introduction of the generic or

5       generic equivalent price.  He said --

6           THE COURT:  I got it.

7           MS. BROWN:  Your Honor, his answer was he was

8       describing exactly the document that he saw that in his mind

9       that led him to believe there is an agreement between those

10      parties and had that obligation.  The witness has directly

11      answered the question.

12          THE COURT:  There was other explanatory information

13      included.  I will sustain the objection with respect to that.

14      BY MR. RENARD:

15      Q.  Mr. Dierks, let me follow up on that.

16          Did you see any documents between CEPS and 3M Sante

17      relating to Flecaine LP prior to the lawsuit being filed other

18      than the first tab which is JX 19?

19      A.  Can you repeat this because I think I have seen that what

20      has been sent from CEPS to us.

21      Q.  Which we had already looked at.  Is that correct?

22      A.  Yes.

23      Q.  Other than that, had you seen any documents executed

24      between 3M Sante and CEPS relating to Flecaine LP prior to the

25      lawsuit being filed?

D1FJMED1                        Dierks - cross

```
 1   A.  Honestly, I don't understand your question.  I think
 2   that --
 3            THE COURT:  Let him clarify.  If you don't understand,
 4   let him clarify.
 5   BY MR. RENARD:
 6   Q.  I want to know because I think it may be important what
 7   documents you saw prior to the lawsuit being filed that
 8   purported to be conventions or amendments to conventions
 9   between 3M Sante and CEPS as it relates to Flecaine LP, and my
10   question is simply this:
11            Other than what we've already discussed which is Tab
12   17, PX 345, were there any other documents that meet that
13   definition?
14   A.  No.  I have seen this convention between Flecaine, 3M and
15   CEPS that we know now is dated out of the Year 2003.
16   Q.  Thank you.
17            Let's then turn, Mr. Dierks, to Tab 6.
18            THE COURT:  Just for my clarity, what we were just
19   looking at, at Tab 5 -- no.  Yes, Tab 5, which is JX 95, you
20   haven't seen this?
21            THE WITNESS:  No.
22            THE COURT:  Does that surprise you?
23            THE WITNESS:  No, because if I may say so, what you
24   have in France is a little bit different than in other
25   countries, is that in France the government or governmental
```

D1FJMED1                          Dierks - cross

1    body CEPS and the companies try to come to an agreement about

2    reimburse price.  Then each year part of it is renewed.  Each

3    year the list of prices are renewed, but this is -- the prices

4    are renewed.  There is no formation because it is a published

5    price, only each year renewed.

6              THE COURT:  Don't you need to look at it to know if

7    there is additional information?

8              THE WITNESS:  No, only -- yes, if there would be

9    additional information.  If there would be additional

10   information, it is not me who has to look at it.

11             If there is additional information that would have

12   consequences on our prices, then someone would have to tell me.

13   It is not me who has to look at them.  We have a country

14   manager, we have a country organization for this.  It is not me

15   as chief operating officer who has to read the CEPS

16   conventions.

17             What would have been the case, let me say --

18             THE COURT:  Would you have directed somebody,

19   especially after the issues that predicated this litigation,

20   sir, let's make sure we know what is in every CEPS agreement

21   pertaining to Tambocor?

22             THE WITNESS:  I think, yes, for sure then as we said,

23   we tried to look at what is in our possession as we got from

24   the CEPS convention.  The CEPS conventions we got the Flecaine

25   to see ones that is from the Year 2003, where CEPS and 3M had

1      agreed upon, we put the product into the market, we get this

2      reimbursed price, and in three years either there is a generic

3      on the market or if there is no generic on the market, then you

4      have to reduce the price to the price of the generic.

5             Then at that time because it is even a mentioned a

6      percentage, but at that time the percentage was in line 50

7      percent.  That states a life.  In the normal CEPS convention,

8      you have the list again with the reimbursed price, there is

9      nothing, nothing knew.

10            THE COURT:  Your assumption would be there is

11     something new unless somebody --

12            THE WITNESS:  For sure informs me there is something

13     new.  As I said, I am the chief operating officer.  I would

14     have been informed, let's say, where there would have been

15     major changes to anything.

16            THE COURT:  And you would be informed by your team?

17            THE WITNESS:  Then normally there is a country manager

18     that either comes directly to the regional director, me or the

19     regional director, then the regional director informs me.  That

20     is all the ways of letting me know of things of importance.

21            THE COURT:  In the absence of what we know now, your

22     team are looking at these documents and somebody came to you

23     and said I have a CEPS convention on Flecaine, do you want to

24     see it, boss, what would you say?

25            THE WITNESS:  I would, without the situation or in --

D1FJMED1                      Dierks - cross

1          THE COURT:  No.  In the situation?

2          THE WITNESS:  No.  Then only as I said because

3    normally the CEPS convention meets, that you agree on a price

4    and it is for five years.  Nevertheless, each year it is

5    re-mentioned.  It is the same for five years.  It is

6    re-mentioned the same price.

7          After five years then they look into the price and

8    then the asking price, it might be the price changes.  Then I

9    would not be expected to be informed.  When it is there, I

10   would have been expected in advance because as long as we knew,

11   you also have to negotiate the price.  Then they would come to

12   me.

13         THE COURT:  If you were told I've got a CEPS

14   convention, that wouldn't without more information flag

15   something for you?

16         THE WITNESS:  Not at all.  The CEPS convention meets

17   only that the prices are written that we know.  That is the

18   difference, let me say, in France.  In most other European

19   countries, you also have to ask for a price and then this price

20   is given and it is published.

21         THE COURT:  Obviously, CEPS conventions can do other

22   things?

23         THE WITNESS:  Yes.

24         THE COURT:  So why would you assume, if someone on

25   your staff said I've got a CEPS convention here, do you want to

D1FJMED1                          Dierks - cross

1    see it, that it would just be a continuation of the published

2    price?

3                THE WITNESS:  No.  If they ask me whether -- they

4    would come whether I want to see it.  Come and say listen, we

5    have your CEPS convention and there's something new in it.  But

6    the pure CEPS convention is only mentioning the same prices

7    which are agreed upon for five years.  They would not come and

8    say listen, we received a new CEPS convention, mentioning this

9    annual renewal that you have each year with the same price.

10                Only if there is something new, let me say, as set now

11    they want to reduce the price or whatever, but normally that

12    does not happen because for five years it is accepted.

13                Something else gets you into trouble.  We have a

14    product Aldara which is a different indication.  Where we have

15    reimbursement or we have reimbursement for two indications

16    which have general awards and kind of superficial price known

17    which is the -- we were now, we had also wanted now to sell it,

18    another indication.  For this then we have to negotiate.

19                Then for sure I am informed by them and they come and

20    say, for example, it is here CEPS, CEPS is willing us to give

21    this indication, but they want to have this what we discussed

22    yesterday, this price volume deal.  So we get this till this

23    volume, this unit, and above we have to pay rebate or something

24    like this.  Then they will come to me.

25                THE COURT:  That negotiation would go into the CEPS

D1FJMED1                          Dierks – cross

1    agreement ultimately?

2              THE WITNESS:  Yes.  Then they would come not because

3    the CEPS was not something that comes as a surprise.  There are

4    negotiations before, and they would negotiate in advance with

5    me and then they would, afterwards come to me and say this is

6    the result of it.

7              THE COURT:  Thank you.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. RENARD:   (Continued)

2   Q.  Mr. Dierks, if you will, go to 1017 again that we looked at

3   previously.  Look at the pages marked 4-5 and 4-6, the document

4   that's entitled at the top Supplement to the November 17, 2003

5   Convention?

6              THE COURT:  Remind me what tab we're under.

7              MR. RENARD:  17, your Honor, which is PX-345.

8              THE COURT:  Thank you.

9   Q.  When you saw that, Mr. Dierks, and saw that this purported

10  to be a supplement to a convention dated November 17, 2003, did

11  you ask anyone even -- did you ask CEPS to get a copy of that

12  November 17, 2003 convention?

13  A.  Me personally, no.

14  Q.  Yes, sir.  When you saw that -- and by the way, when this

15  was delivered to you in the context of what supposedly was news

16  from CEPS about this, you took it seriously and you focused on

17  it, would that be fair to say?

18  A.  On the Aldara question or the Flecaine question?

19  Q.  When CEPS brought these documents that make up PX-345 to

20  your attention, when it was ultimately directed to your

21  attention, it's something you took seriously and spent some

22  time focusing on.  Would that be fair to say?

23  A.  With regard to Flecaine, yes.

24  Q.  When you saw this document here pages 4-5, 4-6 entitled

25  Supplement to a November 17, 2003 Convention, did you think to

1   ask anyone, "You know what, I think I might like to see that

2   convention"?

3           MS. BROWN:  Your Honor, that's been asked and

4   answered.

5           THE COURT:  Go ahead.

6   A.  You know, again, we were speaking with Flecaine.  What you

7   are referring now are out of the document two pages or one page

8   which is related to Aldara, which was not the question.  We

9   were not discussing at that point what happens with Aldara.  We

10  asked when I had received the information, we will have to

11  reduce the price of Flecaine at 50 percent.  So the four --

12          THE COURT:  Wait a second.  I thought you earlier said

13  that you read these pages together as a single document?

14          THE WITNESS:  Yes.

15          THE COURT:  So the question is, when you saw this

16  reference, whatever it is, on PX-345 what's based as 202145,

17  and it mentions a November 17, 2003 convention --

18          THE WITNESS:  Yes.

19          THE COURT:  The question is whether you asked about

20  that convention.

21          THE WITNESS:  What I want to explain is on the first

22  page that I saw was this convention, an agreement with regard

23  to Flecaine.  On the second page is not meant -- this is

24  dealing with Aldara.  For sure I saw the whole document as one,

25  as there's only one page signed and that's the last one, and

1    that was on 2005 but for sure I was at that time interested in

2    what was said according with regard to Aldara.  I was

3    interested --

4                THE COURT:  So the answer is no?

5                THE WITNESS:  No.

6                THE COURT:  You understood it to pertain to Aldara.

7                THE WITNESS:  Yes.

8                THE COURT:  And you were interested in Flecaine.

9                THE WITNESS:  Exactly.  Which was mentioned on the

10   first page.  But as I have said before, at that time, I thought

11   all these pages are related to a date of 2005.

12   Q.  When you received, I take it directly or indirectly, from

13   CEPS these pages that make up PX-345, did you ask anyone to

14   follow-up with CEPS and with words to the effect of: "Is this

15   all there is or are there additional documents relating to

16   conventions between 3M and CEPS relating to Flecaine LP"?

17   A.  For sure I was asking a question a little bit like this, is

18   this everything with regard to Flecaine.

19   Q.  And what was the answer that was ultimately given to you

20   that there was one?

21   A.  That this is the convention that is relative with regard to

22   Flecaine.

23   Q.  And the "this," can you identify that by the page number?

24   A.  Yeah, the ending here is 244.

25   Q.  And to your knowledge, that's the only thing that CEPS ever

D1fQmed2                         Dierks - cross

1   provided Meda relating to conventions between 3M Santé and

2   CEPS?

3   A.   As I said, I was asking with regard to Flecaine, and,

4   according to my understanding, that was convention -- the only

5   convention relative with regard to Flecaine.  I don't know

6   whether they have sent other materials or something like this

7   not related to Flecaine.

8   Q.   Now, let's look at Tab 6 in the same binder, Mr. Dierks,

9   which is DX-383.  Does this appear to be a letter from

10  Christian Senac, who was country manager for Meda France, to

11  Mr. Renaudin, the chairman of CEPS, enclosing a signed

12  convention dated September 28, 2007?

13  A.   Yes, seems to be.

14  Q.   Sir, does this appear to have some handwritten -- and I'm

15  looking at the original document, the original French language

16  document.  Does it appear to have some handwritten

17  modifications to this -- handwritten portions to this

18  convention, particularly on pages -- I think there are some,

19  frankly, on every page of the Annex-3.  Do you see that?

20  A.   Yep.

21  Q.   Had you ever seen this convention --

22  A.   No.

23  Q.   -- before?  Is today the first time you've seen it?

24  A.   Yes.

25  Q.   Before today, when do you believe the first convention was

D1fQmed2                    Dierks - cross

1   that was executed between Meda France and CEPS relating to

2   Flecaine LP?

3   A.  Normally that can only be after we had acquired the product

4   and have -- the marketing authorization has been transferred to

5   us.

6   Q.  That stands to reason, and my question is a little

7   different.  When in time, by year or month or as precise as you

8   can be, when do you understand was the first convention that

9   Meda France entered into with CEPS relating to Flecaine LP?

10  A.  As I said, that must be after we entered -- the marketing

11  approval has been transferred to us.  If you see the timing of

12  the deal, I think the closing was in January 2007.  The

13  transfer of the marketing approval takes roughly half a year.

14  That must be later than this.

15  Q.  Can you be any more specific than the first marketing --

16  well --

17  A.  No.

18  Q.  Let me ask this:  Prior to today and seeing this DX-383,

19  did you even know whether or not Meda France had executed a

20  convention with CEPS relating to Flecaine LP?

21  A.  Each year for all reimbursed products, the company is

22  signing a convention with CEPS, and that you have to do for all

23  your reimbursed products.  That means as soon as we get -- not

24  as the owner, but as soon as the marking authorization has been

25  transferred to us, this product will be part of the convention

1    that signs with CEPS.

2    Q.  Mr. Dierks, my question is a simple one, and I'm not

3    suggesting you are trying to avoid it, but if you would focus

4    on my question.  Were you aware prior to today that Meda France

5    had actually entered into a convention with CEPS relating to

6    Flecaine LP after the acquisition of the Flecaine LP rights?

7    A.  Depends what you mean "were you aware."  As I said, as you

8    have to sign this each year, I am aware that each year we sign

9    such a thing for all reimbursed products that we have.  As

10   Flecaine is a reimbursed product, as soon as marketing

11   authority is transferred to us, I'm aware, let me say, that

12   this will be in the CEPS convention between the company and

13   CEPS.  That does not mean that I have seen it with my eyes.

14   Q.  Is it fair then to say that you assumed --

15   A.  Yes.

16   Q.   -- that there was such a contract, but you did not know to

17   a certainty that one existed?

18   A.  Yes, I know with a certainty that one exists because if

19   none would exist, we would not be allowed to sell the product

20   as a reimbursed price in France.

21   Q.  What happened then, sir, between the date of acquisition

22   and apparently this September 27 -- 28, 2007 convention, which

23   is DX-383?  Did Meda France have authorization to sell Flecaine

24   LP given what you just said?

25   A.  Yes.

D1fQmed2                    Dierks - cross

1    Q.  Under what rights?

2    A.  Under the rights coming out of sales and purchase

3    agreement.

4          THE COURT:  Sales and purchase.

5    A.  Because you have to see one thing; when you acquire the

6    business, you sign contract, but nevertheless the marketing

7    approval has to be transferred to your company, and that is a

8    legal process, a regulatory process.  That is not at the same

9    day when you have signed or closed.  That takes time.

10   Normally, that depends on the country.  In a country like

11   France, normally that takes time, roughly half a year.  After,

12   only after that, you are in the possession, you as the

13   so-called marketing authorization holder, and then it's you who

14   has to do the legal things with CEPS and all.

15   Q.  Sir, turn to Tab 7, which is marked DX-418, but I believe

16   was also JX-126.  Does this appear to be a letter from

17   Mr. Maupas, director general of Meda France to Mr. Renaudin,

18   dated September 17, 2008 attaching an executed supplement to a

19   convention dated September 28, 2007?

20   A.  Yes.

21   Q.  Prior to today, had you ever seen this document?

22   A.  Yes.

23   Q.  When was the first time you saw it?

24   A.  You know, in the year 2008 then we had -- after we had

25   become knowledgeable of this CEPS convention, as you know,

D1fQmed2                          Dierks - cross

1    there was in-house a lot of discussion about this because, as I

2    said, it was written that normally you have to reduce a price

3    by 50 percent, and we tried to speak with CEPS saying, listen,

4    we have not heard about it.  And so it was a whole process.  In

5    that period a lot of different proposals from CEPS came on the

6    table.  So, finally this was in the outcome that we have this

7    two-step price reduction:  First in November 2008 and the

8    second in September 2009 -- in October 2009, and this was

9    signed down in the convention.  So it must be somewhere after

10   this has been signed.

11   Q.  You first saw this document after it was signed?

12   A.  After it was signed.

13   Q.  Yes, sir.  That's your testimony, correct?

14   A.  I'd say so yes.  I knew what it was in before because this

15   was discussed, but this signed version I can only see after it

16   was signed, otherwise it would not be signed.

17   Q.  Let me ask you, sir, when you saw this document sometime

18   after September 17, 2008, and you saw that it was entitled a

19   Supplement to a Convention Dated September 28, 2007, did you

20   ever ask anyone, "You know what," words to the effect, "I

21   wouldn't mind taking a look at what that September 28, 2007

22   agreement is that we're modifying here"?

23   A.  I think you have the wrong estimation on how the discussion

24   about this document was going on through the whole year because

25   it's not that, oh, suddenly we looked, and there's a convention

1    in 2007.  As I said, we had several negotiations with CEPS --

2    not me personally, but the people in France -- and that was the

3    final outcome.

4    Q.  Do you remember my question, Mr. Dierks?  Did you ask

5    anyone when you saw this document to see the September 28, 2007

6    convention that's referred to there?  That was simply my

7    question.  Did you?

8    A.  No, because I did not have to see it too because this was

9    the last convention I assumed we had signed with CEPS as the

10   company Meda.

11   Q.  Sir, in your witness statement, your declaration in

12   paragraph 43, you state, "I recall specifically looking at

13   documents" -- let me back up.  I'll give you a chance to get

14   there.  It's page 13, paragraph 43.  It begins, "In addition to

15   the OM" -- which I believe is a reference to the offering

16   memorandum -- "and the management presentation" -- which I

17   believe is described previously in your declaration, you say --

18   "electronic data room was made available to Meda.  Meda

19   employees, including myself and outside legal counsel, would

20   review documents in the 3M data room.  I recall specifically

21   looking at documents related to marketing and sales information

22   including product relevant information.  In the data room, I

23   did not come across any information related to a signed

24   agreement in France mandating either a price reduction to

25   Tambocor CR or the introduction of a generic version of

1   Tambocor CR and no such agreement was ever brought to my

2   attention."

3           First of all, Mr. Dierks, to expand on an area that we

4   touched upon yesterday, were there any conventions relating to

5   any 3M pharmaceuticals contained in the data room?

6   A.  Not that had been brought to my attention, so I assume no.

7   Q.  Without getting into any detail about the pharmaceutical

8   pricing, public pharmaceutical pricing policies of other

9   European countries, are there documents similar to conventions

10  that are used in the other European countries that have a

11  regulatory system which entails approval of reimbursement

12  prices?

13  A.  Not like the convention in France.

14  Q.  But are there documents that are issued or published by the

15  regulatory authorities in those countries that set those

16  prices?

17  A.  That might be.

18  Q.  You're not familiar though with any other European country

19  that has such a system?

20  A.  As I said, the system in France is a little bit of a

21  special one.  In each country, they have their own system that

22  is always a different one.  There are countries where you have

23  no system at all where you have to ask for reimbursement, and

24  you have countries where you have; but normally this is more

25  than as a kind of declaration of one side, and not like here

D1fQmed2                    Dierks - cross

1   convention which is signed between two companies.

2   Q.  When you say you looked at documents in the 3M data room,

3   do you recall there being an index?

4   A.  Yes.

5   Q.  Kind of a file and subfile listing that at least organized

6   by general topic matter the materials in the data room?

7   A.  As I said yesterday already when you asked me about the

8   data room and my overview, I told you that exactly that is I

9   looked into to see a little bit how the data room is

10  structured.

11  Q.  Yes, sir.  Turn to Tab 9, which is PX-336.

12  A.  Which binder now?

13  Q.  This is the binder of additional exhibits.  You can set

14  aside your declaration.  I think we're done with your

15  declaration and its attached exhibits.

16  A.  OK.

17  Q.  Tab 9, which is PX-336?

18  A.  Yes.

19  Q.  Is this the index that you understand of the documents in

20  the data room?

21  A.  I think so.

22          MR. RENARD:  Your Honor, we would move the admission

23  of PX-336 into evidence.

24          MS. BROWN:  No objection, your Honor.

25          THE COURT:  PX-336 is admitted.

1          (Plaintiff's Exhibit 336 received in evidence)

2     Q.  Interesting point, I note, Mr. Dierks, there is a date at

3     the bottom of this of 5/2/2007.  Do you see that in the bottom

4     right-hand corner?

5     A.  Yes.

6     Q.  It's correct, is it not, that in May of 2007 Meda asked for

7     a copy, an electronic copy of all the documents that had been

8     in the data room?

9     A.  No idea.

10    Q.  Sir, if you will turn to the page of PX-336, and maybe the

11    easiest way to do it is look in the upper right-hand corner,

12    the page that says 7 of 29?

13    A.  Yes.

14    Q.  Do you see an entry there about halfway down a little more

15    than halfway down there is a category entitled "D422 flecainide

16    (Tambocor)"?

17    A.  Yes.

18    Q.  And the second -- if you go down two lines from that,

19    there's an entry that says:  "The flecainide EU status report."

20    Do you see that?

21    A.  Yes.

22    Q.  Do you understand that 59 off to the side references the

23    number of pages for that particular document?

24    A.  No idea.

25    Q.  Turn, sir, to Tab 10, which is DX-167.  This is entitled

D1fQmed2                    Dierks - cross

1    Regulatory Product Report Dated May 2006, 59 pages in length.

2    And I will ask, is this one of the documents that you reviewed

3    that you understood came from the data room?

4    A.   First of all, I have not viewed it.  Secondly, it would not

5    furthermore have been my task to review or view it.  And,

6    thirdly, I don't know where it's come from, but I assume -- I

7    have no reason not to believe you when you tell me it comes

8    from the data room.

9            MR. RENARD:  Your Honor, we would move the admission

10   of DX-167 into evidence.

11           MS. BROWN:  Your Honor, we don't have an objection to

12   the exhibit, although we don't think there's a foundation laid

13   for the fact that it would actually have been in the data room.

14           THE COURT:  That it would actually --

15           MS. BROWN:  Have been in the data room.

16           THE COURT:  OK.  I think that's right.  So, you

17   consent to its admission, but you want to note that it hasn't

18   been established to have been entered into the data room?

19           MS. BROWN:  Exactly.

20           THE COURT:  Any question that that would be assuming a

21   fact not in evidence?  All right, so DX-167 is admitted.

22           (Defendant's Exhibit 167 received in evidence)

23   Q.   Mr. Dierks, then if we could go back to tab 6, which is the

24   index of the data room

25   A.   Tab 6 is a letter from --

D1fQmed2                          Dierks - cross

1   Q.  I'm sorry, tab 9.

2   A.  OK.  If we turn to the page that's marked page 24 of 29.

3   A.  Yes.

4   Q.  This is PX-336.  Do you see a little more than halfway down

5   that particular page, there is a file category entitled

6   marketing plans?

7   A.  Yes.

8   Q.  Do you see the sixth entry down is a file entitled France

9   Marketing Plan Summary 2006?

10  A.  Yes.

11  Q.  It says 3, and that says 15 off to the side, correct?

12  A.  Yes.

13  Q.  Let me turn your attention, sir, to Tab 11, which is

14  DX-367, which is a 15-page document entitled Marketing Plan,

15  and I'll ask whether you've ever seen that before?

16  A.  I can't tell you I've seen exactly this document or other

17  ones as we had a lot of country presentations from the people

18  where these things had been presented by.  I don't know whether

19  I've seen this document or not.

20  Q.  When you said in your witness statement that you looked

21  specifically at documents related to marketing and sales

22  information from the data room --

23  A.  No, not from the data room.  It's overall my -- my task was

24  to look into marketing and sales document organization, not

25  only in the data room but overall in the whole due diligence

D1fQmed2                         Dierks - cross

1    process.

2    Q.  Did you charge anyone with the tasks, anyone who was

3    actually spending time in the data room, appreciable time, did

4    you charge anyone with the task of words to the effect, "Bring

5    me anything relating to the marketing and sales of Flecaine

6    LP"?

7    A.  No.  Normally if you go into the data room, we are looking

8    for the following:  Either information that has not been

9    revealed up to that point in the offering memorandum, in the

10   management presentations or in breakout sessions or which are

11   contradictory to that what we have seen or have.

12          MR. RENARD:  Your Honor, I object to that as

13   non-responsive.

14          Mr. Dierks, if you will, focus on my question.

15          THE COURT:  Mr. Dierks, I'll let you explain, but you

16   have to first answer the question.

17          THE WITNESS:  OK.

18   Q.  Did you ask anyone who was actually spending time in the

19   data room to bring you any significant, important documents

20   relating to the marketing and sales of Flecaine LP?

21   A.  I was asking -- sorry -- I was asking them to bring me

22   documents, as you said important, yes, important documents that

23   either would be contradictory to what we have heard up to now

24   or which would have -- where we would not have seen information

25   yet.

D1fQmed2                    Dierks - cross

1   Q.  Did you put that request in writing wherein if you

2   requested anyone bring me --

3   A.  No.

4   Q.  -- anything that's contradictory in the data room or in the

5   offering memorandum?

6   A.  No, I did not.

7   Q.  Who did you task with that job?

8   A.  We had several legal consultants who were looking into

9   these things.  We had in-house people who were looking into

10  these things.

11  Q.  Did those individuals whom you tasked with that job report

12  back to you that pricing negotiations for Tambocor CR were

13  ongoing in France?

14  A.  No.

15  Q.  Was that something that was consistent with or

16  contradictory from what was stated in the offering memorandum,

17  the fact that there were ongoing negotiations between 3M Santé

18  and CEPS?

19  A.  In the offering memorandum, I think the management

20  presentations, there was nothing said about ongoing pricing

21  negotiations with CEPS.

22  Q.  Did those same people report back to you that the

23  registrations for Flecaine LP were expiring as of December 18,

24  2001?

25  A.  Whether the registration was expiring in 2001?

D1fQmed2                    Dierks - cross

1    Q.   Yes, sir.

2    A.   No, I had not heard that they are expiring in 2001.

3    Q.   I'm sorry.  If I said '01, I misspoke.  Did those people

4    report back to you that the registrations for Flecaine LP were

5    set to expire in 2006?

6    A.   The registration was expiring 2006, no, that I've not

7    heard.

8    Q.   Is that something that you knew prior to the execution of

9    the acquisition agreement in November of 2006, that the

10   five-year registrations for Flecaine LP were set to expire in

11   2006?

12   A.   I think your question is wrong, I'm sorry to say, because

13   there is no expiring of the registration after five years.  So,

14   what you have is, first of all, you have a registration renewal

15   after five years, and that's normal in all European countries,

16   but there's no expiration of registration in 2006.

17   Q.   With that amendment, were you aware that the registrations

18   for Flecaine LP were set to be renewed in 2006?

19   A.   Me personally, no, because I was not looking into the

20   registration files.  I was not a person who was looking into

21   and checking whether all registration files were in line with

22   the laws.

23   Q.   Turn, sir, if you will, to Tab 12 which is DX-299?

24   A.   Yep.

25   Q.   Does this appear to you to be an email chain ending with an

1    email from you to Mr. Senac dated November 29, 2006 and an

2    attached presentation?

3    A.  Yes.

4           MR. RENARD:  Your Honor, Tab 12, which is DX-299, we

5    would move into evidence.

6           MS. BROWN:  No objection, your Honor.

7           THE COURT:  DX-299 is admitted.  Is this the same

8    slide presentation or different?  Oh, yes.  Go ahead.

9           (Defendant's Exhibit 299 received in evidence)

10   Q.  Mr. Dierks, you refer in the email at the top of DX-299 to

11   the fact that the presentation that is attached is one that

12   Benoit Traineau did yesterday in Stockholm?

13   A.  Yes.

14   Q.  Was there a meeting on November 28, 2006 among you, and

15   Mr. Traineau and perhaps others in Stockholm, Sweden?

16   A.  Yes, we had invited some senior management person from 3M

17   to come to Solna mainly for the purpose to find out how they

18   are, what they are, what kind of further possibilities for them

19   we saw in our company.

20   Q.  And, sir, if you -- by the way, did you yourself review the

21   presentation that you attached to this email?

22   A.  You mean reading it when it was sent to me?

23   Q.  Yes, sir.

24   A.  No.  I said what I normally do, because this was a

25   presentation where it was said it was shown yesterday to you,

D1fQmed2                       Dierks - cross

1    and then I opened the presentation, and I see is this the same

2    what I've seen yesterday or not.  So I look to the first tab

3    and this was the case, so I would not review again.

4    Q.  And, sir, if you'll take a look at the page of the

5    presentation that ends with the numbers 298.  It's about

6    halfway through the presentation.

7    A.  298.  Yep.

8    Q.  This slide is entitled Three Critical Issues --

9    A.  Yes.

10   Q.  -- Succeed the Integration, the first.  The second being

11   Managing Health Authorities' Price Pressure.  And the third

12   being Tambocor CR Cycle Life Management.

13           Were subjects numbers two and three discussed during

14   the meeting that you attended with Mr. Traineau on November 28,

15   2006?

16   A.  Depends what you mean by discussed.  He was making this

17   presentation.

18   Q.  Were these subjects -- well, maybe I'm assuming something

19   there.  Did Mr. Traineau, in addition to making a presentation,

20   did he speak while the PowerPoint was being delivered?  Was it

21   a sequential slide show with his narrative?

22   A.  I think that's quite normal that the person who made the

23   presentation is not standing there next to the presentation

24   without saying anything.  For sure he was saying something.

25   Q.  I assumed as much, but I wanted to kind of set that

D1fQmed2                    Dierks - cross

1   predicate.  Now, in his discussion, his narrative as he was

2   going through the slide show, did he talk about the subject of

3   managing the health authorities' price pressure and the

4   Tambocor cycle life management?

5   A.  Yes.

6   Q.  Did you take notes at that meeting?

7   A.  No.

8   Q.  Did you ever see some Meda prepared summary of what took

9   place at the meeting and what was said?

10  A.  No.  As I told you, first of all, the purpose of this

11  meeting was more to get a feeling about the person of

12  Mr. Traineau, so not so much with regard to what the subjects

13  said, but, no, we have not taken notes with regard to these

14  things.  We look more at the person of Mr. Traineau.

15  Q.  Was this meeting in Sweden in 2006 dedicated exclusively to

16  interviewing, if you will, Mr. Traineau?

17  A.  No, there were several other persons.

18  Q.  Several other persons with Meda France?

19  A.  No.  Next day came someone if you want to say that was also

20  placed in France, who was Ton van't Hullenaar, who was heading

21  the marketing for Tambocor and was placed in France.

22  Q.  During this presentation, Mr. Traineau described the

23  history of the negotiations between CEPS and Tambocor CR --

24  A.  No.

25  Q.  -- didn't he?

1   A.  No.

2   Q.  He addressed CEPS price pressure under the then existing

3   conditions, under the then existing negotiations between CEPS

4   and 3M, didn't he?

5   A.  What he had said, he said in France, like in all other

6   countries, also that there's price special coming from the

7   authorities as a source from the government.  And he was also

8   speaking about this Tambocor life cycle management; that

9   Tambocor CR is replacing Tambocor IR.  And if you flip over to

10  the page which ends 1303, then you see that he was indicating

11  that Tambocor CR 2007 would have growth 14 percent while

12  Tambocor IR would have reduction of 23 percent.

13  Q.  So the answer to my question is no?

14  A.  The question is that he was making only general statements

15  about the price percent.

16  Q.  Sir, I told you earlier I wasn't going to come back to your

17  witness statement.  I forgot something I wanted to cover.

18  Forgive me.  Let's go back to your witness statement and look

19  at Tab 5, JX-109?

20  A.  Yes.

21  Q.  Is this a series of emails that took place on December 13,

22  2006?

23  A.  Yes.

24  Q.  And Mr. Senac in the first email in time, which is the

25  bottom one, is reporting to you that he is drawing your

D1fQmed2                    Dierks - cross

1   attention to an issue as the current pricing agreements, the

2   so-called convention and pricing authorization renewals will be

3   transferred to Meda in France.  Do you see that?

4   A.  Yes.

5   Q.  And the issue that he is advising you of is that

6   Mr. Traineau told him, Mr. Senac, the country manager of Meda

7   France, that there is a current risk of a 10 percent price

8   decrease of Flecaine CR, i.e., a risk of 4 million euros price

9   decrease on an annual basis, correct?

10  A.  That's written there.

11  Q.  And whether or not you believe what was being reported to

12  you or otherwise, a risk of a $4 million euro price decrease on

13  an annual basis due to a price decrease in Flecaine LP was a

14  major issue, fair to say?

15  A.  With regard to this, no.

16  Q.  If -- OK.  Mr. Senac ends the question "whether or not we

17  should discuss guarantees from 3M France on the occasion of the

18  local closing," correct?

19  A.  That's written there.

20  Q.  Had to your knowledge any price guarantees been negotiated

21  by Meda in France into any of the country acquisition

22  agreements that were executed at the time of the closing?

23  A.  No idea.  That's why I forwarded this question to

24  Mr. Larnholt and Mr. Stenqvist.

25  Q.  And your question in your single-line transmittal email to

D1fQmed2                         Dierks - cross

1   Messrs. Larnholt and Stenqvist was, does the contract foresee

2   here any kind of mechanism?

3          My question is simply this, by mechanism, were you

4   talking about a price guarantee provision?

5   A.  That was related to the last sentence of the email of

6   Mr. Senac.  The question is whether or not we should discuss

7   guarantees from 3M France on the occasion of the local closing.

8   Q.  Sir, while we're on this notebook, in order we can put an

9   end to the reference to it, if you look at Tab 9?

10  A.  In which?

11  Q.  Same notebook we're on, PX-360?

12  A.  Yes.

13  Q.  This is one of the exhibits to your witness statement.  And

14  I want to direct your attention to the email at the bottom of

15  the first page from Mr. Maupas to you and Mr. van't Hullenaar.

16  And, by the way, I'm not sure it's clear in the record,

17  Mr. Maupas became the country manager of Meda France, correct?

18  A.  Yes, he was the successor of Mr. Senac.

19  Q.  Taking Mr. Senac's place?

20  A.  Yes.

21  Q.  And also Mr. Traineau's place?

22  A.  Mr. Traineau had decided end of January 2007 to leave us.

23  So, as I explained yesterday, when 3M -- when we acquired this

24  business, and when we knew Mr. Traineau by this would come over

25  to us, we split the country manager position into country and

D1fQmed2                              Dierks - cross

1    states -- marketing states or country and states, country

2    manager and marketing states, which Mr. Traineau took over, and

3    the rest Mr. Senac should take over and then we had discussed

4    with Mr. Traineau if he's doing his job well that he will

5    become only country manager.  Then Mr. Traineau left, so

6    Mr. Senac was the only country manager again, and Mr. Maupas

7    took this over.

8    Q.  Plaintiff's Exhibit 360 from Mr. Maupas to you dated

9    April 2, 2008, there is a section in this email entitled

10   Flecaine 2008, correct?

11   A.  Yes.

12   Q.  It begins "a price decrease is" --

13           THE COURT:  Do you want to move this in?

14           MR. RENARD:  Your Honor, I believe it already is.

15           THE COURT:  Except I think you objected.

16           MR. RENARD:  Well, your Honor --

17           THE COURT:  Do I have that right?  Is 361 an issue.

18           MR. RENARD:  But I thought, your Honor, the ruling was

19   that it might be subject to knowing what was said and

20   understood what was understood between --

21           THE COURT:  That's fine.

22           MR. RENARD:  My question is simple.

23           THE WITNESS:  Is it possible that I could have some

24   water, please?  Thank you.

25   Q.  The bottom of that first page of PX-360, there's a

D1fQmed2                          Dierks - cross

1    statement made, the second line from the bottom:  "As far as

2    the percentage of decrease is concerned, his ultimate goal is

3    to set the daily cost of CR at the cost of the IR," correct?

4    A.  Yes, that's what it says.

5    Q.  And is that your understanding at the time?

6    A.  That was the sentence that Mr. Maupas sent to us.

7    Q.  Now, sir, we can set that notebook aside?

8    A.  OK.

9    Q.  Then if we go to Tab 13 of the notebook that I presented to

10   you this morning, which is DX-307, and I will ask you, sir, if

11   that is a string of emails that ends with an email dated

12   December 19, 2006 to Mr. Senac with a copy to you and to others

13   entitled, among other things, Risk of Price Decrease Tambocor

14   CR France?

15             THE COURT:  Which page are you looking at?

16             MR. RENARD:  The email string, your Honor, ending with

17   the email that I identified, which, in other words, is the

18   first one that appears on the document at the top of page 1.

19   Q.  Is that a seem string, Mr. Dierks, that you were involved

20   in?

21   A.  That came out to my knowledge, yes.

22             MR. RENARD:  Your Honor, we would move the admission

23   of DX-307.

24             MS. BROWN:  No objection, your Honor.

25             THE COURT:  DX-307 is admitted.

1           (Defendant's Exhibit 307 received in evidence)

2    Q.  Mr. Dierks, then if you could go to Tab 14?  Is this an

3    email from Mr. van't Hullenaar dated January 12, 2007 to you

4    and others?

5    A.  As you see, yes.

6           MR. RENARD:  Your Honor, we would move the admission

7    of DX-350.

8           MS. BROWN:  No objection.

9           THE COURT:  DX-350 is admitted.

10          (Defendant's Exhibit 350 received in evidence)

11   Q.  Mr. Dierks, I want to examine the time point December 2006

12   prior to the acquisition.

13          THE COURT:  Mr. Renard, approximately how much longer?

14          MR. RENARD:  Your Honor, probably no more than ten

15   minutes.

16          THE COURT:  Let's go ahead and take a quick break, and

17   then we will finish up and go straight into any redirect if

18   there is.  So it's 11:18.  Let's just make it a five minute

19   break.

20          (Recess)

21                          (In open court)

22          THE COURT:  Mr. Renard.

23   BY MR. RENARD:

24   Q.  The same notebook, Mr. Dierks, that we left with, I believe

25   we were last on Tab 13?

D1fQmed2                    Dierks - cross

1   A.  13 or 14?

2   Q.  I was going to ask you some questions before we even focus

3   on the document, so I'll get you there.  Upon the closing in

4   early January of 2007, a number of former 3M Santé employees

5   became employees of Meda France, correct?

6   A.  No, they become employees after the closing.

7   Q.  I'm sorry?

8   A.  They become -- only become employees after the closing, not

9   before the closing.

10  Q.  Included among those persons who became employees of Meda

11  France were Mr. Traineau, correct?

12  A.  Correct.

13  Q.  Who became co-country manager, as we described yesterday?

14  A.  Correct.

15  Q.  And Ms. Helene Kolsky, K-O-L-S-K-Y, correct?

16  A.  Yep.

17  Q.  What was Ms. Kolsky's title with Meda France?

18  A.  She was within Santé, 3M Santé, she was head of the drug

19  regulatory department of France, if I may recall this

20  correctly, and she would have had then a position within the

21  drug regulatory department.  But, you know, to became an

22  employee is not like you have described it.  From the law in

23  Europe is like this, if a business is transferred, then the

24  persons who for the majority of the work worked with these

25  products from a legal point of view are also going over to the

D1fQmed2                    Dierks – cross

1    new company, but they have to the right also to say, no, we do

2    not want to go over.  So they are not automatically employees

3    of the new company.

4    Q.  So, no one was forced to be an employee of Meda France

5    against their will?

6    A.  No.

7    Q.  Ms. Kolsky then, as I understand it, had similar

8    responsibilities and a title similar to what she had prior to

9    the closing with 3M Santé, correct?

10   A.  No.

11   Q.  Head of regulatory affairs?

12   A.  No, because I think this was a question where, you know,

13   when you bring two businesses together, you have the head of

14   drug regulatory also in Meda before.  So normally when the

15   business come together, you have not automatically two heads.

16   Automatically she was not the head.  So then we would have

17   looked into what kind of function we would have been possible

18   to offer her in the drug regulatory department.

19   Q.  Did her initial responsibilities when she became an

20   employee of Meda France include matters relating to CEPS

21   regulatory pricing matters?

22   A.  Within Meda?

23   Q.  Yes, sir.

24   A.  No, I don't think so.

25   Q.  Now, after the acquisition, was a budget prepared for Meda

1    France for calendar year 2007?

2    A.  Could you precise the date after acquisition?

3    Q.  I believe acquisition the closing took place on January 2,

4    2007.

5    A.  The budget was made before.

6    Q.  By who?

7    A.  By Meda France.

8    Q.  So, prior to Meda France -- well, you make a point.  Let me

9    ask you, after the acquisition when Meda France, I take it,

10   expanded in size by acquiring the assets that had been the

11   assets of 3M Santé, was a new 2007 budget prepared on the

12   assumption for or on the basis that Meda France now had these

13   additional pharmaceuticals that it acquired from 3M?

14   A.  As we knew before the acquisition that we will have an

15   acquisition, this was foreseen and put in the budget into it

16   and we took the figures that 3M Santé had planned for Tambocor.

17   Q.  And did those figures assume any price decrease in Flecaine

18   LP for the calendar year 2007?

19   A.  That was exactly all this email corresponding because in

20   December, Mr. Traineau, who was foreseen to become the country

21   manager, stays in marketing for France and under which

22   responsibility it would have been then to realize the figures,

23   came up in the mail that we have seen saying we should take a

24   10 percent price decrease as a risk into this budget.  There is

25   nothing untoward, you know, you get a new job, you know that

D1fQmed2                         Dierks - cross

1    you are responsible and then you have to do this.  And the mail

2    you have here, pointed out exactly about this question:  Should

3    we take this risk in or should we not take this risk in of the

4    10 percent.

5    Q.  Is the answer to my question, there was a 10 percent

6    assumption of a price decrease in Flecaine LP built into the

7    2007 budget for Meda France?

8    A.  There was we took this risk in, yes.

9    Q.  Turn, sir, to tab 14 which is DX-350, and I will ask you if

10   this appears to be an email chain that ends with the one at the

11   top of the first page from Mr. van't Hullenaar to you dated

12   January 12, 2007?

13   A.  Yes.

14   Q.  Does this concern the Meda France 2007 budget?

15   A.  Yes.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

D1FJMED3                         Dierks - cross

1            MR. RENARD:  We move DX 350 into evidence.

2            MS. BROWN:  No objection.

3            THE COURT:  DX is admitted.

4            (Defendant Exhibit 350 received in evidence)

5    BY MR. RENARD:

6    Q.  Turn to 15, sir, which is DX 588, which appears to be an

7    e-mail, an attachment from Ms. Kolsky to Mr. Senac, with a copy

8    dated to --

9            MR. ARMENIO:  We have already objected to this.  Your

10   Honor, I believe, has already ruled on it.  I don't know why it

11   is even being shown to the witness right at this moment.

12           MR. RENARD:  I am identifying it for the purposes of

13   offering it into the record, at which point in time I assume

14   there would be an objection and we would argue it.  With

15   that --

16           MR. ARMENIO:  It has been objected to, and the basis

17   for the objection, this witness has no connection to the

18   document whatsoever, it is completely improper to go fishing

19   with Dr. Dierks on this document.

20           MR. RENARD:  I appreciate that --

21           THE COURT:  I am sorry.

22           THE COURT:  Let me -- we're looking at -- do I have

23   the translation of --

24           MR. RENARD:  Yes, your Honor, at the very last page

25   after the certification is the translation, there is a

 1   translation of the cover e-mail and a translation of that
 2   French language slide of Article II and Article III.
 3              THE COURT:  Saying it is the last?  Okay.
 4              (Pause)
 5              THE COURT:  I want to make sure I am looking at the
 6   right thing.  Tab 15 is --
 7              MR. RENARD:  DX 588, your Honor, which is a January
 8   22, '07 e-mail, Kolsky to Senac with attached presentation, and
 9   then at the very back is the certification and the translation
10   of the two pages of DX 588 that are in the French language.
11              MR. ARMENIO:  Just to make the record clear, we have
12   already checked into DX 588.  There is no foundation with this
13   witness.  The author recipient and copy person, none of them
14   have talked about it.  Ms. Kolsky is not coming to trial.  Mr.
15   Senac in a full day deposition wasn't asked about it.
16              Mr. Raineau will submit a declaration he didn't talk
17   about it.  We further object to the English language
18   translation.  It purports to translate Article 2.2 in a way
19   contrary to the joint stipulated Fact 15 in the pretrial order
20   which is the agreed translation of Article 2.2.  That is an
21   additional objection to the translation.
22              THE COURT:  All right.  Let me hear an effort to lay a
23   foundation.
24              MR. RENARD:  Your Honor, if I may.
25   BY MR. RENARD:

D1FJMED3                           Dierks - cross

1   Q.  First of all, Mr. Dierks, did Mr. Senac ever report to you

2   or advise you of his receipt of this document?

3   A.  No.

4   Q.  Have you ever seen this document?

5   A.  No.  I have seen it for the first time.

6                THE COURT:  Sustained.

7                MR. ARMENIO:  Thank your Honor.

8                MR. RENARD:  Your Honor, may I respectfully be heard

9   on that?

10               THE COURT:  Sure.

11               MR. RENARD:  Your Honor, this document was produced by

12  Meda.  It is a Meda-prepared document.

13               THE COURT:  The witness just said he has never seen it

14  before.  So how can he answer questions about it?

15               MR. RENARD:  Answering questions and respectfully

16  getting it into evidence are two different things.  These are

17  admissions.

18               THE COURT:  That is true.  You can ask him questions

19  about documents in evidence.

20               MR. RENARD:  Your Honor, we would move it into

21  evidence.  At this point I am not going to ask him any

22  documents.  Move it into evidence.  Counsel, please, you argue

23  it now three times without giving me an opportunity.

24               THE COURT:  You have all the opportunity you want, Mr.

25  Armenio.  I will always give everyone an opportunity.

1              MR. RENARD:  I am not suggesting the court isn't.

2              These are admissions by Meda in a document prepared by

3    Meda and --

4              THE COURT:  If there were hearsay objection, you could

5    overcome a hearsay objection.

6              MR. RENARD:  Yes, your Honor.

7              THE COURT:  You still have to move something in, a

8    foundation has to be laid by a witness who has person knowledge

9    of the document.

10             MR. RENARD:  I will, your Honor, I'll move on.

11             THE COURT:  If you get it in some other way and want

12   to come back to it, that is fine.  If you anticipate that,

13   given the way we are ordering witness, that is fine as well.

14             MR. RENARD:  Very well.  I'll move on.

15   BY MR. RENARD:

16   Q.  Mr. Dierks, when is the first time that you're aware of

17   anyone from Meda was informed that CEPS had asked or requested

18   or demanded that 3M introduce a generic alternative to Flecaine

19   P0 with pricing for Flecaine LP at a generic level?

20   A.  Middle of December, 2007 when Mr. Renaudin informed me of

21   this.

22   Q.  Isn't it correct that Mr. Senac was aware earlier than

23   that?

24             MS. BROWN:  Objection, your Honor.  It is --

25   BY MR. RENARD:

D1FJMED3                    Dierks – cross

1    Q.  Turn, sir, to Tab 16, which, sir, is an October 3, 2007

2    e-mail to a number of individuals, copied to a number of

3    individuals including Mr. Senac and I will ask if you have ever

4    seen this before?

5    A.  No.

6    Q.  Did Mr. Senac or anyone else from Meda ever tell you that

7    in, prior to December of 2007, that 3M had discussed with CEPS

8    the possibility of introducing a generic competitor to Flecaine

9    LP?

10   A.  No.

11          MR. RENARD:  Your Honor, we move the admission of DX

12   384.

13          MR. ARMENIO:  Same objection, no foundation whatsoever

14   with this witness.

15          THE COURT:  Sustained.

16   BY MR. RENARD:

17   Q.  Finally, sir, if you turn to Tab 18 to begin with, DX 393

18          MR. RENARD:  I'll note for the record, if I may, going

19   back to Tab 16, DX 384 is also a joint exhibit, JX 116; and,

20   therefore, we move its admission?

21          THE COURT:  So it is already in?

22          MR. RENARD:  Yes, your Honor.

23          THE COURT:  You can ask the witness about something in

24   evidence.

25   BY MR. RENARD:

D1FJMED3                    Dierks - cross

1   Q.  It is correct, is it not, Mr. Dierks that prior to December

2   of 2007 Meda was well aware that there had been discussions if

3   not at one point in time agreements relating to the

4   introduction of a generic equivalent of Flecaine LP?

5   A.  I was not aware and was not aware that somebody else was

6   aware.

7   Q.  Have you read the complaint and the amended complaint that

8   Meda has filed in this case?

9   A.  No.

10  Q.  Were you aware that overtime Meda's allegation in this

11  Court as to when it first learned of the 2003 CEPS convention

12  has changed --

13              MR. ARMENIO:  Objection.

14  Q.  -- from February to the fall to the December of 2007?

15              MR. ARMENIO:  Objection, both assumes facts not in

16  evidence and argumentative.

17              THE COURT:  Sustained.

18  BY MR. RENARD:

19  Q.  Turn, sir, to Tab 18.

20  A.  Yes.

21  Q.  I'll ask you, sir, if that document which is DX 393 is

22  signed by you on behalf of Meda Pharma SAS?

23  A.  Yes.

24  Q.  And then, sir, Tab 19, DX 421, the same question, is that a

25  document signed by you?

D1FJMED3                         Dierks - cross

```
 1   A.  Yes.

 2              MR. RENARD:  Your Honor, we move the admission of DX

 3   393 and DX 421.

 4              THE COURT:  It may be in already.

 5              MS. BROWN:  No objection.

 6              THE COURT:  These are not joint exhibits?

 7              MR. RENARD:  No, your Honor.

 8              MS. BROWN:  No, your Honor.

 9              THE COURT:  DX 393 and DX 421 are admitted.

10              (Defendant Exhibits 393 and 421 received in evidence)

11              MR. RENARD:  Your Honor, if the court will permit me

12   one second.

13              (Pause)

14              MR. RENARD:  Upon consultation, your Honor, I have no

15   further questions.  Mr. Dierks, thank you for your patience.

16              THE COURT:  Do you have redirect?

17              MS. BROWN:  Yes.

18              THE COURT:  I had one question.  I always give

19   everybody a chance do follow-ups, if you want to, after I ask a

20   question.  Mr. Dierks, in your declaration, Mr. Renard asked

21   you about this, Paragraph 43 --

22              THE WITNESS:  Yes.

23              THE COURT:  -- you said I recall specifically looking

24   at documents relating to document and sales information

25   including product information and in the data room you didn't
```

1    come across any information related to a signed agreement in

2    France mandating price reduction.

3              Did you come across other CEPS conventions including

4    annual, the annual renewals?

5              THE WITNESS:  No.

6              THE COURT:  Did you come across the CEPS or with other

7    agencies with respect to other countries those kinds of --

8    well, stick with France -- pricing and reimbursement approvals

9    and the like?

10             THE WITNESS:  No, those were not, but as I told you

11   before, for me when I went into the data room, my job was not

12   to have, first of all, overall view what is in the data room.

13             I was, as I said yesterday, not very long in the data

14   room itself because for this we had consultants looking into it

15   that would have come up with something special, something that

16   we would have not known before, something that would have been

17   contradictory, and nothing like this has -- I have not been

18   informed about anything like this.

19             THE COURT:  When you say you were looking at documents

20   related to this and you didn't see some sets of things, so

21   would you have thought in what you were looking at you would

22   come across CEPS conventions?

23             I am just thinking there might be a volume of them?

24             THE WITNESS:  Let me say it like this:  If, for

25   example, there would have been a point CEPS convention, perhaps

D1FJMED3                         Dierks - cross

1     I would have seen it, but there was not special CEPS

2     convention.

3                  THE COURT:  Was your understanding that there ought to

4     have been?

5                  THE WITNESS:  No.  As I said, it depends.  Now, the

6     CEPS convention --

7                  THE COURT:  I am just talking about not something I

8     understand the distinction you're drawing, but I guess as I'm

9     thinking about it, shouldn't there be sort of a bulk of

10    documents, even the annual renewals that show the published

11    price?

12                 THE WITNESS:  Yes, I would have thought CEPS would

13    have been in the regular --

14                 THE COURT:  Shouldn't somebody have -- and I am

15    assuming they weren't.

16                 THE WITNESS:  Yeah.

17                 THE COURT:  Is that right, they weren't?

18                 THE WITNESS:  No, they weren't, according to my

19    knowledge.

20                 THE COURT:  Should that have surprised somebody?

21                 THE WITNESS:  No.  As I said, as in known CEPS

22    convention, normally it is only a list of prices that are

23    reimbursed which are publicly known.  Let me say no, I would

24    not have been surprised.

25                 Honestly, I would have thought they put something in

1    like this.  If I would have been the one preparing the data

2    room, for sure I would have put them in because for me this is

3    part of, as I said, the paper that you should provide.

4              Let me say on the other side, the information is

5    normally in the CEPS convention that is the price that is

6    publicly known.

7              THE COURT:  Right.  The price is publicly known?

8              THE WITNESS:  Yes.

9              THE COURT:  Otherwise, it is not?

10             THE WITNESS:  Yes.

11             THE COURT:  Is it right, my assumption, there would

12   be, if that kind of material were included, it would be a

13   fairly large volume?

14             THE WITNESS:  Yes, I think so.  You have seen the CEPS

15   convention, yes, CEPS conventions are a table of some pages,

16   depending on how many reimbursed products you have, and 90

17   percent of this is only the list prices for the products.

18             THE COURT:  The drug and price?

19             THE WITNESS:  Yes.  This is normally the only thing

20   that is in, according to my knowledge of the CEPS convention I

21   know, I would say 97 percent, 98 percent only have this.  You

22   have several annexes, so 1 to 6 or something like this and the

23   first ones are more general remarks, then you have, as I said,

24   pricing.  Normally at the end you have something with regard to

25   new products, but the normal CEPS conventions only list

D1FJMED3                    Dierks - cross

1    products with reimbursed price that is well known.

2              THE COURT:  Is it your understanding -- if you don't

3    know, just say so -- with respect to any French products, any

4    CEPS documents, any communications, conventions,

5    authorizations, whatever, anything like that contained are in

6    the data room?

7              THE WITNESS:  Yeah.  Let me say the registration

8    files, we have spoke about this different steps of getting the

9    registration.  For example, all the so-called registration

10   files in which there are CEPS --

11             THE COURT:  Right, but different agency, right?

12             THE WITNESS:  Yes.

13             THE COURT:  I am just asking about CEPS.

14             THE WITNESS:  According to my knowledge, CEPS, no.

15             THE COURT:  Is that surprising?

16             THE WITNESS:  As I said, yes and no.  It would not be

17   surprised, only the list of well known prices, then you could

18   say put it in, but there is no value coming, no information

19   coming out of this paper.  It is surprisingly for sure now

20   because there was one CEPS convention that --

21             THE COURT:  I am sort of just --

22             THE WITNESS:  I am not surprised.  Honestly, I would

23   have put them in the data room, but for me it is not -- saying

24   it is not in, as long as it only gives list of reimbursed

25   prices, there are none.

 1          THE COURT:  Would it be a flag?  If the assumption is
 2     it would be in, as you say, you would do it?
 3          THE WITNESS:  I would do it, yes.  I would put them
 4     in.  That is paperwork that should be in.
 5          THE COURT:  If you were looking at everything,
 6     obviously you have a bigger job than that, but if you were
 7     looking at everything, would you have noticed the absence of
 8     that?
 9          THE WITNESS:  I don't think so because, you know, it
10     is also -- the data room is -- the thing, it is a chain of
11     things.  For sure we ask are there any documents, contracts
12     that are legally binding that are not in the data room, yeah.
13          As I said, you know, for me it is two opposites.  For
14     the year, we do roughly 10 deals.  That is the first time that
15     we have this problem.  That is the first time that we have to
16     seek litigation with regard to this.
17          So when you make business sometimes, and okay, I am
18     now working for them years from here, say made 70 deals, I
19     assume normally that if I advise something, then that the
20     person giving me a fair picture and is coming up and telling
21     me, sorry, that you should know.  I am not assuming people
22     cannot, cannot forget something.
23          I think that is knowledge to speak about let me say a
24     small product to make it like this which has economically no,
25     no importance, but for sure we speak about the biggest product,

D1FJMED3                         Dierks - cross

1    the biggest country, and for sure in the first step I am not

2    saying I assume the person is sitting on the other table wants

3    to hide something from me.

4              I am assuming like it was always he wants to sell

5    something, he wants to have good business deal, and for this

6    good business deal there is a problem that I give you a fair

7    picture of the business that you buy, and that's it.

8              If something is not in, I am not automatically saying

9    they must be hiding something.  I am assuming, okay, people

10   with knowledge and information only what is the reimbursed

11   price that is known, does not -- is not a big thing to put it

12   in or not.

13             THE COURT:  Thank you.  Anything?

14             MR. RENARD:  I have a brief follow-up.

15             THE COURT:  Go ahead.  Scope of what I asked?

16             MR. RENARD:  Yes, your Honor.

17   CROSS-EXAMINATION continued

18   BY MR. RENARD:

19   Q.  Mr. Dierks, you understood, though, that negotiations were

20   ongoing between 3M and CEPS with respect to the next convention

21   for Flecaine LP, correct?

22   A.  I think you asked this question already, and I gave you the

23   answer no, I was not aware that they were ongoing.  I was aware

24   there will be discussions with CEPS because if you bring a

25   product to the market in 2003, and the convention is for five

1  years, that means it will end in 2008.  So I was aware that

2  somewhere in 2007 there must be new, but I was not aware there

3  were ongoing negotiations.

4  Q.  Did you ask 3M for any documents relating to any proposals

5  or suggested conventions; in other words, correspondence

6  between 3M and CEPS relating to this upcoming new convention?

7  A.  As an company, you do not propose conventions.

8  Q.  Right.  CEPS proposes the convention?

9  A.  It is like this:  CEPS, together with the company, speaks

10  about it, and the outcome of this negotiation, if you like to

11  say so, is laid down then in a convention.

12  Q.  Did you ask for any correspondence apart from existence of

13  conventions, any correspondence between CEPS and 3M relating to

14  a proposed convention?

15  A.  No, because there was not a proposed convention.

16          MR. RENARD:  Thank your Honor.  That is all I have.

17          THE COURT:  Redirect, Ms. Brown.  Obviously, you also

18  can ask any redirect within the scope of my questions.

19          MS. BROWN:  Thank your Honor.

20  REDIRECT EXAMINATION

21  BY MS. BROWN:

22  Q.  Dr. Dierks, if you would look in the blue binder in front

23  of you, and if you could turn to Tab 12 --

24          THE COURT:  What is the blue binder?

25          MS. BROWN:  It is the binder that does not contain the

1  declaration.

2          THE WITNESS:  I'm in the wrong one.

3          (Pause)

4          THE COURT:  Got it!

5          THE WITNESS:  Yes.

6  BY MS. BROWN:

7  Q.  If you could turn to the page ending in 1298.

8  A.  Yes.

9  Q.  I believe you were asked some questions on your

10 cross-examination about the bullet points contained on this

11 page, including the second bullet point where it says manage

12 the health authorities --

13         THE COURT:  Would you lower the microphone?  I share

14 your tall personality.

15         MS. BROWN:  I am not as tall as Mr. Renard.

16 BY MS. BROWN:

17 Q.  The second bullet point, you're there?

18 A.  Yes.

19 Q.  When Mr. Traineau gave you this presentation in Sweden, and

20 when you're discussing this information about the health

21 authority's price pressure, did he ever mention to you Article

22 2.2 of the CEPS convention?

23 A.  No, never.

24 Q.  Did he ever mention that there was a convention with CEPS

25 that might have been canceled?

1    A.  No.

2    Q.  Did he ever mention there was a risk of generic pricing

3    with --

4    A.  No.

5    Q.  Did he ever mention there was a risk, 50 percent risk of 50

6    percent price cut for Tambocor?

7    A.  No.

8    Q.  In the discussions surrounding the slide, what did you --

9    your best recollection of what Mr. Traineau was telling you in

10   connection?

11   A.  That there was a general price pressure on reimbursed drugs

12   in France which left in all countries.

13   Q.  In the same binder, can you please turn to Tab 13, the very

14   next tab.

15   A.  Yes.

16   Q.  This is an e-mail.  You were asked some questions about

17   this in your cross-exam.  Do you remember this?

18   A.  Yes.

19   Q.  If you look, I am going to go to the last e-mail in the

20   chain.  Do you see where it says dear all, this is to confirm

21   this is a risk of a price decrease estimated at 10 percent or 4

22   million Euro per capita.  I believe you said earlier when you

23   say this, this was not a major issue.  Why did you believe this

24   is not a major issue?

25   A.  As I said, first of all, if you read this sentence, this is

1    a totally different thing than this article what we have spoken

2    about because he is saying okay, the list of 10 percent price

3    decrease on the occasion of the price, you get every five years

4    for every drug in France.  That is exactly what I mentioned

5    before, drug came into market in 2003, so five years later is

6    2008, that means you start making a decision in 2007.

7              The second thing, Mr. Traineau, as I just told, was

8    the person we have spoke with that said listen, you are our

9    person, if you do your job well, you will be successor of

10   Mr. Renaudin, becoming the country manager of one of the

11   countries of Meda, so very important country.

12             As we took the forecast we have received from Sweden,

13   so his figures, so to say, and for sure that is a bad common

14   thing that a lot of country managers tell us okay, there might

15   be price decrease, there might be resistance, not possibility

16   to achieve the -- that gives them a little reserves, gives them

17   a little bit of air, let me say, and confidence to reach and

18   especially in the situation of Mr. Traineau, there was a

19   special one because he knows we were on a dry period to become

20   the country manager for sure, he wanted to be sure that is what

21   I achieve and that is --

22   Q.  Did you have any understanding at all this risk of a 10

23   percent price decrease related to a signed convention?

24   A.  No, not at all because you see it is not set with regard to

25   convention.  It was the upcoming five years renewal, meaning

1    the normal automatic procedure.

2    Q.  Did you have any understanding at all that this risk of a

3    10 percent price decrease related to some other commitment or

4    obligation made by 3M to CEPS?

5    A.  No.  That is all the point.  For me it is very strange.  We

6    know that a signed convention, a signed convention it is at

7    minus 50 percent.  Here is this person that says there might be

8    a risk of 10 percent.  For me I can't understand this.  I

9    cannot understand how a person, knowing we have signed

10   something like 50 percent, is telling me might reserve of 10

11   percent.

12   Q.  If you can turn to the other binder you have in front of

13   you, and if you can turn to Exhibit 8 --

14   A.  Yes.

15   Q.  -- this is PX 541.  This is an e-mail from Christoph Maupas

16   to you and Ton Vant Hullenaar on January 29, 2008.  Dr. Dierks,

17   can you please explain to us what this e-mail and attachments

18   are?

19             MR. RENARD:  Objection.  I don't believe there was any

20   inquiry about this particular exhibit.

21             MS. BROWN:  I am re-directing on this exhibit in light

22   of the objection that was raised, directly in response to that

23   objection.

24             MR. ARMENIO:  Exhibits discussed in his declaration

25   and there was an objection that there wasn't adequate

1   foundation, and we are trying to establish the adequate

2   foundation, which your Honor I believe allowed us the

3   opportunity to do.

4           MR. RENARD:  It wasn't a foundation objection at all.

5   The objection is hearsay.  I think I explained at some length

6   why I believe in terms of going through the history and

7   statement of facts, an internal Meda document, to proffer it

8   through the matter asserted.

9           MS. BROWN:  My understanding was that the exhibit,

10  that the objection to foundation was the reason that the

11  exhibit was being not admitted into evidence, not because of

12  hearsay.  That was my understanding.

13          THE COURT:  I think, no, I think this was one of the

14  hearsay objections from yesterday and it was one I asked about

15  the letter was different from the other ones, and what I said

16  was there had been no foundation laid to offer, for example, to

17  establish that it is a business record or another exception.

18          MR. ARMENIO:  This one wasn't from yesterday, your

19  Honor.

20          THE COURT:  It is not?

21          MR. ARMENIO:  This one was just from today, with

22  Mr. Dierks' declaration and was pointed out that perhaps the

23  sentence that introduces this exhibit in his declaration was

24  not sufficient standing alone to establish a business record

25  objection.

1          THE COURT:  This was from yesterday, yes, it was.

2          MR. ARMENIO:  Your Honor, I apologize.  My team is

3     reminding me this was discussed in part yesterday.

4          THE COURT:  And I raised it this morning in going over

5     my views of the objections, indicating that I didn't understand

6     what it was, but I did say -- it was a hearsay objection made

7     to it yesterday, so I'll let you make an effort at laying a

8     foundation.  I mean I gather it is not with respect to the

9     witness's knowledge, but what is in it and see if you can

10    overcome the hearsay objection.

11    BY MS. BROWN:

12    Q.  Dr. Dierks, can you just explain to us what the attachment

13    to this is?

14    A.  After I got the message in the middle of December and then

15    in the end of December 2007 saying that this is the situation

16    that CEPS wants us to reduce the price of Flecaine 50 percent

17    according to the problem, he said the hierarchy, the beginning

18    of January will have a meeting together in Paris and this is

19    outcome out of this meeting that we had.

20    Q.  Is this a Power Point presentation that you created?

21    A.  Not me.  That was created by Christoph Maupas.

22    Q.  Is this a Power Point presentation he showed you during --

23    A.  Yes.

24         MS. BROWN:  Your Honor, we would proffer this exhibit

25    into evidence as PX 541.

1              MR. RENARD:  Your Honor, clearly this is not a

2    business record.

3              THE COURT:  There has been no showing that would get

4    me there.  The objection is sustained.  You want this in to

5    establish the truth of the things contained in here?

6              MS. BROWN:  No, your Honor.  I think we are looking at

7    it more to establish the state of mind of the Meda executives

8    when they were faced with this problem in December leading into

9    January 2008, how they addressed this problem, what they

10   thought their options were and to really show how it

11   impacted -- it showed their belief of what was really going on

12   in this moment of time.  It is contemporaneous, it is within a

13   month of learning about the CEPS convention that existed.

14             THE COURT:  I wouldn't let it in in light of what we

15   have seen so far for the truth, but as with the other ones,

16   I'll see if there is some purpose for which it is being put to

17   me that would be a permissible purpose other than for the

18   truth.

19             MS. BROWN:  Thank your Honor.

20             THE COURT:  But the hearsay objection, to the extent

21   you're offering it for the truth, is sustained.

22             MS. BROWN:  Understood.  Thank you, Dr. Dierks.  I

23   have no further questions.

24             MR. RENARD:  Nothing further, your Honor.

25             THE COURT:  Thank you, Dr. Dierks.

D1FJMED3                              Dierks - redirect

 1            (Witness excused)

 2            THE COURT:  You may call your next witness.

 3            MR. ARMENIO:  Thank your Honor.  Plaintiffs Meda AB

 4     calls Anders Larnholt as the next witness.

 5            MR. CARLINSKY:  Just for clarification, Mr. Dierks now

 6     he has completed his testimony.  Can he remain in the

 7     courtroom?

 8            THE COURT:  Everyone okay with that?

 9            MR. RENARD:  As long as there is no possibility he

10     would be recalled.  If there is any possibility, we ask the

11     rule continue to be imposed.

12            MR. CARLINSKY:  We'll have him leave.  That is a fair

13     point.  If I can be excused to walk Mr. Dierks out?

14      ANDERS LARNHOLT,

15          called as a witness by the Plaintiff,

16          having been duly sworn, testified as follows:

17     DIRECT EXAMINATION

18            MR. ARMENIO:  I am handing to the witness the original

19     of the Larnholt declaration previously submitted to the court.

20            THE COURT:  Mr. Larnholt, do you have your declaration

21     dated December 14th, 2012 in front of you?

22            THE WITNESS:  Yes, I do, your Honor.

23            THE COURT:  Is there anything in your declaration that

24     you think is in error or want to bring to my attention as a

25     mistake?

1           THE WITNESS:  No, your Honor.

2           THE COURT:  Do you swear or affirm that every

3     statement contained in this declaration, under the penalty of

4     perjury, is the truth, the whole truth and nothing but the

5     truth?

6           THE WITNESS:  Yes, I do, your Honor.

7           THE COURT:  Thank you.  So why don't you, Mr. Armenio,

8     move the admission of the declaration and any exhibits

9     reference to the exhibits.

10          MR. ARMENIO:  Yes, your Honor, plaintiff Meda moves

11    the admission of Mr. Larnhold's declaration and moves the

12    admission of six exhibits that have not already been admitted

13    by the court.  Those are PX 235, PX 278, PX 284, PX 239 and PX

14    328.  I would just note for the record that in Mr. Larnhold's

15    declaration there is reference to PX 427.  That has already

16    been admitted as JX 84.

17          THE COURT:  Mr. Collins?

18          MR. COLLINS:  No objection.

19          THE COURT:  Thank you.  So, Larnhold's declaration as

20    well as additional Exhibits P X 235, 278, 284, 239 and 328 are

21    admitted.

22          MR. COLLINS:  Your Honor, I apologize.  I may have

23    misheard.  I thought we were talking about the exhibits.  I do

24    have a few objections to the paragraphs of the declaration, but

25    not the exhibits.

1          THE COURT:  The exhibits are in.

2          (Plaintiff Exhibits 235, 278, 284, 429 and 328

3    received in evidence)

4          MR. ARMENIO:  If I may, your Honor may have misspoken

5    or may have misheard.  It was PX 439, not 239.

6          THE COURT:  You misheard.

7          MR. ARMENIO:  I apologize, your Honor.

8          THE COURT:  So, PX 235, 278, 284, 429 and 328 are

9    admitted.  Go ahead, Mr. Collins.

10          MR. COLLINS:  The first paragraph is Paragraph 65, I

11    believe.  The first paragraph is Paragraph 65, I believe.  The

12    reference to the Grace Way Pharmaceuticals.  It is hearsay,

13    inadmissible hearsay and has no relevance to this lawsuit

14    whatsoever.

15          MR. ARMENIO:  As to relevance, there has been an

16    argument repeatedly by 3M the diligence was somehow not

17    sufficient.  This goes directly to the sufficiency of Meda's

18    diligence when they walked away from the U.S. 3M Pharma

19    business, and it shows what happened to the company Grace Way.

20    That business then went bankrupt.

21          It also is the court record statement of a Grace Way

22    executive, so it is in an official record, as it is a court

23    statement.  So it is relevant and it is not hearsay.

24          THE COURT:  Overruled.

25          MR. COLLINS:  The next one, your Honor, is Paragraph

D1FJMED3                    Larnholt - direct

88.  We believe it is an improper legal conclusion, trying to

interpret the terms of a document.  It is also speculating

about the intent of 3M.  At best maybe he can speak to their

intent, not 3M's intent.  It is a legal conclusion because it

is interpreting a document that is the province of the court.

          THE COURT:  I'll take that for what it is properly

admitted for.  Go ahead.

          MR. COLLINS:  Your Honor, Paragraph 94, your Honor, we

believe is also an improper conclusion, legal conclusion,

improperly opinion testimony when he talks about I believe that

the only way that the agreement, he says could have been

properly disclosed to potential buyers and it goes on to

explain that.  So we believe that is an improper, one, legal

conclusion; and, two, improper lay testimony.

          MR. ARMENIO:  We believe it is both relevant and

appropriate testimony.  3M has argued about what is normal to

have been done in a transaction like this, what should Meda

normally have done as a reasonable participant and this speaks

exactly to that.  Mr. Larnholt has been involved in over 50

transactions, and he is explaining what is normal to see and

usual to see in this transaction.  So it directly responds to

3M's argument that Meda in some way behaved unusually in

connection with this transaction and shows that they, in fact,

did not.

          MR. COLLINS:  Our position is he can certainly testify

1    what he has done in other deals, what Meda has done in other

2    deals.  As far as talking about a standard, I don't believe --

3    it is improper testimony.

4              THE COURT:  I will take that for what is permissibly

5    considered.

6              MR. COLLINS:  Paragraph 97, your Honor, we object to

7    the testimony, that I do not see how 3M could in good faith

8    make these statements when it knew about existence of the CEPS

9    agreement.  We believe again that is an improper, one, legal

10   conclusion, good faith unless it is being used in not a legal

11   determination; two, improper lay testimony, opinion testimony.

12             MR. ARMENIO:  This goes directly to the

13   misrepresentations and fraud of 3M because they make statements

14   in the offering memorandum and business presentation regarding,

15   for example, projected EBITDA margin, how profitable the

16   products will be.

17             Mr. Larnhold's testimony goes directly to the fact you

18   could not project that EBITDA margin steady and growing over

19   time at the same time as having have 50 percent price cut

20   agreement.  It is impossible to reconcile the two.  3M argued

21   continuously the offering memorandum and business presentation

22   somehow should have alerted Meda to these risks.  Mr. Larnholt

23   explains here that is impossible.

24             THE COURT:  I won't take it for a legal conclusion,

25   but for what it is permissibly being offered.

1            MR. COLLINS:  Your Honor, Paragraph 112, the

2   statements that 3M knowingly misrepresented to us the asset we

3   were acquiring.  We believe that is an improper conclusion.  It

4   is also speculation on his part, and he can testify what his

5   belief was, but as far as speculating that 3M knowingly

6   misrepresented, that is an improper legal conclusion.

7            MR. ARMENIO:  This again --

8            THE COURT:  The same response.

9            MR. ARMENIO:  -- goes directly to the case.

10            THE COURT:  My response is the same.

11            MR. ARMENIO:  Thank your Honor.

12            THE COURT:  With those noted objections, Mr.

13   Larnhold's declaration is admitted in with the exception of the

14   one objection I sustained.

15   CROSS EXAMINATION

16   BY MR. COLLINS:

17   Q.  Mr. Renaudin, good afternoon.

18   A.  Good afternoon.

19   Q.  You have submitted a witness statement in this matter,

20   correct?

21   A.  Correct.

22   Q.  You have that in front of you?

23   A.  Yes, I do.

24   Q.  In your witness statement you contend that Meda had been

25   damaged, correct?

1   A.  Correct.

2   Q.  And that Meda had been damaged based on certain conduct by

3   3M.  Is that correct?

4   A.  Sorry.  I can't really hear you.

5   Q.  I am sorry.  And you contend in your witness statement that

6   Meda's been damaged based on certain conduct by 3M, correct?

7   A.  Can you define, "conduct"?

8   Q.  Let me try it a different way.

9          In your witness statement, is it your position that

10  Meda has been damaged based on something that 3M did or didn't

11  do?

12  A.  I don't think I really understand the question.  I think we

13  were damaged when we bought this business and paid too much.

14  Q.  What's the basis for why you believe you paid too much?

15  A.  Because there was an agreement that seriously affected the

16  whole profitability of the company which should have been

17  disclosed, so we could take that into account in our

18  evaluation.

19  Q.  It is your position that that, what you referred to as

20  agreement, that document was not disclosed to you, correct?

21  A.  That agreement was not disclosed, yes.

22  Q.  Any other thing that you, in your witness statement,

23  contend that 3M did wrong?

24  A.  Can you repeat?  I can't hear you.

25          THE COURT:  We are going to see if we can put more

1    volume.  Keep your voice up.

2             MR. COLLINS:  I will.

3             THE COURT:  I think it is not on.

4             MR. CARLINSKY:  It is on.  I tapped it.

5             THE COURT:  I don't hear the taping.

6             MR. CARLINSKY:  I'm hearing taps.

7             THE COURT:  My clerk is going to try.

8             (Pause)

9             THE COURT:  We are going to get somebody up here to

10   look at it.  Do keep your voice up and just let us know if you

11   can't hear something, Mr. Larnholt.

12   BY MR. COLLINS:

13   Q.  Mr. Larnholt, so you say that 3M acted improperly by not

14   disclosing that document or documents to you, correct?

15   A.  This supplemental information that should have been

16   disclosed.  It should have each been disclosed in the offering

17   memoranda.

18   Q.  My question to you is that's the basis, it is what you

19   contend is the nondisclosure of that document or documents is

20   what you believe 3M did wrong?

21   A.  Can you repeat that question?

22   Q.  Other than you say they didn't disclose this document or

23   documents to you, right, is that correct?

24   A.  Yeah, they did not do that.

25   Q.  Is there anything else in your witness statement that you

D1FJMED3                    Larnholt - cross

 1  contend 3M did wrong or should have done or didn't do?

 2  A.  They should have reflected this in the offering memorandum.

 3  Q.  Other than this document that you are telling me about, the

 4  documents, anything else?

 5  A.  I don't really understand the question.  Can you rephrase

 6  it in some other way?

 7          THE COURT:  You have identified the failure to either

 8  disclose the convention itself or discuss it with you as what

 9  3M did wrong, and the question is:  Did they do anything else

10  wrong?

11          THE WITNESS:  And I said that they should have

12  reflected this in the --

13          THE COURT:  Right.  Other than that, other than either

14  giving you the document or providing you information in the

15  offering memorandum or somewhere else, anything other than the

16  failure to disclose either the document or content of the

17  document that they did wrong?

18          THE WITNESS:  Failure to disclose, it is also failure

19  to describe how this would impact the whole business.

20          THE COURT:  Is the question if there is anything

21  unrelated to this?

22          MR. COLLINS:  The document.

23          THE COURT:  Is there anything unrelated, anything

24  else?  They also wore white after Labor Day?

25          Is there anything else in your mind that 3M did that

1    in your view was wrong?  That seems to be the question?

2              MR. COLLINS:  Yes.

3              THE COURT:  I think it is a clear question.

4              THE WITNESS:  Sorry.  I don't really understand it.

5              MR. COLLINS:  I'll try one more time and then we'll

6    move on.

7    BY MR. COLLINS:

8    Q.  Sir, okay, you say in connection with this document that

9    you contend should have been disclosed whether in writing or

10   handing the document, anything else besides related to that

11   document that in your witness statement 3M did wrong?

12   A.  You're referring always to a document.  I think we have to

13   say the document in the offering memorandum, but you should

14   describe how things happened, what you believe would happen in

15   the future for this business.  You don't have to say document.

16   Its in effect an agreement.  It should have been reflected in

17   the figures.  I don't really understand it.

18             THE COURT:  The question is, other than that, other

19   than either providing you the document or reflecting the nature

20   of what was in the document in some other agreement or orally

21   or in any other way, the question is did in your mind 3M do

22   anything else improperly?

23             THE WITNESS:  Yeah, for sure.  They represented to us

24   that they had given us all the material agreements and

25   everything in the contract, and they did not.

D1FJMED3                         Larnholt - cross

 1   BY MR. COLLINS:

 2   Q.  When you say they didn't give you all material agreements,

 3   is there any agreement other than the document you have just

 4   been talking about, or documents related?

 5   A.  Documents -- repeat again?

 6   Q.  When you say they failed to disclose that to you, are we

 7   still just talking about this CEPS convention that you

 8   reference in your witness statement?

 9   A.  I think they failed to disclose how this would impact the

10   whole business.  So you're referring to specific document.  It

11   should have been laid, the whole foundation should have been

12   laid out in the offering memorandum and they represented that

13   that was correct and there was no more material agreements.

14         MR. COLLINS:  I'll move on.  Maybe I'll come back

15   later.

16         THE COURT:  If you don't understand a question, I

17   certainly want to make sure that you're given an opportunity to

18   understand it.  At the moment you do understand it, then you

19   answer the question.

20         THE WITNESS:  No, really don't understand it.

21         THE COURT:  Okay.  All right.  I would actually like

22   to try again because it seems to me a clear question.  I just

23   want to make sure I know what your answer is.

24         I think the question that has been put to you is that

25   maybe I'll say it this way:  Other than anything having to do

D1FJMED3                          Larnholt - cross

1    with what, the substance of what was contained in Article 2.2,

2    in your view, did 3M do anything else wrong?

3             THE WITNESS:  So not related to the 2.2?  Can you

4    repeat that again?

5             THE COURT:  Let's do it this way:  You have indicated

6    one thing you have indicated what 3M in your mind did wrong.

7             What else did they do wrong?

8             THE WITNESS:  They represented that they had given us

9    all material agreements.

10            THE COURT:  What else?  And what material agreements

11   didn't they give you?

12            THE WITNESS:  The agreement that we had to reduce the

13   price in the largest country.

14            THE COURT:  Anything else?

15            THE WITNESS:  (Pause)

16            THE COURT:  Yes or no or I don't know?

17            THE WITNESS:  I don't know.

18            THE COURT:  If you don't know, you don't know.

19            Anything else they did wrong?

20            THE WITNESS:  Yeah, I think they should have

21   represented or given all the information that's the way the

22   business was going forward.

23            THE COURT:  Anything else?

24            THE WITNESS:  Can I think about it a bit and come

25   back?

1              THE COURT:  Sure.  Yes.  Is that answering your

2    question?

3              MR. COLLINS:  Yes.  Thank you, your Honor.

4              THE COURT:  If you think of anything else, you may

5    supplement your testimony.

6              THE WITNESS:  Thank you.

7    BY MR. COLLINS:

8    Q.  Now, sir, you were part of the due diligence team in

9    connection with the transaction with 3M, correct?

10   A.  That is correct.

11   Q.  Who was in charge on the Meda team of due diligence for

12   pricing issues?

13   A.  That would go into -- it would depend if it is an agreement

14   or if it's market and sales.  I think we heard Mr. Dierks

15   earlier today that it was taken care of marketing and sales.  I

16   instructed our legal advisors to go through all agreements in

17   the database.

18   Q.  Was there one person on the team who was in charge of

19   making sure you understand the pricing issues in connection

20   with the products that we're thinking about buying in

21   connection with this business?

22   A.  I think you can maybe say it was a shared responsibility

23   where we also share the information.  Jorge-Thomas Dierks was

24   taking care of the marketing and sales.  We had another person

25   taking care of safety and regulatory IP.  It might have that

D1FJMED3                           Larnholt - cross

1   bearing on that.  We had our legal advisors going through the

2   documents, the agreements that might have a bearing on to that.

3          No, it was not one specific person who was only doing

4   that.  There was a team overseeing  the whole due diligence

5   process.

6   Q.  Did you have any involvement in analyzing pricing issues?

7   A.  Can you repeat this?

8   Q.  Did you have any involvement or responsibility in analyzing

9   and investigating pricing issues in connection with this

10  transaction?

11  A.  My responsibility was basically coordinating, and usually

12  when I do due diligence, I very much carry on the contractual

13  side to see what our advisors, our legal advisors are coming up

14  with through their review of all agreements.

15  Q.  I think you said you were coordinating the effort?

16  A.  Yes, you can call it that.

17  Q.  Does coordinating include saying all right, you're in

18  charge of investigating pricing?

19  A.  You know, we have been doing so many transactions, so we

20  can basically take a company and everyone knows what they

21  should be looking at.  It is standard.  I don't have to send my

22  senior executives to look at it.  He knows what to look for.

23          I make sure going into the data room and saying okay,

24  this is very big data room so let's make sure we have the

25  appropriate due diligence team on board with internal people

D1FJMED3                          Larnholt - cross

1   and also a lot of external advisors, and we never had this

2   large team of external advisors in another deal.

3                    (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. COLLINS:   (Continued)

2   Q.  But, sir, having a large team is different from making sure

3   that everybody on that team is tasked appropriately, correct?

4   A.  Correct.  We, as I said, we've been doing the due diligence

5   so many times, so I would imagine that if anyone had a problem

6   in an area they needed more help, he would come back to me or

7   come back to Anders Lonner and say let's involve the person for

8   this or that.

9   Q.  Could you give me the names of the -- you did already.  I'm

10  sorry, could you give me the names of the people who were to

11  focus on this pricing in connection with transaction?

12  A.  As I said, it's joint responsibility but, it comes into

13  different areas.  First of all, you have it in the offering

14  memorandum, in the presentation where it comes to pricing, and

15  we are -- we are operating in Europe, we know that there's

16  usually some percentage points adjustment in pricing every

17  year, that's no different.  So when I assign different persons,

18  as I said, you're to move there to marketing sales which would

19  contain some pricing information.  Also, Marten Osterlund who

20  was reviewing regulatory safety, intellectual property, etc.

21  So if he found anything out of the ordinary that was different

22  from the offering memorandum and the management presentation,

23  he would flag that.  The legal advisers were going through all

24  the contracts.  If they found any material issues, they would

25  flag that in our summary reports that we were reading.

 1    Q.  Now, sir, you yourself spent less than 20 minutes looking

 2    in the electronic data room, is that correct?

 3    A.  As I said usually, we coordinate.  I looked at the scope of

 4    the data room, how big it is, and then we discuss who should be

 5    involved in the team to look at these things, and who are the

 6    advisers that would need help.  If it was a small company, five

 7    documents, I would have read all of them myself in the data

 8    room.  But here was different.  It was huge data room.  So we

 9    make sure to have appropriate due diligence team and legal and

10    external advisers.

11    Q.  And this was a big transaction for Meda, correct?

12    A.  Yes, it was a large transaction.

13    Q.  As far as the price that you were thinking about paying,

14    that was significant to Meda, correct?

15    A.  Correct.

16    Q.  And am I correct, sir, that France under this deal was

17    going to be a big potential -- 3M's business in France was --

18    as part of this transaction was a significant aspect of the

19    transaction, correct?

20    A.  3M France was significant, yes.

21    Q.  Am I correct, sir, that the drug Flecaine was a substantial

22    aspect of this transaction?

23    A.  Correct.

24    Q.  I think you say that the conventions dealing with Flecaine

25    somewhere in your witness statement, I could find it for you,

D1fQmed4                    Larnholt - cross

1    sir, was a really important aspect of this deal, right, is your

2    allegation?

3              THE COURT:  Can you point to a paragraph, Mr. Collins?

4              MR. COLLINS:  Sure.  Paragraph 95.

5    A.  95?

6    Q.  Yes, paragraph 95.

7    A.  Yes.

8    Q.  Am I correct, sir, that the revenues and profits being

9    generated by 3M for the drug Flecaine was a significant issue

10   for you in connection with this transaction, correct?

11   A.  Can you repeat the question again?

12   Q.  Am I correct, sir, that the revenues and profits that 3M

13   was generating from Flecaine in France was a significant issue

14   for Meda?

15   A.  You say that the -- when we were reading the offering

16   memorandum, if the issue of sales was a problem?

17   Q.  No, I'm not saying it's a problem, sir.  Am I correct, sir,

18   that Flecaine was a critical part of the assets that you were

19   purchasing?

20   A.  It was certainly an important part, yes.

21   Q.  And, therefore, the revenues and profits that were being

22   generated from Flecaine in France by 3M was a very important

23   issue for Meda, correct?

24   A.  When you say issue, you mean problem or maybe I interpret

25   the word --

D1fQmed4                              Larnholt - cross

1    Q.   No, just something you wanted to understand, saying let's

2    make sure we understand the revenues and profits from Flecaine

3    in France that 3M generated, so we can determine whether we

4    want to buy this asset.

5    A.   That was one part that was important for sure, and that's

6    why we also felt very comfortable in having Jorg-Thomas Dierks,

7    who just testified, on board because he's also very

8    knowledgeable in French and in France and in this area.

9    Q.   Who was in charge of investigating 3M's business with focus

10   on Flecaine in France?

11   A.   Well, again, if it comes to agreements, we would pick it up

12   through the legal advisers and their analysis.  If it comes

13   anything into regulatory safety, intellectual property, it

14   would be picked up from Marten Osterlund.  If it was anything

15   on the financial side, it would be picked up our financial

16   advisor, our CFO, or person working for him.  Or if Jorg-Thomas

17   Dierks had identified anything, he would identify it.  It was a

18   small core team that were looking into everything, and when we

19   rely on that all the material and information is here.

20   Q.   Were there any CEPS conventions in the electronic data

21   room?

22   A.   I don't think so.

23   Q.   Were there any conventions or similar type documents from

24   other countries in the data room?

25   A.   I don't know.

D1fQmed4                        Larnholt - cross

1    Q.  Sir, did you ever ask anyone from 3M "Have you given us all

2    the CEPS conventions"?

3    A.  I made sure to ask them to give us all material

4    information, specifically all material agreements.  That's key,

5    to be given all material information when you do a deal.

6    Q.  My question, sir, though, is did you specifically ask

7    anyone from 3M "whether you've given us all the CEPS

8    conventions"?

9    A.  If I ask that, no, because at the time, as I said in my

10   declaration or in my deposition, that I heard about CEPS, I

11   mean, there are different names for every country of different

12   pricing authorities, and I know many of them, but not all.  So

13   I heard about CEPS, but not about conventions where I

14   specific -- but I specifically asked "have you given us all

15   material agreements."

16   Q.  Did you ask anyone from 3M, you, did you ask anyone in 3M

17   whether -- "have you given us all your documents with CEPS"?

18   A.  No, my question has been only on the legal side, "have you

19   given us all material agreements," and they represented that

20   they had.

21   Q.  Now, I'm going to ask you another question.  I'm just

22   asking you about CEPS conventions.  Are you aware of anyone

23   from Meda asking for CEPS conventions from 3M?

24   A.  I'm not aware.  It's what I say, I'm very well aware that

25   we asked for all material agreements and all material and

1   relevant information, but I cannot say that we asked this or

2   that.  In many of the breakout sessions, telephone conference

3   and due diligence I was not part, so I cannot testify to what

4   others did or did not ask.

5   Q.  Now, sir, you say, "Upon learning of the CEPS agreement" --

6   this is paragraph 95 --

7   A.  Sorry, paragraph?

8   Q.  95.

9   A.  Yes.

10  Q.  You say, "Upon learning of the CEPS agreement, I was

11  totally shocked."

12          Do you see that?

13  A.  Yes.

14  Q.  Now, sir, you were aware in December -- and this is -- when

15  did you first learn of it?

16  A.  About, I believe it was, roughly one year after closing.

17  Q.  Now, sir, you were aware prior to January 1, 2007 that 3M

18  thought there was a possibility of a 10 percent reduction,

19  correct?

20  A.  On one product, yes.

21  Q.  And that's Flecaine, right?

22  A.  Yes.

23  Q.  Would that be Flecaine LP?

24  A.  Or IR, I don't remember.

25  Q.  Did you understand whether the 10 percent was referring to

 1   just LI or LI and LP?

 2   A.  I don't remember.  Maybe we can see the answer.

 3          THE COURT:  Did you see -- I'm going to do our lunch

 4   break at quarter of, so about four more minutes.

 5          MR. COLLINS:  OK.

 6          THE COURT:  What are we looking at?

 7          MR. COLLINS:  384 which was used earlier today.

 8   Before I go to that --

 9          THE COURT:  This has a JX equivalent?

10          MR. ARMENIO:  Yes JX-116, your Honor.

11          THE COURT:  116.

12   Q.  Sir, I don't see you copied on this document, but it's a

13   document dated October 3, 2007.  Do you see that?

14   A.  Yes.

15   Q.  In this document, Nicole -- you'll have to say the rest of

16   Nicole's name.  We'll just refer to her as Nicole, OK?

17   A.  Yes, that's fine.

18   Q.  The second Nicole paragraph, "My personal recommendation

19   would be to plan for 15 percent reduction as of July 1, 2008."

20   Do you see that?

21   A.  No.

22   Q.  The second full paragraph from the bottom.

23   A.  OK.  Yes.  Thank you.

24   Q.  Were you aware of that on or about this time period?

25   A.  Yeah, I think what I'm sure, as you've already stated, I'm

D1fQmed4                              Larnholt - cross

1      not part of this email.  I'm trying to think back to 2008, and

2      I remember that we had to -- it became in effect that we had to

3      decrease the price to roughly 10 percent one year and maybe

4      something around 20 another year, but if it was exactly on June

5      1st, I don't recall.

6      Q.   OK.   Sure.   Well, my question is in this October 2007 time

7      frame, were you aware that the Meda people were talking about

8      "maybe we should -- there's a possibility of a 15 percent

9      reduction"?

10     A.   I don't recall exact percentages.  I know we said of course

11     that we had to reduce, we had to reduce.  And how much it was,

12     you know, at this time I was also running -- well, actually, I

13     would go promoting from what I did before to running the Nordic

14     operations, so I was not really part of this.  I was part when

15     it came to external communication.

16     Q.   My question is prior to December of 2007, were you aware of

17     people in Meda talking about possible price reductions for

18     Flecaine in France?

19     A.   Repeat once again, please.

20     Q.   Prior to December of 2007, were you aware of discussions

21     within Meda about possible price reductions for Flecaine in

22     France?

23     A.   No, I think I heard, of course, before that we had a risk

24     of 10 percent price decrease which had been between signing and

25     closing and it came to my attention; but from when the deal

1   closed, I was, you know, head of the Nordic region, so I was

2   not involved in this.

3   Q.   Now, sir, were you shocked by when you heard 10 percent

4   prior to the deal closing?

5   A.   I was very concerned when I saw this 10 percent, and I

6   wanted to understand what we had seen and what is reflected in

7   the figures that we have relied upon.

8   Q.   Despite learning of the 10 percent, Meda closed the

9   transaction anyway, correct, on or about January 2, 2007?

10  A.   That is correct.  We, as I said -- no, I didn't say it, but

11  of course when I got this information, I called Dr. Jorg-Thomas

12  Dierks and I asked him his opinion about this, and he confirmed

13  to me the risk for the 10 percent price decrease was a risk and

14  was not a fact, and it was also included in the financial

15  numbers.  And then we decided that together with Anders Lonner,

16  the CEO, to sign -- not to sign, but to close.

17          THE COURT:  Let's take our lunch break and resume --

18  I'd like to make up for some lost time this morning.  So let's

19  start in 45 minutes at 1:30.

20          (Luncheon recess)

21                      AFTERNOON SESSION

22                        1:30 P.M.

23          (In open court)

24          THE COURT:  Continue with the cross-examination of

25  Mr. Larnholt.  And I do advise you, you are under oath.

1           Go ahead, Mr. Collins.

2           MR. COLLINS:  Thank you, your Honor.

3    CROSS-EXAMINATION

4    BY MR. COLLINS:  (Continued)

5    Q.  Going back to the document on the screen October of '07, in

6    a prior answer when we were talking about this document, you

7    said something to the effect "At this time we had to reduce the

8    price."  Does that sound familiar when we're talking about the

9    substance of this document?

10   A.  No.  As I said, we were informed between signing and

11   closing that there was a risk between all attempts and price

12   decrease.  So I would assume there would be discussion about

13   that throughout that year, the coming year, but I did not

14   discuss. I'm not even part of this email.

15   Q.  No. I was referring to your prior answer.  I wasn't saying

16   you were part of the discussion, so I apologize.

17           Sir, when you found out about this risk of a

18   10 percent increase --

19   A.  10 percent decrease.

20   Q.  Decrease, apologize, yes.  Did it occur to you to say,

21   "Let's stop the closing, let's not go forward and investigate

22   this"?

23   A.  My investigation was directly again on the phone with the

24   Dr. Jorg-Thomas Dierks, and I called him up, and I said, "OK,

25   what do you think about this?"  And he said, "This is a risk,

D1fQmed4                          Larnholt - cross

 1   it's not a fact."  And he had confirmed that it was also in the

 2   figures, and, therefore, in our valuation.  So I did not see

 3   that that would be a showstopper to the deal.

 4   Q.  Did you contemplate at all, let's not close and let's

 5   investigate this some more?

 6   A.  Yeah, that was the first thought that appeared in my mind.

 7   Sure.

 8   Q.  Was it solely based on your conversation with Dr.

 9   Jorg-Thomas Dierks that you decided that, no, I'm no longer

10   going to think about possible delay in closing?

11   A.  I called Dierks, and I remember I was having discussions

12   with Henry Stenqvist and Anders Lonner if this would have an

13   effect on closing, but since it was reflected in the figures,

14   it was only a risk.  I thought from my perspective that it did

15   not change the real valuation because it was based on the

16   figures that we had.  So based on that, I thought that we

17   should go ahead with closing.

18   Q.  Did you do anything else to investigate this issue other

19   than what you just told us about?

20   A.  No, I don't think so.

21   Q.  Did you based on investigation and the other facts you had

22   make or made a choice to close in spite of that risk?

23   A.  Yeah, we closed, that's true.

24   Q.  I know you're not part of the document on the screen.  I

25   think I showed you earlier the second to last paragraph where

D1fQmed4                          Larnholt - cross

1    people are talking about a plan for a 15 percent reduction.  Do

2    you see that?

3    A.  Yes.

4    Q.  Was there any anger or panic in the company that bubbled up

5    to you about the 15 percent possibility?

6    A.  No.  As I said, I know about this -- the risk that appeared

7    between signing and closing.  And I think the next point when I

8    got involved when I saw this -- the agreement to reduce the

9    price of 50 percent, which was one year later after closing.

10   But what I was referring to, I saw here 2008, and I remember

11   something in the future that we had describe to our

12   shareholders that we had to take price decreases, but that

13   comes later.

14   Q.  But as far as in the fall of 2007, a concern about planning

15   for a 15 percent reduction didn't bubble up to people of your

16   stature, correct?

17   A.  I don't recall sir, no.  And, again, I was at this time

18   running the Nordic operations, and that was my focus.

19   Q.  Sir, in paragraph 71 of your witness statement or your

20   declaration, page 23, you talk about how Meda was well aware of

21   the pricing pressures felt in all markets including France,

22   right?  All markets in Europe including France?

23   A.  Correct.

24   Q.  Is that an issue that you were aware of; not just Meda

25   generally, but you yourself?

D1fQmed4                        Larnholt - cross

1    A.   Yeah.  Here when we speak about pricing pressures, it's

2    very, very different from this agreement.  Pricing pressure has

3    not been a thing that's happened over the last year.  It's been

4    going on for decades in Europe.  And you can see pricing

5    pressure a couple percentage points per year across -- I mean,

6    it will be different for different markets, but usually pricing

7    pressure is a couple of percentage points.  That's what I mean

8    with pricing pressure, and that's standard in Europe.  And I

9    think there was also information on that in a 3M management

10   presentation in St. Paul that they had also explained that the

11   pricing pressure is roughly a couple of percentage points.

12   Q.   And the existence of pricing pressures you're referring to

13   included France, correct?

14   A.   Yes.

15   Q.   Going to paragraph 78 of your witness statement or

16   declaration --

17   A.   I'm sorry, I couldn't hear you.

18   Q.   I'd like you to refer you to paragraph 78 of your witness

19   statement, page 26.

20   A.   Yes.

21   Q.   In the paragraph you state, "In the data room to which 3M

22   made access for purposes of conducting due diligence, 3M

23   included numerous documents and agreements relating to the

24   prices of 3M's products."

25          Do you see that?

1    A.  Yes.

2    Q.  Is that something you were aware of during the due

3    diligence process or is that something you learned afterwards?

4    A.  I mean, it's -- that documents and agreements are in the

5    data room including prices.  You know, we reviewed a lot of --

6    I mean, I would assume all the agreements that were in the data

7    room which I saw summaries of.  We were focused on all these

8    agreements down to the very small ones.  Of course, different

9    agreements contain different prices.  I remember spending a lot

10   of time looking at some distribution agreements with Algifor

11   that had prices, and how those licenses could affect the deal.

12   So in agreements usually there are prices, but, again, we had

13   lawyers looking through making the summaries for us so we could

14   read it.

15   Q.  So you were looking at pricing issues, you were looking at

16   pricing issues during the due diligence process?

17   A.  We were all looking at the issues.  As I said before, I was

18   looking from a legal perspective.  We had financial advisor and

19   our financial team.  Dr. Jorg-Thomas Dierks, so we were all

20   looking at all relevant information.

21   Q.  Is that something that Meda generally looks at in

22   connection with acquisitions?

23   A.  We want everything that's general -- material to the

24   business, for sure.  We want that to be up front.  We certainly

25   do not want to find it in the data room.  If I would have found

D1fQmed4                          Larnholt - cross

something like this, I mean it would have been the lawyers red

flag if we had discovered this during due diligence.  That is

not the place where you should find this.  It should be in the

information memoranda.

Q.  Did it occur to you during the due diligence process of

"where are all the CEPS conventions"?

A.  As I said before, I knew of the word CEPS that was the

pricing authority, and there are pricing authorities in every

country in Europe.  So I was not -- I was reading the summaries

that we had from our legal advisers, and, you know, looking

through all that.

Q.  As you're reading those summaries in connection with the

due diligence process, did it ever occur to you there's no

summary of the CEPS conventions?

A.  No, because I know that when prices are publicly, you know,

they are agreed between companies and then the authorities,

they're usually listed.

Q.  The price, right, sir?

A.  The price and reimbursement are usually listed in -- what

do you call it -- publicly, it could be bank things, it could

be on the internet, different places.  They are public.  So I

was not looking for that.

Q.  But CEPS conventions have information other than price in

them correct, or do you know?

A.  I had learned that afterwards, yes.

1   Q.  You didn't know that at the time?

2   A.  No.

3   Q.  Sir, I refer you to paragraphs 47 and 48 of your witness

4   statement which are on pages 13 and 15.

5   A.  47 and 48?

6   Q.  Yes.  I am going to refer you to -- I'm going to ask you

7   just a couple of questions about this.

8   A.  Can I read them both, please?

9   Q.  Take your time.

10          (Pause)

11  A.  OK.

12  Q.  In these paragraphs, you're referring to a -- you were

13  permitted to ask questions of 3M through a written spreadsheet

14  process?

15  A.  That's one part of it.  Of course, there are many other

16  sides of asking questions.  I think in also 48 it refers to

17  that we were asking questions in the breakout session, the

18  presentation, and telephone conferences.

19  Q.  Right.  And I'm limiting my questions or next couple of

20  questions just to this written spreadsheet process.

21  A.  Yes.

22  Q.  Did you have involvement in that?

23  A.  Yes, usually as I coordinate due diligence in the beginning

24  of these transactions, I -- this is often how the advisers want

25  you to do -- to field their questions, besides telephone

D1fQmed4                         Larnholt - cross

1    conferences and presentations, and breakout sessions that they

2    want to filter.  Usually starts like that, but as the process

3    evolves, both sides I will not say ignore this, but, you know,

4    they leave it because it's a constant interaction all the time.

5    You don't start popping up your Excel sheet.  So this is how it

6    starts, but it evolves in a constant flow of communication.

7    Q.  But as far as this process, were you the one that people

8    filtered their questions to and you sent them to Goldman?

9    A.  As I said, in the beginning it was like that, and that's my

10   recollection as mostly it is; but the further we progress, you

11   leave this.  I mean, there's constant dialogues, and if our

12   financial advisors want to speak directly to them, you know,

13   they give them a call and they have discussions.

14   Q.  I understand that maybe to a certain extent you're the one

15   coordinating and then maybe other people are asking directly or

16   indirectly.  Were you still part of the process?  Were you

17   still reviewing the questions that were being asked and the

18   responses that you were receiving?

19   A.  No, we were trusting people that they did their job, and

20   their due diligence.  What we do is, of course, since there is

21   open flow of communication here, and we sit in the same

22   corridor, me, Anders Lonner, Henry Stenqvist, Marten Osterlund

23   and the others, we have constant communication, things we see,

24   what should we address, what should we do?

25   Q.  So was it someone's job at Meda to make sure we're asking

D1fQmed4                        Larnholt - cross

1    all the questions we want in connection with the spreadsheet

2    process and we're getting all the answers we want?

3    A.  You have to repeat that with a spreadsheet process.  As I

4    said, that's something you hear in the beginning when maybe 3M

5    has 10 or 20 different things they want to filter, they want to

6    see what questions comes in.  But the further you progress, and

7    we had ones that were negotiating and dealing with 3M, you

8    don't do it through a spreadsheet.  You have open

9    communication.

10   Q.  As far as the spreadsheet process, did Meda ask any

11   questions in connection with that process about pricing for

12   3M's pharmaceutical products in France?

13   A.  As I said, we -- I copy/pasted questions in the beginning,

14   it might be a week or a couple of weeks, but then it was open

15   communications, so ...

16   Q.  I'm just asking about this process, the spreadsheet

17   process.  Did Meda ask any questions about pricings of 3M's

18   pharmaceutical products in France?

19   A.  I don't think so.

20   Q.  Now, sir, in connection with this transaction, one of the

21   benefits to Meda that it was looking for were synergies,

22   correct?

23   A.  Getting the products and the organization is, of course,

24   key.  Synergies can be an upside to that, yes.

25   Q.  But that was something that Meda was focusing on, were

1    synergies values that could be created by this deal, correct?

2    A.  Please specify what type of synergies you mean.

3    Q.  Let me have JX-080A.  Have you seen this document before,

4    sir?

5    A.  Yes, I have.

6    Q.  On the page that we're showing you now, it says calculation

7    Karl Oskar - Assumptions.  Karl Oskar is referring to this

8    potential transaction at the time, correct?

9    A.  At the time, but this is the transaction that we decided

10   not to pursue.

11   Q.  OK.  But one of the things that were being looked at were

12   synergies, correct?

13   A.  Yeah, it's there in bullet point four.

14   Q.  Now, sir, I think you spent some time in your witness

15   statement talking about the calculation of a value for the

16   assets that you were purchasing, correct?

17   A.  Correct.

18   Q.  And that Meda used an EBITDA multiple approach?

19   A.  Correct.

20   Q.  Am I correct, sir, that in connection with that approach

21   you used one year of results for 3M's business?

22   A.  You cannot really say it's based on one year, yes, but this

23   is only if the business is stable with consistent cash flow,

24   then you can take that as proxy going forward.  And if those

25   assumptions are correct, then we can do it like that.

D1fQmed4                    Larnholt - cross

1    Q.  But you used year 2007, correct?

2    A.  Correct.

3    Q.  In connection with -- I believe you just testified when

4    you're using an EBITDA multiple approach, you use that when

5    there's steady cash flow.  Is that what word that you used?

6    A.  If we see a business, I mean, we -- this is the type of

7    business that we have been acquiring, almost all of them, where

8    we have a stable business or slightly growing.  If we see that

9    type of business, we certainly value such a business using an

10   EBITDA multiple valuation approach.  I mean, there are

11   different ways to value companies, but this specific valuation

12   methodology is very appropriate for such types of companies.

13   Q.  Did you use other approaches just as -- nothing else other

14   than -- excuse me -- did you use any other approaches as a

15   check on this approach?

16   A.  You mean for the 3M?

17   Q.  Yes.

18   A.  Yes, of course.  Just calculating that is one part, but I

19   mean, we do an outside evaluation looking at other types of

20   comparable companies, how they've been trading previously, done

21   deals by other companies of similar types of stable assets.  We

22   compare it with our own acquisitions of stable acquisitions

23   before.  We compare it with what other analysts are taking a

24   view on stable assets, even taking a view on 3M Pharma.

25   Q.  Did you consider using a range of years other than just the

D1fQmed4                    Larnholt - cross

1   year 2007?

2   A.  What do you mean range of years?

3   Q.  Like using an average or a median or some kind of stats, a

4   physical analysis.  Instead of just saying "I'm going to take

5   2007, I'm going to look at other years and apply an analysis

6   and get certain weight for certain years and other weight for

7   other years"?

8   A.  Yeah, if you would see something that would happen or

9   rapidly change in the future one or two years out, we would

10  look at this very differently.  It also depends on where you

11  stand when you're actually taking a view on the acquisition.

12  So just using an EBITDA valuation and looking at 2009, for

13  example, will not give the right value because you're also

14  looking at time value for money.  And depending where you are

15  throughout the year, you might apply an average or looking at

16  how the current trend is throughout that year.

17          MR. COLLINS:  Can I take 30 seconds your Honor?

18          THE COURT:  Go ahead.

19          (Pause)

20  Q.  Sir, I think you mentioned you looked at comparable

21  companies, am I correct?

22  A.  Correct.

23  Q.  What comparable companies did you look at?

24  A.  That would be a very long list because, you know,

25  investment bankers, they value the companies like this also,

1    and we meet with bankers more or less every week, and in every

2    meeting we get constant updates of comparable companies, how

3    they're trading, comparable future -- comparatively stored

4    acquisitions, and we can look at those companies.  So, I mean,

5    we always get these lists on the type of EBITDA multiples that

6    have been trading at or have been acquired at.

7    Q.  Does such a list exist, a written list of that?  Let me be

8    more specific.  Would there be a written list that exists that

9    lists the companies and the transactions that you were looking

10   at?

11   A.  Yes, written, it will be in the document, yes, but not

12   prepared by us.  It will be in all these banking presentations

13   that we have whole stacks of at Meda.

14   Q.  Sitting here today, do you remember any of the comparable

15   companies that you mentioned?

16   A.  I think I said it was in my deposition, we were looking at

17   Schering was one of them.  Altana maybe came up, but that was a

18   large company.  And then I would assume that we were looking at

19   every listed company in Europe because those are always

20   included in that, and then we would look at every comparable

21   company transaction that has happened previously.  So it will

22   be -- it would be a very long list, but we can take a look at

23   those and see the average, etc.

24   Q.  So, were there outside consultants helping you with this

25   EBITDA analysis?

D1fQmed4                          Larnholt - cross

1   A.  The EBITDA analysis is quite simple to just read these

2   tables of previous transactions and what they are trading at.

3   We don't need the help of consultants for that.

4   Q.  I just want to make sure I understand.  So, you didn't

5   retain someone specifically to help you with your comparable

6   company and comparable transaction analysis?

7   A.  No, that's something that we get for free more or less

8   every week with comparable companies and how they are trading.

9   Q.  So this was information that you may have gathered over a

10  period of time that you use, correct?

11  A.  Yes.  As I said, we would get it's more or less constant

12  every week.

13          MR. COLLINS:  Ten more seconds, your Honor?

14          THE COURT:  OK.

15          (Pause)

16          MR. COLLINS:  Subject to redirect, that's all I have?

17          MR. ARMENIO:  Brief redirect, if I may, your Honor?

18          THE COURT:  Yes.

19  REDIRECT EXAMINATION

20  BY MR. ARMENIO:

21          THE COURT:  Whenever you're ready Mr. Armenio.

22          MR. ARMENIO:  Thank you, your Honor.

23  Q.  Mr. Larnholt, I just have a few questions for you.  You

24  discussed with counsel this 10 percent risk of a price decrease

25  mentioned in December 2006.  Do you recall that discussion?

1   A.  Yes.

2   Q.  And do you recall discussing with counsel that it was just

3   a risk, not a fact?

4   A.  Correct.

5   Q.  Do you recall discussing that it was made known that this

6   risk was already in the numbers?

7   A.  Correct.

8            MR. COLLINS:  Objection.  Leading.

9   Q.  Do you recall the discussion --

10           THE COURT:  Go ahead.  Rephrase.

11  Q.  Do you recall that general discussion about price risk with

12  counsel?

13  A.  Yes.

14  Q.  Do you recall a general discussion that the price risk may

15  have been in the numbers?

16  A.  Yes.

17  Q.  Whose numbers?

18  A.  Well, we were relying on 3M's numbers.

19  Q.  Directing your attention, and I will put it on the screen,

20  if I could have the Elmo, please.  We see in PX-328, let's look

21  at the top, this is an email from who?

22  A.  From Christian Senac.

23  Q.  Who is ALT@Meda.SE?

24  A.  That is me, Anders Larnholt.

25  Q.  Is this discussing who included this 10 percent risk?

1    A.  Yes, correct.

2    Q.  Who included it?

3    A.  Benoit Traineau.

4    Q.  Let's look back at the top of 328.  As of this date, where

5    was Mr. Traineau employed?

6    A.  3M.

7    Q.  You mentioned earlier and had a discussion with counsel

8    that this agreement, this signed agreement that was not

9    disclosed, you mentioned that it could have affect on figures

10   in the offering memorandum.  Do you remember that general

11   discussion?

12   A.  Yes.  Can you repeat, please.

13   Q.  Sure.  Do you remember having a discussion with Mr. Collins

14   about how the CEPS convention, the agreement could affect

15   figures in the offering memorandum.  Do you recall that

16   discussion?

17   A.  Yes.

18   Q.  Let's take a look specifically at some of the figures in

19   the offering memorandum.  It's already in evidence PX-168.  I'm

20   looking at table 43.  It's on page 80 of the memorandum ending

21   in 690.

22          MR. COLLINS:  Your Honor, I'm going to lodge an

23   objection.  I think it's outside the scope of my cross, outside

24   the scope of the answers, and it's certainly outside the scope

25   of my questions.

1          THE COURT:  Well, you had your moment to object to

2     that.  So overruled, go ahead.

3     Q.  Mr. Larnholt, looking at table 43 in the offering

4     memorandum, what is being discussed in this table?

5     A.  That's the P and L for historic, and projected for Europe

6     the business that we acquired.

7     Q.  And what numbers were you trying to explain to counsel

8     would be affected by this CEPS convention with the 50 percent

9     price reduction?

10    A.  These numbers.

11    Q.  Are there any in specific you can explain to us and discuss

12    for the Court?

13    A.  Well, if they had taken into account that the CEPS

14    agreement with a reduction of 50 percent, that would materially

15    change the whole business.  So, since the pricing agreement

16    reduces about $20 million on EBITDA, it takes away one-quarter

17    of the profits from this company.

18    Q.  So let's slow down.  This is EBITDA, E-B-I-T-D-A, and we

19    see at the second row from the bottom of table 43, is that

20    right?

21    A.  Yes.

22    Q.  How much would be taken away by the CEPS convention?

23    A.  Well, first, to get -- there's also -- first taken away is

24    roughly $$20 million.

25    Q.  What do we see under EBITDA?  What is percent margin?

D1fQmed4                     Dierks - redirect

1   What's that?

2   A.  That's the margin taking the EBITDA divided by sales, net

3   sales.

4   Q.  If the price were to drop by 50 percent, could a business

5   maintain the same EBITDA percentage margin?

6   A.  No.

7   Q.  Is that possible as a matter of finance?

8   A.  Then something would materially change in some of the other

9   rows, but since they are not, the margin would decrease

10  throughout the whole P and L of five percentage points, and

11  that is not happening, so it's a stable business.

12  Q.  So what's being presented here by 3M, is this a stable or

13  unstable business?

14  A.  This is a very stable business.  This is even growing.

15  Q.  With respect to prices, the information that we see on

16  EBITDA margin percentage, does that tell us that the prices are

17  stable or unstable?

18  A.  It says that the prices are very stable.  You can also look

19  at the gross margin.  So you see that's 73 and a half or 73.7,

20  74.6, 75.5, so it's actually growing.  If you will have a price

21  decrease of 50 percent on a large part of 2007, that margin

22  will drop five, six percentage points in one year.  And there's

23  nothing else here that can explain why it shouldn't, so --

24  Q.  Without going through all of the offering memorandum and

25  all of the business presentations, are there other instances

1   that you believe would have had to be changed had the CEPS

2   convention been disclosed to Meda?

3   A.  Repeat, please.

4          MR. COLLINS:  Objection, again, your Honor.  It's

5   outside the scope.  Going further and further outside the scope

6   of my cross.

7          THE COURT:  I think you are at the limit.  I'll

8   sustain the objection.

9          MR. ARMENIO:  Thank you, your Honor.  I think it's

10  clear enough.  Thank you, your Honor.  No further questions.

11         MR. COLLINS:  Just a couple.  And I'll ask counsel,

12  can I have the first document you used?

13  RECROSS EXAMINATION

14  BY MR. COLLINS:

15  Q.  Sir, you were asked a couple questions about this document,

16  right?

17  A.  Yes, correct.

18  Q.  About this 10 percent that you learned of after the

19  agreement was signed, correct?

20  A.  Correct.

21  Q.  I think you said that was something that had been

22  previously disclosed by 3M or did I get that wrong?

23  A.  No, I heard here that there was a risk -- I don't know if

24  this was the first time, but there was a risk of a 10 percent

25  price increase -- sorry -- price decrease.

1  Q.  And you testified earlier that you were initially

2  concerned, but your concerns were relieved because you had been

3  told that this had been disclosed?

4  A.  Say it again, please.

5  Q.  Did I understand your testimony earlier, sir, that you were

6  initially concerned about this 10 percent, but then your

7  concerns were alleviated when you were told that this had been

8  previously disclosed by 3M?

9  A.  Alleviated, I don't understand the question.

10 Q.  Your concerns were resolved.  You no longer had those

11 concerns?

12 A.  No.  As I said we were -- this certainly became an issue,

13 and we looked into it all, and since we relied on 3M's figures

14 and we heard that this was included in those figures, and also

15 that it was only a risk, not a fact, we decided -- and actually

16 Dierks said we could probably do better, so we decided to

17 close.

18 Q.  My question is, what figures were you just referring to

19 that 3M had given you?

20 A.  The figures for Europe for Tambocor.

21 Q.  But, sir, this document refers to a 2007 plan --

22 A.  I cannot hear you.

23 Q.  OK.  This document refers to a 2007 plan that you received

24 from Mr. Traineau, correct?

25 A.  No, I think I received this email from Christian Senac.

1   Q.  I'm sorry, but the email says, "Obviously, this risk has

2   been known by 3M and confirmed by Ben -- Mr. Traineau, who has

3   included it in his 2007 plan assumption," right?

4   A.  What was the question?

5   Q.  That's how you learned of it was in connection with the

6   plan that he presented, not the prior forecast or other

7   documents you got from 3M?

8   A.  I learned of this risk when I received this email.  And as

9   I said, when I saw that, I reached out to Jorg-Thomas Dierks to

10  understand, and it was included in the projections by 3M that

11  we relied upon, and it was a risk but not a fact, and Jorg

12  thought we could have that risk, so we decided to close.

13  Q.  It was included in projections that you relied on to

14  execute the document on November 8?

15  A.  Repeat that, please.

16  Q.  You said it was included in documents that you relied on?

17  A.  My recollection and recollect -- what's the word -- I

18  recall that these pricing -- decrease in pricing was included

19  in 3M's projections that we relied upon.

20  Q.  Sir, isn't it true that this plan you didn't receive until

21  after the document was signed?  The 2007 plan that's referenced

22  there.

23  A.  Well, as I said, when I saw that this risk, and I was

24  thinking, OK, how does this affect the deal, is there something

25  that has not been disclosed to us?  Should we stop it or what

```
1    should happen?  When I saw this, I called Jorg-Thomas Dierks --
2    and I've said that over and over again what I did.
3              MR. COLLINS:  Your Honor, I don't think this document
4    was moved for admission, but I would object if it's moved.  I
5    don't object to them asking questions about it.
6              MR. ARMENIO:  It had been moved at the beginning with
7    his declaration, your Honor.
8              THE COURT:  What is the number?
9              MR. ARMENIO:  PX-328, your Honor.  I believe it was
10   offered with his declaration at the beginning.
11             MR. COLLINS:  Then no objection, your Honor.
12             THE COURT:  All right.
13             MR. ARMENIO:  No further questions, your Honor.
14             THE COURT:  Thank you.  You may step down,
15   Mr. Larnholt.
16             (Witness excused)
17             THE COURT:  You may call your next witness.
18             MR. ARMENIO:  Meda's next witness is Henrik Stenqvist,
19   and I will be doing the proffer.  We will need to have
20   Mr. Stenqvist come in.  He's been sequestered.
21             (Continued on next page)
22
23
24
25
```

D1FJMED5                        Stenqvist – direct

 1              THE COURT:  Good afternoon, Mr. Stenqvist.  Come on

 2      up.

 3       HENRIK  STENQVIST,

 4           called as a witness by the Plaintiff,

 5           having been duly sworn, testified as follows:

 6      DIRECT EXAMINATION

 7              THE COURT:  Thank you Mr. Stenqvist.  In front of you,

 8      is that your declaration dated December 14th, 2012?

 9              THE WITNESS:  Yes, it is.

10              THE COURT:  Are there any errors or mistakes in the

11      declaration that you want to draw my attention to?

12              THE WITNESS:  No, your Honor.

13              THE COURT:  Thank you.  Do you swear or affirm that

14      the testimony contained in this declaration, under penalty of

15      perjury, is the truth, the whole truth and nothing but the

16      truth?

17              THE WITNESS:  That is true.

18              THE COURT:  Thank you.  Go ahead.  Ms. Brown.

19              MS. BROWN:  Your Honor, the only exhibit that we seek

20      to proffer through Mr. Stenqvist that has not already been

21      admitted is PX 364.

22              THE COURT:  Who is handling this witness?

23              MS. BEVILACQUA:  As to exhibits, we do have an

24      objection to PX 364, also PX 328 and PX 372.  These are the

25      same hearsay objections that were raised at the other time

1    these documents were offered, the hearsay within hearsay issue

2    you already looked at, your Honor, just to maintain the

3    objection.

4              THE COURT:  Somebody just point me to 364.  Which

5    exhibit number in his declaration is it?

6              MS. BROWN:  Exhibit 11.

7              THE COURT:  All right.  I'll take a look at it.  My

8    ruling will be consistent with what I said to the extent it

9    raises the same issues, and otherwise I'll take it for what it

10   is permissibly considered for.

11             I understand, Ms. Brown, that is all you're seeking

12   additional admission to?  328 was raised, our records show that

13   was admitted through Mr. Larnholt, okay?  372 was one of the

14   E-mails we discussed yesterday.

15             MS. BROWN:  372 was raised with Mr. Lonner.

16             THE COURT:  I have given my ruling on that.  How about

17   as to the testimony?

18             MS. BEVILACQUA:  As to the declaration, Paragraph 54,

19   the last sentence, nor did, Paragraph 54, nor did 3M disclose

20   the agreement to Meda, we are objecting to on foundation, 602.

21             MS. BROWN:  Your Honor, I didn't think it was a

22   disputed fact whether the convention had been disclosed to

23   Meda.  Mr. Stenqvist's testimony certainly can stand with the

24   rest of that.

25             THE COURT:  Is this like the date issue?

1          MS. BEVILACQUA:  Before Meda in any other way goes to

2     all of the other different ways we are talking about, yes, and

3     the date issue, your Honor.

4          THE COURT:  You can cross him.

5          MS. BEVILACQUA:  Thank you.

6          Paragraph 58, your Honor, the CEPS agreement and the

7     price reduction for Tambocor CR was clearly material to anyone

8     considering acquiring the business.  I believe any potential

9     purchaser with knowledge of the CEPS agreement would discount

10    the value of the business based on his/her view of how

11    significantly the CEPS agreement would affect the projections.

12    That is 602 and 701, lack of foundation, speculation and

13    improper expert testimony and conclusion.

14         MS. BROWN:  Your Honor, this testimony is proper under

15    701 as lay opinion testimony.  I think it squarely fits in each

16    of the subparagraphs there, although we can just look at the

17    first one, rationally based on the perception of the witness.

18         Each of those statements are rationally based on Mr.

19    Stenqvist's perception of what was happening at the time, and

20    also if you look at the second point, helpful to a clear

21    understanding of the witness' testimony.  Mr. Stenqvist's has

22    done dozens of deals.  He has testified already.  He has lots

23    of experience in due diligence and now his testimony is coming

24    in and being offered as lay witness testimony under 701 (a) and

25    (b) and (c).

1          MS. BEVILACQUA:  Your Honor, with respect to those

2     exceptions noted by counsel, the way I read this sentence is --

3     we don't have objection if he is testifying about what his

4     personal experience has been with his negotiations and his

5     deals, but what the sentence says on its face is he is

6     purporting to state any potential purchaser would discount the

7     value based on his or her subjective view, and that is not

8     something this witness is qualified to testify to.  He has not

9     been offered as an expert and it goes beyond the exception, the

10    narrow exception allowed under 701.

11         THE COURT:  I will take this one for what it is

12    appropriately considered for.

13         MS. BEVILACQUA:  Paragraph 61, your Honor, similar

14    problem.  Accordingly, any agreement that could potentially

15    materially impact the pricing or sale of Tambocor and price and

16    sales of Tambocor brand in particular was obviously something

17    that we -- indeed, any potential investor -- would want to

18    review and fully understand.  It is the, "indeed, any potential

19    investor" part also under 602 and 701.

20         MS. BROWN:  This is the same, we believe

21    Mr. Stenqvist's has -- this is his lay opinion based on vast

22    experience with deals, his belief as to what the situation is,

23    his perception at the time and we believe it is appropriate as

24    lay opinion testimony under 701.

25         THE COURT:  All right.  The same response as before.

1          MS. BEVILACQUA:  69, your Honor, the price reduction

2     stated in the CEPS agreement undermined 3M's projections

3     entirely.  Indeed, the significance of sales of Tambocor in

4     France to the business, 3M's failure to account for a 50

5     percent price decrease to Tambocor CR in its projections were

6     to even mention the CEPS agreement to Meda so that it could

7     adjust projections accordingly, rendered the information 3M

8     provided to Meda materially false and misleading, and that is

9     our objection under 602 and 701, your Honor, as a conclusion of

10    law and ultimate issue in the case to be decided.

11         THE COURT:  Well, I will consider it for the purposes

12    of the conclusion of law and otherwise take it for what is

13    permissible as an exhibit.

14         MS. BEVILACQUA:  Just two more along the similar

15    lines, Paragraph 82.  Sorry.  Hang on just a moment, your

16    Honor.  (Pause)  Again can I do 82 and 89 together, your Honor?

17         THE COURT:  Okay.

18         MS. BEVILACQUA:  Because it is the same issue again,

19    602 and 701.  With respect to paragraph 89, we are talking

20    about the last two sentences.

21         MS. BROWN:  Your Honor, I believe these paragraphs,

22    when I read them, they're speaking directly to the financial

23    performance of Meda.  I just don't know who would be better

24    situated to talk about that in than Meda's CFO.  If the

25    objection here is he is not an expert and can't talk about

1    Meda's financials, I just don't understand the objection.  I

2    think he is giving an opinion clearly, lay opinion exception

3    under 701.

4              THE COURT:  Okay.  The last two sentences of 89 I am

5    not seeing even the previous basis for objection.  That is what

6    you said the last two paragraphs of 89.

7              MS. BEVILACQUA:  Last two sentences.  It is the

8    ultimate conclusion, your Honor, to the extent it also draws a

9    conclusion on damages.

10             THE COURT:  All right.  I take that neither as expert

11   testimony nor the legal conclusion as to damage.  Otherwise,

12   I'll consider it for what may admissibly be considered for.

13             82, the same, the same response.

14             All right.  So with those objections noted and there

15   is pending the only new document coming in or requested for

16   admission is 364, the pending hearsay objection, though, I

17   assume I'll take a look at it, but assume it is subject to my

18   previous ruling on the hearsay objections pertaining to

19   documentation of communications with Mr. Gnawed.

20             Otherwise, with the noted objections and my responses,

21   Mr. Stenqvist's declaration is admitted.

22             MS. BROWN:  Thank your Honor.

23             THE COURT:  Go ahead, Ms. Bevilacqua.

24   CROSS EXAMINATION

25   BY MS. BEVILACQUA:

1    Q.   Good afternoon, Mr. Stenqvist.

2    A.   Good afternoon.

3    Q.   You are currently the CFO of Meda, correct?

4    A.   That's correct.

5    Q.   And you were also the CFO of Meda at the time of this

6    transaction?

7    A.   That is also correct.

8    Q.   How long have you been the CFO?

9    A.   Since, formally since January 2004.

10   Q.   You have been involved in the European pharmaceutical

11   industry since approximately 1993, correct?

12   A.   That's correct.

13   Q.   Now, when you were looking at the prospect of acquiring

14   3M's European pharmaceutical business, you viewed that as an

15   interesting opportunity for Meda, right?

16   A.   That's true.

17   Q.   It was interesting because the 3M business would allow you

18   to add value to Meda's existing platform?

19   A.   Yes, that's true.

20   Q.   And the value that was going to be added from Meda's

21   perspective was synergies in combining the two businesses and

22   you had some products that were in the same therapeutic areas,

23   cardio and dermatology, namely?

24   A.   I would turn it around and say that it was mainly the

25   addition products into our existing therapeutic areas that was

1    what was attractive with the acquisition.

2    Q.   Prior to the acquisition of 3M, you had also been involved

3    in valuing target company for acquisition of --

4    A.   Yes.

5    Q.   You're claiming in this case that in valuing the 3M

6    business, you used an EBITA multiple approach to valuation?

7    A.   Yes, we did.

8    Q.   You did the same thing in the Viatris acquisition, the same

9    approach?

10   A.   Yes, we did.

11   Q.   When the Viatris deal was happening, you were also the CFO

12   of Meda?

13   A.   That's true.

14   Q.   Overall the Viatris deal was absolutely larger in terms of

15   overall dollar figure or --

16   A.   Quite similar, I would say, yes, in size.

17   Q.   When you were reviewing the valuation information in the

18   Viatris project, your job, as I understand it, was not to

19   actually create the model or to calculate a purchase price.  Is

20   that right?

21   A.   No, that is right.

22   Q.   Instead, what you were doing was you were sort of

23   performing a check as the CFO?  You were given certain assumed

24   acquisition values, and you analyzed the financials based on

25   those assumptions?

1    A.  That's true.

2    Q.  In the case of Viatris, those acquisition values that you

3    were given, they were given to you by the CEO, Mr. Lonner,

4    correct?

5    A.  Yes.

6    Q.  You didn't undertake any independent analysis as to what

7    that valuation should be?

8    A.  No.  I dealt with the numbers given certain acquisition

9    value.

10   Q.  You don't know how he derived those numbers?

11   A.  No, I don't remember that.

12   Q.  You're not aware of any comparable transactions that

13   anybody looked at prior to doing the Viatris deal, for that

14   deal?

15   A.  Not that I remember.

16   Q.  As Meda's CFO, you understand that you have an obligation

17   to your investors to assure both yourself and your investors

18   that the deal you're entering into is going to be a good deal

19   as best you can, right?

20   A.  Yeah, sure.

21   Q.  That is one important role you play in the way that you do

22   that when you're assuming values and you're assuming financials

23   as your primary focus on the debt levels.  Is that correct?

24   A.  Yes, I would say so, that is the split that we had in the

25   case of the deal you are speaking about.

D1FJMED5                        Stenqvist - cross

1   Q.  Because if you're sitting there as the CFO and you're

2   looking at an assumed purchase price and assumed number for

3   financials, it is just math to get to the EBITA multiple,

4   right?

5   A.  Can you repeat that?

6   Q.  If you're sitting there with an assumed purchase price and

7   an assumed EBITA financial, it is just the math to get to the

8   multiple number?

9           In other words, purchase price divided by EBITA equals

10  the EBITA multiple?

11  A.  Yes, that's true.

12  Q.  So your primary function is to monitor the debt levels and

13  establish what you would think is acceptable for that

14  transaction that could accompany the lenders?

15  A.  I would analyze the debt situation, yes.

16  Q.  I just want to fast forward to the bid for 3M business.

17          Your role in valuing the target you acquired was the

18  same as the Viatris deal?

19  A.  I participated, I remember I participated in discussions

20  around the value.

21  Q.  When Meda first submitted its bid for the 3M business, it

22  was a bid for the global business?

23  A.  Yes.

24  Q.  That bid was based on nothing more than what was contained

25  in the Goldman Sachs offering memorandum?

1    A.  No, that is true.

2    Q.  It so happened before any due diligence started?

3    A.  Yes.

4    Q.  As you progressed, you eventually submitted a binding offer

5    for 825 million for the European business, correct?

6    A.  That's correct.

7    Q.  In reaching that purchase price, you did not ascribe any

8    particular value to any particular product in any particular

9    market.  It is not like you went in and said we expect Tambocor

10   CR in France to do X?

11   A.  We used 3M's financial model as the basis for our analysis.

12   Q.  Right, but your analysis didn't actually ascribe any

13   particular value to any particular product?

14   A.  No, that is true.

15   Q.  You personally did not look at any other comparable

16   transactions in evaluating the purchase price for the 3M

17   business?

18   A.  I did not personally do that, no.

19   Q.  Again what you were focused on wasn't the multiple or the

20   projected EBITA, but the impact that this deal would have on

21   Meda's financial position?

22   A.  I was also focused on the projected EBITA.

23   Q.  I am sorry.  When you say the projected EBITA, do you mean

24   as projected by 3M or do you mean the EBITA multiple?

25   A.  You can't separate the two.

1   Q.  When you predominantly debt financed, this transaction was

2   what you were most concerned about is the debt ratios, correct?

3           Your primary job was to monitor the debt ratio?

4   A.  Yes, the financial position, yes.

5   Q.  Just so I understand what it was when Meda was using this

6   EBITA multiple model, its purchase price divided by EBITA

7   equals the multiple, right?

8   A.  Yes.

9   Q.  You had the 2006 3M EBITA from the 3M financial model you

10  mentioned, and you assumed a multiple range, you assumed a

11  multiple between 9 and 10, correct?

12  A.  We were actually using the 2007 multiple.

13  Q.  So estimated 2007 EBITA?

14  A.  Yeah.

15  Q.  My mistake.

16          So you had the estimated 2007 and then you had an

17  assumed multiple range for the EBITA multiple between 9 and 10?

18  A.  Yes, during this process, yes.

19  Q.  And then the purchase price you ultimately agreed on is

20  really just a function of the math?

21  A.  Yes.

22  Q.  You have an enumerator and it is three variables and you

23  know two of them?

24  A.  Yes.

25  Q.  I would like to look at a presentation that you made.

1          MS. BEVILACQUA:  This is JX 106, your Honor.

2          THE COURT:  Okay.

3   BY MS. BEVILACQUA:

4   Q.  Do you recognize at least the cover page of this

5   presentation?

6   A.  Yeah.  I would have to see more slides.

7   Q.  We'll show you some more.

8   A.  Sure.

9   Q.  Fair enough.

10         THE COURT:  Can the witness be handed the whole

11  document?

12         MS. BEVILACQUA:  Yes, he can, your Honor.

13         (Pause)

14  BY MS. BEVILACQUA:

15  Q.  This is a presentation that you made to your lenders or

16  your banking syndicate in late November 2006, correct?

17  A.  Correct.

18  Q.  So this is post-signing of the acquisition agreement but

19  prior to closing?

20  A.  Yes.

21  Q.  What I want to focus on for a moment is the slide, and the

22  slides aren't numbered, so I will use the Bates number in the

23  bottom-right-hand corner in the page, Bates under 1425.

24  A.  Okay.

25  Q.  In this slide you were showing that the combined product

1    sales for Meda and 3M after the acquisition closes first,

2    right?

3    A.   Yeah.

4    Q.   And what you're telling your investors, your bankers is

5    that no product is greater than 13 percent of the overall

6    business revenue?

7    A.   Correct.

8    Q.   Right?

9         And that the top 10 products together equal

10   approximately 58 percent of revenue?

11   A.   Yes.

12   Q.   This was important for your lenders because it was

13   important to know that there was good diversification between

14   the different products and the different markets, correct?

15   A.   Correct.

16   Q.   Now I want to talk to you just a little bit about forecast.

17        As I understand your claim in this lawsuit, it is that

18   the March 2003 convention between 3M Sante and CEPS imposed an

19   immediate 50 percent price reduction risk on the most important

20   product in the most important market, and that CEPS then asked

21   Meda to reduce the price of Flecaine LP in France by 50

22   percent, and that's substantial in your view?  That is a

23   substantial reduction?

24   A.   That is a very high reduction, yes.

25   Q.   And so I want to talk to you a little bit about how Meda

1    accounted for what you are claiming is a substantial reduction

2    in a significant product.

3            Now at the time of closing, you had already completed

4    the fiscal year budget for 2007.  Is that right?

5    A.  That's true.

6    Q.  In order to create a budget for the combined entity going

7    forward, you took the numbers that each 3M subsidiary gave you

8    and had forecasted for their 2007 operating plans and you

9    incorporated them into the Meda plan?

10   A.  Yeah, so in each market we combined the plans for the

11   ex-Meda basis for the ex-3M basis into a counter plan.

12           Of course, the 3M part of that input came from the 3M

13   people themselves, who would know the business that they did.

14   Q.  So for France specifically, you took the 2007 3M France

15   operating plan and you adopted it wholesale and you made no

16   changes to it?

17   A.  No major changes that I have ever heard about on that local

18   level.

19   Q.  I'd like to show you JX 109.  Now, you found out in

20   December 2006 that the 3M France 2007 operating plan included a

21   10 percent decrease in the price of Flecaine LP, correct?

22           Sorry, can you highlight the top E-mail, please.  Just

23   bring it up so we can all see it.  So the top E-mail is an

24   E-mail from Mr. Dierks, copied to you on December 13th, 2006,

25   asking whether the contract foresees any kind of mechanism, and

1    what he is referencing here --

2              MS. BROWN:  Your Honor, I would really prefer if the

3    witness had the exhibit in front of him.  It makes me

4    uncomfortable he can't see everything in context.  I just don't

5    remember if there is a second page to this E-mail.

6              THE COURT:  Do you think we can do that?

7              MS. BEVILACQUA:  Sure.

8              THE COURT:  Yes, Ms. Bevilacqua.

9              (Pause)

10             THE COURT:  This is --

11             MS. BEVILACQUA:  The copy I had, your Honor, has the

12   DX number on it, but I believe it is JX 109.

13             THE COURT:  All right, which is in.  Go ahead.

14   BY MS. BEVILACQUA:

15   Q.  So maybe if we start at the bottom E-mail first on the

16   page, we have seen different iterations of this throughout the

17   day, but it says that Benoit Traineau has advised me there is a

18   current risk of a 10 percent price decrease of Flecaine CR,

19   i.e., risk of 4 million Euro price decrease on an annual basis.

20             you received this E-mail shortly after from

21   Mr. Dierks, correct?

22   A.  That's correct.

23   Q.  This is the first time you understood there was a 10

24   percent price risk decrease built into the 2007 operating plan?

25   A.  Yes.  At this time I didn't even think we knew it was built

1   in.

2   Q.  But, yes, but this is the first reference to the 10 percent

3   price decrease --

4   A.  Yes.

5   Q.  -- that you were aware of?

6   A.  Yes.

7   Q.  When you received -- you did find out it had been built

8   into the 2007 operating plan by 3M France, correct?

9   A.  Yes.

10  Q.  When you found that out, did you request any further due

11  diligence?

12  A.  No, because we were informed that this was already included

13  in the financial models from which we based our valuation, so

14  there was not so much to do about it, in my opinion.

15  Q.  You did not attempt to trigger the material adverse event

16  clause in the acquisition agreement, did you?

17  A.  No, I did not.

18  Q.  This was prior to the closing, so there was still time to

19  do that, correct?

20  A.  This was between signing and closing, so the agreement had

21  already been signed.

22  Q.  Right.  You didn't negotiate any terms, any additional

23  terms to any local closing documents or local closing contracts

24  for the individual countries based on this 10 percent, correct?

25  A.  No.

 1   Q.  Nor did you actually seek a guarantee from 3M for the price

 2   of Flecaine in France, correct?

 3   A.  No.

 4   Q.  The 10 percent reduction --

 5   A.  But remember this was not a fact; this was a risk.

 6   Q.  I understand.

 7           In fact, the 10 percent budgeted for risk reduction in

 8   Flecaine LP for 2007 never happened?

 9   A.  No, it did not.

10   Q.  In developing your forecasts as the CFO for Meda, that is

11   something that is important to you that they be as accurate as

12   forecasts can possibly be, right?

13   A.  That's right.

14   Q.  There is always some guesswork going forward?

15   A.  There are estimates, yes.

16   Q.  You take steps to make sure that your budgets and your

17   forecasts are accurate as they can be?

18   A.  Yes, I do.

19   Q.  Part of that process is you involve your country managers

20   and local people in building up the budgets?

21   A.  Yes, it is bottom-up.

22   Q.  You would expect those local individuals to have knowledge

23   about the products in your portfolio, the local pricing

24   pressures and other local concerns that might impact the sales

25   or price of your products?

1    A.  Of course.

2    Q.  Then the local people report up the chain to you and

3    ultimately you have a full-year budget?

4    A.  Yes.

5    Q.  With respect to integration of the new 3M portfolio into

6    Meda's, your country teams undertook this same process,

7    especially to make sure that they're getting understanding of

8    all the new products that are coming into the portfolio?

9    A.  Yes, it was a similar budgeting process, yes.

10   Q.  And they're looking at again the pricing issues and the

11   regulatory environment in each country as doing the same thing

12   within Meda's region of operation, correct?

13   A.  Broadly speaking, yes.

14   Q.  In fact, shortly after the closing, your team in France

15   undertook an analysis of pricing pressures and evaluated the

16   probability of a price decrease for Flecaine LP to be zero to

17   15 percent for fiscal Year 2007?

18   A.  I am not so aware.  Could you repeat that.

19   Q.  Yes.  Your team in France shortly after the closing in 2007

20   undertook an analysis of pricing pressures and evaluated the

21   probability or risk of a price decrease for Flecaine LP of zero

22   to 15 percent for fiscal Year 2007?

23   A.  Not that I'm aware of.

24   Q.  But this is something that you would be instructing your

25   people to do, to create budgets that are accurate and

1   accounting for the risks, yes?

2   A.  Yeah, that is true, but I am not aware of any specific

3   French analysis from that period.

4               MS. BEVILACQUA:  Your Honor, now I would like to offer

5   Defendant's Exhibit 588.  I know Mr. Armenio is going to have

6   the same objection.

7               MR. ARMENIO:  Objection number -- third time.  Not an

8   author, not a recipient, not a copy person, no foundation

9   whatsoever.  They had access to Mr. Senac, the seven-hour

10  deposition, never asked him about it.  Mr. Traineau potentially

11  in his declaration could have talked about it, never did, no

12  sponsor, no foundation.  The same objection.

13              MS. BEVILACQUA:  This is an admission as to what the

14  people on the ground in France were doing when they were

15  building up their business.  It is included in their documents.

16              It is a business record, as we heard from Mr. Armenio

17  several times, and the reason they don't want you to see it is

18  because they want you to believe that nobody knew about this or

19  the impact of their conventions or the import of the document.

20              MR. ARMENIO:  Why that is completely wrong is that

21  this was from purportedly Ms. Kolsky who was at Meda for all of

22  about 15 days, if that.  These were 3M's views from a 3M person

23  who came to Meda transiently, provided perhaps her view of

24  things and left.

25              We heard very clearly from Dr. Dierks she did not have

1    CEPS responsibility at Meda.  Very clearly that was wrong.

2    There is no foundation for this at all, certainly not with this

3    witness who is nowhere indicated on this document.

4              THE COURT:  I think we are in the same place which is

5    you have raised points that would overcome hearsay objections,

6    and you can ask the witness if he has got any foundation of

7    knowledge that can explain where this thing comes from to me,

8    which would be a basis for its admission and then you can make

9    arguments.  If he doesn't, then we are in the same place.

10             MR. ARMENIO:  Your Honor, we already actually had that

11   question, whether Mr. Stenqvist was aware of this happening in

12   France, and he said no.  The question your Honor has properly

13   set forth has actually already been asked and answered by the

14   witness with no, he is not aware of it.

15             THE COURT:  He did say no to that.  I don't know if

16   you want to ask him anything about the particular document.

17             MS. BEVILACQUA:  I will ask him a question.

18   BY MS. BEVILACQUA:

19   Q.  Did Mr. Senac, who is the country manager in France at this

20   time, did he report up to you as the CFO that there was a risk

21   of zero to 15 percent for price decrease for Flecaine LP during

22   this time period?

23   A.  During the time?

24   Q.  This time period being late January 2007?

25   A.  No, he did not.

1    Q.  So let's fast forward a little bit in time to the Fall of

2    20007.  At this point in time Mr. Traineau from CEPS informs

3    Meda it can expect a price decrease on CR in France starting in

4    fiscal Year 20008.  Are you aware of that?

5    A.  I'm aware that we budgeted a price reduction from July or

6    August 2008.  That was based on information, local information

7    from the CEPS.

8          MS. BEVILACQUA:  Can you pull up JX 116.  This is

9    already in, your Honor.

10         (Pause)

11   BY MS. BEVILACQUA:

12   Q.  Can you see it, Mr. Stenqvist?  I don't want to strain your

13   eyes.

14   A.  If I try very hard, yes, I can see it.  I don't see my name

15   on it, though.

16   Q.  No, and that is not the question.

17   A.  Okay.  The question?

18   Q.  The question here, first of all, Mr. Senac is reporting at

19   this time to Mr. Vant Hullenaar.  Is that correct?

20   A.  Is it the 10th of March?

21   Q.  No.  It is actually --

22   A.  The 3rd of October?

23   Q.  Of October, yes.

24   A.  I'm not exactly sure when Mr. Vant Hullenaar was appointed

25   regional director.

1    Q.   The E-mail, he is the to line, Mr. Vant Hullenaar is

2    included in the CCs, yes?

3    A.   Yes.

4    Q.   This is summarizing topics that were mentioned at the

5    meeting with Mr. Traineau on September 28th?

6          And for fiscal Year 2007, so that is the fiscal year

7    you're in and you're getting towards the end of the last

8    quarter now for Flecaine CR, the price will not be decreased

9    with a favorable impact of 600, and I am not sure what that

10   currency abbreviation is?

11   A.   A thousand Euros.

12   Q.   So this is in reference to the fact that the budgeted for

13   10 percent decrease isn't going to happen for Flecaine CR and

14   we can see even our people in France are mixing up our letters

15   and what comes after the Flecaine.

16          Then for 2008, Mr. Senac informs he has signed and

17   presented an extension of our agreement convention with the

18   pricing committee for the next years, including all Meda and

19   X30 product portfolio.

20          Were you aware Mr. Senac had entered into a convention

21   on Meda's behalf in this time period?

22   A.   No, I was not.

23   Q.   Then he talks about further the Flecaine status being

24   reviewed by Mr. Raineau, and Mr. Raineau advised him due to the

25   new tariff price of Flecaine, Meda will be requested to reduce

1    the price of Flecaine CR in the course of 2008.  And then

2    skipping a bit, he recommends to plan for a 15 percent

3    reduction as of July 1st, 2008.

4            And that 15 percent reduction Mr. Senac recommends,

5    that actually gets adopted into the Meda 2008 full-year budget,

6    correct?

7    A.  That's correct.

8    Q.  When is the first time that you claim you personally

9    learned about the CEPS pricing convention related to the

10   controlled release form of Tambocor?

11   A.  You mean the 50 percent reduction?

12   Q.  Yes.

13   A.  New Year's Eve 2007, one year after closing.

14   Q.  I think it is referenced as Exhibit 10 to your testimony,

15   PX 350.

16   A.  (Pause)

17   Q.  So as of New Year's Eve 2007, the way your normal budgeting

18   process works, your 2008 budget is already set by this point?

19   A.  Yes.

20   Q.  But you do make adjustments or at least you monitor it

21   continually and you make some adjustments on a quarterly basis,

22   correct?

23   A.  Yeah.

24   Q.  When you learned on December 31st, 2007 that CEPS was

25   claiming or at least the claim was being made for a 50 percent

D1FJMED5                          Stenqvist - cross

1    price reduction on the most important drug in the most

2    important market, you did not change your forecast?

3    A.   There was no planning going on at that time.  We make that

4    after every quarter.  So there was no, no new planning going on

5    around year end of 2007.

6    Q.   You're saying it is a timing issue, if I understand what

7    you're saying correctly?

8    A.   In that situation, yes, at that time.

9    Q.   So you didn't do it immediately on December 31st, but you

10   didn't do it in the first quarter of 20008, either, did you?

11   A.   After the first quarter in 2008, there was a new estimate

12   for 2008.  If I remember well, we made no adjustments for

13   Tambocor CR because there was a dialogue going on between our

14   local French company and the CEPS authority.

15          So it was we had some hopes that this convention could

16   be renegotiated.

17   Q.   Right.  So during the first quarter of 2008, after you

18   learned about the CEPS convention and what you say required a

19   50 percent decrease, you did not adjust the budget for Tambocor

20   CR in France because there were these ongoing dialogue between

21   Meda and CEPS, so you didn't incorporate a 50 percent price

22   decrease, nor did you incorporate a 40 percent price decrease?

23          It stayed whatever it was in the original budget,

24   correct?

25   A.   Yeah.

1          MS. BROWN:  Asked and answered, your Honor.

2          THE COURT:  Go ahead.  I will allow it.

3          THE WITNESS:  No, because there were all indications

4     from the CEPS that the application of this could be delayed and

5     there were some dialogue going on.  So we didn't have better

6     information at that point.

7     BY MS. BEVILACQUA:

8     Q.  I am sorry.  We were talking over each other and I think I

9     got confused at least.

10          My point being when you learned about it, you had this

11     ongoing dialogue, you didn't change the forecast for Tambocor

12     CR in France for 2008?

13     A.  Not after the first quarter, no.

14     Q.  You didn't change it for 2008 after the second quarter,

15     either, did you?

16     A.  I remember that we already had a 15 percent reduction

17     included in the budget, so for every day that passed without

18     entering into for these reductions, we would be better and

19     better off compared to the budgeted 15 percent reduction.

20     Q.  So once you found out about the convention, you didn't

21     account for any additional risk above the risk of the price

22     decrease that was already incorporated into your forecast?

23          MS. BROWN:  Asked and answered.

24          THE COURT:  Overruled.  Go ahead.

25          THE WITNESS:  No, we did not.

```
 1              MS. BEVILACQUA:  I'd like to show you Plaintiff's

 2     Exhibit 364.  This I believe is one of the ones attached to

 3     your witness statement as well.  We do have an objection as to

 4     the hearsay within hearsay, but that is not what I am offering

 5     it for, your Honor.

 6              THE COURT:  Okay.  Which exhibit?

 7              MS. BEVILACQUA:  364.

 8              THE COURT:  I am sorry.  Which tab number?

 9              MS. BEVILACQUA:  I think it is Tab No. 11.

10              (Pause)

11     BY MS. BEVILACQUA:

12     Q.  This is a long E-mail chain.  You are at the top of the

13     first one, I believe.  It is dated 4-3-2008 at the top, yes?

14     A.  Yes.

15     Q.  If you look at the second page, this is an E-mail from

16     Mr. Maupas to Mr. Vant Hullenaar, Mr. Dierks, and at this time

17     Maupas is the country manager in France, correct?

18              THE COURT:  Ms. Bevilacqua, sorry.  Before you proceed

19     with the document, why don't we take a quick break and resume

20     in 10 minutes.

21              MR. ARMENIO:  Thank your Honor.

22              THE COURT:  Thank you.

23              (Recess)

24              THE COURT:  Whenever you're ready, Ms. Bevilacqua.

25              MS. BEVILACQUA:  Thank you, your Honor.
```

1    BY MS. BEVILACQUA:

2    Q.  So I'm looking at the second page of PX 364 where we were

3    before the break.  Your here in the bottom that says Flecaine

4    2008, and Maupas is stating a price decrease is, indeed, to be

5    expected.  However, we can now most probably say it will not

6    happen before summer 2008.  A letter will be sent.

7              As far as the percent of decrease is concerned, his

8    ultimate gole is to sell the daily cost for CR at the cost of

9    IR and, in fact, that is what was ultimately done in this case,

10   wasn't it?

11   A.  Yeah, that was also the reason why the best estimate was

12   not to adjust the full year estimate for Tambocor.

13   Q.  That is right because the price decrease that actually

14   happens in November of 2008 takes effect I think November 1st,

15   2008.  Is that right?

16   A.  Yeah, I believe that's right.

17   Q.  It was a 13 percent price decrease for 2008?

18   A.  That's correct.

19   Q.  And obviously that is lower than what you had built into

20   your forecast?

21   A.  Yes.

22   Q.  You built in 15 percent, right?

23   A.  Yes.

24   Q.  And then there was this phased system where the next year,

25   a month before it was going to go off patent, there was another

1   20 percent price decrease for Flecaine LP, right?

2   A.   Yes.

3   Q.   And that was in October of 2009, roughly?

4   A.   Yes.

5   Q.   Okay.  Now, as I understand your claims in this case,

6   they're predicated on the contention that 3M's projections for

7   future revenues were misleading because 3M did not build in a

8   50 percent price decrease or reflect a 50 percent price

9   decrease for CR in France?

10  A.   That's correct.

11  Q.   And that's in Paragraph 69 of your testimony, right?

12  A.   Yeah.  That was what was in the agreement, was 50 percent.

13  Q.   I understand that is your interpretation of what you think

14  was in the agreement, but you acknowledge in Paragraph 68 of

15  your testimony that you personally were aware of pricing

16  pressures in France and Europe generally and that you were

17  aware of the possibility of generic competition on Tambocor CR

18  in France, correct?

19  A.   Well, the general pricing pressure in Europe has never been

20  of the magnitude of 50 percent, and when it comes to risk for

21  generic pressure, we were not that concerned about that is my

22  recollection for Tambocor CR.

23  Q.   Although what you testified to in your written statement,

24  in Paragraph 68, is that at the time of the acquisition you

25  were generally aware there was pressure in most European

1   countries to reduce the prices of pharmaceutical products, and

2   you were also aware that the patent for Tambocor CR expired in

3   November 2009.  There could be a risk of some competition from

4   generic competitors?

5   A.  Yes, there could be some risk.

6   Q.  And that you had no reason to believe that 3M's assessment

7   of those risks was deficient?

8   A.  No.

9   Q.  And 3M, as we saw earlier, evaluated those risks as being

10  10 percent and incorporated a 10 percent reduction for Flecaine

11  pricing pressures for CR in France?

12  A.  That was what they included in their financial model, yes,

13  we found out afterwards.

14  Q.  When Meda evaluated the risk of a price decrease in France

15  as at least as late as September 2007, you evaluated that risk

16  as building in a 15 percent decrease for fiscal Year 2008, and

17  then --

18  A.  But that was after-the-fact.  That was after discussions

19  between Meda in France and the CEPS.

20  Q.  Correct.

21  A.  New discussions.

22  Q.  I am sorry?

23  A.  New discussions.

24  Q.  It is before you allege you learned 2.2, Article 2.2 of the

25  conventions, right?

D1FJMED5                    Stenqvist – cross

1    A.  Yes, yes.

2    Q.  And in making that assessment in September 2007, you

3    believe that that 15 percent was a reasonable estimate or

4    reasonable evaluation of the risk?

5    A.  Well, that is the result of the dialogue between our local

6    company and the local authority, and it is hard to argue

7    against it.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1fQmed6                        Stenqvist - cross

1    BY MS. BEVILACQUA:

2    Q.  I would like to turn now to DX-535.

3             This was admitted yesterday, your Honor.  It's Meda's

4    2007 annual report.  It's a lengthy document.  I will hand up a

5    copy to your Honor and the witness.

6             THE COURT:  Just in the flow of that last set, let me

7    ask a question.  You said that that's how you evaluated the

8    risk after the discussions.  How would you have evaluated the

9    risk before the discussions?

10            THE WITNESS:  Well, the 15 percent price reduction is

11   a lot.  So we did not -- had no reason to believe that there

12   would be any price reduction of that magnitude before it.

13            THE COURT:  Before discussions -- so I understand,

14   before discussions with CEPS?

15            THE WITNESS:  Yes.

16            THE COURT:  You would not have thought that there was

17   the risk of a 15 percent reduction?

18            THE WITNESS:  No.

19            THE COURT:  Between when you learned of a 10 percent

20   risk of reduction, how would you have evaluated the risk prior

21   to discussions?

22            THE WITNESS:  Well, the 10 percent was never

23   implemented.

24            THE COURT:  If you can put yourself back in the

25   moment, and even if you can't quantify it, how would you go

1    about evaluating the risk as you head into discussions with

2    CEPS?

3                THE WITNESS:  I did not conduct these discussions

4    myself, so I think it's very difficult for me to answer what

5    you bring into such a discussion.

6    BY MS. BEVILACQUA:

7    Q.  Just to follow up on that last point, your Honor, is it

8    fair to say then, Mr. Stenqvist, that you're relying on the

9    local people who are having the discussions with the local

10   regulators what to incorporate for that risk into your yearly

11   budget?

12   A.  In my case, yes, to a large extent.

13   Q.  Now, as Meda's chief financial officer during this time

14   frame, you had a role in compiling its 2007 annual report?

15   A.  Yes, I had.

16   Q.  And the annual report is truthful and accurate in what it

17   communicates about the company's position and its financials to

18   its investors and the public, correct?

19   A.  Correct.

20   Q.  If you would look at page 8 of the annual report.  First

21   two-thirds of the way down there's a heading that says,

22   "changed market?

23   A.  Yes.

24   Q.  It might be easier to look at it in the hard copy unless we

25   can get it blown up a bit more.  It says, "Due to the high cost

1    of publicly financed medicine in Europe, influence over the

2    choice of medications has shifted from prescribing doctor to

3    various coordinating committees and purchasing organizations.

4    Through its position as a buyer, publicly financed health care

5    has gained an upper hand in its attempts to make medicine more

6    cost effective.  This turns the spotlight on direct product

7    comparisons, in terms of medicinal properties and price, which

8    changes the playing field for the pharmaceutical industry."

9              Did I read that accurately?

10   A.  Yes.

11   Q.  That was a risk that you were aware of in 2007 and in 2008

12   when this report was published?

13   A.  Yes.

14   Q.  Would you take a look at page 114 in the same document.

15   A.  14 or one hundred --

16   Q.  114.  This is a section of the annual report discussing

17   risk factors, correct?  And it identifies three, I'll call them

18   subcategories of risk factors:  Two of them dealing with price,

19   first being competitors in pricing, and you're informing your

20   shareholders that "pricing pressure has been and can be

21   expected to remain significant within Meda's business areas, so

22   there is a risk Meda will not be able to maintain current

23   margins on its products."

24             Is that accurate?

25   A.  That's true.

D1fQmed6                              Stenqvist - cross

1    Q.  The second section, "Actions by Authority" immediately

2    underneath.  "Like other companies in the pharmaceutical

3    industry, Meda is subject to government authorities' actions.

4    These actions could include changes in rules and regulations on

5    pricing and discounting of drugs or changed conditions

6    regarding the prescription of certain pharmaceutical.  If

7    Meda's products or activities are subject to further measures

8    or restrictions by authorities, then these actions may have

9    adverse commercial and financial effects on Meda."

10          Is that accurate?

11   A.  That's accurate.

12   Q.  And that's the environment you operated, correct?

13   A.  Correct.

14   Q.  These risk factors were nothing new in 2008, and, in fact,

15   as far back as you can remember in the European pharmaceutical

16   industry, these are not new risk factors?

17   A.  No, but when you write about these risk factors and you

18   read about them and think about them, I am absolutely not

19   reading 50 percent price cuts.  I'm reading something usually

20   much less when we speak about price reduction.

21   Q.  And the 15 percent price cut that you built into your 2008

22   operating budget, that's something that you would consider as

23   covered by this paragraph?

24   A.  Probably.

25   Q.  And these risk factors that we just walked through in your

1    annual report are true; with or without Article 2.2, they will

2    persist?

3    A.   The risk factors are true, of course, yes.

4    Q.   When you were presented with the risk of what you claim

5    Article 2.2 required, that 50 percent price decrease, you did

6    nothing to separately account for that risk beyond what you had

7    already built into that fiscal year 2008 budget?

8    A.   As I explained, when we found out about it on New Year's

9    Eve, 2007, there was no planning going on.  After the first

10   quarter, as we could see from what --

11              THE COURT:  You said that earlier.  What do you mean

12   no planning you said?

13              THE WITNESS:  Because the 2008 budget was already

14   done, and we don't change budgets.  What we do is that we make

15   new estimates for the current year and that we do after every

16   quarter.  So the first time we would do that in 2008 would be

17   after the first quarter; that is, towards the end of April we

18   would start to do that.

19              THE COURT:  So when you say "no planning," you mean

20   budget planning?

21              THE WITNESS:  Yeah.

22              THE COURT:  Do you also mean making contemporaneous

23   estimates?  Or what exactly do you mean?

24              THE WITNESS:  I mean that we update our financial plan

25   for the year three times a year.

1                THE COURT:  Right.  OK.

2                THE WITNESS:  And in between we don't do that really.

3                THE COURT:  OK.

4    Q.  You were involved in compiling and approving purchase price

5    allocations for each country that you acquired within the 3M

6    business, correct?

7    A.  Correct.

8    Q.  Prior to closing, you received some purchase price

9    allocation worksheet estimates from 3M?

10   A.  Yes, I did.

11   Q.  OK.  And then each country, as I understand it, has a

12   separate closing agreement, and those purchase price

13   allocations it reflected in those countries specific

14   agreements, is that your understanding?

15   A.  Yeah, because in order to carry out the acquisition

16   agreement, it was necessary to have local agreements as well

17   for each country where we would be transferring new business,

18   because you can't just move people from one local entity to

19   another without any agreement.  So that was the practical

20   reasoning behind those local agreements.

21   Q.  If you would bring up Defendant's Exhibit 330.

22                MS. BEVILACQUA:  And just so counsel is aware and the

23   Court is aware, the full exhibit of Defendant's Exhibit 330 is

24   hundreds and hundreds of pages because it has Excel

25   spreadsheets attached to it.  Eventually, I'll be moving for

1    admission of the whole exhibit, but I'm only going to show him

2    the contract part at the top.

3            THE COURT:  All right.

4            MR. CARLINSKY:  Your Honor, I'm going to object.  I

5    thought we covered this issue rather extensively in the final

6    pretrial conference where the whole issue of the new injection

7    of this argument was brought into the case for the very first

8    time, and we discussed it from Meda's standpoint, we

9    highlighted why this had been, as far as we were concerned,

10   waived that it was unfair surprise.

11           Now, I realize it was in context of the motion in

12   limine by the defendant, but I understood, and I certainly

13   would have been prepared to make corresponding motion or make

14   one now, but my understanding was given the issue having been

15   raised when it was raised for the very, very, very first time,

16   we have, again, no opportunity for anyone to ever address this

17   issue, this issue would not be allowed to be brought into the

18   case at this late hour.  So I would raise that objection, and I

19   would, if necessary, move now orally in limine to keep this out

20   because I just don't think it has any place in this case.

21           THE COURT:  Well, you can respond to the objection

22   now.  We did discuss it.  As I said, I ruled on what was in

23   front of me.  You didn't -- you made the argument that it was

24   waived.  You didn't ask for the exclusion of evidence

25   pertaining to it, so there was nothing for me to make that

1    assessment, and I think at base, at least I understood the

2    position to be, there was a document that hadn't been objected

3    to in the pretrial order exchange from which they were going to

4    make whatever arguments they could make, and I think that's

5    where we are now.

6              MR. CARLINSKY:  Well, if I can just respond on that.

7    I think that's where I at least understood we were then.  I

8    didn't understand that they would be then questioning witnesses

9    about this document.  In fact, that was a particular point I

10   raised at the end of our discussion.  I said, I think it was

11   Mr. Renard who mentioned, "Well, we intend to examine witnesses

12   about this particular document," and I thought your Honor even

13   put the question to Mr. Renard about that, but I didn't think

14   it was necessary to make some kind of a blanket motion.  The

15   document is in.  Where we concluded, I thought, at the end of

16   the argument, was Mr. Renard's representation that 3M, should

17   it choose to do so, would argue from the documents.

18             I thought it was very different from now questioning a

19   witness about it.  And so I would object to any questioning of

20   the witness about the document.  The document is in.  If the

21   legal arguments are to be made, it's in evidence.  But I think

22   it's very different now to put a question to a witness on a

23   document that had never been raised or an issue that had never

24   been raised in the case, so I object to any questioning of the

25   witness regarding it.

1          MS. BEVILACQUA:  Your Honor, as I recall that final

2     pretrial conference, your Honor also noted the impact it would

3     have or could have on 3M's argument with respect to damages.  I

4     have the CFO here, and he did testify about two amendments to

5     this contract in his deposition.

6          THE COURT:  What's the scope of the questioning you

7     have on this document?

8          MS. BEVILACQUA:  The scope of the questioning is to go

9     through the purchase price allocation, how they did it and how

10    it ties back to the annual report of Meda.

11         THE COURT:  And you questioned Mr. Stenqvist about

12    this document at his deposition?

13         MS. BEVILACQUA:  I questioned him about the two

14    attachments, the two amendments to it, amendment number one and

15    number two, and I, unfortunately, didn't have the primary one

16    in front of him, but I did question him about amendment number

17    one and number two, which are DX-393 and DX-421.

18         THE COURT:  And is that what you're going to ask him

19    about now?

20         MS. BEVILACQUA:  Yes.

21         MR. CARLINSKY:  The two you asked him about in his

22    deposition?

23         MS. BEVILACQUA:  And the first one that they relate

24    to; and as I understand it, your Honor, they made no objection

25    to the document itself or excluding the document.

D1fQmed6                        Stenqvist - cross

1          THE COURT:  I'm sorry, how many questions do you have

2     on this?  Other than what you asked him about in his

3     deposition.

4          MS. BEVILACQUA:  I have seven questions on this

5     document.

6          MR. CARLINSKY:  What pages in his deposition is the

7     question, please?

8          MS. BEVILACQUA:  I believe it starts at page 183.

9          THE COURT:  Mr. Renard said at the final pretrial --

10    let me back up a little bit to give it context.

11          "French agreement, your Honor, we say it's payable by

12    Meda France, the 132 million which was paid for by the -- paid

13    for the French tangible and intangible assets.  That question,

14    in other words, is answered by this contract to which no

15    objection has been asserted."

16          And then I said, "So, it's just a contract

17    interpretation?

18          "Yes, your Honor.  In fact, I would say evidence

19    beyond the contract would presumably be inadmissible because I

20    believe the contract is clear in this regard.  It says that the

21    purchase price is payable by Meda France."

22          And I said, "So you're just going to make these

23    arguments to me in summation?  I thought I understood you to

24    say you were going to question their expert about it."

25          And he did say, "I believe, too, because those

1     questions don't exceed the scope of the direct testimony, then

2     to ask if they considered certain matters and were aware of

3     certain matters, I don't believe that exceeds the scope."

4             Then we changed direction a little bit.  I don't

5     think -- I don't think it was resolved at the final pretrial,

6     and, as I indicated, I was ruling on what was in front of me,

7     and you hadn't put it in front of me.

8             MR. CARLINSKY:  Well, I think though even what your

9     Honor just read, with all respect, all that we heard at best

10    from Mr. Renard is he might question one of our experts about

11    it.  There was no indication, and I'm trying to pull up the

12    transcript because my recollection is the way it was resolved

13    is there would be no witnesses questioned.  Certainly, no fact

14    witnesses.  And this comes back -- I don't want to repeat the

15    argument I previously made, but we have no opportunity given

16    that this issue and the way in which it's been framed to have

17    prepared for this.

18            And I would just observe, I mean, I think it's telling

19    that even in the deposition designations from 3M, none of the

20    testimony that Ms. Bevilacqua now says she's referring to in

21    the witness' deposition was even designated, I think

22    illustrated that this was really an eleventh hour, 59 minute --

23            THE COURT:  I think there's no doubt about that,

24    Mr. Renard admitted that.

25            MR. CARLINSKY:  Yes, and that's the unfairness of it.

1    The unfairness is it's not addressed in Mr. Stenqvist's

2    declaration.  So we had a previous agreement, I thought, that

3    we were going to have at best a question put to the expert, but

4    certainly not any discussion when we had the conference that

5    the questions would be put to a witness.  And I just think it

6    comes back to the unfairness of it.

7             I'd make the motion now, which I am making, which is I

8    object to any questioning of this witness regarding this

9    particular document given that it was not something that had

10   ever been raised in the case.

11            MS. BEVILACQUA:  Your Honor, as I believe you are

12   correct, it was not resolved at the final pretrial hearing.

13            THE COURT:  We are here now.

14            MS. BEVILACQUA:  What I am -- really all I want to do

15   with Mr. Stenqvist is put the document in.  If the document is

16   already in evidence, your Honor, we can argue about it then.  I

17   have questions about how they accounted for the transaction

18   related to the annual report, and your Honor even raised that

19   issue at the final pretrial, you had asked a few questions and

20   you said we don't know, and I would just like to confirm it

21   with him based on the face of the document, their own contract

22   and the annual report.

23            THE COURT:  All right.  Proceed now and -- I think the

24   issue is still in front of me as to whether it's -- meaning to

25   consider evidence based on the acquisition, the ancillary

1    agreement is unfairly prejudicial at this stage and were waived

2    by the defendants, but let me see with specificity what the

3    scope of the questioning is, and then you can argue based on

4    that.  OK?

5              MS. BEVILACQUA:  Thank you.

6              THE COURT:  And I don't think you have addressed the

7    question of since Mr. Renard admitted that this was late

8    discovery, strategic decision on the eve of trial preparations,

9    the prejudice question.

10             MS. BEVILACQUA:  Well, your Honor, we did -- actually,

11   we did address that in our briefing as well, and I know

12   Mr. Renard addressed it at the time.  This is a contract that

13   Meda entered into, and it has been signed, and it is Meda's

14   obligation to sue on the correct contract in the case.  It's an

15   operative fact the contract exists, and they can't get around

16   the fact that the contract exists.  It's been signed, and

17   there's no objection to the authenticity of the document or how

18   the transfer actually took place.

19             THE COURT:  I thought your point was that Meda didn't

20   admit to it.

21             MS. BEVILACQUA:  I'm sorry, shorthand gets the better

22   of me; that Meda France entered into this contract that we are

23   talking about at DX-330 and that 3M Santé was the other party

24   to it.

25             MR. CARLINSKY:  May I just for the record have at

D1fQmed6                         Stenqvist - cross

1    least -- may I just respond?  It goes back to if that's the

2    case, where was it in the affirmative defenses among the 18?

3    If the argument now, which was raised for the first time in

4    late December, is that, oh, we have the wrong plaintiff, or

5    this is the operative agreement, where was it raised in the

6    span of four years?

7         THE COURT:  Yes, I understand.

8         MR. CARLINSKY:  And it is waived.  That was not an

9    answer to the Court's question of prejudice.  There are

10   explanations to documents that parties would have addressed had

11   defendant acted properly here and raised this.  And I know the

12   Court has looked at it because your Honor referenced the extent

13   to which their own affirmative defenses go into detail, and on

14   all sorts of defenses.  Not a word, not a whisper about this

15   particular document.  Now we have a witness.  Now we're hearing

16   that this is one of the -- the list of new arguments, of

17   course, continues to grow.  This one started in December,

18   but --

19        THE COURT:  I got it, Mr. Carlinsky.

20        MR. CARLINSKY:  I'm sorry, I'm a little exercised.  I

21   apologize to the Court for that, but I understand the ruling

22   and I'll sit down.

23        THE COURT:  I haven't made a ruling.  I'm going to

24   allow the questioning.  I have not decided whether I think the

25   argument was waived.  It would be a relatively easy -- well,

1    let's just take it as it comes.  We'll see with specificity

2    what we're dealing with because sometimes people get exercised,

3    and turns out it's no thing, but we'll see.

4            MR. CARLINSKY:  My son tells me that all the time.

5            THE COURT:  Go ahead.

6            MS. BEVILACQUA:  Thank you.

7    BY MS. BEVILACQUA:

8    Q.   Returning back to exhibit 330, this is the business

9    acquisition agreement between 3M Santé and Meda Pharma SAS,

10   which as I understand it, is Meda France, is that correct?

11   A.   Yes, it is.

12   Q.   It lists a purchase price in paragraph 1.1 of $132 million

13   as the purchase price for 3M Santé?

14   A.   Yes, it does, but this is a -- is not the same as the

15   acquisition value.  This is the allocation for tax purposes

16   that you need to have an agreement like this.

17   Q.   I understand, but you had also mentioned before our

18   extended discussion that you can't just transfer things.  You

19   have to actually have an agreement in place to get employees to

20   get the assets and to get everything transferred?

21   A.   Yes, that's true.

22   Q.   OK.  And I understand it's for tax purposes, and, in fact,

23   it's at least one of the purposes for the document page 8 --

24   well 7.12, "The buyer and the seller assert under the penalties

25   set forth in article 1837 of the French tax code that this

1    agreement provides the whole price agreed for the local

2    business transfer."

3          Is that accurate?

4    A.  Yes, that's true, but I would like to point out that the

5    assets included in this agreement is only a subset of all the

6    assets because this agreement doesn't include the product

7    rights of the products, the trade names, the patents, the whole

8    know-how around the products, including Tambocor CR.  So it is

9    parts of the assets which are included here.

10   Q.  And part of the assets included -- I'm looking at what is

11   page 36 in the excerpt -- are lists of marketing authorizations

12   to be transferred by buyer -- to the buyer?

13   A.  Yeah.  The marketing authorizations, they have to be

14   included in local agreements because it's really the local

15   companies who deal with the local regulatory authorities.  So

16   that is included here for practical purposes.

17   Q.  You had mentioned product rights, and the product rights

18   not being included.  And I want to come back to that in just a

19   second, but before I do, I would like to show you two

20   documents, DX-393 and 421.

21          THE COURT:  Are we done with 330?  Are we coming back

22   to it?

23          MS. BEVILACQUA:  I think we're done for now.

24   Q.  Do you recognize these documents?  We'll take them one at a

25   time.  DX-393?

1    A.   Yeah.  Well, vaguely.  I know that there were amendments to

2    these agreements as to values because the final values were not

3    really established until even after closing.

4    Q.   In fact, these documents, DX-393 is dated December 31,

5    2007, so that is after closing, as you've noted.

6    A.   Yeah.

7    Q.   And DX-421 is September 20, 2008.

8    A.   Yeah.

9    Q.   And we looked at these in your deposition, is that correct?

10   A.   Yes, I believe we did.

11   Q.   And we discussed product rights allocation of it.  I just

12   want to make sure I understand how the subsidiary -- the

13   transfer of a local subsidiary worked financially for Meda and

14   its group companies.  So what I'd like to look at next is 535,

15   back to your annual report which you have here in front of you.

16   As I understand it, the way the money flowed was that Meda AB

17   paid the purchase price stated in the French agreement and

18   addendum of $132 million, and then it took -- on behalf of its

19   French subsidiary, and then it took a receivable on its balance

20   sheet.  Is that generally correct?

21   A.   Yes, we finance all our subsidiaries through debt, but only

22   as much debt as we can.

23   Q.   And we can see that if we look at page 92 of the annual

24   report, the balance sheet of the parent company -- this is the

25   balance sheet of the parent company, as it says at the top, and

1   it shows the receivable for your companies for year 2006 of

2   63 million SEK.  And for 2007, it's 3,043,000,000 SEK, as I

3   understand the conversion, which is a difference of about

4   2.98 billion SEK of the Swedish krona?

5   A.  Yes.

6   Q.  Then the conversion you apply at this time was 6.6 as

7   stated on page 81 of your annual report.  And if you apply that

8   conversion rate to this balance sheet, you get about

9   $451 million that the parent company accounted for as a

10  receivable on its balance sheet?

11  A.  Yes.  Yes.

12  Q.  OK.  What form did that receivable take?  Was it a note

13  securitized debt?

14          MR. CARLINSKY:  I want to make an objection.  It

15  actually says receivables plural.

16          MS. BEVILACQUA:  I'm sorry.

17  A.  What's reflected here is our intercompany financing.  We

18  extend loans -- from a group, when I say we, I mean the group.

19  The group extends loans to the subsidiaries.  This particular

20  year, the local 3M acquisitions were an important part of those

21  loans because obviously France didn't have any resources to

22  purchase anything.

23  Q.  And you mentioned product rights.  If we look at page 57 of

24  the annual report, second column you're referencing intangible

25  assets of good will and product rights.  And it's Meda's

1    standard practice to test annually for impairment to good will

2    and to its product rights, is that accurate?

3    A.  Could you repeat that, please?

4    Q.  Sure.  Maybe it will help if we just look at the

5    highlighted portion there.  So, "Good will represents the

6    excess of the costs of an acquisition over the fair value of

7    the group share over the net identifiable assets of the

8    acquired subsidiary on the date of acquisition.  Good will on

9    acquisitions of subsidiaries is recognized in intangible

10   assets.  Good will is tested annually for impairment and

11   carried at cost less accumulated impairment losses."

12          And for product rights, it's similar.  "The product

13   rights are carried at cost. They have a limited useful life and

14   are carried at a cost less accumulated impairment losses."

15          Then the last sentence of that paragraph.  "Value of

16   product rights is tested annually to identify whether

17   impairment exists."

18          So that's something you do as a company, you test

19   whether --

20   A.  Yes, we do.

21   Q.  -- it's impaired.

22          Page 75 of your annual report, you have a note in your

23   financials specifically related to the acquisition of the 3M

24   Pharma.  And you told your investors that the fair market value

25   of the 3M assets acquired was 5.679 billion Swedish krona,

1   which if you applied the rate of exchange is roughly the

2   purchase price.  I think it's a million or two off of

3   854 million?

4   A.  Yes.

5   Q.  And that was accurate and truthful at the time you made

6   that statement?

7   A.  Yes.

8   Q.  And you break it down between product rights and good will,

9   correct?

10  A.  That's true, correct.

11  Q.  And you look --

12  A.  And other assets, to be correct.

13  Q.  To be complete, yes.

14          And if look at the numbers, roughly 75 percent of the

15  acquisition value you attributed to product rights and

16  25 percent to good will?

17  A.  Roughly, yes.

18  Q.  You made the same allocation on a percentage basis in the

19  country specific agreement, roughly 75 percent to product

20  rights and 25 percent to good will?

21  A.  No.  No, I don't agree with that.  That's not what we did.

22  Because in the local agreement what we are really paying for is

23  the good will and the going concern value.

24  Q.  Nonetheless, you're claiming the damages in this case in

25  excess of $200 million, and you have not to date taken an

1    impairment of good will or product rights as it relates to your

2    claim of being paid for the CEPS convention?

3    A.   No, because the values in the balance sheets are based on

4    acquisition values, and we have not found any reason to impair

5    those values because of performance of the closing.

6              MS. BEVILACQUA:  Your Honor, where before I forget,

7    and I know it's going to be objected to, I move for the

8    admission of 330, 393 and 421.

9              THE COURT:  All right.  Let me hear from plaintiffs.

10             MR. CARLINSKY:  I'm going to say objection for the

11   reasons --

12             THE COURT:  To all of them?

13             MR. CARLINSKY:  I think so, your Honor.  Because I

14   think they all go together, and so I object to all three of

15   them on the same grounds that we've discussed today and

16   previously.

17             THE COURT:  Two of them were asked about of

18   Mr. Stenqvist during his declaration, right -- during his

19   deposition?

20             MR. CARLINSKY:  They were, but they were done -- I

21   think there were a few questions that were asked, but I think

22   these -- the two amendments go with the original agreement.

23   The purpose for which they're now being proffered is a whole

24   new issue that's been raised for the first time far too late.

25   So on that basis, I object to all three.  But particularly

1    object to 330 more strenuously than the other two.

2              THE COURT:  All right.  I am going to reserve on that

3    question.  I will note I had read one portion of the final

4    pretrial as to what Mr. Renard had represented.  That was

5    specifically in my response to experts he had earlier said

6    we're going to ask the damage experts about it.  We're going to

7    ask their executives who were involved in negotiating this

8    thing about it.

9              So I think you reacted to the portion that I read and

10   said whatever you're going to let in, it shouldn't be broader

11   than what was indicated at the final pretrial conference, and

12   you objected to that, and I just wanted to be clear that it had

13   been broader at the final pretrial, and I take the objection

14   point, obviously, seriously.

15             MR. CARLINSKY:  And I would just note, and I'll look

16   at this over the evening, there was toward the end of the

17   colloquy with Mr. Renard, it's a statement on page 66 at line

18   16, where he said after all of the colloquy, obviously, and the

19   objections were being discussed:  "Yes, your Honor.  In fact, I

20   would say evidence beyond the contract would probably be

21   inadmissible because I believe the contract is clear in that

22   regard.  It says that the purchase price is payable by Meda

23   France."  And then ...

24             THE COURT:  Right, that was with my question as to

25   interpretation of the contract.

1          MR. CARLINSKY:  Yes.

2          THE COURT:  I understand the objection.  I think they

3     are very serious questions raised with the waiver intention.

4     We've now seen the scope of the questions that are being asked

5     and the documents being objected to.  So I'm going to reserve,

6     and I may take submissions on that.  I do just want to make

7     sure it's clear where we left it, where I understood we left it

8     at the final pretrial as I've indicated.  OK.

9          MR. CARLINSKY:  Thank you.

10    BY MS. BEVILACQUA:

11    Q.  It's Meda's claim in this case that the CEPS agreement

12    negatively affected Meda's revenues and EBITDA, correct?

13         MR. ARMENIO:  Objection.

14    A.  Correct.

15         MR. ARMENIO:  Objection.

16         THE COURT:  Hang on.

17         MR. ARMENIO:  Objection.  Now we're getting to your

18    Honor's ruling on Allegheny.  The claim is a very clear claim

19    for acquisition price overpayment.  Your Honor has already

20    ruled for damages.  We're not talking about post acquisition

21    revenues and impairments and the like.  So that question is

22    objectionable because it goes against your Honor's ruling, very

23    clear rulings that we're not going to be looking at post

24    closing events at all with respect to damages.

25         MS. BEVILACQUA:  I don't think I've asked a question

1    yet other than --

2              THE COURT:  The question was:  "It's Meda's claim in

3    this case that the CEPS agreement negatively affected Meda's

4    revenues and EBITDA, correct?"

5              MR. ARMENIO:  And that's basically saying isn't it

6    Meda's claim that you're relying on post closing?  And it's not

7    right.  We're saying the acquisition price is wrong.  So

8    there's no basis to ask that of this witness.  And I think,

9    quite frankly, it's a question to try to draw in and begin a

10   discussion of post closing events which would be entirely

11   improper.

12             MS. BEVILACQUA:  Your Honor, I was quoting from the

13   witness' direct testimony in written form, paragraph 82, first

14   sentence:"  "The CEPS agreement which 3M failed to disclose to

15   Meda prior to the acquisition negatively affected Meda's

16   revenues and EBITDA."

17             MR. ARMENIO:  And your Honor's ruled that that kind of

18   post closing evidence isn't coming in on damages.  So we, of

19   course, understood your Honor wouldn't be looking at that

20   statement, wherever made from anyone, for damages purposes.

21             THE COURT:  All right.  You can ask the question.

22   It's clear in my mind what will be permissibly considered for

23   damages.  I don't know what the answer is, but I think

24   Ms. Bevilacqua has by pointing to the quote from the witness'

25   own testimony, which you put in, certainly allows the question

D1fQmed6                      Stenqvist - cross

1    to be asked.  Go ahead.

2    BY MS. BEVILACQUA:

3    Q.  You acknowledged earlier in your written testimony at

4    paragraph 68, and we saw this one before, the generalized risk

5    of a price decrease for Tambocor CR, and the risk posed by

6    patent expiration.

7            Now, Meda had 34 months between the time of closing

8    and the time of the expiration of the patent, is that correct?

9    According to the math, the closing was January 2, 2007 and the

10   patent expired at the end of October 2009?

11   A.  Sounds like more than two and a half years, less than

12   three.

13   Q.  And what Meda experienced from CEPS was no reduction in

14   price for 22 of those 34 months?

15   A.  Well, the first price reduction was in the first of

16   November of 2008.

17   Q.  Right, and that was at 13 percent, not 50 percent?

18   A.  That's correct.

19   Q.  And then you had a period of another eleven months until

20   one month before the patent expired where the price was

21   decreased by 20 percent?  I'm sorry, I need a verbal response.

22   A.  Yes.

23   Q.  Then when the patent expired, Meda is still having the

24   price of Tambocor's CR at that same level it was before the

25   patent expiration?

1    A.  Yes.  But we never made any adjustments to any plans to

2    account for patent expiring.

3    Q.  And you've never written off or otherwise impaired the

4    Tambocor CR asset in France?

5    A.  Could you please repeat?

6    Q.  Yes.  You've never otherwise written down, taken a loss, or

7    shown an impairment for the Tambocor CR France assets?

8              MR. ARMENIO:  Just the same objection, your Honor,

9    just to state it for the record.

10             THE COURT:  I'll consider that objection standing, and

11   my ruling as to what I will and will not consider post

12   acquisition evidence to be permissibly considered.  So consider

13   it preserved.

14             MR. ARMENIO:  Thank you, your Honor.

15   A.  So, your question is whether we took in any impairment on

16   Tambocor post closing?

17   Q.  Right.

18   A.  No, we have not done that.

19   Q.  And you didn't change your forecasts or inform your

20   investors of this harm that you have allegedly suffered since

21   the beginning of the signing of the acquisition agreement?

22   A.  I think those are two different things.  Forecasts and

23   information to investors.  I think we discussed forecasts, and

24   as soon as we had signed this agreement with 13 percent plus

25   20 percent reductions, that was immediately put into our plans.

1    What was your question about investors?

2    Q.  I've forgotten it.  So it's OK.

3    A.  OK.

4         THE COURT:  It's knowable, if you want to know it.

5         MS. BEVILACQUA:  I may know it, it's OK.

6    Q.  And you're claiming in excess of $200 million, which is a

7    quarter of the purchase price?

8    A.  Correct.

9    Q.  You're claiming a quarter of the purchase price adjustment

10   for, in essence, for the product rights Tambocor to which you

11   have never taken an impairment or going off patent in 34 months

12   and represented less than 13 percent of the revenue of the

13   entire business?

14        MR. ARMENIO:  Objection.  Lack of clarity as to which

15   business they're talking about.  It's mixing completely the

16   graphic that was shown --

17        THE COURT:  Sustained.

18   A.  It represents --

19        THE COURT:  I'm sorry.  If I sustain, you don't have

20   to answer.

21        THE WITNESS:  OK.

22        MS. BEVILACQUA:  Nothing further, your Honor, subject

23   to redirect.

24        THE COURT:  Ms. Brown.

25

D1fQmed6                          Stenqvist - cross

1   REDIRECT EXAMINATION

2   BY MS. BROWN:

3   Q.  Mr. Stenqvist, do you still have a copy in front of you of

4   DX-290 PowerPoint presentation titled Acquisition of 3M

5   Pharmaceuticals Europe?

6   A.  Yes.

7   Q.  I believe you were asked a few questions about this

8   document in your cross.  Do you remember that?

9   A.  Yes, I remember.

10  Q.  And do you remember discussing with Ms. Bevilacqua how this

11  PowerPoint contained information that you were giving your

12  lenders?

13  A.  Yes.

14  Q.  Could you please turn to the page that ends in the Bates

15  number 1391?

16  A.  Yes.

17  Q.  Do you see how this slide says "The Meda Way - One Step

18  Ahead," and then there are bullet points underneath that.  The

19  first bullet point, growth by acquiring cash cows; and the next

20  bullet point, building strong profitability gives long-term

21  possibilities.  What is it that you were communicating to your

22  lenders in this portion of your PowerPoint?

23  A.  That the 3M acquisition was completely in line with the

24  Meda way or growth by cash cows, and that the cash generated

25  from each new acquisition and from the business as a whole

1      would give to other possibilities going into the future.  That

2      3M was completely -- the 3M acquisition and 3M business was

3      completely in line with that, we thought.

4      Q.  Why did you think the 3M acquisition was consistent with

5      acquiring a cash cow?

6      A.  Because it consisted of very stable products, very strong

7      products with estimated strong long-term cash flows.

8      Q.  What were you communicating to your lenders in the second

9      bullet point?

10     A.  That we would maintain a very strong profitability from

11     this business, and, of course, that's what you want to tell

12     lenders so that you can borrow money from them.  They're very

13     interested in strong cash flows.

14     Q.  When you prepared this document for your lenders on

15     November 2006 -- that's the date on the front page of the

16     document -- did any of the points in this PowerPoint reflect

17     any of the terms contained in the CEPS convention or Article

18     2.2 that's the subject of this litigation?

19     A.  No, we didn't know about any CEPS conventions of that kind

20     on November 22.

21     Q.  Now, do you remember you were asked some questions about

22     Meda's annual report.  I don't know if I have a copy of it, but

23     the 2007 annual report.  Do the financials of all of Meda's

24     subsidiaries, including the French subsidiaries, do they roll

25     up into the parent company Meda AB?

1    A.  Ultimately, yes.

2    Q.  Now, does the future EBITDA that you expect to earn from

3    any product when you're doing a valuation have anything to do

4    at all with how you calculate impairment of an asset for

5    financial statement reporting purposes?

6    A.  Please repeat the question.

7    Q.  Does the future EBITDA that you expect to earn from a

8    product that you look at when you're doing a valuation, did

9    that have anything to do with how you calculate impairment of

10   an asset for your financial statement reporting purposes?

11   A.  Yes, it has something to do with that.  It's cash flows,

12   but that includes the EBITDA.

13   Q.  Can you explain that, please?

14   A.  That the impairment of assets is an estimate of all future

15   cash flows, and, of course, the future cash flow of an asset

16   includes the EBITDA, the future EBITDA.

17   Q.  Now, when we go back and look at the -- I believe there was

18   some testimony about the pledges.  I want to walk through that

19   time line a little bit.  On December 31, 2007 you testified in

20   your cross that you expected there was a risk of a 10 percent

21   price decrease.  Do you remember that?

22   A.  Yes.

23   Q.  I just want to kind of walk through what you said before to

24   give us a frame of reference?

25   A.  Yep.

1   Q.  And then do you remember looking at documents in

2   August 2008 referencing a 15 percent price decrease

3   incorporated into the pledges for Tambocor CR?

4   A.  Is your question whether I saw the document or if I

5   remember the 15 percent reduction incorporated into the budget?

6   Q.  That's a good clarification.  Let's just stick with what

7   you know yourself; not what was in the document.

8   A.  Yes, we included a 15 percent price reduction in the 2008

9   budget.

10  Q.  By September 2008 there was a new agreement with CEPS that

11  had these other price reductions we've talked about, the

12  13 percent in 2008 and then the 20 percent in October of 2009,

13  correct?

14  A.  Correct.

15  Q.  So let's go back so we have a time line a little bit.  In

16  December of 2007 when you learned of the risk of a 10 percent

17  price decrease, how was that reflected in Meda's budget for

18  2008?

19  A.  Sorry, but when we learned about the 10 percent, that was

20  in 2006 --

21  Q.  You're absolutely right.  I misstated that question.  In

22  December of -- on New Year's Eve --

23  A.  Yeah.

24  Q.  -- when you learned of the CEPS convention at the

25  50 percent price decrease set out in that convention, at that

1    point in time, what type of price reduction did you have in

2    your budget?

3    A.   We had a 15 percent price reduction because, as I said,

4    there had been some guidance from the CEPS to our local country

5    manager during the fall of 2007.

6    Q.   Now, your first quarter estimate is done at the end of

7    April 2008?

8    A.   Yes, correct.

9    Q.   And why was there no change to Meda's full year estimate at

10   the end of April 2008?

11   A.   Because there were indications from the CEPS that the

12   application of the price reductions were going to be faced, and

13   that only a part of it would come in 2008, and then the rest in

14   2009.  And it was according to the estimates of our local

15   company we could hopefully remain within budget for 2008, but

16   there was -- at that point in time there was sufficient

17   information to actually change that original estimate.

18   Q.   So, if you would please turn to Exhibit 11 in the binder

19   with your declaration.  That is a document that you were shown

20   during your cross.  It is PX-364.  If you look at the email

21   starting on page 2, this is an email I believe you looked at

22   with Ms. Bevilacqua, and it's dated April 2, 2008.  Before she

23   directed you to the paragraph that said "Flecaine 2008," the

24   first paragraph.  But if you look at the second paragraph

25   underneath that, you see where it says, "Altogether for

D1fQmed6                    Stenqvist - redirect

Flecaine 2008 price decrease, we should be more or less in line
with what was assumed in 2008 plan, and we are now in a better
position to forecast accordingly."

        Now, this was in April 2008.  When exactly were you
working on your first quarter estimate in 2008?
A.  A few weeks later than this email.  So when we have the
first quarter result, we also decide explain -- we also make a
new estimate for the full year.  And this all indicates that
there was a possibility that we could end up in line with what
we have in the original budgets.
Q.  Now, we have just one more quarter before a new convention
is actually signed, and that's the second quarter of 2008.
When were you doing your new full year estimate for the second
quarter of 2008?
A.  Late July.
Q.  So if you would please turn to Tab 13 in your binder.
There is a PowerPoint here from July 7, 2008.  Was this a
PowerPoint meeting that you attended?
A.  Yes.
Q.  If you would look at page 6 of that PowerPoint, do you
recall being informed on July 7, 2008, that there had been a
meeting on July 3 with your local French country manager,
Mr. Renaudin and CEPS?
A.  Yes.
Q.  And do you see in the middle of that page where it says,

1    "Two-steps phasing has been requested on our side and already

2    accepted."  And then it says the dates obtained October 1st.

3    And this was approximately how many weeks, would you say,

4    before you were doing the second quarter full year estimate for

5    2008?

6    A.  Again, a few weeks before we make our estimates.

7    Q.  When you did make your estimate for the second quarter of

8    2008, what at that point in time did you decide to include in

9    the 2008 plan as far as Tambocor CR?

10   A.  Well, there was no need to make any major price adjustments

11   because that was already included in the budget.

12             MS. BROWN:  I have no further questions, your Honor.

13             THE COURT:  All set, Ms. Bevilacqua?

14             MS. BEVILACQUA:  Nothing further.

15             THE COURT:  Thank you Mr. Stenqvist.  You can step

16   down.

17             (Witness excused)

18             MR. ARMENIO:  Plaintiff, your Honor calls as its next

19   witness, non-party witness Mr. Jason Haas, formerly with

20   Goldman Sachs.

21             THE COURT:  Let's take a five minute break, and you

22   can have him come on in and come on up.

23             MR. ARMENIO:  Thank you, your Honor.

24             THE COURT:  We will finish out the day.  I'm going to

25   assume we're going to go -- we're a little bit behind, so we

1   will go a little bit late, somewhere in the 5:15 to 5:30 range.

2   We'll see where things end up.  OK?

3            MR. ARMENIO:  Yes, your Honor.

4            MR. CARLINSKY:  Thank you, your Honor.

5            (Recess)

6                              (In open court)

7            THE COURT:  Mr. Haas, please rise.

8    JASON HAAS,

9        called as a witness by the Plaintiff,

10       having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. ARMENIO:

13           THE DEPUTY CLERK:  Please state and spell your full

14   name.

15           THE WITNESS:  Jason Haas, J-A-S-O-N; H-A-A-S.

16           THE COURT:  Thank you, Mr. Haas.

17           Go ahead.

18           MR. CARLINSKY:  Thank you, your Honor.

19   Q.  Mr. Haas, you're appearing today pursuant to subpoena, is

20   that correct?

21   A.  Yes.

22   Q.  And in preparing for your deposition testimony today, other

23   than meeting with your own personal counsel, have you had

24   occasion to meet with any of the lawyers representing 3M?

25   A.  Yes, about I guess a couple weeks ago I met with this

1  gentleman over here.

2  Q.  Mr. Widell?

3  A.  Yes.

4  Q.  Did you meet with him once or more than once?

5  A.  Once.

6  Q.  Have you spoken to any of the 3M lawyers in addition to the

7  meeting in connection with your testimony today?

8  A.  No.

9  Q.  Would it be correct you haven't met with anybody from the

10  Meda team to discuss your testimony today?

11  A.  Well, I met with you for a deposition awhile back.

12  Q.  But other than your deposition, we haven't had any

13  conversations in preparing for testimony today?

14  A.  No.

15  Q.  Now, talking about your deposition, have you had a chance

16  before coming to court today to re-read your deposition?

17  A.  No.

18  Q.  When you testified at your deposition, did you do so

19  truthfully?

20  A.  Yes.

21  Q.  Do you have any reason to believe today that anything you

22  said in your deposition was false or inaccurate or would be

23  subject to change?

24  A.  No.

25  Q.  Now, I understand that since we last met, you had a change

1   of employment, is that correct?

2   A.   Correct.

3   Q.   Where do you work now?

4   A.   At Deutsche Bank.

5   Q.   At the time of your deposition, where did you work?

6   A.   Goldman Sachs.

7   Q.   When did you begin at Deutsche Bank?

8   A.   My first official day was October 30th.

9   Q.   How many years were you at Goldman Sachs?

10  A.   17.

11  Q.   What was your position -- let's start at Goldman Sachs.

12  what was your position?

13  A.   I was managing director in the health care investment

14  banking group.

15  Q.   You are an investment banker, sir?

16  A.   Correct.

17  Q.   That's the same position you have at Deutsche Bank?

18  A.   Correct.

19  Q.   And you said in the health care group.  Does that mean as

20  an investment banker that you're involved in advising clients

21  in connection with health care business mergers and

22  acquisitions?

23  A.   Yes.

24  Q.   And you do have some familiarity with this dispute between

25  Meda and 3M?

1    A.  Yes, based on the interactions we talked about just a

2    minute ago.

3    Q.  Do you recall when the transaction that's at the heart of

4    this dispute ultimately took place either signed or closed?

5    A.  I believe it was November 2006.

6    Q.  Do you remember when it closed?

7    A.  My recollection it was around the end of that year.  I

8    don't recall if it was before or after the end of the year;

9    sometime in that time frame.

10   Q.  And Goldman Sachs was advising the seller, is that

11   accurate?

12   A.  Correct, we advised 3M.

13   Q.  Which company or companies of 3M were you working on behalf

14   of?

15   A.  I don't understand the question.

16   Q.  What company did you understand was selling its business?

17   A.  3M.

18   Q.  Can you differentiate between any 3M subsidiaries or did

19   you just refer to it as 3M?

20   A.  I just referred to it as 3M.

21   Q.  Who did you understand was buying the business?

22   A.  The business we're talking about was Meda; that was the

23   purchaser.

24   Q.  Where did you understand Meda was from?

25   A.  A Swedish company.

1  Q.  Now, is it correct that Goldman Sachs was the financial

2  adviser to 3M?

3  A.  Yes.

4  Q.  And as the financial adviser to 3M, does 3M ultimately pay

5  your fee if there's a successful acquisition?

6  A.  Yes.

7  Q.  And is that what happened in this case?

8  A.  Yes, I believe they paid our fee.  I don't recall exactly,

9  but I believe they did.

10  Q.  Do you recall when it was that you first learned 3M was

11  interested in divesting or selling its pharmaceutical business?

12  A.  I don't recall exactly, but my recollection it was

13  approximately a year or so, maybe a little bit longer before

14  the November transaction actually occurred.

15  Q.  So, would it be fair to say sometime in late 2005?

16  A.  That's about my recollection.  Maybe the summertime.  Maybe

17  later.  I don't recall exactly.

18  Q.  And is it correct that by January 2006, you and Goldman

19  Sachs were already working on advising 3M in connection with

20  its sales and business?

21  A.  I believe that's right.  I don't remember the exact time

22  frames, but it was along those lines.

23  Q.  You mentioned that you're in the -- you're a banker in

24  health care.  Do you have experience dealing with

25  pharmaceutical companies?

1    A.  Yes, my principal responsibility has been working with

2    pharmaceutical companies.

3    Q.  Over the course of your career, how many transactions

4    either representing buyer or seller would you estimate you've

5    been involved in involving pharmaceutical or health care

6    companies?

7    A.  I don't know exactly.  I'll say something in the order of

8    magnitude of 50 or so.

9    Q.  And is your understanding that's why in connection with the

10   3M sale of the business you were asked to be a part of the

11   banking team?

12   A.  Yes.

13            MR. WIDELL:  Your Honor, Mr. Haas may have been

14   compelled to be here by subpoena, but these questions are

15   awfully close to leading or are leading questions, apart from

16   opening questions.

17            MR. CARLINSKY:  I'm trying to do it as efficiently as

18   I can, your Honor.

19            THE COURT:  You'll have to follow the rules.  A little

20   bit of leeway, but let's do non-leading questions.

21            Sustained.

22   BY MR. ARMENIO:

23   Q.  In connection with the Meda 3M transaction -- strike that.

24   Let me ask it a different way.  Ultimately, did 3M, was 3M

25   successful in selling its business?

D1fQmed6                          Haas - direct

1   A.   The businesses were sold, so we successfully completed the

2   transactions.

3   Q.   How was the business sold?  Was it sold as a single

4   business?  Was it sold as parts?  What's your recollection?

5   A.   There were three pieces.

6   Q.   What were they?

7   A.   The Americas, Europe and Asia, broadly speaking.

8   Q.   To your recollection, was the sale of the business in three

9   separate parts more successful to 3M than whatever potential

10   sale there had been of the business as a whole?

11   A.   Yes.  We didn't have an effective buyer for the whole

12   business, so the way to sell the business was in three

13   components.

14   Q.   Were there efforts made to sell the business as a whole?

15   A.   There were.

16   Q.   Is it your testimony, Mr. Haas, from recollection that

17   despite the effort to sell the business as a whole, there was

18   no viable buyer for the business as a whole?

19   A.   That's my recollection.

20   Q.   OK.  Now, I'd like to bring up, if you can, PX-303.

21          MR. ARMENIO:  I'd like to move this into evidence.  I

22   understand from the pretrial order, there is no objection to

23   this document.

24          THE COURT:  Counsel, let me just, defendants.

25          MR. WIDELL:  No objection, your Honor.

1           THE COURT:  Plaintiff's 303 is admitted.

2           (Plaintiff's Exhibit 303 received in evidence)

3   Q.  Mr. Haas, this is a document I think we looked at this in

4   your deposition as well.  This is a script from a presentation

5   that was made to 3M's board of directors in November 2006 in

6   connection with asking the board to approve the sale of the

7   business.  Do you have that general recollection?

8           THE COURT:  Do you have the whole document?

9   Q.  Yes.  In fact, Mr. Haas, if you'd like, it's in front of

10  you.  It should be the very first tab -- I'm sorry.

11  A.  303, you said?

12  Q.  Yes.

13  A.  I got it here.  Sorry.  What's the question?

14  Q.  Do you recognize this as the script that Mr. Sauer used at

15  the board meeting that you attended in November of 2006?

16  A.  I don't recognize it directly as the script.  I can read

17  through it, but I don't know that I have seen this or had it.

18  Q.  I'm sorry?

19  A.  I don't know that I have seen it or had it, but I recognize

20  it as a script to the board.

21  Q.  You did attend the board meeting in November, correct, when

22  the board was being asked to approve the sale of the

23  transactions?

24  A.  I presume I did, but I don't recall specifically.

25          MR. CARLINSKY:  Your Honor, I'd like to give the Court

1    a copy.

2              THE COURT:  For some reason, I have a binder that ends

3    at 300, the next one begins at 304.  Fancy that, all the paper

4    I have up here and the one I need.

5    A.  It says here I'm on the telephone, actually, in the third

6    paragraph.  So I wasn't actually at the meeting.

7    Q.  I'd like you to turn, if you would, please, to the first

8    page -- well, obviously there's a reference there to you

9    joining by telephone.

10             Then I direct your attention to the second page.  You

11   see there's a reference there to a quote "This sum of the parts

12   approach has enabled us to get a good price at 2.2 billion."

13             Do you see that there?

14   A.  Yes, I do.

15   Q.  And if you turn to the third page, actually with the number

16   3, so it ends with the Bates number 388.  It says, "The total

17   of 2.2 billion is well above the only global bid of

18   1.5 billion, which in addition to being low, was not very

19   certain."

20             Do you see that?

21   A.  I do.

22   Q.  Is that consistent with your recollection that the result

23   of selling the business in three parts resulted in a total

24   purchase price to 3M of roughly $700 million more than whatever

25   the global bid represented?

1    A.  That's what this represents.  That's, you know, not

2    inconsistent with my recollection.

3    Q.  You understand what we're looking at, this particular

4    document, PX-303, Mr. Sauer was the person making the

5    presentation, correct?

6    A.  It appears that way.

7    Q.  And that's consistent with your recollection?

8    A.  Yes.

9    Q.  Mr. Sauer -- you do know who Mr. Sauer is, correct?

10   A.  Yes.

11   Q.  In connection with the work you were doing, had you met

12   him?

13   A.  Yes.

14   Q.  What was his position at the time?

15   A.  I believe he was the head of the health care business for

16   3M.

17   Q.  Was it your understanding that he was the senior most

18   person overseeing the entire health care business?

19   A.  That was my recollection.  That's my recollection.

20   Q.  Just so we're clear, the health care business, one

21   component of it, is that pharmaceutical?

22   A.  Correct.

23   Q.  And if you look to, please, page 6.  Here Mr. Sauer states,

24   you'll see "How our final valuation compares to our previous

25   estimate and walk-away position."

D1fQmed6                       Haas - direct

1          Do you that?

2    A.  I do.

3    Q.  And then below he says, "Over all, we greatly exceeded our

4    fears about what we might have to accept for this challenged

5    business, and solidly exceeded our estimate and expectations."

6          Do you see that?

7    A.  I do, yes.

8    Q.  Do you have a recollection of those remarks or

9    understanding of what Mr. Sauer meant by those remarks?

10   A.  I don't recall him saying that per se.

11   Q.  OK.  Looking up, you see there's a table that says Pharma

12   Sale Valuation?

13   A.  Yes.

14   Q.  And there's a line there, it says Sale Total Consideration,

15   and then there's a line under it that says GS Est, the sale

16   price average range.  Do you see that?

17   A.  I do.

18   Q.  Is your understanding the GS there is Goldman Sachs?

19   A.  Yes, that would be consistent.

20   Q.  And is it consistent that the estimated sale price that

21   Goldman Sachs estimated for the entirety of the pharmaceutical

22   business that 3M was selling was 1.875 billion?

23   A.  Based on what it says here, that says it's an average of

24   range.  I don't know what the range was, but that's what it

25   says on the page.  I don't recall the exact numbers.

1    Q.  Below that, there is a line that says Worst Case Keep

2    Value.  Do you see that?

3    A.  I do.

4    Q.  Do you remember whether 3M or Goldman ran some type of

5    analysis of what price had to be exceeded otherwise they would

6    keep the business?

7    A.  I don't recall what the keep value is based upon.

8    Q.  But irrespective of what the keep value is based upon, do

9    you recall the fact that such a value was in fact determined by

10   3M?

11   A.  I recall they had, you know, a -- you know, an internal

12   value, if you will, for the business.

13   Q.  Is it your understanding that the number we're looking at,

14   the 1288 was their internal value for the business?

15   A.  It would appear that way, but I don't recall the numbers.

16   Q.  Is it your best belief looking at this or is it at least

17   consistent with your best belief as to what the then internal

18   value of 3M had for the business?

19   A.  It would appear that way based on this page, but, again, I

20   don't have a direct recollection of it.

21   Q.  If we look at page 7 -- by the way, just going back to

22   Mr. Sauer's comment about the challenged business, do you

23   recall any discussion with Mr. Sauer or anyone from 3M in which

24   they describe their Pharma business as a challenged business?

25   A.  I don't recall that terminology, no.  I do know that the

business was not important to them, and that's how we thought

about it, but I don't recall the words challenged.

Q.  Do you recall anyone at 3M ever advising you or expressing

to you their concern that the business was in a declining

growth mode rather than a growing or expanding growth mode?

A.  We talked about the fact that the business was kind of a

flat, low-growth business, and it was business that was

non-core, so they were not interested in continuing to make

investments to make it grow again.  Those are the nature of the

discussions we had.

Q.  So, the way in which the business was described to you was

a flat business as opposed to one that was --

A.  A low-growth business.

Q.  Low growth.  There is a difference, by the way, between

flat and low growth, do you agree?

A.  There can be.  I'm using a very general term.  It was a

non-growing business maybe is a better way to say it.

Q.  Non-growing?  Is that what your answer was?

A.  Why don't you ask the question again.  I'll try to be more

specific with my answer.

Q.  I'm just trying to understand what you were told by 3M how

they described the business.  Was it described to you as a flat

business?  Was it described to you as a low-growth business?

I'm just using your phraseology.

A.  Yeah, fair enough.  I don't recall the specific, you know,

1    characterization of the business.

2    Q.  Irrespective of their characterization, did you, from the

3    materials and the information that was supplied to you, have a

4    view as to whether the business was a flat business, a

5    low-growth business, a declining growth business or something

6    else?

7    A.  The characteristics of the different pieces were actually

8    different from one another, which is I guess why I'm struggling

9    a little bit to characterize the overall business.  Certain

10   businesses were growing faster than other business segments.

11   Q.  Then we'll get to them in specific pieces, but while we're

12   on this document, so we can finish up, if you would look at

13   page 7, please.

14   A.  Sure.

15   Q.  You'll see Mr. Sauer remarks, he says, "As Goldman will be

16   walking us through a more detailed analysis of value, I will

17   just hit the high points."  And he writes, "On a global basis,

18   the transaction is valued at 10 X reported EBITDA and 7 X

19   adjusted numbers."

20           Do you see that?

21   A.  I do.

22   Q.  And you do you understand that one way of valuing a pharma

23   business, that you looked at in fact as Goldman Sachs, was to

24   look at a multiple of EBITDA, is that right?

25   A.  Correct.

1    Q.  By the way, in some or all of the prior deals that you said

2    you worked on 50 deals, is that a common valuation methodology

3    that you've used as a banker is to look at a multiple of EBITDA

4    in trying to arrive at the value of a company?

5    A.  It's one of the metrics we would use for sure.

6    Q.  In fact, one of the metrics you did use here at the outset

7    of the transaction?

8    A.  It would appear that way.

9    Q.  Now, did Goldman Sachs prepare something called a fairness

10   opinion?

11   A.  We did.

12   Q.  Just very briefly, because I realize it's late in the day,

13   and I'm sure the Court knows or has appreciation for what it

14   is, can you very briefly describe what a fairness opinion is?

15   A.  It's an analysis of the valuation of a company, and whether

16   we think that the company, whether it's a buyer or a seller, is

17   getting or paying a fair price for a business, you know, based

18   on a number of different metrics.

19   Q.  We're going to get to the fairness opinion in a moment.

20   Let me ask you this:  Do you recall as a result of the

21   $2.2 billion, give or take, that 3M ultimately received, how

22   much of a profit -- or let me state it differently, pretax gain

23   3M reported on the sale of the business?

24   A.  I have no recollection.

25   Q.  Can I see if turning to page 13 of exhibit 303 helps

1    refresh your recollection.  This is the page ending Bates

2    number 398.

3    A.  OK, I'm looking at it.

4    Q.  Does that document refresh your recollection, sir?

5    A.  Not really.  I can see what it says on the page, but I

6    don't have any independent recollection of the profit in the

7    business or the gain.

8    Q.  Do you see that at least in Mr. Sauer's comments to the

9    board, he indicates that "3M will report a pretax gain of

10   approximately $1.9 billion."

11            Do you see that there?

12   A.  I do.

13   Q.  Is that at least consistent with what you understood at the

14   time was the reported pretax gain?

15   A.  I don't have any recollection at the time.

16   Q.  None at all.  So you don't know whether that's consistent

17   or inconsistent?

18   A.  I see what it says on the page, but I don't have any

19   independent recollection of it.

20   Q.  I appreciate that.  If you would kindly turn to Exhibit 99.

21   This is JX-99.  You should have it in front of you.

22   A.  I have it.

23            MR. ARMENIO:  It might be easiest if I give the Court

24   a copy.

25            THE COURT:  Probably would.

1        MR. CARLINSKY:  I don't want to add more paper to the

2   piles.  I'm happy to take them back.  Thank you.  Just a piece

3   of housekeeping.  I'd move Exhibit 99.

4        THE COURT:  It's in.

5        MR. ARMENIO:  This one's in.

6   Q.  Mr. Haas, what is Exhibit 99?

7   A.  This looks like the fairness presentation for the 3M deal.

8   Q.  Is it your understanding that these were the materials that

9   were actually provided to the 3M board?

10  A.  I presume that they were provided to the board.

11  Q.  Is that your best belief?

12  A.  I guess so.  I mean, I don't, you know, recall if it was

13  this version or another version or if we provided a fairness

14  opinion, I don't recall if we did or not, but I presume we did

15  based on what this looks like.

16  Q.  If you would, please, turn to page 27.  It ends in Bates

17  367.  You'll see at 27, this indicates "3M Pharma business

18  Europe business overview."  Just as a predicate, is it correct

19  that Goldman Sachs provided fairness opinions with respect to

20  each of the three segments of the business that was sold?

21  A.  I actually don't recall whether we provided a fairness

22  opinion or not in general terms, so I don't recall if we did on

23  an individual business-by-business basis.  I don't doubt that

24  we did even though we prepared fairness materials, but I don't

25  recall whether we actually presented them or not to the board.

1    Q.  Fair enough.  Is it the case that in the course of the sale

2    transactions there were preliminary bids by potential

3    purchasers, and then at some later point in time there were

4    binding or final bids?

5    A.  Yes.

6    Q.  Can you just very briefly describe to us the process, how

7    the process went from preliminary bids to final bids?

8    A.   In general terms, we got preliminary bids from various

9    parties, I believe, for the whole business, and then for the

10   different components of the businesses.  Parties were then

11   afforded the ability to conduct due diligence for a period of

12   time.  I don't recall for how long.  And then they were asked

13   to ultimately provide final bids based on, you know, the

14   diligence that they completed.

15   Q.  If you would turn to page 28, the next page of the

16   document.

17   A.  Yes.

18   Q.  It indicates "summary of bids Europe."  It has four names,

19   and it has columns.  I just want to make sure we're clear that

20   this is accurate and consistent with your recollection.  Meda

21   made a preliminary bid of $800 million for the European

22   business?

23   A.  Yes, it appears that way.

24   Q.  Is that consistent with your recollection?

25   A.  Roughly, I don't remember the specifics, but that seems

1    reasonable.

2    Q.   And the next party down is a company called Almirall that

3    made a preliminary bid of 850 million?

4    A.   Right.

5    Q.   Then there are two other companies that made preliminary

6    bids; one at 542 million and one at 350 million?

7    A.   That's what it appears, sure.

8    Q.   Then as I understand it, preliminary bids, they're not

9    binding, is that correct?

10   A.   Correct.

11   Q.   But at the point in time when final bids are submitted, are

12   those intended or at least understood to be binding?

13   A.   They're understood to be generally binding subject to

14   completion.

15   Q.   The preliminary bids, at that point that purchasers make a

16   preliminary bid, do they have the offering memorandum?

17   A.   I don't recall.  I presume they did, but I don't recall

18   specifics.

19   Q.   And just looking at the next column here, final bids.  We

20   see that Meda made a final bid of $825 million?

21   A.   Yes, I see.

22   Q.   And then it actually indicates a final purchase price of

23   $856 million?

24   A.   I see that, yes.

25   Q.   And then with respect to Almirall, its final bid came in at

1    $700 million?

2    A.  Correct.  I see that.

3    Q.  And the other two companies seem to have dropped off the

4    page?

5    A.  That's what it appears, yes.

6    Q.  Is that consistent with your recollection?

7    A.  That's generally consistent with my recollection.

8    Q.  So to the extent that Meda paid $856 million, am I correct

9    that it paid 156 million more than the next and only bidder for

10   the business?

11          MR. WIDELL:  Objection, your Honor.  This is assuming

12   facts not in evidence.  There's been no foundation.  There's

13   been no foundation that Meda actually paid $856 million at

14   closing, much less cash that's reflected.  This is

15   significantly before the closing of the transaction.

16          MR. CARLINSKY:  I will restate question.

17   Q.  Mr. Haas, Meda paid, I don't think it's in dispute, 850

18   something million dollars.  So I'll leave the last digit as a

19   something.  Would I be correct to the extent Meda paid 850

20   something million dollars for the business, it paid at least a

21   hundred 50 million more than the next and only other bidder for

22   the business?

23   A.  Yeah, when you compare the 850 something to 700, that's a

24   hundred 50-ish million dollars more.

25   Q.  At the point when Meda made its final bid and then

1    ultimately the final purchase price, did you believe that

2    Goldman Sachs had conducted a proper auction for the business?

3    A.  I believe we did.

4    Q.  What's that based upon?

5    A.  We -- I believe there was a public announcement that 3M was

6    planning to divest the business.  So we, Goldman Sachs, reached

7    out to parties that we thought would be interested in buying

8    the business, and we also were receptive to phone calls of

9    parties that inquired about the business, so we ran the process

10   based on that input.

11   Q.  In your experience as a banker, do you believe that the

12   fair value of the business was bought following an auction an

13   arm's length buyer was willing to pay for the business?

14   A.  Can you repeat that question?

15   Q.  Did you as a banker understand that the fair value, the

16   value of this particular business, or any business for that

17   matter, sir, is what following an auction an arm's length

18   purchaser is willing to pay for the business?

19   A.  I think so, yeah.

20   Q.  Did you feel that in this particular case that process

21   resulting in the bid from Meda was an accurate reflection of

22   the valuation of the business based upon whatever the

23   assumptions were that went into that bid?

24   A.  It was the price for this business, and the other

25   businesses were reflective of what parties are willing to pay

1   for the business, if that's your question.

2   Q.  Now, I want to go back -- we were looking at documents in

3   October.  I want to go back to the point in time earlier on in

4   the process when you were first advising 3M about potential

5   sale of the business before there were any bidders.  At that

6   point in time, did Goldman Sachs conduct any analyses to try to

7   arrive at a range of valuations for either the entirety of the

8   business or the three segments of the business?

9   A.  I'm sure we did preliminary valuation work which we shared

10  with 3M to give them a sense as to what the business could be

11  worth.

12  Q.  At that point in time, again, before bidders started or

13  before materials went out and the process was sold as part of

14  an auction, did you use an EBITDA multiple valuation as a

15  metric for arriving at a preliminary recommended value or price

16  for the business?

17  A.  I don't remember what we put in front of 3M and the

18  analysis we did specifically, but, you know, in general course,

19  that would have been a component of an overall valuation

20  analysis.

21  Q.  When you, Goldman Sachs, were preparing whatever analyses

22  you were for purposes of advising on valuation, did you rely on

23  information provided from 3M?

24  A.  We would have, yes.

25  Q.  What kind of information?

1   A.  Generally speaking, their internal financial projections

2   for the business, and some qualitative assessment of the

3   overall business to put the numbers in context.

4   Q.  Did your valuations run off of the projections that were

5   received from 3M?

6   A.  I presume they did, but I don't again recall the specific

7   numbers.

8   Q.  Well, without regard to the specific numbers, is it your

9   practice -- your, meaning you, Mr. Haas, and Goldman Sachs --

10  that in determining the valuations, what you do is you turn to

11  the company on whose behalf you're advising, and you ask for

12  the company's financial projections, and you use those to build

13  your model?

14  A.  That's correct, yes.

15  Q.  Do you have any reason to believe you did it any

16  differently here?

17  A.  I don't.

18  Q.  Is it also the case that you're relying upon the company

19  that's providing you with the projections to provide you with

20  what it believes are the most accurate projections?

21  A.  Yeah, that's our assumption and what we strive for.

22  Q.  Now, we looked at the comment earlier by Mr. Sauer about

23  selling or referencing the challenged business.  Do you

24  remember that remark generally we looked at?

25  A.  I remember generally you mentioned that one.

1   Q.  Did you understand that 3M had concern about its ability to

2   either sell the business or achieve a particular price for the

3   business?

4   A.  The concern that I recall 3M expressing was that if we were

5   not able to sell the business as a whole, which would have been

6   a simpler transaction, and we went to sell the business in

7   pieces, these three pieces I mentioned, the concern was if they

8   couldn't sell one of the pieces, would they be left with one

9   particular piece or two particular pieces and have a business

10  that was not, you know, the full business.

11  Q.  Did you also have a concern -- did you also have an

12  understanding that 3M was concerned whether it would even be

13  able to find buyers for the business as a whole or the various

14  parts?

15  A.  I think there was a question as to whether we would have a

16  successful transaction, but I don't think there was any more or

17  less concern, you know, at various junctures of the process.

18  Q.  Can we bring up PX-129, please.

19          MR. WIDELL:  I'm sorry for interrupting.  I just want

20  to put the Court on notice that it's my understanding that

21  Mr. Haas basically spent most of his day here today waiting to

22  go on and is not going to be available tomorrow.  And I'm sort

23  of stating a problem without a solution.

24          THE COURT:  I always appreciate that.

25          MR. WIDELL:  Maybe we can split the remaining time or

D1fQmed6                          Haas - direct

1    something like that or --

2              THE COURT:  How much longer Mr. Carlinsky?

3              MR. CARLINSKY:  I would have, I would say, at least an

4    hour.  Your Honor, Mr. Haas is under subpoena.  I was

5    originally the main proponent multiple times of not having

6    Mr. Haas come at all.  I suggested it be done by deposition

7    designations.  We had strenuous objections from my friends at

8    the other table.  Now, Mr. Haas -- and I do feel for him and

9    I've tried to be as accommodating as possible -- but I do have

10   an examination, and I would like to conclude it.  I won't do it

11   today, but certainly we will do it within the first two hours

12   tomorrow morning.

13             THE COURT:  Well, here is what we're going to do.

14   We're going to keep going now because no matter what, we're not

15   going to get done tonight, and then I am going to ask the two

16   of you to work with Mr. Haas to figure out a time to finish

17   over the course of, if we need to take things out of order or

18   the like, but see if you can't figure it out.  But while we've

19   got Mr. Haas here, we'll keep going.

20             MR. WIDELL:  We'll do that, your Honor.

21             (Continued on next page)

22

23

24

25

1    Q.  Mr. Haas, directing your attention back to PX 129 --

2              MR. CARLINSKY:  Which I will also move into evidence

3    at this point.  I understand there is no objection?

4              THE COURT:  PX 129.

5              MR. WIDELL:  No objection, your Honor.

6              THE COURT:  It is admitted.

7              (Plaintiff's Exhibit 129 received in evidence)

8    BY MR. CARLINSKY:

9    Q.  If you look at PX 129, you'll see that Mr. Keel from 3M --

10   you do know who Mr. Keel is?

11   A.  Yes.

12   Q.  He was an executive at 3M in connection with the sale of

13   the business?

14   A.  Yes.

15   Q.  He was writing, you'll see he was writing to you and

16   Mr. Kim an E-mail at 2:03 pm on the page ending 620 and he says

17   please see Jim Vaughan's comments below regarding potential

18   pharma buyers, and he says we need to make sure we leverage GS

19   global reach on this one.

20              Do you see that statement?

21   A.  Yes.

22   Q.  If you look down, you'll see on the next page, the page

23   ending 621, there is a comment from Mr. Sauer on the E-mail and

24   he says to Paul Keel, quoting in the first line, "Please make

25   sure GS has their global hat on in pulling out all the stops to

1   sell pharma."  Do you see that?

2   A.  I do, yes.

3   Q.  And when you saw those comments, did that reflect in your

4   mind concern by 3M that they might have a problem selling this

5   particular business?

6   A.  I don't recall, you know, the time of my seeing this

7   E-mail, but it is consistent with what I said before, that if

8   they were to sell the whole business, they wanted to make

9   sure -- if they were to sell the business in pieces, they

10  wanted to sell all the pieces at the same time.

11  Q.  That is what you understood from the comment, make sure to

12  pull out all the stops?

13  A.  Again I don't recall reading this at the time, but my

14  reading of it today is reflective of what I just said.

15          MR. CARLINSKY:  If we can bring up, please, PX 137.  I

16  move this into evidence.  I understand there is no objection?

17          MR. WIDELL:  No objection.

18          THE COURT:  PX 137 is admitted.

19          (Plaintiff's Exhibit 137 received in evidence)

20  BY MR. CARLINSKY:

21  Q.  If you look at the second page, there is an E-mail from

22  Lawrence Kim to Howard Rowe and to yourself.  Do you see that?

23  A.  I do.

24  Q.  Mr. Kim was part of your team?

25  A.  Yes.

D1FJMED7                          Haas - direct

1   Q.  And Mr. Rowe, was he also part of your team?

2   A.  Not part of the time working on 3M.  He was a colleague who

3   worked in the London office at the time.

4   Q.  Mr. Kim, was he working closely with you?

5   A.  He was, yes.

6           MR. WIDELL:  Objection.  This is leading back into a

7   lot of leading questions.

8           THE COURT:  It certainly is and has.

9           MR. CARLINSKY:  I am happy to go to a direct format.

10          I am just trying to lay some background and foundation

11  and be as efficient as possible.  I am happy to make this

12  longer if Mr. Widell thinks it would somehow --

13          THE COURT:  He has given you a fair amount of leeway.

14  He has not objected earlier.

15  BY MR. CARLINSKY:

16  Q.  Mr. Haas, what, if anything, did Mr. Kim tell you about

17  what key products were?

18  A.  I didn't hear the tail end of that question.

19  Q.  What, if anything, did Mr. Kim in his E-mail tell you about

20  what the key products were?

21  A.  Based on what it says in the E-mail?

22  Q.  Yes.

23  A.  (No answer)

24  Q.  Which Tambocor?

25  A.  Tambocor CR.  I am reading what it says here.

```
1    Q.  Turning to the first page, there is an E-mail from Mr.

2    Rowe?

3    A.  Yes.

4    Q.  By the way, where was Mr. Rowe located?

5    A.  He was in our London office.

6    Q.  What role, if any, were you looking for him to play in

7    connection with the sale of the business?

8    A.  He would have been one of the people that we would have

9    reached out to to determine which buyers may or may not be

10   interested in the business.

11   Q.  Do you see Mr. Rowe's reaction, what a mix, exclamation

12   point.  Unless I am missing a trick, I do not think the big

13   boys are going to be interested here.

14          Do you see that?

15   A.  I do.

16   Q.  When you received that E-mail, what, if any, concern did

17   you have about the ability to sell the European part of the 3M

18   business?

19   A.  That the large cap pharma companies would not likely have

20   an interest in the business, which was consistent with our

21   perspective.

22   Q.  Did you believe the universe of potential purchasers was,

23   therefore, narrow or something else?

24   A.  We always believed --

25          MR. WIDELL:  Objection; leading.
```

1              MR. CARLINSKY:  That is why I put in "or something

2        else."

3              THE COURT:  Well, sustained.

4        BY MR. CARLINSKY:

5        Q.  What, if any, reaction did you have in terms of whether

6        there would be a limited universe of potential purchasers?

7        A.  It was consistent with our perspective going into the

8        process that the large cap pharma companies would not likely be

9        interested in the business.

10       Q.  Did you have any understanding from the E-mail that we just

11       looked at as to how significant a product Tambocor CR was in

12       the European pharma business?

13       A.  I am sure I did at the time.  I don't recall the details of

14       it now.

15       Q.  I am not necessarily asking about details, but did you

16       understand that it was a dominant product?  Did you understand

17       it was a very significant product?  Did you have some other

18       understanding?

19       A.  My recollection is it was a significant product, but I

20       don't recall anything more than that.

21       Q.  Did you understand it to be one of the key products, as

22       Mr. Kim reflects in his E-mail, or did you have some other

23       understanding?

24       A.  I don't have reason to doubt that this E-mail is accurate,

25       but I don't recall again the details from back then.

1   Q.  At the time that you were working on the potential sale of

2   the 3M pharma, Europe pharma business, did you have an

3   understanding as to from what country the bulk of Tambocor CR

4   sales came?

5   A.  I am sure I did at the time, but I don't recall offhand

6   now.

7   Q.  Now, during the course of the work that you were doing on

8   behalf of 3M, would it be fair to say you discussed Tambocor CR

9   or Tambocor LP as it has been referred to with 3M?

10  A.  I am sure we did, yes.

11  Q.  You say you are sure you did.

12          Would it be fair to say in the course of the work you

13  did, you had discussions about any of the key or significant

14  products?

15  A.  Sure, in the normal course we would have talked about all

16  the significant products in the portfolio.

17  Q.  What, if any, understanding did have regarding whether --

18  let me lay a predicate.

19          Did you understand there was more than just the

20  Tambocor CR product?

21  A.  My recollection is that there was an IR product, I believe,

22  and there was a CR product that was to follow.

23  Q.  Did you have an understanding as to in which way the

24  balance was shifting in terms of sales, in favor of the IR

25  product or in favor of the CR product?

1   A.  In favor of the CR products.

2   Q.  Do you recall that the key country for the Tambocor

3   products was France?

4          MR. WIDELL:  Objection, your Honor, just continues to

5   be leading.

6          THE COURT:  Sustained.

7   BY MR. CARLINSKY:

8   Q.  Would you turn to PX 168.  It will be in your binder.

9   A.  Yep, I've got it.

10  Q.  Would you turn to page in the 0M, Page 3 ending 616.

11  A.  Okay.

12  Q.  Do you see there there is a Table 2 and there is a

13  breakdown by region, and then it indicates Europe?

14  A.  I see it.

15  Q.  Take a moment, if you would, to read that because I want to

16  see whether that helps refresh your recollection as to whether

17  what you understood at the time was the country --

18         THE COURT:  You didn't ask him yet.  Just ask him.

19         MR. CARLINSKY:  I did.  I did.  He said he didn't

20  recall.  Then I posed France, and I was told I was leading.

21         THE COURT:  I don't think he said he didn't recall.

22         Do you remember what country was the key country where

23  Tambocor was --

24         THE WITNESS:  Now looking at this, it strikes me as

25  France.  That is not inconsistent with my recollection.

1          THE COURT:  Fair enough, Mr. Carlinsky.

2          THE WITNESS:  I can't recall offhand.

3          THE COURT:  Thank you.  You have the answer, yes?

4          MR. CARLINSKY:  Yes, now I do.

5    BY MR. CARLINSKY:

6    Q.  Mr. Haas, what was your understanding again in terms of

7    which direction sales of Tambocor in France were heading, in

8    favor of IR or in favor of CR?

9    A.  I don't recall the specifics.  I do recall that the IR

10   version was becoming generic, I believe, and the CR version was

11   being launched.  I don't remember the timing.  I assume that

12   trend was consistent in France, but I don't recall the

13   specifics on the country.

14   Q.  You don't recall in which direction the sales were

15   trending?

16   A.  No.  I'll make an educated guess.

17   Q.  No, I don't want you to make an educated guess?

18   A.  I can look at the numbers, but I don't recall offhand.

19   Q.  Do you want to look back to plaintiff's PX 168.

20   A.  Okay.

21   Q.  I direct your attention to Page 82 which ends at the

22   bottom, Bates number Meda 188692.  You'll see if you look down

23   four sentences, I believe it is four sentences, it says parents

24   in --

25          (Pause)

1   A.  Sorry.  You're on Page 82, you said?

2   Q.  82 of the offering memo.

3   A.  Okay.

4   Q.  And --

5   A.  Sorry.  At the top?

6   Q.  You see it has fiscal Year 2006 key forecast assumptions?

7   A.  Yes.

8   Q.  By the way, Goldman Sachs played a role in preparing the

9   offering memorandum.  Is that accurate?

10  A.  Yes.

11  Q.  Looking at the line that talks about if patients in France

12  switch from Tambocor IR to Tambocor CR, some of these prices

13  issues may be offset.  Do you see that?

14  A.  Yes, I see that.

15  Q.  And referring to the prior sentence where there was

16  government pricing mandates that reduce selling price, do you

17  see that?

18  A.  I do.

19  Q.  Does that help refresh your recollection, sir, as to in

20  which direction you understood the sales of Tambocor CR were

21  trending?

22  A.  I recall as a general matter they were trending down in IR

23  and up in CR in Europe generally.  I don't recall the country's

24  specific dynamics.

25  Q.  You said -- take that down.  We will be looking at the OM,

1    I suspect, the next time we get together in more detail.  You

2    said something about IR.  You understood IR was under generic

3    attack, I think you said?

4    A.  I believe the patent expired or was going to expire in IR.

5    Q.  Did you also understand that there was still patent life

6    left on CR?

7    A.  I believe so.

8    Q.  Did you have an understanding that CR, Tambocor CR was

9    under generic attack?

10   A.  I don't have any recollection of that.

11   Q.  In fact, your recollection would be to the contrary,

12   correct?

13   A.  My presumption would be to the contrary.  I don't have

14   specific recollection.

15             MR. WIDELL:  Objection, your Honor; leading.

16             THE COURT:  I'll allow that one.

17   BY MR. CARLINSKY:

18   Q.  Now, as an investment banker, as you say, with

19   pharmaceutical experience and having worked on deals, did you

20   have some understanding of pricing pressures generally in

21   Europe?

22   A.  In general terms.

23   Q.  What was your general understanding of pricing pressures in

24   Europe?

25   A.  There was pricing pressure in Europe in the sense that

1    prices were generally moving downward as opposed to upward.

2    Q.  Okay.  Did you believe that prices were also stable in

3    Europe?

4    A.  I don't recall the specifics from that point in time.

5    Q.  Now, do you recall having any discussions during the time

6    that you were working on the transaction with 3M management

7    about any specific pricing agreements that existed between 3M

8    and any European governments?

9    A.  I don't recall one way or the other.  I just don't recall

10   the dialogue.

11   Q.  If I may, I would like to show you your deposition

12   testimony.

13          THE COURT:  What page?

14          MR. CARLINSKY:  It is 96 line 16 to 24, 98 lines 3

15   through 9.

16          THE WITNESS:  Do I have it here or is it only on the

17   screen?

18          MR. CARLINSKY:  I am going to give it to you.  If I

19   may, your Honor, approach.  You can look at it on the screen,

20   but this may be faster.

21          THE WITNESS:  Okay.  What page did you say?

22          MR. CARLINSKY:  First would you go to 96, 16 to 24,

23   and then 98, 3 through 9.

24          (Pause)

25   A.  Sorry.  I am on 96.  The Question 16?

D1FJMED7                        Haas - direct

1   Q.  Yes.

2   A.  Through 24?

3   Q.  Yes.  Does that help refresh your recollection that, in

4   fact, there was no dialogue between you and 3M executives

5   regarding any specific pricing agreements that may have existed

6   between 3M and any European governments?

7   A.  I think that this is the same answer I just gave you which

8   is I don't recall one way or the other whether there was

9   dialogue about this issue or not.

10          MR. WIDELL:  Objection.

11          THE COURT:  Sustained.  It seems to me to be the same

12   answer.

13   BY MR. CARLINSKY:

14   Q.  Do you recall being shown any specific pricing agreements

15   by 3M?

16   A.  Again it is the same answer, I don't recall one way or the

17   other whether I saw something or didn't see anything about that

18   specific issue.

19   Q.  You have no recollection one way or the other?

20   A.  I do not have any recollection one way or the other.

21   Q.  Again looking at your testimony Page 98 lines 3 through

22   9 --

23   A.  98, 3 through 9?

24          MR. WIDELL:  The same objection.

25          THE COURT:  Sustained.

1    BY MR. CARLINSKY:

2    Q.  And 97, at 17?

3    A.  Sorry?  97, line 17?

4    Q.  Yes, sir.

5    A.  Okay.  What is the question?

6    Q.  My question is, does this help refresh your recollection

7    that you previously testified --

8    A.  Okay.

9    Q.  -- that you did not see any specific agreements?  You can

10   look at the questions and the answers for context.

11   A.  I don't know.  I don't have a recollection one way or the

12   other on this, on this particular question.

13            MR. WIDELL:  Your Honor, maybe so the record is clear,

14   at least me, I am not actually sure what the question is unless

15   it is just a follow-through from --

16            THE COURT:  He asked if it refreshes his recollection

17   with respect to whether he has seen any specific agreements,

18   and the answer is no, that he doesn't recall seeing any one way

19   or the other.

20            MR. CARLINSKY:  Right.

21   BY MR. CARLINSKY:

22   Q.  I am looking at his deposition testimony, and I am asking

23   you, Mr. Haas, do you see that in your deposition, at Page 97,

24   at line 17 at the end of your answer there, you stated "so we

25   didn't see specific agreements."

1          Do you see that, sir?

2     A.  I do see that, yes.

3     Q.  Just so we have the question in context, it says the

4     question was did you expect that to the extent that there are

5     any agreements or arrangements in place between 3M and any

6     particular European government that concerned prices of the

7     products that were going to be a part of the business that was

8     being put up for sale, that 3M would bring that to your

9     attention?

10         You went on to say not necessarily.  We did due

11    diligence at a slightly higher level.  I don't think we saw

12    specifically, well the data room contained whatever documents

13    the data room contained.  In terms of our due diligence that we

14    discussed with the 3M management team, we didn't get into the

15    details of specific agreement that they had with either the

16    governments or suppliers or with other parties.  So we didn't

17    see specific agreements.

18         Do you see that, sir?

19    A.  I do see that, sir.

20         MR. WIDELL:  Objection.  He was reading the passage

21    into the record.

22         THE COURT:  Well, there's an apparent inconsistency.

23    The witness can explain it if he would like.  I think that is

24    what it it is being offered for.  Why don't you just go ahead

25    and ask the question.

1   BY MR. CARLINSKY:

2   Q.  You gave that testimony in your deposition.  Was that

3   accurate testimony?

4   A.  I believe it is accurate testimony in the sense that I was

5   answering your question.

6   Q.  And the question that you were asked at that time was

7   whether you had been shown during the course of the work you

8   were doing for 3M any specific government pricing agreements.

9          Didn't you understand that to have been the question I

10  asked you in your deposition?

11  A.  Yeah.  I don't recall seeing any particular agreements.

12          MR. WIDELL:  Objection.

13  Q.  That is not my question?

14          THE COURT:  Go ahead.

15          MR. WIDELL:  The objection is that Mr. Carlinsky

16  misstated what Mr. Haas was asked at his deposition, which was

17  not whether he had seen any specific pricing agreements.  It

18  was whether you expect to see any pricing agreements, and the

19  answerer was not necessarily, and he went on to finish his

20  answer.

21          (Pause)

22          MR. CARLINSKY:  The question I asked the witness here,

23  your Honor, was whether 3M --

24          THE COURT:  Let's just get -- Mr. Haas, do you

25  understand this answer is consistent with what you're

1    testifying or is your memory different, or you're not sure?

2              THE WITNESS:  The answer is that I don't recall one

3    way or another, you know, what we saw at the time that we saw

4    this stuff six years ago.  I don't know if that is consistent

5    or inconsistent with what was said at the deposition, but that

6    is my recollection.

7    BY MR. CARLINSKY:

8    Q.  Now what I would like to ask you to do if you would,

9    please, is look at Page 97 line 18 through Page 98 line 9.

10             MR. WIDELL:  Objection, your Honor.  I apologize for

11   keeping doing this, but it doesn't sound like there is any

12   impeachment use going on.  The witness is being asked to look

13   at some deposition testimony before a question is asked.

14             The question is asked, the examiner doesn't like the

15   answer and directs the witness to the prior testimony.  It

16   seems like an improper use of the deposition transcript.

17   Certainly it doesn't appear it will be to impeach an answer to

18   a question that hasn't been asked yet.

19             MR. CARLINSKY:  I have to ask the question.

20             THE COURT:  That is the way it usually works.

21             MR. CARLINSKY:  I thought I did.

22             THE COURT:  What is the pending question?  And I can

23   look at the testimony and if it is a prior inconsistent

24   statement, we can think about it.

25   BY MR. CARLINSKY:

1    Q.  Mr. Haas, isn't it a fact that 3M did not provide you with

2    any specific pricing agreements during the period of time that

3    you were advising it in connection with the sale of the pharma

4    business?

5    A.  I don't recall whether they did or did not.

6    Q.  Now Let's see if this will help refresh your recollection

7    then.

8              THE COURT:  What are we looking at?

9              MR. CARLINSKY:  Would you kindly look at 97, line 18

10   through 98 line 9.

11             THE COURT:  Let me read it.

12             (Pause)

13   BY MR. CARLINSKY:

14   Q.  Have you looked at that testimony, sir?

15   A.  I did, yes.

16   Q.  Did you give that testimony --

17             THE COURT:  Just a second.  (Pause)

18             All right.  Go ahead.

19   BY MR. CARLINSKY:

20   Q.  Mr. Haas, did you look at your deposition testimony?

21   A.  I did, yes.

22   Q.  When you were asked the question at Page 97 line 18:

23   "Q  And is that true for each significant product like Tambocor

24   and Minitran that you understood were key products within the

25   European business?  That is, you didn't seek to do due

D1FJMED7                       Haas - direct

1   diligence whether there were any pricing agreements between 3M

2   and any European governments concerning those products?"

3          Your answer was:

4   "A  Not to my recollection.  I don't recall seeing any

5   particular pricing agreements or contracts for that matter that

6   3M had with any outside parties."

7          Do you see that answer?

8   A.  I do, yes.

9   Q.  When you testified then, were you testifying truthfully,

10  sir?

11         MR. WIDELL:  Objection, your Honor.  It is a different

12  question.  The question on the record is, isn't it a fact that

13  3M did not provide you with any specific pricing agreements?

14  That is not, not the question being asked here.

15         The question that is being asked at the deposition was

16  did you or Goldman Sachs do any due diligence as a verb, do due

17  diligence to ascertain if there were any specific agreements.

18         MR. CARLINSKY:  I don't understand that objection.

19         THE COURT:  Well, the answer is I don't recall seeing

20  any particular pricing agreements or contracts.

21         Is that fair to say that is consistent with your

22  testimony today?

23         THE WITNESS:  Yes, I personally don't recall seeing,

24  you know, the agreements that we're talking about here.  I go

25  on to say the team could have done more diligence or otherwise

1    that I didn't see.  That is the spirit of the answer, I

2    believe.

3    BY MR. CARLINSKY:

4    Q.  Today you're telling us you don't recall one way or the

5    other.  At your deposition you testified very clearly you

6    didn't recall seeing any pricing agreements, didn't you, sir?

7              MR. WIDELL:  Objection.

8              THE COURT:  Sustained.  He said I don't recall.

9    A.  I am certain that whatever was in the data room some of our

10   team members may looked at, but I didn't look at the data room

11   in particular.

12             It sounds to me like pretty similar to "I don't recall

13   one way or the other," not the exact words, but the meaning

14   seems to me similar.

15   BY MR. CARLINSKY:

16   Q.  Do you recall any dialogue that you had with anyone at 3M

17   regarding pricing agreements or specific pricing agreements?

18   A.  I do not recall, I guess I'll say it one way or the other

19   whether we had that dialogue.  I presume we had dialogue about

20   price and volume, but I don't recall the specifics of any of

21   that.

22   Q.  Again I will direct your attention to Page 96 line 16

23   through 24.

24   A.  Okay.

25   Q.  At line 16, you were asked in connection with the due

D1FJMED7                          Haas – direct

1    diligence due on the European business, did you or anyone on

2    your team at Goldman Sachs attempt to determine whether there

3    were agreements with any of the European governments regarding

4    prices at which products would be sold going forward?  Do you

5    see that question?

6              MR. WIDELL:  Objection.

7    Q.  And the answer you gave is, "I don't recall dialogue about

8    specific agreements with governments."

9              Do you see that answer?

10   A.  I do see that answer.

11   Q.  You didn't testify, sir, that I don't recall one way or the

12   other.  Your testimony in your deposition was "I don't recall

13   dialogue about specific agreements," correct?

14   A.  My recollection from the deposition is the intention of my

15   answers were I said I don't recall is that I don't recall one

16   way or the other, which is I didn't answer the question just

17   now that way.

18             I didn't I guess before I saw this in writing, you

19   know, think about the difference between I don't recall or I

20   don't recall one way or the other.

21             MR. CARLINSKY:  Your Honor, permission to treat the

22   witness as a hostile witness and examine him with leading

23   questions, please.

24             MR. WIDELL:  I object.

25             THE COURT:  You have been asking leading questions all

1   throughout the testimony.

2            MR. CARLINSKY:  I tried to change when objection was

3   raised.  I ask permission to treat him as a hostile witness.

4            THE COURT:  All that means here is if you can ask him

5   leading questions.

6            MR. CARLINSKY:  Yes.

7            THE COURT:  I suppose you might raise your voice, too,

8   but it doesn't have any impact on me.

9            MR. CARLINSKY:  I want to be able to do this more

10  efficiently.

11           MR. WIDELL:  There is nothing hostile about this

12  interaction.

13           THE COURT:  I agree.  Mr. Carlinsky, you have read it

14  with a certain intonation.  You understand you to suggest there

15  is an inconsistency between saying specifically I don't recall

16  and the answer now, which is I don't recall one way or the

17  other.

18           There is an inference available of an inconsistency,

19  and that is for me to decide what to do with.  I have heard the

20  witness' testimony as to his explanation, and if this is how

21  you want to use your time, okay.

22           MR. CARLINSKY:  I can move on this particular point.

23           THE COURT:  Good.

24  BY MR. CARLINSKY:

25  Q.  Mr. Haas, just to finish up this line with two more

1    questions, do you recall whether you even felt the need to ask

2    3M whether there were any specific pricing agreements relating

3    to any of the products or any of the key products in the

4    European business?

5    A.  I don't recall one way or the other.

6    Q.  Did you expect that if there were agreements in place

7    between 3M and any government to reduce the price of any of the

8    key products by a material amount, if those would have been

9    made available to you by 3M?

10   A.  What was the question?  Did I expect?

11   Q.  Did you expect as a banker working for 3M, did you have an

12   expectation that if there were agreements between 3M and a

13   third party, government or otherwise, that risked a material

14   price decrease on any of the featured products that this was

15   being sold on, those agreements would be brought to your

16   attention?

17           MR. WIDELL:  Objection, your Honor.  The question was

18   already asked, actually the exact question from the deposition

19   transcript and the answer was read in.  It is basically an

20   asked and answered objection.  The answer was "not

21   necessarily," and it came out in the transcript.

22           MR. CARLINSKY:  I am putting the question to the

23   witness here.

24           THE COURT:  I am going to overrule that.

25   A.  Is it the question you asked me previously?

D1FJMED7                        Haas - direct

1    Q.  No.  I am asking you the question now, did you have an

2    expectation, if there were agreements in place that affected

3    the price in a material way on a key product in the business

4    you were trying to sell, the European business, do you have an

5    expectation those agreements would have been brought to your

6    attention?

7    A.  Again I guess not necessarily.  Sometimes those documents

8    are in a data room or otherwise, but we do not necessarily see

9    those documents.  We would do due diligence around the numbers.

10   Q.  If the documents existed and they had a potential material

11   effect or impact on the business, would your expectations have

12   been different?

13   A.  We generally look at the financial projections and ask

14   questions around those projections.

15   Q.  That is not my question.

16   A.  We tend not to independently verify the underlying

17   documents or assumptions that underlie a set of projections.

18   Q.  You're relying on management to give you those projections?

19   A.  Correct.

20   Q.  My question is different, Mr. Haas.

21          If there were agreements in place that put at risk a

22   material impact to the business, would you have expected those

23   types of agreements to be made available to you?

24   A.  Again not necessarily.  The projections were consistent

25   with what those agreements stated.

1    Q.  Let me ask you a very specific question.

2              If there was an agreement in place whereby the sales

3    price of Tambocor CR in France was going to be reduced at a

4    material level going forward, would you have expected that

5    information to have been brought to your attention?

6    A.  If it was embedded in the financial projections, it would

7    have been part of the discussion around the financial

8    projections.  That is the context in which we would have

9    discussed something like that.

10   Q.  I am not sure I understand your answer.

11             THE COURT:  Do you mean, Mr. Haas, you would have

12   expected it either to be embedded in the financial projections

13   or somehow otherwise brought to your attention?

14             THE WITNESS:  Yeah, I think that is a fair way to

15   characterize that.

16   BY MR. CARLINSKY:

17   Q.  Mr. Haas, I am going to direct your attention again to your

18   deposition testimony, at Page 178 line 5 through Line 12.

19             THE COURT:  Actually, it is 5:30 so we are going to

20   stop for the evening.  How much longer do you anticipate with

21   Mr. Haas?

22             MR. CARLINSKY:  45 minutes, moving to different

23   topics.

24             THE COURT:  "Half an hour ago" you said an hour ago.

25             MR. CARLINSKY:  Then we had a bunch of colloquy.

1              THE COURT:  Fair enough.  Mr. Widell, how long do you

2     anticipate?

3              MR. WIDELL:  I'm anticipating about 30 minutes.

4              THE COURT:  Well, work something out with Mr. Haas as

5     to -- do you have something, Mr. Carlinsky, before on this

6     specific point?

7              MR. CARLINSKY:  I was hoping we were going to continue

8     with Mr. Haas tomorrow morning.

9              THE COURT:  As I say, you are going to need to work it

10    out.  I don't know what -- that is for you all to work out.

11             MR. CARLINSKY:  Can we ask Mr. Haas what his schedule

12    is tomorrow?

13             THE COURT:  You don't need me for that, unless you do,

14    in which case I am here.

15             MR. CARLINSKY:  I'll worry about it.

16             THE COURT:  We are going to get his testimony so you

17    have got to work it out.  You are excused for the evening.  You

18    can step down.  You remain under oath, and we'll bring you back

19    in to finish up the examination.

20             THE WITNESS:  Thanks.

21             (The witness left the witness stand)

22             THE COURT:  We'll pick up hopefully with Mr. Haas in

23    the morning, but you all will work it out.

24             I have a request which is just for you all to come to

25    agreement on what documents have been admitted thus far,

1    including any translations where necessary to joint -- we had a

2    couple of instances where we were talking about documents that

3    have been admitted as joint exhibits.  Make sure you're in

4    agreement as to what has been admitted thus far and check with

5    my staff to make sure we're on the same page, and that way I'll

6    have in front of me with some clarity what has been admitted so

7    I know we're discussing something that is in, okay?

8              Anything else we need to address?

9              MR. WIDELL:  Not from the defendants' side.

10             MR. ARMENIO:  From the plaintiff, your Honor, it is

11    just your Honor mentioned you might want some briefing around

12    the DX 330 motion in limine on the French agreement, so I would

13    mention that.  A similar issue is DX 588, the presentation that

14    they tried with three different witnesses to get in.  It was

15    sustained each time.

16             All our fact witnesses are done, so there is nobody

17    else for them to turn to.  I would ask that your Honor, how you

18    would like us to deal with that, whether you want I can make a

19    verbal motion right now on it or you like paper on it.  I am

20    happy to proceed with it that way.  I don't want to keep taking

21    up your Honor's time with the same argument again and again.

22             THE COURT:  Why don't you put both those points in

23    paper.

24             MR. CARLINSKY:  Cn we get it to the court on Thursday?

25             THE COURT:  That is fine, simultaneous on Thursday.

1          MR. ARMENIO:  Yes, your Honor.  Thank your Honor.

2          THE COURT:  All right.  We are a little behind on

3    time, obviously.  We can check with my clerk.  I need to still

4    start us at 9:30 tomorrow and end in the 5:00 to 5:30 range for

5    my own obligations, so we're going to shave some time off of

6    lunch and breaks and the like.  If we haven't gotten to the 18

7    hours a side by the time anticipated, I may, rather than

8    killing ourselves each day, take whatever is left that we need

9    to do on the Thursday that we had anticipated for closing.  My

10   hope is not to do that.  I need that time as much as you all

11   do, but you get 18 hours each, you will get 18 hours each, all

12   right?  I will see everyone at 9:30.

13          Let me just say, the time is your time, but some

14   streamlining can be done I think still with just organizing the

15   exhibits and the like between what is being referred to, what

16   is already in, what is in front of the witness and the like.

17          Let's work on that.

18          (Court adjourned until Wednesday, January 16, 2013, at

19   9:30 o'clock am)

20

21

22

23

24

25

D1FJMED7                        Haas – direct

                              JOINT EXHIBITS

1    Exhibit No.                                    Received

3     1 A through 180 A   . . . . . . . . . . . . 209

```
 1                          INDEX OF EXAMINATION

 2   Examination of:                                Page

 3   Cross By Mr. Renard . . . . . . . . . . . . 222

 4   Redirect By Ms. Brown  . . . . . . . . . . 287

 5   ANDERS LARNHOLT

 6   Direct Mr. Armenio . . . . . . . . . . . . 295

 7   Cross By Mr. Collins . . . . . . . . . . . 300

 8   Redirect By Mr. Armenio  . . . . . . . . . 332

 9   Recross By Mr. Collins . . . . . . . . . . 337

10   HENRIK  STENQVIST

11   Direct The Court . . . . . . . . . . . . . 341

12   Cross By Ms. Bevilacqua  . . . . . . . . . 346

13   Redirect By Ms. Brown  . . . . . . . . . . 399

14   JASON HAAS

15   Direct By Mr. Armenio  . . . . . . . . . . 406

16                          PLAINTIFF EXHIBITS

17   Exhibit No.                                 Received

18    345 and 345 A  . . . . . . . . . . . . . 227

19    336  . . . . . . . . . . . . . . . . . . 255

20    235, 278, 284, 429 and 328   . . . . . . 297

21    303  . . . . . . . . . . . . . . . . . . 413

22    129  . . . . . . . . . . . . . . . . . . 431

23

24

25
```

460

137   . . . . . . . . . . . . . . . . . 432

                         DEFENDANT EXHIBITS

Exhibit No.                                    Received

41, 42 and 383   . . . . . . . . . . . . 228

167   . . . . . . . . . . . . . . . . . 256

299   . . . . . . . . . . . . . . . . . 261

307   . . . . . . . . . . . . . . . . . 269

350   . . . . . . . . . . . . . . . . . 269

350   . . . . . . . . . . . . . . . . . 274

393 and 421   . . . . . . . . . . . . . 280