D1VJMED1                          Summations

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
MEDA AB

                    Plaintiff

          v.                          11 CV 0412 (AJN)

3M COMPANY, 3M INNOVATIVE
PROPERTIES COMPANY, and RIKER
LABORATORIES, INC.

                    Defendants
------------------------------x
                                      New York, N.Y.
                                      January 31, 2013
                                      9:45 a.m.

Before:
                    HON. ALISON J. NATHAN,
                                      District Judge

                          APPEARANCES

QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Attorneys for Plaintiff
MICHAEL B. CARLINSKY
PETER J. ARMENIO
DEBORAH K. BROWN
NICHOLAS J. CALAMARI


BICKEL & BREWER
     Attorneys for Defendants
ALEXANDER DAVID WIDELL
JAMES S. RENARD
JEREMY D. CAMP
MICHAEL COLLINS
AAMER RAVJI

DORSEY & WHITNEY LLP
     Attorneys for Defendants
THERESA M. BEVILACQUA


-also present-
MARY YEAGER

1        (Trial resumes)

2        (In open court)

3        THE COURT:  Good morning, everyone.  Please be seated.

4        We're here for summation and closing argument in this

5   matter that we tried a week ago.  I think I set 90 minutes per

6   side if you need it.  Obviously, if you don't or if I think I

7   need more time, I'll let you know.  We'll see what the flow of

8   the argument is.

9        I guess we didn't talk about a structure, whether

10  there would be a rebuttal.  Typically in a jury context I

11  encourage the defendants to go first and then the plaintiffs to

12  go, but we could also have a short rebuttal for plaintiffs.

13       Have you thought about how you want, made an

14  assumption how it would be structured?

15       MR. CARLINSKY:  I think our thought, your Honor, was

16  that we would start with our closing, we would try to reserve

17  about 20 or 25 minutes for rebuttal following the defendant's

18  closing.

19       THE COURT:  Mr. Renard?

20       MR. RENARD:  Your Honor, that is fine with us.

21       THE COURT:  All right.  Let's see how we go.  Who will

22  make the closing for plaintiffs?

23       MR. ARMENIO:  If it is acceptable to your Honor, what

24  we will do is split the closing along familiar lines, where I

25  will be handling most of the breach of contract and damages and

D1VJMED1                           Summations

1    Mr. Carlinsky will be handling most of the fraud aspects.

2                THE COURT:  You want to reserve 20 minutes?

3                MR. ARMENIO:  Yes, your Honor.

4                THE COURT:  You'll lead it off, Mr. Armenio?

5                MR. ARMENIO:  Yes, your Honor.  Thank you.

6                May it please the court, the evidence presented during

7    trial in this matter was more than sufficient to prove each of

8    Meda's claims in this action, breach of contract, breach of the

9    covenant of good faith and fair dealing and fraud.

10               As Meda showed, each of these claims flows naturally

11   from the background and context of the transaction between 3M

12   and Meda for the business and the background and context of

13   3M's negotiations with CEPS for the undisclosed pricing

14   agreement that has been at issue in this trial.

15               Meda further showed how each of its claims is fully

16   supported and comports with contemporaneous documents and

17   presented those documents in a chronological fashion, showing

18   what people were actually saying and thinking at the time these

19   actions were occurring, not after-the-fact, with later

20   arguments and later theories.

21               3M's defenses, it would seem, constantly changed

22   throughout this two-year litigation and even constantly changed

23   during this trial.  We see they have no support for those

24   defenses in the background and context of the transactions at

25   issue or in contemporaneous documents.

1          With respect to the background and context of 3M's

2     sale of the business, just to touch on it -- and these are

3     familiar from the opening -- 3M knew its pharmaceutical

4     business was falling.  We saw that out of the board of

5     director's presentation, PX 133, and we learned more of that at

6     trial from Mr. Sauer.  He told us at the point they decided to

7     exit the worsening of the situation in France meant the spinoff

8     option was doubtful.

9          That meant this business was in such bad shape that it

10    couldn't even be viable spun off and they needed a buyer.  That

11    is what they told the board, and they presented to the board in

12    PX 142 the upside down hockey stick.  The pharmaceutical

13    business was in such bad shape by the end of 2005, they

14    projected almost negative 10 percent.  Mr. Sauer admitted it on

15    the stand, by November 2005 the negative 10 percent, not quite

16    but close.

17         Mr. Sampson, we heard him talk about the death spiral

18    of the business in the contemporaneous documents, PX 158, and

19    then during trial he admitted as soon as he took over the

20    business from Mr. Labinger, they needed to look for different

21    options, and Mr. Sauer was concerned with the trajectory of the

22    business.

23         Now, when we look and contrast that death spiral,

24    negative 10 percent situation worsening, the business couldn't

25    even survive on its own, we contrast that with what 3M told

1  Meda in the offering memorandum, PX 168.  The court is fully

2  familiar with that document at this point.  Mr. Sauer explained

3  that despite all of 3M's arguments, he agreed that this

4  offering memorandum didn't speak at all to the risk of a

5  pricing decline for Tambocor CR.

6          Throughout the offering memorandum we showed how 3M

7  took pains to talk about how strong EBITDA margins would be,

8  the business was highly profitable and substantial and

9  consistent cash flow including specifically in Europe, Cable 43

10 and specifically for cardio, showing it was glowing.

11         3M decided to speak on this issue.  They decided to

12 tell Meda the business was strong and growing, and once they

13 made that choice of speaking, they had to tell Meda the whole

14 truth, and the fact of the matter is they didn't.  They put in

15 statement after statement about EBITA and gross margins being

16 constant up.  We heard from Mr. Larnholt and @Mr. Gears when

17 you see this margin staying high on the revenue, you know that

18 prices are stable.  That is the business that 3M presented to

19 Meda.

20         When asked on the stand about this, anything in the

21 offering memorandum that refers to pricing pressure, there is

22 general statements -- Sampson?  Yes.  Anything specific about

23 Tambocor CR?  Mr. Lonner admitted he didn't factor it into the

24 offering memorandum.  They knew and they didn't tell Meda.  It

25 was even more apparent in the business presentation, PX 421,

 1  where they presented the chart of Tambocor CR sales growing so

 2  much that they would offset any decline in Tambocor II, and Mr.

 3  Sampson, when confronted with this slide, admitted he didn't

 4  expect a reader, reviewing Page 155, to conclude that the

 5  Tambocor CR price in France was at risk.  In what is perhaps

 6  the understatement of the year, it is very difficult to tell

 7  from the growing sales, 46 percent up year-over-year.  3M

 8  portrayed the business as growing and portrayed Tambocor CR and

 9  didn't tell the truth.

10       There was nothing in here to alert Meda.  The best

11  Mr. Sampson could come up with was well, maybe the growth rate

12  slowed down a little bit, but they portrayed in the business

13  presentation and the offering memorandum that Tambocor CR was

14  still growing, and Mr. Sampson had to admit nothing specific

15  about a particular risk as Tambocor CR?  Correct.

16       Mr. Sauer admitted the same thing.  Nothing that would

17  indicate in these documents the offering memorandum and

18  business presentation, that Tambocor CR is actually at risk?

19       Correct.

20       So these are admissions that have fleshed out the

21  theories of the case on which we brought suit, on which we

22  opened and on which we have been consistent throughout these

23  two years.

24       We look about pricing specifically.  Mr. Lonner asked

25  Mr. Sampson whether it was any other information that Meda

1   needed to know about at the business presentation.  It is in

2   the Lonner Declaration, Paragraph 39.  Mr. Sampson said there

3   was nothing else, and on the stand Mr. Sampson would not deny

4   that this conversation happened, professed a lack of memory,

5   but he didn't deny it Mr. Lonner further talked about whether

6   there was discussing of pricing in the business presentation,

7   and he explained yes, pricing, yes, means in France that you

8   have to take into consideration the reimbursement situation.

9         So they were talking.  Mr. Lonner, CEO of Meda, was

10  talking to Mr. Sampson, the global head of 3M Pharma, including

11  about pricing, and Mr. Sampson, as he admitted, said nothing,

12  and he said nothing even though a month earlier, in May of

13  2006, he admitted he learned specifically about the pricing

14  convention in a meeting in Serge, France.

15        Mr. Sauer, he was no better than Mr. Sampson.  He knew

16  the risk.  On your Honor's direct questioning, you asked

17  Mr. Sauer can he quantify the risk?  And he responds, was it an

18  important risk?  Yes.  What kind of decrease was conveyed to

19  you?  A pretty wide range of outcomes.

20        Then in questioning, further questioning from Meda, do

21  you recall you have been advised there was a risk of 40

22  percent?  I was shown slides on it.  40 was on there.

23        Mr. Sauer knew of the risk.  Mr. Sampson knew of the

24  risk.  They stayed silent despite the representations they knew

25  were being made to Meda that were false regarding the stability

D1VJMED1                    Summation - Mr. Armenio

1   and growing profitability of Tambocor CR in France.

2           Mr. Keel, Mr. Keel was no better than Mr. Sauer or

3   Mr. Sampson.  He sent Meda the happy e-mail in October 2006,

4   Oh, look how good the business is doing, it is up versus the

5   offering memorandum.  JX 98.

6           Roughly the same time in France we see in JX 104 A,

7   Ms. Kolsky is talking about how they had to delay the review of

8   the case file in order to preserve the price of Flecaine IR and

9   CR.  So while Mr. Keel is telling Meda don't worry, everything

10  is in great shape, Ms. Kolsky and her colleagues in France, JX

11  104 A, are busy delaying the price negotiation because they all

12  know as soon as that price negotiation, as soon as they bring

13  to CEPS attention the fact they're overdue on their convention,

14  the price is going to go down dramatically and the business is

15  going to lose significant value.

16          James, go to slide 20, please.

17          THE COURT:  Mr. Armenio, I want to give you some room

18  to do the presentation, but I have been thinking in boxes a

19  little bit.  You are still in the sort of providing pointed all

20  of this in the context of the overall context of the

21  transaction and what was disclosed, right?

22          Because I think you said you were going to focus on

23  the contract dispute?

24          MR. ARMENIO:  Yes, your Honor.

25          My thought, and I wanted to present it the way your

D1VJMED1                    Summation - Mr. Armenio

1    Honor wants to hear it, was to talk about the background of the

2    business transaction which I just did and to talk about a bit

3    of the background of the CEPS-3M negotiation and then go and

4    show how that background in context and the contemporaneous

5    documents plug in and prove the elements of the contract case,

6    and Mr. Carlinsky will do the same on the fraud case.

7         So looking at Slide 20, your Honor I am sure has read

8    Article 2.2 more times than your Honor probably cares to have

9    red it, JX 19 A, we know when the price was published April 12,

10   2003, so we know this three years was coming due in April 12,

11   2006.

12        What is really striking in this whole case is Meda

13   based its case on the actual negotiation between Eric Felber

14   and CEPS that resulted in the March 2003 convention.  3M did

15   not.  3M didn't do that at all.  They didn't even have, Mr.

16   Schur was sitting there on the stand, the proffered expert in

17   French law on this convention, and he admitted he didn't even

18   read the deposition of Felber prior to preparing his

19   declaration.

20        How how can you have a person opine on French law on

21   the document when they don't read the hundred-plus pages

22   deposition 3M negotiated and all contemporaneous documents

23   exhibits to that deposition?

24        THE COURT:  You mean then that the question, the

25   French law question of what was 2.2, if it was a regulation, if

1    it was a requirement, if it was contract, was there a breach,

2    turns at some level on the intent of Mr. Felber as a matter of

3    French law?  And what can you point me to for that proposition?

4         And if not, then why should Mr. Schur have cared what

5    Mr. Felber had to say?

6         MR. ARMENIO:  If we look at the French law and you

7    look at the negotiation, what happens here is in reality, there

8    was no lack of clarity or ambiguity.  3M knew exactly what it

9    was bargaining for, as reflected by the documents from

10   Mr. Felber leading up to the transaction and the documents

11   leading after.

12        3M's prime argument is wholly detached from that and

13   say they say, oh, it is too ambiguous to be enforced, it is too

14   unclear to mean anything.  We were free from this because

15   it's -- what did Mr. Schur say, a throw away it was in his

16   view.

17        What the contemporaneous evidence of negotiation and

18   the then implementation shows is it was not ambiguous to 3M at

19   all, and what it shows is that their prime argument of

20   ambiguity and lack of clarity is baseless.

21        THE COURT:  I am going to go back to my question.

22        To think in the box of your breach of contract claims,

23   your warranty claims, tell me how the pieces come together?  I

24   think of the answer to those questions and I think, as I've

25   looked at at least the arguments presented in the document you

1  submitted yesterday, which I've read both, and I am glad to

2  have it, I can't say I have had enough time to fully, fully

3  study, but I think the basis of the argument is, Judge, we're

4  going to tell you about what a law is, what a regulation is,

5  what a requirement is, what a contract is as matters of French

6  law, and then we are going to look at 2.2 and show you how it

7  fits within that.

8           And so I think that's right, and then tell me how I

9  know what to do as a matter of understanding French law with

10 the intentions of the 3M employee who negotiated that provision

11 of CEPS.

12          MR. ARMENIO:  I think the clearest answer to your

13 Honor's question is Mr. Schur's admission that -- Page 1307 of

14 the transcript, and he explains that when a future price is

15 fixed but contingent on a future event in a convention, CEPS

16 can publish the price when the event occurs.

17          So the whole argument --

18          THE COURT:  Say it again.

19          MR. ARMENIO:  Sure.  Mr. Schur admits when there is a

20 future price contingent -- can you put 20 up on the screen --

21 when a future price is fixed but contingent on a future event

22 in a convention, CEPS can publish the price when the event

23 occurs.  So we see here there is a future event at the end of

24 the three-year period and it is fixed what is going to happen.

25          Either 3M will have put in a equivalent of proprietary

1   drugs on the market or they're going to price their Flecaine LP

2   at the price corresponding to the generic drug, and the whole

3   argument has not been over whether that is French law.  Mr.

4   Schur admits it.  He admits it flatly and he says he admitted

5   further, CEPS' job is to enforce future price changes that are

6   agreed to in a convention.  That is at 13 of page 1309.

7           THE COURT:  Right, and he says but this isn't that.

8           MR. ARMENIO:  Correct.  He is arguing, well, this

9   isn't clear enough to fix the price.  In his mind, he wanted to

10  see 16.35 euros or something more.  In his view, that is what

11  is necessary.

12          THE COURT:  He said a couple of times they know how to

13  do this.  If it is what they wanted to do, they would have done

14  it.

15          MR. ARMENIO:  What we have shown is in the negotiation

16  leading up to Article 2.2 and the implementation of it

17  afterwards, 3M knew exactly what the formula was.  There are

18  documents, document after document, where 3M explains the

19  particular amount of the price increase in its own internal

20  workings.

21          So they knew -- if we go, James, please, Slide 28 --

22  for example in PX 62 A, at that point it is the beginning of

23  2005, 3M knew that there was a fixed formula for what would

24  occur in 2006 for this and it was a decrease in price minus 40

25  percent.  That is right in PX 62 A.  Then we see later in time

1    when the CEPS policy changes, they have similar documentation

2    showing that it then became a minus 50 percent for the generic.

3                So when we look at this language -- James, can we go

4    do 20 again -- about whether the price was fixed, what 3M

5    bargained for and what 3M then implemented and understood shows

6    that the future event and the price in the future was fixed,

7    and 3M certainly knew what it was fixed to be.

8                The concept of whether a third party, divorced from

9    all of these things, what they know precisely, I would suggest

10   they would because the pricing of a generic was known in France

11   by CEPS policy and decree of these documents, but especially 3M

12   knew.  3M negotiated for this.  They were kept off the market

13   for over 400 days by CEPS and the social security minister

14   until they agreed to do just this, launch a generic or go to

15   the generic price within three years.

16               There is no possibility that they didn't know what was

17   expected of them.  When you have a future price condition like

18   this, Mr. Schur himself admits CEPS can just publish the price,

19   Mr. Destal's testimony is exactly consistent, and so that is

20   why I view the negotiation leading up to it.

21               THE COURT:  Why couldn't it be that is what they were

22   trying to do, but they didn't do it as a matter of French law?

23               Is that a possibility?

24               Because then it seems to me your point about what

25   Felber had in his mind and Mr. Renaudin had in his mind is

1    pertinent to the question of what they were trying to do, but

2    not necessarily what they effectuated, which seems to me again

3    in the context at least of the contract claims.

4             MR. ARMENIO:  Can we go to 79, please, James, please.

5             To answer your Honor's question, even if they somehow

6    didn't use the exact right words to reach regulatory status,

7    everyone on the stand knew that this document at a minimum

8    provided industry guidance.  We see that in Section 3.07 of the

9    contract.  Everybody knew, every single person who got on the

10   stand and testimony, at a minimum, bare minimum, this

11   convention indicated what CEPS expected to happen within three

12   years.  Mr. Schur used the word, "markers."  He said it set

13   down markers for what CEPS expected to happen in three years.

14            So even if it didn't rise to the level of specificity

15   for a regulation -- we submit that it did, but even if it did

16   not, it still at a minimum provided industry guidance to 3M

17   regarding what should happen, and 3M breached its

18   representation on 3.07 because it didn't tell Meda.

19            So you have got at a minimum a regulator who expected

20   a significant price cut in three years.  We believe it rose to

21   the level of a regulation in the law, but at a minimum it was

22   an expectation and guidance by CEPS of what they expect to

23   happen, and 3M, despite this representation that it told Meda

24   about all industry guidance, didn't tell Meda.

25            So Meda is sitting there, and as the documents show,

1    completely surprised, gets this letter from CEPS saying no

2    generic on the market, time for you to cut the price by 50

3    percent, and they scramble and negotiate and they explain they

4    didn't know, but even after all of that they get hit with a 30

5    percent price cut.

6           Again we believe that this is a regulation and

7    violates 3.07 in that regard, but at a minimum it is an

8    industry guidance more often.  Let's take a look at law.

9           THE COURT:  Sir, I want to focus my eyes for a second

10   on the rest.

11          MR. ARMENIO:  Yes, your Honor.

12          (Pause)

13          THE COURT:  Okay.  Thank you.

14          MR. ARMENIO:  We look further.  In addition to

15   violation of the representation by not providing industry

16   guidance, they violated by not being in compliance with the law

17   because let's look at the law.  Law includes regulations, and

18   again we have ample testimony from Mr. Schur and Mr. Destal

19   that the convention was a regulatory act, so at a minimum it

20   should have been disclosed.

21          Mr. Schur wants to say only part of the document was a

22   regulatory act, not all of it, but the document itself wasn't

23   disclosed at all.  No part of it was disclosed.  They violated

24   it.  Mr. Destal explains the whole document.  This is a

25   regulatory act.

1           THE COURT:  On this point, his point was part of it

2       was and that part was the pricing and that part wasn't a lack

3       of compliance with the listed pricing.

4           MR. ARMENIO:  But actually -- and I am glad you raised

5       that, your Honor -- there was, there really was because

6       something that Mr. Schur said was important.

7           At Page 1306, he explains the convention is a

8       regulatory act because it governs the conduct of non-parties

9       like pharmacists and patients.  That is why it is a regulatory

10      act in France.  It is not just again CEPS and drug company.  It

11      affects the pharmacists and the patients, and that is why it is

12      a regulatory act.

13          If I am a patient on May 5th, 2006, I am paying too

14      much for Flecaine LP because 3M violated its convention with

15      CEPS.  I am harmed as a patient in France every single day

16      after May 12, 2006 because I'm paying too much.  That

17      convention specifies the price that patients should pay.

18          They go in and they pay, and there is the wholesale

19      price and there is the pharmacist's price.  Yes, social

20      security covers a lot of it, but that is the price both to the

21      patient if there is any out-of-pocket if they don't have any

22      insurance and through to the government.

23          Every single person overpaid after April 12th, 2006

24      because 3M didn't honor its contract.  It is a regulatory act.

25      The future price fixed formula was in there.  Reduce it to the

1    price of a generic.  That is why the whole thing is a

2    regulatory act and you can't just part and parcel it.

3            The people who stood to benefit the most, the people

4    who actually pay were harmed the most the day after three years

5    when 3M kept silent, didn't tell CEPS, didn't give them the

6    required notice under 162-20-1 and also then Meda was harmed

7    because it didn't tell Meda.  It was a regulation in its

8    entirety, meant to protect patients and pharmacists and it was

9    thwarted because 3M didn't put a generic on the market and

10   didn't cut the price.

11           If we look at further the definition of law includes

12   governmental orders, and a government order includes decrees

13   but also stipulations and determinations, at a minimum every

14   person who got on the stand admitted that this convention was

15   an agreed form work of intent.  It was at a minimum an agreed

16   understanding.  It was an agreement.  We have countless

17   documents that call it a contract.  At a minimum it was a

18   stipulation between CEPS and 3M; here's what we're going to do

19   in three years.

20           Meda contends it had the specificity in the price

21   prediction provision to be a regulation, but even if it did

22   not, it was at a minimum a stipulation between CEPS and 3M

23   which makes it a law that 3M was not in compliance with, and at

24   the barest minimum, it was an industry guidance of CEPS telling

25   3M what it wants the price to be, putting down, as Mr. Schur

1    himself said, the markers of what he expected, of what CEPS

2    expected to see.

3            When we look, we can see --

4            THE COURT:  Under this theory, there was a whole lot

5    of stuff that should have been put in that data room that

6    wasn't, right?

7            MR. ARMENIO:  There was a whole lot of stuff that

8    should have been put in that data room, you're exactly right,

9    your Honor.  They breached their representation on this

10   countless ways, but what we know from Mr. Dierks, who explained

11   it, is 90 plus percent of the time he even used the No. 97 or

12   98, a convention is just the price, the drug name and the

13   price, just those two things and those are published.  So the

14   fact that there was not a stack of conventions that just said

15   drug price, drug name and drug price didn't set off alarm bells

16   for Dr. Dierks.

17           THE COURT:  Doesn't that run against your argument as

18   to what the intent of this language was if you're saying the

19   intent of this language should be read in a way to capture just

20   a massive amount of stuff that everybody would know?

21           I mean it seems to me it is fairly obvious from

22   questioning and testimony that anyone looking at it would know

23   there were no CEPS conventions in there, and if that didn't set

24   off an alarm or if what you're saying is it didn't set off an

25   alarm because all that information could be easily gotten, why

 1    doesn't that run against your argument as to what this language

 2    was meant to capture?

 3         Why would you contract, as a matter of contract

 4    interpretation, why would you contract to require -- why would

 5    anybody contract to require disclosure of tons of stuff that

 6    isn't disclosed?

 7         MR. ARMENIO:  If we look at this one, 3.07, it is to

 8    seller's knowledge, the business is not in violation of any law

 9    and has complied in all material respects with the regulatory

10    respects and guidance.  This is the representation in 3.07.  We

11    are good corporate citizens, we are not breaking the law and we

12    are not out of compliance since December 31, 2004.

13         THE COURT:  That answers it with respect to 3.07 and

14    the compliance provision.  I guess that's right.

15         So your answer is well, even if all those -- well, I

16    guess then the question is should CEPS, should all of the

17    pricing conventions have been in there or is your answer no so

18    long as they were in compliance?

19         MR. ARMENIO:  For 3.07, the breach is the lack of

20    compliance and the fact that they were in violation of law.

21         For 3.07, it doesn't matter, in my view, your Honor,

22    whether the convention was in or not in the data room because

23    it is 3M saying we haven't violated the law --

24         THE COURT:  Right.

25         MR. ARMENIO:  -- as defined, and they did.  They

D1VJMED1                    Summation - Mr. Armenio

1    violated a regulation.  At a minimum, they violated a

2    stipulation.  Then they said since December 31, we've complied

3    in all material respects with regulatory requirements and

4    industry guidance.

5          They didn't comply.  By mid-April 2006 they were out

6    of compliance with the regulatory requirement and the

7    convention which was at a minimum an industry guidance of what

8    CEPS should be doing.  For 3.07, they breach regardless of

9    whether the convention is in or not in the data room because

10   they're not in compliance and they're in violation of law.

11         If your Honor would like to look, we can look further

12   at Slide 87.  I misspoke.  Slide 85.  This is the 3.12,

13   disclosure of all material and assumed contracts.  Now, this

14   one there's really a couple of definitions going on.  There is

15   an assumed contract, capital A, capital C definition, and there

16   is a material contract, capital M, capital C, and the assumed

17   contracts are defined terms in the agreement and it lists all

18   the things that would make it an assumed contract.

19         When we looked at contracts pursuant to which a third

20   party purchases the products, it's the case that this could be

21   an assumed contract, right, because CEPS conventions govern the

22   price at which it is purchased, but the rep that is actually

23   made is all material, sellers made available to purchase all

24   material, lower case M, assumed contracts.  If you have an

25   assumed contract like a convention that's not material because

1    all it does is reflect the price that's --

2              THE COURT:  So material assumed contracts would be a

3    subset of assumed contracts?

4              MR. ARMENIO:  Absolutely.

5              THE COURT:  Now lets talk about why assumed contracts

6    doesn't just at the end fall under what is set forth in Section

7    1.101 of the disclosure schedule.

8              MR. ARMENIO:  When we look at that argument, our

9    argument hasn't changed from the opening.  I know we had the

10   exchange with your Honor at the opening.  If we read it their

11   way, it is an absurd result.

12             THE COURT:  So you're sophisticated parties.  You

13   contract, right?  You contracted for certain language.  Unless

14   you can cite me a proposition of law that says I should read a

15   different meaning into an absurd result -- and I don't think

16   you have.  What I think you need to do is walk me through some

17   plausible reading of the words as they're written that you

18   negotiated for and got that comes out to a different conclusion

19   than that.

20             You wouldn't have written it that way, I gather?

21             MR. ARMENIO:  Quinn Emanuel trial lawyers, yes, I

22   wouldn't have been involved in writing it, your Honor.  If we

23   look at Section 312, it is from PX 305, let's put up the

24   language.  So they're saying this provides as of the date a

25   complete list of every assumed contract referred to in clauses

1  1 through 11.  So similar to what we mentioned in opening,

2  there is no need for a 1 through 11 if it is just everything on

3  the list is on the list.

4          Then it goes through further and talks about how

5  certain of the assumed contracts need additional categories 1

6  through 7 and are, therefore, material contracts with a capital

7  M.  They say sellers made available to purchaser true and

8  complete copies of all material, lower case M, assumed

9  contracts.  We know that didn't happen.

10         THE COURT:  Now what we know is we have to go to the

11  definition of assumed contract, don't we?

12         MR. ARMENIO:  Yes, absolutely.  So if we look at it,

13  there are a variety of -- and it goes down and has 11 different

14  aspects where it could be shall mean the following contracts,

15  the contracts pursuant to which a third party purchases

16  products from the seller, the contracts relating to the

17  marketing of the products, the contracts relating to payment of

18  rebates.

19         The construction that 3M wants is that this is then

20  limited by only the things on Section 1.01 as opposed to this

21  being a statement that these are the assumed contracts and

22  we've put those on Article 1.1.

23         THE COURT:  So what language could get into that

24  reading?

25         MR. ARMENIO:  I think as we'll set forth in our

1    conclusions of law, that is the fair reading that avoids the

2    absurd result.

3        THE COURT:  You'll cite me a case for the proposition

4    that I should interpret the language to avoid the otherwise

5    plain language, to avoid an absurd result.

6        MR. ARMENIO:  We'll include all the authority we have

7    on that point, your Honor.

8        THE COURT:  Okay.  All right.  At pace, you concede

9    that the language as written, seemingly plain meaning, even if

10   it is somewhat absurd is the disclosure of everything that is

11   being disclosed?

12       MR. ARMENIO:  I don't, your Honor.  I continue to

13   believe that when read fairly, even avoiding and not having to

14   resort to the case law, avoiding absurd results and the like --

15       THE COURT:  That is what I want you to walk me through

16   because I'm not there yet.

17       MR. ARMENIO:  When I look at the language --

18       THE COURT:  Use your pointer thing so we are talking

19   about the actual words.

20       MR. ARMENIO:  When I look at the language, the

21   contracts pursuant to which a third party purchases the

22   products from the seller, so I think there is agreement that

23   one would be satisfied for the CEPS convention at issue here,

24   and the language that everyone is focused on is "that are."

25       THE COURT:  You wanted, "and between seller and that,"

1    right?  Or no?  That still wouldn't get you there.

2              MR. ARMENIO:  I think quite frankly, if I had to put

3    myself into the mind of the drafter, they had a "that which"

4    problem.

5              It is really what is intended here is it means all the

6    contracts pursuant to which a third party purchases the

7    products from the seller which we're setting forth on the

8    schedule as opposed to that which then defines introductory

9    clause and limits it to that which is on the schedule.

10             Because then it doesn't make sense otherwise to have

11   11 categories of documents when they could have just said an

12   assumed contract shall mean any contract listed in Section 1.01

13   A of the seller disclosure schedule, period.

14             That's how it would have been written if it means what

15   3M says it means.  So I think reading it, number one, I think

16   this is a "that which" problem.  It is not meant there.  It is

17   saying this is an assumed contract, as your Honor said, maybe

18   the words would have been much more clear if it said and we're

19   putting it on 1.01, which, oh, by the way, is also on 1.01, but

20   I don't believe it should properly be read to limiting it to

21   only on 1.01 both in reading it and avoiding the absurd result

22   of, well, they wouldn't have written it this way if they meant

23   what is on the schedule is on the schedule.  They just would

24   have written it that way if that is what was intended.

25             If we look at what is on this document, the only

1   testimony regarding the intention of the parties in connection

2   with contract drafting was from Mr. Larnholt.

3        THE COURT:  Right, but I only get to caring about

4   intent if you show me an ambiguity.

5        MR. ARMENIO:  I believe, your Honor, at a minimum,

6   having 11 different categories in an assumed contract

7   definition that spans more than half a page, it is at least

8   ambiguous whether it really is just assumed contract shall mean

9   all of the contracts on Section 1.01 A, seller disclosure

10  schedule, period.

11       THE COURT:  So that the rest of that language would be

12  superfluous is what you think leads to a conclusion of

13  ambiguity?

14       MR. ARMENIO:  I think it shows the superfluity of the

15  rest of the language, shows it is not what the parties

16  intended, so at a minimum the plain language is ambiguous so we

17  look at it and understand well what was the intent here.

18  Mr. Larnholt testified the intention was to be as broad as

19  possible and get full disclosure.  There was no contrary

20  evidence from 3M.

21       The result, reading it again 3M's way, in addition to

22  rendering all that contract language superfluous which is

23  against fundamental contract interpretation maxims, would also

24  render it absurd.  It is absurd that a buyer would let a seller

25  just dictate I'm telling you and representing to you what I'm

1    representing to you, and that's it.  It makes no senses

2    specially in the context of the overall agreement and in the

3    context of the sale of this business.

4            There was some fight, and I think a case well, is it

5    binding enough to be, is this convention binding enough to be a

6    contract that would fall under the 3.12 requirement of

7    disclosure.  I think that has been resolved by the French law.

8    Both the French law cited L-161-16-4.  The price shall be set

9    by agreement between the company and CEPS and violations of

10   agreements shall be reported and prosecuted.

11           R-162-20-1, when changes in the sale price have been

12   provided, the economic committee shall make sure the conditions

13   for changes in the price have been met and the company shall

14   forward the necessary items at least 40 days ahead.  As Mr.

15   Schur explained, that is an obligation.  This is language of

16   obligation.

17           Mr. Destal explained it very clearly that CEPS doesn't

18   have to ask the funds of the company to lower the price.  The

19   company has to spontaneously lower the prices according to the

20   obligations of the convention.  This was certainly not an

21   agreement to agree, not something that was nonbinding.

22           THE COURT:  Did Mr. Destal ever testify that it was a

23   contract?

24           MR. ARMENIO:  What he testified to is that it is a

25   regulatory act which reflects the agreement of the parties, so

1    it is both.  It has this dual character, your Honor, under

2    French law.  It is a contract between CEPS and the company and

3    it is a regular layer to act because it also governs the prices

4    for pharmacists and patients and everybody else.

5           When they go to the pharmacy between April 12, 2003

6    and 2006, they paid 1710 euros governed by this convention.  It

7    was the law in France.

8           After that date in 2006, April 13, 2006, they were

9    supposed to pay the generic price, but they didn't because 3M

10   never honored its obligations under the convention.  So it is

11   both.  CEPS and the company have a contract and it is a

12   regulation that governs conduct law.  We can see the contract

13   aspect comes out in the cases.  For example, Mr. Schur cites a

14   drug company can be sued by a private citizen or another drug

15   company for failure to comply with its CEPS obligations, and

16   that is a suit to enforce them to honor their obligations under

17   the CEPS convention.

18          If we look at it further, Mr. Schur actually talked

19   about in his redirect what would be the language, what would be

20   the effect of the language in a convention that was not a

21   regulatory act in his view.  He said it would be an

22   administrative contract.  He said it clearly on questioning

23   from Mr. Renard.  It wasn't a trick, it wasn't anything.  It

24   was on redirect.  Even Mr. Schur admits that for those portions

25   he doesn't believe are regulatory act, that language is an

D1VJMED1                        Summation - Mr. Armenio

1    administrative contract.

2              So I don't think really on the record we have from

3    Mr. Destal, from Mr. Mariotte who actually speaks to this issue

4    and from Mr. Schur that there can be any doubt there is a

5    contract reflected in the convention and it should have been

6    disclosed under Section 3.12 of the contract.

7              If we go ahead to Section 3.5 of the contract --

8    James, Slide 94, please -- this is another representation that

9    3M violated because it was supposed to provide all regulatory

10   filings, and it represented it was also in compliance in all

11   material respects with all regulatory filings and laws.  It was

12   supposed to provide them and it represented it was in

13   compliance.  Two parts, two representations in Section 3.15, 3M

14   breached both.

15             When we look at regulatory filings, okay, regulatory

16   filings, the definition includes a definition of marketing

17   authorization.

18             THE COURT:  Does this just turn into a redundant

19   argument with with 3.07?

20             (Continued on next page)

21

22

23

24

25

1   MR. ARMENIO:  I don't believe so, your Honor.  Because

2   this one turns on what is a regulatory filing.  And there is

3   additional specific language on regulatory filing.  The

4   definition is marketing authorization and related submission,

5   including correspondence between seller and health authorities.

6   And every person who got on that stand admitted that SEPS

7   embodies a health authority, represents the health authority,

8   is comprised of health authorities.  Ms. Barreau was clear on

9   that issue, as was every witness.  SEPS is the government.  And

10  SEPS is comprised of government ministers from all of the other

11  health authorities.  There is no way out of SEPS being a health

12  authority.

13          But even if you go further, the definition of

14  marketing authorization, which is part of regulatory filings,

15  includes lowercase marketing authorizations issued by a health

16  authority.  But then you can look past that, and even if the

17  Court were not persuaded that SEPS was a health authority --

18  and we believe of course that it is -- marketing authorizations

19  also include supplements or variations thereto, including all

20  pricing and reimbursement approvals.

21          So there is clear language that even if SEPS were

22  somehow not a health authority, all pricing and reimbursement

23  approvals are part of the definition of marketing

24  authorization, therefore part of the definition of regulatory

25  filings -- capital R, capital F -- and 3M violated its

D1V8MED2                    Summation - Mr. Armenio

1   representations that it provided all of them and was in

2   compliance.

3        THE COURT:  Just grammatically marketing

4   authorizations.  So you want to say that the comma after

5   territory -- well, you tell me.  What does "thereto" refer to

6   in that clause?

7        MR. ARMENIO:  If we look at it with any supplements or

8   variations, thereto would refer to everything that's being

9   defined up front.  Marketing authorizations, registrations,

10  permits, licenses, for a product issued by a health authority.

11  And then there is the extra language that's added, and it's

12  added by Meda during the negotiations, and Mr. Larnholt

13  testified to it, to make sure that it's capturing all pricing

14  and reimbursement approvals.

15       Meda intended to add this.  Mr. Larnholt testified to

16  it.  If we look at Larnholt declaration in 87 and 88, they

17  changed the definition of marketing authorizations to add,

18  including all pricing and reimbursement approvals.  And we can

19  see in JX 89, the actual markup that added this language is the

20  same day of Meda's firm bid for the business.

21       This was an important factor.  And Mr. Larnholt has

22  explained, I believe, that this was important because Meda was

23  a European company, 3M was an American company, and sometimes

24  American companies get confused because the FDA doesn't do this

25  pricing effort that happens in Europe, and this is added.  So

1    this language captures it and was specifically added to capture

2    pricing and reimbursement approvals.

3          And when we see from the conduct of 3M, they knew it

4    was supposed to be in there.  For example, the Giovanonni

5    e-mail, JX 163A; the Brown e-mail, PX 182.  3M knew, the people

6    in corporate charged with populating the data room, they knew

7    it was supposed to be in there, pricing reimbursement, specific

8    commitment that 3M can have regarding price.

9          Then they say, well, highly sensitive pricing

10   discussions.  At least identify the existence of such document

11   in the appropriate placeholder.  They knew that was supposed to

12   be in the data room.  They understood very clearly what they

13   agreed to.

14         And when we talk about the documents, we see that they

15   didn't follow their own compliance policy.  They didn't follow

16   their own Giovanonni e-mail and Brown e-mail to collect this

17   stuff up.  So they knew what they had to provide.  And the

18   evidence has shown they purposely didn't provide it.  And I

19   won't belabor the point.  Mr. Carlinsky will go into it with

20   what happened in France when Ms. Kolsky and others were asked

21   to gather up this information and didn't do so.  It didn't get

22   in the data room.  Mr. Sauer and Mr. Sampson knew about it.

23   They didn't get it into the data room or otherwise disclose it.

24         So this language was added to the contract by Meda,

25   for a particular reason, to capture these types of pricing

1   agreements, and there is undisputed testimony in the record

2   from Mr. Larnholt on that.  There is the undisputed markup of

3   the document, JX 89.  No contrary testimony or evidence of any

4   kind from 3M that that was not the purpose for the addition.

5           So we look at health authority includes any government

6   agency in a country responsible for licenses and approvals,

7   clinical testing and manufacture or sale.  So that gets us into

8   the first half of marketing authorizations.  But even if the

9   Court is not persuaded that SEPS were a health authority,

10  despite all the testimony and documents to that effect, at a

11  minimum, these pricing and reimbursement approvals were

12  specifically added with the intent to capture pricing

13  conventions.

14          THE COURT:  Go back.  So that alternative reading, you

15  would say that issued by a health authority refers to licenses?

16          MR. ARMENIO:  If you look at health authority defined,

17  it means any governmental agency in the country.

18          THE COURT:  I understand the argument for health

19  authority.  But you're saying even if I am not persuaded, it's

20  a pricing and reimbursement approval for a marketing

21  authorization, right?

22          MR. ARMENIO:  Correct.

23          THE COURT:  Then you have to explain to me how I could

24  skip over the language of health authority and just get to

25  that, rather than seeing health authority language as

1    effectively modifying marketing authorizations and then only

2    saying and all pricing and reimbursement approvals?

3           MR. ARMENIO:  I think the best way to read it, the way

4    I would propose it to be read, marketing authorizations means

5    marketing authorizations, registrations, permits, and other

6    licenses for a product issued by a health authority.

7           Now, I will pause there and I would say health

8    authority, SEPS is one.  And licenses, yes.  SEPS gives a

9    license and a permit for this drug to be sold in a pharmacy

10   with a reimbursed price.  And we heard that from everybody on

11   the stand.  You can't sell it with a reimbursed price until you

12   go through SEPS.  We saw 3M spend 400-plus days with its

13   product not on the market because it needed the SEPS pricing

14   approval.  And it talks about these permits that permit

15   development, manufacture, use or sale, and -- so it's in

16   addition to these marketing authorizations, registrations

17   permits, and licenses issued by the health authority -- and

18   supplements and variations thereto, and it adds the language,

19   including all pricing and reimbursement approvals.

20          So the clear intent of the language, both the plain

21   language and the intent we put in evidence, is that supplements

22   and variations thereto is meant to include pricing and

23   reimbursement approvals.  I think, given any supplements or

24   variations thereto, including all pricing and reimbursement

25   approvals, the plain reading of that is that whatever

 1    supplements and variations thereto means, it includes pricing

 2    and reimbursement approvals.  And we have the clear testimony

 3    of Mr. Larnholt, and the markup in the document, that's what

 4    they intended.

 5         We also saw the conduct from 3M at least within the

 6    people initially populating the data room, that's how they

 7    understood it as well.  Because that's what they did.  They

 8    tried to collect it up, certain folks.  Mr. Brown and

 9    Ms. Giovanonni, they tried to collect it up.  They were

10    thwarted by Kolsky and the others in France and Mr. Sauer and

11    Mr. Sampson, but they tried to collect it up.  So they knew

12    what they were responsible for.

13         Let me just touch on good faith and fair dealing.

14    Even if your Honor were to find that somehow through the three

15    sections -- 3.07, 3.12, 3.15 -- 3M somehow did not have a duty

16    to provide this information, and did not breach its obligations

17    by being in violation without telling Meda, 3M still breached

18    the covenant of good faith and fair dealing.

19         What we saw here, and the evidence was undisputed,

20    Meda was a risk averse company and a risk averse acquirer.  We

21    saw that in the testimony of Mr. Lonner and Mr. Larnholt.  And

22    3M's expert, Mr. Garrambone, admitted it.  The company built

23    its portfolio in licensing and product development and avoids

24    risky situations.

25         THE COURT:  Mr. Armenio, have you ever seen a case

1     where sophisticated parties negotiated fairly extensive

2     disclosure requirements, but the one thing that they didn't

3     include, which would be the structure of me getting to this

4     argument, was the thing that really, really mattered, and

5     therefore it was a breach of the covenant of good faith and

6     fair dealing, and I should effectively add in that thing that

7     was so important, yet you didn't capture it in the language?

8     Can you cite me to a case for that proposition?

9               MR. ARMENIO:  When we are putting together our

10    conclusions of law, we are certainly addressing it.  What I

11    would focus on is two points.  Number one, there is an

12    underlying fraud here overall.  So 3M cannot take refuge in the

13    particular disclaimers and the particular --

14              THE COURT:  That's a fraud claim.

15              MR. ARMENIO:  -- limitations.

16              It also affects when we look at covenant of good faith

17    and fair dealing.

18              Is it the case when I, as a careful draftsperson, I

19    can make a line that only I, 3M, can see?  Meda didn't see.

20    Meda thought it was getting all material information.  You

21    heard Mr. Lonner and Larnholt say they believed and wanted all

22    material information.  That's what they believed they were

23    getting.  And what is not fair is if a company like 3M comes in

24    and says, oh, well, I don't have to do it over here.

25              THE COURT:  So you want to say that the fraud was so

D1V8MED2                   Summation - Mr. Armenio

deep and embedded and thought out that the drafting of this

language was done to avoid disclosing this particular document.

          MR. ARMENIO:  What I am saying, your Honor, is that

drafting of specific disclosures can't allow a company to avoid

the fundamental value of the deal to the purchaser.  What Meda

wanted here, the fundamental thing Meda wanted was a stable

cash cow business.  That's what it wanted to buy.  It asked for

all material information in connection with its evaluation of

the business.  It believed it was receiving all material

information.  We believe it was not given that, and that there

were multiple breaches of the contract that were a trigger by

3M not providing this information and not being in compliance

with law.

          But if we look at it, if 3M has a very literalistic

view of these representations and believes there is somehow a

way that you can get around all these representations and still

deny the benefit of the bargain to Meda, which wanted as a risk

averse company a stable cash cow business, that is per se a

breach of the covenant of good faith and fair dealing.  They

knew exactly what Meda wanted.  We want a stable cash cow

business.  We are risk averse.  If they believe they can trace

around and move and dodge and weave and get around these

representations --

          THE COURT:  And hold you to the language of the

contract that you bargained for.

1    MR. ARMENIO:  The language of the contract that was

2    bargained for, while 3M had full knowledge of what it was

3    hiding, and Meda had no idea of what they were hiding and lying

4    to us about, in effect, they want to hold Meda to say, oh, you

5    said what we told you was enough.

6    THE COURT:  So your implied covenant argument turns --

7    to get there I need to find not only that there was not a

8    breach, but that there is a fraud.

9    MR. ARMENIO:  I don't think your Honor needs to find

10   as far as fraud to find a covenant of good faith and fair

11   dealing.  Fraud has its own higher standard.

12   THE COURT:  You said it was a fraud.  I understood

13   that to mean as legally defined.

14   MR. ARMENIO:  It is certainly a fraud and Mr.

15   Carlinsky will speak to that.  But if we take a step back, did

16   3M know information, and by withholding that information,

17   denied Meda the benefit of its bargain?  I think the answers to

18   those two things are abundantly clear.  Mr. Sampson and Mr.

19   Sauer sat on the stand and testified, they knew of the risk,

20   they knew of the convention, and they didn't tell Meda.  They

21   knew Meda, as a risk averse company, it wanted a stable cash

22   cow business.  They knew there was a risk.

23   Mr. Sauer admitted, on your Honor's own questioning,

24   an important risk that could be up to even 40 percent, and yet

25   they said nothing.  In that kind of situation, they are denying

1   Meda the benefit of the bargain Meda sought.  Meda believed it

2   was being told everything.  But if somehow there is an overly

3   literal reading of these representations that 3M can somehow

4   get around all of them, and hide a pricing agreement on the

5   most important product, in the most important country, if

6   that's somehow outside of violating the contract -- again, I

7   don't believe it is -- but if that's somehow outside, it's

8   fundamentally depriving Meda of the benefit of its bargain.

9          So I don't think it has to go all the way to fraud to

10  prove that breach of covenant and fair dealing.  To me it's

11  first principle.  I want a stable cash cow business.  Please

12  tell me everything so I can decide whether to buy to.

13         Meda, this is a wonderful stable cash cow business,

14  with EBITDA growing, stable and consistent earnings, no

15  problems.  Mr. Lonner, Mr. Sampson, have you told me everything

16  I need to know?  Sure, there is nothing.  In the data room,

17  anything?  Nothing.

18         They buy what they think is a stable cash cow

19  business, and it is not.  They get the letter from SEPS cutting

20  the biggest product in the biggest market.  They were

21  fundamentally denied the benefit of their bargain.  And when 3M

22  tries to say, we negotiated for these very precise limitations

23  in the contract, they didn't negotiate with equal knowledge.

24  They did not.  And by manipulating the lack of equal knowledge,

25  Meda ended up buying a business that didn't exist.  Meda wanted

1    to buy a stable cash cow business.  They were selling a

2    business they knew was risky, with declining growth, they

3    needed to sell, their CEO was saying it's a pity we didn't do

4    it last year.

5         THE COURT:  No buyer knows what will be disclosed when

6    they are drafting their disclosure requirements, right?  The

7    whole point is to draft language that will capture everything

8    that you think could be there.

9         MR. ARMENIO:  I think the unequivocal evidence from

10   Mr. Schur, Mr. Garrambone, and all the witnesses is that

11   everyone in the industry would expect a pricing agreement on

12   the most important product in the most important country to the

13   business to be disclosed as a matter of fundamental business

14   ethics.  Mr. Schur and Mr. Garrambone said that.

15   Mr. Garrambone said -- at Pfizer, what would you have done --

16   either we would have disclosed it or we would have cleaned it

17   up first before going through the sale process.

18        So at a minimum, there is the expectations that an

19   agreement of this magnitude -- most important product, most

20   important country -- is going to be disclosed regardless of

21   what the lawyers end up doting the Is and crossing the Ts on.

22   This is too big.  This is the elephant.  It has to be

23   disclosed.

24        THE COURT:  You have gone for an hour.  Just one

25   question on that.  If the most important thing was purchasing a

1    stable company with an even stable cash flow, couldn't you have

2    done some kind of warrantee for that?  Can't at the end of the

3    day you contract for what it is that is most important to you?

4            MR. ARMENIO:  There is language available that we have

5    all seen in contracts.  What the problem was here is there was

6    nothing that 3M ever said to put Meda on even the remoteness

7    notice that it might need such language.  Everything they said

8    about the business was that it was stable, it was consistent,

9    it was going great.  They never said anything that would alert

10   a prospective purchaser that they might need some of the

11   protections that your Honor mentions.  If 3M had said anything

12   about specific price risks of Tambocor CR, I think that would

13   be a different situation.  They didn't.

14           THE COURT:  So this is a theory of contract, which is

15   seller must do a certain amount of disclosing before we can

16   have the information we need to go into contracting what we

17   think we need to protect us?

18           MR. ARMENIO:  I think what it is is in contract law

19   and in fraud law, if you're going to speak about something, you

20   can't lie, number one, and you can't speak halfway and give

21   half-truths.  And everything 3M did misrepresented the business

22   to Meda as being stable and a cash cow, when they knew that was

23   a lie.  They knew that was not the situation.  And we can even

24   see from the EBITDA valuation that Meda used.  They used the

25   valuation, as explained by Mr. Larnholt, that you use for a

1    stable cash cow business.  If it had been a risky business, it

2    would have even been valued differently.  So everything 3M did

3    to present the business was to present it as a stable cash cow

4    business, attractive to Meda, and hide the reality.  And they

5    succeeded.  But I think I need to cede the floor to Mr.

6    Carlinsky.

7              THE COURT:  He is getting nervous.

8              MR. CARLINSKY:  Your Honor, this was a fraud, and if

9    we can turn to, let's start on slide 103.

10             Here are the elements.  I am not going to spend time

11   now.  We will brief those for the Court.

12             If we can flip to slide number 4, James.

13             We know the materiality of this SEPS convention.  We

14   have to remember what we are talking about here.  This is not a

15   minor product in a minor country.  This product Tambocor CR was

16   the flagship product.  It was the featured product, as you

17   heard from Sauer and Sampson.  When we look at the offering

18   memo, when we look at the management presentation, it is really

19   all about Tambocor CR.  And I note that when Mr. Keel

20   testified, a 15 percent price reduction to the legacy product

21   IR, which, of course, happened in early '06, was big news.

22   Imagine the big news with a 50 percent price reduction on CR,

23   the flagship featured product.

24             These are slides that I am not going to spend time on,

25   other than there is no question here that in France, and I am

 1   going to start in France, they knew exactly what the convention

 2   provided for and what the risks were associated with Article

 3   2.2.  Mr. Traineau said --

 4           THE COURT:  Is this your scienter argument?

 5           MR. CARLINSKY:  It is all part of the scienter

 6   argument.  And what I think is clear here was a deliberate

 7   cover-up.

 8           So Mr. Traineau says, of course we know what the

 9   language was, and he talked about how it had to be overcome.

10   And the Court asked, when was that pressure or the risks

11   associated ultimately going to present itself?  Somewhere in

12   2006.  And even Ms. Barreau, who fought to try to explain away

13   the convention, recognized it would at a minimum be the

14   starting point of any discussions Mr. Renaudin.

15           We saw this slide.  This is the e-mail JX 163A, on

16   April 20, that goes out in Europe, and it of course asks for

17   lots of different documents that are supposed to populate the

18   data room, but it specifically identifies pricing reimbursement

19   and it talks about specific commitment that 3M could have

20   regarding price.  It cannot be more clear, specific commitment

21   regarding price.  And what happens?  The next day, as we see in

22   JX 163A, Ms. Kolsky, who receives this request, Ms. Kolsky in

23   163A --

24           THE COURT:  Slow down a little bit.  I am going to

25   give both sides some additional time.

1      MR. CARLINSKY:  Let me put on the elmo for a minute

2  163A.  This is Kolsky's e-mail, the very next day.  It's part

3  of the long chain.  She has just received, specifically, Ms.

4  Giovanonni's e-mail that we looked at, which talks about, among

5  other things, the collection of specific commitments, pricing,

6  the price and reimbursement, the dossier, summary of the price

7  dossier.

8      THE COURT:  What is the (volume clause ...)?  Did we

9  get any testimony on that?

10      MR. CARLINSKY:  We don't have any testimony on that,

11  but we do have Mr. Wanlass who recognizes this reference,

12  because it's then picked up in some documents we are going to

13  see following on this document, where Mr. Brown is talking

14  about these references.  Mr. Wanlass, the 30(b) representative,

15  testifies, yes, I understood this to be referring to the

16  Tambocor CR convention.  And we will see that in a moment.

17      But we don't even have to question it because we know,

18  we have Kolsky here, who receives this, and what she says is,

19  we have been pulling together all of the documents that have

20  been requested, with the exception of one, which she says, I am

21  unable to respond without having received your guarantee.  And

22  she goes on to talk about, since it is required for each

23  subsidiary to provide the specific price/volume clauses, and

24  she identifies specifically Flecaine, and she says, these

25  should remain confidential.  So her message is, I am not

D1V8MED2                    Summation - Mr. Carlinsky

1    produces these unless you, and who does it go to, a list of

2    names that we have all become familiar with, Mr. Traineau,

3    Husson, Delspy and Biffaud, members of the Flecaine steering

4    committee.

5              So that's what happens on the 21st.  I will leave that

6    up there for your Honor.  And what she is saying is, I am not

7    going to produce this document even though it's clearly been

8    called for.

9              Next slide, please.

10             Now we have PX 182.  This is Mr. Ian Brown, who has

11   been identified as the lawyer in the UK responsible for the due

12   diligence efforts for the UK and Europe.  And he writes, There

13   has been some question about what should be done with highly

14   sensitive/confidential documents (e.g., highly sensitive

15   government pricing discussions).  If you determine that the

16   documents are relevant and material, but are too sensitive in

17   the first round, we suggest you identify the existence and

18   indicate in a folder that it will be available upon request.

19             We then have another e-mail from Mr. Brown on May 16

20   where he says, if agreements are so commercially sensitive, we

21   would not want to disclose them at this stage, but only

22   disclose them at a subsequent stage when we knew the buyer was

23   serious.  Please indicate, slip folder or some kind of a slip

24   sheet.  And he says, I know that in one country, for example,

25   this is the route that has been followed with some particularly

1   sensitive government contracts.  He is talking, of course,

2   about the Tambocor or the French pricing agreements.

3          THE COURT:  You say agreements or agreement?

4          MR. CARLINSKY:  He is referring in the plural.  But

5   what Mr. Wanlass says, I understood that reference to be a

6   reference to the Tambocor CR price convention.  He testified to

7   that.

8          But the more important point is, your Honor, he is

9   testifying, what ultimately happens?  He says, I know no slip

10  sheet was put in, even though that was what was supposed to

11  have happened, and he can't tell us why not.  So the witness

12  charged with answering the question of Ms. Kolsky, you say

13  you're not going to produce it.  Mr. Brown, you're focused on

14  this issue.  It's not as if somebody can legitimately say,

15  well, we kind of never even focused on it.  We have direct

16  attention focused on this issue, and we have no answer provided

17  by Mr. Wanlass nor from any witness who has come in here to

18  testify.

19         THE COURT:  But is one plausible answer that they

20  screwed up?

21         MR. CARLINSKY:  One plausible answer is they screwed

22  up, if Mr. Wanlass had done the investigation and come in here

23  and testified that, I spoke to team people, I asked Ian Brown,

24  how is this issue resolved, and he told me that it was a

25  screw-up, or if he talked to Mr. Kolsky and came in and said,

1   Kolsky ultimately produced the document to Ian Brown and it sat

2   in his files and somehow it was not ultimately disclosed.

3           THE COURT:  It was their burden to explain it?

4           MR. CARLINSKY:  It was their burden to explain it.

5   Once there was a 30(b)(6) witness, charged with that duty to

6   investigate and ultimately come forward and testify on that

7   issue, it was their duty.

8           THE COURT:  But he came forward and he said he didn't

9   know.

10          MR. CARLINSKY:  He came forward and said, I don't know

11  because I didn't speak to any of them.  His entire

12  investigation amounted to one thing only.  I spoke to outside

13  counsel, and I reviewed documents that were cherry-picked.

14          But there is another point I want to make, your Honor,

15  which is let's go to 108.

16          The same Kolsky that we just saw on April 21 saying, I

17  am not going to produce these documents, telling the steering

18  committee, remember -- I'm sorry.  Here is 108.  Remember this

19  e-mail from Kolsky, PX 194A, on May 30, how she is talking

20  about the consequences of the delay.

21          By the way, what I would like to show your Honor is we

22  saw the e-mail from Kolsky which is -- let's go back to the

23  elmo -- April 21, which is JX 163.  The day before, and this is

24  JX 163A, here is Kolsky, and she is writing to her cronies on

25  the steering committee, and she talking about the delays

D1V8MED2                    Summation - Mr. Carlinsky

1    associated with Tambocor and the materials going to the

2    transparency committee.  The day before she writes, This

3    estimate is favorable to the preservation of the estimate of

4    the operating plan of 2006."

5            So the day before she is saying essentially good news,

6    the whole entire SEPS negotiation is going to be pushed off.

7    The next day, on April 21, she is saying, I'm not producing to

8    the data room the convention.  And then a month later, if we

9    can go back to slide 108, she talks about and is celebrating

10   the consequences of the delay.

11           A 2006 operating plan, Q3 and Q4, unmarred by any

12   reduction in the price of Flecaine.  And then look at that last

13   line, your Honor.  "A more attractive image of France pharma

14   for prospective buyers between now and the fall than there will

15   be at the end of the negotiation."

16           Your Honor, in fraud cases you don't typically get

17   someone who says, I admit I am committing fraud.  But I will

18   tell your Honor, in my experience, that's as close as it gets.

19   We are dressing up this business.  We are creating an

20   attractive image, a false image, but an attractive image.  Why?

21   Because we are not going to produce the convention, and we are

22   going to push off these negotiations, because if the

23   negotiations had happened during the period of the sale, it

24   wouldn't have been just red flags that would have gone off.  It

25   would have been red flares.  Because all of a sudden there

1    would have been a price reduction, and all of a sudden Meda

2    would have said, wait a minute, what's going on here?

3           And what Kolsky here, and we are going to see some of

4    her later e-mails -- if we go to the next slide, please -- this

5    is the very next day, she is writing again to the steering

6    committee, I am pleased with your remarks since I tried

7    yesterday to postpone this meeting with HAS in our best

8    interest.  And then, of course, after the fact, in November of

9    2006, the same Kolsky -- and I am making the link back to, I'm

10   not producing this convention unless you tell me, steering

11   committee, that's who her e-mail April 21 went to -- she says,

12   they are celebrating that they have managed to push off the

13   delay of the file in order to preserve the price of Flecaine IR

14   and CR until the end of the year 2006 and the non-application

15   of the specific clause.

16          Now, next slide.  Again, we have no explanation.

17   Mr. Wanlass says, well, it was a mistake, but I don't have any

18   evidence.  I am just deducing that because there were some

19   documents that were cherry-picked for me to see.

20          THE COURT:  Can you go back one?

21          MR. CARLINSKY:  Yes.

22          THE COURT:  So the re-registration date has passed,

23   largely passed.  And we have delayed, in order to preserve the

24   price, until the end of the year 2006, and the non-application

25   of the specific clause.

 1          MR. CARLINSKY:  Yes.

 2          THE COURT:  Isn't that consistent with their theory,

 3   which is that the whole effort was to get a non-application of

 4   this clause having been successful in that?

 5          MR. CARLINSKY:  First of all, they should have

 6   disclosed the agreement because every witness recognized the

 7   significant risk associated with the agreement.  What these

 8   documents are telling us, and in fact go back to the prior

 9   document where she is talking about a prettier image for the

10   business, what she is saying, and she recognizes, if we go back

11   a couple of slides, a better image than there will be at the

12   end of the negotiation.  She is recognizing that when we get to

13   the end of the negotiation, there is going to be a price

14   decrease.

15          THE COURT:  But again, so their theory, the whole game

16   here, the whole pricing game, is time.  And so that's what the

17   currency of the negotiation is -- not currency, but that's the

18   goal, get more time, time is money, and so, of course, what we

19   will show is we have successfully pushed for more time.

20          MR. CARLINSKY:  They are clearly pushing for more

21   time.  They are clearly trying to delay.  But why are they

22   trying to delay at that point, your Honor?  They are trying to

23   delay it because Meda is an interested buyer.  Meda doesn't

24   know about any of this information.  And if they can delay it

25   as opposed to the negotiation happens and Renaudin says, I am

enforcing and I want 50 percent or 40 percent, that's going to

send up red flares.  And Meda, as Mr. Keel recognized in one of

his documents that we looked at, they had no back-up plan.

They had no other buyers.  Mr. Keel recognized a sketchy

process.  Any issue that comes up is a surprise.

That's what Ms. Kolsky is talking about here.  Let's

push this off so that when this business is being looked at as

we are selling it, it will look more attractive than it

ultimately really will be.  And whether it was delayed because

they thought they were going to be able to delay things, or it

was delayed because they were hiding it, they had an

obligation, if we are buying the business, if Meda is buying

the business, to disclose it, so Meda can understand what the

risk is.  We know what happens after when SEPS comes and says,

we expect 50 percent.  But this is all delay, delay, delay, and

don't tell Meda.

Now, that's France.  We now know, because Mr. Sampson

and Mr. Sauer took the stand -- if we can go to 112 -- we now

know in addition, and, your Honor, I don't think it's an

overstatement to say that Mr. Sampson admitted to fraud.  Mr.

Sampson admitted he learned of the convention by May of 2006.

He learned of it from Mr. Traineau.  He testified at 842 that

the convention that he was being told about harks back to 2003.

So we know exactly what convention we are talking about.  And

there was a need for 3M to try and go back and negotiate, try

D1V8MED2                    Summation - Mr. Carlinsky

1    to go back and negotiate.  That's part of Mr. Sampson's

2    testimony.

3              Next slide, please.  Then he was asked, and he

4    testified, I remember that pricing is a challenge, and that

5    there was a convention that existed that may have required 3M

6    to change its price.

7              And he was asked, do you remember that there was a

8    discussion that the alternative to a price -- he is describing

9    his meeting with Traineau when he is learning about the

10   convention in May of '06.  And he says, I remember that as an

11   alternative was the launch of a generic or the equivalent of a

12   generic.  He remembers being told that.  And he also testified

13   that with respect to the price option, understood that the

14   price risk was to do with generic price levels.  Never said it

15   was unclear, didn't understand it.  He talks about what he was

16   told.  Then he was asked, did you see in the materials when

17   this was ultimately coming due?  And he said, the convention

18   laid out what they expected to happen.  This is Mr. Sampson's

19   testimony.

20             Next slide.  Of course he knew the significance of

21   Tambocor.  82 percent of the business's operating profits, and

22   now he is aware that this product is subject to a significant

23   serious price risk.

24             Next slide, please.  So what happens?

25             Let's actually jump to 116 for a minute.

D1V8MED2                    Summation - Mr. Carlinsky

1            He was the most senior executive.  He had

2    responsibility for the management, presentation and approval of

3    all of the disclosures.  Mr. Lonner testified, I asked Mr.

4    Sampson at the management presentation.  When was that, your

5    Honor?  That's in June.  That's the month after Sampson knows

6    from the French team of this pricing convention.

7            "In the presentation, Mr. Sampson, did you say

8    anything to Meda to advise them of what you had learned a month

9    earlier?"

10           "I did not."

11           Go back a slide, 115.  DX 255, which is in evidence.

12   Mr. Sampson spent -- in fact, I have it here, but in the

13   interest of time -- Mr. Sampson spent two days in September

14   with Meda where they were negotiating the acquisition

15   agreement, two days.

16           Now, why is that important?  Mr. Sampson gave us a

17   whole litany of excuses why he didn't disclose what he had

18   learned, and one of them was, well, I didn't know whether they

19   were serious yet.  But then by August 30, Meda submits a

20   binding offer, and now they are meeting in Minnesota to

21   negotiate the acquisition agreement.  And Sampson is there for

22   two entire days; he is in every meeting session with Meda.

23   Does he say a word?  Not a word.

24           I asked him, What about after the acquisition

25   agreement was signed, or at any point in time, did you ever

1    pick up the phone to say, you should know that there is a

2    significant risk associated with the business, the European

3    business that you're buying and you're paying $850 million for?

4    Perhaps you see the risk differently than us.  Anything.  Not a

5    word.  Mr. Sampson sat there with full knowledge and didn't say

6    a word.

7            Now, if we can go to Mr. Sauer.  Mr. Sauer testified

8    he was involved in numerous discussions in '05 and '06 with

9    Traineau and Biffaud in which they warned him of, his wards, an

10   important risk to the price of Flecaine.  He admitted that

11   among the scenarios he was told was a 40 percent price

12   decrease.

13           Next slide, please.  And your Honor asked a great

14   question.  We were talking about -- you're looking at me.  Does

15   that mean time is almost up?

16           THE COURT:  Yes.  You have been going 85 minutes.  You

17   had 90 minutes.  I am going to extend each side by 20 minutes.

18   So if you want to reserve 20, you have got five.

19           MR. CARLINSKY:  Your Honor asked a question, the

20   document that Mr. Sauer ultimately testified he was asked about

21   when he conducted his investigation after the issues arose, and

22   he said, I learned that a document had not been turned over.

23   And then your Honor asked this question:

24           "Do you connect that document to the information that

25   was being conveyed about the risk of a price reduction for

1   Tambocor CR due to government pressures?"

2           He says, "I do."

3           So a critical point is it was the convention that

4   created the risk.  The risk that he was being told about when

5   he was meeting with the French team, not general pricing

6   pressures in Europe or in France, but a specific risk tied to a

7   particular document, namely, the convention, that ultimately

8   wasn't disclosed.

9           Next slide.  I asked Mr. Sauer, "Knowing what you"

10  knew, why didn't you tell Meda?"

11          Answer:  "It wasn't my role."

12          I asked him, "Whose role would it have been?"

13          Answer:  "The people leading the process.  John

14  Sampson."

15          We know John Sampson, of course, stayed silent

16  throughout.

17          Next slide.  I asked Mr. Sauer about why in the 500

18  page long, or whatever, 150 page long offering memorandum, or

19  in the management presentation, there couldn't have been one

20  sentence?  Your Honor will remember I focused on there was a

21  sentence in there about Aldara going up 5 percent.  They found

22  room for that one sentence.  Yet Tambocor CR, and we are going

23  to look very quickly at how much feature there is of Tambocor

24  CR, they couldn't put in one sentence, one sentence that said,

25  you should be aware that there is a specific risk of price

1   reduction associated with this drug.  But they didn't.  And

2   what does that tell us?  That tells us guilty minds.

3          Next slide, please, 121.  This is the slide regarding

4   Aldara.  They put in that one sentence about a 5 percent price

5   increase accentuating the positive, because it was an important

6   drug in the U.S.  Well, what was more important than Tambocor

7   CR in Europe?  Nothing.

8          Then, of course, we have the next slide 122.  This was

9   a document in January of '07.  This is JX 113, where again the

10  business is celebrating the very good job done to postpone

11  further price negotiation with authorities beyond 2006, one of

12  the key achievements.  Why?  Because they sold the business and

13  Meda was the schnook who had no idea this was all going on and

14  ultimately the purchase price was as full and robust as they

15  could possibly ever have imagined.

16         Next slide, please.

17         So let's just quickly remember.  The offering

18  memoranda, it references Tambocor CR up 46 percent

19  year-over-year.  And each witness, Sampson and Sauer, admitted

20  no disclosure at all anywhere in the offering memoranda that

21  would put the reader on notice or give them any inclination

22  that that product was at risk of a price decrease.

23         You're talking all about this product.  Where is that

24  one sentence that gives the fair presentation.  As Mr. Armenio

25  said, when you open your mouth and you make those kinds of

D1V8MED2                    Summation - Mr. Carlinsky

1    representations, you can't decide to tell just the part that

2    you like and leave out.  That's fraud.  This, your Honor, was

3    fraud.

4          Next slide, please.  Again, there is a reference

5    specifically about, As patients in France switch from Tambocor

6    IR to CR, some of these general pricing issues may be offset.

7    And I asked Mr. Sauer and Mr. Sampson, that was telling the

8    reader that the reason there is an offset is because Tambocor

9    CR is selling at a much higher price.  They agreed.  They also

10   agreed nothing there would indicate to a reader, oh, by the

11   way, you have this time bomb ticking inside your business

12   because there is this price convention that any moment in time

13   SEPS is going to say 50 percent.  Not a word.  Yet they are

14   talking about all the positives.

15         We have this slide, and I won't spend much time on it.

16   Price evolution.  Why is this in here?  It gives these

17   statements about health economic approach to optimizing

18   pricing, pricing processes in place.  Both, again, Sauer and

19   Sampson, nothing there that would indicate to a reader that

20   there is a risk of a Tambocor CR price reduction, even though

21   they both full well know there is at the point of this

22   management presentation.  Those slides are there to mask.  Not

23   only didn't they disclose, they deceived.  These were designed

24   to mask the truth so nobody would ask the question because

25   everything looked copacetic.

1     Next slide.  We saw this.  Tambocor CR sales.  They

2  both acknowledged, it was a positive statement, and it was in

3  their purposefully to be a positive statement.  So a reader

4  looking at that would think, boy, this is a great product that

5  I am buying.

6     Then the next slide, of course, Mr. Sampson tried to

7  explain, well, there was no disclosure, but there was something

8  about flattening cardio sales.  And, of course, when confronted

9  with this slide, he was forced to admit that, as he says, when

10 I asked him, would you agree no reader reading this would

11 conclude that Tambocor CR in France was at risk of a material

12 price reduction, it is very difficult to tell from that.  And

13 he admitted from that slide, the top box of PX 421 shows CR

14 continuing to grow.

15    So, again, where is the footnote, the sentence,

16 whatever it is, to say, but you should know?  It's not there

17 and Sampson ultimately approved it.

18    Next slide.  We can skip motive, but this Court has

19 heard enormous motive.  This business, to put it charitably,

20 was an absolute dog, a dog they couldn't get rid of quickly

21 enough.  And what Mr. Buckley says is, too bad we waited a

22 year.

23    The next slide.  Sauer, as of September 16, we have no

24 backups if necessary.  Imagine if Meda got word of this price

25 reduction risk?

1           And then we have, of course, the results.  They took a

2    gamble here, your Honor, a gamble.  They maximized.  They got

3    so much more money than they ever imagined they would for this

4    business.  Their bogey was $725 million for the entirety of the

5    business.  They got a loan for Europe, 850-something million

6    dollars.  And as Mr. Sauer told the board of directors, we

7    greatly exceeded our fears for this challenged business.  Of

8    course they did.  And they took a gamble and they didn't

9    disclose the convention because the only buyer for Europe would

10   have either ran for the exit or would have said we want a

11   purchase price reduction.  Just like Meda did, as we saw in

12   Mr. Keel's testimony, any time an issue that affected

13   potentially the revenues, any time an issue arose that they

14   became aware of.  You remember there was a point where in

15   Mr. Keel's testimony Meda learned that in Germany they might

16   not get $2 million of revenue.  First thing they said was we

17   want a purchase price reduction.  So they kept all of this

18   quiet because they didn't want to scare off Meda.

19           The last point I just want to end on, we now see in

20   the findings of fact that 3M proposed that there are

21   disclaimers here, and the disclaimers effectively disclaim any

22   reliance on extra-contractual representations.

23           I just want to say, and we will brief this for your

24   Honor, if we go to slide 133, this has been the law in New York

25   for over a 100 years.  And the law is, if you know something

1    and you deliberately hide it, you cannot rely upon -- actually,

2    let's go to the next one, *Jackson v. State*.  The next slide is

3    even better.  You can put in disclaimers, but the one thing a

4    disclaimer does not relieve you of is a willful

5    misrepresentation.  It may apply to an innocent mistake, but

6    not to a willful misrepresentation.  And from that doctrine

7    back in 1925 in the *Jackson* case, we know multiple courts have

8    recognized, and certainly the law in New York is clear, that

9    when information is peculiarly within the knowledge of the

10   seller here, as this Article 2.2 was, there is no validity to a

11   disclaimer.  It doesn't apply.  It doesn't immunize you from

12   liability.  We cite two cases, and we will certainly provide

13   the Court with more case law.

14            Then the last point on this is at slide 137, which is

15   the other doctrine relating to disclaimers, and that is a

16   disclaimer must be specific if it's going to have any

17   enforceability.  It must track the substance of the alleged

18   misrepresentation.  And general disclaimers --

19            THE COURT:  No dispute you're a sophisticated party?

20            MR. CARLINSKY:  No dispute.  By the way, this law

21   makes it clear, although I don't know have the quote on the

22   board, the case law is clear -- there it is, the *JP Morgan*

23   case.  The law does not stand for the extraordinary proposition

24   that a general sweeping disclaimer can serve to disclaim any

25   and all extrinsic fraud between sophisticated parties.  The

1    touchstone is specificity.  And why is that, your Honor?

2    Because if you have a specific disclaimer, that might be either

3    the red arrow or the red flag or the something that might tell

4    the other party, who is in complete oblivion at that point,

5    well, they are disclaiming something specific.

6            So if they said you should not trust our projections

7    for Tambocor CR, or they said something specific to Tambocor

8    CR, or the projections upon which it was based, specific

9    disclaimers, then perhaps the disclaimer would have validity.

10   Because then what it would do is it would send the message, OK,

11   we are being told something here, we should focus.  But a

12   general disclaimer as a matter of law just doesn't do it.

13           Thank you, your Honor.

14           THE COURT:  We will take a break before we start with

15   Mr. Renard.  One question on reasonable reliance.

16           In your view, and based on the testimony, what would a

17   reasonable purchaser have thought, given general pricing

18   reductions and what was going on in Europe and going on in

19   France, given the history of the drug, what would they have

20   thought the price trajectory looked like?

21           MR. CARLINSKY:  I think the answer was from the

22   witnesses.  They expected the price of Tambocor CR to stay

23   where it was.  And Mr. Biffaud testified, of course, they were

24   working to try to convince SEPS not to reduce the price.  He

25   too said, we were hoping and thought we could maintain the

1  price of the drug at what it was.

2          So to answer your Honor's question, I think the

3  reasonable assumption here was the price would be maintained.

4  We know that at the end of the year, after the acquisition

5  agreement is signed, we have Mr. Traineau who mentions that

6  there is a risk of 10 percent.  Traineau, the man who knows

7  about this, the man who tells Sampson about it, says there is a

8  10 percent price risk.  Based upon what?  Nothing about the

9  convention.  He says, when this comes up for renegotiation, as

10  these conventions do every five years, there is a 10 percent

11  price risk.  That's the extent it.

12          So at most, maybe, maybe there is an expectation that

13  there could be a 10 percent price risk as part of just the

14  regular ordinary negotiations.  But that's not even mentioned

15  until the document is signed.  An explanation is given that

16  Mr. Traineau's operating plan already somehow factors that in.

17          So in answer to your Honor's question, I think, from

18  Meda's standpoint, when you have the documents themselves, the

19  two documents that are used to sell this business, and they are

20  so heavily focused on Tambocor CR, it's like if I sell

21  McDonald's and I don't tell you that the Big Mac, which of

22  course is my best seller, but the Tambocor CR was the Big Mac,

23  and not to tell somebody that I have agreed to reduce the price

24  of the Big Mac by 50 percent, and I am not telling you that

25  when I sell you the business, it's unheard of.

1              THE COURT:  A reasonable purchaser would have thought

2      it would stay the same price forever?

3              MR. CARLINSKY:  At least through patent expiration.

4              THE COURT:  So that's 2009.

5              MR. CARLINSKY:  Yes.

6              Actually, in the case of Meda, they also recognize

7      that notwithstanding patent expiration, given the nature of

8      this drug, and the very serious condition which it ultimately

9      treated, there is an expectation that even past that patent

10     expiration, the price could be maintained, maybe not precisely

11     at what level it was, perhaps it might have had some pressure

12     downward, but not that it was going to be effectively

13     supplanted by a generic, because the expectation here was this

14     drug, cardiologists were not going to move their patients who

15     have this very serious condition to a different drug.

16             So I think the reasonable purchaser here, and Meda was

17     the reasonable purchaser here, expected the price to stay.  And

18     nothing that 3M told it gave it any reason to think otherwise,

19     when you look at all of those very positive statements.

20             THE COURT:  Surely, the expiration of the patent is

21     going to produce a risk of a price reduction, right?

22             MR. CARLINSKY:  Yes.  A risk that Meda thought was

23     quite low in terms of a price reduction or supplanting by a

24     generic.

25             THE COURT:  Whose testimony was that?

 1            MR. CARLINSKY:  Mr. Dierks' testimony.  I think it's

 2   in his declaration.  He makes that point particularly clear.

 3            Look, your Honor, you don't ever have a fraud case

 4   where somebody walks in and says, you have got me, or has the

 5   confession note.  As the Court knows, you look at motive and

 6   opportunity.  It is more than ample here.  You look at

 7   conscious behavior and knowledge.  Sampson and Sauer have the

 8   knowledge.  Sampson has the knowledge and is sitting in the

 9   room with the Meda executives.  Mr. Lonner said they talked

10   about pricing issues, and he asks, of course, what else should

11   I know about?  There is no plausible excuse why at that point,

12   at a minimum, Sampson didn't disclose what he had learned.

13   Just a month earlier, just a month earlier.

14            And when you look at it in the context of all those

15   positive statements, again, all about how great Tambocor CR is,

16   and the featured flagship product, you sell your McDonald's and

17   you talk about the Big Mac being the greatest thing and it's

18   going to take you into the next century, and you don't mention

19   you have an agreement to cut the price by 50 percent?

20   Regardless of how you evaluated the risk.  Even if you didn't

21   believe it to be a 100 percent certainty, or a 90 percent

22   certainty, how is it that you don't disclose it?  The answer is

23   obvious.

24            (Continued on next page)

25

1    MR. CARLINSKY:  It is because it is fraud, because it

2    had to unload the dog and they didn't want to do anything to

3    upset that process.

4    THE COURT:  Thank you.  We'll take a 10-minute break.

5    I'll still allow a 20 minute opportunity for rebuttal.  Mr.

6    Renard, I'll even add to your time.  So you'll have two hours,

7    Mr. Renard.

8    MR. RENARD:  Thank your Honor.

9    THE COURT:  I'll just figure out exactly how we are

10   going to do this.  We'll see you then.

11   (Recess)

12   THE COURT:  Let's be seated.

13   Mr. Renard, whenever you're ready.

14   MR. RENARD:  Thank you, your Honor.

15   May it please the court.  Your Honor, when Meda filed

16   this lawsuit against my clients, and throughout the pretrial

17   period of this case, and up to and including the opening

18   statement, it made five what we believe essential

19   representations to this Court:

20   Number one, that product pricing information was

21   critical to Meda.  In conducting its due diligence, in making

22   its decision to agree to acquire 3M's pharmaceutical business

23   covering 81 countries, the defined capital T-territory, and

24   that information was so material to its decision to acquire

25   that business, that that's the overriding consideration in its

1   acquisition of the pharmaceutical business;

2           Number two, 3M was required to disclose but

3   fraudulently concealed from Meda --

4           THE COURT:  Sorry.  I don't understand.  Number one,

5   you're saying product pricing information was critical?

6           MR. RENARD:  Critical.  That is an essential premise

7   of their case to this Court.

8           THE COURT:  You're telling me about their case?

9           MR. RENARD:  Yes.

10          THE COURT:  Sorry.  I thought you were telling me your

11  case.  For a second I thought you were making my life easy.

12          MR. RENARD:  It is good we clarified that.

13          Number two, 3M was required to disclose, but

14  fraudulently concealed from Meda one particular pricing

15  reimbursement convention regarding one particular product in

16  one particular country; namely, the March 2003 convention which

17  contained Article 2.2 relating to Tambocor CR in France

18          Number three, that that convention, or at least

19  Article 2.2, was in existence and was in full force and effect

20  as of November 8, 2006 when the parties executed the

21  acquisition agreement, and also at the subsequent closing on

22  January 2, 2007, and that 3M was in breach of a mandate to

23  reduce by 50 percent the price of Tambocor CR;

24          Number four, that Meda was completely unaware of the

25  existence of Article 2.2 and its implications prior to the

1    closing and didn't find out about its existence until

2    alternatively, and this date kept moving, until February 2007,

3    the Fall of 2007 and later December of 2007;

4            Number five, that had it known of that information,

5    Meda -- and now they say or any reasonable buyer -- would have

6    paid over $210 million less for that pharmaceutical business

7    covering that 81-country territory.

8            Your Honor, now that the trial is completed and the

9    evidence is in the record, we state with a great degree of

10   confidence that the record evidence does not support any of

11   those five essential representations that Meda has made with

12   respect to both its breach of contract case and its fraud case.

13   In fact, the evidence demonstrates to the contrary.

14           We, your Honor, like the court, think in boxes, at

15   least thought of boxes in terms of how we were to present what

16   we thought was the critical information and arguments to the

17   court.  For that reason, your Honor, we are not going to

18   proceed in a chronological background or great degree of

19   background facts because I believe that there are some issues

20   that the court needs to address, wanted to address and wanted

21   to look for during this trial.  At least that was our take on

22   things, your Honor.

23           Consequently, we have come up with six points we would

24   like to discuss in our time today:

25           Number one, 3M had no obligation to disclose the CEPS

D1VJMED3                    Summation – Renard

 1    conventions but, in any event, Meda knew that those conventions

 2    had not been provided and never even asked to see them, an

 3    overriding consideration, your Honor, that has consequences

 4    both with respect to Meda's breach of warranty claim but also

 5    with respect to its fraud claim;

 6         Number two, we would like to discuss the nature of

 7    CEPS conventions with an eye towards the French law that is

 8    applicable to those conventions;

 9         With that background, we would like to take a look at

10    Article 2.2, whether or not it mandated a reduction as Meda

11    asserts in this case of the price of Tambocor CR.

12         Number four, your Honor, and this is important,

13    understandably was not addressed in Meda's closing argument,

14    Article 2.2 was not even in effect at the time of the

15    acquisition agreement and subsequent closing, and that has

16    major consequences both with respect to its fraud claim and

17    also with respect to its warranty claim.

18         Number five, Meda has failed to prove a breach of

19    warranty or a fraud.

20         Of course, number six, Meda has failed to demonstrate

21    any recoverable damages.

22         Those are the boxes, your Honor, that we would like to

23    present to the court today, and obviously if your Honor wants

24    to take any of those out of order, we're certainly prepared to

25    do so.

1          Dealing to the first question presented, was 3M even

2     obligated to provide the CEPS conventions to Meda and did Meda

3     know those conventions had not been provided?  An interesting

4     component of the acquisition agreement on which Meda sues, all

5     of the representations and warranties appear in Article III of

6     the acquisition agreement.  Article III contains a preamble.

7     An important of that preamble is except as specifically

8     contemplated by this agreement, seller represents and warrants

9     to purchaser that all the statements contained in this Article

10    III are true.

11          In other words, the representations and warranties,

12    including 3.07, 3.12 and 3.15, are subject to whatever

13    exceptions exist elsewhere in the agreement.  Of course, there

14    is a major exception, your Honor, and we talked about this.

15          Section 5.02, which begins, and I would say apropos of

16    the preamble to Article III, notwithstanding anything contained

17    in this or any other agreement executed on or prior to the date

18    hereof, seller shall not have any obligation to make available

19    to purchaser any information if making such information

20    available would contravene any applicable law or any binding

21    agreement including a confidentiality agreement.

22          Your Honor, as we know --

23          THE COURT:  Go back.  Dot, dot, dot, provided that

24    seller, upon the reasonable request of purchaser, will provide

25    purchaser with a complete and accurate description of --

1           MR. RENARD:  Absolutely, your Honor.

2           THE COURT:  How does that work?

3           MR. RENARD:  The way it worked here is there is -- we

4    will discuss this in greater detail within this box, but there

5    was never any inquiry, and that is the most interesting thing

6    that I think came out of the testimony of Meda's four

7    executives, and those are the only fact witnesses, the top four

8    executives.  There was never any inquiry from a party who is

9    coming to this Court and saying product pricing information was

10   all important to our determination of evaluating this

11   opportunity and deciding whether to close.

12           No question whatsoever about product pricing,

13   agreements with governments, conventions, anything.  In fact,

14   as the court may recall, I asked Mr. Dierks who was probably

15   the most knowledgeable about CEPS conventions and the whole

16   European reimbursement product pricing scheme, Mr. Dierks,

17   including the fact that he didn't see and knew that there

18   weren't any conventions in the data room, I said did you ever

19   see any due diligence material prepared internally by Meda, any

20   memos, any reports, any e-mails that made any reference

21   whatsoever to product pricing, and his answer was no.

22           There was never any inquiry about this, your Honor.

23   Of course, we know, however, that there were discussions,

24   including those by Mr. Traineau, prior to closing, in which he

25   talked about the negotiating history with CEPS, the history of

1    the conventions with CEPS, and also the existence of Article

2    2.2 and the fact that he had been stricken out in the most

3    recent amendment to a convention that CEPS and 3M had executed.

4    This was the meeting that took place November 28, 2006.

5         He did inform Meda of that.  Mr. Traineau testified

6    about at length in his declaration.  He reconfirmed it on

7    cross-examination, and I think the only thing that Meda says,

8    can say in response to that is frankly, Mr. Traineau must be

9    lying.

10         Your Honor, I respectfully submit given the

11   gentleman's demeanor and the way he answered questions and his

12   general presentation, there is no basis other than Mr. Lonner

13   and Mr. Dierks saying I don't recall him ever talking about

14   this.

15         Well, there was another person in that meeting, Mr.

16   Vant Hullenaar, who works with Meda, wasn't presented as a

17   witness, did testify in his deposition he did recall Mr.

18   Traineau bringing up the subject of negotiations with CEPS, the

19   10 percent price decrease estimate, but the point being, your

20   Honor, yes, we did put Meda on notice of Article 2.2, its

21   history, the fact it had been stricken out.  The point being

22   with respect to 5.02, there was never the question, there was

23   never the predicate request for information, shall cooperate in

24   any requests to otherwise enable disclosure of this.  That was

25   never asserted, your Honor.  Consequently --

1           THE COURT:  How would it work?

2           Setting aside what your contentions are here, if there

3    were something that could be shown to fall within one of the

4    subparts here, if the purchaser didn't know about it, how could

5    that request be made?

6           MR. RENARD:  Your Honor, the purchaser certainly knew

7    about CEPS conventions.

8           THE COURT:  I am asking a hypothetical.

9           MR. RENARD:  In that hypothetical, your Honor, I am

10   not sure other than it does put the onus on the buyer in this

11   case to request --

12          THE COURT:  So a buyer has to ask affirmatively about

13   information that is by definition confidential?

14          MR. RENARD:  Perhaps, your Honor, hypothetically in

15   that situation, understanding that wasn't this case, the buyer

16   would say is there anything that would otherwise have to be

17   made available pursuant to Section 3.12, 3.15 or some other

18   warranty in Article III of the acquisition agreement that you

19   have not provided because --

20          THE COURT:  Well, we have Mr. Lonner testimony, right,

21   that -- Mr. Lonner who testified that he asked -- maybe it was

22   Mr. Larnholt, I am forgetting who, but the testimony from that

23   meeting where he testified that he asked if there was anything

24   else.

25          MR. RENARD:  Your Honor, that was a general question

1    put at the very beginning of due diligence.  This was June 26,

2    2006.  Mr. Lonner says he asked Mr. Sampson is there anything

3    else that I should know about?  And Mr. Sampson, according to

4    Mr. Lonner, said no.

5              Your Honor, that is hardly the --

6              THE COURT:  Back to my hypothetical.  That is the

7    meaning of this provision, if you have something that is by

8    definition confidential, how would the purchaser know to ask

9    for a factual description?

10             MR. RENARD:  Your Honor, I would say given the

11   existence of this, to ask whether or not anything has been

12   withheld, as a result of knowing of the existence of 5.02?

13             THE COURT:  Yes.

14             MR. RENARD:  A hypothetical buyer would say look,

15   there are some representations --

16             THE COURT:  So you're saying the question should be is

17   there anything that pursuant to 5.02 has been withheld on the

18   basis of what is contained in 5.02?

19             MR. RENARD:  Yes, your Honor, because otherwise you do

20   have the right on the part of the seller here, again using the

21   same language that was negotiated between sophisticated

22   parties, and even assuming, and I will show later that none of

23   these warranties even applies to the CEPS conventions, that

24   even assuming that they did apply, the sophisticated parties

25   here negotiated a provision that said look, the seller, here

D1VJMED3                        Summation - Renard

```
 1    3M, may refrain from producing information that might otherwise
 2    be obligated to produce if, in fact, it is subject to either a
 3    confidentiality agreement with a third party, number one; or,
 4    number two, contravenes some applicable law.  That was a right,
 5    your Honor, that 3M had.
 6            THE COURT:  What testimony do you think establishes
 7    those propositions here?
 8            MR. RENARD:  Your Honor, it is not testimony.
 9            THE COURT:  No, no.  That is what 2.2 is?
10            MR. RENARD:  Yes, your Honor.
11            THE COURT:  It falls within one of these provisions?
12            MR. RENARD:  Yes, your Honor.
13            As your Honor knows, and what we'll be dealing with
14    this in a bit, conventions are set up under French law pursuant
15    to social security code Section L-162-17-R.  And that allows,
16    your Honor, for conventions to be amended, to be replaced
17    chronologically in sequences Mr. Schur testified about.
18            This March 10, 2003 convention, which is the subject
19    of Meda's pleading, and has heard time and time again, your
20    Honor, went out of existence on the very next convention which
21    was a full convention dated November 17, 2003.  That
22    convention, your Honor, contained a confidentiality provision.
23    That is Article 4.1.  The parties reciprocally undertake to
24    respect its confidentiality.  Your Honor, it was the November
25    17, 2003 convention --
```

1          THE COURT:  There is no comparable provision in the

2     March 2003?

3          MR. RENARD:  That's correct, your Honor, but

4     understand that the representations and warranties had to do

5     with then existing contracts and then existing regulatory acts.

6     There wasn't an obligation anywhere in the warranties and

7     representations that they're suing on that required 3M to put

8     together the historical record of, in other words, old

9     contracts, old conventions, old agreements with governmental

10    entities or private parties.

11         THE COURT:  So for me, for this to matter to me, I

12    have to, I have to agree with your contention that the March

13    2003 convention was no longer in effect?

14         MR. RENARD:  Yes, your Honor, yes, with respect to

15    this contractual limitation.

16         THE COURT:  If I disagree with that proposition, then

17    this provision has no bearing?

18         MR. RENARD:  Your Honor, this provision would

19    certainly have a bearing with respect to the November 17, 2003

20    convention and every amendment to it, and it was amended in

21    September of 2004, it was amended in August of 2005, and as the

22    court knows, it was amended again on September 15th, 2006.

23         Those were all amendments to the convention, dated

24    November 17, 2003, which we believe merely makes the point that

25    the March 10, 2003 convention went out of existence when this

1    later convention was executed between CEPS and 3M Sante.

2          Your Honor, it was this confidentiality provision

3    which continued to exist with each and every annual amendment

4    in '04, '05 and '06 through the date of closing and through the

5    acquisition agreement and it contained this confidentiality

6    provision.

7          THE COURT:  The language the parties reciprocally

8    undertake to respect its confidentiality?  What testimony is

9    there regarding whether that language or evidence -- I don't

10   mean just testimony -- is the same as what 5.02 requires?

11         MR. RENARD:  Your Honor, 5.02, of course, requires

12   that there be a confidentiality agreement.  We have the words

13   the parties reciprocally undertake.  Obviously, you have

14   undertaking between two parties so it is not a unilateral

15   undertaking to respect its confidentiality.

16         Your Honor, in terms of testimony, witness testimony,

17   what that means, there is none whatsoever in this case.  All we

18   know is this Article 4.1 came into existence in November '03

19   and continued to exist through the transaction contained this

20   sentence which appears to us and I think should be reasonably

21   construed as a confidentiality agreement.

22         THE COURT:  This reminds me of the 2.2 language.

23         MR. RENARD:  I think it is clear in Article 2.2.

24         THE COURT:  I bet you do!

25         MR. RENARD:  Of course, Mr. Schur testified, and we'll

D1VJMED3                         Summation - Renard

1    talk more about this notion of abrogation and supersession with

2    respect to CEPS conventions that it did contain a

3    confidentiality clause, we construed it to be such.  In

4    addition to that --

5              THE COURT:  Sorry.  I was thinking about something.

6              MR. RENARD:  That has to do, your Honor, with the

7    notion of a confidentiality agreement between CEPS and 3M Sante

8    with respect to this convention and all of its amendments.

9              In addition, as you recall, Section 5.02 (b) of the

10   acquisition agreement provides for the ability to withhold from

11   provision material information if it is otherwise prohibited by

12   law.  Mr. Dierks' testimony at trial was, in response to one of

13   my questions, was Meda in convention with CEPS.  Mr. Dierks

14   stated he didn't believe he could do so, and that is to putting

15   it mildly given the competition laws of Europe.

16             Is it 3M's position they withheld the document because

17   of 5.02 and the confidentiality requirement?

18             MR. RENARD:  Your Honor, I think we need to break this

19   down into two chronological segments because there has been

20   some confusion I think in terms of what was going on.

21             There was a due diligence period that included the

22   electronic data room.  That due diligence period which began

23   roughly the tail end of June and ran up shortly before the

24   execution of the acquisition agreement was not governed by the

25   acquisition agreement, the acquisition agreement coming into in

D1VJMED3                          Summation - Renard

1    effect November of 2006.

2             What we were dealing with prior to the acquisition

3    agreement was a process.  The court has seen this.  In fact,

4    counsel has used Ian Brown's memo about where he recognizes

5    that, look, pricing information is at a minimum sensitive and

6    we don't want to be giving this out.  We think the process

7    ought to be putting slip sheets in, allowing the person

8    conducting the due diligence -- this is prior to the

9    acquisition agreement ever being executed -- to at least know

10   of the existence of this agreements.

11            Then we can deal with whether or not later we describe

12   these agreements, whether or not we make them available to

13   prospective buyers, but that will come later in the process,

14   and that is where Mr. Wanlass testified about.  That

15   contemplated process early on process in the due diligence

16   process was not followed.  That was unfortunate.

17            Following that, though, your Honor, we have the

18   acquisition agreement that has Section 5.02.  Clearly 3M

19   believed that these pricing agreements and these conventions

20   not just with France, we are talking about an 81-country

21   territory, was very sensitive information.

22            The parties negotiated Section 5.2 (b) into the

23   agreements, your Honor, and that provision allowed 3M not to,

24   in fact, make those conventions available to Meda.

25            THE COURT:  Is it 3M's position that but for that

D1VJMED3                        Summation - Renard

1    provision, they would have?

2             MR. RENARD:  Your Honor, no -- obviously, there was --

3    no because, among other things, those CEPS conventions don't

4    fit within 3.07, 3.12 and 3.15.  There was no obligation to do

5    so.  The decision had been made during the due diligence

6    process not to provide these documents, instead to have these

7    slip sheets.  That didn't happen.

8             Your Honor, whether or not they would have had made

9    them available had it not been for Section 502 (b), your Honor,

10   it is our position that there was no obligation under 3.07,

11   3.12 and 3.15 to make these available in any event.

12            This, your Honor, is the beginning point to the

13   argument with respect to there was no obligation because of

14   5.02 to make them available, and more importantly, your Honor,

15   can Meda claim it was misled by not having been provided with

16   the CEPS conventions?  And the answer is no.

17            We believe that the contractual confidentiality

18   provision, the reciprocal obligation on the part of CEPS and 3M

19   Sante in that November 17, Note 3 convention as well as just

20   the general competition laws within Europe, prohibited us from

21   making those CEPS conventions or any other similar information

22   available to Meda.

23            But was there any request with respect to getting

24   these conventions, any information about these conventions and

25   the responses?  No, Meda never asked.  You can recall, and I

D1VJMED3                         Summation - Renard

1    talked about Mr. Dierks' testimony, your Honor, with respect to

2    not having ever seen anything internally created by Meda that

3    suggested any interest whatsoever in specific product pricing

4    as to specific products.

5          Mr. Keel testified, and he was the one leading the

6    effort with respect to this sale, that he had countless

7    conversations with Meda's executives, hundreds of e-mails,

8    dozens of hours on the phone and never once did the subject of

9    product pricing come up.  In fact, the electronic data room

10   inquiry log, your Honor, which is in evidence, will show that

11   of the 105 formal questions that were put to 3M in connection

12   with the due diligence, not a single one related to product

13   pricing.

14         Mr. Dierks -- and this, your Honor, is sort of the

15   interesting revelation in this case -- it was presented as, you

16   know, among this haystack, there was a missing, one missing

17   needle and that was this 2003 convention.  That was this

18   convention that revealed the existence of Article 2.2.

19         Mr. Dierks kind of set that argument up, if you will,

20   in his trial declaration in which he said lots of Meda

21   employees including myself spent time reviewing documents in

22   the data room.  He specifically recalls looking at sales and

23   marketing information.  I did not come across any information

24   related to a -- and look how he narrowly defines this -- a

25   signed agreement in France mandating either a price reduction

1    to Tambocor CR or introduction of generic version of CR, et

2    cetera, no such agreement was ever brought to my attention.

3           Your Honor questioned Mr. Dierks on the stand, in

4    fact, essentially using that language in his declaration and

5    said you don't recall specifically looking at documents

6    relating to this signed agreement mandating a price reduction?

7    Did you come across any other CEPS conventions including any

8    annual renewals?  The answer was no.

9           And then, your Honor, what I thought was revealing,

10   given the fact again that this acquisition related not just to

11   France, frankly not just to Europe, but 81 different countries,

12   most of which have some reimbursement and social security state

13   sponsored medical support, shouldn't there be a bulk of

14   documents that show published prices?  Answer:  Yes.

15          I am assuming they weren't there.  Is that right, they

16   weren't?  No, they weren't, according to my knowledge.

17          Mr. Larnholt was asked the same thing.  Were there any

18   CEPS conventions in the electronic data room?  I don't think

19   so.

20          Mr. Wanlass was talking again about the fact there

21   were no slip sheets for any pricing convention for any product

22   in Europe.

23          Mr. Shah, the due diligence expert for Meda, actually

24   duplicated what apparently Meda's employees did, that is to go

25   into the electronic data room.  He didn't see any CEPS

1    conventions in there, didn't see any other similar information

2    with respect to any other of the countries in this 81-country

3    territory, but certainly Meda was aware of these conventions

4    and these pricing agreements.

5            Your Honor, here we have a fraud case and a breach of

6    warranty case which is based upon an alleged failure to provide

7    a specific document.

8            THE COURT:  But I asked I think Mr. Armenio about

9    this, and obviously this was on my mind, but I understood the

10   thrust of the breach of disclosure argument to be premised on

11   the fact that this was a convention that they're arguing was in

12   violation, that there was a breach, and that that is what

13   isolates it to a single document as opposed to what presumably

14   would be a lot of documents that show pricing.

15           MR. RENARD:  Your Honor, there are two kinds of

16   warranties, if you will, on which Meda is suing.  There are the

17   warranties that say I have given you a particular category of

18   documents.

19           THE COURT:  Right.

20           MR. RENARD:  3.12 is assumed contracts, 3.15 is

21   regulatory filings.

22           THE COURT:  Right.

23           MR. RENARD:  Then you have the representations.  I'm

24   talking about whether or not there was any obligation --

25           THE COURT:  You're not talking about 3.07?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. RENARD:  This is talking about an obligation to

2     provide, to physically give over or --

3          THE COURT:  Really we are talking about 3.12?

4          MR. RENARD:  And 3.15, regulatory filings.  There is a

5     similar -- we have made available all regulatory filings very

6     much similar to 3.12.

7          THE COURT:  Can you get the language so I can get my

8     eyes on it?

9          (Pause)

10         MR. RENARD:  Page 61, here it is, your Honor, on the

11    screen.

12         THE COURT:  Yes.

13         MR. RENARD:  All existing regulatory filings are set

14    forth on Section 3.15 of -- as provided with access, et cetera.

15         THE COURT:  Right.

16         MR. RENARD:  Go back then to Page 17, your Honor, with

17    respect to this notion of you never provided me this document

18    so I could look at it and understand the consequences of it.

19    The problem, if you will, your Honor, for Meda is much greater

20    than that.  Meda understood that there was an entire class, an

21    entire category of documents.

22         Whether or not we were obligated to provide those

23    under any of these specific warranties or representations, they

24    were aware that there is this entire class of information that

25    had not been provided to them, that they say was of such

1    critical importance to their decisions, and they reduce it

2    down.  In fact, you even heard that argument by counsel this

3    morning, and that is well, it didn't matter whether or not this

4    entire class was given to it, we wanted to know those

5    conventions and pricing agreements that had specific

6    information.

7            Well, your Honor, the problem with that is one of the

8    things they're suing on is you didn't give us a document that

9    was within a much broader class of information.

10           THE COURT:  You want to say to set aside 3.07, but you

11   want to say if you're right, Meda, about your interpretation of

12   3.12 and 3.15, then you're admitting that there was a whole

13   bunch of material that anybody doing any kind of minimal

14   diligence would have seen was not disclosed?

15           MR. RENARD:  In fact, it goes to with respect to

16   fraud, Merrill Lynch, a plaintiff may not satisfy its burden by

17   simply pointing to warranties for the purposes of showing fraud

18   that it knew were false.

19           THE COURT:  If you're right, that deals with 3.12 and

20   3.15, but not 3.07.

21           MR. RENARD:  That's correct.  Recall we were talking

22   about the very beginning, the title of this particular section,

23   "Was 3M obligated to provide the CEPS conventions?"

24           That gets us a fair ways in the contract analysis to

25   deal with the physical delivery or physical availability.  It

1    just wasn't there.  There was no obligation because of the

2    contractual confidentiality clause and general competition law.

3         THE COURT:  Tell me how the 5.02 would interact with

4    the 3.07 violation?  It is not a disclosure of the agreement.

5         If I think there is a 3.07 violation, it would be

6    disclosure of noncompliance which presumably wouldn't run into

7    a 5.02 problem, right?

8         MR. RENARD:  Yes, your Honor.  We recall 5.02 deals

9    with making information available, and that is the bit line

10   down.  We can go to Page 18, please.

11        To complete the thought, your Honor, one, there was no

12   obligation we believe under 5.02 independent of the specific

13   contractual languages we have on 3.12 and 3.15 to make these

14   CEPS conventions available, both because of contract as well as

15   prevailing law, but even beyond that the fact that Meda,

16   knowing full well of the absence of this universe of documents

17   that the court correctly said would fill boxes, volume of

18   information, not once asking for it knowing it wasn't there yet

19   claiming it was of such critical importance, undercuts the

20   argument this information was of critical importance to them

21   generally.

22        Your Honor, a perfect example of that -- and

23   forgetting price reduction agreements, and we'll talk about

24   whether 2.2 was truly a price reduction agreement -- recall Mr.

25   Dierks, I asked whether he was aware of these rebate provisions

1    that exist in a lot of conventions.  These are the provisions

2    that rather counterintuitively if you sell too much of a

3    product or product beyond what is set forth in an agreement

4    with CEPS, then you end up giving more money back in, like a

5    rebate provision or retroactive discount.  He said he was aware

6    of such provisions if you're buying a company, pharmaceutical

7    company, and you're aware of these rebate provisions in France

8    and similar jurisdictions, you would want to know because that

9    would affect the value of the assets that you're buying.

10          And yet using the rebate provision as a perfect

11   example, Meda for whatever reason, and I think the reason had

12   to do with how they approached the valuation of this company

13   and what they were looking for in terms of synergies and the

14   like, but that aside, that Meda would never have asked to see

15   that information, never questioned it.

16          You have to draw the conclusion that that just wasn't

17   material to their decision to purchase these assets.  Then you

18   take that one step further, and knowing full well whether it is

19   3 percent, which was Mr. Dierks' offhand estimate of how many

20   conventions actually have special provisions, I think it is

21   much greater than that, but we don't need to go there.  That is

22   not an evidentiary dispute in this trial.

23          The fact you have the possibility there are these

24   provisions and Meda was not even interested in them tells you a

25   lot about the truth of their assertion this information was

1    material because they never looked at it, there were no

2    internship documents that showed that they even cared about it,

3    that they even recorded down prices.

4         Your Honor, I think that belies the notion that this

5    was material and belies the notion that they now can

6    retroactively, with 20/20 hindsight, go back and say this stuff

7    was of such key importance to us, we had to have it, knowing

8    the full universe of that wasn't there.

9         With that, your Honor, I would like to go to the next

10   box.  This box is a small one, but I think it set up a

11   discussion about what is the nature of Article 2.2 as well as

12   whether Article 2.2 even existed as of the date of the

13   acquisition agreement.

14        I mentioned this particular article.  I have it

15   memorized because it is probably the most important one in the

16   French social security code.  This is the basic statute,

17   162-17-R that sets up what a convention is.  It says the

18   economic committee, CEPS, may enter into agreements with

19   businesses for maximum duration of four years in relation to

20   one or more medications.

21        I'll stop there for a second.

22        Do you recall Mr. Destal coming up with a theory, and

23   that I think is being charitable in connection with what it

24   was, this theory of symmetrical conventions, that you have a

25   product-specific convention that can only be amended by another

1   product-specific convention, these annual portfolio-wide

2   conventions can only be modified by another annual

3   portfolio-wide convention.  Your Honor, that doesn't exist

4   anywhere in French law.

5       It is interesting here that the prelude to 162-17-R

6   talks about agreements that relate to one, that would be a

7   product specific convention, or more medications which would

8   include the annual portfolio-wide medications.  Those

9   agreements determine the relationship between the committee and

10  each business, and in particular, and these are the two main

11  things that conventions do for the purposes of this case:

12      Number one, set forth the price or the declared sales

13  price;

14      Number two, the means by which the business

15  participates in the implementation of the aforesaid ministerial

16  guidelines.  Those are the guidelines referred to in the very

17  first line.

18      Your Honor, Mr. Schur testified about the distention

19  between price-setting provisions and that second, the means by

20  which businesses participate in the implementation.  It has to

21  do, your Honor, with the distinction between regulatory acts

22  and administrative agreements.  You'll recall that Mr. Schur

23  testified that the price-fixing provisions of a convention --

24  and again "convention" is not to be distinguished between

25  annual conventions and product-specific conventions because

1    this statute does not such thing -- the provision that sets the

2    prices is regulatory.  Why is that?  It means it is

3    administrative legislation.  It is regulatory act.

4         Why is it a regulatory act?  Because, your Honor, it

5    affects the relationship between parties who are not part of

6    this convention but the general population, and that is

7    pharmacists who actually sell these reimbursable drugs and the

8    general public, the patients who purchase them.  That is why

9    the pricing-specific provisions are regulatory acts.

10        I asked him then about Article 2, and this was in

11   reference to the March 2003 convention, is that a regulatory

12   act?  And he said no, because it doesn't fix a price or provide

13   a clause or a formula that fixes a price.

14        We talked about well, are there portions of

15   conventions that are not regulatory acts?  And Mr. Schur said

16   certainly, and he gave an example what I just described; rebate

17   provisions.  Why is that not a public act, your Honor?  Because

18   that concerns the relationship solely between CEPS and the drug

19   manufacturer.  That would be an administrative agreement.

20        There is a difference.  Regulatory acts being

21   legislative in nature affecting parties other than those to the

22   convention and administrative agreements that are between CEPS

23   and the drug company that enter into them, a key distinction

24   for going forward in terms of what these provisions mean and

25   what Section 2.2 means.

1    Another provision that is important in the French

2    social security code is 162.20, and this says an agreement

3    concluded pursuant to, and we just saw one of those articles

4    records, 162-17-4, between business acting as commercial

5    operator and CEPS may be altered by means of a writer at the

6    request of the business or of the committee.  You can have

7    amendments to these conventions, product-specific or annual,

8    done at the instigation of either CEPS or a drug manufacturer.

9    That takes us then to the inquiry what did Article 2.2

10   mean and did it require a specific reduction in the

11   reimbursement price of Tambocor CR.  We have all seen this

12   language.  It doesn't become any clearer with each passing

13   reference, but it was important to put this again in front of

14   us.

15   Article 2.2, which was part of the March 2003

16   convention, in fact, came into being as a result of that

17   convention, essentially set forth an optional process, if you

18   will.  The laboratory agrees to take all necessary steps to

19   ensure that at the end of a three-year period dating from the

20   publication of the official journal from the prices of the

21   proprietary drugs of Article 2 of Table 1, Tambocor CR, an

22   equivalent of each of these proprietary drugs, or failing that,

23   each of these proprietary drugs are placed on the market at the

24   price of the generic drug corresponding to these proprietary

25   drugs.

1           One thing we know for sure, your Honor, that at no

2    time between March 2003 and April 12 of 2006, which I think

3    marked that three-year period, was there any generic drug

4    corresponding to Tambocor CR.  That is an undisputed fact.  So

5    what Meda says is well, what 2.2 required that 3M Sante had the

6    place on the market or actually had to reduce the price of

7    Tambocor CR to its generic equivalent, and I should say its

8    hypothetical generic equivalent because that generic was not on

9    the market at the time.

10          The key part of Meda's argument, your Honor, was that

11   this was a certain fixed formula for determining what the price

12   should be from April 12, 2006, and it is simply not.  There is

13   no formula in there.  Mr. Schur's testimony was saying in order

14   for there to be an enforceable price change clause, you have to

15   have the price specified by amount or you have to have a

16   formula by which you can determine a fixed amount.

17          He further said if you have a clause that requires a

18   modification of a price in the future, all CEPS needs to do is

19   to publish the price, and that's in the statute, your Honor.

20   Counsel brought out Mr. Destal's testimony that oh, no, no, if

21   there is an enforceable price change clause, the drug

22   manufacturer simply drops the price of its drug.  That is not

23   true.  You have to have the new price published by CEPS.  It is

24   CEPS that puts into effect a price change.

25          However, in order to do that pursuant to a price

change clause, you have to have a clause in an enforceable

convention that says come X date, the price of this drug will

drop to Y euros, or if in the future something happens, then

your price will be reduced to X euros or X percent of what it

presently stands at, something that you can sink your teeth in.

THE COURT:  It seemed like -- and one thing I asked

Mr. Schur about -- something new was going on in 2.2, right;

that is to say, it seems that there was this I think even

pursuant to Mr. Schur's testimony, an early implementation of a

new policy towards counter generics.

MR. RENARD:  The minister's guidelines which was a

letter addressed to CEPS which found their way then into each

of the annual reports of CEPS which set forth their policies,

those guidelines had come out on December 24, 2002.  In fact,

that was one of the reasons why there was a delay in getting

this initial convention for Tambocor CR, because CEPS was

telling us we're going to have this minister guidelines coming

out soon, you have to wait for those.  That was a key reason

for the delay.  The guideline was going to come out and it was

going to change the landscape of reimbursing in France.

It did.  Mr. Schur said he believed, based on the

wording of Article 2.2, that 2.2 was an attempt by CEPS to

essentially incorporate the policies that had been announced

pursuant to the minister guidelines.  In fact, he believes this

may well have been the first case where there was a pricing

1    convention that attempted in a rough and ready sense --

2           THE COURT:  What I struggle with is how, then, to --

3    he had a pretty rigid doctrinal analysis.  You need to see X, Y

4    and Z in order for it to be this, but was interposing that lens

5    on something that was admittedly new.

6           MR. RENARD:  Yes, your Honor, but the ministerial

7    guidelines -- and we'll talk about that in a minute -- the

8    effect that it had in terms of this notion that Meda was seeing

9    calm seas for the next several years until 2009, that there

10   wasn't any real prospect of a price reduction.  Your Honor,

11   that is nonsense given the minister's guidelines and the

12   policies that were stated by CEPS in each of its successive

13   annual guidelines.  This was an attempt to come up with a rough

14   and ready sense of administering and applying those ministry

15   guidelines.

16          THE COURT:  Why couldn't it have been -- how is it

17   inconsistent with Mr. Schur's testimony that there were these

18   guidelines, but that what CEPS was trying to do here was a sort

19   of rigid application of that approach?

20          That is to say, not aspirational and not negotiable,

21   but we've got this new policy and now we need to implement it,

22   and here's that first shot of implementing it and, therefore,

23   moving it into a different category than simply the same thing

24   that is produced as a policy statement?

25          MR. RENARD:  Two things could have been done in this

1     convention.  One was to set forth a price, a date and specific

2     by euro or percentage reduction in what Tambocor CR was going

3     to be.  Or, two, your Honor --

4             THE COURT:  The date we have, right?  We have three

5     years?

6             MR. RENARD:  Yes, three years.

7             THE COURT:  Sorry.  Three years?

8             MR. RENARD:  The point being, your Honor, is that --

9     and Mr. Schur talks about this -- CEPS knows what it is doing

10    and could easily have written a clause here.

11            THE COURT:  He kind of said CEPS didn't know what it

12    was doing and this was confusing and he couldn't make out what

13    "equivalent" meant.  It was a little -- I don't know, there was

14    something, something odd about the notion that at some point

15    CEPS wants to do this, it could do this.  I don't know what it

16    was doing here.  I don't think CEPS knew what it was doing

17    here.

18            MR. RENARD:  Maybe we ought to work backwards.  There

19    is a way to write a provision that makes it abundantly clear

20    there is an obligation on a particular date to drop a price by

21    a fixed percentage for a fixed amount of euros.  That is not

22    Article 2.2.

23            THE COURT:  There is surely a clear way to do that, no

24    doubt.

25            MR. RENARD:  Yes, absolutely.

1           THE COURT:  No doubt this isn't that.

2           MR. RENARD:  It is not that.

3           THE COURT:  What testimony is there that would

4      establish -- this is part of Mr. Schur's testimony -- because

5      it wasn't clear, it, therefore, couldn't do that?

6           MR. RENARD:  Your Honor, it comes in a set-up here Mr.

7      Schur is saying you could have --

8           THE COURT:  Sometimes laws aren't written clearly.

9           MR. RENARD:  That's correct.  Your Honor, it comes

10     with this.  As I said, the linchpin of Meda's argument that

11     this was an enforceable and valid price change clause is that

12     there was no doubt about it, it required a 50 percent reduction

13     in the price of Tambocor CR because that is the price at which

14     any generic would have been introduced upon the market.  That

15     is a misreading -- as I think it was clear during Mr. Schur's

16     redirect examination -- of what the policies actually say.

17          This was a policy, your Honor, in effect in 2006.

18          THE COURT:  The point here, and you can include this

19     in your briefing, is that generic prices can be negotiated,

20     too?

21          MR. RENARD:  Absolutely.

22          THE COURT:  So it can't be mechanically a 50 percent

23     reduction.

24          MR. RENARD:  What does that mean when we're talking

25     about having a price of Tambocor CR at the level of a generic

1   when a generic can be negotiated with CEPS at any level and,

2   your Honor, that is exactly what Mr. Schur was talking about.

3   If somebody wants to introduce a generic, to negotiate a price

4   with CEPS?  Can a company do that?  Absolutely.  That is not --

5   I didn't spend quite enough time on this.

6          This was a policy that said generic manufacturer,

7   you're guaranteed at least a price if you put a generic on the

8   market of 50 percent of the brand name product against which

9   with you're competing.

10          THE COURT:  So a floor?

11          MR. RENARD:  A floor and not a ceiling.  Yet that has

12  been misconstrued by Meda as saying this policy, as articulated

13  here, is what made that a certain fixed price change provision

14  and made Article 2.2 enforceable.

15          This is why we are talking about, your Honor, why Mr.

16  Schur, and it just wasn't rhetoric on his part, it was his

17  expert opinion what Article 2.2 really did, it was aspirational

18  in the sense of saying we're going to have to sit down and

19  conduct a negotiation when this three-year convention comes to

20  an end in 2006.

21          It was an agreement to agree not because we say so,

22  but because that is what the language said.  If you're to

23  introduce a price at a level that was negotiable, then you

24  could only effect a change of price if you again sat down with

25  CEPS in 2006 and negotiated and came up --

1          THE COURT:  Could you go back to the generic one.

2          So that would mean then that 2.2 would suggest that

3     you would see if there were no further discussions of 50

4     percent price reduction?

5          MR. RENARD:  If, if 3M did not want to negotiate it,

6     then yes.

7          THE COURT:  To set the price reduction of 50 percent,

8     the level of which, as the level of which the price proposed

9     should be accepted without discussion.  Okay, so if there were

10    no discussion at the time that the 2.2 language hits, it's 50

11    percent reduction, but you would say with room to negotiate up.

12         MR. RENARD:  All of which is in the power of the

13    pharmaceutical company to determine whether it wants to engage

14    or not engage with CEPS in connection with setting a generic

15    price.

16         As Mr. Schur said, you can get a higher price or lower

17    percentage reduction for the pre-generic price.  Your Honor,

18    that was even borne out by the fact if one looks at -- and we

19    will here in a little bit -- the pricing history of the generic

20    equivalent to Tambocor IR, the immediate release version, went

21    from at various levels 65 to 75 to a hundred percent of what

22    Tambocor IR was, no 50 percent.

23         THE COURT:  Does that mean that what, in your view and

24    Mr. Schur's view, what 2.2 means, that in three years CEPS is

25    going to treat LP like a generic?

1              MR. RENARD:  CEPS is going to negotiate a price

2     reduction.

3              THE COURT:  As if it were negotiating a price

4     reduction on a generic?

5              MR. RENARD:  Your Honor, that would be the upshot of

6     2.2.  However, we also know in the communications with CEPS

7     that they -- by the way, I have to say this.  We talk about the

8     optional nature of 2.2, the first part being the introduction

9     of the generic.

10             Your Honor, Mr. Biffaud in his trial declaration,

11    Paragraphs 33 and 34, he said he replaced Mr. Felber in July of

12    2003.  One of the first things I did -- Paragraph 34 -- in that

13    role was to advise Mr. Renaudin that 3M would not allow generic

14    versions of Flecaine LP into the market prior to the expiration

15    of its patent, one of the actions contemplated by Article 2.2

16    of the March 2003 convention.

17             An interesting point chronologically, Mr. Biffaud,

18    coming in and taking Mr. Felber's place, and that conversation

19    with Mr. Renaudin took place between March 2003 convention and

20    the November 17, 2003 convention, which didn't have Article

21    2.2, but I just wanted to address that first half of the option

22    and then we're dealing with the second half.  It was clear,

23    your Honor, both from CEPS' communications with 3M as well as

24    3M's expectations in its communications with CEPS, it was

25    envisioning after three years it would be sitting down both

1    because of the expiration of the convention, that November 17,

2    2003 convention was a three-year convention by its terms, it

3    was going to expire in 2006, also the registration of Tambocor

4    CR, and your Honor, registration, that is the market

5    authorization issued by the actual health authority that allows

6    for safety and effectiveness purposes, the drug to be sold on

7    the market, that was coming up for renewal in 2006.  So you had

8    these two events coinciding which necessarily required a new

9    negotiation with CEPS.

10         THE COURT:  Just to bring it back into some of the

11   contract, the acquisition agreement language, it seems like

12   even as you're -- tell me why this is wrong -- even as you're

13   describing it, that if you're right about focusing on the

14   generic language, what 2.2 meant was without discussion, one in

15   three years LP is going to be negotiated like a generic; and,

16   therefore, without discussion, we are looking at a 50 percent

17   price reduction but the possibility of negotiating up.

18         So then going back to 3.07, could you talk about --

19   this may be taking you out of your bucket order -- the language

20   around industry guidance and stipulation that Mr. Armenio spent

21   time focusing on.

22         MR. RENARD:  It does segue into what was my next box

23   to address, and that was Article 2.2 even in effect at the time

24   of the acquisition agreement.  On that we believe absolutely

25   not, and we think the credible evidence --

1    THE COURT:  So I can check off a box, does that mean

2    do I think if it was in effect, under your theory, it is at

3    minimum industry guidance or stipulation.

4    MR. RENARD:  To call that industry guidance is

5    incorrect.

6    THE COURT:  In light of how Mr. Schur testified about

7    it, it sounded to me like industry guidance.

8    MR. RENARD:  Your Honor, what we would be talking

9    about under 3.07 was whether or not there was a violation of a

10   regulatory act or a law.  When we talk about a violation, again

11   what Article 2.2 necessarily required was another convention to

12   be executed by CEPS and by 3M Sante because you couldn't --

13   THE COURT:  Just a second to focus on the language of

14   3.07, since December 31, 2004, seller has complied in all

15   material respects with all applicable regulatory requirements

16   and all industry guidance concerning the marketing, promotion

17   and distribution of Meda's natural products.

18   You wanted to take me back into regulatory

19   requirements, but I am asking you based on the language to talk

20   to me about after the "and" all industry guidance concerning

21   the marketing, promotion, et cetera.

22   MR. RENARD:  Again 3M Sante was in accordance with not

23   only any regulatory acts, any agreements that it reached with

24   CEPS, but also any industry guidance.

25   THE COURT:  How is that?

1              MR. RENARD:  Because, your Honor, it necessarily

2     required you could not unilaterally drop the price of Tambocor

3     CR.  You can't do that.  In order to drop the price --

4              THE COURT:  So you're equating industry guidance with

5     unilaterally dropping the price?

6              MR. RENARD:  No, your Honor.  We are talking

7     ultimately about Article 2.2, whether it is industry guidance

8     or regulatory act or a contract, we are talking about whether

9     or not we were acting in accordance with Article 2.2 to the

10    extent it existed.

11             The point under Article 2.2, that second option about

12    pricing, it necessarily required a conversation leading to a

13    convention, a new convention between CEPS and 3M Sante.  You

14    couldn't unilaterally drop the price.  A new price to be issued

15    by CEPS, and in order to get there, you needed a new

16    convention.

17             What we did -- and we will be looking at this in a

18    moment -- in January of 2006, as we were required to do, we

19    made a new application for CEPS in connection with our renewal

20    of our registration and asked CEPS to consider a recommended

21    and proposed price.  The proposed price that was put into that

22    application for renewal was 17.10 euros, and a case was made in

23    that application why that price ought to be maintained.  That

24    was done well in advance of the April 12, 2003 so-called

25    deadline they say applied under Article 2.2.

 1            What happened next?

 2            In August, your Honor, we get a draft amendment to the

 3   November 17, 2003 convention that has in it as the reimbursable

 4   price for Tambocor CR 17.10 euros.  It also had an annex, too,

 5   and we are going to talk about this that had Article 2.2.  It

 6   was stricken.  It was countersigned by Mr. Renaudin, and isn't

 7   it interesting that that 17.10 percent price was the first and

 8   only price offered by CEPS when Meda took over and entered into

 9   its first convention in 2007.

10            The notion that 3M was in violation of Article 2.2 by

11   doing what it did, knowing that there was going to have to be a

12   new convention with CEPS in order to put a new price into

13   effect, given the fact there wasn't a price certain stated in

14   Article 2.2, 3M did what it had to do.  It approached CEPS, it

15   proposed a price.  CEPS respond by providing in the very next

16   convention that was executed by the parties, a convention that

17   had 17.10 euros in it.

18            That is the notion, this notion that there was some

19   violation, some thumbing the nose at CEPS, your Honor, that was

20   the behavior of the two parties to the very next CEPS

21   convention.

22            So to suggest that somehow we violated, we were in

23   breach of, we were thumbing our nose at some obligation doesn't

24   wash.  There was to be another negotiation and, in fact,

25   another negotiation took place and another convention was

D1VJMED3                        Summation - Renard

1    executed.

2              Article 2.2, no matter what point you look at, April

3    12, 2003, or running up to November 8, 2006 when the

4    acquisition agreement was executed, there was no violation of

5    that.  3M did the only thing 3M could have done, and that is go

6    to CEPS and say okay, let's start negotiating.  What emerged

7    from that was a September 15, 2006 convention that had 17.10

8    euros, not a 50 percent reduction, not a 25 percent reduction.

9              It stayed at the same price, and that was the outcome,

10   your Honor, of that negotiation that took place in April of

11   2006.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. RENARD:  Mr. Schur, of course, was talking about

2     how this provision could have been written in a way that --

3          THE COURT:  What evidence is there in concert to the

4     information put forth in the letters and the like from Mr.

5     Renaudin after the fact sort of revising, if that's what it is,

6     2.2 and talking about it in obligatory language?

7          MR. RENARD:  That occurred in the tail end of 2007,

8     2008.  What I would say is interesting is what SEPS actually

9     did.  After 2.2 was stricken from the September '06 amendment,

10    executed by 3M and by SEPS, you had the transaction take place.

11    The marketing authorization --

12         THE COURT:  It strikes through the price too.

13         MR. RENARD:  It strikes through the price in Annex 4,

14    but the price is also stated in Annex 3, which is the annex

15    that matters with respect to price.

16         You have Annex 4, which is the special terms.  That

17    was stricken out, it was initialed, and it was sent to SEPS,

18    and it was countersigned by Mr. Renaudin.  That didn't attempt

19    to strike out the Article 3 price and that's the price that

20    matters.

21         THE COURT:  I interrupted you on the way to answering

22    the question about what to make about how Mr. Renaudin talked

23    about 2.2 after the fact.

24         MR. RENARD:  Your Honor, it's interesting.  In the

25    plaintiff's complaint, and you didn't hear about this in the

 1    trial, but in their complaint, they say that Mr. Christian

 2    Senac, who was the country manager for Meda France, had a

 3    conversation with Mr. Renaudin in February of 2007 talking

 4    about this.

 5          What is interesting is that the very first convention

 6    that Meda executes with SEPS in September of 2007 carries

 7    forward exactly what the parties had agreed to in the September

 8    2006 convention between 3M and SEPS, namely, a 17.10 euro

 9    reimbursable price and no Article 2.2.  It's not in there.  It

10    wasn't even proposed.

11          Then, your Honor, we roll forward, and Mr. Renaudin,

12    in connection with negotiations with Meda, first saying we are

13    going to enforce our policies, we are going to make sure that

14    Tambocor CR goes down in accordance with our policies, refers

15    back to Article 2.2.  He does.  And it ends up being talked

16    about in the negotiations.  2.2 never ends up being in any

17    convention between Meda and SEPS.

18          I think as Mr. Schur said it, and said it well, SEPS

19    knows what it's doing.  And if SEPS truly believed that Article

20    2.2 survived and was still in existence even after that

21    September '06 amendment, it would have been in that September

22    '07 convention, the first one that Meda executed with SEPS at a

23    time when Meda had taken over the rights of Tambocor CR.  It

24    wasn't there.  It didn't even come into the discussions until

25    later.

1      So, your Honor, we can look at what Mr. Renaudin said

2   in his negotiations, but we can also look at what SEPS, as a

3   committee, did in connection with entering into these

4   agreements with Meda.  It wasn't there.  In fact, as it turns

5   out --

6      THE COURT:  Couldn't that just be evidence that

7   Renaudin is brightly pointing out the existence of it and the

8   committee has the authority not to enforce it, that is, it

9   exists, but they are open to negotiation?

10      MR. RENARD:  I think Mr. Renaudin, rather than saying

11   continue to exist, was harkening back to that there was this

12   Article 2.2 and using it in terms of negotiating with SEPS.

13      The fact of the matter is, and this was with SEPS'

14   clear approval and knowledge, that after the acquisition in

15   January of 2007, Meda had the benefit of a 17.10 euro

16   reimbursement price for Tambocor CR for 22 months, almost two

17   years had the benefit of that price.  If Mr. Renaudin, and more

18   specifically SEPS, had believed that there was an automatic

19   price reduction, and that that Article 2.2 continued in

20   existence and allowed SEPS to automatically reduce the price by

21   whatever level, it could have implemented and effectuated that.

22   It did not.

23      In fact, the actual history and chronology of the

24   convention shows that SEPS, in the very first agreement that it

25   had with Meda, didn't have this Article 2.2.  That's consistent

1    with our reading, and I believe the appropriate reading of the

2    September 15, 2006 amendment that struck Article 2.2, and it's

3    consistent with the idea that SEPS had gone beyond Article 2.2

4    and realized that that indeed did cease to exist in 2006.  And,

5    your Honor, that was part of the negotiating strategy that Mr.

6    Renaudin had with SEPS.

7               THE COURT:  Does Mr. Schur testify about those

8    statements from Mr. Renaudin?

9               MR. RENARD:  I believe he does, your Honor, in his

10   report.

11              THE COURT:  In his declaration?

12              MR. RENARD:  Yes.

13              In fact, at this point, your Honor, it might be wise

14   to -- why don't we go to number 44, please?

15              This goes to the very point, your Honor, and again,

16   this is one of those key issues that, if Article 2.2 is not in

17   effect at the time of the acquisition agreement, then their

18   entire Article 2.2 case falls.  And yet it's interesting how

19   little is devoted on the part of Meda to this particular issue.

20              Mr. Schur testified, and I asked him, going back to

21   the March 2003 convention, because, again, that's the language

22   in the way that Meda has described Article 2.2 as the March

23   2003 convention, did it even exist?  And he said, obviously, on

24   November 8, 2006, it was of no further force and effect.  And

25   that was because initially the November 17, 2003 convention

1  took it out of effect, but it then went again out of effect

2  pursuant to the September '06 amendment.

3        This goes to the idea, your Honor, of controverting

4  Mr. Destal's notion of symmetrical conventions.

5        I asked Mr. Schur, if we wanted to determine at any

6  point in time what is the convention controls, you look at the

7  chronology of the conventions and choose the one that was

8  applicable at that point in time.  Subsequent conventions

9  abrogate prior conventions, and that's a natural consequence of

10  162.17(4) which is the operative statute.

11        Here, your Honor, is a chart of the various

12  conventions relating to Tambocor CR.

13        The March 10, 2003, which is really the operative

14  convention that Meda wants to focus the Court on, had an

15  Article 2.2, but within a few months thereafter, and this was

16  after Mr. Biffaud's conversation with Mr. Renaudin, had the

17  November 17, '03 convention that Article 2.2 didn't appear in.

18        There were two subsequent conventions where 2.2 was

19  put into effect, and then you have the September 15 convention

20  in which it was eliminated.

21        And as I mentioned, your Honor, the very next

22  convention, and there it is, September 28, 2007, this is the

23  first one Meda France executed with SEPS after it acquired

24  rights to Tambocor CR.  There is no Article 2.2 whatsoever, and

25  neither was there in the subsequent amendment dated September

 1   17, 2008.

 2           Mr. Schur took us through the chronology and mentioned

 3   that in his opinion, his expert opinion, as an expert on French

 4   law, that Article 2 was stricken in 2006.

 5           Your Honor, here are some excerpts out of that

 6   provision.

 7           Mr. Husson, who was then the director general of 3M

 8   Sante, struck out Article 2 and, as you mentioned, the rest of

 9   the provisions within Annex 4 to that proposed convention,

10   initialed them, and sent it to Mr. Renaudin.

11           Your Honor, that was executed on September 15, 2006

12   and Meda has two arguments why this was inoperative.  Number

13   one, it was not counter initialed by Mr. Renaudin.

14           And, by the way, it's undisputed that Mr. Renaudin

15   signed this agreement after Mr. Husson signed it and struck out

16   Article 2.2.  That's in Mr. Husson's deposition, which I think,

17   your Honor, was part of our fact brief that we put in

18   yesterday.

19           So you have Mr. Husson in a cover letter, to Mr.

20   Renaudin, dated September 8, 2006, one week earlier, advising

21   Mr. Renaudin that this provision was being stricken, strikes

22   it, initials it, sends it to Mr. Renaudin, who signs it one

23   week later on September 15, 2006.

24           Argument by Meda:  This was not counter-initialed, the

25   handwritten changes were not counter initialed by Mr. Renaudin.

1           The only expert testimony in the record, your Honor,

2     that cites you to actual French law is Mr. Schur, who says you

3     only need a counter-initialed handwritten change in a document

4     that is notarized.  He even cites the statute in France,

5     saying, except with respect to notarized instruments, you don't

6     need to counter-initial changes, provided that the person who

7     signs last is the person who was not making the handwritten

8     changes, and that was obviously the case here.  3M made it,

9     explained it in a cover letter, gave it to Mr. Renaudin who

10    signed it.

11          Argument number two by Meda is, well, this was only a

12    week after this stricken-out convention was returned to Mr.

13    Renaudin and nothing could happen in a week officially within

14    SEPS.

15          Your Honor, it's interesting, the very first SEPS

16    convention that Meda did with SEPS after Tambocor CR was

17    acquired, that's the September 2007 deal, they made handwritten

18    changes, and we are going to show it here in a minute,

19    initialed them, sent it to Mr. Renaudin on September 27, 2007,

20    and it was executed by Mr. Renaudin the very next day,

21    September 28, 2008.  And they are saying a week was not enough

22    time and it makes it suspicious whether or not this was an

23    official document?

24          Your Honor, those are the best two arguments they

25    have.  It was not counter-initialed by Mr. Renaudin, which is

1    only required in a notarized instrument, and, number two, that

2    the short time between Mr. Husson's letter to Mr. Renaudin and

3    the time that Mr. Renaudin signed it, and you can see the stamp

4    signature there, September 15, 2006, makes it suspicious.  And,

5    your Honor, that's from someone who sent a handwritten change

6    to SEPS which was signed the very next day after.  There is no

7    legitimate, genuine argument that this was not a valid striking

8    and elimination of Article 2.2 from this convention.

9        They don't otherwise question the validity of the

10   convention.  In fact, they refer to it time and time again in

11   their pleadings, in their filings, and during this proceeding

12   that there was this September 15, 2006 convention.  They refuse

13   to accept the fact that Article 2.2 was stricken, because if

14   you do acknowledge that it was stricken, and it was pursuant to

15   French law, then all their arguments with respect to 307, 312,

16   315 go out the window, because this was not an obligation that

17   was subsisting and enforceable and in existence as of November

18   8, 2006, the acquisition agreement, or at the time of closing

19   two months thereafter.

20       This, your Honor, is one of those illuminating parts

21   of this case, that and the fact that they never even cared to

22   even ask or inquire about conventions.  This is a major

23   weakness in their case, and they just don't have much other

24   than those two arguments in response.

25       Here, your Honor, Mr. Husson, just going back and

1    making sure we have covered this, Mr. Husson, whose signature

2    appears on that September 15 amendment, says that he signed it,

3    sent it on, and Mr. Renaudin's signature was applied

4    thereafter.  Therefore, there is no question but that Mr.

5    Renaudin signed the instrument, having a cover letter addressed

6    to him saying this was being stricken out, having it actually

7    being stricken out, and he signs, and under French statute his

8    signature constitutes his authority on the part of the economic

9    committee to sign these.  This was the convention that was in

10   effect at the time that this deal on which they sue was

11   executed.  It was an amendment to the November 17, 2003

12   convention.  And, your Honor, at that point in time, and moving

13   forward, Article 2.2 just didn't exist.

14        Mr. Schur takes on each of their points here in his

15   trial declaration.

16        Under French law, 2.2 is eliminated because French law

17   does not apply to formalities, and that has to do with the

18   initialing of handwritten changes because this was not a

19   notarized instrument.

20        Number two, there is no requirement in SEPS' internal

21   procedures that deletions be initialed by the president of

22   SEPS.

23        Number 3, the SEPS president.  Both that they believed

24   Article 2 had become invalid and that 3M had struck it out.

25        And four, Mr. Renaudin thereafter signed the

1    convention on behalf of SEPS.

2              Your Honor, this goes back to what was going on at

3    this point, what preceded that September amendment in which

4    Article 2.2 was stricken out and the price of 17.10 euros

5    continued in effect?  This is the application that I mentioned

6    earlier for renewal of the registration.  And this is what 3M

7    Sante told SEPS in January of 2006 prior to the so-called April

8    12 deadline.  They are asking for renewal of their listing of

9    reimbursable drugs, making a case, and this is a multipage

10   document JX 49A, and at the very end saying, in light of all of

11   the above, maintenance of the price of Flecaine LP at 17.10 is

12   proposed.

13             This was the first volley in what was expected to be a

14   negotiation with SEPS.  What emanated out of that first volley

15   in January of 2006 was a September 2006 amendment that struck

16   Article 2.2 and maintained 17.10 euros as the reimbursable

17   price for Tambocor CR.

18             THE COURT:  We are either going to break now or in a

19   minute.  I don't want to interrupt your immediate flow.

20             MR. RENARD:  What your wishes are, your Honor.

21             THE COURT:  Why don't you tell me about this slide?

22             MR. RENARD:  This is Annex 3, which, as I said, is

23   breaking it down between regulatory act and matters either by

24   administrative agreement or otherwise.  Annex 3 is what counts

25   for purposes of pricing.  This was not stricken out.  This was

D1V8MED4                    Summation - Mr. Renard

1    what was proposed by SEPS in response to our January renewal

2    application.  This is what SEPS proposed and what 3M accepted,

3    and that was maintenance of the price at 17.10.

4            This belies the notion, your Honor, that SEPS was dead

5    set on reducing the price of Tambocor CR pursuant to the now

6    nonexistent Article 2.2.  They were fine with maintaining that

7    price and that shows you and I think reflects somewhat on the

8    meaning and effect and intent of Article 2.2.  But this is

9    where the price stood, 17.10, with no Article 2.2, and that was

10   the state of affairs when these two parties executed and

11   entered into that acquisition agreement and closed on the

12   transaction.

13           Thank you, your Honor.

14           THE COURT:  Thank you, Mr. Renard.  We will pause on

15   your timing.  I think my staff conveyed we are going to take a

16   lunch break.  I am going to do a sentencing at 2.  You can keep

17   your materials here.  To be safe, we will resume at 3:00.  40

18   minutes remaining, Mr. Renard, and then 20 minutes for the

19   plaintiff.  See you at 3.

20           (Luncheon recess)

21

22

23

24

25

1        AFTERNOON SESSION

2        3:00 pm

3        (Trial resumes)

4        (In open court)

5        THE COURT:  Please be seated.  Mr. Renard, before you

6    get started, just to go back to a point you nearly ended on

7    which was the argument about the dates, the strike-out which is

8    in --

9        MR. RENARD:  September 15.

10       THE COURT:  -- September 15th of '06.  So there is a

11   timing issue that I wanted to ask about which is both of you

12   have to some extent on 3.07 of the acquisition agreement, the

13   date in there is December 31st, 2004, seller has complied in

14   all material respects, dot dot dot.

15       So if I conclude, if I were to conclude -- and I

16   understand your arguments against this -- that Article 2.2

17   created a compliance issue, then the compliance issue would

18   have begun in April 2006, and that's several months before the

19   strike-out.

20       Again I understand your arguments that there is not a

21   compliance issue, but I also understood your focus on the

22   strike-out argument as being whatever it was, it didn't exist

23   at the time, but there is certainly a period of time where it

24   existed whatever it was, right?

25       MR. RENARD:  Your Honor, that is correct.

1          We believe -- and I believe we have discussed this,

2     that Article 2.2 necessitated -- beyond contemplated, it

3     necessitated there being another negotiation to arrive at

4     another convention in order to effectuate any price reduction

5     that might be agreed to by the parties.

6          In order to make that happen, we couldn't

7     self-effectuate it, we just couldn't.  What is required to

8     happen is that we would have to initiate that discussion.  In

9     January of 2006 we filed a renewal application asking for a

10    17.10 euro price.  That was before April 12.  That ultimately

11    resulted, your Honor, in the September 15, 2006 convention that

12    had the 17.10 euro price and struck, we believe, Article 2.2.

13         The language that you focus on has to do with, "in any

14    material respect."  One, we believe that we initiated that

15    negotiation that would have been necessary to reduce the price,

16    but beyond that, your Honor, in terms of in any material

17    respect, during that period of time, and that is from the time

18    we made that application at the beginning of January, there was

19    no indication by CEPS that they believed we were in violation,

20    material or otherwise, of Article 2.2.

21         It was a non-issue.  We believe it was a non-issue,

22    your Honor, because CEPS realized, like we did, that what was

23    being contemplated was that we would have to come back to the

24    table.  You just have to understand the language of 2.2, that

25    second half clause, in order to arrive at a price reduction,

1   there there had to be a convention.  Because it wasn't an

2   automatic 50 percent or 5 percent or 10 percent, there had to

3   be a negotiation over price.

4           Your Honor, we initiated that, and what 2.2

5   contemplated was a subsequent convention, and that, indeed,

6   came about in September of 2006.  I do not believe that,

7   understanding 2.2 that way, how CEPS was handling it and how we

8   were applying for new pricing, I don't see how you can say that

9   was a derogation in any material respect from Article 2.2.

10          That, your Honor, and I think you're harkening to that

11  provision that has historical reference to it, it is the only

12  warranty on which Meda sues.  It has historical reference.

13  Since September 2004 there hasn't been a violation of a

14  regulatory act in any material respect since that point in

15  time.

16          THE COURT:  Well, complied in all respects with all

17  applicable regulatory requirements and all industry guidance.

18          MR. RENARD:  Yes, your Honor.

19          With respect to the industry guidance because I gave

20  that some thought, your Honor, and what is industry guidance?

21  Well, first of all, it would be guidance from the drug

22  pharmaceutical industry, things like best practices.  There was

23  an organization in effect called LEEMS, L E E M S, which is the

24  French pharmaceutical association.

25          THE COURT:  Do we have any testimony or evidence

1   regarding this?

2          MR. RENARD:  You see the framework agreement, the

3   so-called framework agreement that is mentioned at the

4   beginning of a lot of these conventions.  That is -- and

5   mentioned in the ministry guidelines -- that is an overarching

6   agreement that the drug association of France enters into with

7   CEPS which kind of sets the foundation for these

8   company-specific conventions.  They are a pharmaceutical

9   association.

10          You have to look at what does industry guidance mean,

11   your Honor?  That is a term, if they're going to say that that

12   has any play here, I don't believe there was because there

13   wasn't a violation of anything, be it a contract, a regulatory

14   act or industry guidance.  You have to give some construction

15   to what that means.

16          I think a practical construction is best practices or

17   other codes of conduct or standards that are set forth,

18   promulgated by the drug industry in France, and I don't believe

19   there is a violation of that.  That has never been seized on.

20   I don't believe this Article 2.2 -- again, whether you call it

21   a regulatory act, a contract, something that was being

22   contemplated, whether it is industry guidance, was violated in

23   any way, shape or form.  I think that is the meat you have to

24   put around the bones of that particular term, industry

25   guidance.

1           THE COURT:  I know, I understand your arguments

2      against it.  If I disagree with that, I really want to

3      understand the import of the timing issue and the strike-out,

4      and so I think if I disagree with that, then even if the

5      strike-out on September 15th, 2006 effectively annulled or

6      eliminated 2.2, is there still a period of noncompliance, if

7      that is what I think it is, that would fall within the 3.07

8      provision?

9           MR. RENARD:  Then the inquiry would be whether or not

10     there was noncompliance in any material respect with the

11     regulatory act.  For the monies, I don't believe there were.

12          THE COURT:  I understand.

13          MR. RENARD:  Meaning prior to August and September 15,

14     2006, during that run-up period from 2000 of until the time we

15     entered into that convention, given what I believe 2.2

16     contemplated, what we did in order to initiate an organization

17     and get a new convention, keep in mind when we initiated a

18     convention, CEPS response wasn't okay, let's begin

19     give-and-take of the bargaining, we want 11 euros.  It wasn't.

20          Their response was 17.10 euros, and I don't think,

21     your Honor, given that scenario, the fact that prior to April

22     we initiated a negotiation and attempted a negotiation,

23     certainly one that was meant to lead to a convention and did,

24     in fact, lead to a convention, your Honor, you can say that was

25     a violation or noncompliance in any material respect with

1    regulator to act or industry guidance or contract or anything

2    else for that reason.

3          CEPS certainly didn't act as if it was.  Nothing was

4    said.  We were never put on any notice, no suggestion was ever

5    made by Mr. Renaudin that at the beginning of 2006 or any time

6    in that period up to and including September 15, that no, 3M,

7    you didn't do something you were suppose to do, and that

8    bothered me and concerns us, et cetera, et cetera, et cetera,

9    that never occurred, never occurred.

10         Your Honor, to kind of summarize that point where we

11   are, and as Mr. Schur was talking about, no, 2.2 set a marker,

12   and by that I don't mean minimizing what the language was, but

13   it essentially said come 2006, we need to sit down, we need to

14   have a negotiation and we need to enter into a new convention,

15   and that is exactly what happened here.

16         If I may, that picks up with where we left off, and

17   that is that, in fact, not only was there a strike-out of

18   Article 2.2 which we believe was valid and I believe that we

19   have overcome all the arguments that the plaintiff has made

20   with respect to suggesting that that wasn't valid in any way,

21   shape or form.  The fact of the matter is, and this just

22   underscores what I previously said, 17.10 euros was the amount

23   that came out of that September 15th, 2006 amendment.

24         In other words, it stayed the same notwithstanding

25   whatever 2.2 meant and regardless of whether 2.2 had been in

1    effect up to that point in time and that is significant.  Why?

2    This, your Honor, carries us forward in the chronology but also

3    underscores a point that Meda has made in challenging the

4    strike-out of Article 2.2.  These are excerpts from the

5    convention dated September 28, 2007.  This is the first

6    convention again that Meda entered into with CEPS during the

7    period in which they had acquired the Tambocor CR rights.

8            You talk about handwritten changes, your Honor, and

9    there are many, many if you scroll through JX 115, but you can

10   see here, you've got a drug Zamudol that Meda has made

11   handwritten changes to, decreases in the price.

12           THE COURT:  Where am I looking?

13           MR. RENARD:  JX 115.  This would be Annex III to the

14   September 28, 2007 convention between Meda France and CEPS.

15   This goes to the point obviously that you can't make

16   handwritten changes without being initialed by President

17   Renaudin.  You can't make it in any way.  Here we have price

18   changes being written in and you can see the first example,

19   Zamudol LP, 50 milligrams, price decreases being written in and

20   changes being made to the effective date.

21           Notice the effective date written in there, October

22   15, 2007.  That is in the future.  So Meda is writing down this

23   price change is going to take effect sometime after this

24   particular convention and they're handwriting this in, and they

25   handwrite information regarding Flecaine LP.  Notice the

1    prices, 17.10, and this was signed by President Renaudin.

2            Let's underscore this because one of the big points is

3    you had to go through this long involved process in order to

4    make a change to a convention; and, therefore, the one-week

5    period between the time that we submitted that September 15,

6    '06 amendment and the time it was executed by President

7    Renaudin, it just couldn't have happened tat the CEPS committee

8    signed off on that or otherwise approved it.  There is no real

9    evidence of that.  They cite procedures from a 2010 CEPS

10   manual, but that aside, these handwritten changes, your Honor,

11   were signed by Mr. Renaudin on September 28th.

12           They were submitted to CEPS with a cover letter, dated

13   September 27.  One day after Meda France submits this with all

14   these handwritten changes, it is signed by Mr. Renaudin, and

15   they certainly don't question the efficacy of these handwritten

16   changes are made with respect to CEPS convention.  They did it

17   not once, but they did it again.

18           Here we have some deposition testimony from Christian

19   Senac.  Again this was their 30 (b)(6) witness.  He was also

20   the country manager for Meda France who for some reason or

21   another didn't submit a witness statement.  That said, he

22   entered into a convention in September 2007.  Those Article 2

23   clauses were not included in that convention that he signed

24   with Mr. Renaudin.  Mr. Renaudin made no mention of a

25   contractual decrease of 50 percent at that point in time.

1          I mention it was not just once they made handwritten

2    changes, but it was twice.  Here is the second Tambocor CR

3    convention that Meda enters into and this is September 17,

4    2008.  Your Honor, this is the point at which the first price

5    decrease for Tambocor CR comes into effect, and it is a 13

6    percent price decrease initially and to take effect beginning

7    November 1, 2008.  Those are handwritten changes again were

8    made by Meda and it was signed by Mr. Renaudin.  Clearly

9    handwritten changes on a non-notarized document such as a CEPS

10   agreement that are countersigned by Mr. Renaudin are effective.

11         They themselves engaged in the very practice of which

12   we stand accused of having somehow, some way not validly

13   eliminated Article 2.2.  I don't think any other arguments in

14   that respect hold water.  That was eliminated.  It was signed

15   and that very price carried forward.  There was no Article 2.2

16   in that September 28th, 2007 convention, none.

17         Your Honor, we spoke earlier, and the court asked a

18   question about what Article 2.2 really reflected and Mr.

19   Schur's observations about how really what was going on was

20   that CEPS was implementing those ministerial guidelines of

21   September 2002 as reiterated in the various CEPS annual

22   reports.  We saw this in the opening statement, but it bears,

23   your Honor, some repeating because it is important.  These are

24   three columns, Tambocor IR, the immediately release version is

25   on the left.  The Tambocor IR generic is listed in the middle,

1    and we have Tambocor CR also known as Flecaine LP in the far

2    right.  That CTJ column is the daily dosage cost.  That is what

3    CEPS really compares for the purposes of determining relative

4    cost and pricing of one drug to another.  As you can see,

5    Tambocor CR and Tambocor IR begin at roughly the same daily

6    dosage cost back in April of '03, right into low 87 area.

7             What happened in February of 2006 was that there was a

8    mandatory 15 percent reduction in the price of Tambocor IR.

9    This was a unilateral price reduction that was declared by

10   CEPS, your Honor, at a time that CEPS had the power to declare

11   TFR pricing, but decided not to, but instead to make an

12   across-the-board 15 percent reduction with respect to all name

13   brand products that had generic competition, and that includes

14   IR.  So we're out of whack, so to speak, in comparing CR's

15   daily dosage cost with IR.

16            Then around January of 2008, in fact, it was announced

17   the prior year, in 2007, TFR pricing went into effect with

18   respect to Tambocor IR.  You see the 45 cents daily dosage.  It

19   came down from 70 to 45 cents, and that was the same amount as

20   the generic equivalent at 45 cents.  So as we have been saying

21   all along, a couple of things we are going on.

22            Number one, there was a risk in 2006, even prior to

23   that, that IR was going to be subject to TFR pricing, meaning

24   that the price, reimbursable price of IR was going to come down

25   to that equal to IR's generic equivalent, and that in fact

1    happened and it was declared in 2007.

2          There is another policy that goes on and I didn't bore

3    the court with the slides even though I had it earlier, about

4    the often-repeated policy of CEPS that when you have a counter

5    generic drug such as Tambocor CR that is introduced in order to

6    match and meet the competition posed by generics to the drug

7    that is meant to be replaced by CR, and that is Tambocor IR,

8    and that is exactly what happened here.  You recall that we

9    introduced evidence, and I referred to it also in the opening

10   statement, that 3M itself said that Tambocor CR was meant to,

11   and I quote, "counter generics," of Tambocor IR.

12         The policy, therefore, was as Flecaine LI, that is the

13   immediate release version of Tambocor, was coming down to meet

14   the price of its generic competitor.  CEPS policies were that

15   the CR, the counter generic drug, would also start coming down

16   at a rate similar to the drug that it was intended to replace.

17   That is the immediate release version.  That is Tambocor IR.

18         Look what has happened to today, your Honor?  We're

19   virtually, we're 12 cents off in the daily dosage cost of

20   Tambocor CR with that of the generic equivalent to IR and IR

21   itself.  Now, why do we talk about this?  You heard counsel say

22   that it was Meda's expectation at least in the short to

23   mid-range that there was not going to be any price decrease in

24   Tambocor CR.  Mr. Dierks' testimony was -- and he even said he

25   repeated it in his deposition -- that were it not for Article

1    2.2, Tambocor today would still remain at 17.10 euros.

2              Your Honor, that just doesn't hold water.  If you look

3    at the policies, the minister's guidelines, the policies with

4    respect to generics and their equivalents and also if you look

5    at the policies with respect to the pricing of counter generics

6    vis-a-vis the drug it was intended to replace, it all ends up

7    at the same place.

8              Mr. Schur testified about this.  He said ultimately

9    CEPS policy, whether it gets there in a short period of time or

10   it is a gradual period of time, is that that counter generic is

11   ultimately going to be priced at a level equal to the generic

12   competitor of the drug that the counter generic was intended to

13   replace, here Tambocor CR coming down to the price of Tambocor

14   IR which equals the price of its generic equivalent.  Those

15   were the policies of CEPS.

16             We'll present the court with a copy of our closing

17   statement at the conclusion, as I am sure the plaintiffs will

18   also.  We have several slides to talk about these that set

19   forth these policies.  I didn't think we needed to go through

20   that again.  That is what is really going on here.  That is

21   what was really going on over the course of these discussions

22   and conventions, and you can see the progression of the prices.

23   That is precisely what went on.

24             THE COURT:  Sorry.  Just to go back to that one, part

25   of the story that they tell is that -- and it is obviously

 1    different than yours.  I am trying to get the best way to get

 2    at this question.  That makes sense only if that, the story you

 3    tell us will only make sense and would be knowable if you

 4    understood something initially about the price that it was

 5    initially set.  I am not going to have a question.

 6           It has to do with Mr. Felber's testimony you

 7    pronounced with a French accent earlier, but the idea that the

 8    only reason that price was as high as it was as an initial

 9    matter was because that was a price negotiated in the context

10    of 2.2 and the imposition of this policy that you're talking

11    about, but it -- so I guess I am struggling to see how the

12    story that you're telling incorporates or doesn't that

13    beginning point of the story that they tell.

14           MR. RENARD:  Your Honor, that is interesting.

15           I did see the references to the original high price of

16    Tambocor CR.  What is interesting is the first time that CR

17    came out on the market, obviously it was pursuant to that March

18    2003 convention, and you'll see here the effective date of CR

19    coming out was April 12 of 2003.

20           THE COURT:  Right.

21           MR. RENARD:  If you see, your Honor, the daily dosage

22    cost, and Mr. Schur talks about this in his reports, in his

23    declaration, is virtually equal to that of the daily dosage

24    cost of the IR version, meaning measured by daily dosage cost,

25    and that is how CEPS compares drugs for the purposes of

1    reimbursement pricing, you really didn't have CR coming out at

2    a higher level from a CTJ standpoint than was the IR version.

3              You know what?  That is perfectly consistent with the

4    minister's guidelines at the time that say with respect to a

5    Category IV, that is, an ASMR IV counter generic drug, it

6    should be registered at a price so that relative to the drug

7    that it is replacing, so that there is no additional cost to

8    the health care system in the short or middle range, and your

9    Honor, I would say that application of those minister's

10   guidelines in this particular situation, they were applied

11   imperfectly because if, in fact, CR had come out at a higher

12   CTJ price, then that would have been contrary to minister's

13   guidelines that had been instituted only four months prior to

14   that time.

15             THE COURT:  What do you make of Felber's testimony?

16             MR. RENARD:  I am not sure what to make of it, your

17   Honor, because it is in consistent with what actually happened,

18   is in consistent with the minister's guidelines.

19             I also say this:  You had a 17.10 euro price that

20   continued in effect through November of 2008 which you can see

21   here.  I am not sure if, in fact, that CEPS was making some

22   kind of a devil's bargain that you're going to start out high,

23   but you're going to end up low, your Honor.  What you see here

24   is consistent with CEPS policies.

25             In fact, and I point this out earlier, as I mention in

1    February of 2006, you had a 15 percent decrease in the daily

2    dosage reimbursement cost of the IR version.  One would think,

3    therefore, that application of CEPS policy also, you were going

4    to see a 15 percent corresponding decrease in the price of

5    Tambocor CR, I don't just say that.  Mr. Mariotte says that.

6    He says it well could and should have been expected there would

7    be a 15 percent decrease in CR around this time.

8          Well, in fact, that went into the calculus that 3M was

9    making with respect to its budgeting for 2007 and it also went

10   into the calculus that Meda was making for 2007 and 2008.

11         To the court's point might the 13 percent reduction

12   that became effective in November of 2008 followed by the

13   additional 20 percent reduction in October of 2009 somehow,

14   some way represent a deal that was struck originally by CEPS

15   back in March of 2003, and I'd say, your Honor, what you're

16   seeing here -- maybe that kind of shows you that the spirit and

17   intent of Article 2.2 was exactly the way Mr. Schur described

18   it and that was this was a way of applying and effectuating

19   CEPS policies.

20         That is true, and I think history has shown this out.

21   The only thing we can say is that there is still some room

22   there for future decreases in CR to get down to the level of IR

23   and its generic equivalent, but that undoubtedly will come

24   because those are CEPS policies, and I think that is perfectly

25   consistent with Mr. Schur's testimony.

1          Your Honor, if I can now talk some about these

2     warranties in the time I have remaining.  3.12, your Honor, you

3     spoke with counsel about this.  One thing I would add to the

4     court's analysis, let us not collectively forget that what this

5     contract was and what the subsequent contracts were such as the

6     French acquisition agreement, this was a sale of assets.  This

7     wasn't a stock sale.  This was a sale of assets.  At some point

8     contractually you have to identify what the assets are that you

9     are buying.  That is why you have these schedules.  That is why

10    you have a definition of assumed contracts being the documents

11    listed on the schedule.  It is the same that the regulator

12    findings, your Honor, those are scheduled and listed matters.

13    You don't buy what you don't list on the schedules to these

14    acquisition agreements.

15         This notion of well, it couldn't have meant what it

16    actually says, assume contract has to be more than definitional

17    thing whatever is set forth in the schedules.  That is just not

18    correct.  This was an asset sale necessary for the parties to

19    identify the assets.  There were contracts going to be conveyed

20    pursuant to this deal, were contracts listed initially on the

21    acquisition agreement, subsequently on the individual country

22    acquisition agreements like the French agreement.  That is why

23    that makes sense and it is not a circular thing, as counsel

24    said.

25         THE COURT:  I want to make sure I have it.  So 3.12 is

1      not meant to be an exhaustive document disclosure provision, it

2      is meant to be an asset disclosure provision.

3              MR. RENARD:  "Assumed contracts" is defined as those

4      things listed on the schedules.  What I am saying is the reason

5      you have lists of contracts and lists of personal property and

6      lists of regulatory filings is that's what is getting

7      transferred over to Meda.

8              I would parenthetically state that those CEPS

9      conventions do not get listed anywhere on the list of assets

10     that are being transferred pursuant to this acquisition

11     agreement, but pursuant to the French acquisition agreement.

12     That was no mistake, your Honor.  Those don't get transferred.

13             What actually got transferred were the marketing

14     authorizations, and we'll get there in a minute what that

15     means.  A marketing authorization, and this is really not

16     denied between the parties, a marketing authorization in France

17     is issued by the FDA equivalent in France.  It is the permit,

18     the license, the approval that is necessary that the agency has

19     said I think this is safe and effective and I'm going to allow

20     it to be marketed and sold.  That agency is a health agency and

21     that permit allows for the testing and marketing and sale of

22     drugs.

23             CEPS is not engaged in that.  CEPS doesn't permit the

24     sale of drugs.  It permits the reimbursement of drugs being

25     sold on the market.  Those are two different things, and to

1    call it a health authority is like calling the Federal Trade

2    Commission a health authority because it somehow regulates what

3    goes on with boxes the drug is contained in.  It is not a

4    health authority.

5            Your Honor, "assumed assets" was a defined term.

6            Counsel frankly identified the very issue that I had

7    identified when we were having a dialogue with them, and that

8    is it could have been and should have been worded differently

9    if the parties had intended otherwise.  It could have been that

10   "assumed contract" means these important contracts with respect

11   to A, B and C, period, all assumed contracts are listed on

12   schedule, whatever it is.  That is not the way they defined it.

13   This is self-definitional, your Honor, under "assumed

14   contracts."

15           To take the first one as an example I believe was

16   underlined by plaintiff, contracts pursuant to which a third

17   party purchases products from seller that are set forth on

18   Section 1.01 A, that is definitional.

19           Then you get to the question that was raised in

20   opening statements by the plaintiff, and that is well, what did

21   this mean?  It was all circular.  No, it is not circular

22   because you have the warranty that none of those assumed

23   contracts were in material breach.  That was an important

24   warranty and that was the warranty that was given.

25           Your Honor, we just don't fit within that.  We are not

1    an assumed contract by definition.  It would take reformation

2    of this agreement which is not being asked for by the plaintiff

3    to get there, and I believe, your Honor, that dispenses with

4    3.12.

5              We get to 3.15.  All existing material regulatory

6    filings held by any seller are set forth on the disclosure

7    schedule and then further representations regarding no written

8    notice of any proceedings, of any actual possible renewal of

9    regulatory filings or terms less advantageous to the seller.

10             For reasons we have already talked about, and that is

11   that 2.2 wasn't even in effect, we believe at the time of the

12   acquisition agreement, then 3.15 doesn't even kick in.  I would

13   go further than that, your Honor, and that has to do with the

14   whole definition of regulatory filings.

15             By the way, what I have on these screens is verbatim

16   out of the plaintiff's complaint.  Why I have done that, it

17   does accentuate to the court the language they're suing on

18   rather than taking the provision as a whole.

19             Cutting to the chase here of what we believe is before

20   you, "regulatory filings" means marketing authorizations in

21   addition to correspondent.  "Marketing authorizations" means

22   the registrations permits and other licenses issued by a health

23   authority that permits the clinical development, manufacture,

24   use or sale of the product.

25             And any supplements or variations thereto?  What does

1   that mean?  Supplements and variations to those authorizations,

2   registrations, permits and other licenses including all pricing

3   and reimbursement approvals?

4          Then you have definition of health authority again

5   which is the agency responsible for bringing licenses and

6   approvals, permitting testing, manufacture and sale.

7          THE COURT:  So the health authority argument you make

8   is that CEPS couldn't be a health authority because it deals

9   with price?

10          MR. RENARD:  Price.

11          THE COURT:  Pricing and reimbursement?

12          MR. RENARD:  Yes, your Honor.

13          THE COURT:  Well, why, then, what then could the

14   comment including all pricing and reimbursement mean?

15          MR. RENARD:  I mentioned this in opening argument

16   because I believe the court had some question.  I emphasized at

17   that point -- and I can elaborate even further now -- we have

18   to keep in mind --

19          THE COURT:  It seems like I still have the same

20   question.

21          MR. RENARD:  Yes, your Honor.  We need to keep in mind

22   this acquisition agreement was meant to apply to pharmaceutical

23   assets and businesses in 81 countries, a pretty impressive list

24   under the defined term "territories," 81 countries.

25          I mentioned at the time and have subsequently done

1    research on this, that you can have a health authority that

2    issues reimbursement pricing approvals.  It is not the

3    situation in France at all because you have two different

4    agencies, but you do have countries within this territory.

5    Your Honor, I haven't begun to do an exhaustive list, but I

6    have looked at the world health authority available

7    information, and I can give you one notable example, and that

8    is Italy, where the Italian Medicines Association --

9              THE COURT:  That is not now in evidence.

10             MR. CARLINSKY:  I have been reluctant to object.  None

11   of this is in evidence.

12             MR. RENARD:  That is the point, your Honor.

13             It doesn't mean that you can't have a health authority

14   that has pricing and reimbursement approval authority.  France

15   doesn't.  The mere attachment of that clause including all

16   pricing and reimbursement approval doesn't do away with the

17   necessity it needs to be a marketing authorization that permits

18   the development, manufacturing, use or sale.

19             THE COURT:  Why can't, why can't the clause be read

20   marketing authorizations means the marketing authorizations,

21   registrations, permits and other licenses, and then everything

22   after that seems like it, until and any supplements thereto or

23   until including all pricing and reimbursement, refer to

24   licenses.

25             So "marketing authorization" means marketing

1    authorizations, and any other licenses for product issued by a

2    health authority that permits the clinical development,

3    manufacture and sale within the territory; in other words, why

4    can't the health authority reference one reading of it which at

5    least occurs to me is that that health authority only

6    references the licenses.

7            MR. RENARD:  Your Honor, it would be an unusual use of

8    the word "including" if what you're meaning is to use

9    references to a conjunctive, means marketing authorizations,

10   registrations and all pricing and reimbursement approvals.

11           THE COURT:  But this is a provision that begins with

12   marketing authorizations means marketing authorizations.  So we

13   get off on a bad foot, don't we?

14           MR. RENARD:  Your Honor, perhaps the easiest way out

15   of that puzzle is a marketing authorization still has to be

16   issued by a health authority, and a health authority is not

17   CEPS.  It is not necessary to gain CEPS convention, a

18   convention from CEPS in order to put on the market in France a

19   pharmaceutical.

20           THE COURT:  The drafting history of this provision

21   which is in evidence, right, it had been just licenses, and

22   then I think what gets added are these other things in front of

23   licenses and then the including all pricing and reimbursement.

24           MR. RENARD:  If I am not mistaken, the language added

25   is the including all pricing and reimbursement approvals.  They

1    said they added it, don't really explain precisely the

2    circumstances why or what was intended to be encompassed by

3    that, but I believe that you still have --

4              THE COURT:  Well, just go ahead.  I didn't mean to

5    interrupt.

6              MR. RENARD:  Please!

7              THE COURT:  Maybe to cut to the chase and let you move

8    on, let's assume I find ambiguity in this contractual

9    provision, they say in their papers submitted the other day and

10   I think you said, too, they put in testimony as to what the

11   intent of adding that including all pricing and reimbursement

12   approvals means, but you haven't done anything to counter that,

13   is that right?  Or is there anything in evidence?

14             MR. RENARD:  What happens, your Honor, when we get

15   into these various trails, we have to remind ourselves what we

16   are.  This has to do with 3.15.  That is a warranty.  There

17   hasn't been any violation essentially of a regulation or

18   regulatory filing, and that we have provided them with all

19   regulatory filings.  If I may start the analysis there, with

20   respect to whether or not we have provided them those things,

21   even if a CEPS convention qualified as a marketing

22   authorization or a regulatory filing, you still have that

23   argument at 15.02 B which says the confidentiality provision

24   and the law, you don't have the obligation to make that

25   available.

1          THE COURT:  You are bobbing and weaving, Mr. Renard.

2          MR. RENARD:  No.  Beyond that you have the fact there

3     was no violation of a regulatory filing at the time for all the

4     reasons we have talked about.

5          THE COURT:  Okay, I understand.

6          MR. RENARD:  And with that, your Honor, 3.15, we

7     believe, doesn't come into effect.  I think that also segues

8     into 3.07 that I think if may, your Honor, in the time I have

9     available --

10         THE COURT:  Yes, you have 8 minutes, but I will,

11    because I settled a case yesterday, I am going to give both

12    sides a little more time.

13         MR. RENARD:  Your Honor, 3.07, and again this is an

14    excerpt out of the plaintiff's complaint, to seller's

15    knowledge, seller is a defined term.  It includes three

16    particular persons of relevance here; Mr. Traineau, Mr. Vant

17    Hullenaar and Mr. Sampson.

18         The business is not in violation of any law including

19    any environmental law.  Even, your Honor, if we read the law

20    broadly to include convention, and without making any

21    distinction between the regulatory act part of the convention

22    as opposed to any administrative agreement or aspirational

23    statements in any Annex IV, we weren't in violation of any such

24    law.

25         That then brings us to the second sentence the court

1    inquired about.  I think we had a fairly expansive dialogue

2    about that.  Seller has complied in all material respects with

3    all applicable regulatory requirements and all industry

4    guidance.  Your Honor, I believe the way that 2.2 is worded,

5    its intent, the way CEPS treated it and the way it acted with

6    respect to its application as well as the ultimate convention

7    that emanated out of that in September 2006, that even if you

8    want to inquire in the pre-September 2006 time-frame whether

9    there was any noncompliance in any material respect, we would

10   say no for the reasons that are mentioned.

11        Your Honor, that brings us to -- I would like to spend

12   a couple of minutes with respect to the fraud claim and then

13   any additional time the court wants to provide me with respect

14   to damages.

15        I think the one thing I would say about the fraud

16   claim, it begins with a false premise.  You have heard -- in

17   fact, you heard Mr. Carlinsky talk today about what a dog 3M's

18   pharmaceutical business was, how we were desperate to unload

19   this.  Your Honor, I harken back to a slide that we saw in the

20   opening, and I think we saw it again here today.  John Sampson

21   to Brad Sauer, March 21, 2006, not a pretty picture, a death

22   spiral.

23        THE COURT:  Right.

24        MR. RENARD:  Your Honor, as has been explained, that

25   referred to the so-called harvest scenario, one that is

undisputed.  In fact, we call it, it is called a dog and it is
called a terrible business that we were just itching to unload.

Your Honor, this business was profitable, meaning you
take the portfolio of pharmaceuticals and all the assets and
the businesses, it was generating far more revenue and sales
than it was spending in expenses.  It was profitable.

It is difficult to say you have a business here that
they say they would have spent at least $600 million.  I say
they would have spent $854 million had they been possessed of
the knowledge they claim they weren't possessed of which they
were in possession of, regardless to say that a profitable
business was a dog and trying to get rid of it.  It was
profitable.

3M, however, was confronted with a crossroads.  It
either could, because this portfolio of drugs, a lot of them
were older drugs, that should be news to Meda, meaning they
were running out of patent, newer replacement drugs were coming
in, it was still making money and would continue to do so into
the future.  Those projections that were listed there were
entirely accurate, but, your Honor, they were confronted with a
crossroads, and it was do we invest more money into research
and the development of additional drugs so we can replenish our
portfolio with newer drugs, keep the pipeline going or do we
allow these drugs to die off?

I don't say that harshly.  They had their useful

1    economic life run out.  Obviously, your Honor, when you are

2    talking about a harvest scenario, which means let's harvest

3    what we have and drugs we have without replenishing the

4    pipeline, death spiral, you can call it what you want, but it

5    meant ultimately the business was going to -- the drugs were

6    going to cease having a useful economic life at some point in

7    the future.  That is no grand mystery to Meda.  Yet it is such

8    an essential part of the loud and proud story of fraud that

9    they put forward that it was a dying business and we just had

10   to get rid of it.

11            I could go on with a lot of different examples of the

12   overstatements of their fraud claim, the misuse of Helene

13   Kolsky internal documents that we saw time and time again

14   during this case, but I think, your Honor, that the whole

15   chronology of CEPS conventions, what happened, the dialogue

16   that we have had and the presentation I have made thus far and

17   the court has seen with respect to the contract part of the

18   case and what they were really interested in, and it wasn't

19   specific product information, the fraud case, your Honor,

20   doesn't hold water especially when you talk about the clear and

21   convincing standard.

22            We have very good lawyers here representing Meda, and

23   they've put forward what they believe is the best evidence of

24   what they need to make a clear and convincing standard.  It is

25   material like your Honor overstating what was actually going on

1     with the pharmaceutical business.  We have another one, your

2     Honor, it is JX 24.  Pull that up, please.

3           This is the statement, if we can go back, Drew, to the

4     prior page, right there at the bottom.  You saw this

5     highlighted, Flecaine, you have already obtained much effort

6     trying.  Everything is specified in the convention.  Keep going

7     to the top of the next page, the statement about and executed

8     with ferocity.

9           It is interesting.  What we didn't see is the last

10    bullet point, and this is a reference to what Mr. Renaudin was

11    telling 3M back in the middle part of 2004.  However, the joint

12    registration of LI and LP in 2006 could open the door to a

13    renegotiation of the convention.  We will talk about it again

14    in 2006 when the product line is recalled.

15          Your Honor, that is consistent with the understanding

16    that all the 3M employees that you heard testify from the stand

17    believed, that what we had was a negotiation that was going to

18    take place in 2006, revisiting the price of Tambocor CR, and

19    that would be done in connection with re-registration of the

20    entire Flecaine product line at that time, and that is what

21    happened.

22          Your Honor, to read into this that everyone within 3M

23    was dead solid certain that there was going to be a reduction

24    due to Article 2.2 and that reduction was going to be in the

25    magnitude of 50 percent, you can slice and dice whatever

1    internal documents from Helen Kolsky you want to, but it just

2    doesn't accurately reflect the feeling that, and the

3    understanding that those in charge of 3M Sante believed at the

4    time, especially once we got into the latter part of 2005 and

5    first part of 2006 when we did make that application, we did

6    receive the convention back.

7         2.2 was stricken and the 17.10 euro price stayed in

8    place.  Your Honor, there has been talk about a deliberate

9    delay in order to push off this problem onto the sellers, onto

10   the buyer's lap.  Your Honor, the fact of the matter is that --

11   and the testimony shows this -- that when we made our

12   re-registration application in 2006, in connection with that

13   there had to be a revisitation of the ASMR rating, the rating

14   of the relative employment over then existing drugs, that is

15   redone as ASMR rating.  That didn't come out until November of

16   2006.

17        In order to re-register, in order to get CEPS to

18   engage even further in price reduction, in order to come up

19   with a brand new convention, and that's what needed to happen

20   either at the tail end of 2006 or the first part of 2007

21   because recall that November 2003 convention was for a

22   three-year period, and it was set to expire.  In order to get a

23   brand new convention, a start-over annual convention, if you

24   will, it was necessary to have the new ASMR rating because you

25   can't decide a particular drug's reimbursement price until you

1    have an ASMR rating, and that didn't come out until November.

2    The idea, therefore, this was a deliberate slowdown and delay,

3    your Honor, just doesn't hold water given what had to happen in

4    order to enter into a new multi-annual convention.

5             Your Honor, a lot could be said about these various

6    internal documents, and obviously a lot of this was read back

7    to our various witnesses.  The fact of the matter is by clear

8    and convincing evidence was there an attempt to hide from these

9    folks a specific convention relating to a specific product?

10   And the answer is absolutely not.

11            Judge, whatever time --

12            THE COURT:  Let me see where we are.

13            (Off-the-record discussion)

14            THE COURT:  You are five minutes overtime.  You are

15   going to do damages?

16            MR. RENARD:  Your Honor, I think the court has our

17   full understanding of our multiple criticisms with respect to

18   not only their damages model, but their causation case, your

19   Honor, and if the court prefers, I can --

20            THE COURT:  I tell you what.  Why don't I give you 10

21   minutes more if you want it.  You pick the topic.  Then I'll

22   give them equal time or if you want to rest on the papers.

23            MR. RENARD:  Your Honor, I will be very brief about

24   damages.

25            Mr. Neuberger was sponsored as the damage expert in

1    this case, and as became evident from his testimony and frankly

2    his reports, it was no great secret that Mr. Neuberger was

3    depending upon the opinions of Mr. Gallagher and Mr. Mariotte

4    with respect to putting together a damages model.

5            Mr. Marriott's opinion may well have been the most

6    important in the damage model, although there are many, many

7    defects with Mr. Gallagher.  Mr. Mariotte, who is not a French

8    lawyer, but testified as someone experienced with CEPS, gave

9    his probability opinions with respect to the chances of CEPS

10   enforcing Article 2.2.  Of course, we believe it didn't exist

11   and the proof shows it didn't exist at the time of the

12   acquisition agreement.

13           Along with that probability, the probability of -- or

14   the extent to which 2.2 would result in a price decrease, I

15   asked Mr. Mariotte if there was any objective formulation with

16   respect to this approach that he used, and he said no.  He

17   spoke as an experienced person.

18           I tried to emphasize, but it didn't show up very well

19   on the screens, the I's and E's, and suffice it to say

20   Mr. Marriott's opinions about the likelihood of 50 percent

21   reduction and 5 percent reduction come from his anecdotal

22   experience with CEPS.  There was no proof whatsoever he ever

23   encountered with CEPS or otherwise a clause even remotely

24   similar to 2.2, that he could from virtue of even his own

25   personal experience apply that in coming up with some

1    probability of the timing, extent and magnitude of any price

2    reduction.

3           But it is on Mariotte's foundation that Dr. Neuberger

4    builds his damages cause.  Your Honor, one of the things Mr.

5    Neuberger said, it is important to isolate the effect of the

6    breach from anything else that was going on at the time that

7    had price reduction consequences, and this ties back to that --

8    I don't want to call it a perfect storm, but a combination of

9    policies that CEPS had at the time that were over time going to

10   drive CR down to the level of IR which was being given down to

11   the level of IR's generic competitor.  That was a given.

12          Yet Mr. Mariotte does nothing to isolate those

13   probabilities from what he said is the separate and independent

14   effect of having Article 2.2 there even assuming it was still

15   in existence, and it wasn't.

16          I asked Mr. Neuberger, Dr. Neuberger -- because I

17   believe it was a relevant inquiry -- his whole point was if

18   Meda had been possessed of the information known to 3M, how

19   would Meda have assessed the probabilities and magnitude of a

20   future price reduction.  I asked him well, given your attempt

21   to create this hypothetical, was there a drug company out there

22   who knew of Article 2.2, whether or not it existed and whatever

23   it meant and also was in the business of projecting what future

24   product price decreases would be?  Answer:  Yes.

25          Obviously, 3M, and then we looked through 3M had to

1    conduct a business and had to be serious about it and had to,

2    for the purposes of reporting up to corporate and the European

3    division, come up with its best estimates of what the price

4    decreases were going to be for these products in the future.

5         In 2006 Ms. Barreau testified, and this was long

6    before Meda ever came along and long before any efforts to try

7    to sell the pharmaceutical business, that they projected a 13

8    percent decrease in the year, fiscal and calendar year 2006 for

9    Tambocor CR.

10        Of course, there wasn't a price decrease, but that's

11   what they had in mind.  Possessed of whatever Meda believes was

12   relevant, 2.2, whether it was in effect, counter generic

13   pricing, the possibility of TFR pricing, that's what they came

14   up with in a serious attempt to budget for 2006.  Answering Mr.

15   Neuberger's question what would a reasonable pharmaceutical

16   company have assessed of the risk of price decrease, not

17   isolating 2.2, but taking it all in together, it was no more

18   than 13 percent.  2007, it was a 10 percent price decrease.

19        Your Honor just jumping ahead here, and that is

20   exactly the way Meda assessed the risk in 2007 at a time we

21   believe the evidence shows that they were very well aware of

22   Article 2.2, whatever it meant and whether or not it was in

23   effect.

24        In fact, your Honor, for 2008 they budgeted a 15

25   percent price decrease at a time when they certainly had

1   knowledge of Article 2.2, taking into account with their own

2   admissions they learned about 2.2 either in the February or

3   fall or December of 2007.  They knew that rolling into 2008 and

4   they only budgeted a 15 percent price decrease.

5          I say all of this because this is reality, real

6   businesses having to make projections what was going to happen

7   in the future so they could run their business.  This isn't Mr.

8   Mariotte combined with Mr. Gallagher on top of Neuberger coming

9   up with a hypothetical there would have been a 95 percent of a

10  50 percent reduction and, therefore, we are entitled to $210

11  million in damages.  Your Honor, that just doesn't wash.

12         One thing that I'd like to leave with, your Honor, is

13  the fact -- talk about the French agreement, the agreement

14  every time it is mentioned, the plaintiff's sale, we can't talk

15  about it.  Your Honor, they don't have a case unless there was

16  a closing and an actual transfer of assets including the French

17  assets that was the subject of their case.

18         To say we should see, speak, hear nothing about the

19  French agreement is to ignore that key part of the chronology

20  of what happened.  The French agreement was part of the closing

21  binder.  Whether the court finds it supersedes the acquisition

22  agreement with respect to the warranties or was part of all one

23  contract, it still doesn't change this fact, and this fact is

24  that the person, the company that bought the French assets,

25  including the marketing authorizations, the licenses issued by

1    the French equivalent of the FDA, was Meda France.

2            Meda paid the purchase price acting on buyer's behalf,

3    but the obligor, the ultimate obligor was Meda France.  You

4    recall from Mr. Stenqvist's testimony during the

5    cross-examination by Ms. Bevilacqua that what happened here --

6    and it is precisely what we knew had happened -- is that Meda

7    fronted a loan to Meda France to purchase these assets and took

8    a valuable receivable in return.

9            This isn't a shell game.  It is not hide the ball.  It

10   is the fact that the company that is saying it was damaged made

11   a loan.  The terms of that loan we don't know.  Was it

12   interest-bearing?  Was it non-interest-bearing?  It doesn't

13   matter.  They made a loan to a company so it could buy assets,

14   Meda France, assets being the French pharmaceuticals, it now

15   owns and it is those assets that plaintiff is saying have been

16   so horribly devalued.

17           Your Honor, Meda France -- sorry -- Meda made a loan

18   as a valuable receivable.  If they wanted to come in here with

19   a damage model and saying we are only getting 3 percent on that

20   intercompany loan and we could put that money to work and make

21   6 percent, then that is a fine and dandy damage theory, but

22   that is not what they have.  This isn't a gotcha.  This isn't

23   something that comes from their only annual reports and

24   something they never realized and looked at.

25           The fact of the matter is, $132 million was the total

1    amount that was paid for the French business and acquisitions

2    they say was so devalued.  Compare that to the $210 million

3    they say represents a 50 percent decrease in the price of

4    Tambocor CR, which is only one of many assets that was

5    conveyed, there is a total disconnect between the amount that

6    was actually paid for these assets and the damage theory.

7          But of equal importance, your Honor, is the fact that

8    that money, those assets and the ultimate obligation was by

9    someone who was not a part to this matter.  What they have is a

10   loan, and their damage theory is not based upon that.  Your

11   Honor, the damage model itself, independent of the argument I

12   have just made, doesn't hold water.  It is based upon Mr.

13   Mariotte's subjective personal experience.  He is not a lawyer.

14   He is merely talking about probabilities, your Honor, that

15   don't even compare to the probabilities and the projections

16   being done by people who were in the business of doing it,

17   namely, 3M until the time it sold those assets and then Meda

18   after it acquired those assets.

19         His 50 percent reduction scenario doesn't even come

20   close to the 10 to 15 percent per year reductions that 3M was

21   projecting in '06 and '07 and Meda was projecting in '07 and

22   '08.  That reality check, your Honor, I think speaks volumes

23   about their damage theory.

24         I want to end on this, your Honor, on behalf of 3M and

25   our litigation team.  This is our last opportunity to speak to

1     the court.  I want to thank the court and its staff for its

2     service, consideration and the good humor throughout this

3     proceeding, your Honor, and I am sure I speak on behalf of both

4     parties.  As I said, we'll provide the court a copy of our

5     Power Point.

6               THE COURT:  Thank you, Mr. Renard.

7               (Recess)

8               THE COURT:  Please be seated.  You have I think 38

9     minutes, Mr. Carlinsky, and we are going to stick to that time.

10              You have a fair amount of territory to cover.

11              MR. CARLINSKY:  I do.  I will try to cover some, but

12    not all, but for the first time I am going before Mr. Armenio

13    so I don't feel as though I am as pressed for the clock.  Let

14    me get right into it if I may.

15              First I want to start with the question that your

16    Honor asked with regard Sections 3.12 and 3.15.  The argument

17    that was advanced by 3M was that well, if you looked at those

18    provisions, those provisions on their face effectively require

19    the disclosure or production of all documents, and you knew you

20    didn't get all documents; and, therefore, somehow that was a

21    tip-off that either the provision hadn't been complied with,

22    and they put up the slide that had the Allegheny case, and the

23    argument was you should have known at that point that

24    effectively you have been defrauded.  I think that was the

25    slide they put up.

1          What I want to emphasize -- and this is a very small

2     point but an important one -- when you look at 3.15 and 3.12,

3     the word "all" is qualified in the relevant provisions by the

4     word "material."  If I go to the Elmo, for example, we see in

5     3.15 it talks about all existing material regulatory filings

6     held by the seller are set forth on the disclosure schedule.

7          Again the idea is not to bury the purchaser in paper,

8     but to disclose that which is material, and it makes sense, and

9     consistent with what our witnesses said, I don't need a

10    convention that merely says price equals X.  What I want is

11    something that is material.

12         Your Honor knows the definition of materiality.  It

13    has been on the books ever since the Basics of Levenson.  What

14    would a reasonable purchaser want to know?  That is what this

15    is ultimately doing, qualified the definition by materiality.

16         So does 3.12?  3.12 has not surprisingly a materiality

17    limitation.  It is down here at the bottom, seller has made

18    available to purchaser true and complete copies of not all

19    assumed contracts, but again material assumed contracts, the

20    idea being if it is material and you're assuming it, we want to

21    make sure we made it available to you.

22         Now I would like to address the question your Honor

23    asked, which is okay, if I read this language literally, don't

24    you have a problem, Meda, and do you have case law which stands

25    for the proposition that in reading a provision, you should

1     avoid a construction that would render it either absurd or its

2     provisions superfluous.

3            While I didn't have a chance to go back to the office

4     during the lunch break, we did a little bit of research, your

5     Honor.  I am sure we'll address this in more detail in our

6     briefs, but the law is well settled in New York and I suspect

7     everywhere, this is a case that we pulled called GPA,

8     Incorporated versus Liggett Group, a Southern District

9     decision.

10           I have Second Circuit authority as well, but as the

11    court can see, and as I say we'll brief this forward, it is a

12    cardinal rule of contract interpretation that a court should

13    not interpret an agreement in a way which leaves the part

14    meaningless or in effect will bore will the court.

15           If you look down at the N.Y.2d Department case --

16           THE COURT:  Can you look at the document the other

17    way?

18           MR. CARLINSKY:  Yes.  What this is telling us, even in

19    the first analysis when the court is deciding is it clear and

20    unambiguous, the rules of contract interpretation are very

21    straightforward and well-settled.  The first thing the court

22    does is you don't read a sentence in isolation.  You always

23    read it in context of the provision in which it is found and

24    the agreement.  That is Cardinal Rule No. 1.  We'll brief that.

25           Then these two cardinal rules of construction

1    ultimately come in.  When you read 3.12 in context, then we

2    understand that it is perhaps the single most important rep

3    that a seller could give to a buyer to protect it against what

4    are the material contracts that I'm now undertaking and

5    obligating myself.  When you read it in that context and when

6    you read it in the context of, as Mr. Armenio said, your Honor,

7    if 3.12 merely means, it merely means the materiality contracts

8    are those I've chosen to put on the schedule, the rest of 3.12

9    is unnecessary, it would be surplusage, and we'll cite cases

10   which talks specifically about avoiding an interpretation that

11   would render any provision superfluous.

12           It would certainly lead to an absurd result because it

13   would literally say 3M, you get to choose what you want to put

14   on the schedule and I have no recourse as Meda, as the buyer.

15   It would lead to an absurd result.  It would eviscerate, your

16   Honor, with respect to the whole purpose of that particular

17   provision.

18           That is why it makes no sense to read it that way.  By

19   contrast, if you read the provision the way Meda proposes,

20   which is it is not designed to simply say you get to put

21   whatever is on the list and that is it, but instead you're

22   making a representation to me that all material assumed

23   contracts that I'm now going to be bound by have been disclosed

24   to me, every one of those provisions, every one of those

25   provisions is harmonized and that is what the rules of contract

1    interpretation tell us, harmonize, not find ways to read it

2    that leads to absurd results.

3            I think that goes to the question also of in the first

4    analysis when your Honor looks at it, it is ambiguous.  It is,

5    when read in context, ambiguous especially when we apply those

6    rules of construction.

7            The second point I want to raise relates to this 502

8    argument as we predicted before we got to trial we would hear

9    new arguments when we got to trial.  In fact, this is Slide 42

10   -- why don't you bring up Slide 42.  This is one of the new

11   arguments we heard for the first time at trial.  7, 8, 9, if we

12   updated the list, we are probably to 10 or 11.  Why do I

13   mention this?  First of all, it was never raised.  This notion

14   of 502 B, somehow confidentiality created some kind of a

15   barrier was never raised.

16           Why wasn't it raised?

17           Again we have had this discussion back in December.

18   Here is the amended answer that 3M filed.  That is a pleading

19   the court can look at, 18 affirmative defenses.  Now we hear,

20   my God, we couldn't have.  Where was that so we could have

21   addressed it during the course of the litigation properly?

22           They submitted a letter.  This was Ms. Shapiro's

23   letter, PX 413, in evidence, August 13, 2012.  Your Honor is

24   new to the case.  Let me tell you what the case is about,

25   Judge, goes through an entire discussion about the case.  You

1    know what is not in here?  Wait a minute, we couldn't produce

2    this.  There was confidentiality prohibitions in 502 B.  Not a

3    word.

4            What we know is this argument is a recent invention,

5    invented sometime between August 13 when this letter went in

6    and opening arguments, opening statements.  We didn't hear this

7    argument when we were here for the final pretrial conference.

8    It is a new invention.

9            What does it tell us?  It should be given the same

10   attention by the court given by 3M throughout the course of

11   this litigation, which is zero.  It is a new-founded argument

12   and it is nonsense.

13           Now, not only wasn't it raised, you can look at all of

14   the witness declarations that 3M put in.  They don't say a word

15   about this.  Their own witnesses would be expected to say the

16   reason we didn't give you this convention, Meda, was because we

17   couldn't.  502 B, they had an opportunity.  I guess by the time

18   the declarations were being drafted, it hadn't occurred to them

19   yet.  The scales hadn't fallen from their eyes quite yet.

20           Then, of course, we have Mr. Keel who testified.  In

21   his testimony, and your Honor will remember he mentions --

22   because there was this issue raised where Meda -- Keel, at

23   1065, and I asked him certainly by November 6th you believed

24   Meda was a serious bidder, correct?

25           At this time we still, absolutely.

1           Then I said and so I guess what you're saying is that

2     to the extent that there were contracts that you previously

3     were hesitant to disclose because of sensitivity or

4     confidentiality concerns, by the point post-August 30 receipt

5     of that firm bid, you were comfortable disclosing them to Meda?

6           "Right."

7           Of course, that was the case.  Again I don't want to

8     belabor the point of Mr. Brown's memos.  We looked at before,

9     but all he said is to the extent there is any sensitivity

10    regarding any of these documents, whatever they are, maybe we

11    leave them out in the first round, meaning we don't know

12    perhaps when the first couple of companies demonstrates some

13    level of interest, that they're really serious.  All he talked

14    about was the first round.

15          He talked about nevertheless, but let's make sure from

16    a disclosure standpoint what do we do?  We put a document in

17    there.  We put a slip sheet in there.  We put something in

18    there that tells the buyer there is something here you might be

19    interested in, but we might not be able to give it to you just

20    yet.

21          Mr. Brown talks about in later stages making sure that

22    the documents are ultimately produced.  This confidentiality

23    argument I really don't think I need to say more about it other

24    than it is a new-founded excuse.  It is one of the additional

25    excuses.

1          Then we hear, and we heard this in opening, my God,

2     your Honor, Meda has conveniently failed to mention the

3     November 2003 convention.  We heard it in opening.  We heard it

4     in closing.  How could Meda have done such a terrible act,

5     never mentions the November 2003 convention.  Well, wait a

6     minute, 3M never mentions the November 2003 convention.  That

7     is yet another one to add to their list that was raised for the

8     first time in opening arguments.

9          How do we know it?  Again is it in the answer as an

10    affirmative defense or as anything?  You don't find a word

11    about it it in Ms. Shapiro's letter where she says wait, the

12    November 2003 convention somehow trumps or the March convention

13    was -- forget what the word was, abrogated by the November 2003

14    convention.  Not a word.  Is it mentioned in their summary

15    judgment papers?  Not a word.  Yet here we hear for the first

16    time this is it, and we're somehow at fault for not having

17    raised it when in two years of litigation they didn't raise it.

18         I think again it tells us what we are seeing from 3M

19    is a company that doesn't want to accept responsibility for its

20    misdeeds, and it is going to throw every technical argument it

21    can against the wall in the hopes that something is ultimately

22    going to stick.

23         Now, we also heard how CEPS was not a health

24    authority.  I don't think we need to revisit that.  All I want

25    to point out is Mr. Sampson certainly thought CEPS was a health

1    authority.  This is in his declaration at Paragraph 19.  That

2    even after pricing has been agreed to between the government

3    health authorities and the pharmaceutical company, the debate

4    and negotiations can be ongoing.  I asked Mr. Sampson with were

5    those his words?  Yes.  Did he carefully review his

6    declaration?  Yes.

7            Then I asked him, at pages 825 and 826, do you see

8    that, pointing to that reference?  The reference there to

9    government health authorities is a reference in that paragraph

10   to CEPS?  Answer:  Well, it's to the overall health authority

11   of which CEPS is a part.

12           Now, why is that also important?  Because Sampson's

13   involved in the drafting of the acquisition agreement.  To the

14   extent that he understands health authority to include CEPS,

15   doesn't that shed light on what health authority as used in

16   that agreement means?

17           Here is the guy telling us CEPS is a health authority

18   and he is involved in the drafting of that particular

19   agreement, and there are other references in the record to CEPS

20   being a health authority, and the definition itself ultimately

21   bears it out.

22           Then we heard -- because your Honor asked the question

23   of under 3.07, let me just get myself together here a minute --

24   well, wasn't 3M in default before, and we'll talk about the

25   cancellation, alleged cancellation, but wasn't there a default

1   before because we know what happened in April?  Nothing.  We

2   know what was supposed to happen in April.  A lot.

3           The answer we heard from Mr. Renaudin was wait a

4   minute, we had initiated negotiations with CEPS.  Well, that is

5   not the case.  We know that is not the case because we haven't

6   heard any testimony to the contrary, but again let's look at,

7   for example, this is JX 63 from the infamous Helen Kolsky to

8   her cast or band of brothers on the steering committee, and

9   this is April 20th.  And she tells us that the first meeting

10  with CEPS is to occur in July, the first meeting.

11          What Mr. Renaudin tells us is wait a minute, in

12  January we started our negotiation,.  Not so.  It was supposed

13  to start in July.

14          THE COURT:  Didn't he say they sent a letter?

15          MR. CARLINSKY:  He said they sent a letter.  The

16  letter was sent to the transparency committee.  Remember what

17  they were looking for.  They were trying to get a reaffirmation

18  of the ASMR rating at IV, and that sets the whole process of

19  delay, delay in motion.

20          But not to CEPS.  According to what Ms. Kolsky is

21  saying, we are not going to meet with CEPS.  Week 29 is July by

22  my calculation of week 28 above or week 26 is the end of June.

23  It is supposed to start in July and it is supposed to go late

24  into the year, but the negotiations haven't even begun with

25  CEPS as of April, which to your Honor's question, they're in

1    breach.  Of course, they're in breach.  This notion they

2    started the discussion is just completely undermined.

3          Ms. Kolsky says it again, PX 194 A.  This is in May,

4    May 30th, this is where she boasts again about how this delay

5    is going to make the image of the pharma business up for sale

6    look a lot prettier, but she says down at the bottom, we plan

7    to use that point, referring to Merck, as one of our

8    negotiation levers in July.  Then she says in October when the

9    discussion with Renaudin actually begins, we'll be in the final

10   phase of the court proceeding.

11         So as of May 30th, there is no discussion, nothing.

12   They sent a letter.  They sent whatever their application is

13   into the AMSR rating, but nothing with respect to cells.

14         I am going to just briefly touch upon this notion of

15   the cancellation.  I am going to defer that one to Mr. Armenio.

16   I think we know ultimately by 3M's position the fraud here then

17   was perpetrated by CEPS and Mr. Renaudin because there was no

18   Article 2.2 according to 3M.  When Mr. Renaudin came knocking

19   and said Article 2.2, 50 percent, he must have been

20   perpetrating a fraud.  Of course, that is a absurd.  When we

21   look at what ultimately happens, it tells the answer.  There

22   was no agreement by CEPS to any cancellation.

23         I want to go back to something Mr. Traineau said.

24   When Traineau was testifying, what he said was that in July,

25   Article 2.2 lapsed.  I asked him do you mean this agreement

1    that people negotiated for 400 days, that the steering

2    committee has been focused on now for three years, that has

3    been the object of your obsession for three years, it literally

4    lapsed?  He said yes, it lapsed in July.

5           Then I asked him so when you got to September and you

6    strike that out, that's just a ministerial act?  That had no

7    meaning?  He said that's correct, from our standpoint it had

8    lapsed in July.

9           That was his testimony loud and clear.  It is absurd,

10   but that was his testimony.

11   "Q  And your position is that by July, because there had been

12   no discussions with CEPS, that somehow Article 2.2 had lapsed?

13   "A  Yes."

14           I was somewhat incredulous.  I then said down at line

15   20:

16   "Q  It was just gone because Mr. Renaudin as of July hadn't had

17   you into his offices yet for a meeting?  Your view is that at

18   the end of it, is that what I am understanding you to say, it

19   lapsed?

20   "A  It lapsed, yes.

21           He, of course, was unaware of any decision, meeting,

22   any consideration by the CEPS board that would have been in

23   effect allowed 3M to unilaterally say well, this agreement is

24   over.  I will let Mr. Armenio -- I don't want to steal his

25   thunder on that point.

1          Then I asked him, I thought you said that was the

2   striking, meaning the striking of the document they sent back,

3   was not a decision because you had already concluded that the

4   provision had lapsed as of July.  Do I have it right?  And he

5   said yes.

6          Frankly, up above he talks about how the striking was

7   just essentially a ministerial act.  From their standpoint as

8   of July because Renaudin hadn't had them into the office yet,

9   this thing lapsed.  Your Honor knows from having seen the

10  documents the reason Renaudin didn't have them in was because

11  they filed this application and deliberately pushed everything

12  so the business would look as pretty as it possibly could to

13  the Swedes, and they pushed off those discussions that would

14  have ultimately taken place.

15         Now let me finish on fraud.  Your Honor, frankly, I

16  find it incredible, incredible that we did not hear a word

17  about why Mr. Sampson did not disclose that which he knew.  He

18  came in and was redirected.  He never addressed the question.

19  I certainly expected there is going to be a plausible, benign

20  answer.  I listened.  I am certain there was no explanation

21  given.  There was no explanation given why at the French level

22  Kolsky in her e-mail that said I'm not going to produce it and

23  Brown saying let's make sure we have documents in there that

24  indicate to a purchaser, or Traineau, who knows all about the

25  existence of the convention, and he has testified about how he

1    knew they had to try to overcome it, an explanation to the

2    court.  Mr. Wanlass couldn't give us the explanation, we know

3    that, but I expected after all of these years we would hear the

4    explanation.

5         Why wasn't it produced in France, number one?  Was

6    that question ever answered?  They never addressed it.

7         Even more so, Mr. Sampson, who admitted to knowing of

8    the convention, who admitted to knowing of its terms, who

9    admitted to be sitting there in meeting after meeting with

10   Meda, who according to Meda, was discussing pricing issues with

11   them and never disclosed it, not a word to explain why.  And

12   the answer is because there is no explanation, there is no

13   justification.  That conduct is deplorable.  That conduct

14   amounts to fraud.

15        Your Honor has more than clear and convincing evidence

16   particularly in light of Sampson's knowledge and the failure of

17   Sampson or 3M for that matter to even address the issue.

18        Now we didn't hear anything about the disclaimers and

19   so I am not going to go back to that particular point other

20   than to again preview something we'll address in our brief,

21   which is in addition to the peculiar knowledge doctrine, there

22   is a doctrine of law -- slide 136, please, James -- this is

23   also a doctrine of law called the special facts doctrine, a

24   duty to disclose.  It is not even a reliance issue.  A duty to

25   disclose arises where one party's superior knowledge of

1     essential facts renders a transaction without disclosure

2     inherently unfair.  Again we'll provide the court with further

3     authority on this particular point.  It is clear they knew, we

4     didn't.  They put out a 264 page management presentation.

5           They put out a 110 page management presentation that

6     is also in evidence, your Honor, that is specific just to

7     Europe.  It is 150 pages.

8           MR. CARLINSKY:  DX 582 is specific to Europe.  They

9     put out a 108-page offering memorandum, and no one has answered

10    the question that I submit to your Honor which is why not one

11    sentence, one sentence that will tell anyone look at all the

12    great things I'm telling you about this drug Tambocor CR, how

13    it is going up and it is going up and it is going up and it is

14    going to offset the declining market.  One sentence in all of

15    these documents, it can't be found.  When Sampson had an

16    opportunity to make it right, to look Meda in the eye, when he

17    knew they were a serious buyer, sitting there negotiating the

18    acquisition agreement, he remained silent, and we have no

19    explanation as to why.

20          I want to end by saying, your Honor, where is the

21    line?  Where is the line where business ethics cross the line

22    into fraud?  This case crosses that line.  3M doesn't seem to

23    understand where that line is.  This Court, your Honor, has the

24    power to define that line and to tell 3M and any other company

25    like it that enters into a transaction like this you've crossed

1     the line when you have this information and you don't disclose

2     it.

3              Your Honor, I respectfully submit the fraud case here

4     is absolutely clear.  3M has crossed the line, and I ask your

5     Honor respectfully to make sure in the future everyone knows

6     where that line exists.  Thank you very much, your Honor.

7              Thank you very much to the court staff as well.

8              THE COURT:  Thank you, Mr. Carlinsky.

9              MR. ARMENIO:  Your Honor, I wanted to briefly address

10    three points.

11             First off, we have heard a lot about Mr. Schur and

12    CTJ.  The first point, Mr. Schur, there is no evidence in the

13    record that the gentleman has ever appeared before CEPS even

14    one time.  He said right in his own declaration, Paragraph 2,

15    lawyers don't do that in France.  So they're proffering a

16    person with no experience.  We heard a lot from Mr. Renaudin

17    about these people at 3M and all their experience.  Not so.

18             Ms. Barreau was touting she had negotiated one and not

19    even personally negotiated, but been involved in one CEPS

20    convention ever.

21             Mr. Biffaud didn't negotiate this.  He referred to

22    Mr. Felber as the expert.  When we hear about their theories

23    about CTJ and conventions, what strikes me is that it is

24    nowhere in the documents.  Where is it in the documents that 3M

25    has documents from the Flecaine steering committee where they

1    are worrying about CTJ and general CEPS?  We look in the

2    documents for Article 2.2, it is in document after document

3    after document.

4           May we see Slide 48, please.

5           When I asked Mr. Biffaud when he was here, I said

6    look, let's talk about these general policies and you and your

7    team thought you could do that, you could maintain the Flecaine

8    LP price in France through the expiration of the patent in

9    November 2009 despite any general CEPS policies and the like,

10   correct?  Answer:  Yeah, we believe we could maintain the

11   price.

12          It is in the trial record, 907, Page 907, Mr. Dierks

13   believed the same thing, they could maintain the price.  That

14   is in the trial record at page 189.  What is not in the trial

15   record is any of Mr. Schur's hypotheses about CTJ and the like.

16   It just isn't there because that is not how anyone in the real

17   world looks at this.

18          We have heard counsel say it many, many times, he

19   keeps calling Flecaine LP a counter generic.  That is

20   incorrect.  Everyone agrees it has an ASMR rating of IV.  Under

21   all the CEPS policies, that is not a counter generic and CEPS

22   has pricing freedom to have negotiation.

23          What happened here is that freedom was taken away

24   through 3M's own agreement by articles 2.2.  That is what

25   really is going on.  Your Honor asked the question well, what

1     about when the patent expires, isn't something going to happen

2     in the price?  The relevant testimony there, only from Meda

3     witnesses in Dr. Dierks' declaration, Paragraph 29 and 30, and

4     Mr. Lonner's declaration, Paragraph 55 and 57, and they explain

5     that unlike in the U.S. where there is automatic substitution

6     at the pharmacy, so there is a huge patent cliff when things go

7     generic, in France you get to decide whether you want to go to

8     the generic.

9             These are patients who are on a heart erythmia

10    medication they take every day and switching medicines, they

11    might have one of the arrhythmias they're worried about, having

12    stroke and perhaps even die.  So as Dr. Dierks explained, who

13    is a medical doctor, people are very reluctant to ever switch.

14    No pharmacist wants to take that risk of switching a patient.

15    No doctor wants to take that risk and certainly no patient just

16    to save a few euros is going to put their own life in jeopardy.

17    That is why no one at Meda was concerned about there being a

18    big fall-off in the price once the patent disappeared.

19            Meda saw a stable asset that was very unlikely to

20    suffer from strong generic competition because of the kind of

21    drug it was.

22            What was the problem is they didn't know of Article

23    2.2, 3M had already agreed to make it generic.  As your Honor

24    said, at a bare minimum CEPS had already told 3M that it was

25    going to treat Flecaine LP as a result of Article 2.2 as a

1   generic by 2006.

2         I think Mr. Destal would go a little further than

3   that, but at a minimum that is what happened and 3M never told

4   Meda about that agreement, about the possibility as what Mr.

5   Schur calls at least that there were markers that this is where

6   CEPS was going.  If Dr. Dierks and Meda had known that, it

7   would have completely changed the whole dynamic of the

8   negotiation and the team.

9         Let me talk the second point, cancellation.  This

10   argument is so fundamentally misguided that I am trying to just

11   stay and work through it as logically as I can.  There were 400

12   days of negotiation.  We see in JX 142 A, a chronology that is

13   25 pages long of all the interactions with CEPS to get this

14   initial price.  Then when Article 2.2 is brought up with Meda,

15   we see countless letters back and forth negotiating, haggling

16   over the price, Meda says we didn't know, please don't take the

17   whole 50.  CEPS saying we want the whole 50.

18         What do we see with this handwritten striking?

19         Nothing.  There is no discussion like that.  There is

20   no contemporaneous documents going back and forth, and Mr.

21   Traineau, he admitted on the stand there was no meeting of

22   CEPS.  He wasn't even aware of anything being scheduled.  So

23   there was no chance for the minister of social security, who

24   had blocked the initial price for over a year, that minister

25   never got any notice of anything.  There was never a meeting of

D1VJMED5                      Summation - Mr. Armenio

1    the committee with all the ministers that they could even

2    discuss this much less vote on it.

3           What counsel did is he, in a little slight of hand,

4    superimposed the signature on the front page with some of the

5    strike-outs, but as your Honor has seen from the document

6    itself, JX 95, there is no indication that Mr. Renaudin looked

7    at this at all.  There is no counter-initial.  There is no

8    discussion back and forth with him on proposals and

9    counter-proposals.

10           It makes no sense that after negotiating so hard on

11   this issue and extracting this concession from 3M in exchange

12   for granting them a high price --

13           THE COURT:  The high price point, Mr. Renard focused

14   my attention on the chart that showed the daily dosage price,

15   and that paints it in a different light, I think.

16           MR. ARMENIO:  It paints it in a light, a light he

17   likes to talk about.  Can we go to JX 25 A R, please.  Can we

18   go forward one slide, please.

19           This is the real world document from -- can we blow

20   that up, James -- from price differences and catch the little

21   stuff there.  Thank you.  This is the internal 3M document that

22   actually talks about what prices were being sought by LI on the

23   left and LP on the right.  3M wanted 18 euros.  CEPS wanted

24   13.2, and 3M was able to keep it to 17.1, and in exchange

25   for -- and this is indicating both sides liking LP slow acting

1    generic and three years.

2          I understand Mr. Renard wants to talk about CTJ and

3    Mr. Schur does, but nobody else in the whole case was talking

4    about that.  It is not in the contemporaneous documents.

5          What is --

6          THE COURT:  I am not sure that answers my question

7    which is part of the story telling Mr. Felber's testimony goes

8    to this is about how this was a hard fought negotiation and

9    what 3M got in exchange for 2.2 was a high price which they

10   were essentially buying for three years.  We'll take a high

11   price for three years and take a dive on the price at the end

12   of three years.  Just help me understand your response to it

13   actually wasn't that high price if you think about daily

14   dosage.

15         MR. ARMENIO:  What the high price was, and it is

16   reflected in the best document I can refer the court to, JX

17   142, the chronology, other documents reflect it as well,

18   initially social security wanted a generic of LP immediately.

19   It wasn't oh, match the price of LI.  It was we want the

20   generic of Flecaine LP right now, the first thing to go on the

21   market should be generic-priced, generic version Flecaine LP.

22         3M had to negotiate with CEPS off of that by saying

23   two things:  One, oh, we need to build the market up for three

24   years to make a generic even viable; and, two, we need the

25   money for three years to fund our IRM portfolio.  So when we

D1VJMED5                    Summation – Mr. Armenio

1    look at the high price, we have to look at it in comparison to

2    what social security initially wanted which was a generic of

3    Flecaine LP immediately.

4             This is certainly if all of these prices that end up

5    were far, far higher than it had been launched in the first

6    instance as a generic.  The only way they placated the minister

7    of social security as part of CEPS was through these prices

8    which are, in fact, high because they weren't talking, even the

9    ministers weren't talking about CTJ or Mr. Schur or Mr.

10   Renaudin's theory.  They were saying we want a generic now, now

11   in 2003, and they granted a high price for three years because

12   of those two reasons I mentioned.  And again this is reflected

13   best in their chronology, JX 142.

14            THE COURT:  I hope you will use some remaining time on

15   hopefully both, but the ancillary agreement and damages.

16            MR. ARMENIO:  When we look at the ancillary agreement

17   issue, the merger clause, among other things, and the merger

18   clause in the contract eviscerates their argument in the

19   acquisition agreement.  The acquisition agreement merger clause

20   talks about how this agreement including the ancillary

21   agreements shall be read as a single operative unit.

22            So the ancillary agreements didn't supersede anything.

23   Moreover, if we look at it from a damages perspective, they're

24   ignoring $400 million in the U.S.  The actual trademarks, trade

25   dress, patents and all the other rights, the know how all of

1    that was allocated on this tax allocation to the U.S.  They're

2    missing $400 million.

3             So saying, ooh, it says 132 million here, then they're

4    ignoring $400 million for a country everyone on the stand

5    admitted it was the biggest country in the business and

6    Tambocor was the biggest product.  The $132 million argument

7    has been way long gone.  If your Honor looks at it for damages,

8    it is incomplete because it doesn't address the 400 million

9    that was allocated to the U.S. where Meda didn't buy any

10   assess.

11            It is not how Meda valued the business.  How Meda

12   valued the business, the uncontroverted evidence it was an

13   EBITDA multiple approach.  Go to slide 139.

14            We know Merrill Lynch gives us the standard for

15   damages at the time of breach, at the time of closing, what the

16   purchaser would have paid had they known.  Dr. Neuberger gave

17   the right, correct formula for calculating this and nobody

18   criticizes Dr. Neuberger's formula.  They like to criticize the

19   inputs, but there has not been any criticism of Dr. Neuberger's

20   formula.  One of the things important, and Dr. Neuberger

21   explained it both in his declaration, 72-75 and on the stand,

22   this methodology can be applied to any percentage inputs.

23            Here I have to pause for a second and talk about Mr.

24   Mariotte.  Mr. Mariotte has been impugned, to say the least, by

25   Mr. Renard and the 3M team.  We brought to the court a

gentleman who had as his job when he was at Schering Plough

negotiating with CEPS, and then started a consulting company

where he consults for lots of pharmaceutical companies and

public unions and all the relevant stakeholders in France, he

has had over a hundred negotiations with CEPS, and they're

trying to say well, it is too subjective, he doesn't know

enough.

          But Mr. Schur has never appeared before CEPS.  Ms.

Barreau who on the stand didn't like it when I said she wasn't

an expert in CEPS conventions and she thought she was, had one

negotiation.  So what we have for Mr. Mariotte is we have

got -- go to 147, James -- we have got a person who has the

best possible experience here.

          Again as Mr. Mariotte explained, there isn't a book or

a database where we can go to to look up this information about

what happened when people tried similar renegotiations with

CEPS, but we do have Mr. Mariotte who has got his 100

interventions.

          In his experience were somehow atypical, he wrote an

expert report in this case.  He has been disclosed long, long

ago.  They would have brought someone.  If Mr. Mariotte's

experience was atypical, abnormal, incorrect, I am positive

counsel or counsel's predecessors, their predecessors before

them would have brought your Honor contrary evidence from

another individual.

1           THE COURT:  Isn't this case contrary evidence?

2           MR. ARMENIO:  Sorry?

3           THE COURT:  Isn't this case contrary evidence?

4           MR. ARMENIO:  I don't believe it is because if we look

5    at it, Mr. Mariotte said --

6           THE COURT:  This is in the 10 percent?

7           MR. ARMENIO:  Yes, 10 percent chance that it could be

8    a 30 or 40 percent, and in this case we saw Meda was able to

9    get mercy, the lesser reduction by explaining to CEPS we didn't

10   know.

11          And what Mr. Mariotte said is there is no chance that

12   CEPS, having bargained for this price reduction, could ever

13   give it up for no reason, could ever give it up without a

14   corresponding benefit.

15          We see in reality, that is what happened with Meda.

16   When Meda said we didn't know, CEPS didn't say okay, that is

17   okay, we understand, zero.  They still took 30 percent off the

18   price.  There was never any possibility proffered by CEPS or

19   Meda or any evidence at 3M that zero percent was on the table

20   when CEPS came talking to Meda about this.

21          We also know that 3M itself calculated this.  It is in

22   JX 25-A R.  They calculated exactly the difference between what

23   3M was forecasting and what CEPS expected, and it was about $24

24   million euros.  That is exactly the input we see in the EBITDA

25   change that Mr. Gallagher uses as an input and Mr. Mariotte.

1    They want us to say oh, it should be different numbers, it

2    should work differently.

3        Dr. Neuberger addressed that on the stand.  Okay, what

4    if you turn it around and say 5 percent chance of the full 50,

5    5 percent chance of 40 and 80 percent chance of 30 since we

6    know 30 actually happened.  His formula and methodology still

7    works.  You can still use it and the damages can work out to

8    117 million and then there would be interest.

9        When we look at it, 3M wants to talk about causation,

10   DX 274.  When Meda saw a problem with a drug even as small as

11   2.6 million, what did they do?  This is Mr. Keel's notes, DX

12   274, they raised it with 3M and they said they wanted a

13   purchase price adjustment and they pursued it doggedly.

14       There is no way they could have been told of a risk of

15   a 50 percent price even if it was potentially possible it might

16   only be 30 or 40, there was no way they were going to let this

17   go without a purchase price adjustment.  We know that from a

18   fact Mr. Keel's own notes on drugs as mall as 2.6 million, Meda

19   wanted and got a purchase price adjustment.

20       I want to echo counsel's thanks to the court.  The

21   Court, Mr. Silverman, Ms. Nunez, all of our court reporters, I

22   apologize for all the French and Swedish we got a little bit

23   of.  Thank you, everyone, for your patience and consideration.

24       THE COURT:  I thank counsel again for their hard work

25   and zealous representation.  The matter is submitted and I'll

1     put out an opinion in due course.  I'll a wait your post -- did

2     I set a schedule?

3               MR. RENARD:  We did not, your Honor.

4               THE COURT:  How about if I do it now?

5               MR. RENARD:  It would be a three-step process.

6               THE COURT:  So again the balance here is the sooner I

7     get this, the better.  I wish I had it now.  As I say, I was

8     supposed to start a trial on Monday and I settled that case

9     last night.  I have time on my hands next week.  I don't know

10    if anybody is in a position to get it to me next week.

11              MR. CARLINSKY:  I don't think so, your Honor.  I tried

12    pushing the team.  I have seen a lot of tired eyes, too, on the

13    team the last couple of days.  We were going to propose, with

14    the court's permission, a week from Tuesday, so tomorrow is

15    Friday, it would effectively be I think 10 days, we have two

16    weekends.

17              Given we go first, we ask for Tuesday and try for that

18    Monday.  In fact, I am willing to to say that Monday to try to

19    compress the schedule and the back end for reply, we only ask

20    for five days.  We want to do it as quickly as possible.  I

21    want to make sure we give the court what it needs, what it

22    expects.  There are legal issues have been raised.  We want to

23    make sure we address them and not just a rehash of everything

24    the court has already heard.

25              THE COURT:  I think that is fine.  So let's say set

 1  your brief and come back and talk about pages if I haven't done
 2  that already.  So let's say a week from -- at that point say a
 3  week from Tuesday.  Mr. Renard?
 4          MR. RENARD:  Your Honor, with respect to our response,
 5  I guess it would depend upon page length, but if we were in
 6  that 25 or so page --
 7          THE COURT:  Yes, in that ballpark.
 8          MR. RENARD:  A week later, with the court's
 9  indulgence?
10          THE COURT:  It should take you longer to write a
11  shorter brief.
12          MR. RENARD:  Abe Lincoln said something about
13  speeches.
14          THE COURT:  All right.  Let's set then the following
15  Tuesday as the response and we'll get five days for reply.
16          MR. CARLINSKY:  Yes, your Honor.
17          THE COURT:  I am going to propose -- I want to give
18  you the room that you need, but I want to constrain you
19  horribly, and I can assure you that shorter at this point is
20  going to be more impactful.
21          I think I am inclined to say 25 or 30, so I'll say 30.
22  My inclination would be to do 30, 30, 10.
23          MR. CARLINSKY:  That is fair, your Honor.  Thank you.
24          THE COURT:  Don't make the font smaller.  Don't give
25  me a gazillion footnotes.

1          MR. CARLINSKY:  Single space?

2          THE COURT:  Don't change the spacing between the

3     lines.  I am not going to give you a word count, but be

4     reasonable.  I do think the more you cut to the chase of your

5     arguments, the better, the better off.

6              That is all I need.  Again, we are grateful if you

7     both ECF and e-mail, courtesy copies to get to it right away.

8          MR. CARLINSKY:  Each side wanted to give the court a

9     copy of the closing.

10         THE COURT:  I think we are at Court Exhibit 4 will be

11    plaintiff's closing, Court Exhibit 5 defendant's closing.  I

12    think that's all I have.  Needless to say, I am merging the

13    summary judgment motions into the final opinion, so those will

14    be administratively dealt with.  I think that is all I have.

15         MR. ARMENIO:  Nothing further.

16         THE COURT:  Mr. Renard?

17         MR. RENARD:  Nothing from defendants.  Thank you, your

18    Honor.  Thank you, your Honor.

19         THE COURT:  We're adjourned.

20             (Court adjourned)

21

22

23

24

25