UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Meda AB,<br><br>      Plaintiff,<br><br>   -against-<br><br>3M Company; 3M Innovative Properties Company; and Riker Laboratories, Inc.,<br><br>      Defendants. | Case No. 11 Civ. 0412 (AJN)<br><br>ECF Case |

**PLAINTIFF MEDA AB'S REPLY**
**<u>POST-TRIAL CONCLUSIONS OF LAW</u>**

**TABLE OF CONTENTS**

<u>Page</u>

I.     3M BREACHED THE ACQUISITION AGREEMENT ..................................................... 1

    A.     3M Breached Section 3.07 of the Acquisition Agreement ..................................... 1

    B.     3M Breached Section 3.12 of the Acquisition Agreement ..................................... 4

    C.     3M Breached Section 3.15 of the Acquisition Agreement ..................................... 4

II.    3M BREACHED THE COVENANT OF GOOD FAITH AND FAIR DEALING ............ 5

III.   3M FRAUDULENTLY INDUCED MEDA INTO ACQUIRING THE BUSINESS ......... 6

    A.     3M's Misrepresentations and Omissions are Actionable ........................................ 6

    B.     Meda Has Established The Requisite Scienter ....................................................... 7

    C.     Meda Reasonably Relied on 3M's Misrepresentations and Omissions .................. 8

IV.    DAMAGES ........................................................................................................................ 9

    A.     Meda's Damages Model Is Objective And Reasonable ......................................... 9

    B.     Article 2.2 Did Not Merely Reflect Ministerial Guidelines ................................. 10

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Ackerman v. Price Waterhouse*,
   252 A.D.2d 179 (1st Dep't 1998) ................................................................................6

*Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*,
   760 F.2d 442 (2d Cir. 1985) .......................................................................................1

*In re Bear Stearns Cos. Sec. Litig.*,
   2011 WL 223540 (S.D.N.Y. Jan. 19, 2011) ...............................................................6

*Danann Realty Corp. v. Harris*,
   5 N.Y.2d 317 (1959) ..................................................................................................8

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
   748 F.2d 729 (2d Cir. 1984) .......................................................................................8

*Kass v. Kass*,
   91 N.Y.2d 554 (1998) .................................................................................................4

*Krumme v. WestPoint Stevens Inc.*,
   143 F.3d 71 (2d Cir. 1998) .........................................................................................1

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y 1999) ...........................................................................6

*In re Prudential Secs. Inc. Ltd. P'ships Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996) ...............................................................................6

*Schonfeld v. Hilliard*,
   218 F.3d 164 (2d Cir. 2000) .......................................................................................9

*Tiffany (NJ) Inc. v. eBay Inc.*,
   600 F.3d 93 (2d Cir. 2010) .........................................................................................1

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
   487 F.3d 89 (2d Cir. 2007) .........................................................................................9

**Statutes and Rules**

Fed. Rule Evid. 401 .................................................................................................................9

Fed. Rule Evid. 601 .................................................................................................................9

Pursuant to the Court's January 31, 2013 Order, Plaintiff Meda AB ("Meda") respectfully submits this Reply Memorandum in further support of its Post-Trial Conclusions of Law.

## I. 3M BREACHED THE ACQUISITION AGREEMENT

For the reasons stated in Meda's Opposition to Defendants' Motion *In Limine* (ECF No. 168), 3M's argument that the French Agreement "expressly superseded" the representations and warranties in the Acquisition Agreement is both wrong on the merits and waived. Permitting 3M to raise this new argument after Meda submitted its direct testimony for trial would cause Meda severe prejudice—a point 3M tacitly concedes by not addressing it in its post-trial submission. *See Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) (affirming denial of request to amend pleading where there was "simply an insufficient reason for prejudicing Cola by forcing it to proceed to trial, post-discovery" on newly alleged theories); *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998).

### A. 3M Breached Section 3.07 of the Acquisition Agreement

Each of 3M's arguments as to why it allegedly did not breach Section 3.07 is without merit. *First*, 3M argues that it did not breach its representation that "the Business is not in violation of any Law" because, in 3M's erroneous view, Sampson and Traineau were not aware that this representation was false. Sampson and Traineau, however, admitted their awareness of Article 2.2 and that its time for compliance had lapsed. *See* FOF § 1.3.1(a)(iv). Any contrary testimony is not credible. *See* FOF §§ 1.3.1(a)(iv)(1)-(4). Moreover, any professed ignorance could result only from Sampson's and Traineau's refusal to investigate the obvious truth. As the Second Circuit has explained, such "willful blindness is tantamount to knowledge." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 110 fn. 16 (2d Cir. 2010) (collecting cases). 3M cannot insulate itself from liability with representations to the "Seller's Knowledge" without having taken even the most basic steps to investigate the truth.

1

*Second*, 3M claims that it was not in violation of Article 2.2 because it allegedly "initiated the negotiation process" of the Flécaïne LP price in January 2006. In other words, 3M wants the Court to believe that it satisfied the requirement under Article 2.2 to reduce the price of Flécaïne LP to the price of a generic by April 2006 by simply including one sentence in a 52-page document for the re-registration of Flécaïne LP's ASMR rating that said, in effect, 3M wanted to maintain the price. *See* JX-49A. This is nonsense.[1] 3M admitted that after April 2006 CEPS was "going to treat LP like a generic … [a]s if it were negotiating a price reduction on a generic." Trial Tr. at 1473:23-1475:9. 3M knew Flécaïne LP was not initially priced "like a generic." Thus, one sentence in a document seeking to *maintain* the price of Flécaïne LP cannot be the equivalent of 3M fulfilling its requirement to "take all necessary steps to ensure " the change in price of Flécaïne LP to that of a generic. *See* JX-19A.

*Third*, 3M's claim that it was not in violation of the Convention as of November 8, 2006 because it unilaterally struck the Flécaïne-related provisions by hand in September 2006 is meritless. 3M's employees knew that the strike-out did not follow CEPS' protocol and could not change Article 2.2. *See* Trial Tr. at 1178:6-1179:9, 1193:4-7, 1190:23-1191:3 (Traineau cross) (Q. "Did you expect" as of November 28, 2006, "Mr. Renaudin could still point to Article 2.2? A. "He could mention it…."). Indeed, they did not even seek legal advice to determine whether the strike-out was effective. Trial Tr. at 1179:10-23 (Traineau cross). And, of course, 3M's self-serving "unilateral strike-out" theory is irreconcilable with the facts that, in reality, CEPS never met or voted on forgoing the price concession it extracted from 3M in 2003 as would be required

---

[1] In its MOL, 3M was careful not to say that it *actually renegotiated* the price of Flécaïne LP with CEPS in 2006. This is not surprising since 3M's witnesses testified that no renegotiation of Article 2.2 had begun prior to April 2006. *See* Meda COL at 4-5. In addition, 3M's Barreau testified that in "September of *2007*… Renaudin, the President of the Economic Committee, [sought] *to begin* the negotiation process for the re-pricing of Flécaïne." Barreau Decl. ¶ 31 (emphasis added).

to ratify any strike-out, and CEPS enforced Article 2.2 against Meda.  *See* JX-125A; FOF § 2.3.6.  3M's arguments regarding Meda's use of handwriting in CEPS conventions are conclusively refuted by Destal's testimony.  *See* Destal Decl. ¶¶ 45-46; *id.* Ex. 2 at 24-27; *id.* Ex. 3 ¶¶ 52-63.

*Fourth*, 3M claims that it did not breach Section 3.07 because Article 2.2 allegedly did not contain a "future price change clause" and thus was not a regulatory requirement.  This argument is based entirely upon Mr. Schur's post hoc argument that Article 2.2 was too vague for anyone to know how to calculate the future price of Flécaïne LP.  Schur's purported confusion, however, cannot be reconciled with the fact that the contemporaneous documents showed that 3M and CEPS knew exactly how to calculate the price of Flécaïne LP under Article 2.2.[2]  As with the rest of his testimony, which departs at every turn from the contemporaneous documents, Mr. Schur's testimony is perhaps best explained by his never having negotiated with CEPS in his career.  *See* Schur Am. Decl. ¶¶ 1-2.

*Fifth*, 3M argues that it did not breach Section 3.07 because the definition of "industry guidance" should be limited to the phrase in 3.07 that states "including the European Code of Practice for the Promotion of Medicines and similar guidance."  3M MOL ¶ 14; PX-305.  3M's desperate attempt to limit the definition of "industry guidance" is inconsistent with the Acquisition Agreement, which states that "the word 'including' and words of similar import when used in this Agreement shall mean 'including, *without limitation*,' unless otherwise specified."  PX-305 at § 1.03 (emphasis added).  Accordingly, "industry guidance" is not limited to "codes of practice or similar documents" (3M MOL ¶ 14), however, even if it were, industry

---

[2]  *See, e.g.,* JX-41A; PX-62A; JX-122A ("The committee has noted the absence of generic registration [for Flécaïne LP]. … Consequently, the committee is requesting a decrease in PFHT … so that it is equivalent to the PFHT of the corresponding generic.").  Notably, the new "PFHT" price set by CEPS was 8.55 €—*i.e.*, exactly 50% of the initial price of 17.10 €

guidance would indicate that companies should respect their agreements with CEPS. *See* Mariotte Decl. ¶¶ 26-27; Destal Decl. ¶ 32. Mr. Schur admits that Article 2.2 "laid down markers" regarding the price of Flécaïne LP, and 3M's citation to FDA documents cannot change that fact.

*Last*, 3M recycles its "we couldn't disclose it" theory. This is another late theory that is both wrong on the facts and waived. Disclosing a confidential agreement as part of a confidential due diligence protected by a non-disclosure agreement respects confidentiality. It was also perfectly permissible under French law. *See* Trial Tr. 610:5-611:22 (Destal redirect).

### B.  3M Breached Section 3.12 of the Acquisition Agreement

3M argues that the Convention is not an "Assumed Contract" because 3M did not list it on Section 1.01(a) of the Seller Disclosure Schedule. *See* 3M MOL ¶ 20. Tellingly, in its Opposition, 3M does not—and cannot— respond to Meda's arguments and case law demonstrating that 3M's absurdly narrow interpretation of the term "Assumed Contracts" improperly renders numerous provisions of the Acquisition Agreement superfluous. In interpreting contractual provisions, "[f]orm should not prevail over substance and a sensible meaning of words should be sought." *Kass v. Kass,* 91 N.Y.2d 554, 566 (1998). 3M's interpretation of "Assumed Contracts" is not sensible and should be rejected.

### C.  3M Breached Section 3.15 of the Acquisition Agreement

3M argues that the Convention is not a Marketing Authorization and thus is not a Regulatory Filing. This argument, however, ignores that the Convention can be a Regulatory Filing *without* being a Marketing Authorization. "Regulatory Filings" include, in addition to Marketing Authorizations, "materials and information supporting or pertaining to the information in the Marketing Authorizations and related submissions." PX-305 at 3M00010442. Thus, even assuming *arguendo* that the Convention is not a Marketing Authorization (which it

4

clearly is), it is still information pertaining to a Marketing Authorization and, therefore, a "Regulatory Filing." *See* FOF § 1.3.3(a)(ii)(1)(B).

In any event, the Convention is a Marketing Authorization.[3] *See* FOF § 1.3.3(a)(ii)(1)(A). "Marketing Authorizations" are defined as: "the marketing authorizations, registrations, permits and other licenses … for a Product issued by a Health Authority that permits the … use or sale of the Product within the Territory, *and any supplements or variations thereto, including all pricing and reimbursement approvals*." PX-305 at 3M00010441 (emphasis added). The phrase "including all pricing and reimbursement approvals" modifies "any supplements or variations thereto" and thus is an example of what the parties intended the supplements and variations to include. This interpretation is consistent with the only extrinsic evidence offered on this issue. *See* Larnholt Decl. ¶¶ 86-87. It is undisputed that the Convention is a pricing and reimbursement approval, therefore, it is, by definition, a Marketing Authorization. *See* FOF § 1.3.3(a)(ii)(1)(A).[4]

## II. 3M BREACHED THE COVENANT OF GOOD FAITH AND FAIR DEALING

3M fails to rebut the fundamental point of Meda's claim for breach of the covenant of good faith and fair dealing: if 3M's restrictive interpretations of the representations and warranties are credited, 3M deprived Meda of the benefit of its bargain. 3M knew that Meda

---

[3] 3M's feeble argument that CEPS is not a Health Authority (and therefore the Convention is not a Marketing Authorization) is contradicted by 3M's own documents and witnesses, including its key witness John Sampson. *See* FOF § 1.3.3(a)(ii)(1)(D).

[4] 3M's claim that CEPS conventions are not Marketing Authorizations because they were not included on Section 3.15 of the Seller Disclosure Schedule is a non sequitur. *See* 3M MOL ¶ 23. Section 3.15 of the Acquisition Agreement specifically limited the inclusion of documents on the Seller Disclosure Schedule to "material Regulatory Filings." PX-305 at 3M00010466. By limiting this disclosure to only the Regulatory Filings that were "material," neither party expected all of the Regulatory Filings required to run a pharmaceutical business in an 81-country territory to be listed on the Disclosure Schedule. Accordingly, absence on the Disclosure Schedule has no bearing on the definition of Marketing Authorizations.

wanted, and thought it was buying, a stable business with full disclosure of all material risks. 3M sold Meda a business that 3M knew was risky and withheld disclosure of those risks in bad faith. *See Carvel Corp. v. Diversified Mgmt. Group., Inc.* 930 F.2d 228, 230-31 (2d Cir. 1991) (duty of good faith breached if party's decisions frustrate the overall intent of the contract).

### III.   3M FRAUDULENTLY INDUCED MEDA INTO ACQUIRING THE BUSINESS

#### A.   3M's Misrepresentations and Omissions are Actionable

3M does not dispute that, if the Court finds that 3M's *contractual* representations and warranties in the Acquisition Agreement were knowingly false, they are actionable in fraud. *See* 3M MOL at 17.  3M contends, however, that its *extra*-contractual misrepresentations and omissions are not actionable.  3M is wrong.  *First*, 3M argues that its misrepresentations and omissions in the Offering Memorandum ("OM") and the Management Presentation ("MP") are not actionable because they were "statements of opinion and good faith predictions."  The evidence shows, however, that 3M's misrepresentations and omissions in those documents were *not* made in good faith—in fact, they were knowingly false and misleading—because 3M *knew* that the OM and the MP failed to disclose or account for the specific risk of a material reduction to the price of Flécaïne LP in France while showing price stability through, *inter alia*, consistent gross margins and EBITDA percentages.  *See* FOF §§ 2.1.3, 2.1.4.[5]

*Second*, the boilerplate language in the OM and MP regarding the "accuracy" of 3M's projections and the "completeness" of information cannot protect 3M when it *knew* that the

---

[5] *See In re Prudential Secs. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."); *In re Bear Stearns Cos. Sec. Litig.*, 2011 WL 223540, at *56 (S.D.N.Y. Jan. 19, 2011) ("[T]o warn that the untoward may occur when the event is contingent is prudent; **to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit**.") (emphasis added).

documents and projections therein conveyed a misleading impression of the Business. *See Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230-31 (S.D.N.Y 1999) ("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made."); *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 200 (1st Dep't 1998) (cautionary language in offering memo "will not insulate from liability a defendant who has failed to disclose current adverse conditions").

*Third*, 3M's argument (at 19) that it did not have "superior knowledge" of Article 2.2 prior to signing the Acquisition Agreement is wholly unsupported. The record conclusively shows that Meda had no pre-closing access to Article 2.2. The only evidence that 3M cites for its assertion is DX-167, a May 2006 Tambocor Regulatory Product Report that merely states that "[p]ricing negotiation[s] for IR and CR [are] on-going." There is no evidence that this report was provided to Meda during due diligence; and regardless, it does not come close to disclosing that 3M had agreed to reduce the price of Flécaïne LP to a generic level by April 2006, or that 3M had been attempting to "overcome" Article 2.2 for years.

### B. Meda Has Established The Requisite Scienter

In its Opposition, 3M falsely claims (at 21) that Sampson was not aware of the Convention and gave only a non-actionable opinion. The trial transcript speaks for itself, and makes clear that, as of May 16, 2006, Sampson (1) knew that the Convention "required 3M to change its price" of Flécaïne LP (Trial Tr. at 841:15-22); (2) knew that the pricing of Flécaïne LP was at risk of "generic pric[ing] levels" (*id*. at 845:9-23); (3) knew that under the Convention, "the alternative to a price reduction was the launch of a generic or the equivalent of a generic" (*id*. at 842:1-4); (4) knew that the deadline for carrying out the Convention's requirements was 2006 (*id*. at 844:7-16, 845:4-8); (5) reviewed and helped to prepare the MP *after* learning of the Convention (*id*. at 853:15-854:1); (6) attended the MP (*id*. at 853:19-21); yet (7) despite Mr.

7

Lonner's inquiry, did not "say anything to Meda [at the MP] to advise Meda of what [he] had learned just a month earlier … that there was a French pricing convention regarding [Flécaïne LP]" (*id*. at 855:14-18); and (8) never told Meda, at the MP or otherwise, there was a risk to the price of Flécaïne LP as a result of the Convention. *Id*. at 846:20-847:3.  By his own admission, Sampson knowingly failed to disclose indisputably material information to Meda, and thereby committed fraud.  Sampson's statements and omissions were not mere "opinions" and his fraud is directly attributable to 3M through the definition of "Seller's Knowledge."

### C.     Meda Reasonably Relied on 3M's Misrepresentations and Omissions

3M does not—because it cannot—dispute that Meda reasonably relied on 3M's representations and warranties in the Acquisition Agreement.  With respect to 3M's extra-contractual misrepresentations and omissions, 3M argues (at 22) that Traineau purportedly disclosed Article 2.2 to Meda on November 28, 2006—three weeks *after* the parties signed the Acquisition Agreement.  Temporal disconnect aside, Traineau's testimony was not credible:  he was contradicted by every single other witness who attended the November 28, 2006 meeting, including Meda's CEO (Lönner), COO (Dierks), and 3M's former head of European pharma (Hullenaar).  *See* FOF § 2.1.5(b).  Even if Traineau were credible, 3M ignores that a disclosure *subsequent* to the Acquisition Agreement cannot preclude the reasonableness of Meda's reliance upon *entering* into the Acquisition Agreement.[6]  Moreover, 3M's unsupported claim that

---

[6] Contrary to 3M's argument, *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320 (1959), specifically cited *Bridger* and *Jackson* to reaffirm the "fundamental principle" that "an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made," is "not a bar to showing [] fraud."  *Danann*, 5 N.Y.2d at 320. 3M's reliance on *Grumman Allied Indus., Inc. v. Rohr Indus., Inc*., 748 F.2d 729 (2d Cir. 1984), is also misplaced.  In *Grumman*, the defendant adduced "undisputed evidence" of the plaintiff's "unfettered access" to information that would have "confirm[ed] or disprove[d] the substance of the verbal assurances" at issue.  748 F.2d at 737-38.  Here, unlike in *Grumman*, there is no dispute that Meda could not have learned of Article 2.2 absent disclosure by 3M.

Traineau and others disclosed Article 2.2 to Meda *after* the Acquisition Agreement was signed only confirms that Article 2.2 was material information that 3M should have, but admittedly did not, disclose *prior* to the Acquisition Agreement.

3M's argument (at 25) that the special facts doctrine and the peculiar knowledge exception do not apply is premised on 3M's absurd theory that Meda should have asked about Article 2.2 even though it had no reason to believe it existed. Whether "Meda was fully aware of the absence in the data room of *any* French CEPS conventions" is irrelevant. Most conventions contain only publicly available information, such as the price, and there was no reason for Meda to press 3M for publicly available information. *See* FOF § 2.4.2. Such documents were only relevant to Meda's due diligence if they contained atypical provisions—a fact that Meda could not possibly know absent disclosure by 3M.

## IV. DAMAGES

### A. Meda's Damages Model Is Objective And Reasonable

The parties agree that if the Court finds fraud or breach of contract, damages amount to the difference between what Meda paid ($854 million) and the true value of the Business. Here, the only adjustment that needs to be made to estimate the true value of the business is to account for the undisclosed Convention. Meda offered more than sufficient evidence at trial as to the true value of the Business with that adjustment.[7] 3M asserts that Meda's witness testimony is too "subjective" to prove damages. But that testimony is squarely supported by the

---

[7] *See* FOF § 1.4; Trial Tr. 1041:11-18 (Garrambone cross) (EBITDA multiple approach "important" to valuation); *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110-111 (2d Cir. 2007) ("The plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach…. Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection.") (citations and quotations omitted); *Schonfeld v. Hilliard*, 218 F.3d 164, 178-79 (2d Cir. 2000) ("[I]t is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value….").

9

contemporaneous documents. *See* Fed. Rule Evid. 401, 601; *Schonfeld*, 218 F.3d at 178 ("If he is sufficiently qualified, even an asset's owner may testify as to its market value.").[8] Indeed, Meda sought purchase price adjustments for much smaller issues. *See* DX-274.

### B. Article 2.2 Did Not Merely Reflect Ministerial Guidelines

The record shows that CEPS' "counter-generic policies" are *not* requirements and as such would not have put Meda on notice of a required 50% price reduction to Flécaïne LP. CEPS' policies are guidelines that are applied with discretion and in a way that respects the conventions already entered into by CEPS. *See* Destal Decl. at ¶¶ 50-56; Schur Am. Decl. ¶ 24. Indeed, 3M's witnesses did not believe that CEPS' policies would affect the price of Flécaïne LP prior to November 2009. *See* Trial Tr. 907:10-18 (Biffaud cross); Biffaud Decl. ¶¶ 34, 42, 56; Forey Decl. ¶ 15; Traineau Decl. ¶ 19. And in the OM, 3M projected no significant price decrease to Flécaïne LP though the end of 2010. *See* PX-168. There is no reason that a reasonable purchaser, who was unaware of Article 2.2, should be charged with a different expectation. In any event, 3M's argument that Flécaïne LP is a counter-generic drug (3M MOL ¶ 50) is contrary to 3M's contemporaneous documents and witness testimony. Biffaud Decl. ¶ 30; *see also* Barreau Decl. ¶ 12; JX-168. Flécaïne LP had an ASMR rating of IV, which counter-generics cannot obtain. *See* Destal Decl. ¶¶ 53, 54. Indeed, the evidence has shown that Flécaïne LP was a significant advancement to Flécaïne LI (*see* Trial Tr. 181:19-183:2 (Dierks cross)), and thus no reasonable buyer in Meda's shoes would have been aware that CEPS would seek a 50% price reduction on Flécaïne LP without being told by 3M about Article 2.2.

---

[8] That Almirall, the second-place bidder for the business who was also unaware of the Convention, bid $700 million provides comfort that a $643.5 million valuation ($854 million purchase price - $210.5 million in damages = $643.5 million, *see* Neuberger Decl. ¶ 131) *with knowledge* of the Convention is reasonable. *See* Trial Tr. at 424:19-425:24 (Haas direct).

10

Dated: New York, New York
February 25, 2013

                                Respectfully submitted,

                                QUINN EMANUEL
                                  URQUHART & SULLIVAN, LLP

By:    /s/ Peter J. Armenio
        Peter J. Armenio, P.C.
        Michael B. Carlinsky
        Deborah K. Brown
        Nicholas J. Calamari
        Stephen A. Broome
        51 Madison Avenue, 22nd Floor
        New York, New York  10010
        (212) 849-7000

*Attorneys for Plaintiff Meda AB*