```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 03 2013
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MEDA AB,                                          :
                              Plaintiff,          :
                                                  :
            -v-                                   :          11 Civ. 412 (AJN)
                                                  :
                                                  :          MEMORANDUM, ORDER,
3M COMPANY, ET AL.,                               :          AND JUDGMENT
                              Defendants.         :
----------------------------------------------------------------- X

ALISON J. NATHAN, District Judge:

       This action arises out of the acquisition in late 2006 and early 2007 by Plaintiff Meda AB

("Meda") of a European pharmaceutical business from Defendant 3M Company ("3M"). Meda

alleges that 3M breached the acquisition agreement signed on November 8, 2006 ("Acquisition

Agreement"), as well as the implied covenant of good faith and fair dealing. Meda further

claims that 3M defrauded Meda by failing to disclose a drug pricing agreement that it had with

the French government relating to the reimbursement price for an anti-arrhythmic medication in

France, and by misrepresenting the value of the company in light of the information allegedly

contained in that agreement. A nonjury trial was held in this action on January 14, 15, 16, 17,

22, 23, 24, and 31, 2013.

       Pursuant to this Court's procedures for nonjury trials, the parties submitted the direct

testimony of their witnesses by affidavit and their documentary evidence with the pretrial order,

except that live testimony was heard from those witnesses who were not under the direct control

of the party calling them. The Court received direct examination declarations from seven 3M

executives and personnel (Paul Keel, John Sampson, David Wanlass, Benoit Traineau, Stephanie

Barreau, Celine Forey, and Brad Sauer), and four Meda executives (Anders Lönner, Anders

Larnholt, Jorge-Thomas Dierks, and Henrik Stenqvist).  The Court heard live direct testimony

from a representative of Goldman Sachs (Jason Haas), who served as deal advisor to 3M.  The

Court also heard live direct testimony from Brad Sauer, a 3M executive who was called to testify

by Meda.  In addition to the fact witnesses, the Court also received direct examination

declarations from three experts on French law (Jonathan Schur, Olivier Mariotte, and Frédéric

Destal), three experts on damages (Mark Gallagher, Jonathan Neuberger, and Michael Cragg),

and two experts on due diligence and industry practice (Peter Garrambone, Jr. and Bimal Shah).

All witnesses who submitted direct examination declarations were cross-examined live at trial.

The Court received deposition designations from an additional seven witnesses and over 250

exhibits.

        This Opinion represents the Court's findings of fact and conclusions of law for purposes

of Rule 52 of the Federal Rules of Civil Procedure. The findings of fact appear principally in the

following "Findings of Fact" section, but also appear in the remaining sections of the Opinion.

To set forth the Court's reasoning in a manner clear to someone unfamiliar with French

pharmaceutical-pricing regulations, some of the Court's conclusions of law regarding French

pharmaceutical pricing policy and regulations are interspersed in the findings of fact, and are

principally contained in Sections "I.C." below.  For the following reasons, the Court concludes

that Meda has failed to establish that 3M breached any of the warranties in the Acquisition

Agreement, breached the implied covenant of good faith and fair dealing, or committed a fraud.

## I.      FINDINGS OF FACTS

        Based on the evidence presented at trial, the facts stipulated to in the Joint Proposed

Pretrial Order ("JPTO"), and the Court's assessment of the credibility and demeanor of the

witnesses and the inferences reasonably to be drawn therefrom, the Court makes the following

findings of facts.

A.    The Parties

Plaintiff Meda is an international pharmaceutical company based in Solna, Sweden.

(Lönner Decl. ¶ 19).  In 2006, it commenced the acquisition of a European pharmaceuticals

business ("the Euro Pharma Business") from Defendant 3M, a publicly-owned diversified

technology company headquartered in St. Paul, Minnesota.  (Keel Decl. ¶ 6; Sampson Decl. ¶¶ 6,

8).[1]

B.    3M's Decision to Sell its Worldwide Pharmaceutical Subsidiary

The events leading up to the present dispute began in 2005 when 3M began to explore

options for its worldwide pharmaceutical business ("Pharma Business"), which it viewed as

possibly yielding long-term growth, but also short-term financial problems.  (*See, e.g.*, Keel

Decl. ¶ 15; Sampson Decl. ¶ 12).  Meda urges that the Court conclude that 3M was trying to

dump a failing business onto an unsuspecting buyer, but the evidence leads the Court to the

opposite conclusion.  Indeed, as discussed below, the Court finds that 3M had legitimate reasons

for seeking to spin off its Pharma Business, and 3M executives with direct oversight over the

Pharma Business sincerely believed that the unit could thrive when paired with a better fitting

parent company, such as Meda.

---

[1] Defendant 3M Innovative Properties Company is a wholly-owned subsidiary of 3M that owns
certain intellectual property.  Defendant Riker Laboratories, Inc. was a wholly-owned subsidiary
of 3M which 3M acquired in 1970 and formed the basis of 3M's Pharma Business.  3M
purchased Riker as a subsidiary in 1970 and operated this way until 1991 when it was integrated
into 3M as the 3M Pharmaceutical Division.

3M executives began to determine that the Pharma Business did not fit within their company's portfolio in early to mid-2005. (Keel Dec. ¶¶ 15-19). 3M executives were concerned that the Pharma Business required costly investments to maintain, and that the high-risk, high-reward business of trying to find a pharmaceutical that "hit" did not fit within the stable consistency of results sought by 3M investors. (*Id.*). As a result of this assessment, 3M's management assembled a team of experts from 3M, McKinsey & Company ("McKinsey"), and Goldman Sachs ("Goldman") to assess strategies for re-tooling or possibly selling the Pharma Business. McKinsey advised that 3M should either "fix" the Pharma Business through a rebuilding and acquisition strategy, harvest it, or sell it. (*Id.*). The Court credits the testimony of John Sampson, the then-Division Vice President and General Manager of 3M's worldwide Pharma Business, that he viewed the Pharma Business as too valuable to "harvest," meaning to reduce costs by reducing investment and thereby increasing short-term profitability at the expense of the business' future. (Trial Transcript ("Tr.") at 1281). Instead, Sampson believed that the best course of action was to sell the Pharma Business to someone who would be in a position to profit from it. (Tr. at 1282).

At a board meeting held on November 14, 2005, 3M executive Brad Sauer, along with Jessica Hopfield of McKinsey, reported management's assessment of 3M's Pharma Business and recommendations for moving forward. (Keel Decl. ¶¶ 23-24). The board then set in motion a process that ultimately resulted approximately seven months later in what Paul Keel, the Director of Business Development for 3M's Health Care Business at the time of the acquisition, accurately described as "a global open auction initiated by 3M" for the sale of the Pharma Business. (Tr. at 1088).

4

C.   <u>3M's French Pharmaceutical Subsidiary</u>

Only one small piece of this worldwide sale is at issue in this litigation: the reimbursement price for an anti-arrhythmic heart medication sold by the Pharma Business' French subsidiary, 3M Santé.  Meda argues that 3M hid from Meda information indicating that this anti-arrhythmic—which is known as Tambocor in most of the world and known as Flécaïne in France, and which was 3M Santé's best selling drug—was overdue for a price reduction. Specifically, Meda alleges that 3M's failure to disclose during due diligence a non-public provision of a document produced by the French drug pricing authority known as "CEPS" caused Meda to overpay for the entire Euro Pharma Business by over $200 million, an amount that represents close to 25% of the purchase.  However, as discussed below, in light of the nature of French drug reimbursement policies and processes, the Court concludes that threat of a price reduction for Flécaïne LP, the drug at issue, derived largely from a myriad of publicly known factors about which a sophisticated pharmaceutical company with experience doing business in France, such as Meda, would have or should have known.

1.   Flécaïne

The Court begins by looking into the introduction of Tambocor/Flécaïne to the French market.  3M had patented an immediate release compound of flecainide acetate in 1974, and that drug was sold under various brand names in different markets, including the brand name Flécaïne LI in France.  Flécaïne LI is also commonly referred to outside of France as Tambocor IR.  (Joint Stip. ¶ 10).

In 1988, 3M patented a controlled release compound of flecainide acetate that was known in most of the world as Tambocor CR, though it was not introduced to the French market prior to 2001.  (Joint Stip. ¶ 11-12).  Upon its introduction to the French market, Tambocor CR was

5

branded as Flécaïne LP.  3M Santé obtained a patent for Flécaïne LP in France, which was set to

expire in November 2009.  (Joint Stip. ¶ 16).

2.     Negotiating a Reimbursement Price for Flécaïne LP in France

As part of bringing Flécaïne LP to the market, 3M Santé executives engaged in the

ordinary process for obtaining a reimbursement price for a new drug in France.  This process

consists of negotiating a bilateral pricing document with the French drug pricing authority

known as CEPS.  After initially obtaining a reimbursement price for Flécaïne LP higher than that

of a generic, 3M Santé executives engaged in ongoing negotiations with the French government

to prevent a decline in that price.

Meda urges the Court to believe that 3M Santé's concerns about maintaining the

reimbursement price for Flécaïne LP derived solely from a non-public provision in a document

negotiated with the French government in 2003 that was not disclosed to Meda at the time of the

acquisition.  However, as discussed below, the Court finds that the concerns about the future

reimbursement price of Flécaïne LP that animated 3M Santé's executives from 2003 through

2006 derived largely from a myriad of publicly known factors.

i.     The French Drug Approval Process

In France, where the government provides reimbursement for the price of over 90% of

drugs on the market and the citizenry expects to be reimbursed for the cost of their medicines,

one of the most important objectives of a pharmaceutical company introducing a drug to the

market is to convince the French government to agree to a high reimbursement price.  Such was

the case for 3M Santé executives when they brought Flécaïne LP to market.  To understand what

steps 3M Santé executives took to obtain their desired reimbursement price for Flécaïne LP upon

6

its introduction to the French market, it is necessary to first have a basic understanding of the French pharmaceutical regulatory landscape.

Permission to market a drug in France is initially granted by the National Agency for the Security of Medicines (*Agence Nationale de Sécurité de Medicament*) ("ANSM"), which, until 2011, was called the Agency for the Health and Safety of Products (*Agence Française de Sécurité Sanitaire des Produits de Santé*) ("AFSSAPS"). (Joint Stip. ¶ 5). The ANSM provides "medical approval," which is roughly equivalent to the kind of approval granted by the FDA in the United States deeming a drug safe for the public. (*Id.*).

Once medical approval is granted, the Transparency Commission of the High Health Authority (*Haute Autorité de Santé*) assigns ratings to the drug reflecting its medical benefits ("SMR Rating") and the comparative benefit the drug provides relative to other drugs on the market ("ASMR Rating"). (Joint Stip. ¶ 6). The ASMR is assigned on a scale from I to V that assesses a new drug's level of innovation. (*See* Mariotte Rep. § II.1.ii; Schur Decl. ¶¶ 11-14). The ASMR scale operates as follows:

      I.  Major Innovation
     II.  Important Improvement
   III.  Modest Improvement
   IV.  Minor Improvement
    V.  No Improvement

(Schur Decl. ¶ 12).

        ii.    The Pricing Reimbursement Approval Body Known as CEPS

After the drug is rated by the Transparency Commission, the pharmaceutical company must negotiate the reimbursement price of the drug with *le Comité Economique des Produits de Santé* ("CEPS"), the agency responsible for establishing and negotiating the price of

reimbursable drugs that are sold in France. (Joint Stip. ¶ 7). In English, CEPS is sometimes referred to as "the Economic Committee." Article L. 162-16-4 of the French Social Security Code (the "CSS") establishes general principles for drug price fixing and sets forth the competence of CEPS to fix drug prices. It is important to keep in mind that CEPS is an agency independent of the ANSM. As discussed in the previous section, the ANSM is the agency responsible for providing medical approval without which no drugs may be sold in France. CEPS' responsibility, by contrast, relates to pricing reimbursements for drugs that have already received medical approval from the ANSM.

Pursuant to Article L. 162-17-4 of the CSS, CEPS and a pharmaceutical company can execute a "convention," which is a bilateral negotiated document between the company and CEPS that addresses the price of drugs sold by the company.

There are three kinds of conventions. First, there is a multi-year convention between an industry organization called "LEEM" and CEPS that sets the framework for the negotiation of annual CEPS conventions. (Schur Decl. ¶ 19). This is either a three-year or a four-year sector-wide agreement.

Second, there is what is commonly referred to as an "annual convention," which typically contains a list of prices for all reimbursed drugs and a re-affirmation of any other commitments made by a company. Annual conventions are generally signed at or around the end of each year, and the prices of reimbursed drugs are generally not negotiated in connection with this process. (Mariotte Rep. ¶ 14; Schur Decl. ¶ 19).

Third, there is "[a]n agreement that establishes the price of a new drug on the French market or changes the price of an existing drug on the market." (Mariotte Rep. ¶ 14; Schur Decl. ¶ 19). The key convention at issue in this case—the March 2003 Convention between 3M Santé

and CEPS setting the price of Flécaïne LP in France, and in particular Article 2.2 of that

convention—falls in this third category.  As 3M's French law expert Jonathan Schur

persuasively explained, these agreements are not hard and fast rules.  Instead,

> there is a degree of flexibility in the instructions given by the ministers, leaving
> open avenues for improving the position of the drug company even when the
> broad lines of pricing policies are maintained.  Drug companies regularly raise
> numerous factors—scientific, medical, economic, and social—in trying to
> negotiate the most favorable possible arrangement.  Indeed, the French Courdes
> Comptes, the administration's financial watchdog, has criticized the flexibility of
> the pricing system as leading to higher drug prices than would apply if the rules
> were applied strictly, in particular as concerns drugs like Flécaïne LP, which are
> classified by CEPS as 'counter-generics.'

(Schur Decl. ¶ 24).  In general, information from this category of conventions that is publicly

available includes the current wholesale and retail reimbursement prices, which are published in

the *Journal Officiel de la République Française* (the "*Journel Officiel*").  (Dierks Decl. ¶ 17; PX

415 at 20; Schur Decl. ¶ 25).[2]  However, all parties knowledgeable in French drug-pricing

procedures are aware that conventions may contain so-called Annex 4 provisions that address

non-public information between CEPS and the pharmaceutical company regarding future drug

pricing.  (Tr. at 592-93).

   In the event that CEPS and a drug company fail to reach an agreement, CEPS will fix the

drug price by unilateral decision.  (JX-135 at 20).  Companies therefore have an incentive to

conclude a "convention" with CEPS.

   One of the harshest things that CEPS can do is impose so-called "TFR pricing," which

stands for Tarif Forfaitaire de Responsabilité ("Reference Price System").  This procedure

---

[2]  In certain cases, future prices that are fixed in amount and time can be published in the
*Journal Officiel* before they are applicable.

empowers CEPS to impose a single maximum reimbursement amount (called the "TFR") for a branded version of a drug and all of its generics, in effect forcing their price down to the TFR price. (Schur Decl. ¶ 16 & n.4; Destal Decl. ¶¶ 50-55; Biffaud Decl. ¶ 27; Barreau Decl. ¶ 18).

              iii.     3M Santé Obtained a Reimbursement Price for Flécaïne LP

In late 2002 and into 2003, Eric Felber, the then-manager of 3M Santé's Pharma Business, negotiated with CEPS concerning the pricing of both Flécaïne LI, the older immediate release compound form of flecainide acetate whose convention was terminating and whose patent was expired, and flecainide acetate, the new version of Flécaïne whose patent was not scheduled to expire until November of 2009. Felber's negotiations largely took place with Noël Renaudin ("Renaudin"), the then-President of CEPS. (Biffaud Decl. ¶ 28).

Historically, Flécaïne LI had been 3M's most profitable drug in France, accounting for approximately 61% of 3M Santé's pharmaceutical sales and 82% of its pharmaceutical profits. (Biffaud Decl. ¶ 30; DX 54.) With the anticipated entry of generics of Flécaïne LI into the marketplace, and with it an expected 25-30% decrease in the price of Flécaïne LI, it was 3M's business strategy to accelerate the penetration of Flécaïne LP by having cardiologists shift their patients from the lower priced Flécaïne LI to what would be the more expensive Flécaïne LP. (Biffaud Decl. ¶ 30).

Working against this plan, however, 3M Santé understood that CEPS viewed Flécaïne LP as a "counter-generic" – that is, a drug that provided little or no additional benefit over Flécaïne LI. CEPS took the view that 3M manufactured Flécaïne LP to offset the expected decline in the price of Flécaïne LI upon the expiration of its patent. (Biffaud Decl. ¶ 30). CEPS' view was driven by the Transparency Commissions' granting Flécaïne LP an ASMR Rating of only "IV,"

which signals the Commission's view that the drug represents only a "minor improvement" over a prior drug.

With that background, 3M Santé and CEPS entered into a convention in March 2003 (the "March 2003 Convention") which set the prices for Flécaïne LP for a three-year period. (Biffaud Decl. ¶ 31; Barreau Decl. ¶ 12). CEPS set the price of Flécaïne LP at €17.10 per unit. (Forey Decl. ¶ 8). Pursuant to Article 2.2 of the March 2003 Convention—which was a so-called "Annex 4" provision, as discussed in the previous section—3M Santé was to:

> take all necessary steps to ensure that, at the end of a 3-year period dating from the publication in the Official Journal of the prices of the proprietary drugs mentioned in Table 2 or Article 1, an equivalent of each of these proprietary drugs, or failing that, each of these proprietary drugs, are placed on the market at the price of the generic drug corresponding to these proprietary drugs.

(JX 19).

Article 2.2 reflected CEPS' position that Flécaïne LP was a counter-generic drug with minimal or no health benefits over Flécaïne LI that should be priced in accordance with the guidelines it had received from the Ministry of Health. (Biffaud Decl. ¶ 32; Barreau Decl. ¶ 12). 3M Santé executives understood Article 2.2 to embody CEPS' position on Flécaïne LP as a counter-generic and to mean that following the conclusion of the three-year convention, they should either do what they can to get a generic version of Flécaïne LP onto the market, or else see the price of Flécaïne LP fall to that of a generic. (Biffaud Decl. ¶¶ 31-32; Barreau Decl. ¶ 12). 3M Santé did not agree with that position, but "accepted" it with the expectation that 3M Santé would be able to renegotiate these matters by 2006. (Barreau Decl. ¶ 12). Though Article 2.2 was not publicly available, anyone familiar with the French pharmaceutical industry would have known that Flécaïne LP was likely to be viewed by CEPS as a counter-generic based on its ASMR rating of IV. (Schur Decl. ¶¶ 20 & n.6, 35-49).

11

iv.   3M Santé's "Flécaïne Steering Committee"

Because 3M Santé  wanted to maintain the price of Flécaïne LP until the expiration of its

patent in 2009, Frédéric Biffaud, a 3M Santé employee, established a "Steering Committee" to

prepare for future and ongoing negotiation with the Economic Committee well in advance of the

2006 re-registration for Flécaïne LP.  (Biffaud Decl. ¶ 37; Barreau Decl. ¶ 15; Forey Decl. ¶ 10).

The Steering Committee's goal was broadly defined to maintain the price of Flécaïne LP through

the expiration of its patent in 2009, through two principle objectives:  (1) to persuade the

Transparency Committee that Flécaïne LP was not a counter-generic, but rather, a valuable drug

important to the health and welfare of the country; and (2) to analyze the economic factors that

CEPS considers when pricing a reimbursable drug, including 3M Santé's investment in France.

(Biffaud Decl. ¶ 38).  Meda has argued that the Steering Committee was designed specifically to

combat Article 2.2.  However, as discussed below, the Court finds that the Steering Committee

was organized to combat a much broader perceived threat to the price of Flécaïne LP, not a threat

separately or uniquely derived from a single provision in a convention.

a. 3M Santé Executives Did Not Believe That a Price
Decrease Was Automatic

3M Santé employees were concerned about the future reimbursement price for Flécaïne

LP in light of, *inter alia*, the constant pressure imposed by the Ministry of Health to reduce the

health care budget, CEPS' view that Flécaïne LP was a "counter-generic" drug, and CEPS'

hostile attitude toward such drugs.  (Biffaud Decl. ¶ 41).  The Steering Committee was also

reasonably concerned with the authority of CEPS to unilaterally impose TFR pricing on Flécaïne

LP at some point in time that could result in a 40% decrease in the price of the drug.  (*Id.*).  But

they adamantly did not believe that a price decrease was a foregone conclusion.

On July 21, 2004, 3M Santé executives, including Maxim Delpy, Benoit Traineau, Frédéric Biffaud, and Helene Kolsky, met with Mr. Renaudin of CEPS to discuss a future reimbursement price for Flécaïne LP.  During this meeting, Mr. Renaudin warned 3M Santé executives that "when the CEPS signs the agreements involving generic products, it applies them.  It is imperative that the roadmaps be respected."  Following this meeting, Ms. Kolsky informed her colleagues that the CEPS Convention "has a very limited renegotiation margin: For Mr. Renaudin, and on the basis of the agreement signed by 3M in April 2003, registration of a generic of the slow-acting product in 2006 is nonnegotiable: <<*the CEPS will see to it that all contracts are executed with ferocity*>>."  (JX-24A-R).  Moreover, in preparation for meetings with Renaudin, the Steering Committee prepared scripts anticipating the way he might reject any efforts at renegotiating Article 2.2 or otherwise maintaining a high reimbursement price for Flécaïne LP.  (JX-140A).  Yet, though Article 2.2 was unquestionably discussed with Renaudin and within 3M Santé vis-à-vis the future reimbursement price for Flécaïne LP, the Court finds that 3M Santé's employees did not view Article 2.2 as contractually binding, at least not in the sense of an Anglo-American-trained lawyer's understanding of binding "contracts."  (Biffaud Decl. ¶ 40).  Instead, they viewed it within the broader context of the myriad factors that might affect the future price of the drug.

The Court credits the testimony from the 3M Santé executives that, during this time frame, they were concerned that CEPS' publicly-known TFR pricing policy might pose a threat to the reimbursement price for Flécaïne LP.  (Barreau Decl. ¶ 20; Biffaud Decl. ¶ 41).  The Court is not persuaded to discredit the 3M Santé executives based on the testimony of Meda's French law expert, Frédéric Destal, that he would not have viewed Flécaïne LP as at risk for TFR pricing. (Destal Decl. ¶¶ 50-56).  3M Santé executives were further concerned that plans to close

13

3M's plant in Pithiviers France, which employed French citizens, would result in lower reimbursement price for 3M drugs in France. (Barreau Decl. ¶ 24). Based on these concerns, in January of 2005, 3M Santé executives predicted a 15-40% drop in the reimbursement price of Flécaïne LP. (Barreau Decl. ¶ 22).

At the same time, in spite of their concerns about TFR pricing and the pushback that they received from Renaudin, the members of the Steering Committee were not without reason to believe that they might prevail in convincing CEPS to maintain a high reimbursement price for Flécaïne LP. These included the taxes and social security contributions 3M Santé paid and its level of investment in France. (Biffaud Decl. ¶ 47). Additionally, 3M had clear and demonstrable long-standing investments in France, where it maintained large manufacturing and research and development facilities that employed hundreds of French citizens. (Biffaud Decl. ¶ 48). Moreover, as discussed in Section "I.C.1.ii" above, the Court concludes that there was a certain amount of flexibility built into these conventions, and that the negotiations were fluid, ongoing, and always subject to change. (Schur ¶ 24; *see also* Tr. at 840-50). The Court finds that each member of the Steering Committee held a strong belief that 3M had the ability to build a solid case for the annual price maintenance of Flécaïne LP until the expiration of its patent in 2009. (Biffaud Decl. ¶ 42).

By September of 2005, concluding that the risk of TFR pricing had passed, at least in part because of their hard work in convincing French officials of the value of Flécaïne LP, 3M Santé executives lowered their estimates for a drop in the price of Flécaïne LP to 10-30%. (Barreau Decl. ¶¶ 24-25). By that time, 3M had decided not to close the Pithiviers plant, which also factored into the determination the risk of a price decrease had dissipated. (*Id.*). In May of 2006, 3M Santé executives estimated only a 13.2% reduction in the reimbursement price of Flécaïne

14

LP, which accounted for the difference between the price of Flécaïne LP and one of its competitors, Rythmol.  (Barreau Decl. ¶¶ 25-26).

                        b.     The Steering Committee's Negotiations
                                  Continued Through 2006

As the three-year anniversary of the March 2003 Convention approached, continued negotiations over the price of Flécaïne LP were delayed because of the actions of the Transparency Commission, which in turn delayed meetings with CEPS about further pricing negotiations.  (*See* JX-063A; Tr. at 989-991; PX 194).

Nonetheless, in August 2006, CEPS sent 3M Santé a draft "avenant" (i.e. a rider) to the Convention that contained Article 2.2.  By this point in time, as previously discussed, 3M Santé executives reasonably believed that their efforts had substantially reduced the risk to the reimbursement price of Flécaïne LP.  Before signing and returning the avenant to CEPS on September 8, 2006, 3M Santé's Phillipe Husson struck out Article 2.2.  (DX 248).  By letter that accompanied the convention, Husson advised CEPS that the convention "include[d] a substantial change which we wish to share with you."  (*Id.*).  Mr. Renaudin the president of CEPS, counter-signed and returned the avenant to 3M Santé in September 2006 without changing or commenting on the strike-out of Article 2.2.  (DX 263, Amendment to the Agreement, dated September 15, 2006.)

The Court finds that 3M Santé executives were reasonable in believing that they had thereby eliminated Article 2.2 to the March 2003 Convention.  While hand-written alterations to a document negotiated with a government agency may seem unusual to an American practitioner, evidence in the record indicates that it is not uncommon procedure among parties negotiating drug prices with the French government.  In particular, Meda itself used the same

kind of handwritten alterations to effectuate future price changes in official documents following

negotiations with CEPS.  (JX 115; Schur Decl. ¶ 91; Destal ¶¶ 48-49).

    D.   Beginning the 3M Pharma Business Sales Process

Back in Minnesota, 3M executives were hard at work trying to sell the worldwide Pharma

Business, including businesses not just in France, but throughout Europe, Asia, Africa, and the

Americas.

Goldman solicited parties and offered confidential offering memorandums to those who

expressed interest.  Goldman contacted 153 potential purchasers.  (Keel Decl. ¶ 44).  Parties

interested after looking at the confidential OM were invited to a diligence phase.  (*Id.*).

    E.   Preparing an Offering Memorandum

The Court finds that 3M executives in Minnesota put time and care into preparing

offering materials that they believed accurately reflected the state of the Pharma Business.  For

example, following a meeting with Lorence Kim and Jason Haas of Goldman, John Sampson and

his team decided that it was important that the Offering Memorandum ("OM") contain three

points: (1) a historical description of the Pharma Business, (2) a clear description of the assets

being offered for sale, and (3) a forecast of how those assets may perform in the future.  (*See*

Sampson Decl. ¶ 12-18).  The Court finds that Paul Keel, the Director of Business Development

for 3M's Health Care Business at the time of the sale, believed that he had helped put together

materials that provided potential bidders with historical and projected sales revenues broken into

four categories: (i) Aldara, (ii) Cardio (including Flécaïne), (iii) Respiratory, and (iv) other

Branded/OTC.  Other than Aldara, no single drug was provided its own break down.  (Keel Decl.

¶ 36).  The Court credits Keel's testimony that, in developing the projections, the Minnesota-

based 3M executives were deliberately conservative.  (Keel Decl. ¶ 37).

16

The Court credits the testimony of John Sampson that he believed that it was important to disclose the European pricing issues that 3M was addressing. (Sampson Decl. ¶ 20). Therefore, page 82 of the OM contains the statement that "[p]rojected revenues in 2006 are $666mmm, representing a . . . 8.4% decline from 2005 . . . The remaining decrease is expected to come from lower sales of Tambocor and Minitran in Europe, as government pricing mandated in France, Spain and Italy will reduce selling price.  As patients in France switch from Tambocor IR to Tambocor CR, some of these pricing issues may be offset."  DX 150 at 82.[3]

The financial projections and financial data contained in the OM—as well as the subsequent management presentation on June 26-27, 2006, in St. Paul, Minnesota—were based largely on data compiled and created by David Wanlass, the Financial Manager of the Pharmaceutical Division of 3M's Health Care Business at the time of the deal.  The Court credits Wanlass' testimony in its entirety, and finds that he carefully constructed offering materials. Wanlass' work was vetted by his superior, Jim Grilli, as well as by Keel, Sampson, and representatives from Goldman. (Wanlass Decl. ¶ 13).  Wanlass and his colleagues adjusted downward the revenues projected for the cardiology drugs in Europe because John Sampson had advised them that those drugs were facing governmental pricing pressures in Europe.  (*Id.*).

Through this process, the Court finds that 3M executives reasonably believed that they were able to ensure that the projections in the financial model presented in the offering materials were conservative and reliable.

---

[3] As discussed later in this opinion, Meda executives understood this statement as indicating that 3M did not anticipate a reduction in the price of Tambocor CR in France, because otherwise the "offset" point would not make sense. (Dierks Decl. ¶ 34).

F.     The Final Offering Memorandum

The OM featured Tambocor as the Pharma Business' most important cardiology product

in terms of revenue generation, and specifically identified Tambocor CR (i.e. Flécaïne LP) as

growing and offsetting other declines.  The OM stated:

- "The strength of the cardiology franchise, combined with the
  remaining product portfolio, provides the European business with
  strong and consistent cash flows."[4]

- "Since its launch, Tambocor has been a consistent performer.
  Sales are approximately $140mm worldwide, and the product
  continues to see moderate growth overall.  Strong growth in the
  recently launched Tambocor CR (+46% year-over-year) offsets
  declines in the base product (-11%)."[5]

Although the OM projected a $61 million decline in the Business's revenues in 2006, it

further explained that 75% of the decrease was due to the expiration of a patent on MetroGel-

Vaginal, and that "[t]he remaining decrease is expected to come from lower sales of Tambocor

and Minitran in Europe, as government pricing mandates in France, Spain and Italy will reduce

selling price."  The OM stated that "[a]s patients in France switch from Tambocor IR to

Tambocor CR, some of these pricing issues might be offset."  (PX 168).

G.     Meda Expresses Interest in the Pharma Business

Anders Lönner, the CEO of Meda, received an unsolicited call from Raj Shah at

Goldman in April of 2006.  Lönner signed confidentiality papers and reviewed the OM with

Jorg-Thomas Dierks, the Chief Operating Officer of Meda.  Meda made an initial bid of $2.15

---

[4]  PX 168 (at MEDA00188616).

[5]  *Id.* (at MEDA00188639).

billion for the entire worldwide Pharma Business and $800 million for the European portion. (Lönner Decl. ¶ 32).

In addition to Meda, 3M received 25 indications of interest for the global and regional businesses from 21 buyers, with four of those buyers placing dual bids for a region and/or the global business, including: nine offers for the global business; six for the Americas; four for Europe; and six for Asia and Africa. (PX 209).

H.    The June 26-27 Management Presentation

Following its initial bid, Meda executives were invited to Minnesota for meetings on June 26-27, 2006. The following individuals attended these meetings on behalf of Meda: Anders Lönner (CEO), Jörg-Thomas Dierks (COO), Anders Larnholt (VP of Business Development and Investor Relations), Mårten Österlund (VP of Scientific Affairs), Pär-Ola Wirenlind (Treasurer), Hans-Jürgen Kromp (VP of Group Legal Services), and Christer Nordén (Secretary of the Board and outside legal counsel). (Lönner Decl. ¶¶ 35-37). The 3M executives in attendance included Keel, Sampson, and Wanlass.

On June 26, 2006, a general presentation was given for all Meda executives followed by "break out sessions" on more specific topics. At the general presentation, 3M executives presented the Meda Executives with a 263-page Management Presentation covering a variety of topics, including: (i) an overview of the global business; (ii) an overview of the product portfolio; (iii) an overview of the three geographic segments; (iv) the infrastructure of the business; (v) a financial overview; (vi) the product pipeline; and (vii) logistics and next steps. (Keel Decl. ¶¶ 49-51; DX 268).

Keel, whose testimony the Court credits, explained that at the primary meeting, slides were shown regarding management's expectations with respect to future sales of Tambocor in

Europe.  This slide show projected very low ("essentially flat") revenue gains for Tambocor of

only 2.1% compound annual growth rate ("CAGR").  3M executives believed that the

presentation "disclosed that one of the key assumptions for the 2006 forecast, including the

flattened growth trajectory, was that European government mandated price reductions . . . will

result in lower selling pricing and sales for Tambocor and Minitran."  (Keel Decl. ¶ 52).  The 3M

executives that gave the presentation believed that they sent the message that a key driver for the

2007-2010 forecast was that cardiology sales would be generally flat with a modest decline in

2010.  (Keel Decl. ¶ 52).  Meda executives, however, understood the presentation differently,

walking away believing that "based on the stability and growth of Tambacor CR, which 3M was

promoting, it was rational to view this slide as a disclosure relating to Tambocor IR."  (Dierks

Decl. ¶ 39).  In other words, Meda executives walked away from the meeting believing that they

had been told that revenue from sales of Tambocor CR would be stable or growing.

　　　No one from Meda, however, ever asked any questions about the pricing of Flécaïne LP

in France, or posed even general questions regarding the current or anticipated price of

Tambocor IR or Tambocor CR, notwithstanding that the slides in the Management Presentation

disclosed the likelihood of European government-mandated price reductions for the Tambocor

product line.  (Sampson Decl. ¶ 23).  Such a lack of questioning is understandable at least in part

because Tambocor CR was one drug, and the sales of that one drug in one country, France, were

part of a much larger deal that the parties were negotiating.  Indeed, at that time, Meda was still

considering acquiring the Pharma Business in regions beyond just Europe.  (Tr. at 850, 856,

873).  As a result of this broad deal that was still at a relatively preliminary stage, Sampson did

not say anything to Meda at the Management Presentation—or during the break-out sessions that

took place following the Management Presentation—about the 3M Santé team that Sampson

knew was "working hard" to try to avoid a price reduction for Tambocor CR in France.  (Tr. at

850, 856, 873).  Such information was a detail in the scheme of such a large acquisition and

obviously not all details could be addressed at this preliminary stage in the discussions.

Moreover, the Court finds that any business person experienced in the French pharmaceutical

industry would have known that there was at the very least a strong likelihood of ongoing

negotiations with CEPS over reimbursement prices, and would have asked about that

information if it was basic or material to the acquisition.

        Though the Court finds that 3M executives attempted to provide truthful and far-reaching

information to Meda, 3M recognized that it was impossible to discuss in detail every potential

risk about the global Pharma business in the presentation.  Accordingly, the Management

Presentation to Meda warned:

> Statements about 3M Pharma's expected future business and financial
> performance, strategies for growth, product development and life cycle
> management, future performance or results of current or anticipated products are
> based on certain assumptions and expectations of future events and trends that are
> subject to risks and uncertainties.  The following are factors that, individually or
> in the aggregate, could cause actual results to differ materially from expected and
> historical results. . . . Risks Affecting International Operations – International
> operations also could be affected by . . . actions affecting approval, production,
> pricing, reimbursement and marketing of products . . . . Any of these changes
> could adversely affect the Business. . . .

(DX 268 at 2.) (emphasis added).

        In addition, as in the Offering Memorandum, the Management Presentation

advised Meda:

> 3M makes no representation or warranty, express or implied, as to the
> accuracy or completeness of the information contained in this
> presentation, and nothing contained herein is, or shall be relied upon as, a
> promise or representation, whether as to the past or the future.  This
> presentation does not purport to contain all of the information that may be

21

required to evaluate such transaction and any recipient hereof should
conduct its own independent analysis of 3M Pharma and the data
contained or referred to herein.

(DX 268 at 2).

The Court does not find credible Meda's contention that, during the June 26-27 meetings,

Anders Lönner asked whether there was any other information that Meda would want to review,

and that John Sampson replied to that query that all such information had been provided during

due diligence. Lönner and Larnholt's testimony on this point was unpersuasive. Moreover, the

exchange that they testified occurred between Lönner and Sampson would be inconsistent with

the preliminary stage of the due diligence process. (Keel Decl. ¶ 56.). And the Court credits the

testimony of David Wanlass that he would have taken notes of such an exchange had one

occurred. (Wanlass Decl. ¶¶ 19, 22).

I.     Meda's Incomplete Due Diligence

The Court finds that Meda's diligence related to drug pricing was not thorough or

meticulous. Indeed, though Meda was presented with thousands of documents in due diligence,

it apparently never noticed the absence of European drug pricing agreements. Meda's leading

expert on French drug pricing, Chistian Senac, was not involved in the diligence process. (*See*

Tr. at 161, 177; Dierks Decl. ¶ 22). Meda made no inquiries of 3M regarding product pricing.

(Keel Decl. ¶¶ 55, 85; Wanlass Decl. ¶¶ 18, 22; Tr. at 1074).

Significantly, Meda never took full advantage of an electronic data room ("the data

room"), which contained approximately 8,800 documents and a structured question-and-answer

mechanism whereby bidders could probe more deeply into areas of particular interest to them.

(Keel Decl. ¶ 31). The purpose of the data room was to create comprehensive, easy-to-access,

easy-to-read, all-in-one electronic place to allow potential purchasers to dig in deeper to see if

22

they needed to ask additional questions. (Tr. at 1274). The data room, which was constructed at a time when companies beyond just Meda were interested in possibly acquiring the businesses and well before the Acquisition Agreement at issue—including its warranties—was drafted, contained not just documents requested by Meda, but also documents requested by all other interested parties. (Shah Decl. ¶ 28). Meda personnel spent little time in the data room, and none of the documents they reviewed concerned drug pricing. Rather, the vast majority of the time Meda personnel spent in the data room was devoted to human resources and employment matters. (Keel Decl. ¶ 62). Meda never indicated or suggested that any of its due diligence requests or questions were not adequately answered. (DX 6548; Wanlass Decl. ¶¶ 21-22).

In short, although Meda was provided with a significant resource to conduct due diligence, the Court finds that it did not take full advantage of that resource, nor did it engage in diligence regarding drug pricing in a careful or thorough manner.

J.    3M Never Made the 2003 Convention or Article 2.2 Available to Meda

Nonetheless, even if Meda had looked for drug pricing and reimbursement agreements, it would not have found the March 2003 Convention or Article 2.2 in the data room. That is because, as a result of 3M's failure to comply with its own internal procedures for how to handle confidential documents that would otherwise belong in the data room, 3M never made available to Meda the 2003 Convention or Article 2.2, nor did it leave a placeholder or a slip sheet in the data room to alert Meda to the existence of such a document. (Tr. at 1012-1019). This was true not just for the 2003 Convention, but for *all* European drug pricing conventions. (Tr. at 478, 1013).

With regards to the Flécaïne March 2003 Convention and Article 2.2 in particular, there was some uncertainty among 3M Santé executives about whether they should be included in the

23

data room. In an email, Helene Kolsky of 3M Santé specifically raised the question of whether the Flécaïne LP's March 2003 Convention should be included in the data room, and said that she would only include it "having received" her boss's (Benoit Traineau's) "approval." (PX 163A-R.). Nonetheless, whatever uncertainty existed at 3M Santé, the failure to include the drug pricing agreement in the data room was not specific to the March 2003 Convention, nor was it specific to France. Meda did not establish that the failure to include the Meda 2003 Convention or any of its subsequent iterations in the data room was intentional or reckless.

  K. <u>Meda's Valuation and Bid</u>

  Following due diligence, Meda executives prepared a final bid price in part based on projected Tambocor sales provided by 3M. (Lönner Decl. ¶ 55). Meda executives used EBITDA method in valuating the Pharma Business. EBITDA stands for "Earnings Before Interest, Taxes, Depreciation, and Amortization." To value a company using this method, Meda executives first calculated the Pharma Business' projected 2007 EBITDA, and then multiplied that EBITDA by a so-called "EBITDA multiple." An "EBITDA multiplier" is typically a single digit number derived from a study of similar transactions that is intended to produce a rough estimate of the business' overall value. Though Meda executives claim that they derived its EBITDA multiple from a study of comparable transaction, the chosen multiple appears to have been based largely on Meda executives' subjective judgment and experience with one prior acquisition. (Garrambone Decl. ¶ 17; Larnholt Decl. ¶ 37). Though the valuation model employed by Meda executives placed an emphasis on cash flow, the Court finds that Meda engaged in the acquisition in large part because it believed that it could establish beneficial synergies by acquiring another large European pharmaceutical company. (Keel Decl. ¶ 86; DX 535; Tr. at 327; Garrambone Decl. ¶¶ 7, 14-15).

Meda outbid its lone competitor for the Euro Pharma Business, Almirall, by $125 million on August 30, 2006. (PX 252).   Nonetheless, when Meda submitted a "firm offer" of $825 million for the European segment of Pharma Business on August 30, 2006, and a separate, binding offer of $960 million for the European segment together with the Asia and Africa segment, 3M instructed Goldman to tell Meda that Meda "ha[d] not clearly differentiated [it]self from a value standpoint and we would like to give [Meda] the opportunity to do so." (PX 262). Meda's final bid was $854 million for the Euro Pharma Business. (Stenqvist Decl. ¶ 45). This price included not just money to be paid by Meda on its own behalf, but also money to be paid by Meda on "behalf" of some of its subsidiaries, including Meda France, who put up their own funds so that they could individually acquire 3M's businesses in the various countries. (DX 330; Tr. 387-89).

L.   The Agreement is Finalized

On November 8, 2006, Meda and 3M signed an Acquisition Agreement. Some of the relevant provisions in the Acquisition Agreement included disclosure warranties made on the behalf of 3M, a merger clause, and a $100 million cap on damages recoverable for breaches of warranties absent claims for fraud. (Acq. Agmt. §§ 3.07, 3.12, 3.15, 3.17, 4.15, 10.01(c)(iv), 10.03(b)(3)).

Section 11.06 of the Acquisition Agreement provides that "[t]his Agreement, together with the Ancillary Agreements . . . constitutes the entire agreement between the parties . . . ." However, crucial assets for the operation of the French Pharma Business were transferred pursuant to an ancillary agreement executed on January 1, 2007. ("French Ancillary Agreement"). The French Ancillary Agreement was executed solely between 3M Santé and Meda France, Meda's French subsidiary. Pursuant to the French Ancillary Agreement, Meda

25

France purchased assets pertaining to the ability to market Tambocor CR in France from 3M Santé. (*Id.*). Meda France paid for this purchase with funds that it borrowed from Meda. (Tr. at 388-89). Meda, which was defined for purposes of the French Ancillary Agreement as "Buyer Parent," then, acting on "behalf" of Meda France, paid 3M for the French Pharma Business. (*Id.*). In short: for purposes of the acquisition of the French Pharma Business by Meda France, Meda itself served only as a lender and a purchasing agent.

      M.     Traineau's Visit to Sweden

Subsequent to the signing of the primary Acquisition Agreement, but prior to the execution of the French Ancillary Agreement, Benoit Traineau, the then-head of 3M Santé's Pharmaceutical Division, visited Meda's headquarters in Sweden to discuss in specificity the French Pharma Business. Traineau gave a presentation to Meda executives on November 28, 2006, during which time he discussed Article 2.2, as well as his view of the ongoing negotiations between 3M Santé and CEPS, including his opinion that Article 2.2 had been "struck out," and the likelihood of a future decrease in the price of Tambocor CR. (Traineau Decl. ¶¶ 36-39; Tr. 1185-89). The Court assessed Traineau to be reliable and truthful, and the Court credits his testimony as to what he informed Meda executives during his November 2006 trip to Sweden. The Court also credits Traineau's testimony that Meda executives did not act surprised by what he told them. (Traineau Decl. ¶¶ 40-41). The Court is not persuaded by Meda executives who testified to the contrary. (Lönner Decl. ¶ 69; Dierks Decl. ¶¶ 68-72).

Following his visit to Sweden, in December 2006, Traineau again discussed the history of the Convention, the ongoing negotiations with CEPS, and the likelihood of a 10% future price decrease for Tambocor CR with Meda's Country Manager for France. (*See* DX 302; Traineau Decl. ¶¶ 44-48; JX-110; Tr. at 189-90).

Traineau's interactions with Meda executives in November and December of 2006 are significant for two reasons.  First, Traineau did not behave as though he or his employer had been hiding anything material or keeping from Meda information about which Meda did not already know.  Second, Meda executives did not act surprised.  Meda executives' lack of surprise is understandable given that, though Article 2.2 was never turned over during the due diligence process, it embodied threats to the price of Flécaïne LP that were largely ascertainable to anyone familiar with the French pharmaceutical industry based on publicly known attributes of Flécaïne LP.  In light of Meda executives' reactions to Traineau's meeting with them in November of 2006, as well as the information that was already publicly available to them, the Court finds that the information Traineau conveyed to Meda executives during his November 2006 trip to Sweden did not include anything about which Meda executives were not already generally aware.  (Traineau Decl. ¶¶ 40-41; *see also* Schur Decl. ¶¶ 72-73, 77; Maupas Depo. at 77-78; DX 38 at 28-29, 45; DX 412 at 21; PX 417A at 15).

## CONCLUSIONS OF LAW

### II.   3M DID NOT BREACH ANY WARRANTY IN THE ACQUISITION AGREEMENT

The Acquisition Agreement was negotiated by sophisticated parties at an arm's-length basis.  Meda alleges that 3M's failure to disclose Flécaïne LP's March 2003 Convention, including Article 2.2 of that convention, violated three warranties in the Acquisition Agreement. These warranties were bargained for by Meda as part of this larger agreement covering cross-jurisdictional sales of businesses in 81 countries, and therefore involving different legal and regulatory regimes.

"The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013).

Ambiguity is "defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.,* 526 F.3d 63, 68 (2d Cir. 2008). "No ambiguity exists where the contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010). "Thus, the court should not find the contract ambiguous where the interpretation urged by one party would 'strain[ ] the contract language beyond its reasonable and ordinary meaning.'" *Id.* at 467 (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (N.Y. 1957)). And "no ambiguity exists where the alternative construction would be unreasonable." *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir.1996). "That a text is complex or imperfect does not mean it is ambiguous." *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co. N.A.*, --- F. Supp. 2d ---, 2013 WL 1890278, at *9 (S.D.N.Y. May 8, 2013).

If the language of a contract is held ambiguous, the finder of fact may properly consider "extrinsic evidence as to the parties' intent." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). Such an analysis may include consideration of any relevant course of dealing and

course of performance. *See Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006).  Under New York law, a plaintiff bears the burden of proving a breach of contract by a preponderance of the evidence. *Raymond v. Marks*, 116 F.3d 466 (2d Cir. 1997) (unpublished).

As discussed below, the Court concludes that, based on the clear language of the Acquisition Agreement, including the clear definitions of terms provided therein, 3M did not breach any of its bargained-for warranties.

A.      3M Did Not Breach Section 3.07 of the Acquisition Agreement

In Section 3.07 of the Acquisition Agreement, 3M warranted that:

> To Seller's Knowledge, the Business is not in violation of any Law, including any Environmental Law.  Since December 31, 2004, Seller has complied in all material respects with all applicable regulatory requirements and all industry guidance concerning the marketing, promotion and distribution of medicinal products in the Territory, including the European Code of Practice for the Promotion of Medicines and similar guidance in each country in Territory.

(Acq. Agmt. § 3.07).

In a scattershot approach, Meda argues that, by failing to take steps necessary to introduce a generic version of Flécaïne LP to the French market, 3M breached Section 3.07 because it was (1) in violation of a "Law," (2) in non-compliance with a "regulatory requirement," and (3) in non-compliance with "industry guidance."  However, as discussed below, the Court concludes that 3M never violated a law or failed to comply with a regulatory requirement or industry guidance, and that there was no breach of this warranty.

The Court begins with arguments (2) and (3) described above.  As an initial matter, on its face Section 3.07 only warrants that "Seller" had complied in all material respects with "regulatory requirements" and "industry guidance" at all times subsequent to December 31, 2004.  "Seller" is defined on the first page of the Acquisition Agreement to include "3M

29

Company," "3M Innovative Properties Company," and "Riker Laboratories, Inc." (DX 281 at 1). By contrast, the term "Sellers" is defined as "Seller" and each of its subsidiaries. (*Id.*). Section 3.07 only warrants that "Seller," rather than "Sellers," was in compliance with regulatory requirements and industry guidance. However, Meda has presented no evidence that 3M itself or any other *Seller* was ever in non-compliance with a regulatory requirement or industry guidance. Rather, the allegations have been that 3M's French pharmaceutical subsidiary, 3M Santé, was in non-compliance with a regulatory requirement or industry guidance. Indeed, the March 2003 Convention is clear on its face that it is a negotiated document between "3M Santé Laboratories" (also referred to in the document as "the Laboratory") and CEPS. (JX-19A). But Section 3.07 makes no warranty regarding compliance by Seller's subsidiaries, such as 3M Santé. For this reason alone, the Court must reject Meda's argument that Section 3.07 was breached insofar as it makes representations regarding "regulatory requirements" and "industry guidance."

Moreover, the Court is not persuaded that even 3M Santé, the subsidiary, was in non-compliance with any regulatory requirement or industry guidance. Because the terms "regulatory requirements" and "industry guidance" are not fully defined in the agreement, the Court employs the ordinary meaning of the phrases. *Federal Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (undefined terms in a contract should be given their ordinary meaning).

The record does not support the conclusion that Article 2.2 caused 3M Santé to be in noncompliance with industry guidance or regulatory requirements. Article 2.2 did not contain an automatic price reduction formula or price change mechanism, though CEPS knew how to write such provisions into agreements. (Schur Decl. ¶¶ 48, 85; Tr. at 1340-41, 1351, 1353, 1360-61).

30

That is, though CEPS knew how to author provisions in conventions that would create automatic price reductions absent compliance with a condition precedent, Article 2.2 is not such a provision. (*Id.*). Rather, Article 2.2 requires and anticipates future negotiations with CEPS regarding the price of Flécaïne LP. (*Id.*; *see also* Schur Decl. ¶ 46(g)). Thus, 3M Santé was not in violation of any regulatory requirement or industry guidance by failing to lower its price in the absence of introducing a generic. Indeed, it could not have lowered prices on its own even if it wanted to, because only CEPS is authorized to initiate a change in price for a drug in France. (Schur Decl. ¶ 25).

In opposing this argument, Meda's French law expert, Frédéric Destal, testified that Article 2.2 imposed "absolute obligations" on 3M Santé. (Destal Decl. ¶ 36). Destal further testified 3M Santé was therefore in non-compliance with article R. 162-20-1 of the Code on Social Security, which imposes requirements on a company when "the sale price of a medication [has] been provided by the convention" and is about to be changed. (Destal Decl. ¶ 42). But, as discussed, Article 2.2 contained no price reduction formula that was independently or automatically implementable. As a result, 3M Santé could not have been in breach of article R. 162-20-1, as asserted by Destal.

Turning to argument (1) described above, Meda also argues that 3M breached Section 3.07's representation that "[t]o Seller's Knowledge, the Business is not in violation of any Law." "Seller's Knowledge" is defined in the Acquisition Agreement as "the actual knowledge of any individuals <u>without inquiry</u> listed in Section 1.01(e) of the Seller Disclosure Schedule,"[6] which includes John Sampson and Benoit Traineau. But for the reasons discussed more fully in Section "IV.A.1" below, the Court finds that John Sampson had no knowledge of violations of

---

[6] Emphasis supplied.

any "Law" on the part of 3M Santé. Moreover, the Court credits Benoit Traineau's testimony that he believed that Article 2.2 had lapsed and was no longer relevant at the time that the Acquisition Agreement was signed. (Tr. at 1172-76). And Section 3.07's warranty that the Business was "not in violation of any Law" does not contain a representation as to prior violations. It only refers to violations at the time of the agreement. Meda argues that Sampson and Traineau's ignorance of a violation of "Law" could only extend from a "refusal to investigate the obvious truth" and "willful blindness." (Meda Post-Trial Reply at 1). But the evidence in the record does not prove that Sampson or Traineau were willfully blind. Moreover, the agreement only referred to what Sampson and Traineau actually knew "without inquiry." Meda's attempt to impose a willful blindness theory of liability onto this provision is inconsistent with the definition of "Seller's Knowledge" in the Acquisition Agreement. Thus, the Court finds that, to Seller's Knowledge, as that term was defined in the agreement, there was no violation of "Law" at the time that the Acquisition Agreement was signed.[7]

In short, the Court concludes that Section 3.07's representations regarding regulatory requirements and industry guidance only warrants compliance on the part of Seller, which does not include 3M Santé, the party involved with Article 2.2. Thus, even if there had been non-compliance with a regulatory requirement or industry guidance, and the Court determines that there was not, such non-compliance is not captured by Section 3.07 of the Acquisition Agreement. Finally, the Court finds that to Seller's Knowledge, as that term is defined in the

---

[7] Though largely unaddressed in the parties lengthy briefing, another individual on the "Seller's Knowledge" list, Ton van't Hullenaar, testified in his deposition that he was not aware of any binding agreement with CEPS regarding the pricing of Tambocor CR. (van't Hullenaar Depo. at 111-12). Van't Hullenaar joined Meda following the acquisition and Meda provides no reason why the Court should discredit his deposition testimony.

agreement, there was no violation of any "Law" at the time of the agreement. As a result, Section 3.07 was not violated.

      B.  <u>3M Did Not Breach Section 3.12 of the Acquisition Agreement</u>

Meda also argues that 3M breached Section 3.12(a) of the Acquisition Agreement. This provision warrants that "Section 3.12(a) of the Seller Disclosure Schedule sets forth, as of [November 8, 2006], a complete list of every Assumed Contract" that fits within the Acquisition Agreement's definition of "Material Contract." (Acq. Agmt. § 3.12(a)). The provision further warrants that "Seller has made available to Purchaser true and complete copies of all material Assumed Contracts." (*Id.*). Meda argues that 3M breached Section 3.12 by failing to disclose the March 2003 Convention, as well as its subsequent 2004 and 2005 iterations, which Meda asserts were all "Assumed Contracts" and "Material Contracts" for purposes of the Acquisition Agreement. However, as discussed below, the Court concludes that, based on the clear language of the Acquisition Agreement, CEPS conventions are not included within the definition of "Assumed Contracts" or "Material Contracts" and Section 3.12 therefore did not warrant their disclosure.

CEPS conventions do not fall within the definition of Material Contract or Assumed Contract in the Acquisition Agreement. "Assumed Contracts" are defined in Section 1.01 of the Acquisition Agreement as one of thirteen categories of documents that essentially boil down to (1) contracts "that are set forth in Section 1.01(a) of the Seller Disclosure Schedule," (2) certain "Nonassignable Assets," (3) "Purchaser Shared Contracts,"[8] and (4) "Other contracts of the type referred to" in the prior thirteen clauses "entered into . . . from the date hereof to the Closing

---

[8] Purchaser Shared Contracts are defined by Section 2.01(a)(xi) of the Acquisition Agreement as the rights of Seller and its Subsidiaries under contracts listed in Section 2.01(a)(xi) of the Seller Disclosure Schedule.

Date." "Material Contracts" are defined as those "Assumed Contract[s]" that also meet one of seven materiality standards set forth in Section 3.12(a).  (Acq. Agmt. § 3.12(a)).

CEPS Conventions are not listed on Section 1.01(a) of the Seller Disclosure Schedule; they are not a "Nonassignable Asset" as that term is defined in Section 2.10 of the Acquisition Agreement; they are not Purchaser Shared Contracts as that term is defined in Section 2.01(a)(xi); and the conventions at issue were not entered into after November 8, 2006.  As a result, the CEPS conventions that Meda believes ought to have been disclosed do not fall within the definition of "Assumed Contract" or "Material Contract" provided for in the Acquisition Agreement.

Meda argues that restricting the definition of "Material Contract" to those contracts listed in the seller disclosure schedule, as the definition of Assumed Contract textually provides, leads to absurd results that the Court should avoid.  The opposite is true.  Sections 2.01(a)(ii) and 2.01(a)(xi) of the Acquisition Agreement list "Assumed Contracts" and "Purchaser Shared Contracts" as among the "Assets" to be transferred.  Thus, limiting the definition of "Assumed Contract" to those contracts "that are set forth" in specific disclosure schedules was necessary in order for the parties to reach agreement on the assets that were to be transferred.  Meda argues that its interpretation better "harmonizes" the definition of "Assumed Contract" with other sections of the agreement, and avoids a redundancy in the use of the term "Material Contract." But the plain and clear language of the contract excludes the CEPS conventions at issue from the purview of Section 3.12.

In short, because CEPS conventions do not fall under the definition of "Assumed Contract" or "Material Contract" in the Acquisition Agreement as those terms are

unambiguously defined, 3M did not breach Section 3.12 of the agreement by failing to disclose CEPS conventions in general or Article 2.2 in particular.

      C.     <u>3M Did Not Breach Section 3.15 of the Acquisition Agreement</u>

Section 3.15(a) of the Acquisition Agreement represented that all "Regulatory Filings" were disclosed in the Seller Disclosure Schedule. Section 1.01 of the Acquisition Agreement defines "Regulatory Filings" as:

> (i) The Marketing Authorizations, all approval letters dated on or before or after the date of the regulatory approval letter for any Product, and all study data, materials and information supporting or pertaining to the information in the Marketing Authorizations and related submissions . . . (ii) all Investigational New Drug Applications . . . and (iii) all correspondence between Seller and the Health Authorities relating to any INDs or to any Marketing Authorizations.

Four principles guide the Court's conclusion that this warranty did not require disclosure of the March 2003 Convention in general or Article 2.2 in particular: (1) the definition of "Regulatory Filing" is dependent upon the definition of "Marketing Authorization,"[9] (2) the definition of "Marketing Authorizations" is facially tied to "Health Authorities," (3) the definition of "Heath Authorities" in the agreement is unambiguous and (4) CEPS is not a "Health Authority" as that term is unambiguously defined in the agreement.

The definition of "Regulatory Filing" in the Acquisition Agreement boils down to "Marketing Authorizations," letters, study data and information pertaining to "Marketing Authorizations," and correspondence between 3M and "Health Authorities" regarding "Marketing Authorizations." (Acq. Agmt. § 1.01).

Marketing Authorizations are in turn defined as:

---

[9] The definition of "Regulatory Filings" also includes "New Drug Applications," which are not at issue in this litigation. (Acq. Agmt. § 1.01).

> [T]he marketing authorizations, registrations, permits and
> other licenses (including those now issued or pending) for a
> Product issued by a Health Authority that permits the clinical
> development, manufacture, use or sale of the Product within
> the Territory, and any supplements or variations thereto,
> including all pricing and reimbursement approvals.

(Acq. Agmt. § 1.01).

Thus, the term "Marketing Authorizations" is, on its face, tied to documents produced by

a "Health Authority." CEPS is clearly *not* a "Health Authority" as that term is unambiguously

defined in the Acquisition Agreement. A "Health Authority" is defined in the agreement as "the

Food and Drug Administration of the United States of American ('FDA') and/or any

governmental agency in a country where Product is manufactured or sold that is responsible for

granting license and/or approvals permitting the clinical testing, manufacture or sale of Product

in such country." (Acq. Agmt. § 1.01). The Court finds that CEPS has no such authority. In

France, such authority lies with the AFSSAPS, as described in Section "I.C.2.i" above. (*See also*

Mariotte Decl. at Ex. 2; Mariotte Report at 8; Tr. at 250, 540-41).

Meda does not argue in its pre or post-trial briefing that the definition of "Health

Authority" is ambiguous or that it encompasses CEPS. However, Meda submits extrinsic

evidence that it argues indicates that the "Marketing Authorization" language was drafted to try

to capture CEPS conventions. This evidence consists of testimony from Meda executive Anders

Larnholt, who testified that:

> In Europe, where Meda was conducting the vast majority of its business at that
> time, to market a product a company needed both medical approval and pricing
> or reimbursement approval. Thus, we defined "Marketing Authorizations" to
> include both aspects: (1) the medical approval, which was where the relevant
> **Health Authority** approved the drug for use or sale; and (2) the pricing or
> reimbursement approval, which was where the relevant **Health Authority**

36

> provided a price for the drug.  This was key because in Europe it is useless to
> have one without the other.

(Larnholt Decl. ¶ 87) (emphasis added).  But this evidence does not illustrate that the definition

of "Marketing Authorizations" in the contract was intended to cover documents other than those

issued by Health Authorities.  Nor is it relevant to the Court's reading of the agreement's

unambiguous definition of "Health Authority" or "Marketing Authorization."  In essence, Meda

is attempting to use extrinsic evidence regarding the meaning of "Marketing Authorization" in

order to redefine "Health Authority."  But Mr. Larnholt's understanding of the term Health

Authority is irrelevant given that term's unambiguous definition in the Acquisition Agreement.

*See Olin Corp. v. n Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012).  And even if it were

relevant, it does not support redefining the Acquisition Agreement's unambiguous definition of

"Health Authority."

   Meda's argument in its post-trial briefs attempts to elide the Acquisition Agreement's

grounding of the definition of "Regulatory Filings" in "Marketing Authorizations," and therefore

in documents produced by or related to "Health Authorities."  To this end, Meda highlights

statements from numerous witnesses who testified that the March 2003 Convention had a

regulatory character.  But the definition in the agreement confines "Regulatory Filings" to

Marketing Authorizations, materials and correspondence related to Marketing Authorizations,

and "New Drug Applications."  To the extent that some witnesses testified that CEPS

conventions have regulatory character as the word "regulatory" may be broadly understood, such

testimony is not relevant to the question of whether CEPS conventions fall within the narrow

definition of "Regulatory Filing" proscribed by the Acquisition Agreement, i.e. Marketing

Authorizations, materials pertaining to Marketing Authorizations, and New Drug Applications.

*****

In sum, the Court concludes that 3M did not breach any of its warranties in the Acquisition Agreement and therefore cannot be found liable for a breach of contract.

## II.   3M DID NOT BREACH THE IMPLIED COVENENANT OF GOOD FAITH AND FAIR DEALING

"Every contract contains an implied covenant of good faith and fair dealing that precludes a party to a contract from taking an action that would destroy the rights of another party to receive the fruits of the bargain." *Hildene Cap. Mgt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, 2012 WL 3542196, at *7 (S.D.N.Y. Aug. 15, 2012) (internal quotation mark somitted).  Meda proffers several arguments as to why 3M separately breached the implied covenant of good faith and fair dealing, none of which have merit.

First, Meda has argued that even if the March 2003 Convention does not fall within the definitions provided for in Sections 3.07, 3.12, and 3.15 of the Acquisition Agreement, the March 2003 Convention was nonetheless the "fruit" of the disclosure requirements for which Meda bargained.  But "a court cannot imply a covenant inconsistent with the terms expressly set forth in the contract, and a court cannot employ an implied covenant to supply additional terms for which the parties did not bargain." *Hildene*, 2012 WL 3542196, at *7; *Metro. Life Ins. CO. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1516-19 (S.D.N.Y. 1989) (implied warranty can only "protect a legitimate, mutually contemplated benefit" of the bargain and parties cannot use the implied warrant to "create an additional benefit for which they did not bargain.").

The cases relied upon by Meda are inapposite.  For example, in *Don King Prods. v. Douglas*, the implied covenant was violated because a promoter rigged a boxing match, and implicit in the fighter's bargained-for right to fight for prize money was an agreement that it

38

would be a *fair* fight. *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 767-68 (S.D.N.Y. 1990). Thus, the rigging of the boxing match constituted post-contracting behavior designed to deprive the boxer of the benefits for which he had bargained. *Id.* Likewise, in *Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 230-31 (2d Cir. 1991), the Second Circuit found facts sufficient to warrant the inclusion of an "implied covenant of good faith" jury charge because there were allegations that one party to a distributorship agreement had behaved in a manner that intentionally and necessarily frustrated the other party's ability to benefit from that agreement. In the present case, by contrast, the Court finds that 3M took no steps subsequent to the time of the Acquisition Agreement to prevent Meda from enjoying the benefits for which it bargained. Similarly inapposite is Meda's reliance on *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (N.Y. 1978), because disclosure during diligence of the March 2003 Convention is not a requirement "implicit in the agreement viewed as a whole."

Meda finally argues that the implied covenant of good faith was breached because "3M knew that Meda wanted, and thought it was buying, a stable business" and "3M sold Meda a business that 3M knew was risky and withheld disclosure of those risks in bad faith." (Meda Post-Trial Br. at 17; Reply at 6). This argument fails because the Court finds that 3M executives, including John Sampson, then-Division Vice President and General Manager of 3M's worldwide Pharma Business, believed that they were selling Meda a valuable business from which Meda could derive synergies and profits. (*See, e.g.*, Tr. at 744). Moreover, as discussed previously, the Court finds that Meda's motive for acquiring 3M's Euro Pharma Business was largely based on synergistic benefits unaffected in any material respect by the March 2003 Convention. Finally, this argument fails because it is premised in part on Meda's argument that it was a

39

"conservative" and "risk averse" buyer. But the Court finds that Meda's behavior in conducting due diligence for this deal was neither conservative nor cautious.

In short, Meda has not proven that 3M violated the implied covenant of good faith and fair dealing.

## IV.   3M DID NOT COMMIT A FRAUD

Under New York law, a plaintiff alleging fraud must show five elements by clear and convincing evidence: "(1) a material misrepresentation or omission of fact; (2) made by defendant with knowledge of its falsity; (3) and intent to defraud; (4) reasonable reliance on the part of plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). Meda alleges both affirmative fraudulent misstatement and fraudulent omission. Claims for fraudulent omission require a duty to disclose. *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). As discussed below, the Court finds that Meda has failed to prove by clear and convincing evidence that anyone at 3M made any knowing or reckless misstatement of material fact, or knowingly or recklessly failed to speak up at any time during the course of the transaction during which they were under a duty to disclose. The Court therefore concludes that Meda has not established that 3M committed a fraud.

A.  Meda Has Not Proven Scienter by Clear and Convincing Evidence

The Court finds that Meda has failed to show by clear and convincing evidence that anyone at 3M knowingly or recklessly made any fraudulent misrepresentation or omissions. As the Court has already discussed in the "Findings of Fact" section, the Court finds that 3M executives in Minnesota put time and care into preparing what they reasonably believed to be truthful, conservative, and honest offering materials. The Court finds that 3M Santé executives did not believe that Article 2.2 represented a binding agreement with the French government, but

40

instead believed that they had room to negotiate for a continued high reimbursement price for Flécaïne LP. 3M Santé executives reasonably believed that they had eliminated Article 2.2 and prevailed in their negotiations with CEPS prior to the signing of the Acquisition Agreement, as Phillipe Husson struck out the provision and Mr. Renaudin counter signed. No one at 3M, either in Minnesota or in France, knowingly or recklessly deceived Meda. And no one at 3M knowingly or recklessly failed to disclose information that they had a duty to disclose.

Meda appears to make two arguments to meet its burden of proving scienter: (1) that John Sampson "admitted" to making knowing misrepresentations and (2) that scienter can be inferred from other documents in the record, in particular emails sent by former 3M Santé employee Helene Kolsky, a witness who Meda never deposed and never called to testify. (*See* Meda Post-Trial Br. at 19-24, Reply at 7-8).

    1.  John Sampson Did Not Intentionally or Recklessly Deceive 3M

The Court finds that John Sampson did not intentionally or recklessly deceive Meda or its executives. Sampson testified that he knew that "there was a risk" to the price of Flécaïne LP in France, and that he understood that his French team, in whom he had confidence, was working on the issue. (Tr. at 845). Sampson thought that the risk "was to do with generic price levels," although the Court finds that he did not have complete clarity regarding the French drug pricing issue. (*Id.*).

Sampson understood that the ongoing negotiations over the price of Flécaïne LP was part of how drug prices were negotiated in France (and Italy): that there was a back and forth in which "circumstances change, things change, [and] the opportunity to revisit and re-discuss is always there." (Tr. at 843; *see also* Tr. at 852 ("[I]t is not unusual for companies to revisit that if they've got new information, if they believe they can have worthwhile discussion to protect the

41

price of their product.")).  The Court credits Sampson's testimony that he did not view conventions as binding agreements.  (Tr. at 846).  Moreover, the Court finds that Sampson did not believe 3M or any of its subsidiaries to be in a state of non-compliance regarding the price of Flécaïne LP.

The Court also credits Sampson's testimony that, while he understood that there was a convention or a mechanism that created some risk to the price of Flécaïne LP in France, he also believed that his France-based team could be trusted to resolve the matter favorably, and that they had put together a strong case.  (Tr. at 845).  The Court further credits Sampson's testimony that he disclosed what he believed was relevant and material at the time that he contributed to the writing of the OM and at the June 26-27 management presentation.  (Tr. at 851, 855-56).  The Court finds that Sampson at all times behaved reasonably in light of his understanding of the issues in France.

Finally, Meda has argued that John Sampson admitted to fraud when he testified that it was important that at some point prior to closing that Meda get to see the March 2003 Convention (Tr. at 869-870).  (*See* Meda Post-Trial Br. at 22).  (*See* Meda Post-Trial Br. at 22). But it does not follow from Sampson's testimony that the failure to disclose the March 2003 Convention was knowing, intentional, or reckless.  Indeed, 3M has always conceded that it made a mistake in failing to comply with its own internal procedures by not putting the March 2003 Convention in the data room.  (Tr. at 1017-18).  The bottom line is that Meda has not proven by clear and convincing evidence that 3M's failure to disclose CEPS conventions to Meda, including the March 2003 Convention, was knowing, intentional, or reckless.  *Friedman v. Anderson*, 23 A.D.3d 163, 167 (App. Div. 2005) ("A fraud claim is not actionable without evidence that the misrepresentations were made with the intent to deceive.").

2.      No Inferences From Other Evidence in the Record Establishes
        Scienter by Clear and Convincing Evidence

Meda also argues that fraudulent intent may be inferred by other evidence in the record,

particularly emails sent by former 3M Santé employee Helene Kolsky throughout 2006.  In some

of these emails, Kolsky indicates that she was unsure if the convention should be disclosed, and

she inquired of her superiors.  (JX-163A-R).  The problem with Meda's argument regarding

these emails is that France was not the only country whose drug pricing agreements were kept

out of the data room.  No European country's drug pricing agreements were in the data room,

and Meda appears never to have noticed that absence.  The Court finds that there was no specific

effort to hide a *French* drug pricing agreement or, in particular, Article 2.2 of the March 2003

Convention for Flécaïne LP.

Additionally, the email from Kolsky stating that a delay in the renegotiation would

present a "more attractive image" to prospective buyers does not lead to a conclusion that Kolsky

committed a fraud.  Kolsky reported to Benoit Traineau, who was deposed and who was cross-

examined live before the Court.  Meda has done nothing to demonstrate that Traineau acted with

fraudulent scienter, that he took Kolsky's email seriously, or that he even behaved recklessly.

Indeed, nothing in Kolsky's email suggests that she was providing more than an observation; her

email provides no basis to conclude, as Meda urges, that Kolsky hatched, participated in, or

individually effectuated a fraudulent scheme.  Meda has not proven by clear and convincing

evidence that Kolsky or anyone else at 3M or its subsidiaries acted with fraudulent scienter.

*****

Because the Court finds that the evidences does not establish that any person at 3M acted

with fraudulent scienter, Meda's cannot prove a fraud.  As the Court finds that Meda has failed

43

to prove scienter, it need not reach the other elements of the fraud claim. However, the Court

notes that even if Meda could prove scienter, Meda clearly disclaimed reliance on all

representations other than the warranties written into the Acquisition Agreement. (Acq. Agmt.

§§ 3.17, 4.05). *See Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996); *see also Aetna Cas. And

*Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566 (2d Cir. 2005).

## V.    DAMAGES

Even if the Court had reached a different result on liability, the Court concludes that

Meda failed to prove damages at trial. The measure of damages for a fraud stemming from the

sale of a business is the difference between the purchase price and its true value, plus interest,

typically measured at the time of the sale. *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*,

500 F.3d 171, 183 (2d Cir. 2007); *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, --- F. Supp. 2d ---,

2013 WL 856499, at *9 (S.D.N.Y. Feb. 27, 2013). Damages for breach of contract are measured

by the difference between the value of the business as warranted and its true value at the time of

the transaction, plus interest. *Merrill Lynch & Co., Inc.*, 500 F.3d at 185. Damages are to be

judged based on what the parties would have done at the time of contract, and shall not be based

on information learned through hindsight. *Id.*

First, the Court finds that even if there was a fraud or breach of contract, Meda itself

would not have suffered any injury. Rather, such injury would have been suffered by its

subsidiary, Meda France, a separate entity that was never named as a plaintiff in either of the

complaints. Second, Meda's damages argument hinges on testimony by Olivier Mariotte, who is

proffered as an expert in the overlapping area of French pharmaceutical regulatory law and

French pharmaceutical drug pricing business practices. But the Court was not persuaded by

44

Mariotte's testimony and Meda has not otherwise provided a stable or reasonable basis for assessing any damages.

A. Meda Itself Could Not Have Suffered Damages from a Breach of Contract or Fraud

Even if liability could be found, Meda itself would be unable to show that it suffered any damages. Rather, the Court finds that any damages would flow to Meda France, a Meda subsidiary that is not a party to this action. The acquisition of rights relevant to the distribution of Tambocor CR in France was effectuated pursuant to the French Ancillary Agreement, one of the Acquisition Agreement's many ancillary agreements. (DX 330).[10] The ancillary agreements were expressly contemplated by the master Acquisition Agreement. (Acq. Agmt. §§ 1.01, 2.01(c)).

According to the French Ancillary Agreement, Meda France (Meda's French subsidiary) was the "Buyer" of the French Business and Assets and the obligor by whom the purchase price was "Payable." (French Acq. Agmt. §§ 1.1, 1.2). Meda made a loan to Meda France to allow Meda France to acquire the French pharmaceutical business, including the rights to Tambocor CR in France. (Tr. at 387-90). The loan was necessary because Meda France did not on its own have the resources to pay 3M Santé to acquire the business. (Id.). In exchange for the loan to Meda France, Meda "took a receivable on its balance sheet." (Id.; see also DX 535 at 92). Meda then paid $132,987,438 for the French Business and Assets as an agent and "on [Meda France's] behalf." (French Acq. Agmt. § 1.2; Keel Decl. ¶¶ 76, 79).

The French Ancillary Agreement illustrates how assets were transferred from 3M Santé, who was defined as the "Seller" for purposes of the French Ancillary Agreement, to Meda

---

[10] Meda at one point objected to the admission into evidence of the French Acquisition Agreement, but ultimately stipulated to its admission. (Court Ex. 3; Tr. at 1371-77).

France, who is defined as the "Buyer."[11]  For example, schedule 5.3(b).5 to the French

Agreement is a list of "marketing authorizations" for Tambocor CR to be transferred from 3M

Santé to Meda France.  (DX 330 at MEDA-00071732).

Thus, the rights to Tambocor CR and IR were sold by 3M Santé to Meda France, and not

to Meda AB.  (Tr. at 199-200, 387-90).  For purposes of the transaction at issue, Meda acted as a

lender, and not as a buyer.  Meda took for itself a valuable receivable on its balance sheet, and

there is no evidence that the value of that receivable has been impaired.  Thus, Meda itself

suffered no out-of-pocket loss or any other kinds of "injury" as a direct result of the transaction.

As a result, Meda, the only plaintiff named in the amended complaint, suffered no damages.

Despite the prolixity of its briefing in this case, Meda has never addressed this argument

that it suffered no injury, though 3M raised it orally and in its briefs.  Meda has submitted that

other arguments made by 3M with regards to the French Ancillary Agreement constitute

affirmative defenses that have been waived.  (*See, e.g.*, Dkt. Nos. 168, 187).  That may be the

case, but *damages* are an essential element of both claims for breach of contract and fraud.

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011); *Banque*

*Arabe et Int'l D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995).  Meda

therefore had the burden at trial of introducing evidence demonstrating that *it* suffered damages.

But the evidence currently in the record shows that had there been a fraud or breach of contract,

any damages would have been suffered by non-party Meda France.  Meda has presented no

evidence suggesting that Meda France assigned its claims to Meda.  Nor has Meda sought to

---

[11] By contrast, the French Ancillary Agreement defined Meda itself as "Buyer Parent."  (DX 330 at 1).

amend the complaint to name Meda France as a party.  For this reason alone, no damages can be found on any of Meda's three claims.

B. <u>Meda Has Provided No Stable or Reasonable Basis Upon Which to Assess Damages</u>

Even if damages could be said to flow to Meda, the Court would still conclude that damages have not been proven for the breach of contract claim because, as discussed below, the damage award sought by Meda is premised upon expert testimony that the Court does not credit. As a result, Meda has provided no stable or reasonable basis upon which the Court may assess damages. *See Tractebel Energy Marketing, Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110-11 (2d Cir. 2007) (party alleging breach of contract under New York law must "show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach.").

Meda's request for over $200 million in damages, which accounts for nearly 25% of the value of the entire Europe-wide deal, derives from the purchase price adjustment that Meda claims it would have made had it known about Article 2.2.  Because Meda used an EBITDA method of valuing the Euro Pharma Business, Meda's damages expert Jonathan Neuberger submitted to the Court that Meda's damages may be derived from the following formula: [(EBITDA/Breach)*(Multiple Breach)] MINUS [(EBIDTA-Non-Breach)*(Multiple-Non-Breach)] PLUS interest.  (Neuberger Decl. ¶ 64).  Put into plain English, this model takes into consideration Meda's use of an EBITDA valuation method in valuing the Euro Pharma Business—pursuant to which Meda multiplied the Pharma Business' projected 2007 EBITDA by a multiple—and calculates the lower price that Meda claims it would have paid had it known of a lower potential future EBITDA.  However, this model is not helpful to the Court unless there is some way of reliably ascertaining how much less, if at all, Meda would have projected the Euro Pharma Business' future EBITDA in a world of full disclosure.

47

To create numbers to plug into Neuberger's model, Meda relies on Olivier Mariotte, who testified that a reasonable person familiar with the pharmaceutical industry in France, upon learning of Article 2.2 and 3M Santé's failure to introduce a generic drug within 3 years of the March 2003 Convention, would have concluded that there existed a 90% chance of an immediate 50% price reduction for Flécaïne LP in France.  (Mariotte Decl. ¶ 38).  Mr. Mariotte certainly appears to have the qualifications necessary to opine on French pharmaceutical business practices: he has worked in the French healthcare industry for over 25 years, and has conducted negotiations with CEPS regarding the prices of over a dozen drugs.  (Mariotte Decl. ¶ 18).  He was actively involved in establishing the sector-wide agreement that established the general framework for the negotiation of reimbursable drugs in France.  (Mariotte Decl. ¶ 16).[12]

Nonetheless, the Court ultimately finds Mariotte's testimony unpersuasive and does not credit it.  The problem is that Mariotte's testimony does not isolate risks associated with Article 2.2 specifically from other, publicly known, factors that would have contributed to his estimate of a price decrease for Flécaïne LP.  This is fatal to the reliability of his testimony because, as one of Meda's other damages experts testified, in order to determine the amount of damages arising from a breach or a misrepresentation, it is necessary to isolate the effects of the breach or misrepresentation.  (Tr. at 796; Neuberger Decl. ¶ 19).  That means that, in this case, one must isolate the added knowledge, if any, created by the existence of Article 2.2, which was not disclosed to Meda, from publicly known information suggesting a threat to the price of drugs like Flécaïne LP.  But Mariotte does not consider what, if any, extra amount of knowledge Article 2.2

---

[12] 3M filed a *Daubert* motion to exclude the testimony of Mr. Mariotte on the basis that he is unqualified to opine on French law (Dkt. No. 58), which the Court denied on the grounds that evidence not ordinarily admissible may be considered in determining foreign law.  (12/21/12 Tr. at 52-53).

added over what was otherwise disclosed and publicly known.  Rather, he presents an estimate based on what he believes Article 2.2 embodied, which includes information that was publicly known and available to Meda.  Indeed, the Court finds that Meda knew or should have known of many of the factors creating risk to the price of Flécaïne LP.  (See Section "I.C" above).  As a result, Mariotte's estimates result in an overstatement of the changes that Meda would have made to its projected EBITDA and, therefore, when plugged into Neuberger's model, produce a significantly exaggerated estimate as to the damages that might be attributable to the withholding of Article 2.2.

Mariotte makes three arguments in his rebuttal report in an apparent attempt to assert that the risks associated with Article 2.2 were not publicly known, none of which are persuasive. First, he argues that it is wrong to focus on what Meda would have been able to ascertain from Flécaïne LP's ASMR rating of IV because the price would have been in even greater peril if the ASMR rating had been V.  (Mariotte Rebuttal Report at 11-12).  It is true that an ASMR rating of V would have been worse news for Flécaïne LP's reimbursement price, but that does not detract from what a reasonable purchaser could have ascertained based on the ASMR rating of IV.  Mariotte next argues that Meda could not have assumed that Flécaïne LP would be treated as a counter-generic in light of 3M Santé's executives firmly held belief that the drug was not a counter-generic.  This argument makes little sense and it fails to address the point that the risk of CEPS deeming Flécaïne LP a counter-generic was publicly knowable based upon the drug's ASMR rating of IV.  Mariotte finally argues that Meda "did not need to deduce the risk owing to a price discrepancy between Flécaïne LP" because 3M "told Meda employee Christian Senac prior to closing that there was a risk of a 10% price decrease . . . and that was already included in the 3M projections."  (Mariotte Rebuttal Report at 12-13).  First, the Court notes the irony of

Mariotte stating that Traineau's informing Senac of a possible price reduction in December of 2006 was "prior to closing" in light of the position that Meda has taken in this litigation that disclosures at that time were "too late." Second, Mariotte once again misses the key point: to assess the amount of loss that could be attributable to any breach of contract, it is necessary to determine what Article 2.2 represented that was not already known to Meda.

Finally, the Court does not credit Mariotte's testimony because the Court finds that it is inconsistent with what the Court has concluded to be the practice for negotiating drug prices in France. As the Court has already discussed, there are often ongoing negotiations between CEPS and the drug company that are affected by a myriad of factors: a drug company's contributions to the French economy and employment of French citizens, its reputation as a corporate citizen, and the medical value of the drug at issue, among other factors. (Biffaud Decl. ¶ 23; Barreau Decl. ¶ 16). Mariotte's estimated 90% chance of a 50% price decrease is based solely on Article 2.2 in a vacuum, without considering all of these other relevant factors. As a result, his methodology is unreliable.

In sum, the Court does not credit Mariotte's testimony. Meda has not established that Article 2.2 independently created a risk of a 90% chance of a 50% price decrease for Flécaïne LP. Meda has provided no testimony, expert or otherwise, to prove to the Court what, if any, independent risk to the price of Flécaïne LP was posed by Article 2.2. Without such evidence, the Court finds that it has no stable or reasonable manner to estimate any damages. Any effort to adjust those percentages would amount to mere speculation or conjecture.

*****

The Court concludes that Meda's claims all fail because Meda cannot prove damages. Meda, rather than its subsidiary Meda France, has not demonstrated that it was injured by any

fraud or breach.  Moreover, Meda has not provided any stable, reliable, or reasonable manner for assessing damages.

### CONCLUSION

Based on the trial record, and for the reasons stated herein, the Court finds that 3M did not breach any of the warranties in the Acquisition Agreement, did not breach the implied covenant of good faith and fair dealing, and did not commit a fraud.  As a result, all three claims are DISMISSED.  All pending motions are denied as moot and the Clerk of Court is instructed to enter judgment and close this case.

SO ORDERED.

Dated: September 3, 2013
       New York, New York

ALISON J. NATHAN
United States District Judge

51